UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

        -v-                                    :

ALBERTO WILLIAM VILAR,            :
    a/k/a "Albert Vilar,"

                       :

        Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____._____
DATE FILED: JUN 0 9 2005
```

**INDICTMENT**

05 Cr. **05 CRIM.    6 2 1**

## COUNT ONE

(Investment Adviser Fraud)

The Grand Jury charges:

### Relevant Persons and Entities

      1.     At all times relevant to this Indictment, Amerindo Investment Advisors Inc. ("Amerindo U.S."), was a corporation organized under the laws of the State of California. Amerindo U.S. had offices in San Francisco and New York, New York. Amerindo U.S. was the investment adivser to one and more mutual funds focused on high technology and biotechnology securities, and managed assets of institutional clients.

      2.     At all times relevant to this Indictment, Amerindo Investment Advisors, Inc. ("Amerindo Panama"), purported to be a corporation organized under the laws of Panama. Amerindo Panama was, among other things, purportedly the investment adviser to the Amerindo Technology Growth Fund ("ATGF"), a hedge fund incorporated in Panama.

      3.     At all times relevant to this Indictment, Amerindo Investment Advisors (UK) Ltd. ("Amerindo U.K."), purported to be a company that managed portfolios of U.S. emerging growth stocks for U.K. based clients. Amerindo U.K. has an office in London where

the co-founder of Amerindo chiefly works, and where certain administrative functions related to

Amerindo Panama are performed.  Amerindo U.S., Amerindo Panama, and Amerindo U.K., and

subsets of that group of entitities and their predecessors, are collectively referred to hereafter as

"Amerindo."

       4.     ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, was

one of the original founders of Amerindo U.S. and of the predecessor company to Amerindo

Panama, and was, at all times relevant to this Indictment, a shareholder, officer and director of

Amerindo U.S., and one of the two shareholders, directors, and officers of Amerindo Panama.

VILAR received an undergraduate degree from Washington & Jefferson College, and

subsequently pledged and donated millions of dollars to his alma mater.  VILAR also pledged

and contributed millions of dollars to various organizations that supported opera and the arts,

including the American Academy in Berlin.

<u>**Summary of the Fraudulent Scheme**</u>

       5.     As set forth below, from in or about 2002 up to and including on or about

May 26, 2005, VILAR schemed to defraud an investor (the "Victim") by: (a) inducing the Victim

by means of false and fraudulent representations to invest $5 million in a Small Business

Investment Company ("SBIC") sponsored by Amerindo; (b) converting the Victim's $5 million

investment in the Amerindo SBIC to the benefit of VILAR and others; (c) making false and

misleading statements to the Victim about the status of the Amerindo SBIC and the Victim's

investment in that venture; and (d) abusing his discretionary authority to manage the Victim's

investments entrusted to Amerindo by converting approximately $250,000 of the Victim's

portfolio to his own use and the use of others without the knowledge or approval of the Victim.

2

## The Victim's Investments With The Defendant And Amerindo

6.      Beginning in approximately 1987, and continuing up to in or about February 2005, the Victim entrusted millions of dollars of investments to VILAR and Amerindo.

7.      Beginning in or about 1987, the Victim received numerous account statements from Amerindo.  Until in or about August 1995, those statements were printed on stationery bearing the name "Amerindo Investment Advisors Inc." and included the address of Amerindo U.K.  Beginning in or about September 1995, the Victim received account statements from Amerindo that were printed on stationery bearing the name "Amerindo Investment Advisors, Inc." and including the address of a post office box in Panama.  The purported value of the Victim's investments managed by Amerindo, as reflected in the account statements provided by Amerindo, peaked at approximately $18 million in or about September 2000, and then sharply dropped over approximately the following two years.

8.      In or about June 2002, VILAR advised the Victim to invest in an Amerindo venture (the Amerindo SBIC Venture Fund LP) designed to take advantage of a U.S. government program designed to promote venture capital investment in small businesses (the "Amerindo SBIC").  Relying on VILAR's false and fraudulent representations regarding the Amerindo SBIC investment, the Victim agreed to invest approximately $5 million in the Amerindo SBIC.

## The SBIC Program

9.      During a period between in or about 2000 and on or about September 30, 2004, the United States Small Business Administration (the "SBA") provided funding for the Participating Securities SBIC Program (the "SBIC Program").  Under the SBIC Program, a

qualified private venture capital firm that had received an SBIC license from the SBA was eligible to receive matching funds through SBA guarantees. Those matching funds allowed the SBICs to gain the benefits of "leverage" to the invested private capital.

10.    The first step in the applicable SBIC licensure process was to complete a Management Assessment Questionnaire ("MAQ"). If a MAQ satisfied the SBA's criteria, an applicant may have received a "go forth" letter, inviting the applicant to apply for an SBIC license within the following 18 months. If an applicant did not receive a "go forth" letter, it could not apply for an SBIC license.

11.    An applicant that was invited to apply for an SBIC license was required to submit with its application commitment letters from institutions and individuals that had agreed to invest a minimum of $10 million in the SBIC if it was licensed, of which no more than 30% was permitted to come from the principals or affiliated or associated individuals or entities. After an applicant applied for an SBIC license, but prior to that application being approved, the applicant was required to demonstrate that it had $2.5 million of the $10 million minimum deposited in a separate bank account set up for the SBIC.

### Amerindo's Failed Efforts To Obtain An SBIC License

12.    Amerindo made approximately four unsuccessful attempts to obtain an SBIC license beginning in or about 2000, with the assistance of experienced legal counsel. Amerindo first submitted a MAQ to the SBA in or about January 2000. Although Amerindo received a "go forth" letter in or about April 2000, based on a presentation made by VILAR to the SBA Investment Committee on or about April 18, 2000, its license application was rejected.

4

Amerindo submitted a second, and subsequently a third, MAQ, in or about May and September 2002, respectively.

13.     On or about December 27, 2002, the Chief Administrative Officer of the SBA's Investment Division sent a letter to VILAR in which she stated, among other things, "Review of the third MAQ by the Investment Committee produced numerous areas of concern." Those concerns included, among other things, the facts that the principals were located in three different geographic areas (New York, London, and Virginia), and the fact that VILAR would be spending a small fraction of his time on the Amerindo SBIC compared to his interest in the SBIC. That letter concluded, "I am sorry to have to write this letter to you, but we feel that if we proceeded, after receiving three submissions to date, that it would be at considerable time and expense to your team (as well as ourselves), and that ultimately, the Agency Licensing Committee would reject your application." Amerindo did not receive a "go forth" letter as a result of its submission of the third MAQ.

14.     In or about January 2004, VILAR and Amerindo filed a fourth MAQ with the SBA.

15.     In or about February 2004, the SBA posted on its website a notice indicating that, due to a lack of funding by Congress of the SBIC Program, there was no guarantee that applications submitted after approximately the end of March 2004, would be eligible to receive leverage funding. Amerindo abandoned its fourth attempt to obtain an SBIC license after on or about May 28, 2004, and neither VILAR, Amerindo U.S., nor any of the affiliated Amerindo entities ever received the license required to apply for leverage funds under the SBIC Program.

5

### The Defendant's False And Fraudulent Statements
### To The Victim Regarding The Amerindo SBIC Investment

16.    In or about June 2002, VILAR told the Victim that VILAR and his partner were personally investing in a new venture involving investments in small businesses, including biotechnology companies, that would be supported by the government. VILAR told the Victim that the venture had been approved by the government, and invited the Victim to join VILAR and his partner in the venture as the only outside partner. VILAR recommended that the Victim invest $5 million in the venture. VILAR promised the Victim that the Victim would earn approximately $250,000 each quarter from the investment.

### The Defendant's Unauthorized Conversion
### Of The Victim's $5 Million SBIC Investment

17.    The Victim's $5 million investment in the Amerindo SBIC was deposited into an account at a New York City brokerage firm (the "Brokerage Firm") that was opened by VILAR in or about 1987, on behalf of a Panamanian corporation named "Amerindo Management Inc." (the "AMI Account"), of which VILAR held the title of President. On or about June 20, 2002, the AMI Account held numerous equity positions in technology stocks, and had a negative cash balance of approximately $428,122, prior to the incoming transfer of the Victim's $5 million SBIC investment.

18.    On or about June 25 and June 26, 2002, the Brokerage Firm received letters of authorization ("LOAs") directing the Brokerage Firm to transfer by wire from the AMI Account approximately:

a.    $1 million to an account at Chase Manhattan Bank held in the name of "A.W. Vilar" (the "Vilar Account");

     b.    $650,000 to an account at Chase Manhattan Bank held in the name of Amerindo Investment Advisors Inc. (the "Amerindo Account"); and

     c.    $500,000 to a trust account at Bank of New York (the "Trust Account").

    19.    On or about July 9, 2002, the Brokerage firm received an LOA directing the Brokerage Firm to transfer a sum of approximately $3,102,958.85 from the AMI Account to an overseas account in Luxemburg held in the name of an unidentified individual.

    20.    The Brokerage Firm executed the wire transfer instructions described in paragraphs 18 and 19, above, on or about the respective dates it received the LOAs.

    21.    All but approximately $45,000 of the approximately $1,000,000.00 from the Victim's Amerindo SBIC investment that was wire transferred to the Vilar Account was spent within two weeks on charitable contributions and personal expenses of VILAR, including contributions to Washington & Jefferson College and the American Academy in Berlin. The remainder of that portion of the Victim's investment was dissipated soon thereafter, and none of the funds transferred to the Vilar Account were invested in the Amerindo SBIC.

    22.    The approximately $650,000 of the Victim's investment in the Amerindo SBIC that was transferred into the Amerindo Account was spent on Amerindo business expenses, and none of those funds were invested in the Amerindo SBIC.

    23.    At least approximately $400,000 of the approximately $500,000 of the Victim's Amerindo SBIC investment that was transferred to the Trust Account was used to make an investment on behalf of the Victim that was unrelated to the Amerindo SBIC, and which investment the Victim believed would be paid for by funds invested with Amerindo separate and

apart from the $5 million investment the Victim had made in the Amerindo SBIC. None of the approximately $500,000 was invested in the Amerindo SBIC.

### The Defendant's False and Misleading Statements
### Concerning The Victim's $5 Million Amerindo SBIC Investment

24.    After obtaining the Victim's $5 million investment in the Amerindo SBIC venture, VILAR repeatedly made false and fraudulent statements to the Victim concerning the Victim's investment in the Amerindo SBIC, including the following statements:

a.    On or about December 10, 2004, VILAR caused an account statement to be sent to the Victim in New York, New York, via Federal Express delivery from London, in which the Victim's $5 million investment was described as "FUNDS ON DEPOSIT WITH SBIC," and which reflected "INTEREST ON SBIC DEPOSIT" in the amount of $225,000.00.

b.    On or about March 13, 2003, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, wrote a letter to the Victim in which he stated that although there had been an "unprecedented bear market [for] the last three years . . . the monies put into escrow for the new SBIC fund remain at full value." Later in the same letter he stated that, "We are now awaiting permission to commence investing the funds we have placed into escrow, which we expect to happen fairly soon." In fact, as described above, Amerindo and VILAR had been repeatedly rebuffed in their efforts to obtain an SBIC license, the Victim's funds were not placed in escrow, and VILAR had long since spent the Victim's $5 million investment on, among other things, personal and business expenses.

c.    On or about March 25, 2004, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, signed a letter to the accountant of the Victim in which he stated in part that he had been required "to deposit the requisite key money" in connection with Amerindo's efforts to obtain an SBIC license.  In that letter, VILAR also stated that while waiting for the license, "the prices of technology private-placements continued to decline . . . . This means that we did not use a single penny of [Victim's] investment during this declining period, and if and when, as expected, we start to make investments upon securing the renewal of our license later this year, we will be looking at the best prices probably ever seen in the four decade plus history of technology based, venture capital."  At the time VILAR signed this letter, and as described above: (i) an applicant at the MAQ stage of the SBIC licensing process need not have capital on deposit until it is invited to apply for a license, which Amerindo was never invited to do during the period following the Victim's $5 million investment; (ii) Amerindo's third and fourth MAQs did not report the investment of $5 million by the Victim in the Amerindo SBIC; and (iii) VILAR had long since spent the Victim's $5 million investment on, among other things, personal and business expenses.

d.    On or about October 25, 2004, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, signed a memo written to Victim's lawyer, in which he wrote in part:

> Funds on deposit with SBIC, for $5 million.  Technically this represents an escrow deposit for a technology-based SBIC. [Victim] has effectively coinvested with [me] in a new fund that has been approved for investment, but the actual funding leverage-supplement has been delayed owing to budgetary problems in Washington, due to the increase in the deficit and the Iraqi war.

9

In fact, as described above: (i) the Victim's $5 million investment in the Amerindo SBIC was not on deposit with the SBIC, and was not being held in escrow; (ii) Amerindo had not received an SBIC license and was not likely to receive such a license in the near future; (iii) SBA funding for the SBIC Program was not "delayed," but rather had been canceled; and (iv) VILAR had long since spent the Victim's $5 million investment on, among other things, personal and business expenses.

### The Defendant's Conversion of Additional Funds Invested by Victim

25.    As of on or about June 30, 2003, according to an account statement furnished to the Victim by VILAR and Amerindo, the Victim had entrusted a total of approximately $11,045,370.02 in investment funds to VILAR and Amerindo, including approximately $2,067,597.00 held in the Victim's account at the Brokerage Firm (the "Victim's Account").

26.    On or about September 25, 2003, VILAR caused an LOA to be sent from Amerindo to the Brokerage Firm. The LOA bore the forged signature of the Victim and requested that approximately $250,000.00 be transferred from the Victim's Account to an account held at the Brokerage Firm in the name of "Amerindo Technology Growth Fund I" ("ATGF I").

27.    On or about September 26, 2003, VILAR caused another LOA to be sent from Amerindo to the Brokerage Firm requesting that approximately $250,000.00 be transferred immediately from ATGF I to a personal account held by VILAR at Wilmington Trust Company, in Wilmington, Delaware  (the "Wilmington Trust Account").

28.    During an approximately one-month period following the transfer of the approximately $250,000.00 into the Wilmington Trust Account, VILAR spent the funds on, among other things, the personal expenses of VILAR and others.

### Statutory Allegation

29.    From in or about 1987 through on or about May 26, 2005, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, acting as an investment adviser with respect to investors and potential investors in Amerindo Investment Advisors Inc. and its affiliated entities, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, directly and indirectly, did: (a) employ devices, schemes, and artifices to defraud clients and prospective clients; (b) engage in transactions, practices, and courses of business which operated as a fraud and deceit upon clients and prospective clients; and (c) engage in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative.

(Title 15, United States Code, Sections 80b-6 and 80b-17;
and Title 18, United States Code, Section 2).

### COUNT TWO

(Securities Fraud)

The Grand Jury further charges:

30.    The allegations contained in paragraphs 1 through 28 of this Indictment are repeated and realleged as if fully set forth herein.

31.    From in or about June 2002 through on or about May 26, 2005, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert

11

Vilar," the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in transactions, acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons in connection with the purchase and sale of limited partnership interests in Amerindo SBIC Venture Fund LP.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2).

### COUNT THREE

(Mail Fraud)

The Grand Jury further charges:

32.    The allegations contained in paragraphs 1 through 28 of this Indictment are repeated and realleged as if fully set forth herein.

33.    On or about December 10, 2004, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did cause to be deposited any matter or thing whatever to be sent

12

or delivered by any private or commercial interstate carrier, and took and received therefrom, any

such matter and thing; to wit, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant,

sent and caused to be sent and delivered by Federal Express a false and fradulent account

statement to one and more investors.

(Title 18, United States Code, Sections 1341 and 2).

## COUNT FOUR

(Wire Fraud)

The Grand Jury further charges:

34.    The allegations contained in paragraphs 1 through 28 of this Indictment

are repeated and realleged as if fully set forth herein.

35.    On or about June 25, 2002, in the Southern District of New York and

elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, unlawfully,

willfully, and knowingly, having devised and intending to devise a scheme and artifice to

defraud, and for obtaining money by means of false and fraudulent pretenses, representations and

promises, would and did transmit and cause to be transmitted by means of wire and radio

communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds

for the purpose of executing such scheme and artifice; to wit, on or about June 25, 2002,

ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, caused approximately

$1,000,000.00 of investor funds to be sent by wire from outside New York State, to a bank in

New York, New York, which funds were subsequently converted to the defendant's own use

without the knowledge, authorization, or permission of the investor.

(Title 18, United States Code, Sections 1343 and 2).

13

## COUNTS FIVE THROUGH EIGHT

(Money Laundering)

The Grand Jury further charges:

      36.    The allegations contained in paragraphs 1 through 28 of this Indictment are repeated and realleged as if fully set forth herein.

      37.    On or about the dates set forth below, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully, and knowingly engaged and attempted to engage in and cause others to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity, to wit, securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, mail fraud in violation of Title 18, United States Code, Section 1341 and wire fraud in violation of Title 18, United States Code, Section 1343, as set forth below:

| COUNT | APPROXIMATE DATE | TRANSACTION |
|---|---|---|
| FIVE | June 25, 2002 | Wire transfer in the amount of $1,000,000.00 from the AMI Account to the Vilar Account |
| SIX | June 25, 2002 | Wire transfer in the amount of $500,000.00 from the AMI Account to the Trust Account |
| SEVEN | June 26, 2002 | Wire transfer in the amount of $650,000.00 from the AMI Account to the Amerindo Account |

| COUNT | APPROXIMATE DATE | TRANSACTION |
|-------|------------------|-------------|
| EIGHT | July 9, 2002 | Wire transfer in the amount of $3,102,958.85 from the AMI Account to an account at Lloyd's TSB Bank (Luxemburg) |

(Title 18, United States Code, Sections 1957 and 2).

## FORFEITURE ALLEGATIONS

38.     As a result of committing investment adviser fraud, securities fraud, mail fraud, and wire fraud as alleged in Counts One through Four of this Indictment, in violation of Title 15, United States Code, Sections 80b-6, 80b-17, 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Sections 1341, 1343 and 2, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses, including but not limited to a sum of money equal to $5,250,000.00 in United States currency, representing the amount of money fraudulently obtained as a result of the securities, wire, and mail fraud schemes alleged in this Indictment.

39.     As a result the offense of committing money laundering, as alleged in Counts Five through Eight of this Indictment, in violation of Title 18, United States Code, Sections 1957 and 2, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in the offense, and any property traceable to such

15

including but not limited to a sum of money equal to $5,000,000.00 in United States currency,

representing the amount of money fraudulently obtained as a result of the money laundering

crimes alleged in this Indictment.

Substitute Asset Provision

40.     If any of the forfeitable property, as a result of any act or omission of the

defendant:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third person;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be

subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), to

seek forfeiture of any other property of said defendant up to the value of the above forfeitable

property.

(Title 18, United States Code, Sections 981(a)(1), 982,
and Title 28, United States Code, Section 2461).

_____
FOREPERSON

_____
DAVID N. KELLEY
United States Attorney