**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

**UNITED STATES OF AMERICA**

     -against-

                                         **05 Cr. 621 (KMK)**

**ALBERTO WILLIAM VILAR and**
**GARY ALAN TANAKA,**

         **Defendants.**

------------------------------------------------------------x

**DEFENDANT ALBERTO VILAR'S MEMORANDUM**
**OF LAW IN SUPPORT OF HIS MOTIONS TO SUPPRESS**

**HOFFMAN & POLLOK, LLP**

*Attorneys for Defendant Alberto Vilar*
**260 Madison Avenue**
**New York, NY 10016**
**(212) 679-2900**
**(212) 679-1844 (fax)**

# TABLE OF CONTENTS

Page

Statement of Facts……………………………………………………..     1

    I.  The Indictment…..…………………………………………….     1

    II.  The Search Warrant……………………………………………..     4

        A. The Supporting Affidavit……………………………………….     4

        B.  The All-Inclusive Warrant…………………………………..     6

*Argument*:

POINT I  -- The Search Warrant Is Overbroad And The Vast Majority
      Of Its Provisions Are Unsupported By Probable Cause……………………     8

    A.  The "All Records" Exception Is Inapplicable………………………….     11

    B.  The Good-Faith Exception Is Inapplicable`……………………………     12

    C.  A Hearing Should Be Held Pursuant to *Franks v. Delaware*…………..     16

POINT II --  Any and All Statements Made By The Defendant Vilar
      Should Be Suppressed…………………………………………………     17

Conclusion     ………………………………………………………………     18

## TABLE OF AUTHORITIES

Page

*Coolidge v. New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022,
    9 L.Ed. 2d 564 (1971)……………………………………………….    9

*Maryland v. Garrison,* 480 U.S. 79, 107 S. Ct. 1013,
    94 L.Ed. 2d 72 (1987)…………………………………………………    9

*Massachusetts v. Sheppard,* 468 U.S. 981, 104 S. Ct. 3424,
    82 L.Ed. 2d 737 (1984)……………………………………………….    13

*Miranda v. Arizona,* 384 U.S. 436 (1966) ……………………………………    17

*National City Trading Corp. v. United States,* 635 F.2d 1020 (2d Cir. 1980)……...    12

*United States v. Bianco,* 998 F.2d 1112 (2d Cir. 1993)……………………………..    15

*United States v. Brien,* 617 F.2d 299 (1st Cir.), 446 U.S. 919 (1980)………………    12

*United States v. Burke,* 718 F. Supp. 1130 (S.D.N.Y. 1989)………………………….    11, 12, 13

*United States v. George,* 975 F.2d 72 (2d Cir. 1992)………………………………    15

*United States v. Klitzman,* 744 F.2d 955 (3rd Cir. 1984)……………………………    11

*United States v. Lafayette,* 610 F.2d 1 (1st Cir. 1979)………………………………    10

*United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405,
    82 L.Ed.2d 677 (1984)…………………………………………………    12, 13

*United States v. Maxwell*, 920 F.2d 1028 (D.C. Cir. 1990) ………………………….    16

*United States v. Oloyede*, 982 F.2d 133 (4th Cir, 1992)……………………………….    12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

UNITED STATES OF AMERICA

     -against-

                                                 05 Cr. 621 (KMK)

ALBERTO WILLIAM VILAR and
GARY ALAN TANAKA,
                 Defendants.
----------------------------------------------------------

## DEFENDANT ALBERTO VILAR'S MEMORANDUM
## OF LAW IN SUPPORT OF HIS MOTIONS TO SUPPRESS

     Defendant Alberto Vilar respectfully submits this memorandum in support of his motions to suppress evidence seized pursuant to a search warrant executed on or about May 25, 2005 at the offices of Amerindo Investment Advisors, Inc., 399 Park Avenue, 22nd floor, New York, New York; to suppress any and all post-arrest statements taken in violation of *Miranda v. Arizona,* 384 U.S. 436 (1966); for leave to file additional motions based upon defendant's review of the voluminous discovery in this case, and for leave to join in the motions made by counsel for co-defendant Tanaka to the extent said motions are applicable to the defendant Vilar.

## STATEMENT OF FACTS

**I.  The Indictment**

     The indictment charges defendants Vilar and Tanaka with conspiracy to commit securities, mail, wire and investment advisor fraud and money laundering.  The defendants are charged in separate substantive counts with securities fraud, investment advisor fraud, mail fraud, two counts of wire fraud, and four counts of money laundering.  The indictment also

includes forfeiture allegations.  The crux of the indictment is an alleged fraud scheme involving a single investor's funds in the amount of approximately $5 million.

According to the conspiracy count, defendants Vilar and Tanaka were the original founders, as well as shareholders, officers and directors, of a registered investment advisor, Amerindo U.S., that managed assets of institutional clients.   Defendants were also the founders, as well as sole shareholders, directors and officers, of Amerindo Panama, that managed an off-shore investment fund, and Amerindo U.K., that managed U.S. stock portfolios for U.K. based clients.  The investment activities of Amerindo Panama and Amerindo U.K. were handled out of the London office of Amerindo U.K.  Defendant Tanaka directed the traders and was responsible for allocating securities among Amerindo's clients and the funds managed by the three Amerindo entities. (Indictment, ¶1-5).

From 2002 through May, 2005, the defendants allegedly perpetrated a fraud scheme against "the Victim" by soliciting her funds under false pretenses, failing to invest her funds as promised and converting her funds to their own benefit.  The Victim, Lilly Cates, who is not identified by name in the indictment, started entrusting funds to Amerindo for investment in 1987.  Until 1995, she allegedly received statements from Amerindo U.S., and thereafter she allegedly received statements from Amerindo Panama.  The stated value of her investments rose to approximately $18 million in September 2000 and then dropped sharply over the following two years. (Indictment ¶6-8)

In June, 2002, allegedly upon the advice of defendant Vilar, Cates made a $5 million investment in "Amerindo SBIC Venture Fund LP," a fund "designed to promote venture capital investment in small businesses."  *Id.* at ¶9.  From 2000 through September, 2004, the United States Small Business Administration ("SBA") conducted a program (the "SBIC program")

whereby it granted licenses to qualified private venture capital firms which were eligible to receive matching funds through SBA guarantees.  There were various phases of the licensing application process and, beginning in 2000,  Amerindo made four unsuccessful attempts to obtain an SBIC license.  Its fourth and final application was filed in January, 2004 and abandoned on May 28, 2004. *Id.* at ¶¶9-16.

In June, 2002, Vilar allegedly told Cates that he and Tanaka were personally investing in the SBIC Venture Fund, that the venture had been approved by the government, and he invited Cates to join as the only outside partner with an investment of $5 million.  He allegedly promised Cates that she would earn about $250,000 in interest per quarter.   Cates' investment was deposited into the account of a Panamanian corporation called Amerindo Management Inc.  In June, 2002, prior to the deposit, the account allegedly had a negative balance of $428,122.  The same week of the deposit, $1 million was transferred to Vilar's personal account and was allegedly spent on charitable contributions and personal expenses; $650,000 was transferred to another Amerindo account and allegedly spent on Amerindo expenses, and; $500,000 was transferred to a trust account, $400,000 of which was invested on behalf of Cates, but not in the SBIC fund.  A few weeks later, the remaining $2.85 that was transferred to an overseas account in Luxembourg and allegedly used to pay out another investor.  *Id.* at ¶¶17-25.

The conspiracy count further alleges that defendant Vilar made false and misleading statements to Cates regarding her investment, including, *inter alia*, that Cates' money was put in escrow for the new SBIC fund and remained at full value; that Cates' money had not been used during a period of declining stock prices; that the SBIC fund had been approved but the "leverage-supplement" was delayed due to government budgetary problems.  In November,

2004, Cates received a statement from the London office describing her investment as "funds on deposit with SBIC" and reflecting interest on deposit of $225,000. *Id.* at §26(a)-(c).

The conspiracy count also alleges that the defendants converted other funds of Cates, who had invested a total of about $11 million with Amerindo by June, 2003, including $250,000 transferred to an account held by Vilar and allegedly spent on personal expenses. *Id. at ¶¶27-30.*

Each of the substantive counts alleges some aspect of the conspiracy count. The money laundering counts (Counts 7 through 10) allege that the defendants engaged in monetary transactions (wire transfers) in property criminally derived from securities fraud. Finally, the government seeks forfeiture in the amount of $5 million.

## II.    THE SEARCH WARRANT

### A.  The Supporting Affidavit

On May 25, 2005, the government applied for a warrant to search the New York Offices of Amerindo at 399 Park Avenue, 22nd floor.  The supporting affidavit was made by United States Postal Inspector Cynthia Fraterrigo, who recounted conversations with two investors.

According to Fraterrigo, Lisa Mayer said that she had known defendant Vilar for two decades, had dated him on and off, and her family had invested millions of dollars in "guaranteed fixed rate deposit accounts" with Amerindo beginning in 1987.  Vilar allegedly represented that the investments were largely in bank certificates of deposit, government securities and other investment that were "absolutely safe and liquid."  The accounts were managed through an offshore account in the Bahamas called PTC Management Ltd.  Mayer claimed that, in 2003, when her family attempted to redeem approximately $12 million of their funds, their efforts were rebuffed.  Mayer further claimed that Vilar threatened to create tax problems for the Mayers and

was "dribbling out to them as little money . . . as possible." Fraterrigo Search Warrant Affidavit at p.3-4, attached hereto as Exhibit "B".

Two criminal complaints were attached to the affidavit, one against Vilar and Tanaka and the other against Tanaka alone. See Exhibits C and D, attached hereto. Neither complaint mentions the Mayer allegations. The second investor described by Agent Fraterrigo is Lily Cates, "the Victim" referred to in the complaint against Vilar and the indictment against Vilar and Tanaka.[1] According to Cates, in addition to the $5 million investment described in the complaint and indictment, she made an investment in 1988 in Rhodes Capital, and received a stock certificate signed by Vilar and Tanaka. She received account statements reflecting growth in her investment but no other information about it. *Id*. at p. 4-5.

In February, 2005, Cates allegedly attempted to redeem her entire investment portfolio at Amerindo, but Vilar and Amerindo allegedly refused to move her portfolio to the brokerage firm Baer, Stearns & Co. She was informed that she was a client of Amerindo Panama, not Amerindo U.S., and that any redemption would be reduced by fees and taxes she had been unaware of. According to Agent Frateriggo, Baer Stearns' records showed "tens of millions of dollars being wire transferred to the PTC Management account" in the Bahamas. *Id*. at 5.

Cates allegedly told Agent Fraterrigo that three other investors "may have had trouble redeeming all or part of their investments," and she provided their names. Id. at 5.

Finally, Agent Fraterrigo briefly referred to the allegations in a complaint against Tanaka, which was attached to her application. See Exhibit C, attached hereto. The allegations in this complaint have not been alleged in the indictment returned by a grand jury. While the complaint alleges that Tanaka used client funds to purchase thoroughbred horses, nothing in the specific

---

[1]    The indictment does not include any of the allegations from the complaint against Tanaka about his alleged purchasing of racehorses with client funds.

allegations establishes probable cause to believe that client funds were used.    The Tanaka complaint simply describes a number of Letters of Authorization signed by Tanaka instructing the brokerage firm used by Amerindo to wire transfer funds from the Amerindo Technology Growth Fund (ATGF I) or the AMI account to overseas and domestic bank accounts.  Each Letter of Authorization contained a reference to the name of a racehorse and a statement that the transfer "represents a redemption by the above referenced equity partner."  Exhibit C,  at ¶15. The fact that a principal of a successful investment advisor firm took large redemptions (meaning, presumably, that he cashed out his investment in certain funds managed by Amerdino) is neither surprising nor inherently suspicious.  The complaint alleges no facts that suggest that Tanaka was converting client funds for his purchase of racehorses.

### B. The All-Inclusive Warrant

In the course of three pages and eighteen paragraphs, the warrant describes every manner of document and business equipment that would be maintained in financial services office. Except for one paragraph that named specific investors, the categories of things to be seized are so broad that the result, upon information and belief, was the seizure of virtually all of the records and computer equipment in the Amerindo office at 399 Park Avenue in New York.[2]  A copy of the warrant is attached hereto as Exhibit "A."

Paragraph 1 authorizes the seizure of

> "Corporate Records concerning [each of the Amerindo entities] **including but not limited to** records concerning the formation of each of the above-listed Amerindo entities, its shareholders, principals, officers, directors, and employees, changes in ownership, bylaws, resolutions, client lists, client files, investment brochures, marketing materials, investment advisory agreements, copies of correspondence sent to or received from clients, and other documents concerning or reflecting the identities of and communications with clients who have

---

[2]      The government has not yet provided us with the inventory of the search and the defendant Vilar has not personally seen the offices since his arrest.

investments managed or advised by Amerindo.

This paragraph alone, putting aside the seventeen others, authorizes the seizure of practically every piece of paper and computer file in any financial services office, especially because the list of corporate records "includes but is not limited" to those specified.

Paragraphs 2, 4 and 12 are similarly expansive, calling for the seizure of all Amerindo's brokerage account records at Baer Stearns or any other broker-dealer, as well as all records in any way pertaining to client investments. Although each paragraph appears to delineate specific types of documents, the net effect is an authorization to seize virtually all documents.

Paragraph 13 is similarly all-encompassing:

> Bank account statements, brokerage account statements, transaction records, wire transfer instructions and records, copies of checks sent to or received from clients, notes, ledgers, cash receipt journals, deposit tickets and records, and other documents reflecting or relating to movements of funds into or out of the Amerindo Brokerage Accounts

Paragraph 14 calls for an exhaustive list of records of expenses and accounting records, and paragraph 15 call for "documents reflecting information about any current of former Amerindo employee" who had any contact with any Amerindo client or was involved in the management of any account or preparation of account statements. These seven paragraphs alone cover all corporate, brokerage, client investment, bank and accounting records.

Paragraph 9 calls for the personal financial records of the defendants, *i.e*., documents regarding accounts held by Vilar and Tanaka at "any financial institution"

Every type of physical equipment that a typical office maintains is then described in paragraphs 16, 16 [sic] and 17: address books, rolodexes, calendars, travel documents, fax machines, computers, hard drives, cellular phones, pda's, and "any other storage media capable of containing date or text in magnetic electronic optical, digital, analog, or any other format . . . "

10

The final paragraph, which first describes computer equipment, ends with the following line, just to ensure that no stone -- not a one -- remained unturned:

> . . . as well as drafts and final versions of documents and correspondence prepared in connection with the running and supervision of the operations of the investment advisory business.

The described paragraphs, taken together with the others, are repetitive and exhaustive in the extreme.

<u>ARGUMENT</u>

<u>POINT I</u>

**THE SEARCH WARRANT IS OVERBROAD AND THE VAST MAJORITY OF ITS PROVISIONS ARE <u>UNSUPPORTED BY PROBABLE CAUSE</u>**

The affidavit of Agent Fraterrigo discusses two disgruntled investors. Although it mentions a hearsay statement that three other investors "may have had trouble redeeming all or part of their investments," (Exhibit B, Affidavit at p. at 5), "may have had trouble" is not the stuff of probable cause. Thus, looking at the affidavit in the light most favorable to the government, the affidavit established probable cause to believe that some wrongdoing occurred in the accounts of or with respect to two named investors, Lily Cates and the Mayer family. This does not amount to probable cause to search and seize *every* client file, *all* accounting, expense, banking and corporate records, and *all* computer, telephone and facsimile equipment.

In addition, the warrant provides no time-frame whatsoever, even though the allegations in the Tanaka complaint attached to the application is limited to the period of November, 2003 through April, 2005, and the alleged investment scheme involving the SBA loan began, according to the complaint, in January, 2000. *See* Exhibits C and D. The warrant in this case

failed to provide probable cause to search and seize the vast majority of items listed in the warrant and it was unconstitutionally overbroad.[3]

The purpose behind the Fourth Amendment warrant clause is to ensure that "those searches deemed necessary should be as limited as possible. Here, the specific evil is the 'general warrant' abhorred by the colonists, and the problem is not the intrusion *per se*, but of a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed. 2d 564 (1971). By limiting searches "to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison,* 480 U.S. 79, 84, 107 S.Ct. 1013, 1016, 94 L.Ed. 2d 72 (1987).

The warrant in this case is a general warrant that lists every conceivable kind of document, record and equipment that could be found in a financial services office. The warrant authorized the wholesale seizure of everything in the office, without regard to time frames, investors, investments or individual targets of the investigation. It includes generic categories, such as "corporate records," following by a list of examples that are "included but not limited to," (paragraph 10); "documents reflecting or relating to the movements of funds into or out of the Amerindo Brokerage Accounts," (paragraph 13); "documents reflecting information about any current or former Amerindo employee," (paragraph 15); "any other storage media capable of containing data or text," (paragraph 17); and, the coup de grace, "as well as drafts and final versions of documents and correspondence prepared in connection with the running and supervision of the operations of the investment advisory business," (paragraph 17).

---

[3]     Defendant Vilar's affidavit establishing his standing to move to suppress is attached hereto as Exhibit "E."

In *United States v. Lafayette,* 610 F.2d 1 (1st Cir. 1979), a vocational home-study school

was under investigation for fraudulent practices in connection with a federal student loan

program. The warrant authorized the seizure of a long list of documents, both generic and more

specific:

> Books, papers, rosters of students, letters, correspondence,
> documents, memoranda, contracts, agreements, ledgers,
> worksheets, books of account, student files, file jackets and
> contents, computer tapes/discs, computer operation manuals,
> computer tape logs, computer tape layouts, computer tape print-
> outs, Office of Education (HEW) documents and forms, cancellation
> reports and directives, reinstatement reports or forms, Government
> loan registers, refund ledgers, reports and notes, administrative reports,
> financial data cards, lesson and grading cards and registers, registration
> (corporations) documents, student collection reports, financial documents
> (corporations), journals of accounts and student survey data, which are
> and constitute evidence of the commission of violations of the laws of
> the United States, that is violations of 18 U.S.C., Sections 286, 287,
> 371, 1001 and 1014.

*Id.* at 3. The only differences between the warrant in *Lafayette* and the one in this case is that the

Amerindo warrant provides paragraph breaks and it is even more expansive in terms of the types

of documents to be seized. In *Lafayette,* the Court stated:

> The directions to the executing officer are straightforward
> he is to cart away all documents. But while, so interpreted,
> the description would be particular enough, it would also be
> too broad to satisfy the probable cause requirements of the
> fourth amendment. The affidavit does not establish probable
> cause to search and seize all of those items.

*Id.* at 5-6. The Court noted that, while some of the items listed may have been sufficiently

particularized standing along, *e.g.* "rosters of student" and "student collection reports," they

covered documents pre-dating the time frame of the alleged criminal conduct. Thus, no item

satisfied the requirements of the fourth amendment. *Id. at 6.*

The same infirmities affect the Amerindo warrant; it authorized the executing officers to cart away all documents without specifying any time frame whatsoever. While one paragraph of the warrant (¶6) identifies specific investors, it, like all of the other paragraphs, provides no limiting time frame.

Similarly, in *United States v. Klitzman,* 744 F.2d 955 (3rd Cir. 1984), a personal injury lawyer was under investigation for a scheme to defraud medical insurance companies. In finding the search warrant overbroad, the Third Circuit stated:

> The warrants, albeit particular, authorized the postal inspectors to search *all* client files, open or closed, to determine which personal injury case files to seize. The warrants allowed the seizure of all of the firm's financial records, file lists, and appointment books . . . . In effect, the warrants authorized virtually a wholesale search and seizure of the business records of the firm.

*Id.* at 960. The Amerindo warrant is overbroad for the same reasons.

## A.  The "All-Records" Exception is Inapplicable

The government will no doubt attempt to avail itself of the "all-records exception" applicable when the affidavit shows probable cause to believe that that the entire business is permeated by fraud. Evidence to support the all-records exception "could consist of a large number of fraudulent transactions or of documentation – in the form of information gleaned from interviews with former employees or from undercover surveillance of the operation – that the entire operation is a scam." *United States v. Burke,* 718 F.Supp. 1130, 1140 (S.D.N.Y. 1989). The Amerindo warrant application does not even come close to making such a showing. It recites the complaints of two investors, one lacking in specifics and the other pertaining to one investment (the "SBIC" fund). Exhibit B, at p. 3-5.

In *Burke,* the affidavit described fraudulent transactions involving seven customers who purchased allegedly fake Salvador Dali prints. The Court concluded that the evidence was insufficient to show that the entire business was permeated with fraud. *Id.* at 1141; *compare* [where courts concluded businesses were permeated by fraud] *National City Trading Corp. v. United States,* 635 F.2d 1020, 1021-22 (2d Cir. 1980)(affidavit listed over 40 complaints; undercover agents visited the company three times); *United States v. Brien,* 617 F.2d 299, 309 (1st Cir.), 446 U.S. 919 (1980)(affidavit described 250 complaints and interviews with 20 former employees); *United States v Oloyede*, 982 F2d 133 (4th Cir, 1992)(documentation in over 50 cases, two confidential informants outlined in great detail procedures associated with attorney's operation, and review of 26 of attorney's files disclosed that each file contained fraudulent documents).

The affidavit in this case does not support the "all-records" exception to the Fourth Amendment's probable cause and particularity requirements.

**B. <u>The Good-Faith Exception is Inapplicable</u>**

And, of course, the government will attempt to salvage the warrant by application of the "good faith exception." Under *United States v. Leon,* 468 U.S. 897, 919-21, 104 S.Ct. 3405, 3418-19, 82 L.Ed.2d 677 (1984), the question is whether it was objectively reasonable for the executing officers to rely on the warrant's authorization to conduct a wholesale seizure at the Amerindo offices. "The standard of reasonableness . . . is an objective one, . . . [one that] requires officers to have a reasonable knowledge of what the law prohibits." *Id.*

In the case at bar, it was not objectively reasonable for the officers to rely on the authorization to engage in a wholesale seizure of every paper and storage medium capable of

containing data and text. It was also tantamount, on the Magistrate's part, to abandoning a Magistrate's neutral and detached role in approving such a warrant. *Id.* at 923. [4]

In *United States v. Burke,* 718 F.Supp at 1130, Judge Mukasey upheld a search pursuant to an overbroad warrant under the good faith exception based upon the totality of the circumstances, including: 1) the warrants were approved by three federal magistrates and a United States Attorney; 2) the affidavit, although not attached to the warrants, limited the scope of the search to Dali artwork, 3) the search conducted was in fact limited to the allegations in the affidavit, a copy of which each agent was given, and no general search was conducted; and, 4) the law of this Circuit in 1985 left considerable ambiguity as to the exact requirements of the particularity clause of the Fourth Amendments. Judge Mukasey thus concluded that "the officers here had taken 'every step that could reasonably be expected of them' to comply with the Fourth Amendment's requirements," and that "reasonable well-trained officers could not have known that the warrants were impermissibly overbroad." *Id.* at 1141-1142, quoting *Massachusetts v. Sheppard,* 468 U.S. 981, 989, 104 S.Ct. 3424, 3428, 82 L.Ed. 2d 737 (1984).

None of those circumstances can save the Amerindo warrant. So far as we know, only one magistrate approved the warrant. In addition, the affidavit in this case did not serve to limit the warrant. While the initial substantive paragraphs of the warrant (¶6(a), (b) and (d)) described the Mayer and Cates investments, the paragraphs that followed sought to broaden the warrant authorization beyond the Mayer and Cates investments without providing probable cause. As noted above, the affidavit mentioned a hearsay allegation about other investors who "may have had trouble redeeming all or part of their investments." Exhibit B, Affidavit at p. 5, ¶E. This is

---

[4] Under *Leon,* there are four situations where the good faith exception does not apply: 1) where the issuing magistrate was misled by information the affiant knew was false or should have known but for a reckless disregard for the truth; 2) where the affidavit is so lacking in probable cause "as to render official belief in its existence entirely unreasonable"; 3) where the magistrate "abandoned his detached and neutral role," and 4) where a warrant is so facially deficient that the executing officers cannot reasonably presume it valid. 468 U.S. at 923.

not probable cause.   The affidavit also alleges the "funneling of money to overseas bank accounts," without any showing that these accounts were anything other than legitimate off-shore investment accounts -- accounts that are quite prevalent in the private investment advisor industry. Exhibit B, Affidavit at p.6.   Instead of alleging facts supporting probable cause, the affidavit uses words suggestive of criminality, such as "funneling."

Finally, the affidavit alleges that "an investment advisor [was] misappropriating funds" to purchase racehorses for himself.  The attached Tanaka complaint, however, does not establish probable cause to believe client funds were used.  The complaint simply describes a number of Letters of Authorization signed by Tanaka instructing Amerindo's brokerage firm to wire transfer funds from the Amerindo Technology Growth Fund (ATGF I) or the AMI account to overseas and domestic bank accounts, each with a reference to the name of a racehorse and a statement that the transfer "represents a redemption by the above referenced equity partner." Exhibit C, at ¶15.  The fact that a principal of a successful investment advisor firm took large redemptions (meaning, presumably, that he cashed out his investment in certain funds managed by Amerdino) is neither surprising nor inherently suspicious.

Thus, the affidavit did not limit the proposed search to records of the Mayer and Cates allegations.  It included broader allegations unsupported by probable cause which the executing agents were not entitled to rely on.  And, it is clear that a general search was in fact conducted; upon information and belief, the agents carted off virtually every document and piece of computer equipment in the offices.  In addition, unlike the search in *Burke* in 1985, there is no longer any ambiguity, 20 years later, in the law regarding the permissible breadth of search warrants.

17

In *United States v. George,* 975 F.2d 72, 74 (2d Cir. 1992), the warrant listed specific items stolen and used during a robbery, and "any other evidence relating to the commission of a crime." A shotgun, not specified in the warrant, was recovered during the search. The Second Circuit abrogated the warrant because of the last, catch-all clause, which did not specify any particular crime:

> The subject warrant is unconstitutionally overbroad and, unlike the situation in *Buck,* in light of the settled nature of the law concerning the failure for lack of particularity of warrants authorizing the search for "evidence" limited only by reference to "a crime," it is the type of facially invalid warrant that could not have been relied upon in good faith because "one who simply looked at the warrant . . . would . . . suspect that it was invalid."

*Id.* at 78 (citations omitted). [5]

Just a cursory look at the Amerindo warrant reveals its all-inclusive breadth – especially phrases like "included but not limited to," (paragraph 10); "documents reflecting or relating to the movements of funds into or out of the Amerindo Brokerage Accounts," (paragraph 13); "documents reflecting information about any current or former Amerindo employee," (paragraph 15); "any other storage media capable of containing data or text," (paragraph 17); and, "drafts and final version of documents and correspondence prepared in connection with the running and supervision of the operations of the investment advisory business," (paragraph 17). As noted above, none of the paragraphs contains a time frame and there is no reference to any particular crime. Only a single paragraph out of 18 contains the generic term "fraud." Thus, the officers were permitted to seize:

---

[5]     There is a difference of opinion among the Circuits and even within this Circuit as to whether a sufficiently specific affidavit can cure an overbroad warrant. Some Courts have held that the affidavit can cure overbreadth only if it is explicitly incorporated in the warrant itself. *Compare United States v. George,* 975 F.2d at 76 ("[r]esort to an affidavit to remedy a warrant's lack of particularity is only available when it is incorporated by reference in the warrant itself and attached to it") with *United States v. Bianco,* 998 F.2d 1112, 1116-1117 (2d Cir. 1993) (clear that officers were aware of scope and limitations of the search although affidavit was not incorporated or attached; officers took only what was contemplated by the authorizing papers).

      16.  Photographs, address books, Rolodex indices, diaries,
      calendars, identification documents, travel documents, and
      other documents concerning or reflecting information
      concerning the identities of participants in the fraud schemes.

It was left entirely to the officers' discretion to determine who was a participant in unidentified

"fraud schemes" in order to determine which photographs, address books, diaries, calendars "and

other documents" to seize.  *See United States v. Maxwell*, 920 F.2d 1028 (D.C. Cir.

1990)("[r]eferences to broad statutes realistically constitute no limitation at all on the scope of an

otherwise overbroad warrant and therefore cannot save it").

      The good faith exception cannot excuse the overbroad warrant in this case and the

wholesale search and seizure of, essentially, everything in sight.  Any reasonable officer should

have and would have known that the warrant was excessive in scope and transgressed the Fourth

Amendment.

      In the alternative, a hearing should be held to determine what, if any, safeguards and

limitations were in place at the time of the search and whether the affidavit was drafted by an

attorney, rather than an agent, who would be held to a higher standard of knowledge that the

warrant violated the Constitution.

    **C.  A Hearing Should Be Held Pursuant to *Franks v. Delaware***

      The allegations in the affidavit concerning the Mayer investments have never been the

subject of a criminal complaint and are not included in the indictment.  This circumstance

suggests that there is some information in the government's possession that contradicts the

allegation of criminality in connection with the Mayer investments.  If such exculpatory evidence

was in the government's possession at the time of the search warrant affidavit, it would have

been misleading to withhold that information from the Magistrate.  A hearing should therefore be

held to determine whether the Magistrate was misled regarding the Mayer investment.  If

material information was withheld, the warrant must be examined for probable cause as if the information had been disclosed, and, in any event, the good exception would not apply. *United States v. Leon,* 468 U.S. at 923.

## POINT II

### ANY AND ALL STATEMENTS MADE BY THE DEFENDANT VILAR SHOULD BE SUPPRESSED

According to the discovery provided, defendant Vilar was interrogated at US Postal Inspection Service Division Headquarters shortly after his arrest and he made statements.  While the Postal Service Memorandum of Interview states that Mr. Vilar was advised of his Miranda rights during his transportation from Newark Airport, where he was arrested, to Division Headquarters, Mr. Vilar's recollection is that, at no time was he ever advised of a list of rights. *See* Vilar Declaration, attached hereto as Exhibit E.

In light of the above, the defendant moves to suppress his statements pursuant to *Miranda v. Arizona,* 384 U.S. 436 (1966), which requires that any custodial interrogation of a defendant must be preceded by the *Miranda* warnings.

Case 1:05-cr-00621-RJS     Document 32     Filed 09/13/2005     Page 21 of 21

**CONCLUSION**

For all of the reasons set forth above, the evidence seized pursuant to the warrant to search the Amerindo offices, any post-arrest statements made by defendant Vilar, and any and all fruits and leads there from, should be suppressed.  In the alternative, a hearing should be held.

Dated:  New York, New York
        September 12, 2005

                                        Respectfully submitted,

                                        HOFFMAN & POLLOK, LLP

                                        By:_____
                                            Susan C. Wolfe

                                        *Attorneys for Defendant Alberto Vilar*
                                        260 Madison Avenue
                                        New York, NY  10016
                                        (212)  679-2900
                                        (212)  679-1844 (fax)