UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA                :

             -v.-                              :          S1 05 Cr. 621 (KMK)

ALBERTO WILLIAM VILAR,                   :
  a/k/a, "Albert Vilar," and
GARY ALAN TANAKA,                        :

            Defendants.          :
--------------------------------------------------------x


### GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' PRETRIAL MOTIONS TO SUPPRESS


MICHAEL J. GARCIA
*United States Attorney for the*
*Southern District of New York*

*Attorney for the United States of America*


Marc Litt
*Assistant United States Attorney*
*Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    The Scheme To Defraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    The Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Point I:    The Warrant Was Amply Particularized
               And Was Fully Supported By Probable Cause . . . . . . . . . . . . . . . . . . . . 8

        i.    The Warrant and Supporting Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . 9

        ii.    The Warrant Was Supported By Probable Cause
              And Was Not An Impermissible General Warrant . . . . . . . . . . . . . . . . . 20

       iii.    The Warrant Was Not Overbroad . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

       iv.    The Good Faith Exception Applies . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        v.    Vilar's Request for a *Franks* Hearing Should Be Denied . . . . . . . . . . . 33

    Point II:    A Hearing Is Warranted On The Issue Of Whether
               Statements Made By The Defendants
               At The Time Of Their Arrests Should Be Suppressed . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## TABLE OF AUTHORITIES

*Franks* v. *Delaware*, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 33

*Illinois* v. *Gates*, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*National City Trading Corp.* v. *United States*, 635 F.2d 1020 (2d Cir. 1980) . . . . . . . . . . . . . 22

*Rivera* v. *United States*, 928 F.2d 592 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Texas* v. *Brown*, 460 U.S. 730, 742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Buck*, 813 F.2d 588 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24, 30

*United States* v. *Burke*, 718 F. Supp. 1130 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . 21, 23, 25, 27

*United States* v. *Campino*, 890 F.2d 558 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 35

*United States* v. *Dinero Express*, 2000 WL 254012 (S.D.N.Y. Mar. 6, 2000) . . . . . . . . . . . 20-22

*United States* v. *George*, 975 F.2d 72 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . 21, 24, 28, 30

*United States* v. *Gotti*, 42 F. Supp.2d 252 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States* v. *Heldt*, 668 F.2d 1228 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States* v. *Hunter*, 13 F. Supp.2d 574 (D. Vt. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States* v. *Jakobetz*, 955 F.2d 786 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Jasorka*, 153 F.3d 58 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States* v. *Johnson*, 886 F. Supp. 1057 (W.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . 26-27

*United States* v. *Klitzman*, 744 F.2d 955 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States* v. *Kouzmine*, 921 F. Supp. 1131 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . 30

*United States* v. *Lafayette*, 610 F.2d 1 (1ˢᵗ Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States* v. *Leon*, 468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States* v. *Regan*, 706 F. Supp. 1102 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States* v. *Riley*, 906 F.2d 841 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*United States* v. *Rosa*, 11 F.3d 315 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Scharfman*, 448 F.2d 1352 (2d Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States* v. *Shakur*, 560 F. Supp. 337 (S.D.N.Y. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States* v. *Singh*, 390 F.3d 168 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 20, 29, 33, 35

*United States* v. *Smith*, 9 F.3d 1007 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Sugar*, 606 F. Supp. 1134 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States* v. *Young*, 745 F.2d 733 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States* v. *Zanche*, 541 F. Supp. 207 (W.D.N.Y. 1982) . . . . . . . . . . . . . . . . . . 21, 22, 27-28

*United States Postal Service* v. *CEC Services*, 869 F.2d 184 (2d Cir. 1989) . . . . . . . . . . . . . . 22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA       :

         -v.-            :      S1 05 Cr. 621 (KMK)

ALBERTO WILLIAM VILAR,    :
  a/k/a, "Albert Vilar," and
GARY ALAN TANAKA,        :

         Defendants.     :
--------------------------------------------------------x

## GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' PRETRIAL MOTIONS TO SUPPRESS

### PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the pretrial motions to suppress evidence and statements filed by defendants Alberto William Vilar (Vilar) and Gary Alan Tanaka ("Tanaka").[1]

Vilar moves to suppress evidence recovered from a search conducted by U.S. Postal Inspectors on May 26, 2005, at the offices of Amerindo Investment Advisors Inc. ("Amerindo U.S.") located on the twenty-second floor of 399 Park Avenue, New York, New York (the "Amerindo U.S. Office") on the grounds that the warrant approved by U.S. Magistrate Judge Frank Maas (the "Warrant") was unconstitutionally overbroad and unsupported by probable cause by the affidavit submitted by U.S. Postal Inspector Cynthia M. Fraterrigo ("Fraterrigo") in

---

[1] "Vilar Br." refers to the brief of defendant Alberto Vilar in support of his motions to suppress evidence obtained through the execution of a search warrant at the Amerindo U.S. Office and the statements made by Vilar to U.S. Postal Inspectors following his arrest on May 26, 2005. "Vilar Decl." refers to the declaration submitted by Vilar in support of his motions to suppress. "Tanaka Br." refers to the brief of defendant Gary Alan Tanaka in support of his motion to suppress statements that he made to U.S. Postal Inspectors on May 26, 2005. "Tanaka Decl." refers to the declaration submitted by Tanaka in support of his motion to suppress.

the warrant application (the "Warrant Affidavit").[2]  Vilar also moves to suppress any and all

post-arrest statements taken in violation of *Miranda* v. *Arizona*, 384 U.S. 436 (1966).  Vilar

seeks a hearing on both motions.

Tanaka moves to suppress statements made by Tanaka at the time of his arrest, and

requests a hearing on the motion.  Tanaka does not join Vilar's motion to suppress evidence

obtained from the Amerindo U.S. Office as a result of the execution of the Warrant.

Each of the motions is discussed below.

## **Background**

On July 26, 2005, a Grand Jury in the Southern District of New York returned a ten-

count superseding indictment (the "Indictment") charging the defendants with crimes arising

from their activities as investment advisers, owners and operators of three affiliated entities:

Amerindo U.S., Amerindo Investment Advisors, Inc. ("Amerindo Panama"), and Amerindo

Investment Advisors (UK) Ltd. ("Amerindo U.K.").[3]  The Indictment charges the defendants

with participating in a conspiracy to commit securities fraud, investment adviser fraud, mail

fraud, wire fraud, and money laundering.  The Indictment also charges the defendants with

substantive counts of securities fraud, investment adviser fraud, mail, fraud, two counts of wire

fraud, and four counts of money laundering.  Finally, the Indictment seeks forfeiture of $5.25

million.

Vilar and Tanaka were two of the original founders of Amerindo U.S., Amerindo

---

[2]    Although Vilar's motion refers to a May 25, 2005 search, the Warrant, which was obtained on May 25, 2005, was not executed until May 26, 2005.

[3]    An earlier indictment, filed on or about June 9, 2005, contained many of the same charges against defendant Vilar.

Panama, and Amerindo U.K., were officers, directors and shareholders of Amerindo U.S., and were the sole shareholders, directors and officers of Amerindo Panama and Amerindo U.K. (Indictment ¶¶ 4-5). Amerindo U.S. was registered as an investment adviser with the United States Securities and Exchange Commission ("SEC"). (Indictment ¶ 1). Amerindo Panama was the investment adviser to an off-shore investment fund, and Amerindo U.K. managed portfolios of emerging growth stocks for U.K. based clients, and its London office served as the location where certain administrative functions related to Amerindo Panama were performed, including meeting with and corresponding with investors, preparing client account statements, processing investor redemption requests, and directing the trading and financial transactions involving Amerindo Panama investor funds. (Indictment ¶¶ 2-3).

The Indictment alleges a scheme to defraud an investor who had entrusted millions of dollars to Amerindo since 1987 by soliciting millions of dollars from the investor (the "Victim") under false pretenses, failing to invest the Victim's funds as promised, and converting the Victim's funds to the defendants' own benefit and the benefit of others.[4] (Indictment ¶ 6).

## **The Scheme To Defraud**

Cates began investing with Amerindo in or about 1987, and for approximately eight years received account statements on stationery bearing the name of Amerindo U.S., and the address of Amerindo U.K. (Indictment ¶¶ 7-8). Beginning in or about September, 1995, Cates began receiving account statements on stationery bearing the corporate name of Amerindo Panama, and including the address of a Panama post office box. (Indictment ¶ 8). The reported value of

---

[4] Although the Victim is not identified in the Indictment, the Warrant Affidavit identifies the Victim as Lily Cates.

3

Cates's investments with Amerindo peaked at approximately $18 million in or about September 2000, and sharply declined in value over the following two years.  (*Id.*).

In or about June 2002, Vilar advised Cates to invest in the Amerindo SBIC Venture Fund LP (the "Amerindo SBIC"), which was created "to take advantage of a U.S. government program designed to promote venture capital investment in small businesses."  (Indictment ¶ 9). Vilar told Cates that he and Tanaka were personally investing in the venture, which he claimed had been approved by the government, advised Cates to invest $5 million in the Amerindo SBIC, told Cates that she would be Vilar and Tanaka's only outside partner in the investment, and promised her that she would earn approximately $250,000 each quarter from the investment. (Indictment ¶¶ 9, 17).  As a result of Vilar's representations, Cates invested $5 million in the Amerindo SBIC.  (Indictment ¶¶ 9, 18).

On or about June 20, 2002, Cates's $5 million investment in the Amerindo SBIC was deposited into an account opened by Vilar and Tanaka in or about 1987 at Bear, Stearns & Co, Inc. ("Bear, Stearns") on behalf of Amerindo Management Inc., a Panamanian corporation of which Vilar was President, and Tanaka was Vice President.[5]  (Indictment ¶ 18).  Within one week of the deposit, on written instructions signed by Tanaka, Bear, Stearns wire transferred approximately:  $1 million of Cates's investment to a personal bank account held by Vilar at Chase Manhattan Bank; $650,000 of Cates's investment to an account held by Amerindo U.S. at Chase Manhattan Bank; and $500,000 to a trust account, from which approximately $400,000 was used to make an investment on behalf of Cates other than an investment in the Amerindo

---

[5]     Bear, Stearns was referred to in the Indictment as the "Brokerage Firm"; its identity was revealed in the Warrant Affidavit.

SBIC.  On or about July 9, 2002, on written instructions signed by Tanaka, Bear, Stearns wire transferred the remaining amount of Cates's Amerindo SBIC investment, approximately $2.85 million, to a bank account in Luxembourg for the purpose of partially redeeming an unrelated investor's investment in an Amerindo Panama investment product.  (Indictment ¶¶ 18-25).

After obtaining Cates's $5 million investment in the Amerindo SBIC, and converting those funds to the use of himself and others, Vilar repeatedly made false and fraudulent statements to Cates and Cates's representatives concerning the status of her investment.  For example, Vilar informed Cates that her investment was in "escrow," that her funds were "on deposit" with the SBIC, that her investment remained at "full value," and that not "a single penny" of her investment funds had been used.  (Indictment ¶¶ 26(a), (b), (c)).  Vilar and Tanaka also caused an account statement to be prepared and sent via commercial courier from London to Cates, in New York, New York, which described her funds as being "on deposit" with the SBIC, and which reflected accumulated interest of $225,000 on that investment.  (Indictment ¶ 26 (d)).

Vilar also made misrepresentations to Cates and her representatives about the status of the Amerindo SBIC's efforts to obtain the license necessary to receive matching investment funds from the U.S. Government.  (Indictment ¶ 26).  He informed Cates that he expected to receive permission to begin investing the funds "fairly soon" at a time when the Amerindo SBIC had not even completed the first phase of the SBIC licensing process, and had already been repeatedly rebuffed in its efforts to obtain the requisite SBIC license from the U.S. Small Business Adminstration (the "SBA").  (Indictment ¶¶ 10-14, 26(a)).  He later stated that he had been required "to deposit the requisite key money" in connection with Amerindo's efforts to obtain an SBIC license, notwithstanding the fact that there was no such applicable program

5

requirement until much later in the licensing process, and referred to the "renewal" of an Amerindo SBIC license when, in fact, the Amerindo SBIC had never been licensed. (Indictment ¶¶ 12, 13, 16, 26(b). On or about October 25, 2005, Vilar wrote to Cates's lawyer that the Amerindo SBIC had been approved for investment, but that the matching funds to be invested by the Government had been delayed due to budgetary problems. (Indictment ¶ 26(c)). By that time, not only had Amerindo failed to obtain an SBIC license, but it had abandoned its efforts to do so. (Indictment ¶ 16).

The Indictment further alleges that, as part of the conspiracy, Vilar and Tanaka misappropriated approximately $250,000 from Cates on or about September 25 and 26, 2003. (Indictment ¶¶ 27-30). On or about September 25, 2003, as a result of receiving written instructions signed by Tanaka, and bearing the forged signature of Cates, Bear, Stearns transferred approximately $250,000 from an account held by Cates at Bear, Stearns, to another Bear, Stearns account held in the name of Amerindo Technology Growth Fund Inc. ("ATGF I") (Indictment ¶¶ 27-28). The next day, Vilar and Tanaka caused another written instruction signed by Tanaka to be sent to Bear, Stearns, directing that approximately $250,000 be transferred from ATGF I to a personal account held by Vilar at Wilmington Trust Company. (Indictment ¶ 29). During the following approximately one-month period, Vilar spent Cates's $250,000 on personal expenses including the repayment of a mortgage. (Indictment ¶ 30).

## The Charges

Count One of the Indictment charges Vilar and Tanaka with membership in a conspiracy to accomplish the unlawful scheme described above. Count One alleges five objects of the conspiracy: (a) to commit fraud in connection with the purchase and sale of securities, in

violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) to commit investment adviser fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17; (c) to commit mail fraud, in violation of Title 18, United States Code, Section 1341; (d) to commit wire fraud, in violation of Title 18, United States Code, Section1343; and (e) to commit money laundering, in violation of Title 18, United States Code, Section 1957.  Count Two charges the defendants with securities fraud related to fraud committed in connection with the purchase and sale of limited partnership interests in the Amerindo SBIC.  Count Three charges the defendants with investment adviser fraud related to the SBIC fraud and misappropriation of $250,000 from Cates.  Count Four charges the defendants with mail fraud in connection with the false and fraudulent account statement sent to Cates in furtherance of the SBIC fraud.  Counts Five and Six charge the defendants with wire fraud related to the June 25, 2002 wire transfer of approximately $1 million of Cates's Amerindo SBIC investment to Vilar's Chase Manhattan Bank account, and the subsequent July 9, 2002 wire transfer of approximately $2.85 million of Cates's investment to an overseas bank account to redeem another investor's investment in an Amerindo Panama investment product, respectively.  Counts Seven through Ten charge the defendants with money laundering stemming from four separate wire transfers and deposits into bank accounts of the proceeds of the securities fraud, investment adviser fraud, mail fraud and wire fraud schemes.  Finally, the Indictment includes forfeiture allegations seeking money judgments of $5.25 million and $5 million on alternative theories of being proceeds of securities, mail and wire fraud schemes, and property involved in or property traceable to such property obtained as a result of the money laundering crimes alleged in the Indictment.

**ARGUMENT**

**POINT I**

**The Warrant Was Amply Particularized
And Was Fully Supported By Probable Cause**

Defendant Vilar moves to suppress all evidence seized pursuant to the Warrant.  Vilar

claims that the warrant was an impermissible "general" warrant that authorized "the wholesale

seizure of everything in the office."  (Vilar Br. 12).  Vilar further claims that the warrant lacked

probable cause with respect to "the vast majority of items listed in the warrant," *id*., and that the

*Leon* good faith exception does not apply because of the alleged overbreadth of the Warrant.

(Vilar Br. 15-19).  Finally, Vilar seeks a hearing pursuant to *Franks* v. *Delaware*, 438 U.S. 154

(1978) on the ground that, because certain information contained in the Warrant Affidavit has

yet to be alleged in a charging instrument, there is reason to believe that the Magistrate Judge

who approved the Warrant was misled through the omission of exculpatory or material

information.  (Vilar Br. 19-20).

Each of these arguments is flawed and should be rejected by the Court.  As demonstrated

below, the Warrant did not call for the seizure of "everything in the office."  Instead the warrant

called for  particular types of records, *e.g.*, account statements, client lists, trading records, and

corporate organizational documents, or records concerning particular types of transactions or

subject matters, *e.g.*, the Amerindo SBIC and other suspected fraudulent Amerindo investment

products.  Probable cause was well established in the detailed, thrity-four page supporting

affidavit that outlined a continuing pattern of fraud involving the defendants.  Moreover,

contrary to Vilar's contention, even were the Court to find that the Warrant was insufficiently

particularized or not fully supported by probable cause, the *Leon* good faith exception should be

applied.  Finally, Vilar has failed utterly to make the "substantial preliminary showing" required

to obtain a *Franks* hearing and, accordingly, that motion, too, should be denied.

**A.    The Warrant and Supporting Affidavit**

On May 25, 2005, United States Magistrate Judge Frank Maas approved the

Government's application for the Warrant.  Magistrate Judge Maas issued the Warrant on the

basis of facts set forth in a thirty-four page affidavit sworn to by United States Postal Inspector

Cynthia M. Fraterrigo.[6]

The Warrant Affidavit detailed the results of an investigation into an ongoing scheme

that had led to losses of at least approximately $17 million by two investors who had entrusted

their funds with Amerindo and the defendants for more than fifteen years.  The Warrant

Affidavit, through the Vilar criminal complaint, which was incorporated by reference, outlined

substantially all of the factual allegations contained in the Indictment concerning the SBIC fraud

and the misappropriation of $250,000 from Cates.[7]  In addition, the Warrant Affidavit provided

information about another investment made by Cates in or about 1988 in an entity called Rhodes

Capital ("Rhodes"), in return for which she received a stock certificate for two shares signed by

---

[6]       A copy of the Warrant is attached as Exhibit A to the Vilar Brief.  A copy of the
Warrant Affidavit is attached as Exhibit B to the Vilar Brief.  Copies of the criminal complaints filed
against Tanaka ("Tanaka Cplt.") and Vilar ("Vilar Cplt."), which were incorporated by reference
in ¶ 6 of the Warrant Affidavit, are attached to the Vilar Brief as Exhibits C and D, respectively.

[7]       The Vilar criminal complaint did not allege that approximately $2.85 million of
Cates's Amerindo SBIC investment was used to redeem another investor for an investment
unrelated to the SBIC as did the Indictment; rather the criminal complaint reported only that
those funds were wire transferred to an overseas bank account based on written instructions.
(Indictment ¶ 25; Vilar Cplt. ¶ 13(e)).  The Warrant Affidavit, however, did conclude based on
that fact, among others, that there was probable cause to believe that Vilar and Tanaka "have
converted investor funds to their own personal use, and are conducting a Ponzi-type scheme in
which investor funds are not being properly accounted for and segregated."  (Warrant Affidavit ¶
8).

Vilar and Tanaka. (Warrant Affidavit ¶ 6B). Cates's attempts to learn about that million dollar investment were ignored or rejected by Vilar. (*Id*.). When Cates attempted to redeem her entire investment portfolio at Amerindo, including her $1 million investment in Rhodes, and her $5 million investment in the Amerindo SBIC, Amerindo and Vilar refused to move her portfolio to a Bear, Stearns account. (*Id*.). Moreover, Vilar informed Cates for the first time in their nearly twenty-year relationship that she was a client of Amerindo Panama and that any redemption request would have to be submitted to that entity. (*Id*.). Vilar also informed Cates that any redemption would be reduced by unspecified fees and taxes – a significant matter that had never been previously mentioned to Cates. (*Id*.). Finally, in a May 20, 2003 letter to the SEC, in response to a complaint about his handling of the Cates account, Vilar stated that Cates had always been a client of Amerindo Panama, not Amerindo U.S., that Amerindo Panama had been sold in 2001, and that there was currently no overlap between the directors, officers and employees of the two separate entities. (*Id*.). Cates also informed Fraterrigo that she knew of three other Amerindo investors who may have had trouble redeeming all or part of their investments. (Warrant Affidavit ¶ 6E).

The Warrant Affidavit also recounted information provided to Fraterrigo by another victim, Lisa Mayer. Mayer's family had invested approximately $12 million in Guaranteed Fixed Rate Deposit Accounts ("GFRDAs") – accounts which had been described by Vilar, in writing, as being "invested largely in bank certificates of deposit, government securities and other investments 'which are absolutely safe and liquid.'" (Warrant Aff. ¶ 6A). The Warrant Affidavit further reported that the Mayers' efforts to redeem their $12 million investment, beginning in 2003, were rebuffed by Vilar, Tanaka, Tanaka's wife, and Amerindo, and that Vilar

had threatened to create tax problems for the Mayers were they to continue in their efforts to do so.  (*Id*.).

The Warrant Affidavit stated that tens of millions of dollars had been wire transferred from four Amerindo brokerage accounts at Bear Stearns, each of which had been opened by Amerindo, Tanaka and Vilar, on behalf of Panamanian entities (the "Amerindo Brokerage Accounts" which are further defined in the Tanaka Cplt. ¶ 8), to a Bahamian bank account in the name of PTC Management Limited -- the same entity through which Vilar induced the Mayers to manage much of their Amerindo investments.  (Warrant Affidavit ¶¶ 6A, 6C).  The Amerindo Brokerage Accounts were also used to convert approximately $5.25 million of Cates's funds to the defendants' use.  (Vilar Cplt. ¶¶ 13, 14, 22).  Approximately $717,000 of Cates's Amerindo SBIC investment was used by Vilar to make charitable contributions to Washington & Jefferson College, his *alma mater*, and to the American Academy in Berlin.  (Vilar Cplt. ¶¶ 13-14).[8] Furthermore, more than $15 million of wire transfers were made from the Amerindo Brokerage Accounts to the same Amerindo business checking account to which $650,000 of Cates's Amerindo SBIC investment was transferred to pay Amerindo busines expenses including taxes, payroll and rent.  (Vilar Cplt. ¶ 15; Tanaka Cplt. ¶ 13).

Finally, through the incorporation of the Tanaka criminal complaint, the Warrant Affidavit provided information about another scheme by which Tanaka purchased at least five thoroughbred racehorses using approximately $3.4 million of investor money from the Amerindo Brokerage Accounts between on or about June 29, 2001 and April, 13, 2005.  (Tanaka Cplt. ¶¶ 7-15).  Vilar contends that the evidence presented to the Magistrate did not establish probable

---

[8]     Vilar had reportedly made approximately $200 million in charitable donations to various organizations around the world.  (Vilar Cplt. ¶ 7).

cause to believe that Tanaka misappropriated investor funds to purchase his horses, claiming instead that it is "neither surprising nor inherently suspicious" that "a principal of a successful investment advisor firm took large redemptions (meaning, presumably, that he cashed out his investment in certain funds managed by Amerindo)."  (Vilar Br. 17). The inference that Tanaka had used investor funds for those purchases and not his own money, was supported by the following powerful facts set forth in the Warrant Affidavit.

First, on or about February 28, 2003, right in the middle of the period during which he purchased the five horses, Tanaka disclaimed in a letter to the SEC any "direct or indirect record or beneficial interest in any client account managed by Amerindo or any affiliate of Amerindo, other than [his] interest[] in fees payable to Amerindo and of Amerindo and its affiliates." (Tanaka Cplt. ¶ 9).  Second, the AMI Account was a client account seemingly managed by Amerindo or an affiliate of Amerindo.  Cates's $5 million Amerindo SBIC investment was deposited into that account in June 2002 and, according to Vilar, Cates had always been a client of Amerindo Panama.  (Warrant Aff. ¶ 6D).  Third, on May 23, 2005, Tanaka disclaimed any beneficial ownership interest in two of the other Amerindo Brokerage Accounts used to buy horses and stated that the "common beneficial owners [of the accounts] were off-shore Panamanians."  (Tanaka Cplt. ¶ 10).  Fourth, five of the six wire transfer instructions signed by Tanaka in furtherance of his scheme to purchase the horses indicated that the transfers "represented a redemption by the above referenced equity partner," referring to the owner of the account designated to receive the requested transfer (presumably the owners of the horses), not Tanaka, who had signed the letter of authorization.  (Tanaka Cplt. ¶ 15; Vilar Cplt. ¶ 13(d)). Finally, it belies comon sense to believe that an investment adviser would recoup his fees

through the *ad hoc* purchases of thoroughbred racehorses directly from a client account rather than through the more systematic practice of quarterly or annual transfers of such fees to a corporate checking account from which a principal's share could be transferred to that individual's personal bank account for use as that individual saw fit. The Tanaka criminal complaint established probable cause to believe that he had committed three counts of wire fraud, and Magistrate Judge Maas issued a warrant for Tanaka's arrest based on that complaint.[9]

In sum, the Warrant Affidavit provided evidence that:

(1) The founders, owners, directors, principals and operators of the Amerindo investment adviser firms, had converted millions of dollars of investor funds to their own benefit and that of others, and had done so through the use of various Amerindo-affiliated entities, including Amerindo U.S., Amerindo Panama, and Amerindo U.K., at least four Bear, Stearns brokerage accounts established by Vilar and Tanaka on behalf of Panamanian corporations, and overseas and domestic bank accounts;

(2) In the course of the fraud scheme, Cates was subjected to a variety of fraudulent and deceptive practices including Vilar's repeated false representations about the status of the SBIC investment (Vilar Cplt. ¶¶ 20, 21, 22, 21A),[10] Vilar's refusal to respond to Cates's requests for basic information about a $1 million investment that she made in approximately 1988 in Rhodes (Warrant Affidavit ¶ 6B), and the forgery of Cates's signature on

---

[9]    Notably, Tanaka himself, did not challenge the probable cause determination of the Magistrate during the approximately two-month period between his arrest and Indictment.

[10]    Due to misnumbering of paragraphs in the Vilar criminal complaint (two paragraphs numbered "21" and two paragraphs numbered "22"), the second paragraph labeled "21" will be referred to herein as "21A" and the second paragraph labeled "22" will be referred to herein as "22A."

a wire transfer instruction which resulted in $250,000 being transferred without her knowledge or authorization from an account she held at Bear, Stearns, to a personal bank account held by Vilar (Vilar Cplt. ¶¶ 22A-24);

(3)  When investors with investment portfolios with a combined value of no less than $17 million attempted to redeem their investments between approximately 2003 and May, 2005, they were met with responses that further suggested a widespread pattern of fraud and deception involving Vilar, Tanaka, several Amerindo entities, and several Amerindo investment products (Rhodes, GFRDA, Amerindo SBIC).  For example:

(a)  Vilar threatened to create tax problems for the Mayers (whom Vilar had known for approximately 30 years) were they to persist in seeking to redeem approximately $12 million that they had invested in GFRDAs – funds which had purportedly been invested in bank certificates of deposit, government securities and other investments which were "absolutely safe and liquid."  (Warrant Affidavit ¶ 6A).

(b)  When Cates sought to redeem or transfer to another custodian all of her investments with Amerindo, including Rhodes and the Amerindo SBIC, Vilar revealed for the first time in their nearly 20-year relationship that Cates was a client of Amerindo Panama and that requests for redemption must be submitted to that entity.  Vilar also revealed for the first time that any such redemption would be reduced by an unspecified amount of fees and taxes. Finally, not until Vilar wrote a letter to the SEC on May 20, 2005, responding to a complaint about the handling of Cates's Amerindo account, did Vilar disclose the purported fact that Amerindo Panama had been sold in 2001, and that neither he nor Tanaka was a director, officer

14

or employee of Amerindo Panama.[11]  (Warrant Affidavit ¶ 6D).

       (4) At the same time that investors who had invested at least $17 million with Amerindo were unsuccessfully attempting to redeem their investments, including the Mayers' $12 million "absolutely safe and liquid" investment, millions of dollars of investor funds were being used to buy thoroughbred racehorses, tens of millions of dollars were being transferred from the Amerindo Brokerage Accounts to overseas bank accounts, and millions of dollars were being transferred from the Amerindo Brokerage Accounts to fund Amerindo business expenses. ((Warrant Affidavit ¶¶ 6A, 6C; Tanaka Cplt. ¶¶ 13-15).

       (5) Inconsistent disclosures had been made to the SEC concerning the defendants' involvement with, and interest in, Amerindo Panama, and Vilar appeared to be using Amerindo Panama as part of a "shell game" to prevent Cates from redeeming or transferring her investments, thereby calling into question the corporate integrity of the Amerindo affiliates. (Warrant Affidavit ¶ 6D).

Based upon that evidence, the Warrant Affidavit concluded,

Based on the facts set forth above, and my experience and training, it appears that Amerindo and its principals, Vilar and Tanaka, have defrauded investors, have converted investor funds to their own perosonal use, and are conducting a Ponzi-type scheme in which investor funds are not being properly accounted for and segregated.  As a result, there is probable cause to believe that there have been numerous violations of Title 18, United States Code, Sections 1341 (mail fraud),

---

[11]     It is difficult, if not impossible, plausibly to square that representation to the SEC with: (a) Amerindo's September 4, 2002, filing with the SEC in which Vilar and Tanaka were listed as all of the shareholders, directors and officers of Amerindo Panama; (b) Tanaka being described as of May 25, 2005, on Amerindo U.S.'s website as the Founder and Portfolio Manager of Amerindo Panama from 1986 to the present; and (c) Tanaka's continuing control over the AMI Account as demonstrated by his use of approximately $125,000 from the AMI Account to buy a thoroughbred in or about August, 2004, and his use of approximately $750,000 from the AMI Account to purchase another throroughbred racehorse on or about April 13, 2005. (Tanaka Cplt. ¶¶ 3, 4, 10, 15 (d), 15(e); Vilar Cplt. ¶¶ 3, 13(a)).

and 1243 (wire fraud) and Title 15, United States Code, Sections 80b-6 and 80b-17 (invest[ment] adviser fraud).  The use of domestic and overseas financial institutions to convert the investors' money to Vilar's and Tanaka's personal benefit also gives rise to probable cause to believe that there have been violations of anti-money laundering statutes including Title 18, United States Code, Sections 1956 and 1957.  Further, based upon my training and experience, I know that individuals involved in financial fraud schemes like that described above frequently maintain at their places of business for substantial periods of time, records and materials which evidence the operation of such schemes."

(Warrant Affidavit ¶ 8).

In light of this ongoing pattern of fraud and deception involving millions of dollars of funds being misappropriated from investors whom the defendants had known for decades, and the use of tens of millions of dollars of other investor funds to purchase horses and for other purposes, the Government sought and obtained a broad search warrant seeking evidence of the fraud including when the fraud began, who was involved, how the fraud was conducted, and who had been victimized.

The Warrant authorized the executing agents to search for and seize broad categories of documents, commensurate in scope with the broad-ranging scheme described in the Warrant Affidavit.  The Warrant contained eighteen paragraphs which described the categories of documents to be seized.[12]  The Warrant included two specially defined terms, "Amerindo" and "Amerindo Brokerage Accounts," which were employed to limit the scope of the documents to be seized.  The phrase "Amerindo" was defined to include four Amerindo-affiliated companies: Amerindo U.S., Amerindo Panama, Amerindo U.K., and Amerindo Cayman.  The phrase "Amerindo Brokerage Accounts" was given the same definition that was ascribed to it in the Tanaka criminal complaint, namely four brokerage accounts opened at Bear, Stearns by Vilar

---

[12]    There are two paragraphs numbered "16" in the Warrant, the second of which will be referred to herein as "16A."

and Tanaka on behalf of four Panamania coorporations.

Paragraph 1 authorized the seizure of "corporate records" corncerning Amerindo, "including but not limited to records concerning the formation of each of the above-listed Amerindo entities, its shareholders, principals, officers, directors, and employees, changes in ownership, bylaws, resolutions, client lists, client files, investment brochures, marketing materials, investment advisory agreements, copies of correspondence sent to or received from clients, and other documents concerning or reflecting the identities of and communications with clients who have investments managed or advised by Amerindo."

Five of the paragraphs described documents relating to the Amerindo Brokerage Accounts which lay at the center of the fraud – accounts involved in the SBIC fraud, the misappropriation of $250,000 from Cates by means of forging her signature, the purchase of thoroughbred horses, and transfers to a Bahamian bank account and an Amerindo business checking account. (Warrant ¶¶ 2, 4, 11, 13, and 15). Paragraph 2, which defined the term, authorized the seizure of documents concerning the opening of those accounts as well as documents concerning trading activity in the accounts, account statements, and investment performance. Paragraph 4 authorized the seizure of client lists, files, investment brochures, marketing materials, investment advisory agreements, correspondence and other documents reflecting the identities of and communications with clients with investments in those four accounts. Paragraph 11 authorized the seizure of documents reflecting any direct financial or beneficial ownership interest held by Vilar or Tanaka in the four accounts,[13] and paragraph 13 sought records documenting the movements of funds into and out of the four accounts. Finally,

---

[13]     Paragraph 11 also authorized the seizure of documents reflecting any direct financial or beneficial ownership interest held by Vilar or Tanaka in the Amerindo entities.

paragraph 15 sought documents concerning Amerindo employees who dealt with clients with an interest in the four accounts.

Four paragraphs authorized the seizure of documents related to the victims and suspected victims of the fraud schemes, and the specific investments (Rhodes, SBIC, and GFRDA) then believed to be involved in the schemes described in the Warrant Affidavit. (Warrant ¶¶ 3, 6-8). Paragraph 3 authorized the seizure of documents concerning Rhodes Capital – the $1 million investment made by Cates in 1988 about which she could not obtain information from Vilar, and which Amerindo and Vilar refused to transfer to another Bear, Stearns account. Paragraph 6 authorized the seizure of documents reflecting the investments made by the victims and potential victims identified in the Warrant Affidavit. Paragraph 7 authorized the seizure of documents concerning any effort by Amerindo to obtain an SBIC license and documents reflecting funds or commitments raised from investors prior to licensure. Paragraph 8 authorized the seizure of documents concerning GFRDAs including client lists, account statements, and documents reflecting any security purchased by Amerindo in connection with GFRDAs.

Paragraph 5 authorized the seizure of documents concerning clients and investments managed by Amerindo on behalf of clients who receive redemptions through or make investments through overseas bank accounts and trust accounts including the Bahamian account to which tens of millions of dollars had been transferred from the Amerindo Brokerage Accounts.

Paragraph 9 authorized the seizure of documents reflecting any private bank, brokerage or other account with a financial institution held by Amerindo principals including Vilar and Tanaka.

Two paragraphs authorized the seizure of documents related to Amerindo's trading activities, and accounts which may have served as the repository of investor funds. (Warrant ¶¶ 10, 12). Paragraph 10 authorized the seizure of documents reflecting or relating to the cancelation and rebooking of completed trades in accounts managed or controlled by Amerindo or in which Amerindo or its principals have a beneficial ownership interest.[14] Paragraph 12 authorized the seizure of documents reflecting brokerage accounts maintained by Amerindo at any broker-dealer other than Bear, Stearns, including documents reflecting trades done "away" from Bear, Stearns that were subsequently settled at Bear, Stearns.

Paragraph 14 authorized the seizure of records of expenses for Amerindo, incorporation and governance documents, accounting records, and other documents related to the operations of the investment advisory businesses of Amerindo.

Finally three paragraphs authorized the seizure of certain office equipment. (Warrant ¶¶ 16, 16A, 17). Paragraph 16 authorized the seizure of "[p]hotographs, address books, Rolodex indices, diaries, calendars, identification documents, travel documents, and other documents concerning or reflecting information concerning the identities of participants in the fraud schemes." Paragraph 16A authorized the seizure of facsimile machines, and paragraph 17 authorized the seizure of computers and other devices capable of contain data and text that were "used to store information described above, as well as drafts and final versions of documents and correspondence prepared in connection with the running and supervision of the operations of the investment advisory business."

---

[14]    This extremely focused request related to the information provided concerning just such a trade, the proceeds of which were used by Tanaka to purchase a horse. (Tanaka Cplt. ¶ 15(e)).

**B.**    **The Warrant Was Supported By Probable Cause**
**And Was Not An Impermissible General Warrant**

Vilar contends that the Warrant was an unconstitutional "general warrant" the "vast majority" of the provisions of which were unsupported by probable cause. (Vilar Br. 11-14). The Warrant was amply supported by probable cause, and Vilar's assertion that the Warrant authorized "the wholesale seizure of everything in the office, without regard to time frames, investors, investments or individual targets of the investigation" ignores the plain language of the Warrant and the law concerning general warrants.

The legal standard for determining whether a particular warrant application is supported by probable cause is well established. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois* v. *Gates*, 462 U.S. 213, 238 (1983). Such determinations must be approached in a practical way, *id.* at 232, because "probable cause is a flexible, common-sense standard." *Texas* v. *Brown*, 460 U.S. 730, 742 (1983). A warrant issued by a neutral and detached magistrate is "entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant." *United States* v. *Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (quotation omitted); *see*, *e.g.*, *United States* v. *Singh*, 390 F.3d 168, 181 (2d Cir. 2004); *Gates*, 462 U.S. at 236; *United States* v. *Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993); *United States* v. *Jakobetz*, 955 F.2d 786, 803 (2d Cir. 1992). "A reviewing court should not interpret supporting affidavits in 'a hypertechnical, rather than a commonsense manner . . . . [T]he resolution of doubtful cases . . . should be largely determined by the preference to be accorded to warrants.'" *United* States v. *Dinero Express*, 2000 WL 254012, *6 (S.D.N.Y. Mar. 6, 2000) (internal quotations omitted)

20

(quoting *United States* v. *Smith*, 9 F.3d at 1012 (quoting (*United States* v. *Ventresca*, 380 U.S. 102, 109 (1965)).

The particularity requirement of the Fourth Amendment "guards against general searches that leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized." *United States* v. *Riley*, 906 F.2d 841, 844 (2d Cir. 1990); see also *Andresen* v. *Maryland*, 427 U.S. 463, 480 (1976). Thus, although courts have never required precise specification of every item to be seized, *see, e.g.*, *United States* v. *Burke*, 718 F. Supp. 1130, 1143 (S.D.N.Y. 1989) (noting that the Second Circuit has approved of "warrants with quite broad language"); *United States* v. *Scharfman*, 448 F.2d 1352, 1355 (2d Cir. 1971); *United States* v. *Shakur*, 560 F. Supp. 337, 346 (S.D.N.Y. 1983); *United States* v. *Zanche*, 541 F. Supp. 207, 210 (W.D.N.Y. 1982), they require that a warrant reasonably channel the discretion of those charged with executing it. *See, e.g.*, *Riley*, 906 F.2d at 844; *United States* v. *Young*, 745 F.2d 733, 759-760 (2d Cir. 1984). "The warrant must enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *United States* v. *George*, 975 F.2d 72, 75 (2d Cir. 1992). A warrant is not sufficiently particularized if it authorizes "the seizure of 'evidence' without mentioning a particular crime or criminal activity to which the evidence must relate." *Id.* at 77.

However, "the Fourth Amendment does not require that every item or document to be seized be specifically identified within the warrant." *Dinero Express*, 2000 WL 254012 at *8. Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgement as to whether

21

a particular document falls within the described category." *Riley*, 906 F.2d at 844-45.  "Courts

tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best

that could reasonably be expected under the circumstances, have acquired all the descriptive

facts which a reasonable investigation could be expected to uncover, and have insured that all

those facts were included in the warrant." *United States* v. *Buck*, 813 F.2d 588, 590 (2d Cir.

1987).

      The fact that a warrant calls "for seizure of a broad array of items does not, in and of

itself, prove that the warrant fails to meet this requirement of particularity." *United States* v.

*Sugar*, 606 F. Supp. 1134, 1151 (S.D.N.Y. 1985), and "[t]he validity of a warrant is not affected

by the fact that a vast amount of material falls within its scope." *Dinero Express*, 2000 WL

254012, *8.  *See also United States* v. *Heldt*, 668 F.2d 1228, 1254 (D.C. Cir. 1982); *Zanche*, 541

F. Supp. at 210 ("the fact that an exceedingly large number of documents were encompassed by

the list does not invalidate the warrant").  Indeed, the Second Circuit has expressly held that

where "there was probable cause to believe that [a] business was permeated with fraud . . . the

agents could properly seize all of the business records." *National City Trading Corp.* v. *United

States*, 635 F.2d 1020, 1026 (2d Cir. 1980); *accord United States Postal Service* v. *CEC

Services*, 869 F.2d 184, 187 (2d Cir. 1989) ("When the criminal activity pervades that entire

business, seizure of all records of the business is appropriate, and broad language used in

warrants will not offend the particularity requirements").  "In order to fall within the 'all records'

exception, it is not necessary that the affidavit supporting the search warrant set forth specific

factual evidence demonstrating that every part of the enterprise in question is engaged in fraud.

Rather, the affidavit need contain only sufficient factual evidence of fraudulent activity from

which a magistrate could infer that those activities are 'just the tip of the iceberg.'" *Burke*, 718 F.

Supp. at 1139-40 (quoting *United States* v. *Offices Known as 50 State Distributing Co.*, 708 F.2d

1371, 1372-75 (9th Cir. 1983) (quoting *United States* v. *Brien*, 617 F.2d 299, 308 (1st Cir. 1980)).

    The warrant at issue here clearly passes muster under these standards.  The Warrant

described particular categories of documents, primarily records related to: (1) the Amerindo

Brokerage Accounts; (2) the SBIC, GFRDA and Rhodes investments; and (3) the likely victims

(both specifically identified, *e.g.*, Cates, the Mayers, and other suspected victims, and those

categorized by the accounts in which their investments were custodied or the manner in which

their investments were managed, *e.g.*, those who invested in the Amerindo Brokerage Accounts

or had their investment managed through overseas trusts including the overseas trust company

that Vilar had induced the Mayers to invest through and to which tens of millions had been

transferred from the Amerindo Brokerage Accounts).  No greater detail was necessary,

especially in light of the broad nature of the fraudulent scheme under investigation. *See*, *e.g.*,

*United States* v. *Regan*, 706 F. Supp. 1102, 1113 (S.D.N.Y. 1989) ("The degree to which a

warrant must state its terms with particularity varies inversely with the complexity of the

criminal activity investigated").  The descriptions were more than adequate under the

circumstances to enable the seizing agents to identify with reasonable certainty those items that

the magistrate had authorized them to seize.

    Comparing the language of the warrants at issue here to the language found wanting in

the cases cited by Vilar further illustrates that the warrants were sufficiently particularized.  For

example, in *United States* v. *Lafayette*, the First Circuit found to be unconsititutionally overbroad

a warrant that limited the items to be seized solely to those that were "evidence of the laws of the

United States, that is violations of 18 U.S.C. Sections 286, 287, 371, 1001, and 1014." 610 F.2d 1, 3-6 (1st Cir. 1979). In *United States* v. *Klitzman*, 744 F. 2d 955 (3d Cir. 1984), the Third Circuit, in affirming the grant of a preliminary injunction requiring the Government to return evidence seized during the search of a law office, found that the failure to distinguish between the lawyer-target and other lawyers at a firm who had no connection to the alleged criminal activity, and the inclusion of language permitting the agents to seize "any other evidence of a conspiracy to defraud insurance companies" was unconsitutionally overbroad. *Id*. at 956, 960, 962. In *United States* v. *George*, the warrant authorized the agents to seize "any other evidence relating to the commission of a crime." 975 F.2d at 74. Holding that this language, which effectively allowed the agents to seize any evidence of any crime, was overbroad, the Court stated that "[m]ere reference to 'evidence' of a violation of a broad criminal statute or general criminal activity provides no readily ascertainable guidelines for the executing officers as to what items to seize." *Id.* at 76. Similarly, in *United States* v. *Buck*, the Court ruled that a description of "any papers, things or property of any kind relating to previously described crime" of armed bank robbery and murder was too vague because "[t]he warrant only described the crimes – and gave no limitation whatsoever on the kind of evidence sought." 813 F.2d at 590, 592.[15]

The Warrant contained no such broad provision allowing the seizure of "any evidence of a crime" (whether the crime was identified by Code section, as in *Lafayette,* generically, as in *Klitzman*, or not at all, as in *George*). Accordingly, Vilar's claim that the Warrant amounted to an unconstitutional "general" warrant should be rejected.

---

[15]     The *Buck* Court nonetheless held the evidence admissible under the *Leon* good faith exception. 813 F.2d at 592-93.

**C.**     **The Warrant Was Not Overbroad**

Given the holding in *National City Trading Corp*. that where a business is shown to be permeated by fraud all its business records can be seized, the Warrant was clearly not overbroad.

The Warrant Affidavit set forth sufficient facts to allow the Magistrate to conclude that the fraud uncovered to date was "just the tip of the iceberg." *Burke*, 718 F. Supp. at 1140. Long-standing investors were being prevented from obtaining basic information about their investments with Amerindo and/or were being prevented from redeeming or transferring at least $17 million in investments, including $12 million invested in "absolutely safe and liquid" securities. To further frustrate efforts to redeem investments, Vilar for the first time disclosed to Cates that she was a client of a different company (Amerindo Panama) than she thought she was, that there would be an unspecified amount of fees and taxes taken out of any redemption of her investment. Ultimately, he informed her, through a letter to the SEC, that Amerindo Panama had been sold four years earlier – a representation at odds with representations made to an official U.S. Government agency, and an explanation curiously omitted from previous explanations to Cates about the status of her investments. In short, Vilar attempted to distance himself from investments he had solicited from Cates, including the Amerindo SBIC investment that he had solicited from her in June 2002 (after the alleged sale of Amerindo Panama), and was engaging in a "shell game" to prevent Cates from obtaining her money from Amerindo.

The evidence concerning how Cates's $5 million Amerindo SBIC investment was used for Vilar's personal expenses, Amerindo business expenses, and for a transfer to an overseas bank account – especially when viewed in light of Vilar's efforts to distance himself from

responsibility for Cates's investments when she sought to redeem them – all gave rise to the reasonable inference that Vilar, Tanaka, and Amerindo did not have the money to repay Cates, and that they had for some time been operating a Ponzi-type scheme.  That inference was further buttressed by the fact that the Mayers' investment was, according to Vilar, "absolutely safe and liquid" investment, and was also supported by the stonewalling and threats the Mayers received in response to their efforts to redeem their investment.  Finally, the facts that the other Amerindo principal, Tanaka, was buying millions of dollars worth of horses with investor funds, that the Amerindo business checking account had received approximately $15 million from the Amerindo Brokerage Accounts, and that tens of millions of dollars had been transferred to the Bahamian bank account of the very same private trust company through which the Mayers' investment was managed at the urging of Vilar, further supported the inference that a much larger ongoing fraud involving additional investors was being perpetrated through Amerindo's investment advisory businesses.

In these circumstances, a broad search warrant, like that authorized by the Magistrate, was appropriate.  *See United States* v. *Johnson*, 886 F. Supp. 1057, 1072-73 (W.D.N.Y. 1995) (holding that where "the businesses were the vehicle by which the Defendants are alleged to have perpetrated the fraud . . . [and] [i]t appears that the sole business of these related companies was waste transport, storage and disposal, . . . the allegations of illegal conduct permeate all aspects of the Defendants' businesses.  As such, the warrant authorizing a seizure of all business records and documents relating to their business operations, was not unconstitutionally overbroad.").  *Burke*, which is cited by Vilar to support his contention that the "all records exception" to the Fourth Amendment does not here apply, is readily distinguishable.  In *Burke*,

the warrant affidavit concluded that, "Based on the information set forth below, there is probable cause to believe that mail fraud . . . and wire fraud . . ., involving the sale of purported fine art prints by Salvador Dali, has been committed by The Barclay Gallery Ltd." *Burke*, 718 F. Supp. at 1141. The Court held that, because the Government failed to show that "the sale of Dali prints was inseparable from the sale of prints by other painters," or that Barclay's sale of non-Dali artwork was also fraudulent, the warrant was overbroad in that it authorized the seizure of documents unrelated to the alleged fraudulent sales of Dali artwork. Here, by contrast, the Warrant Affidavit recited facts supporting probable cause to believe that a broad-ranging, ongoing, scheme involving multiple investors, multiple types of investments, multiple accounts, and multiple Amerindo entities – all of which were owned and operated by their two principals, the defendants – had resulted in numerous violations of anti-fraud and anti-money laundering statutes. Understandably, the Government had not narrowed the focus of its investigation as it had in *Burke*, and the breadth of the Warrant approved by the Magistrate appropriately reflected the scope of the suspected fraud.

Vilar also complains that the Warrant was overbroad because there was no time limitation on the documents described. This argument also fails:

> It must be observed that courts in this circuit have approved warrants for business records unrestricted by time limitations. *See National City Trading Corp.* v. *United States*, supra at 1021; *Matter of Designer Sportswear, Inc.*, [521 F. Supp. 434, 436-37 (S.D.N.Y. 1981)]; *United States* v. *Auterbridge*, 375 F. Supp. 418 (S.D.N.Y. 1974). More importantly, . . . if the fraud operation under investigation was ongoing, evidence of illegal activity in the past would be relevant to the conspiracy, while records of legitimate transactions prior to the conspiracy will help determine how and when the fraud scheme began.

*United States* v. *Zanche*, 541 F. Supp. at 210. Here, the limitation imposed was not the time frame of the records called for, but rather the entities, accounts, investments, and victims

involved in the fraud.  A limiting time frame, moreover, would not have been especially useful.
Amerindo U.S. was incorporated in 1985.  The two investors who had been defrauded first
invested with Amerindo in or about 1987 and 1988, and the fraud was ongoing.  (Warrant Aff. ¶¶
6A, 6B).  Accordingly, any such time limitation would have extended back nearly twenty years,
to the beginning of the victims' relationship with Amerindo in order to determine when the fraud
began.  The non-temporal  limitations here employed were sufficient and appropriate in relation
to the scheme described in the Warrant, and the fruits of the search should not be suppressed.

Finally, even were the Court to determine that a part or parts of the Warrant were
overbroad or insufficiently supported by probable cause, the appropriate remedy would not be
the  suppression of everything seized pursuant to the Warrant, but rather to suppress only those
items seized beyond the appropriate scope of the Warrant.  As the Second Circuit stated in
*United States* v. *George*:  "When a warrant is severed (or redacted) the constitutionally infirm
portion – usually for lack of particularity or probable cause – is separated from the remainder
and evidence seized pursuant to that portion is suppressed; evidence seized under the valid
portion may be admitted . . . only those items seized beyond the warrant's scope must be
suppressed."  *George*, 975 F.2d at 79.  The Court further explained that severance is appropriate
except in cases where "*no* part of the warrant is sufficiently particularized, where *no* portion of
the warrant may be meaningfully severed, or where the sufficiently particularized portions make
up only an insignificant or tangential part of the warrant."  *Id.* at 79-80 (internal citations
omitted) (emphasis supplied).  Here, there are numerous parts of the Warrant about the propriety
of which there can be no serious dispute, and a meaningful severance of any impermissibly
broad provision could be undertaken if necessary.  Thus, even if some portion of the Warrant

was overbroad, any such overbroad provision should be severed and the remainder of the

Warrant upheld.

**D.    <u>The Good Faith Exception Applies</u>**

Even if some portion of the Warrant is found to have been overbroad, the fruits of the

search should not be suppressed because the agents acted in objective, good faith reliance upon

the Warrant.  The Exclusionary Rule does not apply where evidence is "obtained in objectively

reasonable reliance on a subsequently invalidated Warrant." *United States* v. *Leon*, 468 U.S. 897,

922 (1984); *see*, *e.g.*, *Singh*, 390 F.3d at 181, 183; *United States* v. *Jasorka*, 153 F.3d 58 (2d Cir.

1998) (holding in a child pornography case that, even if the Warrant were invalid, the

Government could introduce evidence seized pursuant to that warrant because law enforcement

officers obtained the evidence in objective, good faith reliance upon the facially valid warrant).

The critical question in determining whether to suppress evidence obtained as a result of

executing a Warrant is, therefore, "whether a reasonably well trained officer would have known

that the search was illegal despite the [judicial officer's] authorization." *Leon*, 468 U.S. at 922 n.

23.

Relying principally on *United States* v. *George*, *supra*, and *United States* v. *Burke*, *supra*,

Vilar argues that the executing agents could not have reasonably relied on the validity of the

Warrant, and that the good faith exception to the Exclusionary Rule established in *Leon* can not

here be applied.  The circumstances of this case are, however, readily distinguishable from those

presented in *George* and *Burke,* and Vilar's motion should be denied.

In *George*, the Second Circuit held that the good faith exception would not permit

admission in evidence of a shotgun seized pursuant to an overbroad "catch-all" provision that

29

authorized seizure of "any other evidence relating to the commission of a crime."  In so holding, the Court stated that it had previously condemned a nearly identical "catch-all" provision in *United States* v. *Buck*, *supra*, and had already "cautioned that 'with respect to searches conducted hereafter, police officers may no longer invoke the reasonable-reliance exception to the exclusionary rule when they attempt to introduce as evidence the fruits of a search undertaken on the basis of warrants containing only a catch-all description of the property to be seized.'" *George*, 975 F.2d at 77 (quoting *Buck*, 813 F.2d at 593 n.2).  Noting that the language at issue in *George* was even broader than the language at issue in *Buck*, the Court held that "it is the type of facially invalid warrant that could not have been relied upon in good faith."  *George*, 972 F. at 78.[16]  *George* only held that the good faith exception did not apply to catch-all provisions which authorized the seizure of "any evidence of a crime."  Several subsequent District Court decisions have read the holding in *George* precisely this way and have applied the good faith exception where a warrant's language was overbroad, but not as egregiously so as the language in *George*.  *See, e.g., United States* v. *Gotti*, 42 F. Supp.2d 252, 276-77 (S.D.N.Y. 1999); *United States* v. *Hunter*, 13 F. Supp.2d 574, 584-85 (D.Vt. 1998); *United States* v. *Kouzmine*, 921 F. Supp. 1131, 1134-35 (S.D.N.Y. 1996).

> *Burke* is distinguishable for the reasons discussed, *supra* at 26-27.  Were the Court to find, however, that it is necessary to have a hearing to determine whether the Warrant, as executed, operated as such a "general" or "overbroad" warrant that no reasonable agent could have relied on it, the Government would be prepared to offer relevant evidence about how the

---

[16]    The *Buck* court had ruled that the good faith exception *did apply* to the somewhat narrower, but still overbroad, language used in the warrant in that case.  *See Buck*, 813 F.2d at 592-93.

search team was prepared for, and conducted the search. Moreover, the Government would be prepared to prove that the agents did not "cart off virtually every document and piece of computer equipment" in the Amerindo U.S. Office, but rather left behind approximately one-half of the documents found there.

No patently overbroad or "catch-all" provisions were included in the Warrant. Indeed, only three of the Warrant's eighteen paragraphs present even arguable questions concerning their breadth. The Government contends, however, that none of those paragraphs, either individually or collectively, rendered the Warrant fatally overbroad or so facially deficient that a reasonable officer could not have relied upon the Warrant in good faith.

Paragraph 1 authorized the seizure of "corporate records," and provided an illustrative list to guide those executing the Warrant. The illustrations, by and large, consisted of basic official corporate documents such as documents reflecting their formation, shareholders, bylaws, ownership changes, marketing materials, and documents reflecting the identities of clients. Read in context of the Warrant, and the Warrant Affidavit, it is clear that this provision sought to authorize the seizure of a limited category of documents concerning who controlled the Amerindo entities, the structure and ownership of the companies, and the promises made to clients through marketing materials, investment adviser agreements and correspondence.

Paragraph 16 authorized the seizure of "Photographs, address books, Rolodex indices, diaries, calendars, identification documents, and other documents concerning or reflecting information concerning the identities of participants in the fraud schemes." Vilar argues that the failure to identify the "participants in the fraud schemes" gave the searching agents too much discretion, and was therefore overbroad. (Vilar Br. 10, 19). In context, however, the agents

31

were authorized to seize the listed items belonging to, or reflecting the activities of, Vilar and

Tanaka, who were clearly identified in the Warrant Affidavit as the key participants in the fraud

schemes.   To the extent that the Government seized documents on the basis of this paragraph

alone that neither belonged to, nor reflected the activities of, Vilar or Tanaka, the Government is

prepared to return those documents to Amerindo.

Finally, Vilar misinterprets the language in paragraph 17 in support of his overbreadth

argument.  Vilar contends that the final phrase of that paragraph, "as well as drafts and final

versions of documents and correspondence prepared in connection with the running and

supervision of the operations of the investment advisory business," impermissibly broadened the

Warrant to include every document in the premises and that, therefore, any reasonable officer

should have known that the Warrant was overbroad and could not be relied upon.  (Vilar Br. 11,

18, 19).  That phrase, however, was clearly meant to describe the computers that could be

searched and seized, not the documents that could be searched and seized.  That is, the phrase

made clear that the computers and electronic storage equipment that could be searched included

not only those that were used to store the information described by the rest of the Warrant, but

also those that were used to store drafts and final versions of business correspondence.  Thus,

paragraph 17 authorized the seizing agents to uncover and seize electronically stored drafts of

the documents found in the files, not just whatever final version or versions were reduced to

paper and stored in physical files.  In the context of the entire Warrant, it simply is not

reasonable to interpret that final clause as expanding every preceding specification, and it did not

do so.

Thus, to the extent that the Warrant suffered from overbreadth, the Warrant was not so

facially deficient that the executing agents could not reasonably presume it to have been valid.

Accordingly, the *Leon* good faith exception to the Exclusionary Rule permits the introduction of

the seized materials in evidence, and Vilar's motion to suppress should be denied.

### E.    Vilar's Request For a *Franks* Hearing Should Be Denied

In *Franks* v. *Delaware*, 438 U.S. 154 (1978), the Supreme Court held that "where the

defendant makes a substantial preliminary showing that a false statement knowingly and

intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant

affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the

Fourth Amendment requires that a hearing be held." 438 U.S. at 155-56. The Court continued:

> To mandate an evidentiary hearing, the challenger's attack must be more than
> conclusory and must be supported by more than a mere desire to cross-examine.
> There must be allegations of deliberate falsehood or of reckless disregard for the
> truth, and those allegations must be accompanied by an offer of proof. They
> should point out specifically the portion of the warrant affidavit that is claimed to
> be false; and they should be accompanied by a statement of supporting reasons.
> Affidavits or sworn or otherwise reliable statements of witnesses should be
> furnished, or their absence satisfactorily explained. Allegations of negligence or
> innocent mistake are insufficient.

*Franks*, 438 U.S. at 171; *see also Singh*, 390 F.3d at 183 ("conjecture" concerning intentional or

reckless omission of information from affidavit not sufficient to warrant a hearing); *Rivera* v.

*United States*, 928 F.2d 592, 604 (2d Cir. 1991) (noting that "[t]he *Franks* standard is a high

one"); *United States* v. *Campino*, 890 F.2d 588, 591-92 (2d Cir. 1989)) (affirming trial court's

denial of *Franks* hearing "because appellants failed to produce evidence of deliberate falsehood

or recklessness in the affidavit.").

The Court should reject Vilar's request for a *Franks* hearing "to determine whether the

Magistrate was misled regarding the Mayer investment."  Vilar Br. at 19.  Vilar has failed to

make any showing whatsoever that the Warrant affidavit contained any false statement, let alone that a false statement was made knowingly and intentionally, or with reckless disregard for the truth. Vilar makes no offer of proof concerning this most serious allegation; but rather offers the mere conjecture that the fact that Vilar has not yet been charged with a criminal offense related to the Mayers' investments "suggests that there is some information in the government's possession that contradicts the allegation of criminality in connection with the Mayer[s'] investments." *Id.* Vilar goes on to argue that, "*If* such exculpatory evidence was in the government's possession at the time of the Warrant affidavit, it would have been misleading to withhold that information from the Magistrate." *Id.* (emphasis supplied).[17]

As the Court well knows, there are numerous reasons why the Government may decide not to include certain allegations concerning criminal conduct in a criminal complaint or in an indictment, none of which have anything to do with the Government's possession of exculpatory or contradictory information. For example, the Government may have reasons to keep parts of an investigation covert for the moment, or the Government may believe that the evidence, while compelling, does not yet rise to the level of proof beyond a reasonable doubt. In any event, Vilar has not come close to meeting his burden as defined in *Franks* and its progeny. Vilar has failed to: (1) identify with specificity any allegedly false or misleading statement contained in the Warrant Affidavit; (2) provide an affidavit or other reliable evidence of the hypothesized deliberate or reckless falsehood; and (3) show that the allegedly false statement was necessary to the finding of probable cause. Courts routinely reject such unfounded requests for *Franks* hearings. *See*, *e.g.*, *Singh*, 390 F.3d at 183-84; *Campino*, 890 F.2d at 592. Vilar's unsupported

---

[17]    Notably, Vilar does not dispute any of the information contained in the Warrant Affidavit concerning the Mayers' investment in Amerindo GFRDAs.

motion, based solely on conclusory allegations and supposition, likewise should be denied.

## POINT II

### A Hearing Is Warranted On The Issue Of Whether Statements Made By The Defendants At The Time Of Their Arrests Should Be Suppressed

Vilar seeks to suppress all statements that he made following his arrest at Newark Airport on May 26, 2005.[18]  (Vilar Br. 1, 20).  In support of that motion, Vilar submitted a sworn declaration in which he stated that, "[t]o the best of my recollection, and I believe my recollection is accurate, at no time before my arrest or while I was being transported for processing or thereafter was I ever told or read a list of rights."  (Vilar Decl. ¶ 4).  Tanaka also seeks to suppress statements made at the time of his arrest.  (Tanaka Br. 1).  Tanaka submitted a sworn declaration in connection with that motion in which he stated, in pertinent part, that the Postal Inspectors who arrested him: (a) entered his hotel room without his permission; (b) made him feel that he was not free to leave; (c) asked him if he knew why they were there before advising him of his *Miranda* rights; (d) identified themselves after five to ten minutes of conversation; (e) presented him with a warrant about ten minutes into their conversation; (f) advised him of his *Miranda* rights approximately 15 minutes after entering his room; (g) continued to ask him questions for about five to ten minutes; and (h) stopped when he indicated that he did not want to speak further without consulting an attorney.  (Tanaka Decl. ¶¶ 4-10).

---

[18]    In his sworn declaration, Vilar contends that he was arrested on May 25, 2005; however, there is no evidence to support that contention, and the Government construes his declaration as applying to his arrest at Newark Airport on May 26, 2005.  (Vilar Decl. ¶ 4).

Notwithstanding the lack of specificity in Vilar's declaration,[19] the Government concedes that the declarations raise factual issues that require a hearing to be resolved. The Government respectfully reserves the right to brief the arguments raised by Vilar and Tanaka in connection with their motions to suppress statements once the factual record has been developed at the hearing on the motions.

## **CONCLUSION**

For the foregoing reasons, Vilar's motion to suppress evidence gathered as a result of the search conducted at Amerindo U.S. Office should be denied, and a hearing should be held on Vilar and Tanaka's motions to suppress statements that they made at the time of their arrests.

Dated: September 26, 2005
     New York, New York

Respectfully submitted,

MICHAEL J. GARCIA,
United States Attorney for the
Southern District of New York,
*Attorney for the United States of America*

By: _____
    MARC LITT
    Assistant United States Attorney
    (212) 637-2295

---

[19]    For example, Vilar refers only to a failure to be informed of "a list of rights." It is unclear to what "list" he is referring. He does not specifically mention the *Miranda* rights or warnings, nor does he describe, in substance, the rights about which the arresting Inspectors allegedly failed to inform him.

## CERTIFICATE OF SERVICE

MARC LITT deposes and says that he is employed in the Office of the United

States Attorney for the Southern District of New York.

That on May 25, 2004, he caused a copy of the attached Government's Proposed

Examination of Prospective Jurors to be filed electronically with the Clerk's Office of the U.S.

District Court for the Southern District of New York, and to be sent by Federal Express to:

> Susan C. Wolfe, Esq.
> Hoffman & Pollok, LLP
> 260 Madison Avenue
> New York, New York 10016
>
> Attorney for Alberto William Vilar
>
> Steven G. Kobre, Esq.
> Kobre & Kim, LLP
> 800 Third Avenue
> New York, New York 10022
>
> Glenn C. Colton, Esq.
> Wilson Sonsini Goodrich & Rosati
> 12 E. 49th Street, 30th Floor
> New York, New York 10017
>
> Attorneys for Gary Alan Tanaka

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C.

Section 1746.

Dated: New York, New York
       September 26, 2005

_____
                        Marc Litt