**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

**UNITED STATES OF AMERICA,**

     -against-

                                   **05 Cr. 621 (KMK)**

**ALBERTO WILLIAM VILAR and**
**GARY ALAN TANAKA,**

                **Defendants.**
-------------------------------------------------------------x


**DEFENDANT ALBERTO VILAR'S MEMORANDUM**
**OF LAW IN SUPPORT OF HIS MOTION TO QUASH GRAND JURY**
**SUBPOENA TO AMERINDO INVESTMENT ADVISORS, INC.**



                                       **HOFFMAN & POLLOK, LLP**

                                       *Attorneys for Defendant Alberto Vilar*
                                       **260 Madison Avenue**
                                       **New York, NY 10016**
                                       **(212) 679-2900**
                                       **(212) 679-1844 (fax)**

*Of Counsel*:


     **Susan C. Wolfe**
     **Lisa Rosenthal**

# TABLE OF CONTENTS

Page

Preliminary Statement ……………………………………………….    1

Statement of Facts……………………………………………………    1

      A.      Indictment…………………………………………….    1

      B.      Search Warrant………………………………………..    4

      C.      The Grand Jury Subpoena…………………………………    6

*Argument:*

Point I -- The Subpoena Must Be Quashed Because
      It Was Issued For Improper Purposes…………………………………    8

Point II – The Subpoena Is Overbroad and Oppressive………………………    9

    A.  The Subpoena Seeks Documents That Are
      Not Relevant ……………………………………………………    10

    B.  The Subpoena Fails to State With
      Particularity the Documents to Be Produced………………………    13

    C.  The Subpoena Does Not Specify a Time Period…………………..    14

Point II – The Subpoena Must Be Quashed Because It Is
      Unreasonable Under the Fourth Amendment………………………    15

Conclusion…………………………………………………………………    17

# TABLE OF AUTHORITIES

Page

*CASES:*

*Federal Trade Comm. v. Am. Tobacco Co.*, 264 U.S. 298,
     44 S. Ct. 336, 68 L. Ed. 696 (1924)…………………………………… 12

*Hale v. Henkel,* 201 U.S. 43, 76, 26, S.Ct. 370, 50 L.Ed. 652     15

*In re Certain Chinese Family Benevolent and Dist. Assocs.*,
     19 F.R.D. 97 (N.D. Cal. 1956)………………………………….. 11, 12

*In re 1979 Grand Jury Subpoena*, 478 F. Supp. 59 (M.D. La. 1979)…………. 14

*In re Grand Jury Subpoena Duces Tecum*, 342 F. Supp. 709
     (D. Md. 1972)……………………………………………………… 14

*In re Grand Jury Subpoena Duces Tecum Addressed to Corrado Bros., Inc.*,
     367 F. Supp. 1126 (D. Del. 1973)…………………………………… 11, 15

*In re Grand Jury Subpoena Duces Tecum Dated January 12, 1985 (Simels)*,
     767 F.2d 26 (2d Cir. 1985)…………………………………………… 9

*In re Grand Jury Subpoena Duces Tecum Dated November 15, 1993*,
     846 F. Supp. 11 (S.D.N.Y. 1994)…………………………………… 11

*In re Grand Jury Subpoena Duces Tecum Served Upon Rabbinical
     Seminary Netzach Israel Ramailis*, 450 F. Supp. 1078
     (E.D.N.Y. 1978)…………………………………………………… 10

*In re United Last Co.*, 7 F.R.D. 759 (D. Mass. 1947)………………………… 14

*Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 66 S. Ct. 494,
     90 L.Ed. 614, 166 A.L.R. 531     15

*United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561     16

*United States v. Debbi,* 258 F.Supp. 2d 313, 314 (S.D.N.Y. 2003)…………... 8

*United States v. Dardi*, 330 F.2d 316 (2d Cir.), *cert. denied*,
     379 U.S. 45, 85 S. Ct. 50, 13 L. Ed.2d 50 (1964)…………………….. 9

*United States v. Eng,* 971 F.2d 854,861 (2d Cir. 1992)……………………….. 8

*United States v. Gurule*, 437 F.2d 239 (10th Cir. 1970)…………………………    10

*United States v. Leung*, 40 F.3d 577 (2d Cir. 1994)…………………………...    9

*United States v. Morton Salt,* 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401    15

*United States v. R. Enters., Inc.*, 498 U.S. 292,
111 S. Ct. 722, 112 L. Ed.2d 795 (1991) …………………………...    10, 13, 14

*OTHER AUTHORITIES:*

Federal Rules of Criminal Procedure
Rule 17(c)(2)……………………………………………………...    1, 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA,

      -against-

                                    05 Cr. 621 (KMK)

ALBERTO WILLIAM VILAR and
GARY ALAN TANAKA,

             Defendants.

------------------------------------------------------------x

## DEFENDANT ALBERTO VILAR'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO QUASH GRAND JURY <u>SUBPOENA TO AMERINDO INVESTMENT ADVISORS, INC.</u>

### <u>Preliminary Statement</u>

Defendant Alberto Vilar submits this memorandum of law in support of his motion, pursuant to Fed. R. Cr. P. 17(c)(2), for an order quashing the grand jury subpoena dated May 26, 2005 (the "Subpoena") addressed to the Custodian of Records of Amerindo Investment Advisors, Inc. ("Amerindo"). As is discussed below, the Subpoena (1) was issued for improper purposes, *i.e.*, to substitute for a potentially invalid search warrant, and its purpose now, post-indictment, can only be to obtain discovery of evidence for trial under a pending indictment; (2) is overbroad and oppressive; and (3) violates the Fourth Amendment   For all these reasons, the subpoena should be quashed as discussed below.

### <u>STATEMENT OF FACTS</u>

**A.**    <u>The Indictment</u>

The indictment charges Defendant -- along with Co-Defendant Gary Tanaka -- with conspiracy to commit securities, mail, wire and investment advisor fraud and money

laundering.  The Defendants are charged in separate substantive counts with securities fraud, investment advisor fraud, mail fraud, two counts of wire fraud, and four counts of money laundering.  The indictment also includes forfeiture allegations.  The crux of the indictment is an alleged fraud scheme involving a single investor's funds in the amount of approximately $5 million.

According to the conspiracy count, Defendants were the original founders, as well as shareholders, officers and directors, of a registered investment advisor, Amerindo, that managed assets of institutional clients.  Defendants were also the founders, as well as sole shareholders, directors and officers, of Amerindo Panama, that managed an off-shore investment fund, and Amerindo U.K., that managed U.S. stock portfolios for U.K. based clients.  The investment activities of Amerindo Panama and Amerindo U.K. were handled out of the London office of Amerindo U.K.  Defendant Tanaka directed the traders and was responsible for allocating securities among Amerindo's clients and the funds managed by the three Amerindo entities. (Indictment, ¶1-5).

From 2002 through May, 2005, Defendants allegedly perpetrated a fraud scheme against "the Victim" by soliciting her funds under false pretenses, failing to invest her funds as promised and converting her funds to their own benefit.  The Victim, Lilly Cates, who is not identified by name in the indictment, started entrusting funds to Amerindo for investment in 1987.  Until 1995, she allegedly received statements from Amerindo, and thereafter she allegedly received statements from Amerindo Panama.  The stated value of her investments rose to approximately $18 million in September 2000 and then dropped sharply over the following two years. (Indictment ¶6-8)

In June, 2002, allegedly upon the advice of Defendant Vilar, Cates made a $5 million investment in "Amerindo SBIC Venture Fund LP," a fund "designed to promote venture capital investment in small businesses." *Id.* at ¶9. From 2000 through September, 2004, the United States Small Business Administration ("SBA") conducted a program (the "SBIC program") whereby it granted licenses to qualified private venture capital firms which were eligible to receive matching funds through SBA guarantees. There were various phases of the licensing application process and, beginning in 2000, Amerindo made four unsuccessful attempts to obtain an SBIC license. Its fourth and final application was filed in January, 2004 and abandoned on May 28, 2004. *Id.* at ¶¶9-16.

In June, 2002, Vilar allegedly told Cates that he and Tanaka were personally investing in the SBIC Venture Fund, that the venture had been approved by the government, and he invited Cates to join as the only outside partner with an investment of $5 million. He allegedly promised Cates that she would earn about $250,000 in interest per quarter. Cates' investment was deposited into the account of a Panamanian corporation called Amerindo Management Inc. In June, 2002, prior to the deposit, the account allegedly had a negative balance of $428,122. The same week of the deposit, $1 million was transferred to Vilar's personal account and was allegedly spent on charitable contributions and personal expenses; $650,000 was transferred to another Amerindo account and allegedly spent on Amerindo expenses, and; $500,000 was transferred to a trust account, $400,000 of which was invested on behalf of Cates, but not in the SBIC fund. A few weeks later, the remaining $2.85 that was transferred to an overseas account in Luxembourg and allegedly used to pay out another investor. *Id.* at ¶¶17-25.

The conspiracy count further alleges that Defendant Vilar made false and misleading statements to Cates regarding her investment, including, *inter alia*, that Cates' money was put in escrow for the new SBIC fund and remained at full value; that Cates' money had not been used during a period of declining stock prices; that the SBIC fund had been approved but the "leverage-supplement" was delayed due to government budgetary problems. In November, 2004, Cates received a statement from the London office describing her investment as "funds on deposit with SBIC" and reflecting interest on deposit of $225,000. *Id.* at §26(a)-(c).

The conspiracy count also alleges that the defendants converted other funds of Cates, who had invested a total of about $11 million with Amerindo by June, 2003, including $250,000 transferred to an account held by Vilar and allegedly spent on personal expenses. *Id. at ¶¶27-30.*

Each of the substantive counts alleges some aspect of the conspiracy count. The money laundering counts (Counts 7 through 10) allege that the defendants engaged in monetary transactions (wire transfers) in property criminally derived from securities fraud. Finally, the government seeks forfeiture in the amount of $5 million.

**B.     The Search Warrant**

On May 25, 2005, the government applied for a warrant to search the New York Offices of Amerindo at 399 Park Avenue, 22nd floor. A search pursuant to the warrant was conducted on May 26, 2005 and a massive number of documents were seized by the government. Subsequent to his indictment, Vilar moved to suppress the search warrant as overbroad, among other grounds. A copy of the search warrant is attached to the accompanying Affirmation of Susan C. Wolfe executed on December 13, 2005 as Exhibit

A.  As argued in Defendant's suppression motion, the warrant describes every manner of document and business equipment that would be maintained in a financial services office. In particular, the following paragraphs of the warrant are fatally overbroad:

- Paragraph 1, which authorized the seizure of "Corporate Records concerning [each of the Amerindo entities] including but not limited to records concerning the formation of each of the above-listed Amerindo entities, its shareholders, principals, officers, directors, and employees, changes in ownership, bylaws, resolutions, client lists, client files, investment brochures, marketing materials, investment advisory agreements, copies of correspondence sent to or received from clients, and other documents concerning or reflecting the identities of and communications with clients who have investments managed or advised by Amerindo."  This paragraph alone, putting aside the seventeen others, authorizes the seizure of practically every piece of paper and computer file in any financial services office, especially because the list of corporate records "includes but is not limited" to those specified.

- Paragraphs 2, 4 and 12, which authorized the seizure of all Amerindo's brokerage account records at Bear Stearns or any other broker-dealer, as well as all records in any way pertaining to client investments.  Although each paragraph appears to delineate specific types of documents, the net effect is an authorization to seize virtually all documents.

- Paragraph 13, which authorized the seizure of "Bank account statements, brokerage account statements, transaction records, wire transfer instructions and records, copies of checks sent to or received from clients, notes, ledgers, cash receipt journals, deposit tickets and records, and other documents reflecting or relating to movements of funds into or out of the Amerindo Brokerage Accounts."  Because Amerindo provides financial services whose business requires it to transfer moneys into and out of bank and brokerage accounts for the benefit of its clients and maintain records of such transactions, this paragraph in essence requires the production of virtually every document at Amerindo.

- Paragraph 14, which authorized seizure of "Records of expenses such as copies of checks and/or wires sent to landlords, employees, counsel, accountants, brokers, utility companies, and other organizations and individuals who provide goods and services to Amerindo, incorporation and governance documents relating to the various entities through which Amerindo, Alberto William Vilar and Gary Alan Tanaka conduct business, documents representing or reflecting communications with accountants, accounting records, documents reflecting communications with boards of directors, and other documents relating to the running and supervision of the operations of the investment advisory business(es) of Amerindo."  This paragraph sweeps up all documents not specifically relating to Amerindo's customers.

- Paragraph 15, which authorized seizure of "Documents reflecting information about any current or former Amerindo employee" who had any contact with any Amerindo client or was involved in the management of any account or preparation of account statements. This provision, too, sweeps up virtually all documents at Amerindo.

- Paragraph 9, which authorized seizure of the personal financial records of the defendants, *i.e.*, documents regarding accounts held by Vilar and Tanaka at "any financial institution."

- Paragraphs 17 and 18, which authorized seizure of all of Amerindo's fax machines, computers, hard drives, cell phones, PDAs and "any other storage media capable of containing data or text in magnetic, electronic, optical, digital, analog, or any other format, used to store information described above," as well as "drafts and final versions of documents and correspondence prepared in connection with the running and supervision of the operations of the investment advisory business." In other words, every document ever created by any person at Amerindo.

## C.    The Grand Jury Subpoena

Perhaps perceiving that the fruits of the search might be subject to suppression because of defects in the search warrant, the government served the Subpoena on Amerindo's counsel either, upon information and belief, the day of the search or the day after. Upon information and belief, based upon conversations with Eugene Licker, counsel for Amerindo, at the time of the search the government agents left certain materials behind and agreed not to continue the search and seizure upon the assurance of counsel for Amerindo that the materials in the offices would be preserved and counsel would accept service of a subpoena.

The Subpoena is striking in its similarity to the search warrant. In fact, the documents requested are identical, and are requested in identical language. A copy of the Subpoena is attached to the Wolfe Affirmation as Exhibit B. Thus, the following paragraphs of the search warrant -- which are defective as overbroad -- correspond to the identical paragraphs in the Subpoena:

| **Search Warrant** | **Subpoena** |
|:---:|:---:|
| 1 | A |
| 2 | B |
| 4 | D |
| 9 | I |
| 12 | L |
| 13 | M |
| 14 | N |
| 15 | O |
| 17 | Q |
| 18 | R |

In addition to the above paragraphs, the Subpoena adds five paragraphs not present in the search warrant, which sweep so broadly as to call, in effect, for the production of all the documents authorized to be seized by the search warrant and more:

- Paragraph U calls for production of "Documents related to current and former Amerindo clients, other than those records that pertain solely to any publicly traded Amerindo mutual fund."

- Paragraph V calls for production of "Investment documents and records related to current and former Amerindo clients other than those records that pertain solely to any publicly traded Amerindo mutual fund."

- Paragraph W calls for production of "Tax documents and records, other than those documents and records that pertain solely to any publicly traded Amerindo mutual fund."

- Paragraph X calls for production of "Documents related to any financial activity of Amerindo, other than those records that pertain solely to any publicly traded Amerindo mutual fund, including account statements from any financial institution used by Amerindo to conduct any financial activity."

- Paragraph Y calls for production of "Documents and records concerning all current and former employees of Amerindo."

Together, these five categories of documents effectively sweep up all of the previously stated categories of documents and require the production of virtually all of Amerindo's documents.

Finally, the Subpoena sets forth no temporal parameters for the production. In other words, on its face it requires Amerindo to produce every responsive document or thing covering the period from the beginning of time to the present day.

## ARGUMENT

### POINT I

**THE SUBPOENA MUST BE QUASHED
BECAUSE IT WAS ISSUED FOR IMPROPER PURPOSES**

The language of the subpoena is identical in almost all respects to the language of the search warrant. The timing of the service of the subpoena, virtually simultaneously with the execution of the search warrant, suggests that the government issued the subpoena in order to avoid the consequences of possible suppression of seized documents. In *United States v. Eng,* 971 F.2d 854,861 (2d Cir. 1992), the Second Circuit stated that "subpoenas must not serve as an after the fact 'insurance policy' to 'validate an unlawful search under the inevitable discovery doctrine.'" (internal citation omitted).

Similarly, in *United States v. Debbi,* 258 F.Supp. 2d 313, 314 (S.D.N.Y. 2003), where the government sought to enforce an administrative subpoena calling for items that had been suppressed, Judge Rakoff reiterated the holding in *Eng, supra,* and quashed the subpoena.

In *Debbi*, as in this case, the government had failed to seek enforcement of the subpoena until months after its return date. In this case, the government obtained the current grand jury indictment without the evidence called for by the subpoena.

8

Enforcement of the subpoena now would only serve to provide the government with evidence for use at trial. Paragraph F of the Subpoena, for example, explicitly seeks production of documents reflecting the Cates investments. Since those investments are the subject of the pending indictment, there would be no legitimate investigatory purpose for demanding those documents now; however, they could conceivably be useful to the government in preparing for the trial of this proceeding, which is an improper purpose for a subpoena.

As the Second Circuit stated, "[t]he law is settled in this circuit and elsewhere that 'it is improper to utilize a Grand Jury for the sole or dominating purpose of preparing an already pending indictment for trial,' *United States v. Dardi*, 330 F.2d 316, 326 (2d Cir.), *cert. denied*, 379 U.S. 45, 85 S. Ct. 50, 13 L. Ed.2d 50 (1964)." *In re Grand Jury Subpoena Duces Tecum Dated January 12, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir. 1985). *Accord, United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994) ("[i]t is, of course, improper for the Government to use the grand jury for the sole or dominant purpose of preparing for trial under a pending indictment"). While the courts have not specified what is meant by a "dominant purpose," there is sufficient evidence now, post-indictment, that the government would be using the grand jury to obtain trial discovery.

The Subpoena should be quashed and the government precluded from issuing a replacement subpoena.

## POINT II

## THE SUBPOENA IS OVERBROAD AND OPPRESSIVE

In the event the Court finds enforcement of the subpoena would serve a proper purpose, it should nevertheless be quashed as overbroad and oppressive. The Supreme

Court stated, in *United States v. R. Enters., Inc.*, 498 U.S. 292, 299, 111 S. Ct. 722, 727,

112 L. Ed.2d 795 (1991), that "[g]rand juries are not licensed to engage in arbitrary

fishing expeditions . . . ."  It is well settled that the following factors must be present for a

grand jury subpoena to avoid being quashed as "unreasonable or oppressive" under Fed.

R. Cr. P. 17(c)(2):

> (1) [T]he subpoena may command only the production of
> things relevant to the investigation being pursued; (2)
> specification of things to be produced must be made with
> reasonable particularity; and (3) production of records
> covering only a reasonable period of time may be required.

*United States v. Gurule*, 437 F.2d 239, 241 (10th Cir. 1970).  *Accord, In re Grand Jury*

*Subpoena Duces Tecum Served Upon Rabbinical Seminary Netzach Israel Ramailis*, 450

F. Supp. 1078, 1084 (E.D.N.Y. 1978).

The Subpoena is defective as to each of the above factors, requiring the Court to

quash it at least with respect to the overbroad elements.

## A.    The Subpoena Seeks Documents That Are Not Relevant

While the government will undoubtedly represent to the Court that it is

conducting an investigation of Amerindo broad enough to require production of every

scrap of paper in Amerindo's possession, that is not sufficient to relieve it of its burden.

Defendants, of course, do not know the exact parameters of the government's present

investigation.  Certain matters can be deduced, however.  First, the pending indictment

makes reference solely to alleged criminal conduct with respect to Lily Cates, involving

an alleged investment or potential investment in the "Amerindo SBIC Venture Fund LP."

The government alleges that the defendants made misrepresentations to Cates regarding

her alleged investments in the "Amerindo SBIC Venture Fund LP," and that they

converted funds received from Cates. It would be logical to assume that the government

is investigating whether other clients of Amerindo made the same investment or potential

investment.

Assuming that these are the parameters of the government's current investigation,

the categories of documents demanded in the Subpoena are not relevant to that

investigation. The government did not issue a grand jury subpoena tailored to obtain

documents concerning investors or potential investors in the "Amerindo SBIC Venture

Fund LP," statements to those investors and disposition of their investments. Rather, the

Subpoena demands production of every type of document that an investment advisory

firm such as Amerindo would be expected to maintain. Indeed, it is difficult to conceive

what documents would *not* be required to be produced when taking Paragraphs A, B, D,

I, L, M, N, O, Q, R, U, V, W, X and Y together. The Subpoena sweeps up a vast number

of documents that are irrelevant to any reasonable criminal investigation with a limited

number of documents that may be relevant. That approach is improper. For example, in

a strikingly similar case, Judge Michael Mukasey quashed as overbroad a subpoena

which sought, *inter alia*, the production of computers, hard drives and disks that

contained both relevant and irrelevant documents. *In re Grand Jury Subpoena Duces

Tecum Dated November 15, 1993*, 846 F. Supp. 11, 12-14 (S.D.N.Y. 1994). *See also In

re Grand Jury Subpoena Duces Tecum Addressed to Corrado Bros., Inc.*, 367 F. Supp.

1126, 1130-31 (D. Del. 1973) (court quashed subpoena to the extent it sought production

of private party communications, which were irrelevant to government's investigation);

*In re Certain Chinese Family Benevolent and Dist. Assocs.*, 19 F.R.D. 97, 101 (N.D. Cal.

1956) (court quashed grand jury subpoena to the extent it required production of all

documents of associations which went well beyond parameters of government's investigation).

The Subpoena was more likely an attempt to sweep as broadly as possible so that the government could search Amerindo's records for any evidence of any criminal violation whatsoever by anyone, regardless of how remote it was from any good-faith basis the government had for investigation. That kind of subpoena is the exemplar of a fishing expedition and, by definition oppressive. *See, e.g., Corrado*, 367 F. Supp. at 1131 ("[n]o document no matter how remote from the nature of an investigation, would be spared seizure on the basis that it *might* possibly contain important information. It is just this type [of] grand scale dragnet approach that Justice Holmes condemned when he said: 'It is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up . . . .'" quoting *Federal Trade Comm. v. Am. Tobacco Co.*, 264 U.S. 298, 44 S. ct. 336, 337, 68 L. Ed. 696 (1924)); *Certain Chinese Family Benevolent and Dist. Assocs.*, 19 F.R.D. at 101 ("[t]he broad demand smacks more of the fishing expedition which was condemned in *Federal Trade Comm. v. Am. Tobacco Co.* [*supra*]").

Assuming that there may be documents that are relevant to the government's current investigation, neither the Court nor Amerindo should be required to redraft the Subpoena so as to limit it to a demand for the production of relevant documents. Thus, the offending paragraphs identified above should be quashed.[1]

---

[1]    In the alternative, Defendant requests that the Court examine, *in camera* if necessary, the premises of the government's current investigation and determine whether the challenged provisions of the Subpoena are relevant.

**B.    The Subpoena Fails to State With
        <u>Particularity the Documents to Be Produced</u>**

The Subpoena also fails to satisfy the second required element, that it specify with

reasonable particularity what categories of documents are to be produced.  While

challenged paragraphs A, B, D, I, M, N and O purport to specify which categories of

documents are to be produced, the over-inclusiveness of these categories makes it

difficult in the extreme to distinguish between what is responsive and what (if anything)

is excludable.  For example, Paragraph A calls for production of

> Corporate records concerning Amerindo [and other entities
> that share the Amerindo name], *including but not limited to*
> records concerning the formation of each of the above-
> listed Amerindo entities, its shareholders, principals,
> officers, directors, and employees, changes in ownership,
> bylaws, resolutions, client lists, client files, investment
> brochures, marketing materials, investment advisory
> agreements, copies of correspondence sent to or received
> from clients, and other documents concerning or reflecting
> the identities of and communications with clients who have
> investments managed or advised by Amerindo.

Exhibit B at 1-2 (emphasis added).  The give-away is the phrase "including but not

limited to."  Amerindo could conceivably be in contempt under the Subpoena even if it

produces all the categories of documents listed, if there is another "record" of a different

type than those specified that "concerns" Amerindo.  The Subpoena defines the terms

"records" and "documents" as meaning "any and all tangible forms of expression in your

possession, custody or control . . . ."  *Id.* at 1.  The other challenged paragraphs raise the

same or similar problems.

The courts indicate that the test for whether a subpoena should be enforced is

whether it is "reasonable."  *United States v. R. Enters., Inc.*, 111 S. Ct. at 727.  It would

not be reasonable for the Court to read this Subpoena as identifying its objects with

particularity where the message it sends, despite any appearance of particularity, is "give us everything."  *See In re 1979 Grand Jury Subpoena*, 478 F. Supp. 59, 62 (M.D. La. 1979) (quashing subpoena because, *inter alia*, subpoena was "extremely vaguely worded and demands that the witness produce numerous documents which may or may not properly be the subject of a subpoena duces tecum").  Accordingly, for these reasons, the challenged paragraphs of the Subpoena should be quashed.

**C.**    **The Subpoena Does Not Specify a Time Period**

Nor does the Subpoena pass muster with respect to its time period.  As noted above, the Subpoena does not specify any time period at all, thus requiring Amerindo to produce responsive documents dating from the very beginning of Amerindo's existence to the present date, a period of almost twenty years.

This is *per se* overbroad and oppressive.  *See, e.g., In re Grand Jury Subpoena Duces Tecum*, 342 F. Supp. 709, 711-13 (D. Md. 1972) (where subpoena demanded production of documents going back over ten years, court quashed subpoena as overbroad); *In re United Last Co.*, 7 F.R.D. 759 (D. Mass. 1947) (subpoena seeking documents created during six-year period quashed as oppressive).  Amerindo has been in business for twenty years.  It would be highly oppressive to require Amerindo to search long-dormant records to produce documents unbounded by time limitations.  Rather, the Subpoena should be quashed (in whole or just as to the challenged paragraphs) and the government required to specify a reasonable production period.

## POINT III

### THE SUBPOENA MUST BE QUASHED
### BECAUSE IT IS UNREASONABLE UNDER THE FOURTH AMENDMENT

The Supreme Court has held that "the reach of a subpoena duces tecum is not without limit.  It may be so broad and sweeping that it violates the Fourth Amendment's prohibition of *unreasonable* searches." *Hale v. Henkel*, 201 US 43, 76, 26 S.Ct. 370, 50 L.Ed. 652 (1906) (Emphasis added). This grand jury subpoena, as demonstrated in Point II, *supra,* is overbroad and, as such, it is unreasonable under the Fourth Amendment.

In the seminal case of Oklahoma *Press Pub. Co. v. Walling Adm'r, Wage and Hour Division, US Department of Labor*, 66 S. CT. 494 (1946), the Supreme Court, in considering the constitutional validity of an administrative subpoena, held that "the gist of the [Fourth Amendment] protection is in the requirement, expressed in terms, that the disclosure sought shall not be *unreasonable*" (Emphasis added). *See United States  v. Morton Salt*, 70 S.Ct. 357 (1950)(administrative subpoena analogous to grand jury subpoena).

The same three factors that define reasonableness under Rule 17(C ) are also the three factors that define reasonableness under the Fourth Amendment.  As the court stated in *In Re Corrado Bros., Inc*. 367 F. Supp. at  129 **--** "a subpoena duces tecum is not without limit. It may be so broad and sweeping that it violates the Fourth Amendment's prohibition of unreasonable searches…three interrelated requirements appear critical (1) that the subpoena command only the production of materials relevant to the investigation; (2) that the subpoena specify the materials to be produced with reasonable particularity

and (3) that the subpoena command production of materials covering only a reasonable period of time.".

     Examining this subpoena for reasonableness applying the above three-part test, and as demonstrated in Point II, *supra,* the conclusion is inescapable that this subpoena is unreasonable.

     In addition to this three part test, the Supreme Court, in *United States. v. Calandra* 94 S.Ct. 613 (1974), held that *privacy* comes into play to distinguish the protection offered by the Fourth Amendment to that under Rule 17(C ):

>  [T]he grand jury's subpoena power is not unlimited. It may consider incompetent evidence, but it may not itself violate a valid privilege, whether established by the Constitution, statutes, or the common law… [it is] without power to invade a *legitimate privacy interest protected by the Fourth Amendment* …

* * *

*Id.* at 346.

> The purpose of the Fourth Amendment is to prevent unreasonable governments intrusions into the privacy of one's person, house, *papers or effects*.

*Id.* at 353.(Emphasis added).

     While the Supreme Court has held that corporations have a more limited privacy scope than individuals, in this case defendant Alberto William Vilar's *individual* privacy rights are being invaded by this all-encompassing dragnet subpoena. Within the myriad of computer files and documents seized, there are also, for example, his personal financial records, emails to friends, family and romantic interests, and personal mementos from past professional achievements. For a man who started and built a thriving investment advisor firm over a span of twenty years, it is reasonable to assume that a great many materials contained in his office drawers and on his personal office computer

16

contained private information – information that he reasonably believed was private and

protected. As the president of Amerindo, the New York offices were not to him simply a

place he worked, but the concrete manifestation of his life's work and ambition. To have

such a place thoroughly combed and materials removed, relevant or not, private or not, is

a deep invasion of privacy.

In sum, the broad wording of the subpoena renders it unreasonable and violates

the legitimate privacy interests of Mr. Vilar.  For this reason as well, the subpoena in

consideration before this Court must be quashed under the Fourth Amendment.

**CONCLUSION**

For all of the reasons set forth above, Defendant Alberto William Vilar

respectfully requests that the Court quash the Subpoena as set forth above.

Dated:          New York, New York
                December 13, 2005

Respectfully submitted,

HOFFMAN & POLLOK, LLP

By:_____
         Susan C. Wolfe

*Attorneys for Defendant Alberto
Vilar*
260 Madison Avenue
New York, NY  10016
(212)  679-2900
(212)  679-1844 (fax)

*Of Counsel*:

Susan C. Wolfe
Lisa Rosenthal

17

18