UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA

     -against-

                                          05 Cr. 0621

ALBERTO VILAR, *et. al.,*

---------------------------------------------------------

**DEFENDANT ALBERTO VILAR'S POST-HEARING MEMORANDUM
IN SUPPORT OF HIS MOTION TO SUPPRESS PHYSICAL EVIDENCE**

     The defendant Alberto Vilar submits this letter memorandum in support of his motion to suppress evidence seized pursuant to an unconstitutionally overbroad search warrant. This memorandum summarizes the testimony taken and the exhibits entered into evidence at the hearing held on December 14, 2005. It demonstrates, not only that the search warrant was overbroad and the search conducted was a prohibited general one, but also that the good faith exception cannot fairly be applied. [1]

Testimony at the Hearing of Inspector John Feiter

     The government called one witness to testify regarding the execution of the search warrant on May 26, 2005 at the Amerindo offices on Park Avenue. That witness, Inspector John Feiter, had limited knowledge and memory of both the events leading up to and the actual execution of the warrant. Nevertheless, the government failed to call, and opposed defendants' request to call, the Case Agent who was primarily responsible for the investigation and who signed the warrant application.

---

[1] This Memorandum focuses primarily on the overbreadth issue. Counsel for Tanaka is submitting simultaneously a Memorandum focusing on the good faith issue. Both defendants join in both Memoranda.

Inspector Feiter was the supervising agent for the investigation against Alberto Vilar and Gary Tanaka. As supervisor and search coordinator of the team that conducted the search of the Amerindo offices, he was responsible for organizing the manpower, resources, the materials, making the assignments, and generally overseeing the search. (Tr.77).

At approximately six a.m. on the morning of the search, Inspector Feiter met with the nineteen members of the search team at Postal Inspection headquarters. (Tr.93) He and the Case Agent, Inspector Cynthia Fraterrigo, gave the team a general overview of the case.(Tr.94). He testified, however, that there is no document containing the general summary he gave, nor could he remember what was said, other than that he "would have" given the names of the two suspects, the names of victims, a brief description of the nature of the case, and referred the team members to the search warrant rider. He did not know which or how many victims' names he mentioned, but he claimed that he "gave the names of some of the victims that were mentioned in the affidavit." (Tr.95, 136) He also could not recall what the Case Agent told the search team during the briefing.(Tr.130).

He told the team to read the rider before leaving the meeting and to refer to it during the actual search. (Tr.79). He also told them to ask him or the Case Agent if they had questions about whether something was covered under the search warrant.(Tr.79). He could not recall whether at any time during his briefing any team members asked any questions. (Tr.95).

In preparation for the search, Inspector Feiter reviewed the affidavit and the "rider" to the search warrant which listed the items to be seized. (Tr.77). He admitted that, other than the Case Agent and the two arresting agents, neither he nor any of the 15 other search team members were given the complaints attached to the search warrant affidavit. (Tr.78, 123, 135, 165).[2]

---

[2] Even though the search agents never saw the actual allegations in the complaints, Inspector Feiter claimed that this was not a problem, since the Case Agent was there to answer questions. Feiter, however, could not recall

2

At approximately 8:15 a.m., Inspector Feiter and his team arrived at the Amerindo offices, identified themselves and informed the employees that they had a search warrant. (Tr.79,80).

The team secured and labeled each room with letters and the individual positions within the rooms with numbers. There were 22 rooms labeled from "A" through "V." (Tr.98). During the search, Inspector Feiter claimed that he answered questions from other inspectors about whether specific items were covered under the rider or he referred them to the Case Agent if he could not answer the question. (Tr. 81) The only question he could recall was when searchers asked him how to handle requests by Amerindo employees to keep personal correspondence. (Tr. 104, 119) Though he could not verify that personal correspondence was not seized, Inspector Feiter said he instructed the agents to "just take a quick look, make sure they are such, and it stays."(Tr.104).

Inspector Feiter was repeatedly asked on cross-examination to identify items or categories of items that were not covered by the search warrant. He was also asked to correlate certain entries on the inventory with sections in the search warrant rider. He claimed that he could not answer the questions, because he only searched a very small area himself. (Tr. 104, 113-114, 121).

Indeed, Inspector Feiter searched only a single room himself. (Tr.81). He was the "inventory person" who cleared each room after it had been searched and made an inventory of items seized, noting the location where each item was seized. (Tr.82) He identified a photocopied collection of the inventory sheets which were admitted into evidence as GX2 (Tr.83). When Inspector Fetier's attention was drawn to the paragraph in the rider listing

---

any information that she provided or any questions that she answered. The government, however, failed to call and opposed the calling of the Case Agent. (Tr. 128-130)

"photographs, diaries and other items concerning the identities of participants in the fraud schemes," he opined that the paragraph was limited to the two targets of the investigation, Mr. Vilar and Mr. Tanaka. (Tr. 118-119; GX2, first para. 16).  The inventory, however, contains entries for photographs that are not limited to the targets.  An example of a page from the inventory listing photographs, without specifying that they are photographs of the defendants, is attached hereto as Exhibit F.[3]  Inspector Feiter acknowledged that other agents exercised their own judgment during the search and may have had a broader view than his of the number and identities of the alleged participants in the fraud scheme and even of the substance of the fraud scheme itself. (Tr. 132-133, 135).  Thus, the testimony and evidence at the hearing established that the search warrant application and rider were unclear as to who were the participants in the alleged scheme, and therefore what materials were covered by the rider.

Demonstrating the enormous breadth of the search warrant, Inspector Feiter agreed that, with respect to the very first paragraph of the rider, it could be interpreted to cover *any* records of the four entities listing in the search warrant.  Since he was not aware of any other entities located in the searched premises, this paragraph would cover any and all business records on the premises. (Tr. 136, 163)   In response to questioning by the court, he stated that, taking the Amerindo Caymen entity as an example, he believed the warrant authorized the seizure of all "official business records," limited only to the extent of excluding blank stationary and duplicate copies of business cards. (Tr. 162)

The search lasted for approximately twelve hours and approximately 170 boxes were seized. (Tr.89)   Two areas, a storage room and file banks, were inventoried but not seized pursuant to an arrangement between the company's attorney and the prosecutor to handle the

---

[3]     Among the reasons that the defendants sought to call the Case Agent, who was far more familiar with the items seized, was to show that items outside the scope of the warrant were seized, such as, according to Inspector Feiter, photographs of people other than the defendants.

4

remaining materials by subpoena. (Tr.86, 102, 112). The materials in these areas were inventoried without any prior determination as the whether they were called for by the search warrant. The inventory of items not seized, which was admitted into evidence as GX3, is 35 pages long and appears to identify, not generically, but specifically, each document or group of documents located in these areas. (Tr. 102)[4] As set forth below, the detailed inventorying of these materials constituted a search.

Inspector Feiter estimated that, from the areas that were completely searched, approximately 60 to 70 percent of office contents were seized. (Tr.89).

Inspector Feiter testified that he believed the search warrant to be valid solely because it was signed by a Magistrate in the Southern District of New York and he did not consider it his responsibility to look at the search warrant application from the point of view of confirming that it showed probable cause. (Tr.124-125). He had never read the complaints submitted with the warrant application, he did not recall any specific guidance that was given to the agents during the search, and he was unfamiliar with the materials actually seized. (Tr. 123, 149, 156) Nevertheless, Inspector Feiter was the only witness the government called to testify about the execution of the warrant and whether the executing agents acted in good faith.

## ARGUMENT

### THE TESTIMONY AT THE HEARING DEMONSTRATES THAT THE SEARCH WARRANT WAS UNCONSTITUTIONALLY OVERBROAD AND THE SEARCH CONDUCTED PURSUANT TO IT WAS A PROHIBITED, GENERAL SEARCH

In their opening Memorandum of Law, the defendants have argued that the warrant in this case was a general warrant that listed every conceivable kind of document, record and

---

[4] The inventories, GX2 and GX3, are too voluminous to be filed electronically. They are being filed with the court under separate cover.

equipment that could be found in a financial services office. The face of the warrant (the rider) authorized the wholesale seizure of everything in the office, without regard to time frames, investors, investments or individual targets of the investigation. The rider includes generic categories, such as "corporate records," followed by a list of examples that are "included but not limited to," (paragraph 10); "documents reflecting or relating to the movements of funds into or out of the Amerindo Brokerage Accounts," (paragraph 13); "documents reflecting information about any current or former Amerindo employee," (paragraph 15); "any other storage media capable of containing data or text," (paragraph 17); and, the coup de grace, "as well as drafts and final versions of documents and correspondence prepared in connection with the running and supervision of the operations of the investment advisory business," (paragraph 17).

This Court requested testimony regarding the execution of the search warrant, presumably in order to determine, *inter alia,* whether the search that was in fact conducted was narrower than the warrant, or whether the search was as all-encompassing as the warrant itself. As noted above, the government called one witness who could not recall whether any limiting instructions were given to the search agents, and who was unfamiliar with the evidence actually seized. Nothing in Inspector Feiter's testimony suggests that the search was more limited than the rider or that it was in any way circumscribed by the specific allegations in the search warrant application or the complaints.

Feiter testified that the warrant authorized the seizure of any and all business records on the premises. (TR. 136, 162-3). With three exceptions, he could not recall any items or categories of items that were *not* seized; the exceptions being personal correspondence specifically identified by an Amerindo employee who asked to keep it, blank stationary, and duplicate business cards. He testified that, from the 20 rooms/areas actually searched, 60 to 70

6

percent of the office contents were taken. Given that most business work spaces include items such as blank paper, stationary, envelopes, phone books, computer software guides, *etc.*, 60 to 70% of a 20-room office (rooms A through V, excluding the two areas not searched) is an extraordinary amount of material.

The remaining two areas, a storage room and file cabinet banks, were searched, and a detailed inventory was made, although the materials were not seized. In *Arizona v. Hicks,* 480 U.S. 321 (1987), the Supreme Court held that the movement of stereo equipment to look at the serial number constituted a search. Similarly, the opening of file cabinets and boxes in a storage room in order to inventory them constituted a search. Thus, it is clear that the government searched the entire Amerindo premises. Under the warrant in this case, no stone was left unturned.

In the chart set forth below, we have itemized the entities, accounts, documents and victims specifically mentioned in the complaints and/or the warrant affidavit in relation to the allegations of fraudulent conduct. We have also itemized the time frames specified in the complaints and the warrant affidavit. We have then culled numerous examples from the inventory showing that documents were seized that were unrelated to the allegations of wrong-doing or outside of the time frames alleged. The referenced pages from the inventory are attached as Exhibits A through R.

**A) Specific Entities, Accounts, Documents and Alleged Victim Mentioned in the Vilar Complaint:**

    1) SBA – United States Small Business Administration; SBIC – Participating Securities Small Business Investment Company; Amerindo SBIC Venture Fund

    2) Lily Cates, including Amerindo US account documentation from 1987 – 1995; Amerindo Panama account documentation from 1995-May, 25, 2005, and Baer Stearns account for/in the name of Lily Cates

3) Account of Amerindo Management Inc, incorporated in Panama, where Lily Cates' $5 million SBIC investment was deposited on June 20, 2002

4) Vilar Chase Manhattan Bank account in the name "A.W. Vilar" – transfer of funds into on June 25, and 26, 2002

5) Amerindo Chase Manhattan Bank account in the name of Amerindo Investment Advisors Inc. – transfer of funds into on June 25 and 26, 2002

6) Bank of New York Trust Account -- transfer of funds into on June 25 and 26, 2002

7) "Luxemburg account"

8) Vilar philanthropic projects -- William and Jefferson College / Vilar Technology Center; American Academy in Berlin / Presidents Circle / Patrons

9) Wilmington Trust Account in Vilar's name – transaction on September 26, 2003

10) Bear Stearns account in the name "Amerindo Technology Growth Fund I" / ATGF I

11) Offshore account held by private trust corporation in Bahamas – transaction on September 26, 2003

B) **Specific Entities, Accounts, Documents Mentioned in the Tanaka Complaint:**

1) Horses owned by Tanaka – Fruhlingssturm, Agata , Don Incauto, Riddlesdown, Distant Valley and trainer Niall O'Callaghan

2) ATGF I (Amerindo Technology Growth Fund Inc.)

3) ATGF II (Amerindo Technology Growth Fund II)

4) Amerindo Management Inc. Account Sub A/C M26

5) Techno Raquia, SA

6) Letters of Authorization sent to Bear Stearns by Tanaka from 2001 to May, 2005

C) **Additional Entities, Accounts, Victims Mentioned in the Search Warrant Affidavit**

1) Lisa, Herbert and Debra Mayer

2) Cates' investment in Rhodes Capital in 1988

8

    3) PTC Management Ltd Account and account at Barclays Bank in the Bahamas

    4) Guaranteed Fixed Rate Deposit Accounts of the Mayers

    5) Brian Harvey, Joy Ulrich and Paul Marcus, who "may have had trouble redeeming all or part of their investments"

D) **Time frames mentioned in the Vilar Complaint:**

    1) Cates received statements from Amerindo US 1987-1995

    2) Cates received statements from Amerindo Panama,1995 to May, 2005

    3) Amerindo's SBA application and approval process -- January, 2000 through May, 2004

    4) Cates $5 million SBIC Venture Fund investment, June, 2002

D) **Time Frames Mentioned in the Tanaka Complaint:**

    1) 2001 through May, 2005 -- Letters of authorization signed and sent by Tanaka to Bear Stearns

E) **Additional Time Frames Mentioned in the Search Warrant Affidavit**

    1) 1988 –Cates' Rhodes Capital Investment

F) **Items Listed in the Inventory Unrelated to the Specific Entities, Accounts And Victims Alleged in the Complaints and in the Warrant Application and/or Outside of the Time Frames Specified Therein:**

    (i)    *(Exhibit A / Position E-5):*

        (a)    "Paul Hastings Invoices '97-'04'
        (b)    "1998 AIA Proxy Voting List"

    (ii)    *(Exhibit B / Position E-18):*

        (a)    "Amerindo Internet Fund Files"
        (b)    "Amerindo Internet Tech. Files"

    (iii)    *(Exhibit C / E-26):*

        (a)    "Prof. Fees, Rent, Tel – Invoices
        (b)    "Tel Bills 2003, Rent Bills, Legal Bills, 1099's – 1999-2003

    (iv)    *(Exhibit D / Position F-1)*:

          (a)    "Folder – Charlie Parker 2002 Questionnaire"
          (b)    "John Rutledge – Rutledge Capital"
          (c)    "2004 Electronic Delivery Consent"

    (v)    *(Exhibit E / Position K-4)*:

          (a)    "Legal Bills – 1999"
          (b)    "1996 Amerindo Tax Return"

    (vi)    *(Exhibit F / Position ILLEGIBLE)*:

          (a)    "KODAK CD's containing photographs" "Book of photographs"
          (b)    "Photograph enclosed in white cover / frame (paper)"
          (c)    "Fold yellow report cover containing 7 pages of photographs"
          (d)    "Clear, yellow folder containing misc. wedding related documents (Vilar) including purchasing / financial info using corporate account"

    (vii)    *(Exhibit G / Position B-8)*:
          (a)    "Folder marked AT&T / Cingular Wireless"
          (b)    "Folder marked AT&T"
          (c)    "Folder Federal Express New York"
          (d)    "Folder Federal Express San Francisco"
          (e)    "Folder Pacific Bell"
          (f)    "Folder Verizon Long Distance (212) 980-5286"

    (viii)    *(Exhibit H / Position C-2)*:

          (a)    "Terminated Employees' File"
          (b)    "Employee Handbook"

    (ix)    *(Exhibit I / Position E-23)*:

          (a)    "Accts Payable includ. Phone Records – 2001"
          (b)    "Accts Pay include. Phone Records – 2001 + Alberto Vilar file"

    (x)    *(Exhibit J / Position E-25)*:

          (a)    "Tel Bills – Amerindo"
          (b)    "Prof. Fees – Invoices + Wires, Legal, Rent, Consult."

 (xi) *(Exhibit K / Position H-7):*

   (a) "Amerindo Employment Agreements (2 binders)"

 (xii) *(Exhibit L / Position J-4):*

   (a) "Amerindo Technology Fund 1998 Annual report"
   (b) "Amerindo Technology Fund 1999 Prospectus"

 (xiii) *(Exhibit M /Position T-3):*

  (a) "US Trust Statements for Dextra 2000"

 (xiv) *(Exhibit N / Position T-4):*

  *(a)* "Weekly Privates Report 1999"

 (xv) Exhibit O / Position O-3):

   (a) "Phone Service invoice for Amerindo – Comsec II, Inc."
   (b) "Verizon Statements Vilar c/o AIA"
   (c) "Bergdoff Goodman acct atmnt – Vilar c/o AIA"
   (d) "T-Mobile invoice AIA"
   (e) "Comcast invoice for AIA"
   (f) "Limo invoice"

 (xvi) *(Exhibit P / Position L-1):*

   (a) "Orange hanging folder containing written speech by Vilar to Hispanic Federation"
   (b) "Purple hanging folder containing Nat'l Ballet School fundraiser docs, Canadian Opera company docs"
   (c) "Orange hanging folder containing interamerican dialogue fundraiser doc's with photo of Vilar & President Cardoso"
   (d) "Email letter from American Friends of Salzburg Festival"
   (e) "Yellow Folder titled Conde Nast Salzburg"

 (xvii) Exhibit Q / Position L-3):

   (a) "Purple folder with resumes; clear folder titled 'Mike Rifle Correspondence' + other misc. documents relating to Vilar"
   (b) "Purple hanging folder with former employee correspondence doc.'s including severance pay info & settlement info"

      (xviii)    (Exhibit R / Position L-4):

          (a)    "Yellow clear folder title 'Rick Marshall'"
          (b)    "Packets (8) Re: Investment + Business Strategies – included is many pkts titled 'THS integration of next generation internet…' by Vilar"
          (c)    "Purple Folder with info on Biotech Investment, 'Acuity' docs & other investment info"

The above demonstrates, not only that the search far exceeded the scope of the alleged wrong-doing, but also that it would certainly have been possible to craft a search warrant rider tailored to the allegations in the complaints and the warrant application.

As set forth in the original Memorandum, the warrant application does not suggest sufficiently pervasive wrong-doing to justify the "all-records exception."  It recites the complaints of two investors, one lacking in specifics (the Mayers) and the other pertaining to one investment (the "SBIC" fund).

In *United States v. Burke,* 718 F.Supp. 1130, 1140 (S.D.N.Y. 1989), the affidavit described fraudulent transactions involving seven customers who purchased allegedly fake Salvador Dali prints.  The Court concluded that the evidence was insufficient to show that the entire business was permeated with fraud. *Id.* at 1141; *compare* [where courts concluded businesses were permeated by fraud] *National City Trading Corp. v. United States,* 635 F.2d 1020, 1021-22 (2d Cir. 1980)(affidavit listed over 40 complaints; undercover agents visited the company three times); *United States v. Brien,* 617 F.2d 299, 309 (1st Cir.), 446 U.S. 919 (1980)(affidavit described 250 complaints and interviews with 20 former employees); *United States v Oloyede*, 982 F2d 133 (4th Cir, 1992)(documentation in over 50 cases, two confidential informants outlined in great detail procedures associated with attorney's operation, and review of 26 of attorney's files disclosed that each file contained fraudulent documents).

As such, the warrant is unconstitutionally overbroad and all evidence and fruits thereof should be suppressed.

Finally, as set forth in the defendant's initial Memorandum and Reply, the good faith exception cannot fairly be applied in this case. Unlike in *Burke,* the warrant affidavit here did not serve to limit the scope of the search, and the search here was, in fact, a prohibited general search. If the good faith exception were to be applied in this case, it would effectively mean that there is no remedy for Fourth Amendment violations – it would mean that law enforcements agents are insulated by the Magistrate's determination and the Magistrate's determination is unassailable by virtue of the officers' good faith reliance on that determination.

## CONCLUSION

For all of the reasons set forth above, the evidence seized pursuant to the warrant to search the Amerindo offices and any and all fruits and leads there from, should be suppressed. In the alternative, the Court should impose some reasonable limitation on the use of evidence seized in derogation of the defendants' Constitutional right to be free of unreasonable searches and seizures.

Dated: New York, New York
       January 9, 2005

>                        Respectfully submitted,
>
>                        HOFFMAN & POLLOK, LLP
>
>                        By:_____
>                            Susan C. Wolfe
>
>                        *Attorneys for Defendant Alberto Vilar*
>                        260 Madison Avenue
>                        New York, NY  10016
>                        (212)  679-2900
>                        (212)  679-1844 (fax)