**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x

UNITED STATES OF AMERICA             :

             -v.-             :     S2 05 Cr. 621 (KMK)

**ALBERTO WILLIAM VILAR,**             :
  a/k/a, "Albert Vilar," and
**GARY ALAN TANAKA,**             :

             **Defendants.**             :
-------------------------------------------------------x


### GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' MOTION TO SUPPRESS EVIDENCE SEIZED IN THE UNITED KINGDOM


MICHAEL J. GARCIA
*United States Attorney for the*
*Southern District of New York*

*Attorney for the United States of America*


Deirdre A. McEvoy
Marc Litt
*Assistant United States Attorneys*
*Of Counsel*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The MLAT Process and The Treaty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    The Search of Cadogan Tate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    POINT I:     The Defendants Have Not Met Their Burden
               To Establish Standing To Challenge The Search . . . . . . . . . . . . . . . . . . 8

    POINT II:    The Search In This Case Met The Reasonableness
               Requirements Of The Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . 12

        A.     Overview Of The Application Of The Fourth Amendment
               To Extraterritorial Searches And Seizures . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.     The Warrant Requirement Of The Fourth Amendment
               Should Not Be Applied To Extraterritorial Searches . . . . . . . . . . . . . . . 17

            1.     The Supreme Court Has Strongly Suggested
                    Limiting The Extraterritorial Application Of
                    The Warrant Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            2.     Extending The Warrant Requirement To Foreign Searches
                    Would Have Significant And Unpredictable Implications
                    For The Ability Of The Executive Branch To Conduct
                    Foreign Affairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        C.     The Search Of Cadogan Tate Was Reasonable Under
               The Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    POINT III:   Even If The Search Violated The Fourth Amendment,
               The Good Faith Exception To The Exclusionary Rule
               Should Apply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    POINT IV:   The Defendants Are Not Entitled To A *Franks* Hearing . . . . . . . . . . . . 39

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>:

<u>Barr</u> v. <u>United States Department of Justice</u>, 819 F.2d 25 (2d Cir. 1987) . . . . . . . . . . . . . . . . . 22

<u>California</u> v. <u>Greenwood</u>, 486 U.S. 35 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

<u>Collelo</u> v. <u>Securities and Exchange Comm'n</u>, 908 F. Supp. 738 (C.D. Cal. 1995) . . . . . . . . . . 22

<u>Coolidge</u> v. <u>New Hampshire</u>, 403 U.S. 443 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

<u>Delaware</u> v. <u>Prouse</u>, 440 U.S. 648 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

<u>Democratic Club</u> v. <u>Rumsfeld</u>, 410 F. Supp. 144 (D.D.C. 1976) . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>First Nat'l City Bank</u> v. <u>Banco Nacional de Cuba</u>, 406 U.S. 759 (1972) . . . . . . . . . . . . . . . . . 23

<u>Franks</u> v. <u>Delaware</u>, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 39, 40

<u>Gudema</u> v. <u>Nassau County</u>, 163 F.3d 717 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>Harlow</u> v. <u>Fitzgerald</u>, 457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>Johnson</u> v. <u>United States</u>, 333 U.S. 10 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

<u>Minnesota</u> v. <u>Carter</u>, 525 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 30

<u>New York</u> v. <u>Burger</u>, 482 U.S. 691 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

<u>Ohio</u> v. <u>Robinette</u>, 519 U.S. 33 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

<u>Pennsylvania Bd. of Probation and Parole</u> v. <u>Scott</u>, 524 U.S. 357 (1998) . . . . . . . . . . . . . . . . 33

<u>Rakas</u> v. <u>Illinois</u>, 439 U.S. 128 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11, 28

<u>Reid</u> v. <u>Covert</u>, 354 U.S. 1 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

<u>Rosado</u> v. <u>Civiletti</u>, 621 F.2d 1179 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

<u>Sale</u> v. <u>Haitian Ctrs. Council</u>, 509 U.S. 155 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>Stonehill</u> v. <u>United States</u>, 405 F.2d 738 (9th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

<u>Underhill</u> v. <u>Hernandez</u>, 168 U.S. 250 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

<u>United States</u> v. <u>Abiodun</u>, No. 04 Cr. 1316 (DC), 2005 WL 3117305,
    (S.D.N.Y. Nov. 22, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>United States</u> v. <u>Ajlouny</u>, 629 F.2d 830 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 37

<u>United States</u> v. <u>Baez</u>, 349 F.2d 90 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

<u>United States</u> v. <u>Barona</u>, 56 F.3d 1087 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 15, 19, 27, 29, 36

<u>United States</u> v. <u>Behety</u>, 32 F.3d 503 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>United States</u> v. <u>Bin Laden</u>, 126 F. Supp. 2d 264
    (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15, 16, 17, 19, 20, 26, 32, 34

<u>United States</u> v. <u>Burke</u>, 718 F. Supp. 1130 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . 34, 38

<u>United States</u> v. <u>Calandra</u>, 414 U.S. 338 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

<u>United States</u> v. <u>Canfield</u>, 212 F.3d 713 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 39, 40-41

<u>United States</u> v. <u>Chuang</u>, 897 F.2d 646 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

<u>United States</u> v. <u>Conroy</u>, 589 F.2d 1258 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

<u>United States</u> v. <u>Curtiss-Wright Export Corp.</u>, 299 U.S. 304 (1936) . . . . . . . . . . . . . . . . . . . . 23

<u>United States</u> v. <u>Halsey</u>, 257 F. Supp. 1002 (S.D.N.Y. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . 39

<u>United States</u> v. <u>Haqq</u>, 278 F.3d 44 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 30

<u>United States</u> v. <u>Janis</u>, 428 U.S. 433 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34

<u>United States</u> v. <u>Juda</u>, 46 F.3d 961 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 29, 36

<u>United States</u> v. <u>Leon</u>, 468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 33, 35

<u>United States</u> v. <u>Marzano</u>, 537 F.2d 257 (7th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>United States</u> v. <u>Maturo</u>, 982 F.2d 57 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

United States v. Melucci, 888 F.2d 200 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Molina-Chacon, 627 F. Supp. 1253 (E.D.N.Y. 1986) . . . . . . . . . . . . . . . . . . . 27

United States v. Montoya de Hernandez, 473 U.S. 531 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. Payner, 447 U.S. 727 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

United States v. Peterson, 812 F.2d 486 (9th Cir. 1987) . . . . . . . . . . . . 16, 27, 29, 35, 36, 37, 38

United States v. Poulsen, 41 F.3d 1330 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Rahme, 813 F.2d 31 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9

United States v. Salameh, No. 93 Cr. 0180 (KTD), 1993 WL 364486,
    (S.D.N.Y. Sept. 15, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Staino, 690 F. Supp. 406 (E.D. Penn. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Varela, 968 F.2d 259 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

United States v. Verdugo-Urquidez, 494 U.S. 259 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Yousef, 327 F.3d 56 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Veronia School District 47J v. Acton, 515 U.S. 646 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Webster v. Doe, 486 U.S. 592 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Wilson v. Arkansas, 514 U.S. 927 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28


Other Authorities:

U.S. Const. amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-13, 28

Fed. R. Crim P. 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 34

50 U.S.C. §§ 1805, 1824 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Note, The Extraterritorial Applicability Of The Fourth Amendment,
    102 Harv. L. Rev. 1672 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29

Treaty Between the Government of the United States of America
        and the Government of the United Kingdom of Great Britain
        and Northern Ireland on Mutual Legal Assistance in Criminal Matters . . . . . . . . . <u>passim</u>

3 Wayne R. LaFave, et al., Criminal Procedure § 9.1(b) (1999) . . . . . . . . . . . . . . . . . . . . . . . . . 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA       :

         -v.-          :     S2 05 Cr. 621 (KMK)

ALBERTO WILLIAM VILAR,      :
  a/k/a, "Albert Vilar," and
GARY ALAN TANAKA,         :

            Defendants.     :
--------------------------------------------------------x

GOVERNMENT'S MEMORANDUM OF LAW
IN RESPONSE TO DEFENDANTS' MOTION TO SUPPRESS
EVIDENCE SEIZED IN THE UNITED KINGDOM

PRELIMINARY STATEMENT

      Defendants Alberto William Vilar and Gary Alan Tanaka seek to suppress all
items seized from a storage facility in the United Kingdom pursuant to search warrants issued by
two District Judges in the United Kingdom.  Specifically, defendants claim that: (1) the Fourth
Amendment applies to a search conducted on foreign soil, of premises purportedly leased by a
foreign corporation, whenever the corporation is owned by U.S. citizens; (2) the Fourth
Amendment requires the Government to first obtain a search warrant for foreign premises from a
U.S. court before seeking a search warrant from foreign authorities; (3) the search was
"unreasonable" under U.S. law because it amounted to a "general" search; (4) the search was
"unreasonable" under U.K. law because the U.K. law enforcement officers allegedly went to the
wrong U.K. court and obtained the wrong type of U.K. search warrant, and in so doing, allegedly
knowingly provided false information to the U.K. court; and (5) the good faith exception to the

1

exclusionary rule established in <u>Leon</u> should not be applied because U.S. Postal Inspectors who participated in the search should have known that the search was unlawful under both U.S. and U.K. law.  Defendants seek a hearing if the Government asserts that the good faith exception applies, and alternatively seek a hearing pursuant to <u>Franks</u> v. <u>Delaware</u>, 438 U.S. 154 (1978) with respect to the allegedly false information sworn to by the U.K. law enforcement officer in his applications to obtain U.K. warrants from two U.K. judges.

Defendants' contentions should be rejected by the Court, and their motion to suppress should be denied.  As discussed in greater detail below, defendants have failed to assert sufficient facts concerning their interest in the property that was searched and seized to establish standing to contest the search.  Even if the defendants can establish standing, their arguments fall flat.  First, the question of whether the Fourth Amendment applies in a case such as this has not been definitively decided but, assuming <u>arguendo</u> that it does here, the Fourth Amendment has been satisfied.  The Warrant Clause of the Fourth Amendment has never been held to require the Government to first obtain a search warrant for foreign premises before seeking, through the Mutual Legal Assistance Treaty ("MLAT")  process, a warrant from a foreign court.  To the extent that the Fourth Amendment applies extraterritorily to protect persons from unreasonable searches and seizures, the strictures of the Fourth Amendment were satisfied by the Government's diligent conduct.  The Government complied fully with the U.S.-U.K. MLAT protocols.  The U.K. courts issued valid warrants.

Second, the search that was conducted was entirely reasonable under Fourth Amendment principles, and was by no measure a "general" search.  Approximately 43 boxes of documents were seized from a universe of approximately 320 boxes of documents that were

2

searched.  Any seizure of wholly irrelevant or entirely personal materials was <u>de minimis</u>, and did not render the search unconstitutionally "general."

Third, the defendants were aware that the search was to be conducted since at least August of 2005, and knew where and when the search would be conducted both before and during the execution of the warrants.  The defendants have failed in the nearly six months that have passed since October 14, 2005, when the search was completed, to challenge the validity of the U.K. search warrants in a U.K. court.  The U.K. warrants have not been found to be defective, and are valid.

Fourth, even were the Court to find that some aspect of the search violated U.S. or U.K. law, the U.S. Postal Inspectors had every reason to rely in good faith on the facially valid warrants issued by the U.K. courts.  U.S. law enforcement officers are entitled to rely on the process established by a treaty ratified by the U.S. and U.K. governments, and are in no position to question the validity of search warrants issued by a foreign court based on foreign principles of law.  Application of the exclusionary rule in this case would do nothing to further the objectives of that rule, and the application of the good faith exception to the rule is warranted.

Finally, defendants' request for a <u>Franks</u> hearing on the assertions made by a U.K. law enforcement officer to a U.K. court in support of his warrant application has no basis in fact or law and should be denied.

For all the reasons discussed below, defendants' motion to suppress the evidence seized by the U.K. pursuant to a valid MLAT request and valid U.K. warrants should be denied.

**Background**

Defendants Alberto William Vilar and Gary Alan Tanaka were arrested on criminal complaints on May 26, 2005. That day, a search warrant issued by a Magistrate Judge in the Southern District of New York was executed by United States Postal Inspectors at the New York office of Amerindo Investment Advisors Inc., a California corporation ("Amerindo U.S."). On or about June 9, 2005, a federal grand jury in the Southern District of New York returned an indictment charging Vilar with investment adviser fraud, securities fraud, mail fraud, wire fraud, and money laundering. The grand jury subsequently returned a superseding indictment on or about July 26, 2005 alleging a conspiracy to commit those substantive crimes, and adding Tanaka as a defendant. The Indictment alleged that the defendants misappropriated the investor funds of a Victim subsequently identified as Lily Cates in schemes that involved Amerindo U.S., Amerindo Investment Advisors, Inc. ("Amerindo Panama"), and Amerindo Investment Advisors (UK) Ltd. ("Amerindo U.K."). The Indictment alleged, among other things, that "Amerindo U.K. had an office in London where the founders of Amerindo worked, and where certain administrative functions related to Amerindo Panama were performed, including meeting with and corresponding with investors, preparation of client account statements, processing investor redemption requests, and directing equity trades and financial transactions involving Amerindo Panama investor funds." (Indictment ¶ 3).[1] According to the Indictment, Cates received statements bearing the names of Amerindo U.S. (until in or about August, 1995) and Amerindo Panama, thereafter. (Indictment ¶ 8). The Indictment also alleged

---

[1]     References to the "Indictment" are to the July 26, 2005 First Superseder (which was the pending indictment for all but one day of the time period at issue). On or about January 31, 2006, a Second Superseding Indictment was returned by the Grand Jury which alleged an expanded fraud scheme with additional victims.

funds were misappropriated from Cates through brokerage accounts held by Panamanian corporations, and that Cates's funds were used to redeem another investor's investment in an Amerindo Panama investment product. (Indictment ¶¶ 2, 18, 28-30, 38(h), 38(I), 38(j)). Count Four of the Indictment alleged that the defendants had committed mail fraud by causing a false and fraudulent account statement to be sent from London, England, to Cates in New York, New York. (Indictment ¶¶ 38(l), 43-44).

<u>The MLAT Process and The Treaty</u>

Formal requests by the U.S. Government to the U.K. Government for assistance with criminal investigations and prosecutions are governed by the Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters (the "Treaty"). The Treaty has governed official requests by the U.S. Government to the U.K. Government for legal assistance since it was ratified by the U.S. Senate on or about December 2, 1996. Under the terms of the Treaty, requests for assistance are first reviewed and then transmitted to the U.K. by the Department of Justice's Office of International Affairs ("OIA"). Appropriate officials in the U.K. review such requests to determine whether they are appropriate and, if they are, appoint individuals to carry out the request to the extent permitted by U.K. law. Article 14 of the Treaty ("Search and Seizure") provides that:

> 1. The Requested Party shall execute a request for the search, seizure and delivery of any article to the Requesting Party if the request includes the information justifying such action under the laws of the Requested Party and it is carried out in accordance with the laws of that Party.

5

> 2. The Requested Party may refuse a request if it relates to conduct in respect of which powers of search and seizure would not be exercisable in the territory of the Requested Party in similar circumstances.

Article 5 of the Treaty ("Execution of Requests") provides that:

> 1. As empowered by this Treaty or by national law, or in accordance with its national practice, the Requested Party shall take whatever steps it deems necessary to give effect to requests received from the Requesting Party. The courts of the Requested Party shall have authority to issue subpoenas, search warrants, or other orders necessary to execute the request.

> 2. When execution of the request requires judicial or administrative action, the request shall be presented to the appropriate authority by the persons appointed by the Central Authority of the Requested Party.

> 3. The method of execution specified in the request shall be followed to the extent that it is not incompatible with the laws and practices of the Requested Party.

In this case, the United States Attorney's Office for the Southern District of New York, through OIA, sent a formal request for assistance to the Central Authority of the United Kingdom dated July 25, 2005, pursuant to the Treaty. (Sher Decl. ¶ 5; Exh. D). The July 25, 2005 MLAT requested that the U.K. authorities search the Amerindo U.K. offices located at 43 Upper Grosvenor Street in London, and seize certain specified evidence from that location. The request summarized certain information developed through the Government's investigation related to the defendants' fraud schemes, and the involvement of Amerindo U.K., and individuals working at Amerindo U.K.'s London offices, in those schemes. Later that summer,

the U.K. authorities reported to the Government that the 43 Upper Grosvenor Street premises had been vacated and subsequently reported that the contents of the office had been moved to a storage facility called "Cadogan Tate," located at Cadogan House, 239 Acton Lane, in London, which then housed approximately 320 boxes of Amerindo materials.  In response, the Government immediately sent to the U.K. Central Authority through OIA an urgent supplemental MLAT request dated September 8, 2005, in which it asked the U.K. authorities to conduct the search described in the July 25 MLAT at the Cadogan Tate warehouse.  In the September 8 MLAT, in response to information received through OIA that the Metropolitan Police were short-staffed as a result of their investigation into bombings of London mass transit facilities, the Government offered to send three U.S. Postal Inspectors to assist with the search, if the U.K authorities requested their help.  (Id.)

The Search of Cadogan Tate

On or about October 13 and 14, 2005, U.S. Postal Inspectors ("U.S.P.I.") Thomas F.X. Feeney, Cynthia M. Fraterrigo and Annmarie Williamson assisted U.K. law enforcement officials, led by Detective Sergeant Howard Shaw, in a search conducted at Cadogan Tate.[2]  The two-day search was conducted pursuant to two warrants – one for each day – obtained by Detective Sergeant Shaw from two different U.K. judicial officers.  (Sher Decl. ¶ 7; Exh. F).  Those warrants stated that, "Authority is hereby given for any constable accompanied by Cynthia FRATERRIGO, Thomas FEENEY and Annmarie WILLIAMSON, to enter the said

---

[2]     U.S.P.I. Feeney was one of the Inspectors who arrested Vilar on May 26, 2005, and had received the criminal complaint against Vilar at that time.  U.S.P.I. Fraterrigo is the case agent who swore out the Vilar and Tanaka criminal complaints and the affidavit in support of the search warrant for Amerindo U.S. on or about May 25, 2005.  U.S.P.I. Fraterrigo was also familiar with the content of the indictments returned by the Grand Jury.

premises . . . and to search for the articles or persons in respect of which the above application is made." (Id.). Each warrant attached the 24-paragraph list of items to be seized that had been included in the Government's July 25 MLAT request. (Id).[3] The search team reviewed the contents of approximately 320 boxes of material stored in approximately eight large shipping crates. From that massive quantity of material, they culled approximately 43 boxes of Amerindo documents as well as Amerindo computer equipment. The seized material was inventoried, sealed and packaged by the U.K. authorities at the scene, and was subsequently shipped to Inspector Fraterrigo in the United States.

## ARGUMENT

### POINT I

#### The Defendants Have Not Met Their Burden
#### To Establish Standing To Challenge The Search

To assert a Fourth Amendment violation, a defendant must first demonstrate standing by establishing a legitimate expectation of privacy in the area searched or the items seized. Rakas v. Illinois, 439 U.S. 128, 143 (1978); United States v. Chuang, 897 F.2d 646, 649 (2d Cir. 1990). The defendant must prove both that he had a subjective expectation of privacy in the area searched and that society is "prepared to accept that expectation as objectively reasonable." California v. Greenwood, 486 U.S. 35, 39-40 (1988). The Second Circuit has often considered the defendant's right of exclusive access to an area to be an "important factor" in this standing determination. See United States v. Rahme, 813 F.2d 31, 34 (2d Cir. 1987) (citing

---

[3]     None of the descriptions of the documents to be seized that were attached to the U.K. warrants used the "including but not limited to" language assailed by the defendants in their challenge to the search warrant approved by U.S. Magistrate Judge Frank Mass which authorized the search of the Amerindo U.S. office in New York, New York.

8

Rawlings v. Kentucky, 448 U.S. 98, 105 (1980), and Rakas, 439 U.S. at 143 n. 12); see also

Gudema v. Nassau County, 163 F.3d 717, 722 (2d Cir. 1998) ("[M]ere ownership of property

does not establish a legitimate expectation of privacy unless the owner vigilantly protects the

right to exclude others.").

   The Second Circuit has not addressed the issue of a defendant's expectation of

privacy in items left at a storage facility.  Some courts have found that a defendant lacked

standing to challenge the search of a storage unit and no longer had an expectation of privacy in

that unit where, among other things, the defendant's rental period had expired due to his default

on monthly payments.  See, e.g., United States v. Abiodun, No. 04 Cr. 1316 (DC), 2005 WL

3117305, at *1-*3 (S.D.N.Y. Nov. 22, 2005); United States v. Salameh, No. 93 Cr. 0180 (KTD),

1993 WL 364486, at *6-*7 (S.D.N.Y. Sept. 15, 1993).  See also United States v. Poulsen, 41

F.3d 1330, 1331, 1334-37 (9th Cir. 1994); United States v. Melucci, 888 F.2d 200, 202 (1st Cir.

1989).

   Here, defendant Tanaka asserts that he "understood that Amerindo U.K.'s

materials would be stored in a secure place at Cadogan Tate that was not accessible by anyone

other than Michael Cooper, counsel to Amerindo U.K., and other agents of Amerindo U.K.

Based on this information, [he] expected that Amerindo U.K.'s storage area at Cadogan Tate

would remain private and free from unlawful, official intrusion."  (Tanaka Aff. ¶ 6).  Similarly,

defendant Vilar asserts that "[a]s a founder and principal of Amerindo U.K. and one who worked

on the premises when in London, I expected that the property of Amerindo U.K.'s London office

would remain private and free from unlawful, official intrusion, both while the property was on

the office premises and after it was transferred to a secure storage facility."  (Vilar Aff. ¶ 6).

Yet, Counsel for defendant Vilar represented at the conference on March 9, 2006, that Cadogan Tate had refused to provide him with access to the stored materials because of "monies owed by the corporate entities."  (3/9/06 Tr. at 4).  Counsel's statement strongly suggests that the defendants and/or Amerindo U.K. defaulted on their lease payment obligations and thereby relinquished any expectation of privacy in the storage unit.  Nothing in the defendant's affidavits demonstrates that the defendants had made the required lease payments as of the time of the search.  Indeed, the defendants have not even submitted a copy of the lease agreement.

In light of the cases cited above which hold that a defendant does not have a legitimate expectation of privacy in materials stored at a storage facility where a defendant's rental period had expired due to his default on monthly payments, defendants have failed to establish their standing to challenge the search conducted at Cadogan Tate.  It is the defendants' burden to proffer facts that demonstrate that they had a legitimate expectation of privacy in the materials at Cadogan Tate at the time that the search was executed.   Without proof of such facts, the defendants cannot establish that they have standing to challenge the search executed in this case.

Moreover, the defendants have not established that they have standing to challenge the seizure of the items that were a primary focus of the search:  documents relating to the clients, investments, and financial activities of Amerindo Panama.  On or about May 20, 2005, the defendants sent a letter to the United States Securities and Exchange Commission in response to a complaint lodged on behalf of Lily Cates concerning the defendants' handling of her Amerindo account.  In their response, the defendants stated that they "formerly owned

10

Amerindo but they sold it to its present owners in 2001." (January 31, 2006 Indictment ¶ 61). They further stated that, "there is no overlap between the directors, officers and employees of Amerindo and Amerindo Panama," and that "there is no common ownership with respect to Amerindo and Amerindo Panama." (Id.) Moreover, according to a letter written by Amerindo U.K.'s solicitor, Michael Cooper, on August 23, 2005, to a U.K. regulatory agency, Mrs. Tanaka believed that "the items stored [at Cadogan Tate] do not all belong to the UK company, [and that] apparently there are several boxes of papers which have not yet been properly catalogued." (Sher Decl. ¶ 9; Exh. H).

The Supreme Court has made clear that the "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Rakas, 439 U.S. at 143 "[W]hen considering the legality of a search of an object within a home, courts have properly focused on the defendant's expectation of privacy in *the object* apart from his expectation of privacy in the home." United States v. Haqq, 278 F.3d 44, 50 (2d Cir. 2002) (emphasis in original); see also 3 Wayne R. LaFave et al., Criminal Procedure § 9.1(b) n. 44 (1999) ("A person in possession of premises has standing with regard to a *search* of those premises and also a seizure of objects therein, and thus may have suppressed the fruits of either type of intrusion if found illegal, but does not also have standing as to the search of a container belonging to another in the premises.") (emphasis in original). Because Vilar and Tanaka continue to assert that they have had no interest in Amerindo Panama since they sold the company in 2001, they have not established that they have a legitimate expectation of privacy in Amerindo Panama documents and thus do not have standing to challenge the seizure of such

items.  Nor have the defendants established that they have standing to contest the search and seizure of the "several boxes of papers which ha[d] not yet been properly catalogued" and other "items" that did not belong to Amerindo U.K.  In the absence of additional evidence concerning the defendants' standing, the Court should deny their motion without considering its merits.

## POINT II

### The Search In This Case Met The Reasonableness Requirements Of The Fourth Amendment

As set forth more fully in subsection A., below, the applicability of the Fourth Amendment to extraterritorial searches and seizures is not well-settled.  Indeed, the Supreme Court has made clear that extension of the Fourth Amendment's protections abroad raises a host of difficult questions and may have unforeseen consequences for the Executive Branch's legitimate exercise of foreign policy.

Against this background, as argued in subsection B., below, the Court should not create new law and extend the Warrant Clause requirement to require both U.S. and foreign court warrants for extraterritorial searches.  Instead, assuming arguendo that the reasonableness requirements of the Fourth Amendment apply, those requirements were fully met here, as demonstrated in subsection C., below.

A.    **Overview Of The Application Of The Fourth Amendment To Extraterritorial Searches And Seizures**

The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

12

U.S. Const. amend. IV.   The Fourth Amendment has two independent clauses.  The first clause

prohibits "unreasonable" searches and seizures.  The second clause, the Warrant Clause,

describes the procedures that must be followed in obtaining a warrant.  The probable cause

requirement is part of the procedures contained in the Warrant Clause.  The text of the Fourth

Amendment, like the text of other provisions in the Bill of Rights, does not speak to the

Amendment's potential extraterritorial application.   "What we know of the history of the

drafting of the Fourth Amendment also suggests that its purpose was to restrict searches and

seizures which might be conducted by the United States in domestic matters."  United States v.

Verdugo-Urquidez, 494 U.S. 259, 266 (1990) (emphasis added).

      Neither the Supreme Court nor the Second Circuit has squarely addressed the

issue of the Fourth Amendment's extraterritorial application, particularly where, as here, a

search is executed pursuant to a valid foreign warrant obtained at the formal request of the

United States pursuant to a MLAT.  In Reid v. Covert, 354 U.S. 1 (1957), the Supreme Court

held that United States citizens could not be tried abroad in military courts for capital offenses.

Though Reid involved the Fifth and Sixth Amendments (rather than the Fourth Amendment), the

four-justice plurality (per Justice Black) noted that "[w]hen the Government reaches out to

punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the

Constitution provide to protect his life and liberty should not be stripped away just because he

happens to be in another land.  This is not a novel concept.  To the contrary, it is as old as

government."  Id. at 6.  As the Verdugo-Urquidez Court noted, however, "[t]he concurrences by

Justices Frankfurter and Harlan in Reid resolved the case on much narrower grounds than the

plurality and declined even to hold that United States citizens were entitled to the full range of

13

constitutional protections in all overseas criminal prosecutions." <u>Verdugo-Urquidez</u>, 494 U.S. at

270 (citing <u>Reid</u>, 354 U.S. at 75).  In concurring in the judgment in <u>Reid</u>, Justice Harlan took

issue with the broad stroke of the plurality opinion:

> I cannot agree with the suggestion that every provision of the
> Constitution must always be deemed automatically applicable to
> American citizens in every part of the world.  For <u>Ross</u> and the
> <u>Insular</u> <u>Cases</u> do stand for an important proposition, one which
> seems to me a wise and necessary gloss on our Constitution.  The
> proposition is, of course, not that the Constitution "does not apply"
> overseas, but that there are provisions in the Constitution which do
> not *necessarily* apply in all circumstances in every foreign place.
> In other words, it seems to me that the basic teaching of <u>Ross</u> and
> the <u>Insular</u> <u>Cases</u> is that there is no rigid and abstract rule that
> Congress, as a condition precedent to exercising power over
> Americans overseas, must exercise it subject to all the guarantees
> of the Constitution, no matter what the conditions and
> considerations are that would make adherence to a specific
> guarantee altogether impracticable and anomalous.

354 U.S. at 74 (Harlan, J., concurring in judgment) (emphasis in original).

Notwithstanding the narrow holding in <u>Reid</u>, several lower courts have held that

the Fourth Amendment does have extraterritorial application when the U.S. government

conducts a search or seizure affecting a U.S. citizen.  <u>See</u> <u>United States</u> v. <u>Juda</u>, 46 F.3d 961, 968

(9th Cir. 1995) ("the Fourth Amendment's reasonableness standard applies to United States

officials conducting a search affecting a United States citizen in a foreign country."); <u>Rosado</u> v.

<u>Civiletti</u>, 621 F.2d 1179, 1189 (2d Cir. 1980) ("the Bill of Rights does apply extraterritorially to

protect American citizens against the illegal conduct of United States agents"); <u>United States</u> v.

<u>Conroy</u>, 589 F.2d 1258, 1264 (5th Cir. 1979) ("The Fourth Amendment not only protects all

within our bounds; it also shelters our citizens wherever they may be in the world from

unreasonable searches by our own government."); <u>United States</u> v. <u>Bin Laden</u>, 126 F. Supp. 2d

14

264, 270-71 (S.D.N.Y. 2000) (finding that even though the searches at issue in the case occurred in Kenya, the defendant, who was an American citizen, could bring a Fourth Amendment challenge); Berlin Democratic Club v. Rumsfeld, 410 F. Supp. 144, 157 n.6 (D.D.C. 1976) ("There is no question, of course, that the United States Constitution applies to actions by United States officials taken against American citizens overseas.").

In analyzing whether the Fourth Amendment applies to overseas searches, the Second Circuit has looked to whether: (1) "the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials" and (2) "the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials." United States v. Maturo, 982 F.2d 57, 61 (2d Cir. 1992) (internal citations omitted).[4]

Other Circuits have adopted a "joint venture" test in the Fourth Amendment context and applied the Fourth Amendment to foreign searches where the involvement of U.S. officials turned it into a joint venture between the United States and the foreign officials. These courts have not established a precise test to determine whether the nature or level of U.S. participation in an overseas search was sufficient to transform the activity into a "joint venture," but rather, have instead relied on a very fact-intensive inquiry. See, e.g., United States v. Barona, 56 F.3d 1087, 1091 (9th Cir. 1995) (holding that the Fourth Amendment applied where an American embassy was interested in information to be obtained by wiretaps in Denmark, U.S. agents requested the wiretaps, information obtained through the wiretaps was immediately

---

[4]    There is no evidence here that the involvement of U.K. law enforcement was in any way designed to evade constitutional requirements, and defendants make no such claim; rather, the Government scrupulously followed the terms of the Treaty which governs requests for assistance with gathering evidence in the U.K.

forwarded to the U.S. agents, and the U.S. provided a translator throughout the wiretap

surveillance); United States v. Behety, 32 F.3d 503, 511 (11th Cir. 1994) (holding that the Fourth

Amendment was inapplicable because the search and seizure were conducted primarily by

Guatemalan officials and the limited participation of U.S. officials – providing a tip to the

foreign government and videotaping part of a search conducted by the foreign officials – did not

constitute a joint venture sufficient to invoke the Fourth Amendment); United States v. Peterson,

812 F.2d 486, 488-90 (9th Cir. 1987) (Kennedy, J.) (concluding that a Philippines wiretapping

operation where "[t]he DEA was involved daily in translating and decoding intercepted

transmissions, as well as advising the Philippine authorities of their relevance" was a joint

venture, but finding no Fourth Amendment violation because the search met the Fourth

Amendment's reasonableness requirement); United States v. Marzano, 537 F.2d 257, 269-70 (7th

Cir. 1976) (finding no joint venture where United States law enforcement officers were merely

present at the scene of a search and seizure); Stonehill v. United States, 405 F.2d 738, 746 (9th

Cir. 1968) (finding no joint venture when United States officials offered information to

Philippine officials and had knowledge of the raid conducted by Philippine officials).[5]

   In the Bin Laden opinion addressing defendant El-Hage's challenge to the

---

[5]   Although the Second Circuit appears to have adopted an "agency" test in the Fourth Amendment context, see Maturo, 982 F.2d at 61, the Second Circuit has adopted a version of the "joint venture doctrine" in the Miranda context. See United States v. Yousef, 327 F.3d 56, 145-46 (2d Cir. 2003) (observing that Second Circuit has "implicitly adopted" the "joint venture" doctrine to determine whether "statements elicited during overseas interrogation by foreign police in the absence of Miranda warnings must be suppressed whenever United States law enforcement officials actively participate in questioning conducted by foreign authorities"); see also United States v. Bin Laden, 132 F. Supp. 2d 168, 187 (S.D.N.Y. 2001) (applying "joint venture" exception to overseas interrogation in which United States law enforcement themselves actively participated in the questioning or used the foreign officials as their interrogational agents in order to circumvent the requirements of Miranda).

overseas search of his Kenyan residence, Judge Sand did not rely upon the "agency" or "joint

venture" doctrines in determining whether the Fourth Amendment applied.  <u>See</u> <u>Bin Laden</u>, 126

F. Supp. 2d at 270-71.  Instead, Judge Sand found that even though the search at issue occurred

in Kenya, El-Hage, an American citizen, could bring a Fourth Amendment challenge.  <u>Id</u>.  In this

case, assuming that defendants Tanaka and Vilar can establish standing to challenge the search,

<u>see</u> <u>supra</u> at 8-12, the Court need not reach the issue of how the "agency" or "joint venture"

doctrine would apply in this case because, even if the Fourth Amendment applies, the search in

this case was eminently reasonable under Fourth Amendment jurisprudence.

**B.     The Warrant Requirement Of The Fourth Amendment**
**Should Not Be Applied to Extraterritorial Searches**

     **1.     The Supreme Court Has Strongly Suggested Limiting**
**The Extraterritorial Application Of The Warrant Clause**

       Although neither the Supreme Court nor the Second Circuit has expressly decided

the question of whether the Warrant Clause applies to extraterritorial searches such as the one at

issue here, the Supreme Court's decision in <u>Verdugo-Urquidez</u> is instructive, and should dispose

of the issue.

       Notably, defendants rely heavily on the Ninth Circuit's decision in <u>Verdugo</u>-

<u>Urquidez</u>, 856 F.2d 1214 (1988), which was overturned by the Supreme Court.  (Def.'s Br. at 11-

12).  In <u>Verdugo-Urquidez</u>, the Supreme Court held that the Fourth Amendment did not apply to

warrantless law enforcement searches of the homes of non-citizens abroad.  All but two of the

justices stated or agreed with statements that the warrant requirement did not apply to foreign

searches, regardless of the nationality of the person whose residence was searched.  Chief Justice

Rehnquist, who wrote for five of the six justices in the majority, in specifically rejecting the

Ninth Circuit's holding requiring a warrant for foreign searches, noted that a warrant "would be a dead letter outside the United States."  494 U.S. at 274.

In their concurring opinions, Justices Kennedy and Stevens were equally direct in asserting their view that the Warrant Clause has no extraterritorial applicability.  Justice Kennedy, relying on the same passage from Justice Harlan's concurring opinion in Reid quoted above, concluded that the "conditions and considerations of this case would make adherence to the Fourth Amendment's warrant requirement impracticable and anomalous."  Id. at 277-78.  Justice Kennedy further reasoned that "[t]he absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials all indicate that the Fourth Amendment's warrant requirement should not apply [in foreign countries] as it does in this country."  Id. at 278.  Similarly, Justice Stevens added:  "I do not believe the Warrant Clause has any application to searches of noncitizens' homes[6] in foreign jurisdictions because American magistrates have no power to authorize such searches."  Id. at 279.  Finally, although he dissented, Justice Blackmun agreed "with the Government . . . that an American magistrate's lack of power to authorize a search abroad renders the Warrant Clause inapplicable to the search of a noncitizen's residence outside this country."  Id. at 297.[7]

While the precise holding in Verdugo-Urquidez was limited to the question of the

_____

[6]    As described in subsection C., infra, it is well-established that a person's home is entitled to greater protection than his commercial space under the Fourth Amendment.  See, e.g., Minnesota v. Carter, 525 U.S. 83, 90 (1998).

[7]    Justice Blackmun thought the warrantless search at issue nonetheless violated the Fourth Amendment because he found nothing in the record to show there was probable cause to conduct the search, which in his view was necessary to determine if the search was reasonable.  Id. at 297-98.

extraterritorial application of the Fourth Amendment to searches of non-United States citizens, seven justices in that case expressly stated, or implicitly agreed, that the negative answer to that question depended in large measure on a recognition that the Warrant Clause of the Fourth Amendment did not apply to foreign searches. Justices Kennedy, Stevens, and Blackmun all appeared to agree with this proposition with respect to <u>any</u> searches. <u>Verdugo-Urquidez</u> thus lends solid support to the Government's position that, even if the Fourth Amendment's reasonableness requirement applies to protect United States citizens abroad, a warrant approved by a U.S. court is not required before foreign searches are conducted.

Nothing in the text of the Fourth Amendment itself suggests that all searches or seizures must be conducted with a warrant and be supported by probable cause. Instead, the Ninth Circuit, in <u>Barona</u>, recognized that <u>Terry</u> "and a long line of Supreme Court authority" have held to the contrary. The <u>Barona</u> court compared foreign searches to the search and seizure involved in <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1, 20 (1968), in that they have "neither been historically subject to the warrant requirement, nor could they be as a practical matter." <u>Barona</u>, 56 F.3d at 1093 & n.1. The court further noted that the Warrant Clause does not state that warrants are always required but only the conditions under which they may be issued. <u>Id</u>.

The Ninth Circuit's view is buttressed by the fact that there is no statutory basis for the issuance of a warrant to conduct searches abroad. <u>See</u> Fed. R. Crim. P. 41; <u>United States</u> v. <u>Bin Laden</u>, 126 F. Supp. 2d at 275 (decided before the enactment of the 2002 Amendments to Rule 41).[8] In collectively viewing the Warrant Clause as inapplicable to extraterritorial searches,

---

[8]    Federal Rule of Criminal Procedure 41(b)(3), which was enacted as part of the Patriot Act, allows a magistrate judge, in an investigation of domestic or international terrorism,

the seven Justices in <u>Verdugo-Urquidez</u> were not merely describing the absence of a warrant

mechanism that could, or should, be cured by Congressional enactment.  Rather, they were

describing the absence of a constitutional mandate for such a requirement.  Thus, defendants'

claim that "[t]he fact that Congress has not yet established a specific mechanism for obtaining

warrants for overseas searches does not favor a contrary result" presupposes, but does not

establish, that the warrant requirement would otherwise apply.  (Def.'s Br. at 14).  Although the

applicability of the Warrant Clause may not hinge on Congress's willingness to create a warrant

mechanism, it is clear that the acquisition of a warrant from an U.S. Magistrate Judge in this case

would "have been impracticable given the absence of any statutory provisions empowering a

magistrate to issue a warrant."  <u>Bin Laden</u>, 126 F. Supp. 2d at 276-77 & n.16.[9]

Defendants' argument that because the Government must, and can, obtain a U.S.

arrest warrant prior to filing an extradition request with the United Kingdom, the Government

should be required to obtain a search warrant from a U.S. court prior to issuing an MLAT

request to obtain evidence through an overseas search is wholly inapposite.  <u>See</u> Def.'s Br. at 15.

First, as the defendants concede in their papers, the Extradition Treaty between the United States

--------

– having authority in any district in which activities related to the terrorism may have occurred –
to issue a warrant for a person or property within or outside that district.  <u>See</u> Fed. R. Crim. P.
41(b)(3).  There is no authority suggesting that "outside the district" extends to extraterritorial
searches outside the United States, or to investigations of mere securities frauds.

[9]    Indeed, any Magistrate Judge in the Southern District of New York, sitting at the
western terminus of the Brooklyn Bridge would refuse a request to approve a search warrant for
a warehouse at the eastern terminus of the Brooklyn Bridge because he or she clearly lacks the
power to do so.  It is sheer folly to believe that a Southern District Magistrate Judge would
approve a warrant to search a storage facility in London, England.  Moreover, as the 1990
Advisory Committee Note to Fed. R. Crim. P. 41 makes clear, the Supreme Court expressly
considered and rejected an amendment to the Rule that would have provided a mechanism for
issuing warrants to search property outside the United States.

and the United Kingdom explicitly requires that the Government obtain an arrest warrant prior to lodging an extradition request under that treaty. There are sensible practical concerns that underlie that requirement. Neither party to an extradition treaty would want to expend the resources to effect an arrest and arrange for extradition to the requesting country if, upon delivery of the individual whose extradition was sought, the requesting country did not have an arrest warrant allowing it to take that individual into custody. No such concern is present in the case of searches or seizures.

Second, Article 14 of the Treaty explicitly provides for mutual assistance in executing requests for the search, seizure and delivery of any article to the requesting country: "The Requested Party shall execute a request for the search, seizure and delivery of any article to the Requesting Party if the request includes the information justifying such action under the laws of the Requested Party and it is carried out in accordance with laws of that Party." Article 14 further provides that, "The Requested Party may refuse a request if it relates to conduct in respect of which powers of search and seizure would not be exercisable in the territory of the Requested Party in similar circumstances." Notably, neither Article 14 of the Treaty, nor any other provision thereunder, requires the Government to obtain a search warrant from a U.S. court prior to making a request for search and seizure through the Treaty. The fact that the Government can, and often does, obtain arrest warrants before invoking extradition treaties, simply has no relevance whatever to whether the Government can or must obtain domestic search warrants prior to requesting that the U.K. search and seize documents pursuant to the Treaty.

Finally, the case on which defendants rely, Collelo v. Securities and Exchange

Comm'n, 908 F. Supp. 738 (C.D. Cal. 1995), is distinguishable from the facts here, and should

not be given any weight by the Court.  In Collelo, a District Judge in the Central District of

California found that the civil plaintiff's Fourth and Fifth Amendment rights were violated when

the SEC, through an MLAT request to the Swiss Confederation, obtained an asset freeze in

Switzerland where there had not been a finding of probable cause made prior to the seizure, the

plaintiff had not timely been notified of the seizure, and Swiss law permitted the seizure on

"reasonable suspicion."  Id. at 748-55.  In so holding, the court distinguished Barr v. United

States Department of Justice, 819 F.2d 25 (2d Cir. 1987), in which the Second Circuit upheld an

asset freeze executed by the Swiss government at the request of the United States the day after

the defendant was indicted by a state grand jury for conspiracy, fraud, and grand larceny.

Collelo, 908 F. Supp. at 751 n. 13.  Collelo is not binding on this Court.  Moreover, it is

significant that here, as in Barr, a grand jury had found probable cause that crimes had been

committed by the defendants prior to the seizure at issue.  Although the Government does not

suggest that Barr is dispositive here, for Barr resolved different issues in an entirely different

context, it is more relevant here than is Collelo.  Finally, it is notable that, in Collelo, the remedy

provided by the court was damages, not return of the property nor the equivalent of

suppression.[10]  This Court should not import the unique holding of Collelo to the criminal

context here, where the consequences of applying the exclusionary rule include "substantial

social costs," Leon, 468 U.S. 897, 907-08 (1984).

       Accordingly, based on the weight of authority that the Warrant Clause does not

apply to extraterritorial searches, and the impracticalities of imposing such a requirement, this

---

[10]     Indeed, the Collelo opinion suggested that Collelo would very likely lose the
assets that had been seized as a result of the court's issuance of a disgorgement order.  Id. at 744.

Court should deny defendants' motion to suppress evidence seized in the U.K. on the ground that the Government failed to obtain a U.S. search warrant.

2.    **Extending The Warrant Requirement To Foreign Searches
Would Have Significant and Unpredictable Implications
For The Ability Of The Executive Branch To Conduct Foreign Affairs**

There are substantial separation of powers considerations that strongly counsel against a court-imposed warrant requirement.  Judicial deference to the Executive Branch in the conduct of foreign affairs has been a consistent theme since Curtiss-Wright.  See United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319-20 (1936) (referring to the "very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations"); see also Sale v. Haitian Ctrs. Council, 509 U.S. 155, 188 (1993) (citing Curtiss-Wright in referring to "foreign and military affairs for which the President has unique responsibility"); Webster v. Doe, 486 U.S. 592, 605-06 (1988) (O'Connor, concurring in part and dissenting in part) (quoting Curtiss-Wright description of President's "delicate, plenary and exclusive power"); Harlow v. Fitzgerald, 457 U.S. 800, 812 n.19 (1982) (referring to "such 'central' Presidential domains as foreign policy and national security, in which the President [has a] singularly vital mandate"); First Nat'l City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 767 (1972) (Rehnquist, J., plurality opinion) (observing that "this Court has recognized the primacy of the Executive in the conduct of foreign relations . . . [and has] emphasized the lead role of the Executive in foreign policy").

In Verdugo-Urquidez, Chief Justice Rehnquist recognized this consistent theme of judicial deference to the Executive Branch in the foreign affairs arena and cautioned that the Ninth Circuit's view that the Warrant Clause applied overseas "would apply not only to law

enforcement operations abroad, but also to other foreign policy operations which might result in 'searches and seizures,'" id., 493 U.S. at 273, which, in turn, "could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest." Id. at 273-74.  Thus, the Chief Justice specifically warned:

> Situations threatening to important American interests may arise half-way around the globe, situations which in the view of the political branches of our Government require an American response with armed force.  If there are to be restrictions on searches and seizures which occur incident to such American action, they must be imposed by the political branches through diplomatic understanding, treaty, or legislation.

Id. at 275.

In urging this Court to extend the warrant requirement to the facts presented here, the defendants are, in essence, asking this Court to hold that the U.S. Government's MLAT with the United Kingdom is unconstitutional to the extent that it does not require U.S. law enforcement agents to obtain a search warrant from a U.S. magistrate before conducting a search in the U.K.  Such an argument has no grounding in Fourth Amendment jurisprudence, but also implicates delicate foreign policy considerations by asking this Court to pass judgment on an international treaty and the legal system of a foreign country.   Cf. Underhill v. Hernandez, 168 U.S. 250, 252 (1897) (American courts "will not sit in judgment on the acts of the government of another [country] done within its own territory.").

The principles of international comity recognized in the extradition context are equally compelling here.   On this score, the Second Circuit in United States v. Baez has observed:

> The Judiciary is unquestionably independent of the Executive. However, the cauldron of circumstances in which extradition

agreements are born implicate the foreign relations of the United States.  In sentencing a defendant extradited to this country in accordance with a diplomatic agreement between the Executive branch and the extraditing nation, a district court delicately must balance its discretionary sentencing decision with the principles of international comity in which the rule of specialty sounds.  Courts should accord deferential consideration to the limitations imposed by an extraditing nation in an effort to protect United States citizens in prosecutions abroad . . . If anything, such deference may well allow the United States to secure the future extradition of other individuals because foreign nations would observe that the limitations they negotiated with the Executive branch in respect to the prosecution of their extradited citizens are being honored.  This is not a surrender of the independence of the Judiciary to the Executive branch.  To the contrary, it is the classical deference courts afford to the political branches in matters of foreign policy.

United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003) (internal citations omitted).

In addition to threatening well-established separation of powers principles, imposing a warrant requirement on foreign searches in which U.S. law enforcement agencies participate could have serious ramifications for international terrorism and narcotics cases.  If a warrant requirement for foreign searches is imposed, U.S. law enforcement agents could be seriously hampered in their efforts to work with their international counterparts to investigate and halt crime that transcends national boundaries.  For example, consider a situation in which the FBI is conducting a joint investigation with Scotland Yard to both gather intelligence and evidence for a pending terrorism prosecution in the Southern District of New York and they have reason to believe that evidence relevant to their investigation exists at the home of a U.S. citizen residing in London (who is not a co-conspirator or "foreign agent" as that term is defined under FISA).[11]  In such a situation, requiring the FBI agents involved in the joint investigation to obtain

---

[11]    This set of facts assumes that neither the Foreign Intelligence Surveillance Act ("FISA"), which permits a court to approve a foreign intelligence search if there is probable cause that the subject of the search is a foreign power, or an agent of a foreign power, and that

a U.S. warrant from a U.S. Magistrate Judge before they or their Scotland Yard counterparts could conduct the search of the U.S. citizen's home in London would be unduly burdensome and could offend the sovereignty of the U.K. Government.

Indeed, the Ninth Circuit's opinion in Verdugo-Urquidez aptly described this concern in the international narcotics context: "International law enforcement is a cooperative venture and it would be an affront to a foreign country's sovereignty if the DEA presented an American warrant and suggested that it gave the American agents all the authority they needed to search a foreign residence."  856 F.2d at 1230, overruled on other grounds by Verdugo-Urquidez, 494 U.S. 259 (1990).   Judge Platt expressed a similar concern in holding that the requirements of the Fourth Amendment did not apply to the seizure of a wallet and attaché case from a defendant by Bermudian police officials:

> It is an unfortunate phenomenon that modern day narcotics trafficking is conducted on a global scale with the dealers or traffickers frequently crossing national boundaries.  It is to be expected that United States law enforcement agencies will have to enlist the cooperation of their counterparts in other parts of the world.  This international cooperation does not mandate the conclusion that the assistance rendered by foreign officials thereby makes them agents of the United States and thus subject to our Constitution and jurisprudence.  It may not be expected that foreign law enforcement officials will be familiar with our legal system.  To impose such an onerous burden would unduly hamper cooperative international efforts to stem the flow of narcotics that are poisoning our nation's youth.

United States v. Molina-Chacon, 627 F. Supp. 1253, 1260 (E.D.N.Y. 1986).

The absence of a warrant requirement for foreign searches would not leave the

---

the place to be searched is used by that foreign power, or its agent, see 50 U.S.C. §§ 1805, 1824, nor the foreign-intelligence exception to the warrant clause, see Bin Laden, 126 F. Supp. 2d at 277 (applying exception where, among other things, the search was conducted primarily for foreign intelligence purposes) applies.

behavior of U.S. law enforcement officers unchecked or individual rights unprotected.  The

primary purpose of the warrant clause is provide a check on law enforcement and to have a

neutral and detached magistrate, instead of the law enforcement officer engaged in "ferreting out

crime," evaluate whether there is probable cause to make an arrest or conduct a search.  See

Johnson v. United States, 333 U.S. 10, 13-14 (1948).  When United States law enforcement

officers act abroad, their conduct already is subject to a number of checks including review by

the executive branch through the MLAT process and, in the context of a cooperative search, the

approval of the foreign government.  See Note, The Extraterritorial Applicability Of The Fourth

Amendment, 102 Harv. L. Rev. 1672, 1690 (1989).   Even absent a warrant requirement, the

Fourth Amendment requires that all searches and seizures be reasonable.   Moreover, where the

circumstances of the search are so extreme as to "shock the conscience," courts can invoke their

supervisory powers to exclude the evidence obtained from that search.  See, e.g., United States v.

Toscanino, 500 F.2d 267, 276 (2d Cir. 1974); Peterson, 812 F.2d at 490; Barona, 56 F.3d at

1091; cf. United States v. Molina-Chacon, 627 F. Supp. at 1260 ("The present case, where

United States officials request that their counterparts in another country apprehend a criminal

wanted by the United States and transport him to the United States in accordance with that

country's laws is not such a situation [where overzealous United States law enforcement

personnel attempt to use foreign officials to circumvent constitutional safeguards]").

        In sum, the Court should reject defendants' argument that the Warrant Clause

applies to an extraterritorial search such as that conducted here.

**C.**    **The Search Of Cadogan Tate Was Reasonable Under The Fourth Amendment**

The Fourth Amendment protects the "[r]ight of the people to be secure in their

persons, houses, papers, and effects, against <u>unreasonable</u> searches and seizures."  U.S. Const.,

amend. IV (emphasis added).  "As the text of the Fourth Amendment indicates, the ultimate

measure of the constitutionality of a government search is 'reasonableness.'" <u>Vernonia School</u>

<u>District 47J</u> v. <u>Acton</u>, 515 U.S. 646, 652 (1995).   The assessment of reasonableness under the

Fourth Amendment is fact-specific and not subject to any bright-line rules.  <u>See</u> <u>Ohio</u> v.

<u>Robinette</u>, 519 U.S. 33, 38 (1996) (the Supreme Court has "consistently eschewed bright-line

rules, instead emphasizing the fact specific nature of the reasonableness inquiry").  <u>See</u> <u>also</u>

<u>Wilson</u> v. <u>Arkansas</u>, 514 U.S. 927, 934 (1995) (describing reasonableness requirement as

"flexible"); <u>United States</u> v. <u>Montoya de Hernandez</u>, 473 U.S. 531, 537 (1985) (reasonableness

depends on "all of the circumstances surrounding the search or seizure and the nature of the

search or seizure itself"); <u>Delaware</u> v. <u>Prouse</u>, 440 U.S. 648, 654 (1979) (reasonableness depends

on balance between "intrusion on the individual's Fourth Amendment interests" and "promotion

of legitimate governmental interests"); <u>Coolidge</u> v. <u>New Hampshire</u>, 403 U.S. 443, 509-10

(1971) ("[t]he relevant test is not reasonableness of the opportunity to procure a warrant, but the

reasonableness of the seizure under all the circumstances.").

In evaluating the reasonableness of searches under the Fourth Amendment, courts

consider the affected individual's subjective expectations of privacy, as limited by society's

recognition of those expectations.  <u>See</u>, <u>e.g.</u>, <u>Rakas</u> v. <u>Illinois</u>, 439 U.S. 128, 144 n. 12 (1978)

("Legitimation of expectation of privacy by law must have a source outside of the Fourth

Amendment, either by reference to concepts of real or personal property law or to

28

understandings that are recognized and permitted by society."). In the case of an extraterritorial search, a U.S. court must decide what constitutes a "reasonable" search from the perspective of the norms of the country where the search occurs. Indeed, in evaluating the reasonableness of foreign searches, courts have found that where the law of the foreign nation is followed, the reasonableness requirement of the Fourth Amendment is satisfied. In Peterson, then Judge Kennedy observed that if a foreign "joint venture" search of an American citizen complies with the requirements of foreign law, that search should be accepted as reasonable within the meaning of the Fourth Amendment. Peterson, 812 F.2d at 491; see also Barona, 56 F.3d at 1094 ("In determining whether a search was reasonable, we must first consult the law of the relevant foreign countries."); United States v. Juda, 46 F.3d 961 (9th Cir. 1994) (a search affecting a United States citizen in a foreign country is reasonable if it conforms to the requirements of foreign law); Note, The Extraterritorial Applicability Of The Fourth Amendment, 102 Harv. L. Rev. 1672, 1687 (1989) ("A country's law provides the surest source for ascertaining its societal norms of privacy. The law of a foreign country, then, should determine the reasonableness of an expectation of privacy within that country."); cf. Verdugo, 494 U.S. at 279 (Stevens, J., concurring in the judgment) (agreeing that the "search conducted by the United States agents with the approval and cooperation of the Mexican authorities was not 'unreasonable'").

Here, the defendants' expectation of privacy in office materials that were stored at an offsite storage facility cannot reasonably trump the privacy rights recognized by U.K. law. At the outset, it is important to note that the defendants' privacy expectations in the area that was searched (the Cadogan Tate storage facility) and the items seized (Amerindo business records) were already diminished because their homes were not searched. It is axiomatic that "an

29

expectation of privacy in commercial premises, however, is different from, and less than, a similar expectation in an individual's home." New York v. Burger, 482 U.S. 691, 700 (1987); Carter, 525 U.S. at 90; ("Property used for commercial purposes is treated differently for Fourth Amendment purposes from residential property."); United States v. Haqq, 278 F.3d at 54 (recognizing the different levels or degrees of privacy interests between the inside of one's home and other areas: "The protection of the Fourth Amendment, by necessity, exists in degrees."). Even more significant, however, is the fact that the search in this case was of a storage facility containing business records of foreign companies, including Amerindo U.K., a U.K. company that was registered with and regulated by a U.K. regulatory agency, the Financial Services Authority. Thus, the defendants' expectations of privacy were even further reduced under the Fourth Amendment given that the search at issue in this case was of foreign companies' records stored at an overseas storage facility.

Not only was there a diminished expectation of privacy in a storage facility containing business records of foreign companies, but the government intrusion in this case complied with local law and thus did not violate any reasonable expectation of privacy as determined by U.K. norms. Detective Sergeant Shaw obtained valid warrants pursuant to U.K. law from two U.K. judges. The warrants authorized not only the search of the Cadogan Tate facility, but expressly permitted the participation of U.S. Postal Inspectors in that search. U.S. Postal Inspectors participated in the search of the Cadogan Tate facility at the request of U.K. law enforcement authorities with knowledge that Detective Sergeant Shaw had obtained U.K warrants granting them permission to participate in the search. In arguing that the search in this case was not reasonable under the Fourth Amendment, Vilar and Tanaka are essentially asking

30

the Court to find that their expectations of privacy in the records of foreign companies located at an offsite storage facility trumped the power of the United Kingdom – a government under whose laws Tanaka chose to live, under whose laws both defendants chose to establish and operate a business, and on whose soil they chose to store their business records – to secure a warrant to conduct a search of those records in compliance with U.K. law. Whatever the proper contours of a reasonableness inquiry in evaluating the legality of a foreign search under the Fourth Amendment may be– a question which has not been definitively answered – the defendants' arguments must fail here. When balancing the intrusion on the defendant's Fourth Amendment interests against the promotion of legitimate government interests in this case, it is plain that the search of the Cadogan Tate facility was manifestly reasonable.

       Put another way, it is axiomatic that the Fourth Amendment protects objectively reasonable expectations of privacy. Any person storing documents in a warehouse in the U.K. can objectively and reasonably expect no more privacy than the protections, such as they are, provided by applicable U.K. law. Thus, if U.K. law permits a search pursuant to a U.K. warrant, then so long as this Government obtains a U.K. warrant, the U.K. search was reasonable.

       Furthermore, the limited scope of the seizure  – approximately 43 boxes out of approximately 320 boxes of documents – and the manner in which the search was executed (under the supervision of U.K. authorities), demonstrate that the search was executed in a reasonable manner and was not, as defendants allege, conducted pursuant to a general warrant or an "overbroad U.K. warrant without any restriction." (Def.'s Br. at 16). The search of Cadogan Tate was conducted during the daytime, the Metropolitan Police created an inventory of the items seized, and U.S. Postal Inspectors, including the case agent, who had knowledge about the

31

case, were present for and participated in the search.  See Bin Laden, 126 F. Supp. 2d at 285

(finding that the limited scope and overall nature of the search indicated that the search was

executed in a reasonable manner and was not conducted pursuant to a general warrant).

Moreover, the scope of the search was limited to those items which were believed to have

evidentiary value for the charges contained in the Indictment (for which a grand jury sitting in

this District had determined there was probable cause), and for the Government's ongoing

investigation into other schemes, including the GFRDA fraud scheme,[12] that were not charged in

the Indictment pending at the time of the search.  In these circumstances, the search was plainly

reasonable under the Fourth Amendment.

## POINT III

### Even If The Search Violated The Fourth Amendment,
### The Good Faith Exception To The Exclusionary Rule Should Apply

Even if the search violated the Fourth Amendment or failed to comply fully

with U.K. law, the exclusionary rule should not be applied because doing so would not fulfill its

policy goal of deterring unlawful searches and because the search was conducted in good faith.

See Bin Laden, 126 F. Supp. 2d at 282 (foreign electronic surveillance in a terrorism

investigation was unlawful because the Government failed to obtain prior approval from the

President or the Attorney General; however, "exclusion of this evidence would be inappropriate

because it would not have the deterrent effect which the exclusionary rule requires and because

the surveillance was undertaken in good faith.").

---

[12]     The GFRDA scheme was charged in the second superseding Indictment returned
by the grand jury on January 31, 2006.

The Supreme Court has made it clear that the use of evidence obtained in violation of the Fourth Amendment does not itself violate the Constitution. Pennsylvania Bd. of Probation and Parole v. Scott, 524 U.S. 357, 362 (1998). Instead, "a Fourth Amendment violation is 'fully accomplished' by the illegal search or seizure, and no exclusion of evidence from a judicial or administrative proceeding can 'cure the invasion of the defendant's rights which he has already suffered.'" Id. (quoting United States v. Leon, 468 U.S. 897, 906 (1984)). The exclusionary rule which precludes use of the evidence at trial is "a judicially created means of deterring illegal searches and seizures," Scott, 524 U.S. at 363, that has been restricted over time. United States v. Varela, 968 F.2d 259, 263 (2d Cir. 1992) (noting "repeated weakening of the exclusionary rule").

"Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." United States v. Calandra, 414 U.S. 338, 348 (1974). "Society pays a heavy price when relevant probative evidence of a defendant's guilt is excluded from consideration at trial." Varela, 968 F.2d at 263 (Walker, J., concurring). Thus, although the Supreme Court has held that such a cost is "worth bearing in certain circumstances," it has "repeatedly emphasized that the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging application of the rule." Scott, 524 U.S. at 364 (quoting United States v. Payner, 447 U.S. 727, 734 (1980)). "If the exclusionary rule is the 'strong medicine' that its proponents claim it to be, then its use in the situations in which it is now applied . . . must be assumed to be a substantial and efficient deterrent." United States v. Janis, 428 U.S. 433, 453

(1976).  Because application of the exclusionary rule in the circumstances presented here would

serve no deterrent purpose, the Court should deny defendants' motion to suppress.

First, for the reasons described above, the "failure" to obtain a U.S. search

warrant ought not be construed as evidence of something less than good faith.  At the time the

search was conducted, there was no statutory basis for U.S. Postal Inspectors to obtain a U.S.

search warrant to conduct the overseas search.  See Fed. R. Crim. 41(b)(1) (only a magistrate

"within the district" containing the property to be searched may issue a warrant).  Therefore, no

valid claim can be made that the U.S. Postal Inspectors violated any U.S. statute or established

U.S. precedent when they participated in the U.K. search at Cadogan Tate.  Good faith is

assessed by reference to the state of circuit law at the time the search was conducted, see United

States v. Burke, 718 F. Supp. 1130, 1145 (S.D.N.Y. 1989), and the law did not require or permit

the Postal Inspectors to obtain a U.S. warrant.[13]

Second, the application of the good faith exception is particularly applicable in

the present case because of the extensive review process by two governments that preceded the

issuance of the U.K. warrants.  Here, the warrants were "approved" by an Assistant United

States Attorney, OIA, the Central Authority for the U.K., a Detective Sergeant of the

Metropolitan Police, and two separate U.K. judges.  The fact that the Treaty process was

followed gave the Postal Inspectors confidence that they were acting lawfully.  The United

---

[13]     That fact that there was no U.S. warrant is not a bar to application of the good faith exception as defendants contend.  (See Def.'s Br. at 19-20).  The very cases cited by defendants demonstrate that the good faith exception applies in cases involving "warrantless" searches.  See  Bin Laden, 126 F. Supp. 2d at 283 ("... the good faith exception has been expanded, since Leon, to cases involving warrantless searches."); Ajlouny, 629 F.2d 830, 840 (2d Cir. 1980) (declining to apply exclusionary rule in a case where officers undertook a warrantless foreign intelligence search with the good faith belief that their conduct was lawful).

34

States did not autonomously engage in an overseas search.  Rather, it followed well-established

process that aimed to ensure the search remained within the confines of U.K. law.  In order to

search Cadogan Tate, the Government relied on the Treaty, which explicitly provided that in

executing requests, the Requested Party would not take action incompatible with its own laws.

See Treaty Art. 5, sec. 3; Art. 14, sec. 2; Peterson, 812 F. 2d at 492 ("American law enforcement

officers were not in an advantageous position to judge whether the search was lawful, as would

have been the case in a domestic setting.").  It is difficult to imagine a situation in which a law

enforcement official's reliance on warrants that had endured such scrutiny would not constitute

good faith.

        Third, the good faith exception applies because the Postal Inspectors acted in

objective good faith reliance on two facially valid U.K. search warrants that a U.K. law

enforcement officer represented to be valid under U.K. law.[14]  See United States v. Leon, 468

U.S. at 922; Peterson, 812 F.2d at 492 (extending the reasoning of Leon "to reliance on foreign

law enforcement officers' representations that there has been compliance with their own law").

United States law enforcement officers face special challenges when requesting or assisting in

overseas searches, including "the lack of familiarity with foreign procedures and foreign law."

United States v. Staino, 690 F. Supp. 406, 411 (E.D. Penn. 1988).  These officers cannot know

the criminal procedures of every jurisdiction from which the United States requests evidence,

much less know those procedures well enough to question the assertions of local authorities.  Cf.

Leon, 468 U.S. at 921 (". . . an officer cannot be expected to question the magistrate's probable-

---

[14]        Should the Court find it necessary to reach the issue of good faith in deciding this
motion, the Government intends to call witnesses including Detective Sergeant Shaw and
Inspector Fraterrigo.  Their testimony would establish that U.K. law was followed and that the
Postal Inspectors had every reason to believe that the search that they conducted was lawful.

cause determination or his judgment that the form of the warrant is technically sufficient").  U.S. agents must instead rely on "foreign law enforcement officers' representations that there has been compliance with their own law."  Peterson, 812 F.2d at 492; see also Barona, 56 F.3d at 1093 n.1; Juda, 46 F.3d at 968 ("The DEA agent reasonably relied on [the representations of the Australian Federal Police], and accordingly, the good faith exception to the exclusionary rule applies."); Staino, 690 F. Supp. at 410 (concluding "that the exclusionary rule does not extend to an official's good-faith reliance on representations of foreign officers that the search complies with foreign law").  Due to this necessary reliance, the Ninth Circuit has recognized that holding law enforcement officers "to a strict liability standard for failings of their foreign associates would be even more incongruous than holding law enforcement officials to a strict liability standard as to the adequacy of domestic warrants."  Peterson, 812 F.2d at 492 (Kennedy, J.).

　　　　　For this reason, the defendants' assertion that "the postal inspectors who executed the search at Cadogan Tate were aware that U.K. Warrant had issued upon false representations" is untenable.  (Def.'s Br. at 23).  Not only is there no evidence that the U.S. Postal Inspectors saw the "Information" containing the allegedly false statements made to the U.K. magistrates prior to or during the execution of the warrants issued by those judges, but U.S. Postal Inspectors are not experts in U.K. law and should not be expected to be versed in the intricacies of foreign law.  In any event, as Detective Sergeant Shaw's testimony would make clear, his application and representations to the British magistrate in connection with obtaining the warrant in this case were accurate, were made in good faith, and resulted in the issuance of appropriate warrants.

　　　　　Because the U.S. Postal Inspectors reasonably believed in good faith that their conduct was in accordance with the law of the jurisdiction in which they conducted the search,

"the imperative of judicial integrity is not offended by permitting unlawfully obtained evidence to be introduced at trial."  United States v. Ajlouny, 629 F.2d at 840-41; see also Peterson, 812 F.2d at 491-92 (explaining that when law enforcement officers act on a "reasonable reliance on representations about foreign law" the exclusionary rule does not function as a deterrent). Contrary to defendants' assertions, the Postal Inspectors should have gained "comfort from the fact that a U.K. court had issued a warrant."  (Def.'s Br. at 19.)  Combined with the assurances from U.K. law enforcement officials, the signed warrants offered powerful evidence that the police were following legally required procedures.  Cf. Peterson, 812 F.2d at 492 (where no judicial authorization for wiretap was obtained, reliance on representation of foreign law was proper when "federal officers sought, and received, assurances from high ranking law enforcement authorities in the Philippines that all necessary authorization was being obtained"). In sum, application of the exclusionary rule here would not serve to deter any adverse conduct on the part of U.S. officials.  See Ajlouny, 629 F.2d at 840-41 (explaining that the good faith of government agents "tends to undercut any deterrence that might be achieved by the application of the exclusionary rule").

The defendants also argue that the Government could not have reasonably relied on the U.K. Warrant because it contained the same purported flaws about which the defendants had previously complained with regard to a domestic warrant.[15]  As explained above, the U.S. Postal Inspectors reasonably relied on the assurances of legality – including the fact that the warrants were issued by two different British magistrates – as credible evidence that the search

---

[15]    The Government's rebuttals to the defendants' arguments in support of their motion to suppress the evidence seized from Amerindo U.S. are set forth in its memoranda in response to the Defendants' pretrial suppression motions.

37

was legal under British law and therefore reasonable under the Fourth Amendment. See Peterson, 812 F.2d at 492; Burke, 718 F. Supp. at 1141 (considering in the "good faith" analysis the fact that the warrants "were approved by no fewer than three federal court magistrates and an Assistant United States Attorney"). But even were the Court to hold that the Inspectors should have judged the lawfulness of the warrants approved by U.K. courts by U.S. standards of breadth and specificity, the Government would be prepared to present evidence about the manner in which the search was executed, particularly its limited scope, to demonstrate its reasonableness under the Fourth Amendment and the applicability of the Leon good faith exception.

Finally, Defendants' argument that the Court should apply the Exclusionary rule in this case because it would deter Government *attorneys*, specifically prosecutors and OIA attorneys, from executing foreign searches without first obtaining a warrant from a U.S. magistrate misses the mark. (Def.'s Br. at 20-21). Defendants cite no authority for the proposition that the good faith of anyone other than the agents involved in the search ought to be considered in determining whether the exclusionary rule applies, and the Government is aware of none. In any event, the Government attorneys acted in good faith and complied with the Treaty in all respects.

Accordingly, the Court should find that the good faith exception of Leon applies and should deny defendants' motion to suppress.

## POINT IV

### The Defendants Are Not Entitled To A *Franks* Hearing

The defendants request a Franks hearing to challenge the assertions made by a

U.K. law enforcement officer to a U.K. court in support of his warrant applications.  Specifically,

defendants claim that Detective Sergeant Shaw's representations that he was "satisfied that the

material does not include items subject to legal privilege, excluded material or special procedure

material," and that "it would not be practicable to communicate with any person entitled to grant

entry to the premises" were knowingly or recklessly false (Def.'s Br. at 17-19, 26).  In making

this request, the defendants fail to identify any basis for extending Franks to an application

submitted by a foreign law enforcement officer to foreign judges for foreign warrants, but rather

implicitly assume that Franks, like the warrant requirement, applies to an overseas search.  The

defendants' request has no basis in law or fact and should be rejected.

Under Franks v. Delaware, 438 U.S. 154 (1978), a defendant may challenge the

propriety of a search warrant "where the affidavit in support of the search warrant is alleged to

contain deliberately or recklessly false or misleading information." United States v. Canfield,

212 F.3d 713, 717 (2d Cir. 2000).  In issuing its ruling in Franks, the Supreme Court observed

that "[i]n deciding today that, in certain circumstances, a challenge to a warrant's veracity must

be permitted, we derive our ground from language of the Warrant Clause itself, which surely

takes the affiant's good faith as its premise: '[N]o Warrants shall issue, but upon probable cause,

supported by Oath or affirmation . . . .'" Franks, 438 U.S. at 164.  In its opinion, the Supreme

Court quoted Judge Frankel in United States v. Halsey, 257 F. Supp. 1002, 1005 (S.D.N.Y.

1966): "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise

'probable cause,' the obvious assumption is that there will be a *truthful* showing." Franks, 438 U.S. at 164-65 (emphasis in original).

As the above quoted language makes clear, the Supreme Court's holding in Franks is premised on the applicability of the Fourth Amendment's warrant requirement based on a probable cause finding. As described in Section II, supra, even if the Fourth Amendment applies generally abroad to protect United States citizens, a warrant or a probable cause determination from U.S. courts is not required before foreign searches are conducted. Thus, asking this Court to extend not only the warrant requirement, but the Supreme Court's ruling in Franks to overseas searches, implicates delicate separation of powers issues and runs roughshod over the power entrusted to the Executive to conduct this nation's foreign affairs. A direct consequence of the defendants' proposed relief – to extend Franks to an overseas search warrant and hold a hearing to assess the veracity of a foreign agent's affirmation to a U.K. Court – is to invite the U.S. judiciary into the foreign affairs arena, which would have serious diplomatic ramifications. Accordingly, the Government urges this Court to reject the defendants' motion.

Even assuming arguendo that Franks applies to overseas search warrants obtained by a foreign law enforcement officer, the defendants have wholly failed to establish that the alleged inaccuracies regarding the existence of privileged and special protection material in the items to be searched, and the practicability of communicating with anyone entitled to grant entry to the premises, would have been material and necessary to the judge's findings that warrants should be issued. Where the alleged inaccuracies are not material to the probable cause analysis, it is not necessary to determine whether "they are actually erroneous or whether they were the result of the affiant's intentional falsehood or 'reckless disregard for the truth.'" Canfield, 212

40

F.3d at 718.  By the defendants' own admissions, the alleged falsehoods in Detective Shaw's information relate to whether Detective Shaw obtained the right kind of warrant (Section 8 warrant versus Schedule I warrant/order) under U.K. law, not to whether a warrant should have been issued in the first place.  (Def.'s Br. at 18-19).  Thus, the defendants' request for a <u>Franks</u> hearing should be denied because none of the alleged inaccuracies in Detective Shaw's Information (separately or collectively) were material to the determination of whether the Court should authorize the search the Cadogan Tate facility in this case.

In any event, even if any of the information identified by the defendants could be viewed as material to the judge's finding, there is no basis to conclude that any material omissions were intentionally or recklessly made.  In fact, the defendants do not – nor could they – contend that Detective Shaw intentionally or deliberately made false representations in the Information.  Although the defendants in a conclusory fashion state that "Detective Shaw either knew or should known" (Def.'s Br. at 18), that the search materials would contain legally privileged and special protection material, defendants fail to make any showing, let alone a substantial one, <u>see</u> <u>Canfield</u>, 212 F.3d at 717-18,  that Detective Shaw deliberately misled the U.K. Magistrate Judge or recklessly disregarded the truth in the Information.  Their argument relies on the assumption that Shaw communicated with Inspector Fraterrigo about whether he should expect to find privileged information at Cadogan Tate prior to obtaining the search warrant, and makes no claim that any such communication ever occurred.

In sum, the defendants have not made a substantial preliminary showing that the Information contained inaccuracies that were necessary to the Magistrate Judge's determination that a warrant should be issued or that there is any basis to conclude that Detective Shaw

intended to mislead the U.K. Magistrate Judges in submitting the Information.  Accordingly, the

defendants' request for a <u>Franks</u> hearing should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, the defendants' motion to suppress evidence seized

from the United Kingdom should be denied.


Dated: March 31, 2006
      New York, New York


                               Respectfully submitted,

                               MICHAEL J. GARCIA,
                               United States Attorney for the
                               Southern District of New York,
                               *Attorney for the United States of America*


                          By: <u>/s/</u>_____
                               Deirdre A. McEvoy/Marc Litt
                               Assistant United States Attorneys
                               (212) 637-2309 /2295