UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA          :

        -v.-          :          S3 05 Cr. 621 (KMK)

ALBERTO WILLIAM VILAR,          :
  a/k/a, "Albert Vilar," and
GARY ALAN TANAKA,          :

           Defendants.          :
--------------------------------------------------------x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR A *FRANKS* HEARING

MICHAEL J. GARCIA
*United States Attorney for the*
*Southern District of New York*

*Attorney for the United States of America*

Marc Litt
Deirdre A. McEvoy
*Assistant United States Attorneys*
    *Of Counsel*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Point I:        Inspector Fraterrigo Did Not Withhold
                    Material Information From The Reviewing Magistrate . . . . . . . . . . . . . 15

          A.      Defendants' Claim That Inspector Fraterrigo's
                    Failure Inform The Magistrate That Amerindo U.S.
                    Could Not Have Been Involved In Defendants' Fraud
                    Is A Red Herring Which Is Refuted By The Evidence . . . . . . . . . . . . . . 16

          B.      There Is No Evidence That Inspector Fraterrigo Knew,
                    Or Should Have Known More About The Experiences
                    Of Paul Marcus And Joy Urich With Amerindo
                    Than What She Reported In The Warrant Affidavit . . . . . . . . . . . . . . . . 25

               1.     Paul Marcus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

               2.     Joy Urich . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

          C.      Inspector Fraterrigo Did Not Mislead The Magistrate
                    By Failing To Report That Cates And The Mayers
                    Had Successfully Received Funds From Amerindo In The Past . . . . . . . 31

          D.      None Of The Asserted Misrepresentations
                    Or Omissions Was Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    Point II:      Defendants' Claim That Inspector Fraterrigo
                    Admitted To Misleading Magistrate Judge Maas
                      About The Existence Of Probable Cause Is Belied By The Record . . . . 38

    Point III:     Inspector Fraterrigo's Testimony About The Return Of
                    Seized Items To Amerindo U.S. And Her Drafting Of
                    Tanaka's Memorandum Of Interview Is Not A Basis To
                    Question Her Veracity And Is Irrelevant To The *Franks*
                    Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Point IV:      The Execution Of The Search Warrant Did Not Destroy The
               Amerindo U.S. Business And Any Effect Of The Search Is,
               In Any Event, Irrelevant To Defendants' *Franks* Motion . . . . . . . . . . . 49

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

# TABLE OF AUTHORITIES

Beard v. City of Northglenn, 24 F.3d 110 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Franks v. Delaware, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Illinois v. Gates, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Rivera v. United States, 928 F.2d 592 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Atkin, 107 F.3d 1213 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

United States v. Awadallah, 349 F.3d 42 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

United States v. Campino, 890 F.2d 558 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Canfield, 212 F.3d 713 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

United States v. Colkley, 899 F.2d 297 (4th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Cook, 348 F. Supp. 2d 22 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Dale, 991 F.2d 819 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 28

United States v. Davis, 617 F.2d 677 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Lopez, No. 96 Cr. 105 (RSP), 1997 WL 567937
    (N.D.N.Y. Sept. 11, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Markey, 131 F. Supp. 2d 316 (D. Conn. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Martin, 426 F.3d 68 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Mastroianni, 749 F.2d 900 (1st Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 28

United States v. Millar, 79 F.3d 338 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Miller, 753 F.2d 1475 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 28

United States v. Ozar, 50 F.3d 1440 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 28

United States v. Perez, 247 F. Supp. 2d 459 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

iii

United States v. Ranney, 298 F.3d 74 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 28

United States v. Rivera, 728 F. Supp. 250 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Salameh, 152 F.3d 88 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Singh, 390 F.3d 168 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16, 40

United States v. Whitley, 249 F.3d 614 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

United States v. Williams, 737 F.2d 594 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Young Buffalo, 591 F.2d 506 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . 14, 15, 28

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | |
| -v.- | :     **S3 05 Cr. 621 (KMK)** |
| | |
| **ALBERTO WILLIAM VILAR,** | : |
|   a/k/a, "Albert Vilar," and | |
| **GARY ALAN TANAKA,** | : |
| | |
| **Defendants.** | : |

-------------------------------------------------------x

### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR A *FRANKS* HEARING

### PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the

defendants' motion for a hearing pursuant to <u>Franks</u> v. <u>Delaware</u>, 438 U.S. 154 (1978) (the

"Motion").[1]  Defendants aver that U.S. Postal Inspector Cynthia Fraterrigo[2] deliberately or

recklessly misled U.S. Magistrate Judge Frank Maas in the affidavit submitted in support of her

---

[1] "Tanaka Mem." refers to the memorandum of law filed by defendant Gary Alan Tanaka in support of the Motion.  "Vilar Ltr." refers to the revised and corrected letter brief filed by defendant Alberto Vilar on August 31, 2006 in which he joined in the Motion.  "Margolis Decl." refers to the August 30, 2006 declaration of Jessica L. Margolis, Esq. filed in support of the Motion.  "Licker Aff." refers to the August 29, 2006 Affidavit of Eugene Licker, Esq. filed in support of the Motion.  The search warrant issued by Magistrate Judge Maas on May 25, 2005, to search the Amerindo U.S. office at 399 Park Avenue in New York, New York, is referred to herein as the "Warrant."  The materials presented to Magistrate Maas in support of the application for the Warrant, including the warrant affidavit (the "Warrant Affidavit"), the criminal complaint against Alberto William Vilar, a/k/a Albert Vilar (the "Vilar Complaint"), and the criminal complaint against Gary Alan Tanaka (the "Tanaka Complaint") are referred to collectively as the "Warrant Application."  "Litt Decl." refers to the September 21, 2006 Declaration of Assistant U.S. Attorney Marc Litt filed in connection with this opposition brief.

[2] On or about August 19, 2006, Inspector Fraterrigo transferred from the U.S. Postal Inspection Service to the U.S. Postal Service Office of Inspector General where she currently serves as a Special Agent.

application for a warrant to search the offices of Amerindo Investment Advisors Inc. ("Amerindo U.S.") by: (1) omitting certain information that she purportedly knew or should have known about the business of Amerindo U.S. and two investors who she reported "may have had trouble redeeming all or part of their investments"; and (2) misrepresenting to the Magistrate her belief about the existence of probable cause to issue the Warrant. Each of the arguments advanced by the defendants should be rejected by the Court. Defendants' arguments about alleged omissions from the warrant affidavit consist of speculation, are not based on any evidence that Inspector Fraterrigo actually knew any of the purportedly material omitted facts, and amount to an argument that Inspector Fraterrigo conducted insufficient investigation prior to seeking the Warrant. Defendants cite no authority for the proposition that a failure to take an investigative step is grounds for a <u>Franks</u> hearing, and their claim should be rejected. Defendants' characterizations of the evidence concerning Inspector Fraterrigo's views concerning the existence of probable cause in support of the Warrant Application twist the record beyond recognition. Inspector Fraterrigo's testimony made clear that she believed, and still believes, that there was probable cause to support the Warrant. But ultimately, the decision about whether there was probable cause was the exclusive province of U.S. Magistrate Judge Frank Maas. Accordingly, defendants' motion for a <u>Franks</u> hearing should be denied.

## **Background**

On May 25, 2005, Inspector Fraterrigo, accompanied by AUSA Marc Litt, presented the Warrant Application to U.S. Magistrate Judge Frank Maas.[3]  The Warrant

---

[3]  Defendants mischaracterize the record when they state that AUSA Litt and Inspector Fraterrigo presented the Application to the Magistrate at "approximately 10:00 p.m." Tanaka Mem. at 4. AUSA Litt and Postal Inspector Fraterrigo consistently testified that Judge Maas

Application alleged facts concerning one or more fraudulent schemes perpetrated by the

defendants in their capacities as investment advisers.  The Warrant Affidavit explicitly noted

that, "[b]ecause this affidavit is submitted for the limited purposes of establishing probable cause

to search the premises described below and seize certain items as specified in Schedule A hereto,

I have not included the details of every aspect of the investigation."  (Margolis Decl., Ex. B at ¶

2).  The Warrant Affidavit summarized the results of an investigation into an ongoing scheme

that had led to losses of at least approximately $17 million by two investors who had entrusted

their funds with Amerindo and the defendants for more than fifteen years.  The Warrant

Affidavit, through the Vilar Complaint, which was incorporated by reference, outlined

substantially all of the factual allegations contained in the Indictment concerning the SBIC fraud

and the misappropriation of $250,000 from Cates.[4]  In addition, the Warrant Affidavit provided

---

reviewed the Application for at least one hour.  See Litt Decl. Ex. A at 101 ("And then we went
to Magistrate Judge Maas from approximately sometime between 9 and 9:30 on May 25, till
10:30, when he issued the warrant.  And I observed Magistrate Maas read the two criminal
complaints, the search warrant affidavit, and the search warrant and rider in my presence during
that approximately hour to hour-and-15-minute time period." and 172 ("Q.  Is it your testimony
that Magistrate Judge Maas took the papers and read over them for over an hour before issuing
the warrants?  A.  At least approximately one hour."); Ex. B at 43 ("Q.  How long did you spend
in Magistrate Maas' residence, approximately?  A.  Approximately one hour.").  It is undisputed
that the Warrant was signed at 10:30 p.m. on May 25.  See Margolis Decl., Ex. A.  Accordingly,
contrary to defendants' assertion, the evidence is clear that the Warrant Application was
presented to the Magistrate between approximately 9:15 and 9:30 p.m., not 10:00 p.m., and that
he reviewed the Warrant Application for at least one hour, not 30 minutes, as defendants
implicitly suggest.

[4]  The Vilar Complaint did not allege that approximately $2.85 million of Cates'
Amerindo SBIC investment was used to redeem another investor for an investment unrelated to
the SBIC as did the Indictment; rather the criminal complaint reported only that those funds were
wire transferred to an overseas bank account based on written instructions.  (Indictment ¶ 25;
Margolis Decl., Ex. C at ¶ 13(e)).  The Warrant Affidavit, however, did conclude based on that
fact, among others, that there was probable cause to believe that Vilar and Tanaka "have
converted investor funds to their own personal use, and are conducting a Ponzi-type scheme in

information about another investment made by Cates in or about 1988 in an entity called Rhodes
Capital ("Rhodes"), in return for which she received a stock certificate for two shares signed by
Vilar and Tanaka.  (Margolis Decl., Ex. B at ¶ 6.B).  Cates' attempts to learn about that million
dollar investment were ignored or rejected by Vilar.  (Id.).  When Cates attempted to redeem her
entire investment portfolio at Amerindo, including her $1 million investment in Rhodes, and her
$5 million investment in the Amerindo SBIC, Amerindo and Vilar refused to move her portfolio
to a Bear, Stearns account.  (Id.).  Moreover, Vilar informed Cates for the first time in their
nearly twenty-year relationship that she was a client of Amerindo Panama and that any
redemption request would have to be submitted to that entity.  (Id.).  Vilar also informed Cates
that any redemption would be reduced by unspecified fees and taxes – a significant matter that
had never been previously mentioned to Cates.  (Id.).  Finally, in a May 20, 2005 letter to the
SEC, in response to a complaint about his handling of the Cates account, Vilar stated that Cates
had always been a client of Amerindo Panama, not Amerindo U.S., that Amerindo Panama had
been sold in 2001, and that there was currently no overlap between the directors, officers and
employees of the two separate entities.  (Id.).  Cates also identified for Inspector Fraterrigo three
individuals (Brian Harvey, Joy Urich, and Paul Marcus) that she believed to be Amerindo
investors who may have had trouble redeeming all or part of their investments.  (Margolis Decl.,
Ex. B at ¶ 6.E).

       The Warrant Affidavit also recounted information provided to Fraterrigo by
another victim, Lisa Mayer.  Mayer's family had invested approximately $12 million in

---

which investor funds are not being properly accounted for and segregated."  (Margolis Decl., Ex.
B at ¶ 8).

4

Guaranteed Fixed Rate Deposit Accounts ("GFRDAs") – accounts which had been described by Vilar, in writing, as being "invested largely in bank certificates of deposit, government securities and other investments 'which are absolutely safe and liquid.'" (Margolis Decl., Ex. B at ¶ 6.A). The Warrant Affidavit further reported that the Mayers' efforts to redeem their $12 million investment, beginning in 2003, were rebuffed by Vilar, Tanaka, Tanaka's wife, and Amerindo, and that Vilar had threatened to create tax problems for the Mayers were they to continue in their efforts to do so. (Id.).

The Warrant Affidavit stated that tens of millions of dollars had been wire transferred from four Amerindo brokerage accounts at Bear Stearns, each of which had been opened by Amerindo, Tanaka and Vilar, on behalf of Panamanian entities (the "Amerindo Brokerage Accounts" which are further defined in the Tanaka Complaint, see Margolis Decl., Ex. D at ¶ 8), to a Bahamian bank account in the name of PTC Management Limited – the same entity through which Vilar induced the Mayers to manage much of their Amerindo investments. (Margolis Decl., Ex. B at ¶¶ 6.A, 6.C). The Amerindo Brokerage Accounts were also used to convert approximately $5.25 million of Cates' funds to the defendants' use. (Margolis Decl., Ex. C at ¶¶ 13, 14, 22). Approximately $717,000 of Cates' Amerindo SBIC investment was used by Vilar to make charitable contributions to Washington & Jefferson College, his alma mater, and to the American Academy in Berlin. (Id. at ¶¶ 13-14).[5] Furthermore, more than $15 million of wire transfers were made from the Amerindo Brokerage Accounts to the same Amerindo business checking account to which $650,000 of Cates' Amerindo SBIC investment was

---

[5] Vilar had reportedly made approximately $200 million in charitable donations to various organizations around the world. (Margolis Decl., Ex. C at ¶ 7).

transferred to pay Amerindo business expenses including taxes, payroll and rent.  (Id. at ¶ 15; Margolis Decl., Ex. D at ¶ 13).

Finally, through the incorporation of the Tanaka Complaint, the Warrant Affidavit provided information about another scheme by which Tanaka purchased at least five thoroughbred racehorses using approximately $3.4 million of investor money from the Amerindo Brokerage Accounts between on or about June 29, 2001 and April, 13, 2005.  (Margolis Decl., Ex. D at ¶¶ 7-15).   In sum, the Warrant Affidavit provided evidence that:

(1)    The founders, owners, directors, principals and operators of the Amerindo investment adviser firms, had converted millions of dollars of investor funds to their own benefit and that of others, and had done so through the use of various Amerindo-affiliated entities, including Amerindo U.S., Amerindo Panama, and Amerindo U.K., at least four Bear, Stearns brokerage accounts established by Vilar and Tanaka on behalf of Panamanian corporations, and overseas and domestic bank accounts;

(2)    During the course of the fraud scheme, Cates was subjected to a variety of fraudulent and deceptive practices including Vilar's repeated false representations about the status of the SBIC investment (Margolis Decl., Ex. C at ¶¶ 20, 21, 22, 21A),[6] Vilar's refusal to respond to Cates' requests for basic information about a $1 million investment that she made in approximately 1988 in Rhodes (Margolis Decl., Ex. B at ¶ 6.B), and the forgery of Cates' signature on a wire transfer instruction which resulted in $250,000 being transferred without her knowledge or authorization from an account she held at Bear, Stearns, to a personal bank

---

[6]  Due to misnumbering of paragraphs in the Vilar criminal complaint (two paragraphs numbered "21" and two paragraphs numbered "22"), the second paragraph labeled "21" is referred to herein as "21A" and the second paragraph labeled "22" is referred to herein as "22A."

account held by Vilar (Margolis Decl., Ex. C at ¶¶ 22A-24);

      (3)    When investors with investment portfolios with a combined value of no less than $17 million attempted to redeem their investments between approximately 2003 and May, 2005, they were met with responses that further suggested a widespread pattern of fraud and deception involving Vilar, Tanaka, several Amerindo entities, and several Amerindo investment products including Rhodes, GFRDA, and an Amerindo SBIC.  For example:

      (a)    Vilar threatened to create tax problems for the Mayers (whom Vilar had known for approximately 30 years) were they to persist in seeking to redeem approximately $12 million that they had invested in GFRDAs – funds which had purportedly been invested in bank certificates of deposit, government securities and other investments which were "absolutely safe and liquid."  (Margolis Decl., Ex. B at ¶ 6.A).

      (b)    When Cates sought to redeem or transfer to another custodian all of her investments with Amerindo, including Rhodes and the Amerindo SBIC, Vilar revealed for the first time in their nearly 20-year relationship that Cates was a client of Amerindo Panama and that requests for redemption must be submitted to that entity.  Vilar also revealed for the first time that any such redemption would be reduced by an unspecified amount of fees and taxes.[7] Finally, not until Vilar wrote a letter to the SEC on May 20, 2005, responding to a complaint about the handling of Cates' Amerindo account, did Vilar disclose the purported fact that Amerindo Panama – the entity which, according to Vilar, had a fiduciary relationship with Cates

---

[7] That contention is at odds with the only document purporting to set forth a general investment management agreement between Cates and Amerindo – a document dated April 30, 1987 not signed by Cates, but rather signed only by Vilar on behalf of Amerindo U.S. as investment manager.  Next to the paragraph in that document concerning fees, the words "NOT APPLICABLE" were inserted.  (See Litt Decl., Ex. C, at 2).

– had been sold in 2001, and that neither he nor Tanaka was a director, officer or employee of

Amerindo Panama.  (Id. at ¶ 6.D).

    (4) At the same time that investors who had invested at least $17 million with

Amerindo were unsuccessfully attempting to redeem their investments, including the Mayers'

$12 million "absolutely safe and liquid" investment, millions of dollars of investor funds were

being used to buy thoroughbred racehorses, tens of millions of dollars were being transferred

from the Amerindo Brokerage Accounts (including accounts denominated "Amerindo

Technology Growth Fund Inc." and "Amerindo Technology Growth Fund II") to overseas bank

accounts, and millions of dollars were being transferred from the Amerindo Brokerage Accounts

to fund Amerindo business expenses.  (Margolis Decl., Ex. B at ¶¶ 6.A, 6.C; Ex. D at ¶¶ 13-15).

    (5) Inconsistent disclosures had been made to the SEC concerning the

defendants' involvement with, and interest in, Amerindo Panama, and Vilar appeared to be using

Amerindo Panama as part of a "shell game" to prevent Cates from redeeming or transferring her

investments, thereby calling into question the corporate integrity of the Amerindo affiliates.

(Margolis Decl., Ex. B at ¶ 6.D; Ex. C at ¶ 3; Ex. D at ¶ 3).

    Based on the foregoing evidence, and all the other evidence contained in the

Warrant Application, the Warrant Affidavit concluded:

> Based on the facts set forth above, and my experience and training,
> it appears that Amerindo and its principals, Vilar and Tanaka, have
> defrauded investors, have converted investor funds to their own
> personal use, and are conducting a Ponzi-type scheme in which
> investor funds are not being properly accounted for and
> segregated.  As a result, there is probable cause to believe that
> there have been numerous violations of Title 18, United States
> Code, Sections 1341 (mail fraud), and 1243 (wire fraud) and Title
> 15, United States Code, Sections 80b-6 and 80b-17 (invest[ment]
> adviser fraud).  The use of domestic and overseas financial

institutions to convert the investors' money to Vilar's and
Tanaka's personal benefit also gives rise to probable cause to
believe that there have been violations of anti-money laundering
statutes including Title 18, United States Code, Sections 1956 and
1957. Further, based upon my training and experience, I know that
individuals involved in financial fraud schemes like that described
above frequently maintain at their places of business for
substantial periods of time, records and materials which evidence
the operation of such schemes."

(Margolis Decl., Ex. B at ¶ 8).

   In light of this ongoing pattern of fraud and deception involving millions of

dollars of funds being misappropriated from investors whom the defendants had known for

decades, and the use of tens of millions of dollars of other investor funds to purchase horses and

for other purposes, the Government sought and obtained a broad search warrant seeking

evidence of the fraud including when the fraud began, who was involved, how the fraud was

conducted, and who had been victimized. After reviewing that application for between one hour

and one hour and fifteen minutes, Judge Maas approved the application at 10:30 p.m., and issued

warrants for the arrests of the defendants based on the probable cause set forth in their respective

criminal complaints.

   On May 26, 2005, U.S. Postal Inspectors: (1) arrested defendant Gary Alan

Tanaka at the Hotel Lombardy in New York, New York; (2) executed the search warrant at the

New York corporate offices of Amerindo Investment Advisors Inc. ("Amerindo U.S.") at 399

Park Avenue, New York, New York; and (3) arrested defendant Alberto Vilar at Newark

International Airport in Newark, New Jersey.

   On September 12, 2005, the defendants filed a motion to suppress the evidence

seized pursuant to the Warrant, suppress statements made to Postal Inspectors on the date of their

arrests, and moved for a <u>Franks</u> hearing.  The motion for the <u>Franks</u> hearing was denied without

prejudice.  (<u>See</u> Margolis Decl., Ex. G at 3-5).  The Court heard testimony on the motion to

suppress evidence seized pursuant to the Warrant on December 14, 2005, May 31, 2006, June 1,

2006, July 7, 2006, July 10, 2006, August 8, 2006, and August 9, 2006.[8]

## ARGUMENT

### Applicable Law

In <u>Franks</u>, the Supreme Court held that, "where the defendant makes a substantial

preliminary showing that a false statement knowingly and intentionally, or with reckless

disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly

false statement is necessary to the finding of probable cause, the Fourth Amendment requires

that a hearing be held." <u>Franks</u>, 438 U.S. at 155-56.  "The <u>Franks</u> standard is a high one."  <u>Rivera</u>

v. <u>United States</u>, 928 F.2d 592, 604 (2d Cir. 1991).  Because "[t]here is, of course, a presumption

of validity with respect to [an] affidavit supporting [a] search warrant[, t]o mandate an

evidentiary hearing, the challenger's attack must be more than conclusory and must be supported

by more than a mere desire to cross-examine."  <u>Franks</u>, 438 U.S. at 171.  It is not sufficient to

allege negligence or innocent mistake.  <u>Id</u>.  Furthermore, "[e]very statement in a warrant

affidavit does not have to be true."  <u>United States</u> v. <u>Canfield</u>, 212 F.3d 713, 717 (2d Cir. 2000)

(internal quotation marks omitted).  Rather, to obtain a <u>Franks</u> hearing, a defendant must make a

substantial preliminary showing that: (1) the warrant affidavit contains a false statement or

---

[8]  The hearings held in 2006 also covered defendants' subsequently filed motions to
suppress evidence seized by the Metropolitan Police pursuant to two U.K. search warrants, and a
motion to quash a Grand Jury subpoena served on Amerindo U.S. on May 26, 2005, which
motion was filed more than six months later, on December 14, 2005.

10

material omission that makes the affidavit misleading; (2) the false statement or material

omission was the result of the affiant's deliberate falsehood or reckless disregard for the truth;

and (3) the false statement or material omission was integral or necessary to the judge's probable

cause finding.  See, e.g., Franks, 438 U.S. at 171; United States v. Martin, 426 F.3d 68, 73 (2d

Cir. 2005); United States v. Singh, 390 F.3d 168, 183 (2d Cir. 2004); United States v.

Awadallah, 349 F.3d 42, 64 (2d Cir. 2003); Canfield, 212 F.3d at 717-18; United States v.

Salameh, 152 F.3d 88, 113 (2d Cir. 1998); United States v. Campino, 890 F.2d 588, 591-92 (2d

Cir. 1989) (affirming trial court's denial of Franks hearing "because appellants failed to produce

evidence of deliberate falsehood or recklessness in the affidavit.").  Allegations of deliberate

falsehood or of reckless disregard for the truth "must be accompanied by an offer of proof.  They

should point out specifically the portion of the warrant affidavit that is claimed to be false; and

they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or

otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily

explained.  Allegations of negligence or innocent mistake are insufficient."  Franks, 438 U.S. at

171 (emphasis supplied); see also Singh, 390 F.3d at 183-84 ("conjecture" concerning

intentional or reckless omission of information from affidavit not sufficient to warrant a

hearing).

                Omissions are less likely to present "'a question of impermissible official

conduct'" because allegations of omissions may result in "'endless conjecture about

investigative leads, fragments of information, or other matters that might . . . have redounded to

defendant's benefit'" had they been included."  United States v. Lopez, No. 96 Cr. 105 (RSP),

1997 WL 567937, at *2 (N.D.N.Y. Sept. 11, 1997) (quoting United States v. Atkin, 107 F.3d

1213, 1217 (6th Cir. 1997)).  "[T]he mere intent to exclude information is insufficient."

Awadallah, 349 F.3d at 67-68 (citing United States v. Colkley, 899 F.2d 297, 300-01 (4th Cir.

1990)).  As the Fourth Circuit stated in Colkley,

> An affiant cannot be expected to include in an affidavit every piece
> of information gathered in the course of an investigation.
> However, every decision not to include certain information in the
> affidavit is 'intentional' insofar as it is made knowingly.  If . . . this
> type of 'intentional' omission is all that Franks requires, the Franks
> intent prerequisite would be satisfied in almost every case . . . .
> [Rather,] Franks protects against omissions that are <u>designed to
> mislead</u>, or that are made in <u>reckless disregard of whether they
> would mislead</u>, the magistrate.

Colkley, 899 F.2d at 300-01 (emphases in original).  As the Eighth Circuit has noted,  "[r]arely

will an unintentional omission be grounds for Franks v. Delaware relief when complex economic

crimes are the subject of the investigation.  In such cases, unless the government has lied to the

issuing judge, the suppression issue should turn on what was in the government's affidavits, not

on what defendants assert with the benefit of hindsight the government should have known."

United States v. Ozar, 50 F.3d 1440, 1445-46 (8th Cir. 1995).

"To prove reckless disregard for the truth, the defendant must prove that the

affiant 'in fact entertained serious doubts as to the truth' of the allegations."  United States v.

Ranney, 298 F.3d 74, 78 (1st Cir. 2002) (quoting United States v. Williams, 737 F.2d 594, 602

(7th Cir. 1984) (citing United States v. Davis, 617 F.2d 677, 694 (D.C. Cir. 1979) (holding that

the First Amendment definition should be applied by analogy in the Franks setting))); Beard v.

City of Northglenn, 24 F.3d 110, 116 (10th Cir. 1994) (same)); see  United States v. Whitley, 249

F.3d 614, 621 (7th Cir. 2001) (citation omitted); United States v. Millar, 79 F.3d 338, 342-43 (2d

Cir. 1996) (upholding denial of Franks hearing where there was no evidence of "deliberate

12

prevarication"); United States v. Rivera, 728 F. Supp. 250, 258 (S.D.N.Y. 1990) (Mukasey, J.),

("If [the affiant] made statements which failed to take account of the facts as he knew them, or

which he seriously doubted were true, that would show reckless disregard for the truth.")

(emphasis added), vacated on other grounds. "Because states of mind must be proved

circumstantially, a fact finder may infer reckless disregard from circumstances evincing obvious

reasons to doubt the veracity of the allegations." United States v. Perez, 247 F. Supp. 2d 459,

473 (S.D.N.Y. 2003) (quoting United States v. Whitley, 249 F.3d 614, 620 (7th Cir. 2001)).

"'Allegations that amount to negligence or innocent mistake do not constitute the required

showing. The focus is not on whether a mistake was made, but rather the intention behind the

mistake.'" United States v. Cook, 348 F. Supp. 2d 22, 29 (S.D.N.Y. 2004) (citing United States

v. Markey, 131 F. Supp. 2d 316, 324 (D. Conn. 2001)).

        The law is also well-established that simple failure to fully investigate is not

sufficient for the required showing of reckless disregard. In Ranney, for example, the First

Circuit upheld the denial of a Franks hearing where the warrant affidavit incorrectly stated that a

company involved in telemarketing fraud did not have access to a supplier's patented products,

thereby precluding the company involved in the fraud from acquiring those products from

another supplier. Defendants claimed that the affiant should have checked to see whether the

information that the company employee had supplied about the supplier's alleged patent was, in

fact, correct. The Court held that, "[a]lthough [the affiant] could have made such an

investigation, defendants have shown no circumstances indicating that he had reason to doubt the

patent's existence. Under the circumstances, his failure to probe further does not amount to

reckless disregard." Ranney, 298 F.3d at 78.

Similarly, in United States v. Dale, 991 F.2d 819 (D.C. Cir. 1993), the court held that, "in general, the failure to investigate fully is not evidence of an affiant's reckless disregard for the truth." Id. at 844 (citing United States v. Miller, 753 F.2d 1475, 1478 (9th Cir. 1985); United States v. Mastroianni, 749 F.2d 900, 909-10 (1st Cir. 1984); United States v. Young Buffalo, 591 F.2d 506, 510 (9th Cir. 1979)). In Dale, the court observed that, "probable cause 'does not require an officer to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence.'" Dale, 991 F.2d at 844 (quoting the lower court's ruling). The Dale court further noted that the failure of the affiant to contact individuals who had a business relationship with the subjects of the investigation in an effort to corroborate information contained in the affidavit "may have been entirely prudent given the possibility of a leak" to the subjects' corporation. Id. The court concluded, "[r]ather than evincing a reckless disregard for the truth, the agent's actions amounted to at most negligence which is insufficient to warrant a Franks hearing." Id. (citing Franks, 438 U.S. at 171) (emphasis in original). Likewise, in Miller, the court held that the affiant did not act with reckless disregard for the truth when he failed to uncover a confidential informant's prior conviction for perjury. Miller, 753 F.2d at 1478 (although "[i]t might have been prudent for the federal agents to check on [a confidential informant's] background and criminal record, [] their failure to do so is not reckless disregard.").

In Young Buffalo, the defendant asserted that an affiant exhibited a reckless disregard for the truth when he included information in a warrant affidavit alleging that the defendant possessed a motorcycle and car similar to vehicles used by a robber matching the defendant's description to flee the scene of his crimes, without conducting further investigation

14

when he knew that the defendant's motorcycle had been in an accident prior to the robbery in

question, and even though investigation would have revealed that: (1) the motorcycle had been

destroyed in that accident, and (2) the description of the get away car (white over maroon) was

the inverse of the description of the car the defendant had rented.  Young Buffalo, 591 F.2d at

510.  The Court found that, "[the affiant's] knowledge of the motorcycle accident raised no duty

to inquire further.  Appellant's ownership of the motorcycle was just one of many facts linking

him to the robberies and failure to investigate all details showed no reckless disregard for the

truth.  Even if we were to find that the information possessed by [the affiant] was enough to

create a duty of further inquiry, these assertions at best raise the possibility of negligence on his

part."  Id. at 510 & n. 6.

## I.

### Inspector Fraterrigo Did Not Withhold
### Material Information From The Reviewing Magistrate

Defendants assert that Inspector Fraterrigo knowingly and/or recklessly withheld

material information from Magistrate Judge Maas concerning: (1) Amerindo U.S.'s business and

defendants' alleged inability to steal the funds of Amerindo U.S.'s clients because the nature of

those client accounts precluded such theft; (2) the alleged fact that two Amerindo investors who

Cates reportedly believed may have had trouble redeeming all or part of their investments had

not had any such difficulty; and (3) the fact that Cates and the Mayers had not had any difficulty

obtaining funds from Amerindo prior to 2001 or 2002.  (See Tanaka Mem. 3, 6-7, 14-23).

Defendants' arguments are without merit and should be rejected.  Defendants make sweeping,

unsupported, conclusory allegations about Inspector Fraterrigo's knowledge – the kinds of

assertions which cannot serve as the basis for granting a motion for a Franks hearing.  See, e.g.,

<u>Franks</u>, 438 U.S. at 171; <u>Singh</u>, 390 F.3d 183.  In apparent recognition of that fact, defendants

charge in the alternative that Inspector Fraterrigo recklessly failed to conduct an investigation

that would have revealed these alleged facts.  Defendants ignore the case law holding that any

such failure to investigate does not necessarily rise to the level of recklessness, and this

argument also should fail.  Finally, even assuming defendants are correct, none of the omitted

"facts," individually or collectively, were material to the issuance of the warrant.  Accordingly,

defendants' motion for a <u>Franks</u> hearing should be denied.

A. **Defendants' Claim That Inspector Fraterrigo's
Failure Inform The Magistrate That Amerindo U.S.
Could Not Have Been Involved In Defendants' Fraud
<u>Is A Red Herring Which Is Refuted By The Evidence</u>**

Vilar takes Inspector Fraterrigo to task for failing to properly distinguish between

Amerindo U.S. and the other "off-shore" Amerindo companies, and argues that by "lump[ing]

Amerindo U.S. together with the other companies, obscur[ed] the critical distinctions that it

handled different kinds of clients and was regulated by the SEC apparently without any history

of complaints."  (<u>See</u> Vilar Ltr. at 2, 3).  As a result, according to Vilar, "[t]he government

convinced the Magistrate to authorize [] a massive search by lumping Amerindo U.S. together

with the three other off-shore companies and failing to make clear that the Mayer and Cates

investments were distinct from the business of Amerindo U.S."  (<u>Id</u>. at 4).  Vilar concludes that

these misrepresentations were material, because, "[h]ad Inspector Fraterrigo made it clear to the

magistrate that Amerindo U.S. advised institutional clients and a publicly traded mutual fund, in

which neither the Mayers nor Cates made any investment, it would have been clear that there

was no probable cause to seize the records of Amerindo U.S., the vast majority of records

located on the premises."  (<u>Id</u>. at 5).

16

For his part, Tanaka alleges that Fraterrigo failed to conduct a thorough investigation of Amerindo U.S. – an investigation that he claims would have revealed that defendants could not have engaged in the alleged fraud through that entity because it only managed assets that were custodied in "closed-loop" accounts from which they could not embezzle funds.  (See Tanaka Br. at 15-19).  In support of that claim, Tanaka chiefly cites the Licker Affidavit, which likewise contends that Amerindo U.S. advised only institutional clients and mutual funds, and a report issued by a court-appointed monitor after an approximately six-month, post-arrest, investigation in which he had access to all the internal financial records of Amerindo U.S.

Defendants' contention that Inspector Fraterrigo should have known that Amerindo U.S. had nothing to do with investment products such as Rhodes or Guaranteed Fixed Rate Deposit Accounts, and that Cates and the Mayers were not clients of Amerindo U.S. is not supported by the evidence.  A review of a sampling of documents to which the defendants themselves affixed their signatures belies defendants' factual predicates.  As a consequence, their contention that a Franks hearing should be held because Inspector Fraterrigo recklessly failed to inform the Magistrate of the "facts" on which their claim is based must fail.

The documents make clear that, from the start of his business relationship with Cates, Vilar believed that she was a client of Amerindo U.S.  The Government is unaware of the existence of any fully executed general investment management agreement between Cates and any Amerindo entity; however, on or about April 30, 1987, Vilar signed a document purporting to be such an agreement between Cates and "Amerindo U.S. Investment Advisors Inc., a company incorporated in California."  (See Litt Decl., Ex. C).  According to a letter dated April

30, 1987, which was printed on Amerindo U.S. letterhead, Vilar sent Cates a form and asked her to return it "to <u>us</u> in Larkspur[, California]." (Litt Decl., Ex. D). He concluded the letter, "[<u>w</u>]e are indeed pleased to welcome you as a client and wish to assure you of <u>our</u> utmost desire to earn the confidence you have placed in <u>us</u>." (<u>Id</u>. (emphases added)).[9] It is hard to imagine how anyone reading that letter would believe that they were a client of any entity other than Amerindo U.S., let alone Amerindo Panama. Indeed, neither "Amerindo Investment Advisors, Inc." nor the word "Panama" is mentioned anywhere in that letter. (<u>See id</u>.). Soon thereafter, in a letter written on Amerindo U.S. letterhead and dated October 1, 1987, Vilar stated that, "[t]his letter will confirm <u>our</u> intention to enter into the below described arrangement which is encompassed within <u>our Guaranteed Fixed Rate Deposit Account program we offer select individuals and institutions</u>." (Litt Decl., Ex. E (emphases added)). Thus it appears that, as far back as October 1987, Vilar believed and represented to Cates that Amerindo U.S. offered a GFRDA program to "select individuals." (<u>Id</u>.).

The next year, the defendants continued to blur the assertedly critical distinctions between Amerindo U.S. and Amerindo Panama, when they both signed a letter to Cates on Amerindo U.S. letterhead in which they "confirm[ed] the official acknowledgment of Amerindo Investment Advisors, Inc. by us, jointly and severally as principals, of the terms and conditions of your account with our company." (Litt Decl., Ex. F). The letter noted that, "[i]n April 1987 <u>Amerindo</u> assumed the responsibility of [your] portfolio . . ." without anywhere defining what

---

[9]    The stationery used by Amerindo U.S. between at least approximately 1987 and 1989 bears return addresses in California and London, and features sketches of what appear to be the Golden Gate Bridge and the Tower Bridge in London. There is no reference in that letterhead, either textual or pictorial, to Panama.

was meant by their shorthand reference to "Amerindo." (Id.).  Once again, defendants made no

explicit reference to "Panama" or "Amerindo Panama." (See id.).  Defendants apparently take

the view that Cates and anyone else reading this early correspondence must have understood the

purported significance of the comma inserted between "Advisors" and "Inc." in the text of the

letter, and must therefore have known, or was reckless in not knowing, that Cates was a client of

Amerindo Panama.  That narrow view of the evidence is not shared by the Government.

Moreover, any failure of Inspector Fraterrigo to appreciate the subtleties of the defendants'

choice of words and punctuation does not rise to the level of recklessness necessary to support

defendants' contention that Inspector Fraterrigo misled the Magistrate about the business

activities of Amerindo U.S.  The fact that defendants may have a different view of the evidence

that was not included in the Warrant Affidavit does not justify the need for a Franks hearing.[10]

Subsequent correspondence further belies defendants' argument.  On or about

March 27, 1989, Vilar sent Cates a letter on Amerindo U.S. letterhead in which he solicited an

investment in "an extremely attractive investment opportunity." (Litt Decl., Ex. H ).

Approximately two and one-half months later, Vilar, "[f]or and on behalf of Amerindo

Investment Advisors Inc.," accepted Cates' offer to purchase two units of Rhodes Capital Group

Limited for a total of $1 million.  (Litt Decl., Ex. I).  Thus, it would appear that Amerindo U.S.

was at least responsible for the marketing of Rhodes to individual investors, and accepted money

sent by investors in response to those marketing efforts.  In April 1990, Vilar wrote a letter to

---

[10]  As the Court told Mr. Hoffman during the July 10, 2006, hearing, "I understand you
have one view of the evidence, but that doesn't by itself mean that that is proof that somehow
she has intentionally misrepresented something to the magistrate judge." (Litt Decl., Ex. G at
13).

Cates on the letterhead of "Amerindo U.S. Advisors Inc." in which he enclosed her most recent account statement, and stated that, "[o]ur growth, in which you participate, continues to be comforting.  We recently were appointed investment manager to State of Louisiana Retirement System; City of San Antonio, Texas, and Carnegie Mellon University."  (Litt Decl., Ex. J (emphases added)).  It is difficult indeed to imagine how an investor or a criminal investigator could possibly know that Vilar was referring to Amerindo Panama.  Again, that is too thin a reed on which to base an allegation of intentionally or recklessly misleading the Magistrate.

In 1991 and 1992, Vilar continued to disregard the very distinction which he and Tanaka attempt now to use as both a sword and a shield.  Vilar continued to send Cates letters on Amerindo U.S. letterhead accompanied by her monthly statements of account.  (Litt Decl., Exs. K and L).  On or about September 1, 1994, Cates signed a discretionary power of attorney appointing Amerindo U.S. (defined in that document as "Amerindo") as her "Purchaser representative and as [her] attorney-in-fact" with respect to the purchase of shares of StarBase Corporation.  (Litt Decl., Ex. M).  In the document, Cates agreed that, "[t]he undersigned has known Amerindo and its principals for at least the past five years, and has been an investment advisory client of Amerindo or of one of its affiliates for at least that period of time."  (Id.).  On September 9, 1994, again on Amerindo U.S. letterhead, Vilar sent information to Cates about StarBase, which he described as "the company we are investing in."  (Litt Decl., Ex. N (emphasis added)).  It would thus appear that, at least with respect to Cates' investment in StarBase, Amerindo U.S. acted as her investment adviser.

Ten years later, in August 2004, Vilar again wrote to Cates on Amerindo U.S. letterhead, listed a number of things that he purportedly had done on her behalf, and stated,

20

"[f]or no other client in the 24-year history of Amerindo have I reached out to this extent, and continue to do so.  We are indeed proud that Amerindo ranked #1 in the nation for June 30 of this year, and believe technology will lead the market over the next five years, when you stand to do very well."  (Litt Decl., Ex. O at 2).  The clear implication of those two sentences, written on Amerindo U.S. letterhead, especially in light of all the other evidence described above, is that Cates was a client of Amerindo U.S., or some conglomeration of Amerindo entities called "Amerindo," not Amerindo Panama.  This correspondence provides additional evidence of the corporate shell game that Vilar and Tanaka played, and further negates defendants' baseless charge that Inspector Fraterrigo intentionally or recklessly misled the Magistrate about the involvement of Amerindo U.S. in the defendants' fraud schemes.

Finally, in correspondence dated as late as of January 2005, Vilar and Tanaka failed to explicitly inform Cates that she was a client of Amerindo Panama; indeed, Tanaka recommended that Vilar send Cates a letter concerning the capital gains and losses associated with her investments in a Bear, Stearns account over which Vilar and Tanaka had discretionary trading authority, on Amerindo U.S. letterhead.  Specifically, in a January 4, 2005 e-mail written by Tanaka to an Amerindo U.S. employee, he included draft text to be included in a letter to be sent to Cates by Vilar and instructed the recipient to, "[p]lease put the contents of this email on your local Amerindo headed paper to send to Lily after comments and any insertions/deletions by Alberto."  (Litt Decl., Ex. P (emphasis added)).  On January 10, Vilar sent a letter to Cates which adopted the substance of Tanaka's proposed text.  (See Litt Decl., Ex. Q).  However, that letter was not sent on the "local Amerindo headed paper" of Amerindo U.S., as Tanaka had suggested, nor was it sent on Amerindo Panama letterhead, as one would have expected had

Cates been considered by Vilar and/or Tanaka to be a client of that "Amerindo," but rather was sent on the letterhead of Amerindo UK. (Id.).[11]

   In sum, the evidence shows that from 1987 through at least January 10, 2005, the defendants, through their correspondence, did not clearly indicate whether Cates was a client of Amerindo U.S., Amerindo Panama, Amerindo U.K., or "Amerindo," generally. That correspondence corroborates the allegation in the Warrant Affidavit that Cates had not been informed that she was a client of Amerindo Panama until sometime in or about February 2005, after her attorney had asked Vilar to redeem her entire investment in Amerindo. (See Margolis Decl., Ex. B at ¶¶ 6.B, 6.D). Moreover, the suggestion that Inspector Fraterrigo should have taken comfort in any representation made by Amerindo U.S. to the SEC about its client roster is ludicrous. After all, the defendants had informed the SEC in multiple filings through February 1, 2005, that Vilar and Tanaka were officers, shareholders, and/or owners of Amerindo Panama,[12] only to reveal on May 20, 2005, in correspondence to the SEC that the "present owners of Amerindo [U.S.] formerly owned Amerindo Panama, but they sold it to its present owners in

---

  [11] To further confuse the issue of what Amerindo entity was serving as Cates' investment adviser, the attachment to the letter is titled, "Amerindo Investment Advisors (Panama) Inc., REALIZED GAINS AND LOSSES, Lily Cates, From 01-01-04 Through 12-31-04." (Litt Decl., Ex. Q at 2).

  [12] See Litt Decl., Ex. R at SEC-0000406 (13-G filed with the SEC on February 1, 2005, stating in Item 8 that, "Messrs. Vilar and Tanaka are the sole shareholders and directors of each of the Advisor Entities," which were defined as Amerindo U.S. and Amerindo Panama, and signed by Vilar as a Director of Amerindo Panama); Ex. S at AUS-066-00250 (Part II of the ADV dated July 31, 2004 (Part I of which was attached to the Margolis Decl. as Ex. U) in which it is reported in response to Item 6 that, "Alberto Vilar and Gary Tanaka . . . are also all of the shareholders, directors and officers of . . . Amerindo Investment Advisors, Inc. . . ."); and Ex. T (a February 28, 2003 letter from Vilar and Tanaka to the SEC in which they certified that they were "the only directors and shareholders of Amerindo and its affiliated advisory firms organized and domiciled in the United Kingdom and Panama, respectively.").

2001."  (Litt Decl., Ex. U at 3).

       With respect to the Mayers, the correspondence cited by the defendants, <u>see</u>

Margolis Decl., Ex. R, may reveal what Renata Tanaka or Amerindo thought, but does not

necessarily show what the Mayers thought, or when they had those thoughts.  The early

correspondence to the Mayers, as with Cates, was written on Amerindo U.S. letterhead, and

speaks of "our" GFRDA program.  (Litt Decl., Ex. V).  On or about April 8, 1988, Vilar and

Tanaka signed, as authorized signatories of "Amerindo Investment Advisors Inc.," a "Certificate

of Guaranteed Fixed Rate Deposit Account" accepting the Mayers' initial deposit of $700,000.

(Litt Decl., Ex. W).  Then, in a letter dated April 11, 1988, again on Amerindo U.S. letterhead,

the defendants "confirm[ed] the official acknowledgment of Amerindo Investment Advisors, Inc.

by us, jointly and severally as officers and principal shareholders of the firm, of the terms and

conditions of [Dr. Herbert Mayer's] account with our company."  (Litt Decl., Ex. X).  There is

nothing in that letter to put the Mayers on notice that their investment was being handled by an

entity other than Amerindo U.S. with the sole exception of the appearance of a comma between

the words "Advisors" and Inc." in the first sentence of the letter – a comma that neither appears

in the letterhead of prior correspondence, nor in the formal "Certificate of Guaranteed Fixed

Rate Deposit Account."  In yet another letter that Vilar sent to Dr. Mayer on Amerindo U.S.

letterhead on April 11, 1988, Vilar wrote that, "[t]his deposit is unconditionally guaranteed as to

principal and interest rate by Amerindo Investment Advisors Inc."  (Litt Decl., Ex. Y).  If the

Mayers were clients of an entity other than Amerindo U.S., or "Amerindo," generally, as

defendants here claim, it's difficult to see how the account opening correspondence clearly

conveyed that fact.

Defendants have not presented any evidence that either Cates or the Mayers believed that they were clients of Amerindo Panama, and have ignored all the evidence to the contrary. As a consequence, defendants' argument that Inspector Fraterrigo failed to inform the Magistrate of the purported "fact" that Amerindo U.S. could have had nothing to do with the alleged fraud schemes is refuted by documents signed and/or authored by Vilar and Tanaka, and should be rejected.

Defendants' allegation that Inspector Fraterrigo's failure to determine that Amerindo U.S. clients could not have been victimized by the defendants because of the nature of the "closed loop" accounts in which their funds were custodied is likewise unpersuasive. First, they offer no evidence that Inspector Fraterrigo, in fact, knew anything about the details of how those accounts operated. Second, defendants offer no evidence why Inspector Fraterrigo should have thought that those accounts operated any differently than the other brokerage accounts used by Vilar and Tanaka to perpetrate their fraud. Their surmises about what Inspector must have known, or should have known, or what was "inconceivable" for her not to have known based on documents that she must have (or should have) had access to, are insufficient support for their motion for a <u>Franks</u> hearing.[13] Moreover, as discussed in Point I.D, <u>infra</u>, in the context of all the information in the Warrant Application, none of the alleged omissions were material.

---

[13] Defendants' general claim that the "SEC had access to and possession of documents relating to the business of Amerindo U.S." (Tanaka Mem. at 18), has no bearing on their <u>Franks</u> motion. Their contention that Inspector Fraterrigo knew or should have known that the SEC had conducted a two-year investigation that concluded on January 14, 2005, with a no-action letter and yet omitted that "fact" from the Warrant Application is unsubstantiated. Defendants have not proffered any evidence that the SEC investigation had anything to do with the subject of Inspector Fraterrigo's criminal investigation nor have they established its relevance to the frauds alleged in the criminal complaints. In any event, defendants have failed to show that Inspector Fraterrigo intentionally or recklesslessly omitted that fact from her Warrant Affidavit.

**B.      There Is No Evidence That Inspector Fraterrigo Knew,
          Or Should Have Known More About, The Experiences
          Of Paul Marcus And Joy Urich With Amerindo
          Than What She Reported In The Warrant Affidavit**

        Defendants have offered no evidence that the statement in the Warrant Affidavit

concerning other possible Amerindo investors who reportedly may have had difficulty

redeeming their investments failed to capture accurately the information then known to Inspector

Fraterrigo.  Defendants likewise have failed to proffer any evidence tending to show that

Inspector Fraterrigo had any reason to doubt the veracity of that information.  Accordingly,

defendants' assertions regarding ¶ 6.E of the Warrant Affidavit offer no support for their motion

for a Franks hearing.

        The Warrant Affidavit stated:

> Cates told me about other individuals who she believed to be
> investors with Amerindo, some of whom may have had trouble
> redeeming all or part of their investments, including Brian Harvey,
> Joy Urich, and Paul Marcus.

(Margolis Decl., Ex. B, ¶ 6.E).  That statement plainly conveyed to the reviewing Magistrate that

not only was it not certain that the three named individuals were, in fact, investors with

Amerindo – although defendants' own motion papers confirm that at least two of them were

Amerindo clients, and are silent with respect to the third – but that it was also uncertain whether

any of them had experienced difficulties in redeeming their Amerindo investments.  The very

language Inspector Fraterrigo used in the Warrant Affidavit shows that she did not embellish to

make the information she had received seem stronger than it was; instead, it demonstrates an

effort to ensure that the Magistrate had an accurate picture of what was, and was not, known or

believed about Harvey, Urich, and Marcus.  Rather than credit Inspector Fraterrigo for

25

attempting to be careful and accurate, however, defendants instead choose to make unsupported and unsupportable allegations about what Inspector Fraterrigo "knew" to fit their theory that she deliberately failed to disclose material information about Marcus and Urich to the Magistrate.

### 1.    Paul Marcus

Defendants make the conclusory allegation that Inspector Fraterrigo had spoken with Marcus prior to submitting the Warrant Affidavit, and that she therefore must have known that Marcus had not had any trouble with Amerindo.  (See Tanaka Mem. at 20 ("Inspector Fraterrigo knew that Lily Cates' speculation as to any 'trouble' Marcus 'may' have had with Amerindo was entirely unfounded, and hid this fact from the Magistrate.") (emphasis added)). In fact, the Government did not contact Marcus prior to May 26, 2005.  (See Litt Decl. at ¶ 29). The sole "basis" for defendants' contention is an October 27, 2005 declaration of Marcus in which he stated that he "told the Government" that the defendants "have never failed to return assets upon my request."  (See Tanaka Mem. at 20; Margolis Decl., Ex. N at ¶ 3).[14]  Although the Marcus declaration betrays no hint as to when he spoke to the Government, Marcus' use of the past tense of the verb "to tell" is, in defendants' eyes, apparently a sufficient basis for alleging that Marcus must have communicated with the Government prior to May 26, 2006, and that therefore Inspector Fraterrigo knew that Marcus had not had any difficulty redeeming his Amerindo investments.

Had Marcus conveyed that information to the Government on or before May 25,

---

[14]  It is telling that Marcus, who reportedly has invested with "Amerindo" throughout a 25-year period chose not to specifically identify the Amerindo entities with which he had invested, but rather lumped them together as "collectively, 'Amerindo'."  (Margolis Decl., Ex. N at ¶¶ 2, 5).

2006, logic dictates that experienced defense counsel would have seen to it that the October 27,

2005 Marcus Declaration included that fact.  After all, on October 27, defendants' first motion

for a <u>Franks</u> hearing was pending, and that fact, in their view, would have buttressed their

motion.  Alternatively, had the defendants not recognized the significance of that information at

the time, it stands to reason that they would have obtained a second declaration from Marcus to

clarify the point.  Their failure to do so speaks volumes and they have, as a consequence, failed

to satisfy their evidentiary burden under <u>Franks</u>.  <u>See</u> <u>Franks</u>, 438 U.S. at 171 ("Affidavits or

sworn or otherwise reliable statements of witnesses should be furnished, or their absence

satisfactorily explained.").

Apparently realizing the recklessness of their assertion concerning Inspector

Fraterrigo's alleged knowledge of Marcus's experience with the defendants, the defendants

concede in the next breath that "it is possible" that Inspector Fraterrigo had not spoken to

Marcus prior to submitting the Warrant Affidavit.  (Tanaka Mem. at 20).  They allege that her

failure to do so, however, represented "the epitome of recklessness."  (<u>Id</u>.).  Defendants do not

proffer a single reason why Inspector Fraterrigo had, or should have had, reason to doubt the

heavily qualified information about Marcus that Cates had provided.  Their implicit argument

seems to be that a defendant is entitled to a <u>Franks</u> hearing whenever it turns out that a piece of

information contained in a warrant application turns out to be incorrect when it was theoretically

possible for the affiant to have determined that fact in advance of submitting the warrant

application, regardless of the risks entailed in conducting that investigation and regardless of the

significance of that information in light of all the other evidence presented.  That is not the law.

Indeed, in their 39 pages of briefing, defendants fail to cite any authority in support of the

proposition that failure to take such an investigative step in these circumstances constitutes "recklessness" in the context of <u>Franks</u>, and ignore entirely all authority to the contrary.  <u>See</u>, <u>e.g.</u>, <u>Ranney</u>, 298 F.3d at 78; <u>Ozar</u>, 50 F.3d at 1445; <u>Dale</u>, 991 F.2d at 844; <u>Miller</u>, 753 F.2d at 1478; <u>Mastroianni</u>, 749 F.2d at 909-10;  <u>Young Buffalo</u>, 591 F.2d at 510.

As the Court no doubt appreciates, requiring such steps in these circumstances would run the risk of markedly diminishing the benefits to be gained from obtaining and executing search warrants.  Each such investigative step taken in a covert investigation increases the risk that the investigation prematurely will become known to the subjects of that investigation and heightens the risk that evidence may be altered or destroyed.  Here, based on Marcus' apparent view that his financial interests are best served by keeping the defendants in control of his investments, (<u>see</u> Margolis Decl., Ex. N at ¶¶ 4-5), it is reasonable to infer that had Inspector Fraterrigo in fact contacted Marcus prior to submitting the Warrant Application, Marcus would have called one or both defendants, thereby prematurely exposing an ongoing investigation.  The law does not require an affiant to take such a step, and the Court should not grant defendants' motion on that ground.

### 2.    <u>Joy Urich</u>

Defendants make similar unsupported allegations with respect to the information contained in the Warrant Affidavit concerning Joy Urich.  Defendants contend, without offering a shred of evidence to support their contention, that Inspector Fraterrigo "<u>knew</u> but intentionally omitted from the warrant application" the fact that Joy Urich had no trouble redeeming her Amerindo investments.  (Tanaka Mem. at 21 (emphasis added); <u>see</u> <u>id</u>. at 6 n. 5 ("Marcus and Urich had no trouble redeeming their investments with Amerindo and Inspector Fraterrigo <u>knew</u>

or should have known those facts.") (emphasis added)).  In fact, the Government did not contact Urich before May 26, 2005.  (See Litt Decl. at ¶ 30).  Defendants' assertion about Urich is not based on any sworn statement, but rather is apparently based solely on the following quotation attributed to Urich in a September 12, 2005 Reuters article: "We got our money out in time, several years ago."  (Margolis Decl., Ex. O at 3).  By merely referring to that reported quote, defendants have failed to meet their burden under Franks,

First, even if reported accurately, Urich's words do not refute the suggestion that she had difficulty redeeming her Amerindo investment.  Urich did not say she got her money out on time; rather, she stated that she got it out in time.[15]  That statement does not yield a clue about whether she or not she had difficulty redeeming the investment prior to receiving her funds.  It only conveys that she ultimately received her money.  Either possibility is equally likely, and defendants' declaration to the contrary should be disregarded by the Court.[16]

Second, even were the Court to accept defendants' interpretation of Urich's statement, defendants have offered no evidence that Inspector Fraterrigo knew anything more about Urich's experience with Amerindo than what was set forth in the Warrant Affidavit.  In the

---

[15]  Although it's not evident what she got her money out "in time" for, fair interpretations of her reported words, in context, include, among others, that she got her money out: (a) before the defendants got arrested; (b) before other investors were altogether unable to redeem their investments; or (c) before defendants engaged in forgery to steal outright client funds (as had, by the date of the article, been alleged in the Vilar Complaint and the first Superseding Indictment).

[16]  To the extent that defendants are relying upon the reporter's conclusory statement that, "[o]ne of the investors identified in the papers said in an interview that she had no trouble getting her money from Amerindo," (see Margolis Decl., Ex. O at 2), they are relying on double-hearsay and a reporter's gloss on either the reported Urich quote (which the Government contends is not a reasonable interpretation of the quote), or some other unspecified and unreported statement allegedly made by Urich.

absence of such evidence, defendants' claim should be rejected.

Third, defendants have failed to obtain an affidavit supporting their contention and have offered no explanation for their failure to do so, thereby violating the clear dictates of <u>Franks</u>.

Fourth, in apparent recognition of the weakness of their primary argument, defendants rely again on the alternative argument that Fraterrigo <u>should</u> have known that Urich had not experienced any difficulty redeeming her investment. To support that contention, defendants mischaracterize the very evidence that they have provided the Court. Specifically, defendants claim that Urich made her statement to the press "<u>shortly</u> after the search warrant was executed." (Tanaka Mem. at 3 (emphasis added)). They do so in an apparent effort to invite the Court to draw the inference that because Urich was willing to speak to the press at around the time the Warrant was executed, she also would have been willing to speak to the Government at that time, thereby adding to their "proof" of Inspector Fraterrigo's alleged recklessness in failing to speak to Urich prior to obtaining the Warrant. (<u>See</u> Tanaka Mem. at 3, 21 (Urich was "willing to talk to the press about her investment")). The only "evidence" proffered by defendants on this point – the news article itself – does not support and, in fact, tends to refute their claim.

The Reuters article is dated September 12, 2005 at 6:31:59 p.m. That means that it was published approximately <u>110 days after the Warrant was obtained</u>. There is no explicit indication in the article about when Urich spoke to the reporter. The text of the article, however, provides powerful evidence of the likelihood that Urich did not speak to the reporter until some time on September 12, 2005. The second sentence of the article reveals that the article was prompted by the release of the formerly sealed Warrant Affidavit in connection with defendants'

30

filing of their suppression motion on September 12, 2005.  (See Margolis Decl., Ex. O at 1 ("In a statement filed under seal in May and released today, a U.S. postal inspector identified a second possible victim in addition to Lily Cates . . . .")).  The third sentence of the article states that, "[t]he investigator also said Cates referred her to three other investors who Cates believed 'may have had trouble' getting their money from Amerindo." (Id.).  It is a fair inference, therefore, that the reporter learned about the existence of Urich on September 12, when the Warrant Affidavit became public, and contacted her on that very day.  In any event, even assuming the reporter had somehow learned prior to September 12 that Urich might have relevant information about this case, the only legitimate inference that could be drawn from the article is that Urich spoke to the reporter at some point between May 26, 2006, and September 12, 2005.  Defendants' description of that unknown time, which could have been as long as three and one-half months, as "shortly" represents, at best, a strained interpretation of the meaning of that word.

As with the allegations concerning Marcus, defendants have proffered no reason why Fraterrigo should have doubted the veracity of Cates' qualified information about Urich.  In these circumstances, Franks and its progeny do not require an affiant on a search warrant to exhaustively investigate every allegation contained in their affidavit, thereby risking the secrecy of the investigation, and the Court should not so find here.

**C.     Inspector Fraterrigo Did Not Mislead The Magistrate
        By Failing To Report That Cates And The Mayers
        Had Successfully Received Funds From Amerindo In The Past**

Defendants assert that, by omitting to state that between 1988 and 2002, "Lily Cates actually received millions of dollars in payments from Amerindo," (Tanaka Mem. at 22),

Inspector Fraterrigo deliberately attempted "to give the impression that Cates received no benefit from her Rhodes investment, when in actuality the evidence supports that she received significant return on the investment."  (Id. at 6-7 n. 6).  Again, defendants overreach and mischaracterize the very documentation they offer in support of their motion.

The Warrant Affidavit devoted one paragraph to describing Cates' experience with her investment in an entity called Rhodes Capital, and Amerindo and Vilar's failure to redeem or transfer her entire Amerindo investment portfolio following her request to do so in February 2005.  That paragraph stated that:

> B.  Lily Cates, who is the "Victim" described in the Vilar Criminal Complaint, described to me an investment of $1 million that she made in or about 1988 in an entity called Rhodes Capital ("Rhodes").  She received a stock certificate for two shares of stock, which was signed by Vilar and Tanaka.  Although her account statements, which she received up until approximately 2002, reflected growth in the Rhodes investment, the investment was never described to her, she never has received a private placement memorandum, nor has she signed a subscription agreement for Rhodes, and her efforts to learn more about the investment were ignored or rejected by Vilar.  In approximately February 2005, Cates attempted to redeem her entire investment portfolio at Amerindo, including her SBIC investment described in the Vilar Criminal Complaint, Rhodes, and any other investment with Amerindo, but Amerindo and Vilar have refused to move her investment portfolio to Bear, Stearns & Co. Inc. . . . as requested.

(Margolis Decl., Ex. B, ¶ 6.B (emphases added)).

The language of the third sentence of the paragraph, which is the focus of defendants' challenge, relates only to Cates' investment in Rhodes, not any other investment that she may have had with Amerindo.  Morever, the affidavit makes no representation about Cates' ability or inability to obtain funds from her Amerindo investments prior to 2002.  There is not even any suggestion that she specifically sought to redeem any Amerindo investment, let alone

Rhodes, prior to 2005.  A neutral and detached Magistrate Judge would not infer from that

paragraph that Cates must have requested redemptions from her Rhodes investment and had

those requests ignored or denied.  Indeed, such a Magistrate would fairly infer that Inspector

Fraterrigo was unaware of any such material failures to redeem because Inspector Fraterrigo had

every incentive to itemize such conduct in the Warrant Affidavit.  Accordingly, the premise of

this argument is unfounded.

       To the extent that the Court considers the argument that ¶ 6.B may have been

misleading because it did not contain evidence that Cates received a "significant return" on her

Rhodes investment, the evidence proffered by defendants either does not support their assertion,

or should be disregarded because it bears no indicia of reliability.  That "evidence" apparently

consists of Exhibits P and Q to the Margolis Declaration.  Exhibit P consists of approximately 39

Client Confirmation Forms ("CCFs")  received by Cates between December 1990 and June

1999.  Approximately 24 of those CCFs were issued by Amerindo Investment Advisors Inc. (the

U.S. company) with a return address in London, and approximately 15 of the CCFs were issued

by Amerindo Investment Advisors, Inc. with a return address of a Post Office Box in Panama

City, Panama.[17]  The CCFs appear to provide varying degrees of information about

approximately 20 transactions.  In sum, they appear to show that Cates received a total of

approximately $2,961,000 from Amerindo between December 1990 and June 1999.  Of that

amount, approximately $2,190,951.95 was received from an investment in something called

"Amerindo International Venture Fund" or "Amerindo International Venture Fund I," not

---

[17]    That Amerindo U.S. considered their London office to be an office of Amerindo
U.S. is supported by the information supplied to the SEC in their July 15, 2004 Form ADV.  (See
Margolis Decl., Ex. U at 18).

Rhodes.  Two documents, LC00473 and LC00476 appear to reflect a redemption of "Rhodes Dividend" and "Rhodes Capital Group Dividends," respectively.  Those Rhodes redemptions totaled a mere $170,048.05.  (See Litt Decl., Ex. Z, Transactions Q and R).

Exhibit Q to the Margolis Declaration, titled "Lily Cates Withdrawals" should be disregarded by the Court.  Defendants are well aware of the fact that the Government first obtained that document in approximately November 2005, when it was received from the U.K. authorities in response to an MLAT request.  They have articulated no basis to believe that its contents were known by Inspector Fraterrigo as of May 25, 2005, other than their pure speculation about what Lily Cates must have told her.  Second, the defendants have supplied no evidence to support the reliability of the contents of this document.  There is no indication about who prepared Exhibit Q, or why.[18]  Exhibit Q does not reveal the source of its data.  Finally, Exhibit Q contains no indication of the investment associated with each purported withdrawal, many of which appear to coincide with the Amerindo International Equity Venture Fund withdrawals reflected in Exhibit P to the Margolis Declaration.

Therefore, the "evidence" on which defendants assert that Lily Cates made a "significant return" on a $1 million investment made in 1988, consists of a total approximately two redemptions totaling $170,048.05 over an approximately eight and one-half year period.  That "return" represents a rate of approximately 1.9 percent per year.  The Court may take notice of the fact that such a return is hardly "significant" in the context of high tech investing in the

---

[18]  The Government notes that the chart stops on June 17, 2002, three days prior to the deposit of Cates' $5 million investment in an Amerindo SBIC, which investment was subsequently "withdrawn" by defendants and used for other purposes, and a year before defendants "redeemed" $250,000 from another investment account of Cates by forging her signature.  (See Margolis Decl., Ex. Q; Ex. C at ¶¶ 13-17, 22-24).

1990's.  Moreover, for the reasons discussed below, failure to disclose any such purported

"facts" about Cates' and the Mayers' ability to redeem their investments prior to 2001 or 2002

was not material to the issuance of the warrant.  Accordingly, defendants' motion should be

denied.

**D.**     **None Of The Asserted Misrepresentations Or Omissions Was Material**

Defendants argue, as they must under <u>Franks</u>, that the alleged misrepresentations

and omissions were "material" and that the Magistrate would not have approved the warrant had

the Warrant Application been "corrected" to account for its alleged deficiencies.  In fact, even

were the Court to conclude that defendants have made sufficiently supported allegations

concerning Inspector Fraterrigo's deliberate or reckless omission of information concerning

Marcus, Urich, Cates, the Mayers, and the nature of Amerindo U.S.'s business, they have failed

to show how those omissions were integral or necessary to the Magistrate's probable cause

determination.  See <u>Franks</u>, 438 U.S. at 171.  As a consequence, defendants' motion should be

denied.

The Warrant Application included a wealth of evidence from which the

Magistrate could properly infer that there was a fair probability that there were other victims of

the defendants' investment adviser fraud, securities fraud, money laundering, mail fraud, and

wire fraud activities, and that information concerning those victims resided at the offices of

Amerindo U.S.  That evidence included the following:

1.     Vilar and Tanaka – two wealthy men with expensive hobbies (charity and

thoroughbred horseracing) – had defrauded two of their oldest clients, among others, through a

variety of investment vehicles including:  the Amerindo SBIC; GFRDAs; Rhodes Capital;

Amerindo Technology Growth Fund Inc.; and Amerindo Technology Growth Fund II.  (See Margolis Decl., Ex. B at ¶¶ 6.A-C; Ex. C; and Ex. D).

2.      Vilar regularly worked in the Amerindo U.S. office in New York, and Tanaka had on office where he worked when he was in New York.  (See Margolis Decl., Ex. B at ¶¶ 4, 7).

3.      Between 2002 and 2004, Vilar had shown Cates approximately 80 boxes of documents at 399 Park Avenue that purportedly contained information necessary to value Cates' investments.  (See Margolis Decl., Ex. B at ¶ 7).

4.      Vilar and Tanaka had used millions of dollars of investor funds to benefit themselves and others, including for the purpose of making charitable donations, buying thoroughbred racehorses, and benefitting the business of Amerindo U.S.  (See Margolis Decl., Ex. C at ¶¶ 13-19, 22-25; and Ex. D at ¶¶ 7, 13-15).

5.      Vilar and Tanaka perpetrated their schemes through one or more of their investment adviser firms, of which they reportedly were (until Vilar claimed otherwise to the SEC on May 20, 2005) shareholders, officers and directors.  (See Margolis Decl., Ex. B at ¶ 6.D; Ex. C at ¶ 3; and Ex. D at ¶¶ 3,4, 9).

6.      Vilar and Tanaka, who were principals, shareholders, officers and directors of all the Amerindo entities, were using Amerindo Panama as part of a corporate shell game to protect themselves and Amerindo U.S.  (See Margolis Decl., Ex. B at ¶ 6.D; Ex. C at ¶ 3; Ex. D at ¶ 3, 4).

7.      Vilar and Tanaka engaged in repeated illegal and unethical conduct, including:  lying to Cates; committing forgery to steal $250,000 of Cates' funds; failing to invest

36

client funds as promised; threatening to cause tax problems for clients; and lying to the SEC. (See Margolis Decl., Ex. B at ¶¶ 6.A, 6.D; Ex. C at ¶¶ 3, 20-25; Ex. D at ¶¶ 3, 9).

In light of those allegations, the fact that Cates and the Mayers were able to redeem part of their investments prior to 2001 or 2002 was not material to the issuance of the Warrant. Given that the Magistrate could fairly draw the inference that client funds were not being invested as promised, that client funds were not being properly segregated, that the "absolutely safe and liquid" GFRDA investment (which turned out to be not so safe and liquid, at least for the Mayers) had been offered to clients since the late 1980s, it still would have been appropriate to issue a warrant that covered the time period during which the GFRDA investment was offered, whether or not investors were receiving funds during part of that period. Moreover, there were sufficient allegations from which the inference fairly could be drawn that by at least a certain point, the defendants were engaged in a Ponzi-type scheme in which client funds were not being appropriately segregated, client funds were not being invested as promised but rather were misappropriated, and tactics were employed to delay or prevent redemptions. Those circumstances support probable cause to obtain documents related to the entire length of the scheme(s), which in this case stretch back at least as far as the Mayers' first investment in a GFRDA in approximately 1987 and Cates' investment in Rhodes in approximately 1988.[19]

The contention that Vilar and Tanaka could not have succeeded in stealing funds from their institutional and mutual fund clients was likewise not material to issuance of the

_____

[19] The Government notes that, although the Warrant Affidavit reports that Cates made the Rhodes investment in or about 1988, the acknowledgment of that investment by Vilar, on behalf of Amerindo U.S. was dated June 6, 1989. (See Margolis Decl., Ex. B at ¶ 6.B; Litt Decl., Ex. I).

warrant.  Even if the information about the nature of the "closed-loop" accounts used in connection with Amerindo U.S.'s institutional and mutual fund clients had been included in the Warrant Application, there were allegations in that application which established that there was probable cause to believe that Amerindo U.S. was deeply involved in defendants' fraudulent activities including, for example: (a) the defendants were officers, directors, shareholders and principals of the Amerindo entities, and exercised control over accounts in which client funds were custodied; (b) there was evidence that the defendants were blurring the distinction between the corporate entities – for example, using wire transfer instructions on Amerindo U.S. letterhead to transfer funds in the (Panamanian) Amerindo Brokerage Accounts to benefit themselves and others, including Amerindo U.S. (<u>see</u> Margolis Decl., Ex. D at ¶ 12); and (c) Amerindo U.S. had benefitted from the alleged fraud schemes, (<u>see</u> Margolis Decl., Ex. C at ¶ 14; Ex. D at ¶ 13). Accordingly, it would have been appropriate to issue a broad search warrant for documents maintained at Amerindo U.S. to gather evidence of that fraud, even were the Warrant Application to be "corrected" to reflect the omissions alleged by defendants.

## II.

### Defendants' Claim That Inspector Fraterrigo Admitted To Misleading Magistrate Judge Maas <u>About The Existence Of Probable Cause Is Belied By The Record</u>

Contrary to defendants' conclusory statements, a fair reading of Inspector Fraterrigo's entire testimony and an objective assessment of her demeanor while testifying shows that she never believed that she had intentionally made any affirmative misrepresentations in the warrant application.  Defendants' claim that Inspector Fraterrigo made a "remarkable concession that she knowingly misled Magistrate Judge Maas about the very issue he was

charged with deciding – namely, whether there was probable cause to support the warrant" is

belied by the record.  Inspector Fraterrigo made clear on re-direct that she always believed that

there was probable cause to support the seizure of items listed in the warrant.  Specifically,

Inspector Fraterrigo testified as follows:

> Q:  At the time you applied for the search warrant, did you believe
> that probable cause existed to search for the items described in
> your search war[ra]n[t]?
>
> A:  Yes.
>
> Q: When you seized items during the search, did you believe
> probable cause existed to search those items?
>
> A: Yes.

(Litt Decl., Ex. AA at 108-09).

More importantly, Inspector Fraterrigo emphatically testified that she did not lie

to, nor did she intentionally mislead, the Magistrate Judge about whether she believed she had

probable cause to seize the items she asked for in her search warrant application:

> Q: When you were asked by the Court on cross-examination when
> you [sic] knew you didn't have probable cause [sic] of every client
> list at the time you got the warrant, were you saying you tried to
> mislead the magistrate judge about that?
>
> A: No, I was not.
>
> . . .
>
> Q: When the Court asked you is it a fact that you knew you didn't
> have possible [sic] cause to get every client list at the time you
> went and got the warrant, were you saying that you lied to the
> magistrate judge about whether you believed you had probable
> cause to get the items you requested to be seized?
>
> A: No.  I was not lying to the judge.  I did not lie to the judge.

39

(Id. at 110-11).  In sharp contrast to defendants' allegations, Inspector Fraterrigo vehemently

denied lying to or misleading the magistrate judge about the existence of probable cause and her

belief that there was probable cause to seize the items requested in the Warrant Application.

        Unable to point to a single affirmative misrepresentation in the Warrant Affidavit

or Warrant Application, defendants instead mischaracterize Inspector Fraterrigo's testimony and

speculate that, "after hearing Inspector Fraterrigo's testimony about misleading the Magistrate

Judge on the key issue of probable cause, one cannot help but wonder what other falsehoods she

perpetrated in order to secure the warrant." (Tanaka Mem. at 24 (emphasis added)).  Such

speculation – based on a mischaracterization of the agent's testimony – not only demonstrates

the fatal flaws in defendants' Franks motion, but is precisely the type of conjecture the Second

Circuit has repeatedly held to be insufficient to warrant a Franks hearing.  See, e.g., Singh, 390

F.3d at 183 ("conjecture" concerning intentional or reckless omission of information from

affidavit not sufficient to warrant a hearing).

        Defendants' characterization of Inspector Fraterrigo's testimony on re-direct as an

"epiphany," a "newfound explanation" and a "sudden shift" is simply incorrect and flatly

contradicted by the record.  Long before Government prosecutors met with her shortly before re-

direct examination commenced, Inspector Fraterrigo attempted on several occasions to clarify

the record and explain her understanding of defense counsel's questions regarding probable

cause during cross-examination.  On cross-examination, Inspector Fraterrigo attempted to

explain that she understood questions about whether she submitted or put probable cause before

the magistrate to be questions about whether she included specific factual information regarding

the particular victim, account or entity referenced in the question in her affidavit in support of

the search warrant.  For example, Inspector Fraterrigo testified on cross-examination:

> Q:  It is the same question I have asked you about the other
> matters.  As to the client files, there were no clients whose files
> other than the five people we just mentioned – the Mayers, the
> Cateses, Urich, Marcus, and Harvey – that you had probable cause
> to believe had been victimized, correct?
>
> A.  I did not list them in the affidavit, but had probable cause –
>
> Q.  But not in the papers, correct?
>
> A.  Not in the papers, correct.

(Litt Decl., Ex. G at 27-28).  On another occasion, Inspector Fraterrigo testified:

> Q: Would it be accurate to say that there are a number of brokerage
> accounts in addition to the ones I just showed you whose
> documents were received which accounts were not named in
> paragraph B as in "boy" page 8 and for which there was no
> probable cause submitted to the magistrate?
>
> A.  They were seized, but they were seized under a different
> paragraph of the affidavit.  I had authority to seize it.

(Id. at 37).

Significantly, in the middle of her cross-examination Inspector Fraterrigo, on her

own, recognized that there seemed to be a misunderstanding about her testimony regarding

probable cause and attempted to clarify that testimony:

> Q.  Let me ask the question again.  Does that document MM fall
> within the category of documents such as those we discussed
> before where there was not any material put before the magistrate
> to support probable cause to seize that document?
>
> A.  This falls along the part of the affidavit that I did not
> specifically put this item in, have evidence specifically for this.
> But there was probable cause that this was covered under.  What I
> submitted in my affidavit – and I think I need to clarify my
> answers that I have said before, because I think there is – in part of
> my affidavit I put down those five individuals.

41

Q.  Correct.

A.  Those five individuals were, in the probable cause I submitted, defrauded by these two individuals.  I put in my affidavit that there is probable cause and reason to believe that there are other investors, other clients, other victims, other possible investments that could have also been defrauded by these individuals.

So when you are asking me if I put specific probable cause on this particular item or investment or Amerindo Tech D, I think it is a bad assumption.  What I have this under is it is probable cause to believe that there were other particular items.  I had reason and probable cause that I submitted before the judge that there are investors that invested with Amerindo and that there are other possible and potential other victims and investors.  <u>I think this is covered under that part of the affidavit, if I made myself clear</u>.[20]

(Litt Decl., Ex. G at 97-98 (emphases added)).  Inspector Fraterrigo did <u>not</u> make herself "clear" in that answer; however, her answer <u>does</u> clearly show that she was confused about the questions she had been asked about probable cause, and that she attempted to correct that misunderstanding before speaking to anyone about her testimony.

Defendants' suggestion that Inspector Fraterrigo's purported "epiphany" was prompted by the short period of time Government prosecutors met with Inspector Fraterrigo prior to re-direct examination is wholly unsubstantiated.    The Government prosecutors asked the Court for permission to speak with Inspector Fraterrigo prior to re-direct examination to satisfy their ethical obligations to ensure that certain of Inspector Fraterrigo's answers on cross-examination were a product of confusion – as the Government believed – and not admissions of misconduct, as the defense characterizes them.  (Litt Decl., Ex. AA at 86-91).  The Court granted

---

[20]    This statement by Inspector Fraterrigo was the basis for the Government's view that her testimony on cross-examination about probable cause was a product of confusion.

the request and directed the Government to elicit from Inspector Fraterrigo on re-direct

examination what had been discussed with Inspector Fraterrigo during that meeting.  (Id. at 91).

On re-direct, the Government complied with that order and asked Inspector Fraterrigo about the

meeting.  Defendants mischaracterize Inspector Fraterrigo's account of what happened at this

meeting.  (Tanaka Mem. at 28).  Inspector Fraterrigo testified that prior to her re-direct

examination she had met with AUSAs for approximately 10 minutes and was asked about a

question posed by the Court about whether "there was probable cause with the client list."  (Litt

Decl., Ex. AA at 94).  Inspector Fraterrigo testified that she "indicated to [the AUSAs] that my

answer was incorrect."  (Id.).  The Court asked Inspector Fraterrigo: "What is it that [the AUSA]

asked you back in the jury room about your answer to my question on July 10?"  Inspector

Fraterrigo responded:

> You [the AUSA] asked me to read the question.  I read the
> question and I said to you [the AUSA] that at the time I got the
> warrant I knew I had probable cause for every client list.  And you
> asked me if there was a confusion with the question at the time and
> I said yes.  <u>And I explained to you that during my cross with
> Hoffman I had tried to explain [sic] to myself and in a brief
> moment in one of his questions about the client list</u>.  I explained
> about the clients that he was specifically pointing out to me.  I said
> at the time I knew I had probable cause and I said this statement
> here what I answered the Court was incorrect.

(Litt Decl., Ex. AA at 97 (emphasis added)).  In response to a later question, Inspector Fraterrigo

again reiterated that she – without the opportunity to consult with anyone – had attempted to

clarify during cross-examination the apparent misunderstanding about what she had meant

regarding probable cause to obtain client lists:

> I recall discussing [in the jury room prior to re-direct] that the –
> one of these days of this – of the – one of the two days that I
> testified that I remembered being frustrated that I wanted to state

> this to the Court and I had came back in one instance and tried to
> clarify my statement and tried to clarify what I meant that I was
> being specifically asked particular investments about particular
> clients and they are not typed in the affidavit. However, it is
> mentioned as – as a – there was reason to believe and there was
> probable cause that these two individuals could be defrauding
> other investors and other clients, and that is what I explained to
> you in the jury room.

(Litt Decl., Ex. AA at 100). As demonstrated above, Inspector Fraterrigo herself recognized the

confusion surrounding her testimony long before the Government prosecutors asked her

questions in advance of her re-direct examination and tried to clarify the misunderstanding, even

if that effort was unsuccessful. Thus, defendants' claim that Inspector Fraterrigo "revised her

testimony <u>only</u> after a break during which the Government raised the very explanation now

offered by Inspector Fraterrigo for the change in her position," (Tanaka Mem. at 28), is simply

inaccurate and contradicted by the record.

Defendants argue that "the notion that the questions posed to Inspector Fraterrigo

during cross-examination were confusing or otherwise subject to misinterpretation in the manner

described by Inspector Fraterrigo is simply not believable" and that "the notion that such a

straightforward line of questioning somehow confused Inspector Fraterrigo is dubious at best."

(Tanaka Mem. at 29). As an initial matter, it is not the least bit surprising that Inspector

Fraterrigo was confused by some of the compound and ambiguous questions posed to her on

cross examination. (<u>See</u>, <u>e.g.</u>, Litt Decl., Ex. G at 20-21, 28, 32, 92-93). To characterize these

series of questions as a "straightforward line of questioning" is one of the many hyperboles to

which the defendants resort in their <u>Franks</u> motion. In any event, defendants have simply

ignored the fact that Inspector Fraterrigo's confusion was not limited to cross-examination. If, as

defendants claim, Inspector Fraterrigo's meeting with Government prosecutors prompted

Inspector Fraterrigo's "epiphany" and shaped her testimony, defendants have utterly failed to explain why Inspector Fraterrigo also exhibited confusion and a lack of understanding with respect to a number of questions posed to her by a Government prosecutor and even the Court on re-direct examination.   (See, e.g., Litt Decl., Ex. AA at 117, 130, 132-37).

Perhaps most importantly, the Court observed Inspector Fraterrigo's demeanor throughout her testimony.  Defendants claim that Inspector Fraterrigo truly thought at the hearing that she was admitting under oath before a federal District Court Judge that she committed perjury when she swore to the truthfulness of her search warrant affidavit.  Inspector Fraterrigo's entire demeanor and tone throughout her testimony refutes the notion that she thought she was admitting to the scurrilous allegations defendants are now lodging against her. If Inspector Fraterrigo – a law enforcement agent for over 11 years with an unblemished record – really thought she was making such a "remarkable concession" it would not have been so easy for her to simply say, "That's correct" over and over again to defense counsel's questions without any change in expression or tone.  Defendants' claim that Inspector Fraterrigo "brazen[ly]" admitted to perjury "time and again" is simply belied by logic, common sense, and her demeanor.

In any event, even if Inspector Fraterrigo was confused about the definition of probable cause (and how that differed, if at all, from the term "reason to be concerned") – a legal conclusion that ultimately was not hers to make – it is the role of the magistrate judge, not the affiant, to determine whether there was sufficient probable cause to justify the issuance of a search warrant. A magistrate, in ascertaining probable cause, must analyze a search warrant affidavit under the totality of the circumstances test.  See Illinois v. Gates, 462 U.S. 213, 230-31

45

(1983).  The totality of the circumstances analysis recognizes that "probable cause is a fluid

concept – turning on the assessment of probabilities in particular factual contexts – not readily,

or even usefully, reduced to a neat set of legal rules."  Id. at 232.  Simply put, there is no

scientific formula to be applied by a magistrate to determine if there is probable cause to issue a

search warrant.  Defendants have not proffered any evidence – nor could they – that Magistrate

Judge Maas abandoned his neutral and detached role in making the probable cause determination

with respect to the Warrant Application.  Contrary to Vilar's conclusory allegations, the

evidence in the record plainly shows that Magistrate Maas reviewed the Warrant Application and

supporting documentation for over an hour, and issued the Warrant.   And where, as here,

defendants have wholly failed to make a substantial preliminary showing that Inspector

Fraterrigo knowingly or recklessly made a false statement or omission and that the statement or

omission was material and necessary to the finding of probable cause, defendants' Franks motion

must fail.

## III.

**Inspector Fraterrigo's Testimony About The Return Of Seized Items
To Amerindo U.S. And Her Drafting Of Tanaka's Memorandum Of Interview
Is Not A Basis To Question Her Veracity And Is Irrelevant To The *Franks* Motion**

Defendants' claim that Inspector Fraterrigo intentionally altered boxes of

evidence to interfere with their ability to cross-examine witnesses at the suppression hearing is

unsubstantiated and is merely an effort to attribute a nefarious motive to Inspector Fraterrigo's

good intentions, thereby further smearing her reputation.  Inspector Fraterrigo testified that prior

to receiving defense counsel's May 26, 2006 letter requesting that certain boxes be brought to

the hearing she provided defense counsel with more than 20 hours of access to review those

materials. (See Litt Decl., Ex. AA at 153-54). Upon receiving that letter, Inspector Fraterrigo went to the evidence room and pulled the items she could identify in the letter. (See id. at 154). With respect to the item(s) she could not identify, Inspector Fraterrigo had one or two conversations with defense counsel about the specific items defense counsel wanted the inspector to bring to the hearing. (See id. at 154-55). Subsequently, Inspector Fraterrigo made arrangements to ensure that defense counsel were provided access to those materials. (See id.). Inspector Fraterrigo testified that upon reviewing the items requested by defense counsel, she identified and returned a subset of those materials containing personal records, including personal letters of Alberto Vilar and a CD with Spanish language, because they should not have been seized pursuant to the warrant. (See id. at 156). Defendants point to no evidence that Inspector Fraterrigo operated with malicious intent in making the decision to return those items and to the contrary, all the evidence in the record demonstrates that Inspector Fraterrigo acted with good faith. (See Litt Decl., Ex. G at 126-134; Ex. AA at 153-56). Instead of recognizing that Inspector Fraterrigo returned items in her possession that should not have been seized as soon as she made that realization, defendants again overreach and claim that Inspector Fraterrigo "tampered" with the evidence. Inspector Fraterrigo made it clear during her testimony that when she returned the items to Amerindo, she did not do so to impede the defense in their cross-examination of her. (See Litt Decl., Ex. G at 132; Ex. AA at 156). As with defendants' gratuitous and unfounded criticism of the Government for destroying Amerindo's business, defendants' claims regarding Inspector Fraterrigo's motive in returning personal items to Amerindo have no basis in fact and are wholly irrelevant to the Franks inquiry.

　　　　　Defendants' challenge to the process that Inspector Fraterrigo followed to return

the personal items that had been seized is similarly baseless.  First, Inspector Fraterrigo testified that she did not draft the letter to Mr. Licker regarding the return of such items and did not play a role in the decision about the process to follow in the return of such items.  (See Litt Decl., Ex. G at 130-32).   In any event, defendants now challenge a procedure – which they have proffered no evidence that they previously complained about – that was followed by the Government when it previously returned items to Amerindo (through company counsel, Mr. Licker) that it determined should not have been seized.

Finally, defendants' claim that Inspector "admitted to backdating the Memorandum of Interview ("MOI") prepared in connection with Mr. Tanaka's arrest" (Tanaka Mem. at 32) is entirely spurious.  Inspector Fraterrigo testified that she wrote an initial draft of the MOI on the date reflected in the MOI, but when she made subsequent additions to the draft and finalized the MOI, she forgot to change the date on the form or template in her computer system.  (See Litt Decl., Ex. AA at 13-15; Def. Ex. WW, XX).   Contrary to defendants' claim that Inspector Fraterrigo admitted to backdating, Inspector Fraterrigo testified that at the time she modified the draft MOI she did not make a conscious decision not to change the date on the form.  (See Litt Decl., Ex. BB at 167).  Rather, Inspector Fraterrigo candidly indicated that Tanaka made the additional statement she added to the draft MOI and had no reason to conceal from anyone the fact that Defense Exhibit XX was created on a date after Defense Exhibit WW. (Id. at 167-68).  Faced with absolutely no concrete evidence to make a substantial preliminary showing that Inspector Fraterrigo intentionally or recklessly misled the magistrate judge, defendants resort "time and again" to conjecture and speculation, which is insufficient to warrant a Franks hearing.  Accordingly, defendants' motion must be rejected.

# IV.

## The Execution Of The Search Warrant Did Not Destroy The Amerindo U.S. Business And Any Effect Of The Search Is, In Any Event, Irrelevant To Defendants' *Franks* Motion

Defendants perniciously pepper their papers with the insinuation that the Search Warrant and its execution was responsible for the destruction of Amerindo U.S.  (See Tanaka Br. at 1 ("[it] sounded the death knell for a company that had been in business for two decades"; "[it] not only destroyed the business, but also put approximately 30 people out of work"), 4 ("destruction of a business"), 19 ("effectively devastating a twenty year old business"; "the clear impact of the warrant . . . in fact, was [] to fatally disrupt the company's operation"), and 33 ("the . . . search that destroyed a twenty year old company")).  They fail to tie this hyperbolic mantra to any of their allegations about misrepresentations or omissions.  Indeed, the assertions appear to be no more than a transparent attempt to distract the Court from the very weakness of defendants' motion.  The defendants offer no facts to support their assertion, and common sense and some of the very evidence offered by the defendants in support of the Motion, in fact, refute it.

First, defendants implicitly contend that the fact that the two principals of Amerindo U.S. and its affiliated companies were arrested had nothing to do with the demise of Amerindo U.S.  Neither defendant challenged the determination of Judge Maas that there was probable cause to issue warrants for the defendants' arrest despite having had every incentive to do so.[21]  It is the height of illogic to suggest that the fate of Amerindo U.S. would have been no

---

[21]    Mr. Vilar was incarcerated for several weeks because he was purportedly unable to raise $4 million to secure his bail notwithstanding his apparent wealth.  Mr. Tanaka was on home detention for approximately one month prior to indictment, having voluntarily waived a

different had the defendants merely been arrested, and had the search of the Amerindo U.S. New York office not occurred.  Second, rather than take steps to keep the business of Amerindo U.S. going following the arrests of the defendants, Amerindo U.S. not only allowed clients to terminate their relationships with Amerindo U.S. earlier than permitted under contract – a laudable action in the circumstance to be sure – but "repeated[ly] prompt[ed]" purportedly loyal clients to "terminate."  (See Licker Aff. at ¶ 7).  Persuading clients to take their business elsewhere is not the hallmark of a business attempting to carry on, but rather of one whose owners have decided to invest their resources elsewhere.

        Finally, defendants cannot argue that they were forced to turn away their clients because of the impact the execution of the Warrant had on Amerindo U.S.  In fact, the execution of the Warrant apparently had minimal impact on Amerindo U.S., especially compared to the arrests and temporary incarceration of its principals.  Two major categories of items were seized during the search:  documents and computers.  Some Amerindo U.S. computers were imaged on site and were not removed from the premises.  As a consequence, the approximately 28 Amerindo U.S. employees who were not arrested on May 26, 2005, had access to the contents of those machines immediately upon the departure of the U.S. Postal Inspectors.  Within approximately two weeks' time, as required by the Warrant, all of the Amerindo U.S. computers thought by the head of the Amerindo U.S. Information Technology department to be of value to Amerindo U.S. were returned to Amerindo U.S. and were available to the approximately 28 Amerindo U.S. employees who had not been arrested pursuant to federal arrest warrants.  With respect to the documents seized by the U.S. Postal Inspectors, no representative of Amerindo

_____

preliminary hearing.

U.S. has ever asserted that they requested and were denied timely access to any of the seized documents.  Indeed, neither Vilar, Tanaka, nor Amerindo U.S.'s corporate counsel sought access to, nor requested copies of, the seized materials for nearly four and one-half months after their seizure, when they finally began – at the Government's urging – to review potentially privileged documents in mid-October 2005.  Had the seizure of documents presented a serious obstacle to the operation of a viable business that its owners wanted to continue, Amerindo U.S. and/or its owners (the defendants) could have arranged to have copies made of any subset of those documents but evidently decided not to do so for reasons that only they know.

In light of the facts that:  (1) the principals of Amerindo U.S. would have been arrested regardless of whether a search was conducted; (2) Amerindo U.S. took affirmative steps to terminate client relationships that could have provided revenues to the support the company; (3) Amerindo U.S. had access to its computer records; and (4) Amerindo U.S. failed to take any steps to gain access to the seized documentary materials, there is simply no credible evidence to suggest that the execution of the Warrant caused Amerindo U.S. to go out of business.  Rather, the evidence suggests that the defendants chose to terminate the business following their arrests and incarceration on serious felony charges which stemmed from conduct related to their handling of client funds in their investment advisory businesses, and the indictment two weeks later of Vilar by a federal Grand Jury on eight felony counts of investment adviser fraud, securities fraud, mail fraud, wire fraud and money laundering.  Execution of the Warrant did not result in the termination of 28 employees of Amerindo U.S.  The arrests of its principals on fraud charges, and defendants' apparent decision to abandon the business were responsible for the termination of those employees and the failure of their business.  Execution of a search warrant

at a business could have a variety of effects on that business.  Defendants have cited no cases to

suggest that the potential for such effects raises a Fourth Amendment concern, nor have they

cited any case suggesting that the ultimate impact of a search on a business, if any, is of any

relevance to deciding a motion on whether to hold a <u>Franks</u> hearing.

### **<u>CONCLUSION</u>**

For the foregoing reasons, defendants motion for a <u>Franks</u> hearing should be

denied.

Dated:  September 21, 2006
        New York, New York


                                    Respectfully submitted,

                                    MICHAEL J. GARCIA,
                                    United States Attorney for the
                                    Southern District of New York,
                                    *Attorney for the United States of America*


                    By: _____
                            Marc Litt
                            Deirdre A. McEvoy
                            Assistant United States Attorneys
                            (212) 637-2295 / -2309