Exhibit AA

1

1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    -----------------------------x
2
3    UNITED STATES OF AMERICA
3
4          v.                    05 Cr. 621 (KMK)
4
5    ALBERTO VILAR                    Hearing
5    GARY TANAKA,
6          Defendant.
6    -----------------------------x
7                             New York, N.Y.
7                             August 8, 2006
8                             11:30 a.m.
8    Before:
9
9         KENNETH M. KARAS
10                            District Judge
10
11   MICHAEL J. GARCIA
11   United States Attorney for the
12   Southern District of New York
12       One St. Andrew's Plaza
13       New York, N.Y.  10007
13   DEIRDRE A. McEVOY
14   MARC O. LITT
14       Assistant United States Attorneys
15
15   JEFFREY C. HOFFMAN, ESQ.
16   Attorneys for Defendant Vilar
16       Hoffman & Pollik, LLP
17       260 Madison Avenue, 22nd Floor
17       New York, New York  10016
18       (212) 679-2900
18
19   GLENN C. COLTON, ESQ.
19   Attorney for Defendant Tanaka
20       Wilson Sonsini Goodrich & Rosati (NYC)
20       12 East 49th Street, 30th Floor
21       New York, New York  10017
21       (212) 999-5804
22
22   STEVEN G. KOBRE, ESQ.
23   Attorney for Defendant Tanaka
23       Kobre & Kim LLP
24       800 Third Avenue
24       New York, New York  10022
25       (212) 488-1200
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

13

6886tan1                C. Fraterrigo - cross

1    A.  Yes.

2    Q.  That is the distinction between the two documents, correct?

3    A.  Also, there was no space between five and a million.

4    Q.  Say that one more time.

5    A.  On page 1, there was a space between -- an added space

6    between five and million.

7    Q.  I see.  You made this change approximately two weeks later?

8    A.  I am -- within two weeks.  I don't know when.

9    Q.  Do you see at the top of WW there is a fax line and a date?

10   A.  Yes.

11   Q.  At the top of XX there is a fax line and a date?

12   A.  Yes.

13   Q.  Does that refresh your recollection as to when you might

14   have made the changes to the documents?

15   A.  No.

16   Q.  Although you are saying it is within two weeks, it is fair

17   to say they were not actually created on the same day?

18   A.  These two documents?

19   Q.  Yes.

20   A.  No.  I don't think so.

21   Q.  Do you see that on XX which is 3501-E that document is

22   signed by you, correct?

23   A.  Yes.

24   Q.  Can you see the date that you put next to your name?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

14

6886tan1                    C. Fraterrigo - cross

1   Q.  It says May 28?

2   A.  Yes.

3   Q.  That wasn't the date that you actually signed this

4   document, was it?

5   A.  No.  This is part of the form and I had just signed it.

6   Q.  Well, this document was a form document?

7   A.  It is a template in our system.  So when I had this -- this

8   one was a draft.  The first one was a draft.  I signed it and

9   then when I realized that I had from my notes on this second

10  one, I didn't add that statement, so I added that statement and

11  I just signed it.  I didn't change the date.

12  Q.  On other memoranda of interview when you have a draft

13  document, you have actually indicated on it "draft," haven't

14  you?

15  A.  Not particularly.  Sometimes I don't sign it if it is a

16  draft.

17  Q.  Is it fair to say whatever is on this 3501, which is the

18  final version, it says May 28, 2005, and that date is wrong?

19  A.  That date is wrong, that's correct.

20  Q.  And while you are using a template, it is also true that

21  you had the ability to change the template to actually put the

22  correct date, isn't that right?

23  A.  Yes.

24  Q.  But the way the final version appears, it appears that you

25  actually wrote this report up just two days after the date of

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

15

6886tan1                C. Fraterrigo - cross

1   interview, isn't that right?

2   A. Yes.

3   Q. That is not the case, isn't that correct?

4   A. No. Not on the second draft.

5   Q. So you spent 45 minutes in Mr. Tanaka's room?

6       MS. McEVOY: Objection. Mischaracterizes the witness'

7   testimony.

8       THE COURT: Really? That is what I thought she said.

9       MS. McEVOY: She said "approximately."

10      THE COURT: Okay.

11      MR. KOBRE: Noted.

12  Q. You spent approximately 45 minutes in Mr. Tanaka's room, is

13  that right?

14  A. Yes.

15  Q. Then what did you do immediately after leaving Mr. Tanaka's

16  room?

17  A. We brought him back to our office at 90 Church Street to

18  process him after he was in the back. We brought him to the

19  back of our offices. Curtis Roinestad, the postal inspector,

20  handle all the processing and I was in my office trying to take

21  care of other matters.

22  Q. Matters relating to this case?

23  A. Yes.

24  Q. Approximately how long did it take you from the time you

25  left the hotel room to the time that you left the location, the

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

86

688ztan2                    C. Fraterrigo - cross

1    Q. Well, if I may just as far as who was there, say, just so I

2    understand, you're saying that you believe that as to who was

3    there is not accurately described in this MLAT; is that your

4    understanding?

5    A. I think one of the individuals, yes, that was there --

6    Q. Okay.

7            THE COURT:  Okay.

8    A. -- it's not accurate.

9            MR. KOBRE:  Thank you.

10           THE COURT:  Sure.  All right, Miss McEvoy, redirect.

11           MS. McEVOY:  Your Honor, may I have a brief sidebar?

12           THE COURT:  Why not.

13           (At the sidebar)

14           MS. McEVOY:  Your Honor, at the July 7th and July 10th

15   hearings, the inspector gave some answer that the government

16   did not anticipate which the government believes it was a

17   product of confusion or misunderstanding, but the government

18   would ask for 10 or 15 minutes with the Inspector prior to

19   redirect to confirm that.

20           MR. HOFFMAN:  Can we be present?  Have you any

21   objections to us being present during that conversation?

22           MS. McEVOY:  I mean -- to the extent that it is a

23   product of confusion and misunderstanding, the defense

24   counsel's presence might intimidate the witness, and not clear

25   up whether or not in fact it was confusion.  The government

                SOUTHERN DISTRICT REPORTERS, P.C.

                        (212) 805-0300

87

688ztan2                    C. Fraterrigo - cross

1    just has to satisfy itself that that's correct, and the

2    government does not expect to prep her during this time period.

3    It's just --

4            THE COURT:  Well, but if it's not prep, then what is

5    it?

6            MS. McEVOY:  It's to clarify, for our purposes, the

7    fact that it was a misunderstanding as opposed to something

8    else.  We need to know that.

9            THE COURT:  As opposed to something that she

10   intentionally misstated, is that what you're worried about?

11           MS. McEVOY:  I don't -- if you read some of her

12   answers literally, I think the record is not clear right now,

13   and I -- exactly that -- not that she intentionally misstated,

14   but that she didn't mean what the --

15           THE COURT:  That's what redirect is for.  I mean

16   that's -- I don't understand what you're asking.  If you take

17   her in the witness room and you ask her some questions to

18   satisfy yourself whether or not there was confusion or

19   something more nefarious than that, the first thing that's

20   going to be asked on recross is what it is that she was asked

21   back in the witness room.

22           McEVOY:  And in fact, your Honor, I plan to elicit

23   from her what I ask her.

24           THE COURT:  So what's the problem with having counsel

25   there to begin with?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

88

688ztan2                    C. Fraterrigo - cross

1       McEVOY:  Just for the -- it's to the extent she's

2   confused and not understanding, and I think counsel's presence

3   is not going to --

4       THE COURT:  But if they're not going to say

5   anything -- I mean, it's not like they're mean people.  I don't

6   really understand what the problem is.  If they're just

7   standing there and they're not asking her questions, what is it

8   that you're worried about?  She doesn't strike me as the kind

9   of person that who gets intimidated by the mere presence of

10  other adults.

11      MS. McEVOY:  I would disagree, your Honor.  Based on

12  the --

13      THE COURT:  A United States Postal Inspector is afraid

14  of what?

15      MS. McEVOY:  I'm not --

16      THE COURT:  Come on.

17      MR. HOFFMAN:  I was just going to say, I have no

18  objection if Colton is not there.

19      MR. KOBRE:  Nor do I.

20      THE COURT:  I am glad that's on the record.  Go ahead.

21      Go ahead.  It's an unusual request.  You'll have to

22  admit it's an unusual request.  You're seeking to prep a

23  witness in the middle of her testimony.

24      MS. McEVOY:  No, your Honor.  In fact, I've been given

25  the opportunity many times to -- not to prep a witness, to ask

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

89

688ztan2                C. Fraterrigo - cross

1   a few clarifying questions before redirect.  It's -- cross is

2   finished.  We haven't been allowed to, you know, to prep the

3   witness.

4          THE COURT:  It's not as if she's on cross.  I mean, I

5   don't think there's any bar like there is when she's on cross.

6   To the extent that Miss McEvoy is going to elicit what it is

7   that she asked her in the back, you're going to -- in the

8   witness room --

9          MS. McEVOY:  Yes, yes, very briefly.

10         THE COURT:  So what's the problem, gentlemen?

11         MR. HOFFMAN:  It just seems, frankly, somewhat

12  unseemly, and it's going to open up on recross, you know, the

13  question of what were you told, et cetera, et cetera.  I think

14  it's --

15         THE COURT:  But that's true of any prep.  I mean, if

16  they took her in the witness room right before they started

17  direct, no doubt you would ask her what she was asked.

18         MR. HOFFMAN:  That's true.  I'm just trying to do a

19  process that doesn't require that.  I mean, if she simply is

20  going to say, were you asked this, did you answer that and did

21  you understand the question, and is that your proper answer,

22  what's the difference if we're sitting there?  I mean then we

23  don't have to be concerned then she was nudged or told or

24  might -- you know, it's just --

25         THE COURT:  But that's true of any witness.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

90

688ztan2                    C. Fraterrigo - cross

1          MR. HOFFMAN:  I understand.

2          THE COURT:  I mean, I do think with all the lawyers in

3     this case, as I do in all cases, I personally, lawyers will

4     follow their ethical obligations and there is no reason

5     whatsoever to doubt that here.  I think it might --

6          MS. McEVOY:  That's exactly why I come to ask for

7     this.

8          THE COURT:  I think it might be more efficient, in

9     fact, to do it this way.  And to the extent that you all are

10    going to get a chance to -- I'll give you leeway on recross --

11         MR. HOFFMAN:  Okay.

12         THE COURT:  -- as to what was done in the witness

13    room.  I don't have a problem with that.  And, Miss McEvoy, I'm

14    going to trust you to give us a full recitation of what went on

15    back there when you are examining the witness on redirect.

16    Okay.

17         MS. McEVOY:  Yes, your Honor.  And prior to actually

18    asking the witness any questions in the room, I will let her

19    know that I will be asking her what we talked about.

20         THE COURT:  Okay.

21         MR. KOBRE:  The only thing I would say is that I think

22    it's one thing if your Honor's going to grant the government to

23    take five or ten minutes to meet, and I'm not sure there is a

24    prohibition if the witness is still on cross-examination.  The

25    only -- I guess the only part of the objection I would have to

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

91

688ztan2                    C. Fraterrigo - cross

1    it is if in any way -- the reason is because is the government

2    believes this witness was mistaken and not like was confused

3    and not mistaken.  I don't think that should form a basis of

4    what the government should be allowed to speak to the witness

5    or not.

6         THE COURT:  If the government is concerned about the

7    veracity of its witness, I'm not talking about this case, but

8    in general, they have ethical obligations to address that,

9    sooner rather than later.  If, because of the way this has been

10   broken up, they haven't had a chance to address this with her

11   until now.  And, look, I'm going to let them do it.  They're

12   telling me it's going to take 10 or 15 minutes.  I'm going to

13   give leeway on cross.

14        MR. KOBRE:  Okay.

15        THE COURT:  I made it clear to Miss McEvoy what my

16   expectations is.

17        MR. KOBRE:  Right.

18        THE COURT:  So I don't have a problem with it, all

19   right.  So let's go ahead and take a 15 minute break and go in

20   the back with the witness go ahead, Miss McEvoy.

21        MR. KOBRE:  Actually one other thing before we break.

22   Will it be just Miss McEvoy or Mr. Litt as well who might

23   ultimately be having to testify to the interaction between the

24   two of them?

25        THE COURT:  I would expect you would have somebody

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

94

6886TAN3                    Fraterrigo - redirect

1          (In open court)

2          THE COURT:  Ms. McEvoy, are you prepared to go ahead?

3          MS. McEVOY:  Yes, your Honor.  May I proceed?

4          THE COURT:  You may.

5     BY MS. McEVOY:

6     Q.  Inspector Fraterrigo, after cross-examination but prior to

7     your testimony now on redirect, did we spend some time together

8     in the jury room?

9     A.  Yes.

10    Q.  Approximately how long did we spend together?

11    A.  About 10 minutes.

12    Q.  Were two other AUSAs present?

13    A.  Yes.

14    Q.  To the best of your recollection can you recount for the

15    Court what I said to you and what you said to me?

16    A.  You pointed out a question that the Court asked me on one

17    of the days I testified regarding clients, if there was

18    probable cause with the client list.  I indicated to you that

19    my answer was incorrect.

20          There were also questions --

21    Q.  Before we get to the other questions, can you turn to the

22    transcript before you, July 10 transcript, page 94.

23    A.  Yes.

24    Q.  Lines 4 through 8 where the Court asked the question:  Is

25    it a fact that you knew you didn't have probable cause to get

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

97

6886TAN3                    Fraterrigo - redirect

1   compound question.  Let's start with the first point.  What is

2   it that you Ms. McEvoy asked you back in the jury room about

3   your answer to my question on July 10?

4        THE WITNESS:  You asked me to read the question.  I

5   read the question and I said to you that at the time I got the

6   warrant I knew I had probable cause for every client list.  And

7   you asked me if there was a confusion with the question at the

8   time and I said yes.  And I explained to you that during my

9   cross with Hoffman I had tried to explain to myself and in a

10  brief moment in one of his questions about the client list.  I

11  explained about the clients that he was specifically pointing

12  out to me.  I said at the time I knew I had probable cause and

13  I said this statement here what I answered the Court was

14  incorrect.

15  BY MS. McEVOY:

16  Q.  What did you tell me in the robing room about how it was

17  incorrect?

18  A.  That I -- that in the affidavit I knew I stated that there

19  was probable cause to believe that to take client lists, other

20  than the clients that were mentioned, because these two

21  individuals were investment advisors, they had clients that

22  were investors, and that I had probable cause on particular

23  clients and I had information on particular clients and I had

24  reason to believe that other investors and other clients were

25  being defrauded.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

100

6886TAN3                    Fraterrigo - redirect

1  jury room?

2  A.  I recall discussing that the -- one of these days of

3  this -- of the -- one of the two days that I testified that I

4  remembered being frustrated that I wanted to state this to the

5  Court and I had came back in one instance and tried to clarify

6  my statement and tried to clarify what I meant that I was being

7  specifically asked particular investments about particular

8  clients and they are not typed in the affidavit.  However, it

9  is mentioned as -- as a -- there was reason to believe and

10  there was probable cause to believe that these two individuals

11  could be defrauding other investors and other clients, and that

12  is what I explained to you in the jury room.

13  Q.  In the jury room did anyone from the government tell you

14  what to say either on redirect or examination or on recross?

15  A.  No.

16  Q.  Is there anything else you recall from the robing room

17  before we get onto another topic?

18  A.  No.

19  Q.  Let's start with you mentioned just now trying to clarify

20  at one point during your previous testimony what you meant.

21  A.  Yes.

22  Q.  Can you turn to the transcript before you, July 10, pages

23  97 and 98.  On 97 it starts with line 16 and page 98 I think it

24  ends with line 17.  If you could take a moment and read that to

25  yourself?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

108

6886TAN3                    Fraterrigo - redirect

1        THE COURT:  I think in the context it is appropriate

2   to lay some quick background.  Go ahead.

3        THE WITNESS:  Can you repeat the question?

4   BY MS. McEVOY:

5   Q.  What documents did your search warrant application to the

6   magistrate judge include?

7   A.  It included the complaints on Vilar and Gary Tanaka.

8   Q.  What, if anything, else did your application to the first

9   search warrant include?

10  A.  It also included an attachment of items to be seized, facts

11  of my investigation and probable cause.

12  Q.  When you say "facts of your investigation," what is the

13  name of the document that includes the facts of your

14  investigation?

15  A.  The affidavit.

16  Q.  Did you include in this affidavit all the information you

17  had learned up until this point through the course of your

18  investigation?

19  A.  No.

20  Q.  At the time you applied for the search warrant, did you

21  believe that probable cause existed to search for the items

22  described in your search warn?

23  A.  Yes.

24  Q.  When you seized items during the search, did you believe

25  probable cause existed to seize those items?

109

6886TAN3                     Fraterrigo - redirect

1    A.  Yes.

2         MR. HOFFMAN:  I am going to object to this line of

3    inquiry or just note I think the government now is opening the

4    door to what is in this witness's mind.  They are asking

5    questions about whether or not she included certain facts in

6    the affidavit that she knows.  To allow these answers to stand,

7    we have to be able to cross-examine this witness.

8         THE COURT:  Inspector, when you say you had probable

9    cause to seize the items you did, are you saying what is in the

10   affidavit and supporting complaints or based on information

11   that was not included in the complaints and affidavit?

12        THE WITNESS:  Based on what is included in the

13   complaints and affidavit.

14        THE COURT:  That is the whole issue about the 11th

15   Circuit and I think the 5th Circuit that allows, to the

16   government's advantage and law enforcement officer to say,

17   well, the affidavit was Hooey, but I know all this other stuff,

18   I told you my view on that line of authority.  If there was

19   other stuff that was in her head and it wasn't in the

20   affidavit, in my mind it does not support the warrant and what

21   was taken.  It comes down to four corners of the affidavit and

22   supporting documents.  That is why I wanted to clarify that

23   question.

24        Go ahead, Ms. McEvoy.

25        MS. McEVOY:  The government is not asking for the

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

110

6886TAN3                    Fraterrigo - redirect

1  inspector's belief, just what she supported to the magistrate

2  judge.

3          THE COURT:  Right.

4  BY MS. McEVOY:

5  Q.  When you were asked by the Court on cross-examination when

6  you knew you didn't have probable cause of every client list at

7  the time you got the warrant, were you saying you tried to

8  mislead the magistrate judge about that?

9  A.  No, I was not.

10  Q.  Were you saying that you lied to the magistrate judge about

11  whether you believed you had probable cause to get the items

12  you asked for in the search warrant?

13          MR. KOBRE:  Objection.  She is leading.

14          THE COURT:  I don't think she is leading, no.  She is

15  asking whether she misled the magistrate.

16          MR. KOBRE:  She is saying --

17          THE COURT:  It is not leading.

18  BY MS. McEVOY:

19  Q.  Do you need me to repeat the question?

20  A.  Yes.

21  Q.  Sticking with the same question asked by the Court on

22  cross-examination.  When the Court asked you is it a fact that

23  you knew you didn't have possible cause to get every client

24  list at the time you went and got the warrant, were you saying

25  that you lied to the magistrate judge about whether you

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

111

6886TAN3                    Fraterrigo - redirect

1   believed you had probable cause to get the items you requested

2   to be seized?

3   A.  No.  I was not lying to the judge.  I did not lie to the

4   judge.

5   Q.  Let's turn and talk about now about the probable cause that

6   you submitted in your application to the magistrate judge.  If

7   you could turn to the Government Exhibit 33 before you which is

8   your affidavit in support of the application for a search

9   warrant.

10  A.  Yes.

11  Q.  You testified before that you included facts in that

12  affidavit?

13  A.  Yes.

14  Q.  You just described for us what parts of the affidavit

15  include facts?

16          MS. HOFFMAN:  I am going to object to this, your

17  Honor.  The affidavit speaks for itself.  Her characterization

18  is meaningless.  It has been put in evidence and pretty much

19  read through on direct as well as somewhat on cross.

20          THE COURT:  I am not sure what you mean by facts as

21  opposed to what?

22          MS. McEVOY:  Conclusions.  I am trying to get the

23  inspector's understanding when she says she put facts in, what

24  she means by facts.

25          THE COURT:  Well, I am not sure by the distinction

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

117

6886TAN3                    Fraterrigo - redirect

1    investments that she doesn't have specific knowledge about.  I
2    take it that is your point, right?
3            MS. McEVOY:  Yes.
4            THE COURT:  So then make the point.  Do it more
5    efficiently.  I don't know why we need to break this down.  I
6    do think Mr. Hoffman the door is open to do some of this.
7    There is no need for it to be done in this way.  Why don't you
8    try to be more efficient about it.
9            MS. McEVOY:  Okay.  I am trying.
10   BY MS. McEVOY:
11   Q.  Based on your experience, Inspector Fraterrigo, in
12   determining whether there is a false statement in investment
13   brochure, does it matter which client it was sent to?
14   A.  I don't understand the question.
15   Q.  For example, if you find a false statement in an investment
16   brochure, does it matter whether the client was an institution
17   or an individual?
18   A.  No.
19   Q.  If you could look at paragraph 6(b) of your search warrant
20   affidavit, your third sentence.  Do you see where you say,
21   "Although her account statements which she received up to
22   2002 -- this is Ms. Kates?
23           THE COURT:  Slow down.
24   A.  Yes.
25   Q.  "Reflected a growth in the Roads Investment.  The

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

130

688ztan4                 Fraterrigo - redirect

1   A.  I interpreted it as information about the filing for the

2   business name of entities, like I'm trying to explain,

3   corporate records I determine as documents relating to the

4   structure of the entities.

5   Q.  Could you give us an example?

6   A.  Like a, like a, like a filing, a business certificate of

7   the entity, description of who owns the entity.  I, where

8   interpreted as anything relating to the like minutes, things

9   like that, board minutes, board description of the structure of

10  the entities.

11  Q.  At the time you executed the search warrant, what, if any,

12  distinction did you make between the term corporate records as

13  included in paragraph one of that rider, and business records

14  in general?

15  A.  I didn't make any distinction.

16  Q.  So was it your view that you could seize any document, any

17  Amerindo business document under paragraph one of that rider?

18  A.  No, no.  I mean I -- I saw it as limiting to those what's

19  followed through in the paragraph.

20  Q.  When you say what's followed through in the paragraph,

21  you're going to have to explain.

22  A.  Within that paragraph what is described as including like

23  shareholders, principals, officers, directors, employees and

24  such, like that.

25  Q.  Did you view paragraph -- whether you executed that

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

132

688ztan4                Fraterrigo - redirect

1  Q. What about every, did you believe you had probable cause to

2  seize every Amerindo business document?

3  A. No.

4        THE COURT: I want to understand exactly how it is

5  that you think paragraphs below paragraph one limited paragraph

6  one. That's what you're saying, right?

7        THE WITNESS: Yes.

8        THE COURT: Did you say it's a pyramid; it's almost an

9  inverted pyramid, so the most generic description begins in

10  paragraph one and the paragraphs that follow that narrow the

11  scope of the search warrant?

12        THE WITNESS: That's the way.

13        THE COURT: So that each paragraph would narrow what

14  precedes it?

15        THE WITNESS: That's my impression.

16        THE COURT: So then by that logic, the only thing you

17  could look at is the last paragraph in the rider because that's

18  the -- what defines the scope of the search.

19        THE WITNESS: No, it's there -- paragraph one is, to

20  me, is a general paragraph that indicates, you know, particular

21  entities of Amerindo, and then it states shareholders,

22  principals, officers, and such. The other documents provide

23  specifics for paragraph one.

24  Q. I think that's what we're trying to understand, Inspector

25  Fraterrigo?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

133

688ztan4                    Fraterrigo - redirect

1   A.  Yes.  It's -- maybe it's not an inverted pyramid, but it's
2   just each paragraph provides specifics for corporate records.
3   Instead of the paragraph number one alone, corporate records
4   can mean any business records in Amerindo; whereas, the other
5   paragraphs provide -- narrows it down, I mean.
6   Q.  I guess what is -- what you can you explain for us on the
7   one hand you just testified that you didn't interpret paragraph
8   one to mean every Amerindo business record that you --
9       MR. HOFFMAN:  Object, your Honor, to -- that's a
10  misstatement of or mischaracterization.
11      THE COURT:  Inspector, do you think -- you think you
12  were entitled to take every single Amerindo business or
13  corporate record under this search warrant?
14      THE WITNESS:  No.
15      THE COURT:  All right.  And what was it that you think
16  limited the scope of which corporate or business records of
17  Amerindo you were allowed to take?
18      THE WITNESS:  The other paragraphs in the attachment.
19      THE COURT:  Okay.  When you say any other paragraphs,
20  what is -- what exactly does that mean here?  Let me -- do you
21  have the rider there with you?
22      THE WITNESS:  Yes.  This is -- these are the
23  paragraphs from two to 17 limited, limited number one.
24      THE COURT:  Okay.  Can I just borrow that for a
25  second.  Was paragraph two limited by paragraph three?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

134

688ztan4                    Fraterrigo - redirect

1      THE WITNESS:  No.  Paragraph one was limited by the

2  others.  That's the way I took it.  It's the way I took it.

3      THE COURT:  So by that logic, would you even need to

4  read paragraph one?  You could just get rid of it and then you

5  would be allowed to seize everything in paragraphs two through

6  17.  What purpose does paragraph one serve, then, in your view?

7      THE WITNESS:  It provides a general sense, a general

8  information of what particular documents.

9  BY MS. McEVOY:

10  Q.  Are there any -- when it says corporate records in

11  paragraph one, are there any types of corporate records listed

12  there that you believe paragraph one, standing alone, gave you

13  authority to seize as opposed to any of the other paragraphs in

14  the warrant --

15  A.  Yes.

16  Q.  -- rider?  What types of corporate records did you view

17  paragraph one giving you authority to seize without having to

18  look at the rest of the rider?

19  A.  Shareholder information, bylaws, resolutions, what's listed

20  there.

21      THE COURT:  What's listed in paragraph one?

22      THE WITNESS:  Yes.

23      THE COURT:  So -- I'm sorry.  Could I borrow this

24  again?  So, according to paragraph one, you can seize any and

25  all client files and marketing materials for any of the

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

135

688ztan4                    Fraterrigo - redirect

1    Amerindo entities; is that right?

2            THE WITNESS:  Yes.

3            THE COURT:  So then, in other words, what's in

4    paragraph one stands alone and authorizes you to take any and

5    all marketing materials for any of the Amerindo entities?

6            THE WITNESS:  Yes.

7    BY MS. McEVOY:

8    Q.  When you executed the search warrant, did you view

9    paragraph one standing alone?

10   A.  No.  I made determinations when I was searching the office,

11   I made particular determinations whether it was covered under

12   the warrant, and then later determined if it was useful to the

13   investigation, and I seized what.

14   Q.  Right.  But you said you made a determination based on what

15   did you --

16   A.  Based on this attachment, based on my understanding of the

17   attachment.

18   Q.  And my question to you is, Inspector Fraterrigo, did you

19   make that determination based on a particular paragraph?

20   A.  Yes.

21   Q.  Can you just explain for us the process you followed when

22   determining which items to seize?

23   A.  I, as I went through documents, I made a determination

24   whether it was covered under the warrant, and if it was covered

25   under the warrant, I made a determination there whether it was

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

136

688ztan4                    Fraterrigo - redirect

1   useful to the investigation, and if it was I seized it.

2   Q.  Under the Judge's question which he just asked you, client

3   files, if, as you just testified, all Amerindo client files

4   could be seized under paragraph one, what was the process you

5   followed to determine whether or not you were going to seize

6   the client files?

7         MR. HOFFMAN:  I'm going to object to that.  She asked

8   the question before what process did you use.  She answered it

9   very specifically.

10        MS. McEVOY:  I'm asking a specific example here.

11        THE COURT:  I'll allow the question.

12  Q.  If you came across a -- if, as you just testified, you were

13  authorized to seize any client file under paragraph one of the

14  rider?

15  A.  Uh-huh.

16  Q.  Did you, in fact, just seize all client files under

17  paragraph one of the rider?

18  A.  Um, I seized client files that were relating to -- I don't

19  know if I actually seized that particular client files.  I

20  mean, it would be covered under paragraph one.

21        THE COURT:  Can I have this?  All right.  When it says

22  that property that can be seized, paragraph one, court records

23  concerning Amerindo investment advisors, and then it lists the

24  other entities, including but not limited to marketing

25  materials, copies of correspondence sent to or received from

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

137

688ztan4                Fraterrigo - redirect

1    client -- let's just take those two categories, marketing

2    materials and copies of correspondence sent to or received from

3    clients.  What, if any, limitation in that paragraph would

4    there be in your ability to seize any and all correspondence

5    sent to and received from clients or any and all marketing

6    materials?

7        THE WITNESS:  There would be no limitation.

8    Q.  Is that how you executed the warrant in practice?

9    A.  No.

10   Q.  How did you execute the warrant?

11   A.  I made determinations there.  I reviewed the material to --

12   that I was intending to -- that was covered under the warrant,

13   and I made a determination there whether it would be useful to

14   the investigation and, if not, I took it and if not, I left it.

15   Q.  And during your briefing to the postal inspectors, did you

16   instruct them to seize every document that related to the

17   businesses of Amerindo U.S. and Panama and Cayman?

18       MR. KOBRE:  Objection, leading.

19       THE COURT:  No, overruled.  It's not leading.

20   A.  No, I did not.

21   Q.  And executing the search warrant, did you seize all

22   business documents relating to Amerindo, U.S, u.K., Cayman and

23   Panama?

24   A.  No.

25       THE COURT:  In your briefing to the Inspectors, did

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

153

688ztan4                    Fraterrigo - redirect

1    talking about, Inspector?

2            THE WITNESS:  Yes, yes.

3            THE COURT:  Okay.  And you inferred from that that the

4    others had similar information in them?

5            THE WITNESS:  Yes.

6            THE COURT:  All right.

7    Q.  Do you recall being asked a question on cross-examination

8    about a series of questions, actually, about the letter Miss

9    Wolf sent to the government dated May 26, 2005, requesting

10   access to certain boxes of the search documents?

11   A.  Yes.

12   Q.  I believe it was defense exhibit VV.

13           Prior to receiving that letter, approximately, how

14   much time did your other postal inspectors spend with defense

15   counsel providing them access to those search materials?

16   A.  Provided them plenty of time to go through those materials.

17   Q.  Can you give us an estimate of how many hours, prior to

18   receiving that letter, May 26, 2006, actually?

19           THE COURT:  How about this, Inspector; was it more

20   than five hours?

21           THE WITNESS:  Yes.

22           THE COURT:  Was it more than ten hours?

23           THE WITNESS:  Yes.

24           THE COURT:  Was it more than 20 hours?

25           THE WITNESS:  Yes.  I'm just -- there was several

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

154

688ztan4                 Fraterrigo - redirect

1   days.

2        THE COURT:  All right.  Go ahead, Ms. McEvoy.

3   Q.  After receiving that letter from Miss Wolf, what steps, if

4   any, did you take to identify the items listed in Miss Wolf's

5   letter?

6   A.  I went to the evidence room and pulled all the items that

7   she wanted.

8   Q.  And how many boxes do you recall Miss Wolf requested?

9   A.  It was 12 boxes.

10  Q.  And did you review the boxes?

11  A.  Yes.

12  Q.  For what purpose?

13  A.  For purpose of going through it to see what was in it and

14  determining what could be of interest in these boxes.

15  Q.  Were there instances in which you reviewed the boxes, but

16  could not identify the specific items listed in Miss Wolf's

17  letter?

18  A.  Yes.

19  Q.  Approximately, how many types?

20  A.  There was one particular item.

21  Q.  One particular?

22  A.  There was one particular envelope or box that she named in

23  the letter that I could not find.

24  Q.  What did you do in those instances?

25  A.  I tried -- I went through the rest of the boxes and I

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

155

688ztan4                    Fraterrigo - redirect

1    believe I located the possible document.

2    Q.  Did there come a time when you had a conversation with

3    Ms. Wolf about which items she specifically wanted you to bring

4    to the hearing?

5    A.  Yes.

6    Q.  Approximately, how many conversations did you have with

7    Miss Wolf about the items listed in her letter?

8    A.  I believe it was may have been one, one conversation, maybe

9    two.  I can't recall.

10   Q.  And between the date of that letter, May 26, 2006 and

11   today, did there also come a time when defense counsel

12   requested access to the search materials?

13   A.  Yes.

14   Q.  Did you accommodate those requests?

15   A.  Yes.

16   Q.  How?

17   A.  I scheduled time to -- for myself to sit with them as they

18   reviewed the boxes, and I also arranged other postal inspectors

19   to sit with them as they viewed the boxes.

20   Q.  And approximately, on approximately how many occasions did

21   you or other postal inspectors provide access to defense

22   counsel so they could review the boxes in preparation for the

23   hearing?

24         MR. KOBRE:  Your Honor, to short circuit this, I don't

25   think defense is at all claiming they didn't have access to

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

156

688ztan4                    Fraterrigo - redirect

1  these boxes.

2          The issue is after being identified, defense counsel

3  wanted to use them at the hearing, they were -- the items were

4  removed and sent back to the company. The government can go

5  through this line, take the time, but we don't contest access.

6          THE COURT: I assumed that all along, yes. I

7  didn't -- I agree, and anyway, I think you made the point.

8          MS. McEVOY: I'll just ask the question.

9          THE COURT: Go head, ask the question.

10  Q. When you were asked on cross-examination by Mr. Kobre

11  whether you were trying to impede the defense from preparing

12  for cross-examination, were you trying to impede them --

13  A. No, I was not.

14  Q. -- to prepare for cross-examination?

15          With respect to the items you returned to Amerindo,

16  what was your purpose in returning those items?

17  A. The purpose was that decision was made that it was not

18  covered under the warrant and it should have not been seized,

19  and it was returned.

20  Q. And what was the nature of those items?

21  A. There were personal letters from Alberto Vilar to a woman,

22  other personal letters of Alberta Vilar. I believe there was a

23  CD with Spanish language. I can't recall the others.

24  Q. Were they business records?

25  A. No.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300