HOFFMAN & POLLOK LLP
ATTORNEYS AT LAW
260 MADISON AVENUE
NEW YORK, N.Y. 10016
(212) 679-2900
FAX NO: (212) 679-1844

JEFFREY C. HOFFMAN
JOHN L. POLLOK
SUSAN C. WOLFE
WILLIAM A. ROME
LISA ROSENTHAL
JACQUELINE N. LAND

MICHAEL S. POLLOK
OF COUNSEL

ROBERT H. KIERNAN
(1973 - 1995)

September 28, 2006

Hon. Kenneth M. Karas
Judge, U.S. District Court
United States Courthouse
500 Pearl Street – Rm. 2260
New York, N.Y. 10007-1312
Fax No: 212 805-7968

   Re:   *United States v. Alberto Vilar* - 05 Cr. 0621

Dear Judge Karas:

   This letter is submitted in reply and in further support of the defendants' motion for a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674 (1978).

   The government does not dispute that Amerindo U.S., whose offices on Park Avenue were the subject of the search, advised numerous institutional clients and mutual funds. *See* Affidavit of Eugene Licker, Esq., dated August, 29, 2006, submitted by Mr. Tanaka. The government does not claim that it was unaware of the nature of Amerindo U.S.'s clients, nor could the government make such an argument. As a regulated investment advisor, Amerindo U.S. was required to file reports with the SEC, to which the government clearly had access, having selectively referred to them in the search warrant application. Indeed, the docket sheet for the SEC action commenced almost simultaneously with this case lists AUSA Marc O. Litt as the SEC's lead counsel. *See SEC v. Amerindo Investment Advisors Inc.,* 05 cv 5231 (LTS). The complaint in that action was filed less than a week after the execution of the search warrant, and it was based on information provided by Lily Cates a year before the execution of the search warrant. *Id.*; *see* Indictment S3 at ¶59 ( in a letter dated April 8, 2005, SEC requested a response to complaint by "Victim No. 1").

   Having at its disposal the SEC's information about Amerindo U.S., its business and its clients, the government failed to inform the Magistrate that the premises to be searched housed voluminous records of institutional clients and mutual funds whose investments were entirely separate from Lily Cates and the Mayer family. Instead, buried in the complaint attached to Inspector Fraterrigo's affidavit was the statement that "Amerindo also historically has offered investment services for institutional clients and high net worth individuals . . . . " Vilar Complaint, at p. 3; attached as Exhibit C to the Margolis Affidavit. As noted in our previous submission, the placement and

HOFFMAN & POLLOK LLP

Hon. Kenneth M. Karas
September 28, 2006
Page 2

characterization of this information failed to convey the crucial fact that voluminous, *current* records of institutional clients and mutual funds were likely to be found on the premises, and the government provided no probable cause to search or seize them. Had the business of Amerindo U.S. been properly disclosed, it would have alerted the Magistrate to the overbreadth of the proposed warrant.

In addition, Mr. Tanaka has attached documents to his submission showing, through client confirmation forms, that Cates had received almost $3 million in redemptions from her investments.[1] The clear implication of the search warrant application, however, is that Cates never received any funds from her investments:

> B. Lily Cates, who is the "Victim" described in the Vilar Criminal Complaint, described to me an investment of $1 million that she made in or about 1988 in an entity called Rhodes Capital ("Rhodes"). She received a stock certificate for two shares of stock, which was signed by Vilar and Tanaka. Although her account statements, which she received up until approximately 2002, reflected growth in the Rhodes investment, the investment was never described to her, she never has received a private placement memorandum, nor has she signed a subscription agreement for Rhodes, and her efforts to learn more about the investment were ignored or rejected by Vilar. In approximately February 2005, Cates attempted to redeem her entire investment portfolio at Amerindo, including her SBIC investment described in the Vilar CriminalComplaint, Rhodes, and any other investment with Amerindo, but Amerindo and Vilar have refused to move her investment portfolio to Baer Stearns & Co. Inc. . . as requested.

Fraterrigo Affidavit, dated May 25, 2006.

The government argues that the defendants have presented no basis to believe that Inspector Fraterrigo knew about any redemptions as of May 25, 2006. (Govt Memo at 34). It is inconceivable, and the court should reject any suggestion, that Inspector Fraterrigo simply never asked Cates if she had any other investments and if she had received any money from them. It is far more reasonable to conclude that Cates told

---

[1] A document obtained from the London office, Exhibit Q to the Margolis affidavit, indicates that Cates received over $6 million in redemptions.

HOFFMAN & POLLOK LLP

Hon. Kenneth M. Karas
September 28, 2006
Page 3

Inspector Fraterrigo about her other investments, and Inspector Fraterrigo chose not to disclose that information to the Magistrate. "Any reasonable person would have known that this was the kind of thing the judge would wish to know." *Wilson v. Russo*, 212 F.3d 781, 788 (3rd Cir. 2000).[2]

It is obvious, in reviewing the government's lengthy submission, that, at the time of the warrant application, its information about wrongdoing involved two specific investors (Cates and the Mayers) and three specific investment vehicles (Rhodes, GFRDA and SBIC). The Government used these two clients and three investment vehicles to seek records of *all clients and all investments vehicles, for the entire 20 year life of the investment advisory business* simply because the GFRDA and Rhodes investments allegedly occurred in 1987 and 1988. The bulk of the government's opposition to a *Franks* hearing is devoted, not to addressing the material information that we contend was withheld, but to attempting to show that it had probable cause, albeit not always presented in the application, to seize all of the records of Amerindo U.S. While not directly related to the *Franks* issue, we address those arguments as well.

Stressing that the defendants had known these two clients "for decades," the government suggests that this factor somehow created a broad expanse of probable cause to seize all manner of records and computer information. (Govt Memo at 9). To the contrary, however, the common characteristics of these two investors served to create a narrower category of potential fraud victims. The government also stresses that there was evidence the defendants converted "tens of millions of dollars of investor funds." *Id.* According to the warrant application, Cates and the Mayers invested a total of $18 million. That amount, considered in the context of a company that managed $1.2. billion in assets, also showed that the alleged fraud was of limited scale.[3]

Based on these two clients and the relatively small amount of funds, the government concluded that there was a "Ponzi scheme" at work. The warrant application, however, did not support that broad conclusion. At most, the allegations in the application suggested that the funds of these two longtime clients were handled without formality and mingled with the defendants' own funds.

---

[2] If Cates lied to Inspector Fraterrigo about having other investments or receiving redemptions, that should be disclosed to the defendants as *Brady / Giglio* material.

[3] According to several articles retrieved from a simple "Google" search of "Amerindo," the company managed up to $8 billion in assets between 1999 and 2002..

HOFFMAN & POLLOK LLP

Hon. Kenneth M. Karas
September 28, 2006
Page 4

The government attempts to explain its failure to contact the three other investors mentioned by Cates as a sound investigative strategy to avoid alerting the targets of their investigation. (Govt Memo at 14, 28). The government ignores the fact that Cates had already complained to the SEC long before the search warrant application. *See* Indictment S3 at ¶59. The defendants were already aware of an official investigation into their conduct.

With respect to Inspector Fraterrigo's testimony that she **did not** have probable cause to seize a vast array of documents listed in the rider, (Tr. 7/10/06 at 30-34, 38, 49, 52, 94), the government argues that Inspector Fraterrigo was "confused." Even if the Court ultimately agrees that she was confused rather than that she made false statements in her warrant application, her "confusion" demonstrates the reason why the Fourth Amendment prohibits overbroad warrants. By limiting searches "to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison,* 480 U.S. 79, 84, 107 S.Ct. 1013, 1016, 94 L.Ed. 2d 72 (1987).

It appears from Inspector Fraterrigo's testimony that she lacked a basic understanding of the meaning of probable cause. She was "confused" not only in her answers on cross-examination, but also about the crucial legal principle addressed in her warrant application. She was no better able to articulate on redirect what she had probable cause to seize. (Tr. 8/8/06 at p. 131-133). Indeed, she claimed that she ultimately executed the search warrant by making on-the-spot determinations about what would be "useful" to the investigation. (*Id.* at 137-140) The purpose of the Fourth Amendment particularity requirement is to prevent this kind of discretion exercised by an officer in the field.

With respect to the return of property the defendants specifically requested for use at the hearing, the government argues that it utilized the same procedure it previously used to return search materials to Amerindo U.S.'s counsel. The materials previously returned, however, had not been the subject of a specific request for production at a hearing. Shortly before the hearing on July 7th, the government removed items from boxes without keeping a record of what was removed and which box it came from, knowing that the defendants intended to use those items, which should not have been seized, to demonstrate the overbreadth of the search. By removing materials from the boxes without maintaining any record, the government

HOFFMAN & POLLOK LLP

Hon. Kenneth M. Karas
September 28, 2006
Page 5

destroyed the chain of custody and made it impossible to ascertain which agents improperly seized the items. Those actions are inconsistent with good faith.

For all of the reasons set forth above and in defendants' prior submissions, the evidence seized pursuant to the search warrant, and all fruits and leads obtained there from, should be suppressed. In the alternative, a *Franks* hearing should be held.

Respectfully submitted,

*Susan C. Wolfe*
SUSAN C. WOLFE

cc: AUSA Marc Litt
AUSA Deirdre McAvoy
Jessica Margolis, Esq.
Glenn Colton, Esq.
Steven Kobre, Esq.