

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York  10007*

November 21, 2006

BY HAND

The Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 920
New York, New York 10007

>      Re:   United States v. Alberto William Vilar and Gary Alan Tanaka,
>            S3 05 Cr. 621 (KMK)

Dear Judge Karas:

      The Government respectfully submits this letter in opposition to defendants' request to reopen the Franks hearing for the purpose of further exploring the issues set forth in the November 16, 2006 letter to Your Honor from Susan C. Wolfe, Esq. ("Def. Ltr.").

      Defendants seek to take additional testimony from Special Agent Fraterrigo concerning: (1) "information" provided to Lily Cates concerning Rhodes Capital, and (2) Lily Cates' successful transfer of approximately one-quarter of her approximately $12 million portfolio of investments managed by the defendants and Amerindo to an account over which the defendants could no longer exercise control. (Def. Ltr. 1-2). In a letter motion lacking citation to any pertinent authority, defendants implicitly allege that they have articulated the required substantial preliminary showing that Special Agent Fraterrigo intentionally misled the magistrate, or recklessly disregarded information, the inclusion of which in the warrant affidavit would have materially affected the magistrate's probable cause finding. See Franks v. Delaware, 438 U.S. 154, 171 (1978). As an initial matter, defendants' motion was untimely filed, and defendants have offered no legitimate explanation why these issues were not raised in their August 30, 2006 motion for a Franks hearing. Defendants' substantive arguments are, in any event, wrong, and their effort to prolong the Franks hearing should be rejected. Defendants also seek to expand the scope of the Franks hearing to "the full scope of what the case agent and prosecutor knew prior to drafting the search warrant application." (Def. Ltr. at 3). This wholly unsupported request to conduct a limitless fishing expedition into everything known by the Government prior to May 25, 2006 and into every allegation contained in the warrant affidavit – without regard to the truth of those allegations – should likewise be denied.

Hon. Kenneth M. Karas
November 21, 2006
Page 2

1.  Defendants' Motion Was Not Timely Filed And Should Be Rejected

On August 9, 2006, the Court set a schedule for briefing any <u>Franks</u> issues that defendants sought to raise. (<u>See</u> Ex. 1; 8/9/06 Tr. at 320-24).[1] That schedule provided three weeks for the defendants to marshal all the evidence at their disposal, and required that defendants file any papers in support of a motion for a <u>Franks</u> hearing on or before August 30, 2006. (<u>Id</u>.). Defendants failed to raise either of these issues in their motion papers and, as a consequence, it was neither briefed by the Government nor argued at the October 25, 2006 conference. Instead, defendants sprang these issues on the Court and the Government at the November 15 hearing without any prior notice. In fact, defendants have had all the evidence that they needed to raise both issues for more than one year.

With respect to the Rhodes Capital issue, both defendants had received copies of DX J from the Government by early August 2005.[2] Defendants have articulated no reason for their failure to identify this <u>Franks</u> issue in their original briefing, and the Court should not allow them to do so now.

With respect to the $3 million transfer of assets by Cates, Mr. Colton's accusation that the defendants did not raise the issue of Cates' transfer in advance of the hearing "because the government had the information [concerning post-2002 'redemptions'] and didn't produce it[,]" is contradicted by the documents defendants have had for more than one year. (Ex. 2; 11/15/06 Tr. at 58-59). So, too, is defendants' allegation that, "the information [was] only disclosed to the defense a week before the hearing." (Def. Ltr. at 2). The Court should not credit defendants' remarkable claim that they were unaware that nearly $3 million of assets disappeared from one of their clients' accounts without their knowledge. In rejecting that contention, the Court need not rely only on logic and common sense. As described below, more than one year ago, the Government produced substantial documentary evidence of Cates' transfer, including:

>   (1)  Cates' February 28, 2005 letter to Bear Stearns authorizing the transfer of the assets in her two Bear Stearns accounts (the "102 Account" and the "105 Account") managed by Amerindo (<u>see</u> BSC 0726, attached hereto as Ex. 4);[3]

---

[1]  Excerpts from the transcripts of proceedings on August 9, 2006 ("8/9/06 Tr.") and November 15, 2006 ("11/15/06 Tr.") are attached hereto as Exhibits 1 and 2, respectively.

[2]  DX J is attached hereto as Exhibit 3.

[3]  To protect privacy rights, the Government has redacted Cates' address and all but the account number prefixes from Exhibits 4-9. Unredacted versions of all of these documents were produced to the defendants in discovery more than one year ago.

Hon. Kenneth M. Karas
November 21, 2006
Page 3

>
> (2) Copies of the monthly account statements for February 2005 for both the 102 Account and the 105 Account showing closing balances of $0.00 (see printouts from BSC 0059, attached hereto as Ex. 5);
>
> (3) A copy of the monthly account statement for February 2005 for the 105 Account, which document was seized in the search of Amerindo U.S., shows a closing balance of $0.00, and which bears the handwritten notation "Account Closed 2/28/05" (see AUS-056-00410-16, attached hereto as Ex. 6);
>
> (4) A copy of the monthly account statement for February 2005 for the 102 Account, which document was addressed to the Amerindo U.K., was obtained from U.K. authorities as a consequence of the Government's MLAT request, and which shows a closing balance of $0.00 (see AUK-42-00601-05, attached hereto as Ex. 7);
>
> (5) Two copies of the March 2, 2005 e-mail message from Ed Swanson to Michael Shattner (one of Alberto Vilar's personal assistants) with a copy to Vilar, informing Amerindo that, "Bear Stearns, at the written request of Lily Cates, has transferred all securities and funds in [the 102 Account and the 105 Account] to Lily's personal account at Bear Stearns." (See AUK-4-01585 and AUK-30-01356, attached hereto as Ex. 8);[4] and
>
> (6) A copy of Ex. 8 forwarded to Maxine Rye with the instructions described in n. 4, supra, which electronic record was found in the "Sent Items" folder of Michael Shattner's Amerindo computer records. (See Ex. 9 attached hereto).

In sum, the evidence shows that for more than one year the defendants have had access to numerous sources of information evidencing both issues that they belatedly raise. Defendants' failure timely to file motions on these grounds apparently resulted from either a tactical decision to hold the issues in abeyance or from their wholesale disregard of the documentary and electronic evidence produced by the Government. Because of the defendants' lack of diligence, the Court should refuse to consider their motion in its entirety. To the extent the Court does consider defendants' late-filed motion, it should reject that motion for the reasons set forth below.

---

[4] Those documents further indicate that the message was forwarded to an Amerindo employee in London named Maxine Rye, with instructions to "[p]lease pass on to GT." (Id.).

Hon. Kenneth M. Karas
November 21, 2006
Page 4

2.      The Failure To Describe Cates' Investment In Rhodes Capital

Defendants contend that a document in the Government's possession at the time the warrant affidavit was presented to Magistrate Judge Maas (DX J) "squarely contradicts" the assertion in the warrant affidavit that the Rhodes Capital investment was "never described to [Ms. Cates.]" (GX 33 at ¶ 6.B). Material contained in Court-approved redactions from the interview notes and memoranda of interview belie that assertion, as does close scrutiny of DX J itself. DX J contains "information" about certain aspects of Rhodes Capital Group Limited's operations; however, it simply does not contain any meaningful description of Cates' investment in Rhodes. Moreover, defendants' difference of opinion with the Government about the meaning and significance of DX J does not constitute the substantial preliminary showing required to justify a Franks hearing. As a consequence, defendants' motion should be denied.

First, notes of the interviews of Ms. Cates make clear that she informed Government investigators prior to May 25, 2005 that not only did Vilar know that she did not understand the Rhodes investment prior to investing, but that he in fact dissuaded her from trying to understand the investment. The notes from Postal Inspector Golden's April 20, 2005 interview of Ms. Cates read:

> Rhodes Capital
>     Vilar & Gary only took 2 people in
>     LC does not know what Rhodes Capital is, but only that it is
>         not public & very closely held
>             [Gary = Gary Tanaka]

(April 20, 2005 Interview Notes at 2). Golden's memorandum of interview summarized that information in the following sentence fragment: "Cates was never provided any details regarding Rhodes Capital, other than being informed by Vilar".

The notes from the May 10, 2005 interview of Ms. Cates – notes that were shown to Mr. Colton during the November 15 hearing – read as follows:

> Rhodes Cap?
> described to her?
> . . .
> - explain R.C.?
>     - told her partnership other
>     people's $ - trust him
>     - Vilar told her - she looked
>     puzzled - learning disability
>     + dyslexia. He said he
>     knew that she didn't understand

Hon. Kenneth M. Karas
November 21, 2006
Page 5

> the less you know the better
> He said you know you don't
> understand it.

(May 10, 2005 Interview Notes at 3). As Special Agent Fraterrigo summarized in the MOI related to that interview: "VILAR told her about an investment, Rhodes Capital. He explained it was a partnership with other investors who trusted him with their money. He told her that he sold all the shares at $500,000 per share. VILAR realized that she did not understand his explanation of the investment. He told her, 'the less you know the better.'" Thus, the interview notes clearly support the allegations contained in the search warrant affidavit.

Second, the document relied upon by defendants provides scant information about the Rhodes investment, let alone the kind of description that an investor would want to have before investing $1 million. The first two pages (a cover letter and a title page to a financial report) provide no material information whatever. (See Ex. 3 at LC-00509-10).[5] From the next page and one-quarter, a reader would learn the following: (1) Rhodes Capital Group Limited ("Rhodes") was funded in February 1989 with approximately $448 million in assets, one-third of which were cash, and two-thirds bonds (see id. at LC-00511); (2) the company started investment operations on April 6, 1989 (see id.); (3) as of September 30, 1989, the company had invested about 62% of its approximately $502 million in assets in unspecified equities (see id.); (4) the company made profits of about $5 million (not including unspecified incentive fees), for an apparent 6-month return of about 1% (see id.); (5) Rhodes shared offices with an unspecified Amerindo entity in San Francisco and Miami (see id.); (6) Rhodes had a plan to lease even larger offices in San Francisco in the first quarter of 1990 (see id.); (7) Francis Saldutti joined the firm as Director of Equity Investment Research, and Rhodes intended to hire a second analyst to cover health, medical devices and biotechnology fields (see id.); (8) Rhodes gained an unquantified financial advantage from having its own unidentified registered broker-dealer operation in Miami (see id.); and (9) Rhodes' affiliated investment advisor, an unspecified Amerindo entity, performed well in 1989 and was expected to do well in 1990, which was in turn expected to help Rhodes' "credibility" (see id. at LC-00512). The remaining two and three-quarter pages of the document consist of a general discussion of the current and projected future trends in the equity markets and a chart showing certain unaudited, six-month, financial results for Rhodes. (See id. at LC-00512-14).

---

[5] The offer to discuss the investment contained in the cover letter and cited by defendants, see Def. Ltr. at 1, is not inconsistent with the allegation contained in the search warrant affidavit. An offer in a form letter made by an individual whose representations could not be taken at face value, (see Ex. 2; 11/15/06 Tr. at 143-44), is no evidence that such a discussion ever actually occurred, nor does it provide evidence of the content of any such discussion. That letter simply does not amount to the substantial preliminary showing required to obtain a Franks hearing.

Hon. Kenneth M. Karas
November 21, 2006
Page 6

      Notably, DX J says nothing about any of the things that one would expect to be included in a useful description of the investment including, for example: (I) how investor funds were to be used; (ii) limitations on how investor funds could be used; (iii) the duration of the investment; (iv) risk factors associated with the investment; (v) the amount and formula for calculating management fees; (vi) the amount and formula for calculating incentive fees; (vii) how and when profits are calculated and shared; (viii) where the investment is domiciled; (ix) whether the investment falls under government regulation, and if so, by what country and agency; (x) whether its operations are audited or not (and if so, by whom); (xi) the circumstances and process by which an investor could redeem his or her investment; (xii) the role (if any) played by Vilar and Tanaka in the venture; and (xiii) what (if any) Amerindo entity is involved in the investment (and in what capacity).  Thus, the solitary document cited by defendants provides no meaningful <u>description</u> of the Rhodes investment, and neither contradicts the statement in paragraph 6.B of the search warrant affidavit, nor the import of that statement as reiterated in paragraph 6.F:  that investors "lacked basic information about their investments."  (GX 33 at ¶ 6.F).  Moreover, defendants do not contend that any other document, description or information about Rhodes was provided to Cates between 1989 and 2005.  Their inability to cite any evidence that the Government knew of the existence of any such document prior to obtaining the warrant speaks volumes.

      The record about what the Government knew about this issue at the time the search warrant was obtained is clear: (1) Cates received one document which included some information about Rhodes and its initial financial results, but did not receive a <u>description</u> of her investment in Rhodes; (2) Vilar knew that she didn't understand the Rhodes investment and specifically discouraged her from even attempting to understand it; and (3) there is no evidence that Special Agent Fraterrigo had any evidence to the contrary at the time she signed the warrant affidavit. Defendants have once again failed to make the substantial preliminary showing required to warrant a <u>Franks</u> hearing.  See <u>Franks</u>, 438 U.S. at 171.  The warrant affidavit accurately reported that the Rhodes Capital investment was never <u>described</u> to Ms. Cates. Furthermore, inclusion of all the information that the Government had about this subject, including DX J and Mr. Vilar's admonition to Ms. Cates that, "the less you know the better," would, on balance, have provided even more factual support to justify the inference that Rhodes was not a legitimate investment, and that at least as far back as 1989, Vilar had breached his fiduciary duties as an investment adviser by knowingly failing to ensure that his client had a basic understanding of a $1 million investment that he had recommended.  Defendants have failed to make the required substantial preliminary showings of both scienter and materiality required by <u>Franks</u> and, accordingly, defendants' motion should be denied.[6]

---

      [6]     In apparent recognition of the weakness of their argument, defendants attempt to blur the issue by arguing that because the Government knew that Cates received DX J, the Government knew that she had received "information" about Rhodes and that the warrant affidavit was, as a consequence, either false or misleading.  This effort to distract attention from

3.       The Fact That Lily Cates Had To Resort To
Self-Help To Protect $3 Million Of Her Amerindo
Investments Is Fully Consistent With The Allegations
<u>Set Forth In The Warrant Affidavit</u>

      Defendants also move to reopen the <u>Franks</u> hearing to take additional testimony about Special Agent Fraterrigo's knowledge about Cates' successful transfer of $3 million of her Amerindo investment portfolio to an account over which the defendants could not exercise control. The defendants have been fully aware of that fact for over one year, yet failed to raise the issue in accordance with the Court-ordered briefing schedule. Accordingly, the Court should not even consider this last-ditch effort to extend the <u>Franks</u> hearing. Moreover, even were the Court to consider defendants' argument, it should deny the motion because the fact that Cates was able to extract a fraction of her Amerindo investments from the defendants without any assistance from Vilar or Amerindo is fully consistent with the warrant affidavit.

      Paragraph 6.B of the warrant affidavit stated that

> In approximately February 2005, Cates attempted to redeem her entire investment portfolio at Amerindo, including her SBIC investment described in the Vilar Criminal Complaint, Rhodes, and any other investment with Amerindo, but Amerindo and Vilar have refused to move her investment portfolio to Bear, Stearns & Co. Inc.

(GX 33 at ¶ 6.B). As the Court noted at the November 15 hearing, that statement is <u>not</u> inconsistent with the fact that Cates was able, through self-help, to protect $3 million of her approximately $12 million investment portfolio from Vilar, Tanaka and Amerindo, after Vilar and Amerindo refused to comply with her request. (<u>See</u> Ex. 2; 11/15/06 Tr. at 55-56, 140). The statement contained in paragraph 6.F of the search warrant affidavit ("[t]he totality of the circumstances in this case, including investors being prevented from redeeming or transferring their multi-million dollar investments . . .") is likewise not inconsistent with Cates' successful resort to self-help. The Mayers were prevented by the defendants from redeeming approximately $11 million of their GFRDA investment when it matured on December 31, 2003. Cates was prevented from redeeming approximately $12 million of her Amerindo managed investments in February 2005. Cates, too, was prevented from both transferring and redeeming $9 million of her $12 million in Amerindo managed investments in February 2005. Evidently, the only reason Cates was able to transfer approximately $3 million of those investments was because the assets were held in an account over which defendants did not have <u>exclusive</u> control,

---

the clear allegation in the warrant affidavit concerning the failure to provide a "description" and "basic information" about the investment, (<u>see</u> GX 33 at ¶¶ 6.B and 6.F), should be ignored.

Hon. Kenneth M. Karas
November 21, 2006
Page 8

and there was nothing that Vilar, Tanaka or Amerindo could do to prevent Cates from transferring that portion of her investments. Defendants have not pointed, and cannot point, to any evidence that Vilar or Amerindo did anything to assist their client of nearly two decades with her legitimate request to fully redeem or transfer her investments managed by Amerindo.

Because defendants have not identified any evidence inconsistent with the assertions contained in the search warrant affidavit about Vilar and Amerindo's refusal to redeem or transfer Cates' assets, there is no basis to reopen the <u>Franks</u> hearing to further explore this issue. As a consequence, defendants' motion should be denied without a hearing.

4.  <u>The Testimony Sought From AUSA Litt Is Irrelevant</u>

Defendants' desire to cross-examine AUSA Litt in these circumstances represents nothing more than an effort to force the prosecution team to prepare for an additional pre-trial hearing rather than prepare for trial. Defendants have for nearly one year expressed their interest in obtaining testimony from AUSA Litt concerning the drafting of the search warrant. Defendants have repeatedly asserted that the good faith of the Government (agent and prosecutor) are at issue; however, in the more than one year since defendants filed their first <u>Franks</u> motion, they have failed to cite a single case holding that the testimony of a prosecutor is relevant to the <u>Franks</u> inquiry into whether <u>the affiant</u> materially misled the judicial officer who reviewed a warrant application either deliberately or through reckless disregard. The Government has not found any authority to support defendants' novel proposition, nor have the defendants. <u>Franks</u> provides a mechanism to assess the good faith of a search warrant affiant in certain rare circumstances. The knowledge and actions of the prosecutor, absent extraordinary circumstances of which there is no evidence here, are simply irrelevant.

Citing unspecified "information" and unspecified "testimony," defendants conclude that "the integrity of the affidavit as a whole is in question." (Def. Ltr. at 2). On that basis, and the completely unremarkable testimony from Special Agent Fraterrigo that AUSA Litt drafted the search warrant affidavit, was aware of certain facts not contained in the affidavit, and that Special Agent Fraterrigo was not sure whether or not she had access to a letter written to AUSA Litt by Lily Cates' attorney in which Cates' successful transfer of $3 million was described, they assert that AUSA Litt's testimony is required to determine whether he spoke to Special Agent Fraterrigo about certain matters or withheld information from her. (<u>See</u> Def. Ltr. at 2). To the extent that Special Agent Fraterrigo did not recall whether she had seen certain documents prior to swearing to the search warrant affidavit, defendants have failed utterly to identify the materiality of that failure of recollection, particularly in light of the fact that the Government has acknowledged what documents were in the Government's possession prior to Special Agent Fraterrigo swearing to the search warrant affidavit. AUSA Litt's testimony concerning an issue that the Government is not contesting is wholly unnecessary. Moreover, defendants' speculation that AUSA Litt did not provide Special Agent Fraterrigo with a copy of the Swanson memo (which contained information about Cates' ability to transfer part of her Amerindo managed

Hon. Kenneth M. Karas
November 21, 2006
Page 9

investments), is irrelevant.[7] Any such failure – which the Government does not concede – is of no moment because the allegedly "withheld" fact is <u>not</u> inconsistent with anything in the warrant affidavit. (<u>See</u> Part 3, <u>supra</u>). Defendants' conclusory arguments do not meet the particularity requirements of <u>Franks</u>. Accordingly, defendants' motion to reopen the <u>Franks</u> hearing for the purpose of cross-examining AUSA Litt should be denied.

5.  There Is No Basis To Reopen The Franks Hearing To
    Explore "The Full Scope Of What The Case Agent And
    Prosecutor Knew Prior To Drafting The Search Warrant Application"

      Defendants conclude their motion papers with the breathtakingly conclusory argument that, "[b]ased on the record developed at the *Franks* hearing on Wednesday, . . . the Court should permit an even broader range of inquiry that: 1) encompasses the full scope of what the case agent and prosecutor knew prior to drafting the search warrant application, and 2) allows defense counsel to effectively challenge the witness' credibility, rather than just challenging their testimony on narrowly defined issues." (Def. Ltr. at 3). That argument flouts the clear requirements of <u>Franks</u> and its progeny. Those cases demand that the defendants identify a false statement or material omission, that they make a substantial preliminary showing that the statement or omission resulted from the affiant's deliberate falsehood or reckless disregard for the truth, and that the statement or omission was integral or necessary to the judge's probable cause finding. <u>See</u> <u>Franks</u>, 438 U.S. at 171; <u>United States</u> v. <u>Martin</u>, 426 F.3d 68, 73 (2d Cir. 2005); <u>United States</u> v. <u>Singh</u>, 390 F.3d 168, 183 (2d Cir. 2004); <u>United States</u> v. <u>Salameh</u>, 152 F.3d 88, 113 (2d Cir. 1998); <u>United States</u> v. <u>Campino</u>, 890 F.2d 588, 591-92 (2d Cir. 1989). While the defendants may believe it assists their defense of this case for the Court to permit them to engage in a broad fishing expedition to explore the basis for every single word contained in the warrant affidavit, they have articulated no lawful basis to be permitted to do so.[8] The Court should reject out of hand defendants' motion.

---

[7]    <u>See</u> DX AZ, attached hereto as Ex. 10.

[8]    Defendants' complaint about their inability to effectively challenge the witness' credibility in the hearings held to date (<u>see</u> Def. Ltr. at 3) is so cryptic that it defies response. <u>Franks</u> hearings are by their nature both rare and limited in scope. They are generally not a forum for defendants to "try" every aspect of a criminal investigation. To the extent that this statement constitutes an oblique reference to the defendants' asserted desire to call Ms. Cates and Ms. Mayer as witnesses to impeach unspecified testimony of Special Agent Fraterrigo and AUSA Litt, the Government notes that defendants have never proffered with specificity any rationale for doing so, and have again failed to do so here.

Hon. Kenneth M. Karas
November 21, 2006
Page 10

    For all the reasons set forth above, the Government respectfully requests that the Court deny defendants' motion in its entirety without hearing.

                                                Respectfully submitted,

                                                MICHAEL J. GARCIA
                                                UNITED STATES ATTORNEY

                                     By:       /s/
                                                Marc Litt
                                                Deirdre A. McEvoy
                                                Assistant United States Attorneys
                                                (212) 637-2295 / -2309