**EXHIBIT A**

```
                                                                    1
         65VVVILH
    1    UNITED STATES DISTRICT COURT
    1    SOUTHERN DISTRICT OF NEW YORK
    2    ------------------------------x
    2
    3    UNITED STATES OF AMERICA,
    3
    4              v.                        05 CR 621 (KMK)
    4
    5    ALBERTO VILAR,
    5    GARY TANAKA                         SUPPRESSION HEARING
    6
    6              Defendants.
    7
    7    ------------------------------x
    8
    8                                        New York, N.Y.
    9                                        May 31, 2006
    9                                        10:05 a.m.
   10
   10
   11    Before:
   11
   12                   HON. KENNETH M. KARAS,
   12
   13                                        District Judge
   13
   14
   14                         APPEARANCES
   15
   15    MICHAEL J. GARCIA
   16         United States Attorney for the
   16         Southern District of New York
   17    DEIRDRE McEVOY
   17    MARC LITT
   18         Assistant United States Attorneys
   18
   19    HOFFMAN & POLLOK
   19       ' Attorneys for Defendant Alberto Vilar
   20    JEFFREY C. HOFFMAN
   20    SUSAN C. WOLFE
   21
   21    Attorneys for Defendant Gary Tanaka:
   22
   22    WILSON SONSINI GOODRICH & ROSATI
   23         GLENN CHARLES COLTON
   23             -AND-
   24    KOBRE & KIM
   24         STEVEN GARY KOBRE
   25
                       SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

65VVVILH                    Licker - direct

1    Q.  During the second conversation, did the subject of a

2    subpoena come up?

3    A.  It's hard to number the conversations.  I can't say whether

4    it was the second or the third.  It was sometime after the

5    first.

6    Q.  Okay.  Do you recall what time during the day this subject

7    came up?

8    A.  I believe it came up prior to the time I returned to my

9    office at K&L which, as I said, I thought I place at about 1

10   o'clock.

11   Q.  And what was the substance of the conversation?

12   A.  At some point I became aware, I think, from speaking to Mr.

13   Feiter, Inspector Feiter, Postal Inspector Feiter, that they

14   had doubts about their abilities, the inspector had their

15   doubts about their ability to complete the search that day.

16        And someone, I don't remember if it was me or if it

17   was Marc Litt, I don't believe it was me, but someone suggested

18   that, as an alternative, if we would continue our agreement to

19   preserve the documents, we had already had that conversation,

20   and accept service of a grand jury subpoena that would allow

21   the postal inspectors to leave.

22   Q.  You mentioned that you had a conversation about preserving

23   the contents of the office?

24   A.  We had a general conversation about preserving relevant

25   information, wherever it was found.

                    SOUTHERN DISTRICT REPORTERS, P.C.

                         (212) 805-0300

65VVVILH                          Shaw - direct

1          THE COURT:  What was the home office recommendation,

2    did we get that?

3          THE WITNESS:  Section 8.

4          THE COURT:  Okay.  I wasn't clear.  Go ahead.

5    Q.  Prior to applying for the -- strike that.  Did you wind up

6    making an application for a Section 8 warrant in this case?

7    A.  Yes.

8    Q.  Prior to doing so, did you consider whether it was

9    necessary to obtain a Schedule 1 order or a Schedule 1 warrant?

10   A.  Yes.

11   Q.  What was the result of that consideration?

12   A.  I rejected that option.

13   Q.  Why?

14   A.  A Schedule 1 order -- I was not looking for special

15   procedure material here, primarily I was not.  And

16   consequently, the Schedule 1 option was not available to me.  I

17   was not looking for excluded material, either.

18   Q.  Why do you say you weren't looking primarily for special

19   procedure material?

20   A.  I was looking at -- my view was that I was looking at

21   premises controlled by named suspects for material that they '

22   had used to facilitate their own criminal activity.  I was

23   searching, if you like, in simple terms, I was searching the

24   address of a suspect, for evidence of his criminality.

25   Q.  Why does that -- what's the import of that for your

                    SOUTHERN DISTRICT REPORTERS, P.C.

                           (212) 805-0300

250

65VVVILH                        Shaw - direct

1    maybe just happen to be in possession of material that I need

2    access to.  And that's why they're inter parte.  That's why the

3    bank would be given notice by me that I intend to make this

4    application, and they have a right of audience and to object.

5              THE COURT:  Can I ask a follow-up?  In the example you

6    gave in the Italian request, if the lawyer was a solo

7    practitioner who had his or her own office, their own computer,

8    own file cabinets, under your view of your authority under

9    Section 8, would it have been proper to go the Section 8 route

10   rather than the Schedule 1 route?

11             THE WITNESS:  Yes.

12             THE COURT:  Even though the lawyer obviously has

13   privileged information, and the privilege belongs to the

14   clients of that lawyer?

15             THE WITNESS:  One can't obtain a warrant to access

16   privileged material.  The warrant would be to access special

17   procedure material or exclude material only.  I would be aware

18   that there was likely to be privileged material at the lawyer's

19   office, but I would not be applying for a warrant to access

20   privileged material.

21             THE COURT:  So when you execute the search, how would

22   you decide what to take and what not to take?  How would you

23   know what's privileged and what isn't privileged?

24             THE WITNESS:  With the lawyer's office, I actually

25   took independent counsel with me in that particular situation,

                    SOUTHERN DISTRICT REPORTERS, P.C.

                          (212) 805-0300

254

65VVVILH                    Shaw - direct

1   Q.  Any other reason?

2   A.  I don't recall anything in the MLAT that would suggest I

3   was going to find legal privileged material there.  I have

4   no -- I don't recall -- thinking back to October last year, I

5   don't recall anything that gave me specific cause to believe

6   that.

7   Q.  Did you ask anyone from the United States, either directly

8   or through the home office, whether they believed that it was

9   likely that potentially legally privileged material under U.S.

10  law might be found among the Amerindo documents at Cadogan

11  Tate?

12  A.  No.  I repeat that I was not searching -- I was not getting

13  a warrant to search for legal privileged material.  There's no

14  facility to do that under English law.

15  Q.  How did you determine to which court to take the warrant

16  application on October 10, 2005?

17  A.  Having decided that I was going to apply for a Section 8

18  warrant, having seen that the home office also concurred with

19  that view, I had to apply before magistrate's court.  I chose

20  Bow Street Magistrate's Court to do that.

21  Q.  Why did you choose Bow Street Magistrate Court?

22  A.  Bow Street Magistrate Court is the premier magistrate court

23  for the country.  It's not too far from my office.  I have

24  regular work at the court as part of my mutual assistance

25  function.  And that's the court where the expertise lies in the

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

65VVVILH                        Shaw - direct

1    field of mutual assistance.

2    Q.  Did you show the warrant application to anyone prior to

3    taking it to court on October 10, 2005?

4    A.  My senior supervisor.

5    Q.  Who's that?

6    A.  Detective Inspector Fuller.

7    Q.  Why did you do that?

8    A.  I'm not entitled to make an application for search warrant

9    without the approval of an independent supervising police

10   officer.

11   Q.  Was he an independent supervising police officer?

12   A.  Yes.

13   Q.  Did you discuss the application with him?

14   A.  I'm sure I did, but I can't remember the nature of the

15   conversation.  But I wouldn't have just handed it to him and

16   walked off.

17   Q.  Do you recall any questions that Detective Inspector Fuller

18   asked you about the application?

19   A.  He asked -- I do recall him asking me logistical questions.

20   We were short of staff, as I mentioned earlier.  This was

21   probably going to be a two-day event.  Where was I going to get

22   the staff from to do it?  I remember those questions.  I don't

23   remember if there were further questions.

24   Q.  Did Detective Inspector Fuller express any concerns about

25   the application?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300