**EXHIBIT B**

```
                                                                    309
     661VVILH
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    UNITED STATES OF AMERICA,
3
4              v.                              05 CR 621 (KMK)
4
5    ALBERTO VILAR,
5    GARY TANAKA,                              SUPPRESSION HEARING
6
6              Defendants.
7
7    ------------------------------x
8
8                                              New York, N.Y.
9                                              June 1, 2006
9                                              11:45 a.m.
10
10
11   Before:
11
12              HON. KENNETH M. KARAS,
12
13                                      District Judge
13
14                         APPEARANCES
14
15
15   MICHAEL J. GARCIA
16        United States Attorney for the
16        Southern District of New York
17   DEIRDRE McEVOY
17   MARC LITT
18        Assistant United States Attorneys
18
19   HOFFMAN & POLLOK
19        Attorneys for Defendant Alberto Vilar
20   SUSAN C. WOLFE
20
21   Attorneys for Defendant Gary Tanaka:
21
22   WILSON SONSINI GOODRICH & ROSATI
22        GLENN CHARLES COLTON
23             -AND-
23   KOBRE & KIM
24        STEVEN GARY KOBRE
25
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

```
                                                                        311
        661VVILH
 1      HOWARD SHAW,
 2           called as a witness by the Government,
 3           having been duly sworn, testified as follows:
 4      CROSS-EXAMINATION
 5      BY MR. KOBRE:
 6      Q.   Detective, good morning.
 7      A.   Good morning, sir.
 8      Q.   My name is Steven Kobre.  I represent one of the defendants
 9      in this case, Mr. Tanaka and I'm going to ask you some
10      questions for the next, say, probably a little over an hour,
11      okay?
12      A.   I understand.
13      Q.   You are not an attorney, correct?
14      A.   That's correct.
15      Q.   You're not a solicitor, correct?
16      A.   No, sir.
17      Q.   And you're not a barrister, as well, correct?
18      A.   Correct.
19      Q.   And the descriptions of U.K. law that you provided on
20      direct examination, that's a description based on your
21      understanding of U.K. law, correct?
22      A.   Yes.
23      Q.   And you accept the fact that these are -- that your
24      opinions are not legal opinions, they're just your opinions of
25      what the law is, correct?
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300
```

```
        661VVILH                    Shaw - cross
 1    A.   They're my opinions based on my experience and my training,
 2    correct.
 3    Q.   And prior to testifying -- withdrawn.  There have been
 4    instances in your career where you have determined that
 5    evidence is applicable for, say, a Section 8 warrant, and
 6    lawyers to whom you've presented an application for a warrant
 7    have disagreed, is that right?
 8    A.   Yes, yes, I believe so.
 9    Q.   And in preparation for your testimony today, did you have
10    an opportunity to meet with lawyers for the United States
11    government?
12    A.   Yes, sir.
13    Q.   And when did you meet with lawyers for the government?
14    A.   On Tuesday, two days ago, sir.
15    Q.   And who did you meet with?
16    A.   Mr. Litt, and I'm sure she'll forgive me, Deirdre, I don't
17    know her surname.
18    Q.   How long did you meet with them?
19    A.   Several hours, sir, on Tuesday.
20    Q.   When you say "several hours," can you give me a ballpark?
21    A.   Yeah.  I was -- I think I got to the office something like
22    9:30 in the morning, and I left at about 4 p.m.
23    Q.   And was one of the things that they did with you was go
24    through the MLAT materials that had been provided?
25    A.   That's a rather broad question.
```

keep up. But also under a duty of an obligation to do my work properly. So I had to balance them.

Q. You say working at a pace. Do you mean they are working at a fast pace?

A. Well, the three of them and one of me, sir, reviewing what they're doing. So I'm, of necessity, working at a third of their speed. Although they would be looking through more material than me, because I'm only looking at the material they drew up. It's a difficult situation to describe, paint a picture of.

Q. Did there come a time -- withdrawn. You knew prior to the search that some of the information that -- withdrawn.

You knew prior to the search that it was likely that some of the information that you might come across was bank records, correct?

A. Yes.

Q. And you knew that some of the information you might come across were client account statements of Amerindo, correct?

A. Yes.

Q. And you knew that Amerindo was an investment adviser, right?

A. Yes.

Q. And one of the things investment advisors do is they have possession of private client information, correct?

A. Yes.

```
        661VVILH                    Shaw - cross
 1   Q.  They have records that likely contain client's Social
 2   Security numbers, right?
 3   A.  But I wouldn't know that as a matter of course, but that
 4   was what was stated in the MLAT, yes.
 5   Q.  And that was your expectation in executing the search
 6   warrant, correct?
 7   A.  Yes.
 8   Q.  And it was also your expectation that the documents would
 9   contain clients' either bank account information or private
10   financial information, correct?
11   A.  They could be, yes.
12   Q.  And you testified, I believe, on direct, that the Schedule
13   1 -- withdrawn.
14          The reason why that information, in other words, the
15   documents that I just asked you about, the client documents,
16   was not special procedure material was because you weren't
17   looking for that information, is that right?
18   A.  No.
19   Q.  Okay.  Why was it, in your view, not special procedure
20   material?
21   A.  Special procedure material documents are created in the
22   ordinary course of business by innocent third-party businesses,
23   held by them with confidence, great expectation of
24   confidentiality.  That was not what we were looking for.  We
25   were looking for documents created to facilitate criminal
```

```
                                                                    390
        661VVILH              Shaw - cross
 1   A.  Whether there are any difficulties or issues I need to be
 2   made aware of.
 3   Q.  Okay.  And I believe you testified on direct examination
 4   that when you asked him about difficulties, he would understand
 5   that you were referring to whether there was any special
 6   procedure material or privilege documents, is that right?
 7   A.  I would absolutely expect him to raise any issues about
 8   legality of what was going on.
 9   Q.  But is it your testimony as you sit here today that by the
10   use of the word "difficulties," that he would understand that
11   you were referring to special procedure material or privileged
12   documents?
13   A.  Amongst other things, yes.
14   Q.  If special procedure material related to -- withdrawn.  How
15   would the finding special procedure material be a difficulty?
16   A.  If they had found these crates contain lots of material,
17   didn't have any relevance at all to Amerindo, belonged to
18   another company, for example, they would raise that with me and
19   discuss with me then about whether or not we would obtain a
20   different type of warrant.  None of those issues were raised.
21   Q.  Did they raise the issue with you that they were finding
22   records relating to a company called Amerindo-Cayman?
23   A.  No.
24   Q.  Are you familiar with the fact that there were records that
25   were actually seized from the Cadogan Tate facility that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

661VVILH                    Shaw - cross

1  related to a company called Amerindo-Cayman?
2  A. Was I aware. I don't think so, sir, no.
3  Q. And, in fact, the search warrant -- withdrawn. In fact,
4  the MLAT materials didn't refer to a company called
5  Amerindo-Cayman, isn't that right?
6  A. I don't know about the MLAT material. If one looks at the
7  front page of the search warrant, the front page of Exhibit 24,
8  sir, I've given a broad description of the material that I'm
9  seeking. It begins, Documents relating to activities in
10 Amerindo-U.K. and associated companies. Amerindo-Cayman was
11 put forward within that category.
12 Q. By what standard did you determine what an associated
13 company was?
14 A. Well, companies that are associated in the way that
15 Amerindo U.S. and Amerindo-U.K. or Panama are associated to
16 Amerindo-U.K., the same principals, the same business activity.
17 Q. So I'm just asking you by what standard were you able to
18 conclude that an entity was an associated company?
19 A. Yes.
20        MR. LITT: Objection. There's no testimony that he
21 ever did. I don't know if he's asking a hypothetical question
22 or an actual question.
23        THE COURT: No. Indeed, the testimony is implicit in
24 the answer that it was done whether by him or somebody else, or
25 how it might have been justified, since it's conceded in the

392

```
        661VVILH                  Shaw - cross
 1   answer that it was done.
 2           MR. KOBRE:  I mean that's what he made the call on,
 3   what documents to take.
 4           THE COURT:  Or if somebody else did.  But the point is
 5   that the question was asked assuming Amerindo-Cayman documents
 6   were taken, would that be done under the warrant, and the
 7   witness gave an answer.
 8           MR. KOBRE:  Right.
 9   BY MR. KOBRE:
10   Q.  And my question is, as you were searching the material,
11   what standard did you use for determining whether a company was
12   an associated company with principals?
13   A.  In the way that I've described, whether if they were
14   principals, the same names were involved, for example, or if
15   there was some form of evidence, wrong word, "obvious link" is
16   the phrase I'm looking for.
17   Q.  Okay.  So if the companies -- it was your view as you were
18   reviewing the materials that if companies had "Amerindo" in the
19   name, you felt it came within the rubric of the search warrant,
20   is that right?
21   A.  That seemed reasonable in the circumstances.  We were
22   searching Amerindo-U.K. offices.
23   Q.  You recall having a conversation with the U.S. postal
24   inspectors and asking them about what standards you used in
25   determining an associated company with Amerindo?
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

```
                                                                    417
       661VVILH                    Shaw - cross
 1     A.   Correct.
 2     Q.   That's because the government is not entitled to possession
 3     of it, correct?
 4     A.   Correct.
 5     Q.   And the government is also not entitled to see it, correct?
 6     A.   I'm sorry, that's not right.  The government --
 7          THE COURT:  First, the question before is not right?
 8          THE WITNESS:  Yes, your Honor, I'm sorry.
 9     A.   Could you ask that question again, ma'am, please?
10          THE COURT:  Two questions ago, right?
11          THE WITNESS:  Yes, sir.
12          THE COURT:  Okay.  The government is not allowed to
13     seize legally privileged materially, I think it was.
14     Q.   And that's because the government's not entitled to possess
15     it?
16     A.   The government is not entitled to seek a warrant granting
17     authority to seize legally privileged material.  That doesn't
18     mean that law enforcement officers can't seize material which
19     later subsequently turns out to be legal privilege during the
20     course of their search, as long as at the time of seizing it
21     they held an honest belief that it was not legal privilege
22     material.
23     Q.   Okay.  Now, let me ask you this:  If you have an honest
24     belief before you enter a premises that there will be legally
25     privileged materials, that you're not searching for --
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

418

```
       661VVILH                   Shaw - cross
 1    obviously you're not searching for them because you cannot
 2    seize them, right?
 3    A.  Yes, ma'am.
 4    Q.  Then you have to get a Schedule 1 warrant, right?
 5    A.  No, ma'am.
 6    Q.  Tell me what's incorrect about that.
 7    A.  I'm not entitled to obtain any form of warrant to search
 8    for legal privilege material.  If I believe that there's likely
 9    to be legal privilege material on-site, but is not what I am
10    looking for, then I have to make an independent determination
11    as to how I'm going to deal with that, whether I'm going to
12    take legal counsel.  But there's a clear distinction.  I'm
13    sorry, I'll leave it that way.
14    Q.  Well, you make a determination whether to take legal
15    counsel.
16    A.  Yes.  If I think that there's likely to be legal privilege
17    material at the scene of my search, although I'm not looking
18    for that, I will then have to make a determination as to
19    whether I should take legal counsel with me.  I don't have to,
20    because there are provisions in law I can deal with it in other
21    ways.
22    Q.  Okay.  Well, under what circumstances when you do
23    anticipate that there will be legal materials would you not opt
24    to take legal counsel?
25              MR. LITT:  Objection.  Relevance.  The witness has
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```