**EXHIBIT C**

6775VILH.txt

1

6775VILH            hearing

1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    UNITED STATES OF AMERICA,
3
4            v.                    05 Cr. 621 (KMK)
4
5    ALBERTO VILAR and GARY TANAKA,
5
6                Defendants.
6
7    ------------------------------x
7
8
8                            July 7, 2006
9                            10:30 a.m.
9
10
10   Before:
11
11                  HON. KENNETH M. KARAS,
12
12                        District Judge
13
13
14                    APPEARANCES
14
15   MICHAEL J. GARCIA
15       United States Attorney for the
16       Southern District of New York
16   BY:  MARC LITT
17       DEIRDRE McEVOY
17       Assistant United States Attorneys
18
18   HOFFMAN & POLLOK, L.L.P.
19       Attorneys for Defendant Vilar
19   BY:  JEFFREY C. HOFFMAN
20       SUSAN C. WOLFE
20
21   WILSON, SONSINI, GOODRICH & ROSATI
21       Attorneys for Defendant Tanaka
22   BY:  GLENN CHARLES COLTON
22       JESSICA MARGOLIS
23       and
23   KOBRE & KIM, L.L.P.
24   BY:  STEVEN GARY KOBRE
24       JUSTIN SHER
25
25

6775VILH.txt
10    was a very long-time friend and good friend of Alberto Vilar,
11    invested approximately $11 million in guaranteed fixed rate
12    deposits, her name was Lisa Mayer.  And her family is Herbert
13    Mayer and Deborah Mayer, the Mayer family.
14    Q.  What, if any things, did you explain to the postal
15    inspectors during the briefing about specific account
16    information that was covered by the search warrant?
17    A.  I explained to the postal inspectors that the two
18    individuals, Gary Tanaka and Alberto Vilar, used the Bear
19    Stearns brokerage accounts and used the Chase Manhattan Bank,
20    JP Morgan Chase bank accounts to wire money back and forth.
21    Q.  What, if anything, did you tell the postal inspectors about
22    an account in the name of PTC?
23    A.  I explained to the inspectors that the money was -- some
24    portions of money that was in the brokerage account was wired
25    to an offshore account to an account called PTC, Private Trust
                  SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                          49
     6775VILH          Fraterrigo - direct
1    Company, in the Bahamas.
2            MR. HOFFMAN:  Your Honor, I'm going to object at this
3    point.  I have no objection to a question what did you say, but
4    as opposed to telling her -- as opposed to leading her into
5    each thing saying what did you say about that.  I would like
6    her memory as to what did you say.
7            THE COURT:  Overruled.
8            Go ahead.
9    BY MS. McEVOY::
10    Q.  What, if anything, did you explain to the postal inspectors
11    about the charges against Gary Tanaka?
12    A.  I explained that Gary Tanaka was charged with wire fraud
13    and that investors' money that was held in the Bear Stearns
14    brokerage account was being wired out to purchase horses.
15            There were several horses that were in the complaint
16    and that if, you know, while they're conducting the search if
17    they came across any material involving any wire transfers, to
18    look for any purchase agreements or any documentation
19    surrounding the wire transfers.
20    Q.  What, if anything, did you distribute to the postal
21    inspectors during the briefing?
22    A.  I distributed the search warrants to the inspectors and the
23    search warrant affidavits to the inspectors that were
24    conducting the search.
25            And I distributed the arrest warrants and the
                  SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                          50
     6775VILH          Fraterrigo - direct
1    complaints to the inspectors that were participating in the
2    arrests.
3    Q.  At what point were the complaints and search warrants and
4    affidavits distributed during the briefing?
5    A.  Toward the end of the briefing.
                              Page 27

6775VILH.txt

6  Q.  What, if anything, did you see the postal inspectors do
7  with the documents you handed out?
8  A.  I recall them reading, going through it, and asking
9  questions.
10  Q.  And, with respect to you recall them reading, how did you
11  know they were reading?
12  A.  I observed them going through the documents, reviewing the
13  warrants in the affidavits.
14  Q.  Did you distribute the complaints to all the postal
15  inspectors?
16  A.  No, I did not.
17  Q.  Why not?
18  A.  It was based on my past experience with search warrants
19  the -- I failed to give it -- it was an oversight that I should
20  have given the complaints to all the inspectors.  At the time I
21  didn't realize that the -- I didn't remember that the
22  complaint -- that the search warrant referred to the complaint
23  as an attachment.
24       I have always been accustomed to having a search
25  warrant that incorporates the language of the complaint in the
          SOUTHERN DISTRICT REPORTERS (212) 805-0300
                              51
6775VILH        Fraterrigo - direct
1  actual search warrant affidavit and in this instance I
2  separated the two and did not think it -- did not recall it was
3  referred to in this search warrant affidavit.
4  Q.  What, if any instructions, did you give to the inspectors
5  when you handed out the search warrants and affidavits?
6  A.  I explained to them to read it over and that if they had
7  any questions, that I would be at the search site later in the
8  morning or early afternoon and, if they had any questions, they
9  can ask myself or Inspector John Feiter.
10       I also explained to them while they were conducting
11  the search to pay attention to the inventory sheets.  In our
12  inventory sheets it lists the items that are seized and not to
13  generalize the item that they were seizing as a business record
14  or corporate record and to specifically indicate what it is:
15  The name of the file, the name of the item or a better.  A
16  detailed description of the item on the inventory sheet.
17  Q.  You mentioned that there were questions from postal
18  inspectors at the briefing or after the briefing?
19  A.  Yes, there were.
20  Q.  Do you recall the nature of the questions that the postal
21  inspectors asked you after the briefing?
22  A.  I recall there were several questions but I don't recall
23  all of them what were said.
24       The few that I do remember was there was a question
25  about Gary Tanaka and the horses.  The inspector asked me what
          SOUTHERN DISTRICT REPORTERS (212) 805-0300
                              52
6775VILH        Fraterrigo - direct
1  in particular would -- what particular documents should we --
                          Page 28

6775VILH.txt

10   search.
11   Q. And, what was the role of U.S. postal inspectors in the
12   search?
13   A. We were there to assist in the search.
14   Q. And, what was your understanding of who had the authority
15   to seize documents at Cadogan Tate?
16   A. The Metropolitan Police.
17   Q. Did you or the other postal inspectors have the authority
18   to seize documents at Cadogan Tate?
19   A. No, we did not.
20   Q. Why not?
21   A. We were U.S. federal agents, we didn't have the authority
22   to seize any items in the U.K.
23   Q. And what was your understanding based on?
24   A. Based on U.S. law and my personal experience.
25   Q. What did you observe the Metropolitan Police detectives do
              SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                    114
       6775VILH          Fraterrigo - direct
1    during the search?
2    A. They instructed the Cadogan employees to open up the first
3    crate and they began the search.
4    Q. And, once the search began, what did you observe the
5    Metropolitan Police do?
6    A. They were going through the boxes, reading documents, and
7    looking through file cabinets that were stored in the first
8    crate.
9    Q. And, how do you know this?
10   A. I observed them doing that.
11   Q. How did the search progress?
12   A. When we opened up the first crate we lined up all the items
13   that were in the crate in a row. All the inspectors and the
14   Metropolitan Police detectives were going through with the
15   boxes and the file cabinets that were in the crate.
16       There were -- at one point the Detective Durrant was,
17   he asked me several questions about particular documents. And
18   he decided that since I had, I was the case agent I had the
19   most knowledge of the investigation and the other two postal
20   inspectors that were with me had a fairly good understanding of
21   the investigation. He concluded that we -- us three postal
22   inspectors -- would go through the boxes, identify items that
23   were potentially evidence or that was covered under the warrant
24   and we would provide those items to him, actually Detective
25   Durrant.
              SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                    115
       6775VILH          Fraterrigo - direct
1    Q. And, during the search -- sorry. One clarifying question.
2        When you say Detective Durrant decided and Detective
3    Durrant concluded, how do you know that that was Detective
4    Durrant's decision and conclusion?
5    A. Well, we had a discussion. After he was asking me several
                                Page 62

6775VILH.txt

6   questions we had a conversation and it was decided that that's
7   how we were going to proceed for being efficient.
8   Q.  During the search, did you ever come across material that
9   you thought might be privileged?
10  A.  Yes.
11  Q.  What did you do?
12  A.  Any items that I thought was privileged I took that item
13  and handed it over to either Detective Ann Williamson or Tom
14  Feeney.
15  Q.  Detective?
16  A.  I'm sorry.  Postal Inspector Ann Williamson.
17  Q.  Did you separate potentially privileged material out from
18  the rest of the materials?
19  A.  No, I did not.
20  Q.  Why not?
21  A.  For two reasons, one, we didn't have the materials to
22  separate it out.  We normally, in the U.S. searches, we take
23  the items and put it in an envelope and mark it privileged and
24  confidential and keep it separate.  In this particular search
25  we didn't have the envelopes.  We requested, though, any kind
              SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                116
     6775VILH          Fraterrigo - direct
1   of envelope or any kind of way, some sort of way of separating
2   it from the rest and Cadogan Tate did not have that for us; and
3   two, the Metropolitan Police did not want us taking out items
4   from the boxes and separating it from its original box.  They
5   wanted us to keep the items together.
6         So, if we were taking an item out of the box we had to
7   place it on top.  So, the privileged material had to be placed
8   on top as well so they could see it.
9   Q.  Did you read the potentially privileged material?
10  A.  No, I did not.
11  Q.  Who did you ask for envelopes and other supplies?  Did you
12  ask Cadogan Tate or Metropolitan Police?
13  A.  I think it was both.  I think Cadogan Tate had their own
14  materials and they didn't have any envelopes and Cadogan Tate
15  didn't have them either.
16  Q.  Did you have any conversations with the Metropolitan Police
17  about the process you followed with respect to potentially
18  privileged material?
19  A.  No, I did not.
20  Q.  Why not?
21  A.  It didn't come across to me.  I didn't think of it at the
22  time.
23  Q.  Did Inspectors Feeney and Williamson ask you any questions
24  during the search?
25  A.  Yes.
              SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                117
     6775VILH          Fraterrigo - direct
1   Q.  What, generally, do you recall them asking you during the
                              Page 63

6775VILH.txt

10    application?
11    A.  I believe that's correct.
12    Q.  Now, other than documents concerning Lily Cates starting
13    1988 forward, and Lisa Mayer beginning in 1987 forward, other
14    than those two individuals and those two dates that are
15    reflective of those two individuals, when you were briefing the
16    individuals who were going to participate in the search
17    warrant, did you have an understanding of what dates you
18    believe the search warrant covered concerning materials
19    exclusive of those two individuals?
20         MS. McEVOY:  Objection, your Honor.  I have no problem
21    with the Inspector answering the question with respect to what
22    we conveyed to the postal inspectors during the briefing.  But
23    as to her suggestive belief and investigation, I would object.
24         THE COURT:  Overruled.
25    A.  The date of the search I told the inspectors that Alberto
              SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                    140
6775VILH            Fraterrigo - cross
1    Vilar had a almost 20-year relationship with both of these
2    investors and that they began investing with him approximately
3    20 years ago.  I didn't give an exact date.
4    Q.  My question is did you, other than documents concerning
5    these two individuals, other than documents concerning these
6    two individuals, did you have an understanding as to what dates
7    you were allowed to get documents, to take documents pursuant
8    to the search warrant for concerning anything other than these
9    two individuals, Cates and Mayer?
10    A.  Other than these two individuals I didn't have a time frame
11    as to the documents.
12    Q.  So, did you believe, in your own -- and you were one of the
13    agents who executed the search, correct?
14    A.  Yes.
15    Q.  So, in your own understanding of what you could do, did you
16    have an understanding that you could take documents that other
17    than that pertaining to Cates and Mayer that were, let's say,
18    from 1979?
19    A.  I mean, I can't -- I can't answer that saying I'm going to
20    take a document from 1979 unless it has some sort of relevance
21    to the warrant.
22         I mean, it has to be an item that's covered in the
23    warrant.  If it's an SBIC application in 1979 then it's part of
24    the SBIC portion of the warrant.  I can't just say I'm going to
25    take a document from 1979.
              SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                    141
6775VILH            Fraterrigo - cross
1    Q.  For example, in the materials to be searched portion of the
2    warrant, page 7?
3    A.  Yes.
4    Q.  If you look down at paragraph 9 and look at (A) where it
5    says, it lists documents to be taken such as corporate records
                            Page 76

6775VILH.txt
6   concerning Amerindo Investment Advisors, Inc.; now, that
7   doesn't limit the corporate records, doesn't say certain
8   corporate records, corporate records having to do with SBIC?
9   It says, corporate records concerning Amerindo Investment
10  Advisors, Inc., (Amerindo U.S.)
11          Was it your understanding that any and all documents
12  that come within the description of corporate records
13  concerning Amerindo Investment Advisors, Inc., no matter how
14  old those were, were seizable under this warrant?
15  A.  Yes.
16  Q.  And so, to get back to the question I asked you earlier, if
17  there was a corporate record, something having to do with
18  Amerindo U.S., that was a 1979 dated document, your
19  understanding is that that was seizable, is that correct?
20  A.  Yes.
21  Q.  And, if that -- withdrawn.
22          Next it says Amerindo Investment Advisors Cayman
23  Limited.  Would your answer be the same for that?
24  A.  Yes.
25  Q.  And, the same for Amerindo Investment Advisors U.K.
            SOUTHERN DISTRICT REPORTERS (212) 805-0300
                              142
       6775VILH            Fraterrigo - cross
1   Limited?
2   A.  Yes.
3   Q.  And, the same for Amerindo Investment Advisors Panama?
4   A.  That's correct.
5   Q.  And, for the others that are named on that sheet?
6   A.  Yes.
7   Q.  So, any document, no matter how old it was, as long as it
8   came within the words of that paragraph it was your
9   understanding was seizable, is that correct?
10  A.  Yes.
11  Q.  Would it be accurate to say that you gave no instruction to
12  any of the people participating in the search warrant that they
13  should limit, in any way shape or form, seizing any document
14  regardless of its age, as long as it came within the
15  description of the paragraph we just mentioned?
16  A.  I gave no indication of any time frame.
17  Q.  That's all I'm asking, time frame.
18  A.  Yes.  But I did not isolate that particular paragraph.
19  Q.  You talked about the whole document?
20  A.  The whole.
21  Q.  Which included that paragraph?
22  A.  Yes.
23  Q.  The affidavit that you signed and submitted in order to get
24  the search warrant, did you prepare that affidavit yourself?
25  A.  I provided the probable cause.
            SOUTHERN DISTRICT REPORTERS (212) 805-0300
                              143
       6775VILH            Fraterrigo - cross
1   Q.  My question is, did you type it up?
                          Page 77

6775VILH.txt

18  know, I had probable cause to believe that there could be other
19  investors.
20  BY MR. HOFFMAN::
21  Q.  Tell me what probable cause you had to believe that
22  investment brochures sent to or from the Los Angeles Fire and
23  Police Department were evidence of criminality?
24  A.  I -- my understanding at the time was that I had probable
25  cause and I still believe to this day I had probable cause to

SOUTHERN DISTRICT REPORTERS (212) 805-0300

149

6775VILH          Fraterrigo - cross
1  seize any investment brochures from 20 years ago.
2  Q.  I'm asking you from the Los Angeles Fire and Police
3  Department.
4  A.  That's from the mutual fund.  They're from the U.S. Mutual
5  Fund, if I understand you.
6  Q.  Right, and U.S. Mutual Funds' offices were at Park Avenue,
7  correct?
8  A.  That's correct.
9  Q.  And so, what probable cause was there to take investment
10  brochures that were seized to and/or from -- sent to or
11  received from the Los Angeles Fire and Police Department?
12  A.  It was a -- probable cause that I had was these two
13  investment advisors were, failed to redeem two investors, and
14  my understanding was that there was other -- I had other
15  information to believe that I had reason and probable cause at
16  the time to seize any items from that fund.
17  Q.  How about from the Bayer Corporation?
18  A.  I'm sorry?
19  Q.  The Bayer Corporation, another client of the fund, did you
20  have probable cause to believe that you could seize investment
21  brochures that were sent to and from the Bayer Corporation to
22  Amerindo Investment Advisors, the registered investment
23  advisory company?
24      THE COURT:  B-A-Y-E-R?
25      MR. HOFFMAN:  Correct.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

150

6775VILH          Fraterrigo - cross
1      THE COURT:  The aspirin?
2      MR. HOFFMAN:  Yes, sir.
3  A.  I don't think I had probable cause to seize anything out of
4  that.
5  Q.  How about Johnson and Johnson.
6  A.  No.
7  Q.  City of Seattle Employees' Retirement?
8  A.  No.
9  Q.  City of Stanford Employees' Retirement?
10  A.  No.
11  Q.  Whirlpool Corporation?
12  A.  No.
13  Q.  And if I went down a list of a hundred or so other, other

Page 81

6775VILH.txt
14    than the two individuals you have mentioned but institutional
15    entities like this that were, whose records were housed at the
16    Park Avenue office and who were clients of Amerindo Investment
17    Advisors, Inc., the registered investment advisory company,
18    would it be accurate to say you had no probable cause to seize
19    their -- I will use the specific words -- investment brochure
20    sent to or gotten from them, correct?
21         MS. McEVOY:  Your Honor, the government would just
22    object to Mr. Hoffman's testimony on that issue.
23         THE COURT:  Overruled.
24         THE WITNESS:  No.
25    BY MR. HOFFMAN::
         SOUTHERN DISTRICT REPORTERS (212) 805-0300
                               151
       6775VILH          Fraterrigo - cross
 1    Q.  No, meaning that's correct?
 2    A.  That's correct.
 3    Q.  You also asked in paragraph 4 of attachment A for marketing
 4    materials.  What did you mean by that?
 5    A.  Marketing materials?
 6    Q.  Yes.
 7    A.  Any marketing materials from Amerindo, any marketing
 8    materials regarding any of their investments or funds.
 9    Q.  So, when you say marketing materials, you mean any
10    materials that are sent out to clients or potential clients
11    that describe what they do, what Amerindo does?
12    A.  That's what I believed it was, yes.
13    Q.  And, Amerindo Investment Advisors, Inc., the reason I keep
14    repeating is of course because you have lumped all the Amerindo
15    into one so I am sticking with one now, Amerindo Investment
16    Advisors, Inc., the licensed U.S. investment advisory company;
17    you've stated a moment ago that you were aware that they had a
18    lot of institutional clients, correct?
19    A.  Yes.
20    Q.  And, would it be accurate to say that you had no probable
21    cause to seize marketing material from that entity that would
22    have been sent to all of these institutional clients over 20
23    years, correct?
24    A.  That's correct.
25         If it's not in the warrant, it wasn't seized.  It
         SOUTHERN DISTRICT REPORTERS (212) 805-0300
                               152
       6775VILH          Fraterrigo - cross
 1    wasn't covered.  It wasn't covered.
 2    Q.  Well, the warrant says marketing materials.  It doesn't
 3    say -- it doesn't limit it as to who they were sent to.  It
 4    says marketing materials sent to or received from clients.
 5    A.  That's correct.
 6    Q.  And my question to you is, of the dozens if not hundreds of
 7    institutional clients that this would cover for Amerindo
 8    Investment Advisors, Inc. U.S., licensed investment advisory
 9    company, you had zero probable cause to seize marketing
                            Page 82

6775VILH.txt
10    materials sent to or from those clients, correct?
11    A.  That's correct.
12    Q.  It also says investment advisory agreements from clients,
13    or to or from clients; and the same would be true that you
14    would have no probable cause -- zero -- to seize investment
15    advisory agreements between the licensed investment advisor
16    Amerindo U.S. and Amerindo Investment Advisors U.S. and all the
17    institutional clients it has had over a 20 year period,
18    correct?
19    A.  That's correct.
20    Q.  And, you have asked for all correspondence, copies of
21    correspondence sent to or received from clients, and the same
22    would be true that you have no probable cause to seize copies
23    of correspondence between the licensed Amerindo Investment
24    Advisors, Inc., U.S., the licensed investment advisory company
25    and, let's say, the 20 years' worth of institutional clients
                SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                        153
       6775VILH          Fraterrigo - cross
1     that it had, correct?
2     A.  That's correct.
3     Q.  Did you ever tell the people who you briefed on what they
4     were allowed to seize that they were not allowed to seize any
5     of the various documents I just went over with you as it
6     related to clients of institutional clients of Amerindo
7     Investment Advisors, Inc., the American licensed company?
8     A.  No, I did not.
9     Q.  Would it be accurate to say that any of the other
10    paragraphs in attachment A that refer to generic-type documents
11    as I just read to you, broadly described documents that were
12    between Amerindo Investment Advisors, Inc., the licensed
13    American registered investment advisory company, and its 20
14    years' worth of institutional clients, you had no probable
15    cause for the seizure of those documents?
16         MS. McEVOY:  Your Honor, objection.  Just ambiguous
17    question.
18         MR. HOFFMAN:  I can go through it.
19         THE COURT:  Go ahead, Mr. Hoffman.
20         MR. HOFFMAN:  Okay.
21    Q.  Sticking with paragraph 4 you also asked for other
22    documents -- if you look at paragraph 4, after you asked for
23    the documents we just discussed concerning those that were sent
24    to or received from client, you then go on and say:  And other
25    documents concerning or reflecting the identities of and
                SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                        154
       6775VILH          Fraterrigo - cross
1     communications with clients who have investments in the
2     Amerindo brokerage account.
3          Do you see that?
4     A.  Yes.
5     Q.  Would it be accurate to say that there was no probable
                                Page 83

6775VILH.txt
6   cause to seize documents of any of the institutional clients of
7   the licensed investment advisor Amerindo Investment Advisors,
8   Inc., U.S., that had investments in Amerindo brokerage
9   accounts, is that correct?
10  A.  Yes, that's correct.
11  Q.  And it would be equally correct to say that you never told
12  that to any of the agents who executed the search warrant that
13  those documents, there was no probable cause for and they
14  shouldn't take them, correct?
15  A.  That's correct.
16  Q.  Would it be equally correct that nowhere in your
17  submission, in your sworn affidavit, do you state that there
18  are 20 years' worth, give or take, of institutional clients of
19  Amerindo Investment Advisors, the licensed U.S. company, whose
20  documents should not be taken?
21  A.  I didn't put that in my affidavit.
22  Q.  And, in fact, nowhere in your affidavit do you even say
23  that there are such clients?
24          MS. McEVOY:  Your Honor, objection for -- based on
25  your earlier rulings of what is not in the affidavit.
            SOUTHERN DISTRICT REPORTERS (212) 805-0300
                              155
     6775VILH          Fraterrigo - cross
1          THE COURT:  Overruled, because that has to do with
2   something different.  You are talking about a relationship
3   between what has been sought or not sought and that's what we
4   are going through --
5          MR. HOFFMAN:  Correct.
6          THE COURT:  -- and why?  Overruled.  Go ahead.
7          THE WITNESS:  Can you repeat it?  I'm sorry.
8   BY MR. HOFFMAN::
9   Q.  And, in fact, you never even state in your affidavit and
10  the attachment thereto that there are such institutional
11  clients as Amerindo U.S., the licensed Amerindo investment
12  advisory company that they exist, these institutional clients?
13          You never state that in the affidavit, is that
14  correct?
15  A.  That's correct.
16  Q.  Looking at paragraph 5 you ask for client lists, client
17  files, investment brochures, marketing materials, investment
18  advisory agreements, copies of correspondence sent to or
19  received from clients and other documents concerning or
20  reflecting the identities of an communications with clients who
21  have investments managed by Amerindo who receive redemptions
22  through or make investments through overseas bank accounts and
23  trust companies including PTC Management, Limited, and
24  Barclays.
25          Do you see that?
            SOUTHERN DISTRICT REPORTERS (212) 805-0300
                              156
     6775VILH          Fraterrigo - cross
1   A.  Yes.
                         Page 84

6775VILH.txt

2  Q.  Did you have any probable cause to ask for client lists
3  that would include, for example, any of the institutional
4  clients of Amerindo U.S., the licensed investment advisors
5  company, whose monies were so invested?
6  A.  No.
7  Q.  And that would be the same under that paragraph, you would
8  have no probable cause to those clients to their client files,
9  investment brochures, marketing materials, etc., correct?
10  A.  That's correct.
11  Q.  Now, in paragraph 6 you ask for documents reflecting all
12  investments in which Brian Harvey was involved, correct?
13  A.  That's correct.
14  Q.  And, again, you swear and state that you have probable
15  cause to seize all documents reflecting Brian Harvey's
16  investments, correct?
17  A.  That's correct.
18  Q.  And, what was the probable cause that you had, that you
19  swore you had concerning Brian Harvey?
20  A.  I had information to believe that this individual did
21  not -- attempted to redeem an investment, had trouble with his
22  investment.
23  Q.  Was that information you got from Brian Harvey?
24  A.  No, it was not.
25  Q.  Was that a document?
             SOUTHERN DISTRICT REPORTERS (212) 805-0300
                              157
   6775VILH            Fraterrigo - cross
1        MS. McEVOY:  Objection.
2        THE COURT:  Sustained.
3        Mr. Hoffman, if it is in the affidavit it is in the
4  affidavit, fine, if she wants to point to something in the
5  affidavit.  What's behind it, we're not going there.
6        MR. HOFFMAN:  Thank you.
7  Q.  Show me what in this affidavit supports probable cause that
8  you swore you had that Brian Harvey documents reflecting
9  investments should be seized; what probable cause you had --
10  I'm sorry -- what probable cause there was in these documents
11  that show that there was evidence of criminality concerning
12  Brian Harvey, on the premises at Park Avenue?
13  A.  Paragraph E of the affidavit.
14        THE COURT:  Which paragraph?  I'm sorry.
15        THE WITNESS:  E.
16        THE COURT:  E.
17        MR. HOFFMAN:  Can I have one moment?
18        THE COURT:  Sure.
19  BY MR. HOFFMAN::
20  Q.  Are you talking about page 9?
21  A.  I'm sorry.  Page 5 of the affidavit, paragraph E.
22  Q.  Okay, there are two paragraph Es.  They're on different
23  numbers.  There is one on page 9.  But, on paragraph E you are
24  talking about page 5 where you state:  Cates told me about
25  other individuals who she believed to be investors with
                              Page 85