**EXHIBIT H**

Nov 14 06 Franks Tr.txt

1

6bftvilh

1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   UNITED STATES OF AMERICA,
3
4          v.                    05 CR 621 (KMK)
4
5   ALBERTO VILAR and GARY TANAKA,
5
6              Defendants.
6
7   ------------------------------x
7
8                        New York, N.Y.
8                        November 15, 2006
9                        11:15 a.m.
9
10
10  Before:
11
11              HON. KENNETH M. KARAS,
12
12                         District Judge
13
13
14                   APPEARANCES
14
15  MICHAEL J. GARCIA
15      United States Attorney for the
16      Southern District of New York
16  DEIRDRE ANN McEVOY
17  MARC O. LITT
17     Assistant United States Attorneys
18
18  HOFFMAN & POLLOK
19      Attorneys for Defendant Vilar
19  JEFFREY HOFFMAN
20  SUSAN C. WOLFE
20
21  WILSON, SONSINI, GOODRICH & ROSATI
21      Attorneys for Defendant Gary Tanaka
22  GLENN C. COLTON
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

Nov 14 06 Franks Tr.txt

5   supposed to come from?
6   A.  From her other investments at Amerindo.
7   Q.  Not the SBIC?
8   A.  Correct.
9   Q.  What happened -- what, if anything, happened after Lilly
10  Cates invested in the SBIC?
11  A.  After she invested she was supposed to expect her first
12  payment in September of 2002.  September 2002 came and she did
13  not receive her first quarter payment, which was $250,000.  In
14  October of 2002 she met with Gary Tanaka and Alberto Vilar in
15  the Amerindo U.S. office and told Gary Tanaka and Alberto Vilar
16  she did not receive her September payment.  Gary Tanaka told
17  her when he returns to London, he would take care of it.
18  Q.  Did Lilly Cates succeed in getting her quarterly funds from
19  Amerindo?
20  A.  No, she did not.
21  Q.  Did there come a time when Lilly Cates requested the
22  redemption or transfer of all her investments managed by
23  Amerindo?
24  A.  Yes.
25  Q.  Approximately when was that?
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                10
♀
        6bftvilh            Fraterrigo - direct
1   A.  February of 2005.
2   Q.  Was that request honored?
3   A.  No, it was not.
4   Q.  As of May 25th, 2005, at the point in which you got the
5   Amerindo U.S. search warrant, what was the status of Lilly
6   Cates' request to redeem or transfer her Amerindo investments?
7   A.  Lilly Cates wasn't able to redeem her investments.
8   Amerindo did not return her money from her investments.
9   Q.  What was the approximate value of Lilly Cates' investments
10  managed by Amerindo as of the last account statement she
11  received?
12  A.  Approximately $12 dollars.
13  Q.  Turning to the Mayer family, based on your investigation
14  leading up to your obtaining the search warrant for Amerindo
15  U.S., did there come a time that the Mayer family invested
16  money through Amerindo?
17  A.  Yes.
18  Q.  Approximately starting when?
19  A.  April of 1988.
20  Q.  Prior to May 25th, 2005, did you discuss with the Mayers
21  their ability to obtain money out of their Amerindo
22  investments?
23  A.  Yes.
24  Q.  Was their experience uniform throughout their investment
25  history with Amerindo or did it vary over time?
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300
                                        Page 6

Nov 14 06 Franks Tr.txt

11

6bftvilh                Fraterrigo - direct

1    A.  It varied over time.
2    Q.  Generally what was the Mayers' experience?
3    A.  Lisa Mayer explained to me that she -- up until 1997 they
4    were having trouble redeeming their investments from Amerindo.
5    Q.  So Lisa Mayer explained to you up until '97 --
6    A.  Sorry, from 1997 on it was when they were having trouble
7    redeeming their investments.
8         MR. COLTON:  I object to the methodology of the
9    questions.  The government asks a leading question to correct
10   the answer, and it's inappropriate.
11        THE COURT:  But sometimes people are confused and
12   lawyers are allowed to try to clear it up.
13        MR. COLTON:  I have no problem with the clarifying,
14   but I don't want the clarifying to be by leading.
15        THE COURT:  The warning is noted but otherwise
16   overruled.
17   Q.  And prior to 1997, what did Lisa Mayer describe to you as
18   the Mayers' experience with Amerindo?
19   A.  She explained to me they were receiving her interest
20   payments.  They didn't indicate they had had any problems with
21   their investments.
22   Q.  You mentioned that starting 1997 was the first point that
23   Lisa Mayer described to you having trouble with her
24   investments.  What happened in 1997 as Lisa Mayer described it
25   to you?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

12

6bftvilh                Fraterrigo - direct

1    A.  In 1997 was the first time they requested to redeem their
2    GFRDA investment.  They were discouraged by Alberto Vilar to
3    redeem that investment.  However, they were able to redeem
4    their ATGF investment.
5    Q.  After 1997 did there come a time when the Mayers again
6    attempted to redeem their GFRDA investment?
7    A.  Yes.
8    Q.  When was that?
9    A.  That was in December of 2000.
10   Q.  What happened in 2000, December 2000?
11   A.  In December 2000 they requested to redeem their GFRDA
12   investment and they were told that they didn't give the proper
13   30-day notice to redeem their investment.
14   Q.  Based on your interview with Lisa Mayer, was she aware of
15   the notice requirement?
16   A.  No, she was not.
17   Q.  What happened next after Amerindo said they could not
18   redeem their GFRDA investment because they had not complied
19   with the 30-day notice requirement?
20   A.  The Mayer family renewed their investment for three years
21   at 11 percent per annum.

Page 7

Nov 14 06 Franks Tr.txt

22  Q.  Did have you an impression from Ms. Mayer about whether the
23  Mayers believed they had a choice to renew their GFRDA
24  investment?
25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

6bftvilh          Fraterrigo - direct
1  Q.  What was that impression?
2  A.  From what the Mayers described to me, Lisa Mayer described
3  to me, the family did not have a choice.
4  Q.  After 2000, did there come a time when the Mayers again
5  requested money from Amerindo?
6  A.  Yes.
7  Q.  When was that?
8  A.  In the spring of 2002.
9  Q.  And what were the circumstances in the spring of 2002 under
10  which they requested money from Amerindo?
11  A.  They were looking to purchase a house.  They found a house
12  in Scarsdale that they were looking to put money down to
13  purchase the house.
14  Q.  And what was Amerindo's response to the requests by the
15  Mayers in the spring of 2002 for the money for a down payment
16  of a house?
17  A.  Lisa Mayer told me she spoke to Alberto Vilar and he
18  relayed that Gary and I are not a bank.  He also told Lisa
19  Mayer that if they redeemed their investment they would incur a
20  45 percent penalty if they redeemed their investment.
21  Q.  And what investment are you referring to?
22  A.  The GFRDA.
23  Q.  How, if at all, did that differ from previous
24  correspondence from Alberto Vilar?
25  A.  In a previous letter from Alberto Vilar he stated that it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

6bftvilh          Fraterrigo - direct
1  would be a 20 percent penalty if they redeemed.
2  Q.  After Amerindo denied the Mayers' request for money in the
3  spring of 2002, did the Mayers make attempts to obtain money
4  from other sources?
5  A.  Yes.
6  Q.  What did the Mayers do?
7  A.  They attempted to get a loan from a bank.
8  Q.  What, if anything, did the Mayers need from Amerindo in
9  order to obtain a loan?
10  A.  They needed a financial certification from Amerindo in
11  order for them to get the loan.
12  Q.  What, if any, efforts did the Mayers make to get a
13  financial certification from Amerindo?
14  A.  Lisa Mayer told me that she --
15      MR. COLTON:  I object to the line, your Honor.  I

Page 8

Nov 14 06 Franks Tr.txt

16  don't believe this has anything to do with redemption, although
17  I may be wrong if there's an offer.
18      THE COURT: Ms. McEvoy?
19      MS. McEVOY: Your Honor, I think it directly relates
20  to the events in the spring of 2002 of the Mayers' attempts to
21  get money, and when they couldn't get money from Amerindo, they
22  asked Amerindo for another -- for financial certification in
23  order for them to get money from a third party. And that also
24  failed. So I think it goes directly to that information.
25      THE COURT: But I thought that the issue was
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                        15
    6bftvilh          Fraterrigo - direct
1  redemptions before 2003, 2005, depending on which inventory
2  we're talking about here, not whether or not they were unable
3  to get other documents. Because the idea here is to look at
4  what was in the four corners of the affidavit and what it was
5  that Inspector Fraterrigo knew that wasn't in the four corners
6  of the affidavit as it related to the specific allegations. I
7  don't recall any allegations about willingness to provide
8  initial certifications or not in the affidavit.
9      MS. McEVOY: I think, your Honor, in paragraph 6A
10  specifically the lines that your Honor pointed out in your
11  opinion there is general language about Lisa Mayer feeling that
12  her -- the Mayers feeling that their money was held hostage. I
13  think this goes to those provisions and whether or not those
14  provisions in paragraph 6A are accurate based on these facts.
15      THE COURT: I mean the analysis of the affidavit
16  relating to the question of redemptions -- and there was the
17  specific paragraph about how for years because of her father
18  being ill Lisa Mayer tried to get money and then the generic
19  catch-all paragraph. But that all had to do with the question
20  of redemptions and not about whether or not Amerindo was
21  otherwise cooperating in the effort of the Mayers to get money
22  from other sources.
23      MS. McEVOY: I think it's part and parcel of the same
24  story, your Honor.
25      THE COURT: I don't agree. I don't agree at this
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                        16
    6bftvilh          Fraterrigo - direct
1  point. I don't agree. Sustain the objection.
2  BY MS. McEVOY:
3  Q. What happened next in connection with the Mayers' attempts
4  to get money from Amerindo?
5  A. In September of 2002 the Mayer family had dinner with
6  Alberto Vilar in Westchester. They had a conversation with
7  Alberto Vilar regarding their investment, and if they could
8  rely on the 11 percent interest on their investment. Alberto
9  Vilar replied that they could count on their interest for six
                    Page 9

Nov 14 06 Franks Tr.txt

10  to eight months.
11  Q.  I'm sorry, when was this?
12  A.  September of 2002.
13  Q.  Did there come a time when the Mayers stopped receiving
14  interest payments?
15  A.  Yes.
16  Q.  When was that?
17  A.  In October of 2002.
18  Q.  What, if anything, did the Mayers do in response to that?
19  A.  The Mayer family -- as Lisa described it, they tried to
20  call Alberto Vilar and they received no response.  They had a
21  conversation with Gary Tanaka in December of 2002 where he
22  provided comments that they were restructuring and they were
23  evasive in their response about their money.  And in December
24  of 2002 they went to the residence of Alberto Vilar in New York
25  City -- Lisa Mayer, Deborah Mayer and Herbert, Dr. Herbert
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                17
       6bftvilh          Fraterrigo - direct
1  Mayer in a wheelchair went to New York City to speak to Alberto
2  Vilar in person.
3  Q.  What happened when they went to Alberto Vilar's?
4  A.  When they went to the residence they spoke to the doorman.
5  The doorman said Alberto Vilar was upstairs.  When they went
6  upstairs they believed Alberto Vilar was in the apartment and
7  they were ringing the doorbell for an hour pleading with them
8  to talk to him to get their money.
9  Q.  Did they speak with Alberto Vilar on that occasion?
10  A.  No, they did not.
11  Q.  Directing your attention to January 2003, what, if
12  anything, happened with respect to the Mayers' attempts to
13  obtain from the Amerindo investments?
14  A.  Lisa Mayer told me she made several phone calls to Amerindo
15  to Alberto Vilar.  She received no response.  She wrote a
16  letter to Alberto Vilar and Gary Tanaka and she received a
17  letter in January 2003 from Rinato Tanaka.
18  Q.  What, if anything, did the letter say?
19  A.  The letter explained to the Mayer family that their
20  interest payments were going to be reduced from $96,000 to
21  $50,000 and payments would be made to them ad hoc.
22  Q.  Is that something that the Mayers requested?
23  A.  No.
24  Q.  Between January 2003 and November 2003, what, if any,
25  efforts did the Mayers make to get additional money from
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                18
       6bftvilh          Fraterrigo - direct
1  Amerindo investments?
2  A.  The Mayer family made several phone calls, sent letters in
3  requesting to get their interest payment or any redemption on
                            Page 10

Nov 14 06 Franks Tr.txt

4    their investments.
5    Q.  Were the Mayers successful?
6    A.  No, they were not.
7    Q.  Did there come a time when the Mayers requested the
8    redemption or transfer of all their investments managed by
9    Amerindo?
10    A.  Yes.
11    Q.  Approximately when was that?
12    A.  That was in November of 2003.
13    Q.  Who made the redemption request?
14    A.  The Mayer family, the attorney on behalf of the Mayer
15    family, as well as the director of the trust account.
16    Q.  Did the redemption request comply with the 30-day notice
17    requirement mentioned by Renata Tanaka in the year 2000?
18    A.  Yes.
19    Q.  After the redemption request, did the Mayers get their
20    entire investment back as they requested?
21    A.  No, they did not.
22    Q.  Did they get any money from Amerindo after they submitted
23    the redemption request?
24    A.  Yes.
25    Q.  And what were the circumstances of that?

19

6bftvilh            Fraterrigo - direct
1    A.  There were several payments here and there which Lisa Mayer
2    described totaled approximately $600,000.
3    Q.  And what were the circumstances leading up to those
4    payments as Lisa Mayer described them to you?
5    A.  Renata Tanaka and Gary Tanaka tried to make arrangements
6    with the Mayer attorney to make payments over time, and Mayer
7    family didn't agree with it, they wanted their full redemption
8    of their investment.  And payments were made here and there and
9    it totaled $600,000.
10    Q.  Is that an approximate amount?
11    A.  Yes, it is.
12    Q.  As of May 25th, 2005 what was the status of the Mayers'
13    request to redeem their entire Amerindo investments?
14    A.  They were not able to redeem their entire investment.
15    Q.  What was the approximate value of the Mayers' Amerindo
16    investments at that time?
17    A.  Approximately $11 million.
18    Q.  Now I'm going to direct your attention to the search
19    warrant affidavit --
20    A.  Yes.
21    Q.  -- that you swore to.  What was the process by which the
22    search warrant affidavit for Amerindo U.S. was drafted?
23    A.  The affidavit was drafted by AUSA Mark Litt.  I reviewed
24    it, I read it, I verified it for accuracy, and it was presented
25    to his supervisor for approval and then we presented it to the

Nov 14 06 Franks Tr.txt

8        (Defendant's Exhibit J received in evidence)
9    Q.  Inspector Fraterrigo or Agent Fraterrigo, your testimony is
10   that you reviewed documents to confirm statements made.  Did
11   you review any documents with respect to Rhodes Capital before
12   signing the search warrant affidavit?
13   A.  I recall seeing a certificate from Lilly Cates, I didn't
14   see this document.
15   Q.  When you say a certificate, what are you referring to?
16   A.  I believe it was a copy of her purchase of the two units.
17   I can't recall if I received that.  I believe I received that
18   before without looking at my file.
19   Q.  When you say that, you're referring to the certificate?
20   A.  The certificate, yeah.
21   Q.  You would agree with me, wouldn't you, Inspector
22   Fraterrigo, that Defendant's J, which is now admitted, does
23   indeed describe the Rhodes Capital investment?
24        MS. McEVOY:  Objection.
25        THE COURT:  It's in.  You can make the argument.  She
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                        35
     6bftvilh              Fraterrigo - cross
1    said she didn't see it beforehand.
2    Q.  What steps did you take to look through the documents
3    provided by Lilly Cates to look for Rhodes Capital investments
4    before swearing to a magistrate judge that she never received
5    information describing her investment?
6        MS. McEVOY:  Objection.
7        THE COURT:  Yes, sustained.
8    Q.  Inspector Fraterrigo, when you swore out the affidavit
9    before Judge Maas, you didn't tell Judge Maas that the one
10   million dollars Lilly Cates invested in Rhodes Capital came
11   from a redemption of profit from her investments with Amerindo?
12        THE COURT:  You have to establish whether or not she
13   knew that.
14        MR. COLTON:  First establish they didn't tell him.
15        THE COURT:  No, no.
16        MR. COLTON:  Fine.
17   Q.  Inspector Fraterrigo, you knew when you swore out the
18   affidavit before Judge Maas that the Rhodes Capital purchase by
19   Lilly Cates was done with a million dollars of redeemed profit
20   from her previous Amerindo investment; correct?
21   A.  Yes, that's correct.
22   Q.  And you did not tell Judge Maas that; correct?
23   A.  That's correct.
24   Q.  Given that you you're making allegations of impropriety
25   with respect to the Rhodes Capital investment, didn't you think
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
                                                        36
     6bftvilh              Fraterrigo - cross
1    that a million dollars of profit by Lilly Cates as of the time
                          Page 20

Nov 14 06 Franks Tr.txt
2   of investing in Rhodes Capital would be something that the
3   magistrate would want to know in making his decision?
4          MS. McEVOY:  Objection, argumentative.
5          THE COURT:  Well, don't be so argumentative, otherwise
6   it's fine.  It's argumentative because of tone more than
7   someone reading it, but it's too early in the day to be heated
8   up.
9          MR. COLTON:  I apologize for the tone.
10  A. Can you repeat the question?
11  Q. Sure.  Didn't you think the fact that Lilly Cates purchased
12  her Rhodes Capital investment with a million dollars of profit
13  from a previous Amerindo investment was a fact that the
14  magistrate would want to know in assessing the search warrant
15  application?
16  A. I didn't think of it at the time.  I didn't put it in.  I
17  didn't think of it at the time.
18  Q. Would your answer as to all of the redemptions and all of
19  the profits and all of the interest of Lilly Cates that she
20  received over her 18-year history with Amerindo be the same,
21  i.e., you never thought about it?
22  A. That's correct.
23  Q. And all of the money received from the Mayers -- by the
24  Mayers from Amerindo, all of the redemptions, all of the
25  profits, you never thought about it?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                    37
      6bftvilh              Fraterrigo - cross
1   A. No, I didn't put it in.  I put in what was facts that they
2   did not receive their money.
3   Q. And you knew when you swore out the search warrant
4   affidavit you were requesting permission to search for
5   documents, not just 2002 or 2003, but all the way back to 1987?
6   A. That's correct.
7   Q. And still your testimony is you didn't think that any
8   evidence from 1987 to 2002 would be relevant to Judge Maas?
9          MS. McEVOY:  Objection.  Mischaracterizes her
10  testimony.
11         THE COURT:  Rephrase it.
12  Q. You didn't think about whether it would be relevant to
13  Judge Maas?
14  A. No, I just didn't think of it.  I didn't think whether it
15  was relevant or it was not relevant, I just didn't think of it.
16  Q. Did it occur to you when you swore out the search warrant
17  affidavit that you were presenting no evidence at all with
18  respect to the pre-2002 period?
19  A. No, it didn't occur to me.
20  Q. Did you ever think or have any conversation with the U.S.
21  Attorney's Office about what the probable cause was for
22  pre-2002 documents and events?
23         MS. McEVOY:  Objection.
24         THE COURT:  Rephrase it, Mr. Colton.
                                            Page 21

Nov 14 06 Franks Tr.txt
25   Q.  Did you ever think about what the probable cause was for a
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

38

6bftvilh             Fraterrigo - cross
1    search warrant for pre-2002 documents?
2           MS. McEVOY:  Objection, that's not the subject of the
3    Franks hearing.
4           THE COURT:  Why don't you be more specific.
5    Q.  Did you ever think about whether redemptions, interest or
6    profit from investments would be relevant in 2002, all the way
7    back to 1987, for a search warrant seeking documents from that
8    period?
9    A.  Can you repeat that?
10   Q.  Sure.  Would you agree with me that redemptions, profit and
11   interest earned by investors between 1987 and 2002 is relevant
12   to the question of probable cause for that time period?
13          MS. McEVOY:  Objection as to whether the question is
14   pertaining to her mindset now as opposed to whether she
15   considered that then.
16          THE COURT:  Fair point.
17   Q.  As adopted at that time.
18   A.  It didn't seem like the same question that you asked
19   before.  Could you repeat the question that I asked before?
20   Q.  I'll stick with the one that I want you to answer.
21   A.  Okay.
22   Q.  I hear you, and I'm trying to adopt to both your counsel's
23   objections to make it --
24          THE COURT:  At the time you swore out the affidavit,
25   Agent, did you contemplate whether or not it was important to
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

39

6bftvilh             Fraterrigo - cross
1    Magistrate Judge Maas or any magistrate about whether or not
2    Ms. Cates and the Mayer family redeemed their investments
3    before 2002 going back to '87.
4           THE WITNESS:  No, I did not.
5           THE COURT:  Did you contemplate it, even though --
6    well, you knew that the request for the warrant was going to
7    seek permission to get documents at Amerindo going back to
8    1987; correct?
9           THE WITNESS:  That's correct.
10          THE COURT:  Did you think, given that request, that it
11   was -- it might be important to the Magistrate Judge to know
12   whether or not the victims you identified were in fact able to
13   redeem their investments from the period of '87 to 2002?
14          THE WITNESS:  No, I didn't.
15          THE COURT:  Okay.  Go ahead, Mr. Colton.
16          MR. COLTON:  Thank you, your Honor.
17   BY MR. COLTON:
18   Q.  I show you what's been marked as Defendant's B for the
Page 22

Nov 14 06 Franks Tr.txt

19   hearing of November 15th.
20         What you're looking at and correct me in I'm wrong,
21   Agent Fraterrigo, in Defendant's B is Inspector Golden's
22   memorandum of interview of the Lilly Cates interview of
23   April 20, 2005; correct?
24   A.  That's correct.
25   Q.  And that's the document that you testified earlier that you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

40

6bftvilh          Fraterrigo - cross
1   reviewed prior to swearing out the search warrant at issue?
2   A.  That's correct.
3   Q.  And in that document it contains the information that Lilly
4   Cates --
5         MS. McEVOY:  Objection from reading from the document.
6   The government doesn't understand the basis.
7         MR. COLTON:  The government moves B for the purpose of
8   this hearing.
9         THE COURT:  She doesn't move it, you move it, the
10   defense moves B.
11         MR. COLTON:  Sorry.  Does the government object to the
12   defense moving it?
13         MS. McEVOY:  Yes, because the government doesn't
14   understand the basis.
15         MR. COLTON:  These are the notes that she testified
16   she reviewed, therefore it contains information that are the
17   basis of her swearing out the search warrant.  She already
18   testified to that.
19         MS. McEVOY:  First of all, she didn't say she reviewed
20   notes, she said she reviewed the draft MOI, for clarity of the
21   record.  And second, it hasn't been established that she has a
22   lack of recollection about these notes.  If you have a question
23   for the agent about something in this MOI and she doesn't
24   recall it, the government doesn't have an objection.
25         THE COURT:  What's the point?  I mean if she said she

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

41

6bftvilh          Fraterrigo - cross
1   reviewed the MOI, and the issue is what she had in her head
2   when she swore out the affidavit, what doesn't it come in just
3   for that purpose?
4         MS. McEVOY:  That's fine, your Honor, I just don't
5   see -- I mean a proper basis for its introduction has not been
6   established.
7         THE COURT:  I would think that you can go ahead and
8   ask the agent, but I think she could authenticate it for
9   purposes it's going to come in for at this hearing.
10         MR. COLTON:  I thought I did, but --
11         THE COURT:  Normally, Ms. McEvoy, I understand this
12   would be hearsay, but the whole issue here is what Agent

Page 23

Nov 14 06 Franks Tr.txt

24  you litigated.  And I let you have some leeway because of the
25  use of redemption, but --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

47

6bftvilh          Fraterrigo - cross

1        MR. COLTON:  It goes hand in hand, your Honor.
2        THE COURT:  No, it doesn't, it really doesn't.  And I
3   actually am very disappointed this is how this is starting off.
4   Because there are some specific statements that I agreed with
5   you were the basis to have a Franks hearing, and we are not
6   even dealing with those statements, we're dealing with other
7   statements.
8        MR. COLTON:  I'll move on, your Honor, but I would
9   note for the record that if there is an affirmative
10  misstatement -- the government led the agent through all this
11  testimony how she verified every fact, now I have something
12  that shows clearly she didn't.
13       THE COURT:  The government did not ask her about
14  Rhodes.
15       MR. COLTON:  They asked her if she verified every
16  fact, and she didn't.
17       THE COURT:  They were actually -- if you'll recall, I
18  would not let Ms. McEvoy go beyond the four corners of the
19  affidavit, and there's a very discrete reason we're having this
20  hearing.  If you thought in the course of the discovery that
21  you received in preparation for this hearing that there were
22  other misrepresentations that justified a broader Franks
23  hearing, you could have written me a letter.  Instead what you
24  have done is waited until we started the hearing and then
25  launched with Rhodes investment statements.  I let you talk

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

48

6bftvilh          Fraterrigo - cross

1   about the redemptions because that is relevant, but whether or
2   not there were misrepresentations about her getting information
3   and what information she got and whether or not Agent
4   Fraterrigo knew about that is a different topic.
5        MR. COLTON:  I'll move on.
6        THE COURT:  Okay.
7   BY MR. COLTON:
8   Q.  Inspector Fraterrigo, when you swore out the search warrant
9   affidavit on May 25th, 2005, you knew that, according to Lilly
10  Cates, she had no difficulty redeeming investments prior to
11  2002; correct?
12  A.  That is correct.
13  Q.  And you did not inform the magistrate of that; correct?
14  A.  That is correct.
15  Q.  In fact, Lilly Cates told you that she, quote, received a
16  lot of money from Amerindo in 1995; correct?
17  A.  That's correct.

Page 27

Nov 14 06 Franks Tr.txt

18  Q. And you failed to tell the magistrate judge that as well;
19  correct?
20  A. That is correct.
21  Q. In fact, you knew from the documents that you had reviewed
22  prior to swearing out the search warrant affidavit that there
23  were many, many redemptions prior to 2002; correct?
24  A. That is correct.
25  Q. In your search warrant affidavit, Government Exhibit 33 for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

49

6bftvilh          Fraterrigo - cross

1   the hearing, the last full sentence on page four you swear
2   under oath:  In approximately February 2005, Cates attempted to
3   redeem her entire investment portfolio at Amerindo, including
4   her SBIC investment described in the Vilar criminal complaint,
5   Rhodes, and any other investment with Amerindo, but Amerindo
6   and Vilar have refused to move her investment portfolio to bear
7   Stearns.
8   A. That's correct.
9   Q. But you neglected to tell the magistrate that Lilly Cates
10  told you that on February 28th, 2005 she effectively redeemed
11  $3 million of her Amerindo investment; correct?
12  A. I did not have that information.
13  Q. I show you what what's marked as Defendant's H for this
14  hearing for identification.  Sorry, I handed you the wrong
15  document.  I'm also showing you Defendant's C for
16  identification for this hearing.
17       Now looking at Defendant's Exhibit C, do you recognize
18  that?
19  A. Yes.
20  Q. These are notes of an interview with Lilly Cates; correct?
21       MS. McEVOY:  Objection, your Honor.  I believe Agent
22  Fraterrigo said she did not see these notes prior to obtaining
23  the search warrant.
24       MR. COLTON:  I object to the government testifying for
25  her.  She can answer that question.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

50

6bftvilh          Fraterrigo - cross

1        THE COURT:  I object to the whole tone of this, and
2   we're going to use this hearing as a laboratory experiment of
3   whether or not this trial can be done efficiently.
4        Ms. McEvoy, please don't testify.  Mr. Colton can ask
5   the question.  If you think it's an improper question, you can
6   object.  If Agent Fraterrigo says she didn't review this
7   beforehand, then I presume Mr. Colton will move on.  If she
8   says she did, then he will ask questions that are appropriate
9        Mr. Colton, ask questions about Defendant's C starting
10  with whether or not she saw this or reviewed these notes before
11  she swore out the affidavit.

Page 28

Nov 14 06 Franks Tr.txt

11    night in the garage and took the lawn mower.  That doesn't
12    change the fact when I asked my neighbor for the lawn mower, he
13    said no.
14            And the allegation in the affidavit is that the
15    defendants said no, so she went through some self-help to
16    recuperate some of her investment.  It's never been argued to
17    me that there should be a Franks hearing because the government
18    misrepresented to Judge Maas or gave him the impression that
19    all of the money, all of the SBIC money that she invested, let
20    alone all the money she invested, was gone.  And it's unclear
21    to me, even if that is true, that the $3 million that she was
22    able on her own -- after being, according to the affidavit,
23    rebuffed by the defendants -- to redeem is SBIC investment
24    money.  So even if the government does allege SBIC is gone, it
25    doesn't mean there aren't other investments that she could on
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                        60
        6bftvilh              Fraterrigo - cross
1    her own get from Bear Stearns.
2            I understand there may be new things you're learning.
3    I'm not saying we can't have a discussion about what more there
4    needs to be a hearing about, but I don't want to do it this
5    way.
6            MR. COLTON:  That's fine, your Honor.
7    BY MR. COLTON:
8    Q.  Agent Fraterrigo, Lilly Cates told you in no uncertain
9    terms that in May 2002 she was able to redeem both $166,000
10   from Amerindo and $150,000 from Amerindo; correct?
11   A.  She did not tell me?  Is that the question?
12   Q.  She told you she was in fact able, adding those numbers up,
13   to redeem $316,000 in May of 2002 from Amerindo?
14   A.  Without looking at my notes on it I can't recall exactly
15   that.
16   Q.  Do you have Defendant's H for identification in front of
17   you?
18   A.  Yes.
19   Q.  And Defendant's H for this hearing, November 15th, are
20   notes that you took; correct?
21   A.  That's correct.
22   Q.  And these are notes that you had access to prior to
23   swearing out the search warrant affidavit on May 25, 2005?
24   A.  That is correct.
25   Q.  And your notes at page --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                        61
        6bftvilh              Fraterrigo - cross
1            MR. COLTON:  The defense moves the admission of
2    Defendant's H.
3            MS. McEVOY:  No objection.
4            MR. HOFFMAN:  No objection.
                            Page 34

Nov 14 06 Franks Tr.txt

5      THE COURT: Defendant's H is received.
6      (Defendant's Exhibit H received in evidence)
7   Q.  In fact, Agent Fraterrigo, your Honor notes on the bottom
8   of what is the third page, Bates stamped FR67, says:  Transfer
9   of Amerindo 150,000, May 2002; correct?
10  A.  That's correct.
11  Q.  And Lilly Cates told you she was able to redeem $150,000 in
12  May 2002?
13  A.  That's correct.
14  Q.  And you did not tell Magistrate Maas about that redemption;
15  correct?
16  A.  No, I did not.
17  Q.  On the next page of H --
18      THE COURT:  Which page?
19      MR. COLTON:  I was on 67 at the bottom right corner.
20      THE COURT:  Got it.
21  Q.  On page -- sorry, also page 67, if you move up to the page
22  it says either 5/21 or 5/24, I can't read your writing, 166,000
23  on Lilly's behalf to Lisa Jewelry.  Do you see that?
24  A.  Yes.
25  Q.  So Lilly Cates told that you Amerindo made a transfer on
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                          62
    6bftvilh              Fraterrigo - cross
1   her behalf or redemption of $166,000; correct?
2   A.  That's correct.
3   Q.  And you did not tell Magistrate Judge Maas about that
4   $166,000 transfer or redemption either; did you?
5   A.  No, I did not put that in the affidavit.
6   Q.  And your testimony earlier in this hearing was that
7   starting in 2002 Lilly Cates had difficulty redeeming; correct?
8       MS. McEVOY:  Objection.
9       THE COURT:  Basis for the objection?
10      MS. McEVOY:  Without testifying, mischaracterizes her
11  earlier testimony.
12      MR. COLTON:  I'll change it to an open-ended question.
13  Q.  Did you testify that starting in 2002 Lilly Cates had
14  difficulty redeeming her investment?
15  A.  I testified after June 2002, after she made her SBIC
16  investment, she wasn't able to redeem her investment.
17  Q.  But you did not tell the magistrate judge either the first
18  statement you just made that after June 2002 she had difficulty
19  nor did you tell him about the May 2002 redemptions.  All left
20  out; correct?
21      MS. McEVOY:  Objection as to form.
22      THE COURT:  Technically you're right, but it's
23  answerable.
24      Did you tell the magistrate judge about either of
25  those facts?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                              Page 35

Nov 14 06 Franks Tr.txt
63
6bftvilh            Fraterrigo - cross
1        THE WITNESS:  I did not tell him about the May 2002
2    redemption.
3        THE COURT:  It's time for our lunch break.  If you are
4    about to move to another topic --
5        MR. COLTON:  It's a good time.  I have more of this
6    topic, but it's a break in between.
7        THE COURT:  So let's break for lunch.  We'll come back
8    at 2:00.  You may want to, Mr. Colton, think about what you can
9    do for say about an hour and change worth of time, because we
10    wasted a lot of time on peripheral stuff.  So we are finishing
11    today.
12        MR. COLTON:  By way of guidance, the government has
13    produced at least 40 or 50 documents all reflecting redemptions
14    by the Mayers or Cates.
15        THE COURT:  I know because I looked at them before it
16    got produced, it's not too voluminous, and we spent a lot of
17    time on stuff that wasn't directly related to what this hearing
18    was about.  So I'm letting you know that in about an hour's
19    time after we resume, it's going to be time for Mr. Vilar's
20    counsel to have their chance to cross-examine.
21        MS. McEVOY:  And also the government has no problem
22    stipulating to the introduction of those documents provided.
23    We see what they are.
24        THE COURT:  That's a fair suggestion.  If you all want
25    to try to work that out, that would be most helpful.  See you
             SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300
                                              64
6bftvilh            Fraterrigo - cross
1    all at 2:00.
2        MR. COLTON:  One more thing.  I think the same rules
3    about the witness being on cross --
4        THE COURT:  Agent, you know the drill.
5        THE WITNESS:  Yes.
6        THE COURT:  Thank you.
7        (Luncheon recess taken)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
                         Page 36

Nov 14 06 Franks Tr.txt

10    Amerinda; correct?
11    A. That is correct.
12        THE COURT: Defense offers D, your Honor.
13        MS. McEVOY: No objection.
14        MR. HOFFMAN: No objection.
15        THE COURT: Defendant's D is received.
16        (Defendant's Exhibit D received in evidence)
17    Q. Agent Fraterrigo, leaving aside the $5 million, 2002
18    investment, outside of that, this memorandum describes a one
19    million dollar investment in Rhodes, and then 300,000 in
20    Amerindo Tech D. Anything else?
21    A. I believe that's it.
22    Q. So now that we have reviewed your memorandum of interview
23    of May 10th, 2005, is it fair to say this after questioning of
24    Lilly Cates she told that you she invested approximately 1.3
25    million in Amerindo other than the SBIC?
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                69
        6bftvilh            Fraterrigo - cross
1    A. Initially she invested 1.2 million with Amerindo and then
2    the proceeds that she made from the 1.2 million she invested
3    one million in Rhodes, then 300,000 in the Amerindo Tech D.
4    Q. Let me rephrase. From your interview with Lilly Cates you
5    learned that out of pocket transferring assets to Amerindo she
6    transferred 1.2 million?
7    A. That's correct.
8    Q. And then transferred 300,000?
9    A. That's correct.
10    Q. So out of pocket she entrusted out of her own pocket to
11    Amerindo a million and a half?
12    A. And the 5 million.
13    Q. Yes, outside of 5 million, which came later.
14    A. That's correct.
15    Q. During the time period from when she started with Amerindo
16    until 1990, you knew that she didn't put in a million and a
17    half and had gotten out 3 million plus another million to put
18    into Rhodes; correct?
19        MS. McEVOY: Objection.
20        THE COURT: I'm not sure what the basis of the
21    objection is.
22        MS. McEVOY: It's a mischaracterization of testimony.
23        THE COURT: Why don't you ask her if she knew that.
24    Q. Based on your interviews with Lilly Cates in which you
25    asked about her investment history, did you know that she
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                70
        6bftvilh            Fraterrigo - cross
1    invested 1.2 million, then 300,000, but ended up redeeming 3
2    million as reflected in the confirmations and another one
3    million as we discussed in the Rhodes investment?
                          Page 39

Nov 14 06 Franks Tr.txt

4  A.  I know that she invested the 1.2 million, the 300,000 in
5  the Amerindo Tech D and the one million in the Rhodes.  I knew
6  that she had expenses that she had paid by Amerindo that she
7  was able to redeem some of her money from the interest in all
8  of her Amerindo investments.  I didn't add it up.
9  Q.  So it's fair to say that you never mentioned to -- made the
10  decision not to tell Judge Maas that in the early period from
11  1987 or '88 through 1999 she actually took out of Amerindo over
12  two times as much as she put into Amerindo?
13          MS. McEVOY:  Objection as to form.
14          THE COURT:  You may want to rephrase it, instead of
15  making the decision.
16  Q.  You did not tell Judge Maas that during the late '80s and
17  the '90s Lilly Cates took out of Amerindo more than twice what
18  she put in?
19  A.  No, I did not.
20  Q.  At the time you filled out the affidavit did you believe
21  that that would be a fact that Judge Maas would want to know in
22  determining whether there was probable cause to allow you to
23  search for documents related to that '90s and late 80s time
24  period?
25  A.  I don't understand your question, I don't -- can you repeat
             SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

                                          71
     6bftvilh              Fraterrigo - cross
1  that?
2  Q.  You asked for a search warrant that allowed you to search
3  for documents related to the late '80s and to the '90s;
4  correct?
5  A.  That's correct.
6  Q.  Didn't you think when you filled out the search warrant
7  that Judge Maas, in deciding whether to grant a search warrant
8  for documents from the '80s and the '90s, would want to know
9  that during that time period one of the two victims collected
10  twice as much as she actually put into the company?
11  A.  No, I didn't think of that at the time.
12          THE COURT:  Just so I'm clear, Agent, you were aware
13  as of May 25th, that in fact she had redeemed twice what she
14  put in from the time period Mr. Colton just mentioned, roughly.
15          THE WITNESS:  I know that he said she was able to redeem
16  her expenses, I don't know the exact amount of how much she was
17  able to redeem.
18          THE COURT:  Do you know that she redeemed more than
19  she put in?
20          THE WITNESS:  No, I don't know for sure if I did.  I
21  don't think I did.
22  BY MR. COLTON:
23  Q.  But you don't dispute that you had a available to you to
24  verify facts in your affidavit client confirmations that
25  reflect redemptions and cash payments to Lilly Cates or to
             SOUTHERN DISTRICT REPORTERS, P.C.
                                    Page 40

Nov 14 06 Franks Tr.txt

72

6bftvilh                Fraterrigo - cross
1  vendors designated by Lilly Cates?
2  A.  Yes, I had that information.
3  Q.  And you don't have any reason to believe, do you, that
4  Lilly Cates kept every single client confirmation and
5  redemption notice that she got from Amerindo over a 17-year
6  period; do you?
7        MS. McEVOY:  Objection.
8        THE COURT:  Agent, is it possible that you weren't
9  given every confirmation that Ms. Cates might have received
10  from Amerindo, or do you know?
11        THE WITNESS:  It's possible, I don't know for sure.
12  Q.  Did you ask her for every confirmation or every piece of
13  evidence of redemption that she had?
14  A.  No, I believe we did ask her for all of the documents that
15  she had relating to her investments in Amerindo.
16  Q.  Did you do anything to correlate between the amount she
17  told you she received when she verbally spoke to you and the
18  documents she provided to you?
19  A.  Correlate what specific fact?
20  Q.  To see whether she was telling you about even more
21  redemptions than appeared in the client confirmation she gave
22  you.
23  A.  I don't recall.  I don't know if I did.
24  Q.  Is the reason that you didn't try to calculate this was
25  because you didn't think it was relevant whether she was making
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

73

6bftvilh                Fraterrigo - cross
1  200, 300 percent returns, that wasn't relevant to the question
2  of whether some type of crime might have been committed in the
3  '80s or '90s?
4        MS. McEVOY:  Objection.
5        THE COURT:  Overruled.
6  A.  I didn't think if it was relevant, I didn't think of that.
7  That thought didn't come to my mind at the time.
8  Q.  When you signed the search warrant affidavit, were you
9  aware that you were seeking to search documents from the '80s
10  and the '90s as well as the post-2002 period?
11        MS. McEVOY:  Objection, asked and answered.
12        THE COURT:  It has been asked and answered.  I mean
13  the answer is yes, she said that.
14        MR. COLTON:  I didn't recall the answer, that's fine.
15  Q.  I would like to turn your attention now to the Mayers.
16  You're familiar with the vehicle we have been discussing, fixed
17  rate deposits or guaranteed fixed rate deposit accounts?
18  A.  That's correct.
19  Q.  And you understood from your investigation prior to
20  May 25th, 2005, that those were limited term investments?
                       Page 41

Nov 14 06 Franks Tr.txt

21  A.  Yes.
22  Q.  And you understood that it wasn't one 18-year investment;
23  correct?
24  A.  That's correct.
25  Q.  But you did not tell Judge Maas that guaranteed fixed rate

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

74

6bftvilh            Fraterrigo - cross

1   deposits were investments that matured and would have to be
2   renewed; did you?
3   A.  No, I did not.
4   Q.  And you did not tell Judge Maas that guaranteed fixed rate
5   deposits are not available to the investor until maturity; did
6   you?
7   A.  No, I did not.
8   Q.  But when you filled out the search warrant affidavit, you
9   knew that fixed rate deposits were for a particular term and
10  weren't available until maturity; correct?
11  A.  That's correct.
12  Q.  And when you filled out the affidavit, you knew -- and I
13  mean that search warrant affidavit -- that the fixed rate
14  deposit account that the Mayers invested in 1987 was not the
15  same account they were in at the time of the search warrant?
16  A.  I know that their investment, guaranteed fixed rate
17  deposit, changed over time.
18  Q.  And you didn't tell Judge Maas that?
19  A.  No, I did not.
20  Q.  So when you wrote that in the affidavit that they invested
21  in guaranteed fixed rate deposit accounts --
22          THE COURT:  Do you want to give the paragraph?
23          MR. COLTON:  Sorry, Government Exhibit 33 for the
24  hearing, paragraph 6A, page 3.
25  A.  Okay.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

75

6bftvilh            Fraterrigo - cross

1   Q.  You refer in 6A to the Mayers investing million of dollars
2   with Vilar and Amerindo beginning in or about 1987.
3   A.  That's correct.
4   Q.  And you didn't tell Judge Maas that that expired in '89?
5   A.  No, I did not.
6   Q.  You make reference on the next page that the Mayers
7   attempted to redeem in or about 2003 approximately 12 million
8   in fixed rate deposits; correct?
9   A.  That is correct.
10  Q.  But you knew when you wrote that sentence that the fixed
11  rate deposits that you referred to were not even due to mature
12  until the end of 2003; correct?
13  A.  In November 2003 they attempted to redeem, and in December
14  of 2003 was when it was matured.

Page 42

Nov 14 06 Franks Tr.txt

15  Q.  But you didn't write any of that down?
16  A.  No.
17  Q.  And you didn't tell Judge Maas any of what you told this
18  Court?
19  A.  I put down in or about 2000.  That's an accurate statement.
20  Q.  Didn't you think that Judge Maas would want to know that in
21  2003 by contract the Mayers did not have a right to redeem
22  their fixed rate deposit until the end of 2003?
23  A.  But in 2003 they gave proper notice, as they were told
24  before, to redeem their investment.  And that statement is
25  true, that they attempted to redeem and they weren't able to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

76

6bftvilh            Fraterrigo - cross
1  redeem.
2  Q.  But you did leave Judge Maas with the impression that all
3  of 2003 went by without them being able to redeem without
4  telling Judge Maas that they weren't entitled to redeem in
5  2003; correct?
6        MS. McEVOY:  Objection.
7        THE COURT:  Did they mature in December of '03,
8  Mr. Colton.
9        MR. COLTON:  December 31, 2003.
10       THE COURT:  So they did mature in 2003.
11       MR. COLTON:  Yes.
12  Q.  But when the sentence, Inspector Fraterrigo, says:  In or
13  about 2003 when the Mayers attempted to redeem approximately 12
14  million invested in fixed rate deposits, Amerindo, Vilar,
15  Tanaka, Tanaka's wife, all rebuffed their efforts and refused
16  to relieve the funds.  Didn't you think it was relevant that
17  during the first year that you referred to the Mayers weren't
18  entitled to the funds?
19       MS. McEVOY:  Objection.
20       THE COURT:  Sustained.
21       MR. COLTON:  I'll move on.
22       THE COURT:  Move on.
23  Q.  Agent Fraterrigo, you knew that the Mayers had received
24  substantial payments from Amerindo during the time period of
25  1988 through -- at least through 2003; correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

77

6bftvilh            Fraterrigo - cross
1  A.  I recall from what the Mayers told me it was up until 2002.
2  Q.  In fact, in your interview with the Mayers, Lisa Mayer told
3  you that she received regular payments in the late '80s and the
4  '90s; correct?
5  A.  That's correct.  That was involving their interest
6  payments.
7  Q.  But you didn't tell Judge Maas that in the '80s and the
8  '90s the Mayers received regular payments; did you?

Page 43

Nov 14 06 Franks Tr.txt
9    A.  No, I did not.
10   Q.  And in fact, the Mayers provided you with a large number of
11   documents that evidence consistent and repeated payments or
12   redemptions by Amerindo to the Mayers during the '80s and the
13   '90s; correct?
14   A.  It provided some documentation of the redemptions, that's
15   correct.
16   Q.  We'll take it back to July of 1988.  I show you what's been
17   marked as Defendant's P, as in Poppa, for identification.  This
18   is a letter from Amerindo, correct, to the Mayers?
19   A.  Yes.
20   Q.  And it reflects a redemption of $26,250 in interest;
21   correct?
22   A.  That's correct.
23   Q.  And you had this document available to you prior to signing
24   your search warrant affidavit?
25   A.  Yes, I did.
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
                                                    78
     6bftvilh              Fraterrigo - cross
1    Q.  And you didn't tell Judge Maas about that redemption?
2          MS. McEVOY:  Objection as to form.
3    Q.  You didn't tell Judge Maas about that interest payment made
4    by Amerindo to the Mayers?
5    A.  That's correct.
6          MR. COLTON:  Offer P, your Honor.
7          MS. McEVOY:  No objection, your Honor.
8          MR. HOFFMAN:  No objection.
9          THE COURT:  Defendant's P is received.
10         (Defendant's Exhibit P received in evidence)
11   Q.  Showing you now what's marked as Defendant's Q.
12   Defendant's Q is a letter from Amerinda to Dr. Herbert Mayer
13   reflecting an interest payment of $26,250 in April of 1989;
14   correct?
15   A.  That is correct.
16   Q.  And this document was available to you when you swore out
17   your search warrant affidavit; correct?
18   A.  Yes.
19   Q.  And you did not tell Judge Maas about this interest payment
20   either; did you?
21   A.  No, I did not.
22         MR. COLTON:  Defense offers Q, your Honor.
23         MS. McEVOY:  No objection.
24         MR. HOFFMAN:  No objection.
25         THE COURT:  Received.
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
                                                    79
     6bftvilh              Fraterrigo - cross
1          (Defendant's Exhibit Q received in evidence)
2    Q.  I show you now what has been marked as Defendant's R, as in
                          Page 44

Nov 14 06 Franks Tr.txt

3  Romeo, for identification.
4       THE COURT:  If you got a lot of these --
5       MR. COLTON:  I'll gather them up while I question at
6  the same time.
7       THE COURT:  Okay.
8       MR. COLTON:  I have to give Ms. Margolis the credit
9  for that.
10       THE COURT:  Duly noted.  Thank you, Ms. Margolis.
11  Q.  Defendant's R is another letter from Amerindo reflecting an
12  interest payment actually paid to the Mayers; correct?
13  A.  Yes.
14  Q.  And this was available to you when you swore out your
15  search warrant affidavit; correct?
16  A.  Yes.
17  Q.  And this is another $26,000 -- $26,250 payment; correct?
18  A.  Yes.
19  Q.  And you didn't tell Judge Maas about this payment either;
20  did you?
21  A.  No, I didn't put it in the affidavit.
22  Q.  Say again?
23  A.  No, I didn't put it in the affidavit.
24  Q.  When you say no, you didn't put it in the affidavit, you
25  didn't tell him verbally either?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

80

6bftvilh          Fraterrigo - cross
1  A.  No.
2  Q.  And to your knowledge, it was never communicated to Judge
3  Maas prior to the time he was asked to issue the search
4  warrant?
5  A.  That is correct.
6       THE COURT:  I assume you want to offer that.
7       MR. COLTON:  Yes.
8       MS. McEVOY:  No objection.
9       MR. HOFFMAN:  No objection.
10       THE COURT:  R is received.
11       (Defendant's Exhibit R received in evidence)
12  Q.  I show you now Defendant's, T, U, and V.  Take a moment
13  it look at those if you don't mind, Agent.
14       Let me know when you have had a chance to review.
15  A.  Okay, I'm ready.
16  Q.  Defendant's S is a document that was available to you prior
17  to the time you swore out your search warrant affidavit?
18  A.  Yes.
19  Q.  And it reflects an interest payment of $20,000 in this
20  November 15th, 1991 letter from Amerindo to the Mayers, page 2
21  of the document, third full sentence, third full paragraph?
22  A.  Yes.
23       MR. COLTON:  Defendants offer S, your Honor.
24       MS. McEVOY:  No objection.
25       MR. HOFFMAN:  No objection.

Page 45

Nov 14 06 Franks Tr.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

81

6bftvilh              Fraterrigo - cross

1        THE COURT:  Received.
2        (Defendant's Exhibit S received in evidence)
3        THE COURT:  Can I help shortcut this?  Agent, were all
4    these available to you before you swore out the affidavit, S,
5    T, U and V?
6        THE WITNESS:  Yes, they were.
7        THE COURT:  Do you want to go what through is
8    significant about each?
9        MR. COLTON:  In that case I offer all of them, S, T, U
10   and V for the record.
11       MS. McEVOY:  No objection.
12       MR. HOFFMAN:  No objection.
13       THE COURT:  Received.
14       (Defendant's Exhibit T, U and V received in evidence)
15   Q.  Looking at Defendant's T now in evidence, that document
16   which was available to you reflects two payments to the Mayers
17   in this March '92 letter, one for $20,000 and one for $18,508;
18   correct?
19   A.  Yes, that's correct.
20   Q.  And you did not tell Judge Maas about that $38,000 worth of
21   payments from Amerindo to the Mayers; did you?
22   A.  No, I did not.
23   Q.  Looking at Defendant's U, this document, which was
24   available to you prior to your swearing out the search warrant
25   affidavit, reflects in March of 1994 a $500,000 payment from

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

82

6bftvilh              Fraterrigo - cross

1    Amerindo to the Mayers; correct?
2    A.  That is correct.
3    Q.  And you did not tell Judge Maas about that $500,000;
4    correct?
5    A.  No.
6        THE COURT:  Can I just be more specific for the
7    record?  It reflects in fact a redemption off of the Technology
8    Growth Fund; is that right?
9        MR. COLTON:  That's true.  In that same paragraph it
10   says proceeds received.
11       THE COURT:  Is that right, Agent?
12       THE WITNESS:  That is correct.
13   Q.  So you did not tell judge Maas about the $500,000 proceeds
14   received as reflected in Defendant's U; did you?
15   A.  No.
16       MS. McEVOY:  Your Honor, I guess I can do this after
17   the witness leaves the stand, but I believe the record is a
18   little misleading as of now with respect to this document,
19   but --

Page 46

Nov 14 06 Franks Tr.txt

20        THE COURT:  The record is always misleading until
21   someone gives redirect is your theory, right, and you're
22   misleading by doing recross.  There's no finishing today.
23        MS. McEVOY:  To the extent --
24        THE COURT:  You can do it on redirect.
25        MS. McEVOY:  Okay.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                    83
     6bftvilh                Fraterrigo - cross
1         THE COURT:  The document is in; right?  So if you
2    think Mr. Colton mischaracterized the document, you can tell me
3    in your closing submission or you can do it on your redirect.
4         MR. COLTON:  As to Defendant's V, I just I ask whether
5    the government has a copy of the last page MAY 2000118 where
6    the amount is legible.  The copy we were provided is not
7    legible.  They may not have one either, I don't know.
8         THE COURT:  Mr. Colton, this is something that could
9    have been done before.
10        MR. COLTON:  It could have, but I didn't realize I
11   couldn't read it.  But I could go through the other --
12   BY MR. COLTON:
13   Q.  Inspector, this document, Defendant's B, which was
14   available to you before you swore out the search warrant
15   affidavit --
16   A.  Yes.
17   Q.  -- reflects payments from Amerindo to the Mayers in the
18   amounts of $48,782, 45,562, 500,000 and 48,752, correct, and
19   one illegible.
20   A.  That's correct.
21   Q.  And you did not tell Judge Maas about the redemptions or
22   payments to the Mayers on Defendant's B that total at least
23   $640,000?
24   A.  That's correct.
25   Q.  I now show you what has been marked as Defendant's X.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                    84
     6bftvilh                Fraterrigo - cross
1    Defendant's X is a document that was available to you prior to
2    the time you swore out the search warrant affidavit May 25,
3    2005; correct?
4    A.  That's correct.
5         MR. COLTON:  Defense offers X, your Honor.
6         MS. McEVOY:  No objection, your Honor.
7         MR. HOFFMAN:  No objection.
8         THE COURT:  Okay.  Defendant's X is received.
9         (Defendant's Exhibit X received in evidence)
10   Q.  Defendant's X is a 1997 letter from Amerindo to the Mayers
11   reflecting a transfer -- or redemption, excuse me, of funds
12   received by the Mayers in the amount of $4,644,854.90; correct?
13   A.  That's a confirmation that they're redeemed 4.6, that's
                            Page 47

Nov 14 06 Franks Tr.txt
14  correct.
15  Q.  And it also says the amount is received; correct?
16  A.  That's correct.
17  Q.  And you didn't tell Judge Maas about this almost -- this
18  over four and a half million dollar payment from Amerindo to
19  the Mayers in 1997?
20  A.  No.
21  Q.  And when you testified earlier today about alleged trouble
22  the Mayers had in 1997, you didn't tell Judge Karas about this
23  four and a half million dollar plus redemption and payment by
24  Amerindo to the Mayers?
25          MS. McEVOY:  Objection, your Honor.
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                        85
        6bftvilh            Fraterrigo - cross
1           THE COURT:  Basis?
2           MS. McEVOY:  Mischaracterizes her testimony.
3           THE COURT:  It's been a long day, I can't remember if
4   does or not.  Do you want to rephrase it?  If there's a
5   specific answer that you recall giving, I realize you don't
6   have the transcript yet, but if you could be as specific as
7   possible.
8   Q.  Earlier this morning when you were testifying about the
9   Mayers in 1997 you discussed alleged trouble that they had in
10  1997 redeeming fixed rate deposits.  Do you remember that?
11  A.  That's correct.
12  Q.  At no time did you tell this Court or Judge Maas about the
13  four and a half plus million dollars of redemption received by
14  the Mayers from Amerindo in July of 1997; correct?
15  A.  That is correct, but I wasn't asked that question.  This is
16  from ATGF.
17  Q.  I understand.  Is there any reason that you didn't tell
18  Judge Maas about this four and a half million dollar redemption
19  that Amerindo made?
20  A.  No.
21  Q.  Didn't you think that Judge Maas, in deciding whether to
22  issue a search warrant that covered the '87 to '97 period would
23  want to know that Amerindo made good and paid to the Mayers
24  four and a half plus million dollars in July of 1997?
25  A.  No.
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                        86
        6bftvilh            Fraterrigo - cross
1   Q.  You didn't think he would want to know that?
2   A.  I didn't think of it at the time.
3   Q.  Did you discuss with Mr. Litt or anybody else at the U.S.
4   Attorney's Office during the vetting process of the search
5   warrant affidavit the fact of such a four and a half plus
6   million dollar redemption in 1997?
7   A.  No, we were referring to the GFRDA investment.
                                              Page 48

Nov 14 06 Franks Tr.txt

8    Q. During the course of vetting the search warrant affidavit
9    with Mr. Litt and his supervisors or supervisor at the U.S.
10   Attorney's Office, was there any discussion in which you were
11   involved about redemptions and payments by Amerindo to the
12   Mayers in the '87 to '97 period?
13   A. No, I don't recall that.
14   Q. Nobody asked you?
15   A. No, I don't recall that.
16   Q. You didn't volunteer to tell anybody about these
17   redemptions that you knew about?
18   A. No, I don't recall thinking that at the time, no.
19   Q. But when you interviewed the Mayers you did ask them about
20   their investment history, both investments into and redemptions
21   from Amerindo; correct?
22   A. Yes, that's correct.
23   Q. Because you thought during the course of that investigation
24   that that information was important?
25   A. That is correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

87

6bftvilh              Fraterrigo - cross
1    Q. It's information you wanted to know in deciding how to
2    pursue the investigation in which you were the lead case agent;
3    correct?
4    A. Yes, that's correct.
5    Q. But at the same time you didn't think about whether
6    information that's relevant to you as case agent during the
7    investigation would want to be known by the judge who was
8    making a very important decision?
9        MS. McEVOY:  Objection as to the form.
10       THE COURT:  I'll allow it.
11   A. As I stated in paragraph two of the affidavit, I didn't
12   include every detail and every aspect of my investigation in
13   the affidavit.
14   Q. To be fair, Agent, you didn't include any redemption or any
15   aspect of any payment at all from Amerindo to the Mayers,
16   period; isn't that true?
17   A. I did not put that, that's correct.
18   Q. In fact, Lisa Mayer specifically told you in an interview
19   about the four and a half or $4.6 million redemption in July of
20   '97; didn't she?
21   A. That was from her ATFG account, that's correct.
22   Q. She specifically told you about it?
23   A. Yes, she did.
24   Q. Would it surprise you to learn that in the '88 to '97
25   period just the documentary evidence that has been admitted in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

88

6bftvilh              Fraterrigo - cross
1    this hearing demonstrates payments from Amerindo to the Mayers

Page 49

Nov 14 06 Franks Tr.txt

2  of approximately $6 million?
3      MS. McEVOY:  Objection.  Assumes facts not in evidence
4  and it's also testimony.
5      THE COURT:  You'll have to lay a foundation for that,
6  Mr. Colton.
7  Q.  I put before you a whole host of the documents that you had
8  available to you that list redemptions and payments by Amerindo
9  to the Mayers; correct?
10  A.  That's correct.
11  Q.  Did you know at any time that the Mayers redeemed
12  approximately $6 million worth of assets from Amerindo during
13  that '88 to '97 period?  Did you know?
14      MS. McEVOY:  Objection to "as you know" -- sorry, as
15  to "at that time."
16      THE COURT:  He's always said he means before the
17  affidavit.
18  A.  Can you repeat the question?
19  Q.  Did you know either at the time or any time before you
20  swore out the search warrant affidavit on May 25, 2005, that in
21  the '88 to '97 time period the Mayers received funds from
22  Amerindo for redemptions or interest of at least $6 million?
23  A.  Yes.
24  Q.  You knew that.  And you didn't tell Judge Maas?
25  A.  No.
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300
                                              89
    6bftvilh            Fraterrigo - cross
1  Q.  But yet you did tell Judge Maas that you thought there was
2  probable cause to believe that you should have a right to
3  search that '88 to '97 time period throughout all of Amerindo
4  U.S.?
5      MS. McEVOY:  Objection, asked and answered.
6      THE COURT:  One more time, Mr. Colton.  I'll let you
7  do it.
8      MR. COLTON:  Thank you.
9  A.  Can you repeat the question?
10      THE COURT:  Could I impose on the court reporter,
11  please?
12      (Record read)
13  A.  Yes.
14  Q.  You testified on direct about an attempted redemption of
15  the fixed rate deposit in '97.  Do you recall that?
16  A.  That's correct.
17  Q.  But you knew back when you filled out the search warrant
18  affidavit and you knew when you testified this morning that
19  that fixed rate deposit account was not yet mature in '97 when
20  that redemption was attempted; correct?
21  A.  That's correct.
22  Q.  But yet you didn't tell Judge Maas anything about the '97
23  attempted redemption; correct?
24  A.  No.
                                          Page 50

Nov 14 06 Franks Tr.txt

25   Q.  And in testifying this morning you left out of your
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

90

6bftvilh              Fraterrigo - cross
1   testimony the fact that the account that they sought to redeem
2   wasn't mature?
3        MS. McEVOY:  Objection as to form.
4        THE COURT:  What's wrong with the form?
5        MS. McEVOY:  With respect to the part "left out of
6   your testimony."  I don't believe she was asked that question.
7        THE COURT:  Go ahead, rephrase it.
8   Q.  You failed to mention to this Court that the redemption
9   that was attempted in '97 was an attempted redemption of an
10  account that was not yet mature?
11       MS. McEVOY:  I object to the form again.
12       THE COURT:  Overruled.
13  A.  It was a -- from what I recall, that the Mayers attempted
14  to redeem their account and giving notification prior to
15  maturity in 1997.
16       THE COURT:  Is this the issue, Agent, about the 30-day
17  notice?
18       THE WITNESS:  No, this was different.
19       THE COURT:  All right.  Go ahead, Mr. Colton.
20  Q.  But your testimony earlier today was that the Mayers had
21  trouble redeeming fixed rate deposits in '97.  That was your
22  testimony; correct?
23  A.  Yes, that's what was told to me by the Mayer family.  Lisa
24  Mayer, this is what was told to me by Lisa Mayer.
25  Q.  But you also were told that that account that they
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

91

6bftvilh              Fraterrigo - cross
1   attempted to redeem was not yet mature?
2   A.  I don't believe I testified -- I mean I believe what I
3   understood at the time was that they were giving notification
4   and they wanted to redeem the account and they were discouraged
5   not to.
6   Q.  But at the time they sought to redeem they didn't have a
7   right to redeem; correct?  That's your state of knowledge as
8   you sit here today.
9        MS. McEVOY:  Objection, relevance.
10       THE COURT:  Not today, it's what it was at the time.
11       MR. COLTON:  I disagree, your Honor, she only
12  testified to what she knew today.  This was not in the
13  affidavit at all.  I'm clearing up the record from the
14  testimony elicited by the government about '97, which is simply
15  not mentioned in the affidavit at all.
16       MS. McEVOY:  Your Honor, the testimony this morning
17  had to do with what she was told by Lisa Mayer and what she
18  knew of the review of the documents before she swore to the
Page 51

Nov 14 06 Franks Tr.txt
19    search warrant.  The government made clear that that was the
20    limit of the questions this morning.  It had nothing to do with
21    her knowledge today.
22          MR. COLTON:  I'll fix it to try to solve that problem,
23    your Honor.
24          THE COURT:  Go ahead.
25    Q.  As of May 25th, 2005 when you executed the search warrant
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                        92
      6bftvilh            Fraterrigo - cross
1     affidavit, you knew, because Lisa Mayer told you, that the 1997
2     fixed rate deposit account was not yet mature at the time the
3     Mayers sought to redeem it?
4     A.  No, I don't believe I made that -- I believe, without
5     looking at the documents I can't answer that question.
6     Q.  I show you what has been marked as Defendant's F, as in
7     foxtrot, for identification, November 15, 2006 hearing.  And
8     I'll refer to your attention -- first of all, these are your
9     notes of a May 10th, 2005 interview with the Mayers, Lisa Mayer
10    and her attorney; correct?
11    A.  No, this is my notes of Bernard Mark, the attorney for Lisa
12    Mayer alone.
13    Q.  And Bernard Mark was an agent of Lisa Mayer; correct?
14    A.  Mayer's attorney, that's correct.
15    Q.  And so Mr. Mark told you on May 10th, 2005, slightly more
16    than two weeks before you swore out the affidavit, page Bates
17    35, which is the third page of the document:  1997, hard to
18    liquidate before maturity.
19    A.  That's correct.
20    Q.  So you knew, because you were told by the Mayers' attorney,
21    that the attempt at liquidation was before maturity?
22    A.  I knew that from the Mayers, from the attorney.
23          THE COURT:  Did you want to offer F?
24          MR. COLTON:  Yes, your Honor.
25    A.  Lisa Mayer told me that she was trying to redeem it.  She
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                        93
      6bftvilh            Fraterrigo - cross
1     didn't tell me that it was before maturity, the attorney did.
2     Q.  But your investigation showed you through the attorney that
3     attempted redemption was premature?
4     A.  Prior to maturity.
5     Q.  Yes.
6     A.  Correct.
7           MR. COLTON:  Defense offers F, your Honor.
8           MR. HOFFMAN:  No objection.
9           MS. McEVOY:  No objection.
10          THE COURT:  F is received.
11          (Defendant's Exhibit F received in evidence)
12    Q.  Inspector Fraterrigo, in going to Judge Maas you only
                                Page 52

Nov 14 06 Franks Tr.txt
13  presented to him information from one fixed rate deposit
14  investor, the Mayers, correct, or one family of investors?
15  A.  One family of investors?
16  Q.  In other words, the Mayer family was the only fixed rate
17  deposit investors that you discussed with Judge Maas?
18  A.  Yes.
19  Q.  Did you tell Judge Maas that the fixed rate deposit program
20  of Amerindo was a very limited program?
21  A.  No.
22  Q.  Did you tell Judge Maas --
23      THE COURT:  Hang on, I think you have to establish
24  whether or not she knew that.
25      MR. COLTON:  Fair enough.
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300
                                          94
      6bftvilh          Fraterrigo - cross
1   Q.  Did you know that?
2   A.  By limited by certain terms, no, I didn't.
3   Q.  Did you know at the time you swore out the affidavit that
4   the Amerindo fixed rate deposit program was limited as an
5   additional service of the firm to private equity clients only?
6   A.  I believe I had that information in a document.
7   Q.  You do or you don't?
8   A.  I believe I had that information in a document, I can't
9   recall if I had that before the 25th of May.
10  Q.  I show you what has been marked for identification as
11  Defendant's Y.  Defendant's Y is a document that was available
12  to you prior to your swearing out the search warrant affidavit
13  of May 25; correct?
14  A.  That is correct.
15      MR. COLTON:  I offer Y, your Honor.
16      MS. McEVOY:  No objection.
17      MR. HOFFMAN:  No objection.
18      THE COURT:  Defendant's Y is received.
19      (Defendant's Exhibit Y received in evidence)
20  Q.  Defendant's Y is a letter from Amerindo to the Mayers dated
21  July 21, 1997; correct?
22  A.  That is correct.
23  Q.  And in the second paragraph in fact it says, second
24  sentence:  As we pointed out to you on a number of times, the
25  fixed rate deposit business was neither particularly attractive
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300
                                          95
      6bftvilh          Fraterrigo - cross
1   nor significant to us as a business proposition.  We only
2   offered it as an additional service to our private equity
3   clients.
4       That information was available to you; correct?
5   A.  That's correct.
6   Q.  And you reviewed documents given to you by the Mayers
                  Page 53

Nov 14 06 Franks Tr.txt

7  before submitting your search warrant affidavit to Judge Maas;
8  correct?
9  A. I'm sorry, I didn't hear that.
10 Q. You reviewed documents given to you by the Mayers before
11 submitting a search warrant affidavit to Judge Maas; correct?
12 A. Yes.
13 Q. But you never told Judge Maas that the fixed rate deposit
14 program was limited to certain special customers of Amerindo;
15 correct?
16 A. No.
17 Q. So in asking Judge Maas to grant you a search warrant from
18 the beginning of Amerindo for a vast array of records, you
19 didn't tell him that the Mayers, as investors in the fixed rate
20 program, were in a very limited program; did you?
21 A. No, I did not.
22 Q. Didn't you think that Judge Maas, in trying to decide
23 whether the information you were providing about fixed rate
24 program, would want to know how big it was or how widespread it
25 was in trying to decide whether to give you a search warrant
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                        96
      6bftvilh              Fraterrigo - cross
1  for all of Amerindo U.S.?
2       MS. McEVOY:  Objection.
3       THE COURT:  What's the basis for the objection?
4       MS. McEVOY:  Relevance and beyond the scope of
5  redemption.
6       THE COURT:  Now you're going to make that objection?
7       MS. McEVOY:  To the extent that it had to do with
8  redemptions of GFRDA, that's one thing, but --
9       THE COURT:  This is the same issue, Mr. Colton, it's
10 just broadening the scope of the hearing.  I understand why you
11 want to do it.
12      MR. COLTON:  I'll move on.
13      THE COURT:  Thank you.  I think you're past your 15
14 minute warning.  You started at 2:20.
15      MR. COLTON:  You noticed that.
16      THE COURT:  I notice more than you think.
17      MR. COLTON:  Not more than I think, that's for sure.
18 I'm accelerating the pace.
19 BY MR. COLTON:
20 Q. Showing you AA, AB, AC, AD, and AF, Agent Fraterrigo, let
21 me know when you have had a chance to look at the exhibits I
22 have shown you.
23 A. Is there an AE?
24 Q. No.  So AA, AB, AC, AD and AF were all documents available
25 to you in your investigation prior to signing the search
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                        97
      6bftvilh              Fraterrigo - cross
                          Page 54

Nov 14 06 Franks Tr.txt
1  warrant affidavit of May 25; correct?
2  A.  That's correct.
3      MR. COLTON:  Defense offers AA, AB, AC, AD and AF.
4      MS. McEVOY:  No objection.
5      MR. HOFFMAN:  No objection.
6      THE COURT:  Okay, received.
7      (Defendant's Exhibit AA, AB, AC, AD and AF received in
8  evidence)
9  Q.  In the interest of speed, Agent Fraterrigo, each of these
10 documents, AA, AB, AC, AD and AF, list redemptions or interest
11 payments and result in cash paid by Amerindo to the Mayers
12 during the '98 to 2000 time period; correct?
13 A.  That is correct.
14     THE COURT:  In the interest of efficiency.
15     MR. COLTON:  As opposed to?
16     THE COURT:  Speed.
17     MR. COLTON:  Fair enough.  So adopt.
18 Q.  In fact, just by way of example, AC reflects a $1.7 million
19 redemption; correct?
20 A.  That's correct.
21 Q.  And AD reflects a $2.35 million redemption; correct?
22 A.  That's correct.
23 Q.  $2.35 million that was sent from Amerindo to the Mayers
24 bank; correct?
25 A.  That's correct.
          SOUTHERN DISTRICT REPORTERS, P.C.
                 (212) 805-0300
                                        98
   6bftvilh            Fraterrigo - cross
1  Q.  And as to all of the redemptions and interest payments and
2  payments reflected in AA through AD and AF, you did not tell
3  Judge Maas about any of those payments, redemptions or interest
4  payments; correct?
5  A.  That's correct.
6  Q.  In fact, as reflected in AF, you knew and did not tell
7  Judge Maas that the Mayers were receiving interest payments in
8  the summer of 2000 that ranged from 90 to $200,000 per month
9  from Amerindo; correct?
10 A.  That's correct.
11 Q.  And after testifying about trouble redeeming fixed rate
12 deposits in 1997, you did not mention that in 2000, after the
13 renewal of the fixed rate deposit, the interest payments
14 actually being made were of that substantial 100 to $200,000
15 range; did you?
16     MS. McEVOY:  Objection to form.
17     THE COURT:  To the word substantial?
18     MS. McEVOY:  Also I think completing parts of her
19 testimony about interest payments versus redemptions.
20     THE COURT:  If you want -- I might have missed that,
21 but go ahead if you want to break it down, Mr. Colton.
22 Q.  You testified about the '97 attempted redemption of fixed
23 rates by the Mayers; correct?
                                   Page 55

Nov 14 06 Franks Tr.txt
24   A.  Yes.
25   Q.  In your state of knowledge as of May 25, 2005 was that the
         SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300
                                                    99
     6bftvilh            Fraterrigo - cross
1    Mayers actually renewed their fixed rate deposit investment?
2           THE COURT:  After '97.
3    Q.  After '97?
4    A.  That is correct.
5    Q.  And in 2000, which would have been three years after '97,
6    you knew both while you were sitting here testifying today and
7    before you signed the 2005 search warrant affidavit, that the
8    interest payments in the summer of 2000 had risen to the level
9    of $200,000 a month?
10          MS. McEVOY:  Objection as to the part of the question
11   regarding her state of knowledge now.
12          THE COURT:  I understand the point that Mr. Colton is
13   trying to make, I understand the point that you make.  It
14   doesn't really matter.  It's her state of knowledge as of today
15   and also as of May 25.
16          So the question is:  Did you know at the time you
17   swore to the affidavit what it is that Mr. Colton just
18   represented about the interest payments post 1997 on the GFRDA?
19          THE WITNESS:  I know they were receiving interest
20   payments and it was cut off in October of 2002.
21          THE COURT:  But did you know in the summer of 2000
22   that they were getting interest payments in the dollar amounts
23   Mr. Colton just mentioned?
24          THE WITNESS:  Yes.
25          THE COURT:  Did you know that this morning when you
         SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300
                                                    100
     6bftvilh            Fraterrigo - cross
1    testified?
2           THE WITNESS:  Yes.
3           THE COURT:  Presumably if she knew it before, she knew
4    it today.  But go ahead, Mr. Colton.
5    BY MR. COLTON:
6    Q.  Did you know that the interest payments reflected in the
7    documents that you have been handed, AA through AF, and the
8    others -- strike that.
9           Did you know that the interest payments between '98
10   and 2000 and other redemptions paid by Amerindo to the Mayers
11   through '98 to 2000 totaled over $5 million?
12          MS. McEVOY:  Objection.
13          THE COURT:  Did you know the dollar amount of what
14   they got?
15          THE WITNESS:  I don't know the exact dollar amount,
16   but I know they were getting interest payments.
17          THE COURT:  Did you know it was in the thousands or
                                             Page 56

Nov 14 06 Franks Tr.txt

18  hundred of thousands or millions?
19      THE WITNESS:  I knew it was in the millions, I didn't
20  know the exact number at the time.
21  BY MR. COLTON:
22  Q.  So you knew that the Mayers in the '98 to 2000 time period
23  received millions of dollars from Amerindo and didn't tell
24  Judge Maas; correct?
25  A.  I knew at the time it was the ATGF, they were able to
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                        101
      6bftvilh          Fraterrigo - cross
1   redeem on the ATGF and getting some interests on the GFRDA, and
2   that at a certain point they weren't able to redeem their GFRDA
3   investment.
4   Q.  How much was the Mayers' original investment?
5   A.  700,000.
6   Q.  700,000.  And you didn't --
7       THE COURT:  Original investment in Amerindo in general
8   or in a particular fund?
9       THE WITNESS:  Initial investment was 700,000.
10      THE COURT:  Go ahead, Mr. Colton.
11  Q.  Given that level of initial investment, did you think it
12  was relevant to the probable cause inquiry that their
13  redemptions and payments between '88 and 2000 were in excess of
14  $10 million?
15      THE COURT:  Hang on.  You got --
16      MR. COLTON:  I'm doing the math.
17      THE COURT:  But you got to lay the foundation she knew
18  it was 10 million.  So I laid the foundation for you that she
19  knew it was millions, in the shorter time period you probably
20  could extrapolate it was millions.
21      MR. COLTON:  I apologize, I know I could do it in a
22  longer, more careful way.  I was trying to get the point.
23  Q.  You knew it was in the millions; correct?
24      MS. McEVOY:  Objection.  What was in the millions?
25  Q.  You knew the redemptions and interest payments received by
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                        102
      6bftvilh          Fraterrigo - cross
1   the Mayers from Amerindo pre-2000 was in the millions, and you
2   knew that as of May 25, 2005?
3   A.  That's correct.
4   Q.  And as compared to initial investment of $700,000, you
5   didn't think that would be relevant to the probable cause
6   determination with respect to '88 to 2000?
7       MS. McEVOY:  Objection.
8       THE COURT:  Overruled.
9       To Judge Maas.
10  Q.  To Judge Maas.
11  A.  I knew there were other monies that the Mayers had invested
                                        Page 57

Nov 14 06 Franks Tr.txt
12  in Amerindo throughout the years, but I --
13  Q.  Let's examine that.  You knew when you swore out the search
14  warrant affidavit before Judge Maas that the Mayers were not
15  only receiving interest payments and redemptions but were
16  making the affirmative decision to continue to trust and invest
17  more money with Amerindo over time?
18  A.  I knew at a certain point it stopped.  I know that they had
19  initial investment of 700,000 then made another investment,
20  then it changed over time.
21         MR. COLTON:  I'm making good time.
22         THE COURT:  You are coming up on your deadline.
23         MR. COLTON:  I am going to do all documents at once in
24  one more area.
25         THE COURT:  Let's do that.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                        103
       6bftvilh              Fraterrigo - cross
1  BY MR. COLTON:
2  Q.  For the record, I'm showing you AJ, AK, AL, AM, AN, AQ and
3  AR.  Agent Fraterrigo, let me know when you have had a chance
4  to review those.
5  A.  I'm ready.
6  Q.  Each of the documents that you have been handed AJ through
7  AN, AQ and AR were documents that were available to you
8  provided by the Mayers before you signed the search warrant
9  affidavit; correct?
10  A.  That's correct.
11  Q.  And each of those documents reflects a further investment
12  by the Mayers into Amerindo during the course of that time
13  period covered by those documents; correct?
14  A.  That's correct.
15  Q.  And you did not tell Judge Maas that during the time period
16  before 2003 that the Mayers were continuing to invest
17  additional sums with Amerindo?
18  A.  No.
19  Q.  Didn't you think it would be relevant to the Judge's
20  determination of probable cause as to the time period of 1988
21  to 2000 that not only were the Mayers not dissatisfied but they
22  were satisfied enough to continue to invest further with
23  Amerindo?
24         MS. McEVOY:  Objection as to relevance to probable
25  cause.  That's not the subject of this.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                        104
       6bftvilh              Fraterrigo - cross
1         THE COURT:  Really?  What else are we here for?
2         The whole idea is whether or not there were things
3  relevant to probable cause that should have been told to the
4  judge that weren't.
5         MS. McEVOY:  It's one thing if the question is
                          Page 58

Nov 14 06 Franks Tr.txt
6   phrased:  Did you tell the magistrate judge about these facts.
7   It's a legal determination, the materiality assessment.
8          THE COURT:  Mr. Colton asked the same question phrased
9   almost identically on all the other documents that he's shown.
10  So go ahead and answer the question.
11         THE WITNESS:  Could are you repeat that?
12         (Record read)
13  A.  I didn't think of it at the time.
14         MR. COLTON:  Defense moves AJ, AK, AL, AN, AQ and AR.
15         MS. McEVOY:  No objection.
16         MR. HOFFMAN:  No objection.
17         THE COURT:  Received.
18         (Defendant's Exhibit AJ, AK, AL, AN, AQ and AR
19  received in evidence)
20         MR. COLTON:  Just for the record, for the purposes of
21  this hearing I have spoken with the government, we stipulate
22  that the government had Exhibit AS before May 25th, 2005, and I
23  think we stipulate to its admissibility for this hearing.
24         THE COURT:  For this hearing only.
25         MS. McEVOY:  That's correct.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                   105
       6bftvilh          Fraterrigo - cross
1          THE COURT:  Okay, so AS is received.
2          (Defendant's Exhibit AS received in evidence)
3   Q.  Inspector Fraterrigo, AS reflects a $523,000 purchase by
4   the Mayers in 2000; correct?
5   A.  That's correct.
6   Q.  Earlier you testified about the fixed rate deposit account
7   that the Mayers sought to redeem in 2003; correct?
8   A.  That's correct.
9   Q.  And you knew when you swore out the search warrant
10  affidavit on May 25th, 2005, that the Mayers had elected to
11  actually renew in January of 2001; correct?
12         MS. McEVOY:  Objection as to form, "renew."
13  Q.  Renew their fixed rate deposit account in January 2001.
14  A.  I know they renewed their fixed rate deposit in or about
15  January of 2001, that's correct.
16  Q.  I show you what has been marked as AT and AU1.
17  A.  Yes.
18  Q.  Exhibit AT is a document provided by the Mayers to the
19  government that was available to you prior to May 25th, 2005;
20  correct?
21  A.  That's correct.
22  Q.  As is AU1; correct?
23  A.  That is correct.
24         MR. COLTON:  Defense offers AT and AU1, your Honor.
25         THE COURT:  Any objection?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                   106
                         Page 59

Nov 14 06 Franks Tr.txt
17  A.  That's correct.
18  Q.  And some of them had MAY series which reflected the Mayers;
19  correct?
20        MR. LITT:  Could we have one moment?
21        THE COURT:  Of course.
22        MR. COLTON:  What I ask the Court to do is hold AU1 in
23  abeyance and we'll try to work it out.
24        THE COURT:  Fine.
25        MR. COLTON:  I offer AT, which I think there was no
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300
                                                      110
6bftvilh            Fraterrigo - cross
1  objection to.
2        MS. McEVOY:  That's correct, your Honor.
3        THE COURT:  All right.  AT is received, and I'll hold
4  AU1 in abeyance.
5        And we're wrapping this up; right?
6        MR. COLTON:  That's correct.
7        (Defendant's Exhibit AT received in evidence)
8  BY MR. COLTON:
9  Q.  In fact, AT, which was available to you, is a letter from
10  the Mayers to Alberto Vilar and Gary Tanaka of 1997 in which
11  they say:  We are certainly most appreciative and grateful for
12  your years of fine work and excellent results.  Correct?  The
13  bottom of the page.
14  A.  Yes.
15  Q.  And you didn't tell Judge Maas that the Mayers were that
16  pleased with Amerindo's performance in their tenth year of
17  investment with Amerindo; correct?
18  A.  That's correct.
19  Q.  In your affidavit, which is Government Exhibit 33, with
20  respect to the Mayers, you represent that in 2003, at the end
21  of paragraph 6A, Amerindo is just dribbling out to the Mayers
22  as little money as possible from their multimillion dollar
23  investment; correct?
24  A.  That's correct.
25  Q.  But you didn't tell Judge Maas that in 2004 alone Amerindo
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300
                                                      111
6bftvilh            Fraterrigo - cross
1  paid to the Mayers $600,000; did you?
2  A.  No, I did not.
3  Q.  But as you testified this morning, as of May 25th, 2005 you
4  knew that Amerindo had paid the Mayers $600,000 in 2004;
5  correct?
6  A.  That's correct.
7  Q.  How do you define dribble?
8  A.  They asked for their full redemption of their investment,
9  and Amerindo gave them payments here and there.  They did not
10  give a full redemption of their investment as they requested.
                                              Page 62

Nov 14 06 Franks Tr.txt

11  Q. So in your definition of dribble, that's equal to $50,000 a
12  month?
13  A. It was payments here and there. It wasn't regular
14  payments, it's whatever they could provide. It wasn't -- the
15  Mayer family told me that they gave proper notification to make
16  a full redemption on their investment, and they were given
17  payments here and there from Amerindo.
18  Q. And I'm asking you whether an average of $50,000 cash per
19  month is what you consider to be dribble about.
20      MS. McEVOY: Objection. Assumes facts not in
21  evidence.
22  Q. 600,000 divided by twelve.
23      THE COURT: I think she's actually answered the
24  question. I think she answered the question.
25  Q. In fact, Lisa Mayer did tell you that she got $600,000
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

♀                                                112
    6bftvilh            Fraterrigo - cross
1  since 2004; correct?
2  A. Sorry?
3  Q. She told that you specifically in an interview, Lisa Mayer
4  said we got $600,000 in 2004 from Amerindo?
5      MS. McEVOY: Objection, asked and answered.
6      MR. COLTON: That's different than she knew, she was
7  told by the witness.
8      THE COURT: She knew because she was told by the
9  witness.
10     MR. COLTON: It's in documents.
11     THE COURT: But at the end of day she knew.
12  Q. But you didn't tell Judge Maas about this $600,000 in
13  payments of 2004?
14     MS. McEVOY: Objection, asked and answered.
15     THE COURT: Sustained.
16     MR. COLTON: One moment, your Honor.
17  Q. Inspector Fraterrigo, do you still have Defendant's H in
18  front of you? I recognize it's light. If it would be easier,
19  I'll get you another copy.
20  A. Yes.
21  Q. And Defendant's H is a your notes of an interview with
22  Lilly Cates; correct?
23  A. That's correct.
24  Q. And in taking he those notes you endeavored to be accurate;
25  correct?
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

♀                                                113
    6bftvilh            Fraterrigo - cross
1      THE COURT: She already said that, come on.
2  Q. Referring to what is page FR77 at the bottom right-hand
3  corner, on May 24th, 2005, almost a year and a half ago and on
4  the day before you swore out the search warrant and complaints,
                    Page 63

Nov 14 06 Franks Tr.txt
19   May 25th, were you aware of misrepresentations by Mr. Vilar to
20   investors?
21   A.  Yes.
22   Q.  Did you take the statement in this letter by Mr. Vilar, "We
23   have only offered fixed rate deposit accounts to our
24   long-standing private equity clients who sought to diversify
25   their equity capital gains," at face value?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

144

6bftvilh          Fraterrigo - redirect
1   A.  No.
2            MR. HOFFMAN:  Objection.
3            THE COURT:  Overruled.
4   A.  No.
5   Q.  As Lisa Mayer described her family's investment history
6   with Amerindo to you, were the Mayers able to redeem their
7   GFRDA investment in 1997?
8   A.  No, they were not.
9   Q.  What happened?
10   A.  In 1997 they were discouraged not to, and they eventually
11   kept their GFRDA investment with Amerindo.  They were able to
12   redeem their ATGF investment.
13   Q.  You were asked a series of questions on cross-examination
14   about whether certain information you knew at the time about
15   redemptions, payments, were relevant to the probable cause
16   determination.  Prior to swearing to a search warrant
17   affidavit, did you consciously give consideration one way or
18   another to whether that information was relevant to the
19   probable cause determination?
20   A.  No, I did not.
21            MS. McEVOY:  No further questions.
22            THE COURT:  Recross at your own risk.
23            MR. COLTON:  I'm examining the difference between no
24   minutes and two minutes.  That's all I'm looking at, a couple
25   of things.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

145

6bftvilh          Fraterrigo - recross
1            THE COURT:  I stand by my statement.
2            MR. COLTON:  All I would like to do, your Honor, is
3   complete out the record with a couple of documents.  And I
4   actually am happy not to ask about it other than foundation.
5            THE COURT:  Fine.
6   RECROSS EXAMINATION
7   BY MR. COLTON:
8   Q.  Agent Fraterrigo, I show you what has been marked for
9   identification as Defendant's AY.
10   A.  Yes.
11   Q.  AY is a document provided to the government by the Mayers
12   and available to you before May 25th, 2005?

Page 81

Nov 14 06 Franks Tr.txt

13  A.  Yes.
14          MS. McEVOY:  Objection as to scope.
15          THE COURT:  Well, this is in merely to complete the
16  record on the documents the government just put in.
17          MR. COLTON:  That's right.  And frankly I'm happy she
18  had it.  Defense now offers it.
19          MS. McEVOY:  I'm not sure how it completes the record
20  on the subjects on the documents the government put in.
21          MR. COLTON:  The question the government is clearly
22  arguing is that the state of the inspector's knowledge was the
23  Mayers said they wouldn't give us our money back.  There is a
24  suggestion, I think a good one, if you read this document that
25  there was -- that was available to the agent -- that they were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

146

6bftvilh          Fraterrigo - recross
1  discussing the workout and negotiating a workout.  And there is
2  a difference between refusing to give the money and trying to
3  negotiate a workout.  Our position is it should have been told
4  to Magistrate Judge Maas.  It wasn't.  We know that from the
5  affidavit.  We would just like this document in the record.
6  The Court can take it for what it's worth, and I won't even ask
7  the agent questions about it.
8          THE COURT:  Ms. McEvoy?
9          MS. McEVOY:  Your Honor, this is beyond the scope.  It
10  has to do with the proposed schedule redemption payments that
11  Inspector Fraterrigo testified about on cross-examination.
12          THE COURT:  But it's a schedule, basically an offer.
13  It's a compromise:  Let's work this out, here's our proposal.
14          MS. McEVOY:  Right.  It's beyond the scope at the end
15  of the day.
16          THE COURT:  It could have gone in, frankly, when
17  Mr. Colton crossed initially, so I'm not going to worry about
18  it.  It's in.
19          I take it you have no objection.
20          MR. HOFFMAN:  I have no objection.
21          THE COURT:  So AY is in.
22          (Defendant's Exhibit AY received in evidence)
23          THE COURT:  Anything else, Mr. Colton?
24          MR. COLTON:  Just to complete the record, I didn't
25  offer Exhibit I, which was the listing of the documents the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

147

6bftvilh          Fraterrigo - recross
1  government represents were in possession of the government.
2          THE COURT:  The cover letter?
3          MR. COLTON:  Yes.  For record completeness I would
4  like that as part of the record.
5          THE COURT:  Any objection to that?
6          MS. McEVOY:  No objection.

Page 82