**EXHIBIT I**

```
                                5CESvilarf.txt
                                      1
    5CESVILAR
 1  UNITED STATES DISTRICT COURT
 1  SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 2
 3  UNITED STATES OF AMERICA,
 3
 4
 5         v.                 05 Cr. 621
 6
 6  ALBERTO VILAR and GARY TANAKA,
 7
 7         Defendants.
 8
 8  ------------------------------x
 9
 9                              December 14, 2005
10                              9:45 a.m.
10
11  Before:
11
12              HON. KENNETH M. KARAS,
12
13                       District Judge
13
14                  APPEARANCES
14
15  MICHAEL J. GARCIA
15      United States Attorney for the
16      Southern District of New York
16  MARC LITT,
17      Assistant United States Attorney
17
18  SUSAN WOLFE, ESQ.
18  JEFFREY HOFFMAN, ESQ.
19      Attorneys for Defendant Alberto Vilar
19
20  GLENN COLTON, ESQ.
20  STEVEN KOBRE, ESQ.
21      Attorneys for Defendant Gary Tanaka
21
22
22
23
24
25
25
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
                                      2
    5CESVILAR
```

```
                                          5CESvilarf.txt
10   you organized your group for the search at 399 Park Avenue, the
11   Amerindo offices?
12   A. I informed my superiors that I was going to need a number
13   of inspectors assigned for a search at that location. I was
14   given a list of inspectors who would participate. I organized
15   a meeting with them the morning of the search at our division
16   headquarters here in New York City. We reviewed the rider and
17   the affidavit for the search warrant. I made assignments for
18   individual assignments once we entered the premises.
19   Q. Can you just walk through the documents that you reviewed?
20   A. Each inspector who was assigned to the search reviewed the
21   affidavit for the search warrant and the rider for the search
22   warrant.
23   Q. When you say the rider for the search warrant, what are you
24   referring to?
25   A. The listing of the items to be seized.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
                                                              78
     5CESVILAR            Feiter - direct
 1   Q. And when you say the affidavit for the search warrant, what
 2   are you referring to?
 3   A. The affidavit that was submitted by the government to
 4   obtain a search warrant from the magistrate.
 5   Q. Did that include the complaints that were made part of that
 6   affidavit or not?
 7   A. No, it did not.
 8   Q. Did some agents receive the package, including the
 9   complaints?
10   A. Those that were assigned to the arrest teams, yes.
11   Q. Now, the morning of the search, what happened?
12   A. We met, as I said, at my division headquarters. We had
13   that meeting. I gave out the assignments of what I wanted
14   individual inspectors to do once we reached the premises. Once
15   I received word from the arrest teams that it was clear to go
16   in, I entered the premises and identified myself to an employee
17   there, informed them that we had a federal search warrant and
18   then had people begin to secure the area.
19   Q. Before we get to the point when you arrived at the site,
20   was there a briefing that morning?
21   A. Yes, at our division headquarters.
22   Q. And aside from the documents that you described being given
23   to the various agents, was any other information given to those
24   inspectors?
25   A. They were given a general overview of the case. They were
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
                                                              79
     5CESVILAR            Feiter - direct
 1   given instructions and if they had any questions about whether
 2   items were covered under the warrant to ask either myself or
 3   the case agent, and they were given instructions that we always
                         Page 44
```

5CESvilarf.txt

15  Q. When was that?
16  A. The day of the search, and probably several days after that
17  too.
18      MR. KOBRE: No objection.
19      MS. WOLFE: Your Honor, I have no objection either.
20      I would just like to reserve the right -- if I may, we
21  received a copy of the inventory. It wasn't in any order, any
22  specific order, so if at some future date we determine that one
23  piece of paper is missing, we should be able to work it out
24  with the government to supplement.
25      Thank you.
         SOUTHERN DISTRICT REPORTERS, P.C.
              (212) 805-0300

85

5CESVILAR         Feiter - direct
1       THE COURT: Such optimism.
2       MR. LITT: We probably can. The government's intent
3   in offering this exhibit is that it is the full and complete
4   set of the search inventory documents.
5       THE COURT: In terms of the question before me,
6   Government Exhibit 2 is received.
7       (Government's Exhibit 2 received in evidence)
8       THE COURT: You may continue, Mr. Litt.
9   BY MR LITT:
10  Q. How long did your team spend searching the premises
11  approximately?
12  A. I think it was about 12 hours.
13  Q. Did you or your team do anything to document documents that
14  were not seized?
15  A. Yes, we did.
16  Q. What did you do?
17  A. Part of our procedure is if you do a position, a labeled
18  position, and nothing is taken from that position, a sheet
19  still has to be filled out to clear that position and that is
20  just filled out in large letters "nil", meaning nothing was
21  taken from that position.
22  Q. So looking at Government Exhibit 2, approximately the last
23  40 pages or so --
24  A. Yes.
25  Q. -- are those examples where there is either a line or an X
         SOUTHERN DISTRICT REPORTERS, P.C.
              (212) 805-0300

86

5CESVILAR         Feiter - direct
1   and the word nil written, and are those examples from your
2   experience of positions where no documents were taken?
3   A. Yes.
4   Q. Did you do anything else in connection with this search to
5   record documents that were not seized?
6   A. Yes, we did.
7   Q. What was that?
8   A. There came a point early on in the search where discussions

Page 48

5CESvilarf.txt

9  were engaged in between the counsel that was there for the
10  firm, myself, the case agent, and the U.S. Attorney's Office
11  that some documents or a large amount of documents might be
12  handled by subpoena. So while that conversation was going on I
13  had people assigned there to search do a brief inventory on
14  those positions for the documents we were talking about.
15  Q. Who brought up that subject first? Was that brought up by
16  you or the attorney or someone else?
17  A. By the "subject" you mean the subpoena aspect?
18  Q. Correct.
19  A. That was brought up by the counsel.
20  Q. When you say the counsel, is that the outside counsel for
21  Amerindo?
22  A. Yes, Mr. Licker.
23      MR. LITT: May I approach?
24      THE COURT: You may.
25  Q. Inspector, I have handed you what is marked as Government

          SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300

87

5CESVILAR          Feiter - direct
1   Exhibit 3 for identification. Do you have that?
2   A. Yes, I do.
3   Q. Do you recognize that group of documents?
4   A. These are photocopies of the inventory that I had
5   instructed several inspectors to perform on the documents we
6   were just talking about.
7   Q. Meaning the documents that you were not going to search and
8   seize?
9   A. Correct.
10  Q. Did you prepare these inventories?
11  A. No, I did not.
12  Q. Did you see them at the scene at the time of the search?
13  A. Yes, I did.
14  Q. Have you seen them since then?
15  A. Yes, I have.
16  Q. When was the last time you saw them?
17  A. Within the last several days.
18  Q. Was that in connection with preparing for your testimony
19  today?
20  A. Yes, it was.
21      MR. LITT: The government would offer Government
22  Exhibit 3 for identification as Government Exhibit 3.
23      MR. KOBRE: One question, if I may.
24  VOIR DIRE EXAMINATION
25  BY MR. KOBRE:

          SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300

88

5CESVILAR          Feiter - direct
1   Q. Do you know where these documents have been maintained
2   since the time of the search to the time you prepared to

```
                                              5CESvilarf.txt
     19   A. Without the affidavit in front of me I couldn't remember.
     20   Q. In the interest of not being duplicative with co-counsel, I
     21   will move to another area.
     22        Agent Feiter, were there any materials that you saw or
     23   that you were aware of through your conversations with the
     24   other agents, were there any materials on the premises which
     25   were not called for by the search warrant?
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                   (212) 805-0300
                                                                      101
          5CESVILAR            Feiter - cross
     1    A. Yes.
     2    Q. And what materials were not called for?
     3    A. Specific instances I can't name them at this time, but
     4    there were items that were left so those would not have been in
     5    compliance with the rider.
     6    Q. Well, you testified that there were certain items that were
     7    left that were supposed to be retrieved or produced
     8    subsequently, correct?
     9    A. Correct.
     10        THE COURT: Through the subpoena you are referring to.
     11        MS. WOLFE: Yes.
     12   Q. And those were items that were considered, for lack of a
     13   better word, responsive to the rider, covered by the rider, the
     14   search warrant rider?
     15   A. No.
     16   Q. Let me ask it this way: Is it your understanding that
     17   everything that was covered by the search warrant rider was
     18   taken that day?
     19   A. No, that is not my understanding.
     20   Q. So there were other materials that were covered that were
     21   left there?
     22   A. It's possible. We did not review that entire section that
     23   we just did the quick inventory of because of the discussions
     24   about subpoena compliance.
     25   Q. But when you say you did the quick inventory of a certain
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                   (212) 805-0300
                                                                      102
          5CESVILAR            Feiter - cross
     1    area, what area was that?
     2    A. It would be if you are looking down the main hallway of the
     3    office from the entrance area to the right-hand side there are
     4    ceiling-to-floor cabinets that line that almost entire side, as
     5    well as being doubled up at part of it, and then a storage
     6    hallway room in the middle of that.
     7    Q. And was a determination made that the materials contained
     8    in those file cabinets and in the storage room were covered by
     9    the rider?
     10   A. No, no determination like that was made.
     11   Q. Was there an inventory made of the contents of first we
     12   will talk about the file cabinets?
                                     Page 57
```

5CESvilarf.txt

16       THE COURT:  Okay.
17  Q.  I will ask you to turn to page 3 and look at paragraph 6 of
18  the search warrant affidavit.  Let me first ask you:  Do you
19  recall this being a copy of the affidavit or does this appear
20  to be a copy of the affidavit that you reviewed prior to the
21  search?
22  A.  Yes.
23  Q.  I will ask you now to turn to page 3, paragraph 6.  And do
24  you see there at the beginning of the paragraph it indicates
25  that in describing the schemes forming the basis for probable

5CESVILAR            Feiter - cross
1   cause it refers the reader to the criminal complaints against
2   Mr. Vilar and Mr. Tanaka, do you see that?
3   A.  You mean annexed as Exhibit A, is that what you are
4   referring to?
5   Q.  Yes.
6   A.  Yes.
7   Q.  As I understand your testimony, in reading the affidavits
8   you were not provided with a copy of the complaints against
9   Mr. Vilar and Mr. Tanaka, correct?
10  A.  That is correct.
11  Q.  And the agents that were actually executing the search also
12  were not provided with those complaints, correct?
13  A.  Correct.
14  Q.  So to the extent that the agents were looking for some
15  definition, if you will, of the nature of the scheme, and they
16  turned to the affidavit, they would not be able to appreciate
17  what the true nature of the scheme is, am I correct?
18  A.  I wouldn't agree with that, no.
19  Q.  Okay.
20       Well, am I correct that paragraph 6 in defining the
21  scheme refers the reader to the allegations against Mr. Tanaka
22  and Mr. Vilar in the complaint?
23  A.  Yes.
24  Q.  So if the reader doesn't actually have the complaint, it's
25  not possible for them to know what is actually alleged in those

5CESVILAR            Feiter - cross
1   complaints when reading this affidavit, isn't that right?
2   A.  I don't think I would agree with that, no.  Because if you
3   continue on and read the rest of this affidavit along with the
4   rider, and knowing that you have a case agent there to answer
5   any questions, I think you have a pretty sound basis.
6   Q.  We are going to get to the case agent.  I am asking
7   specifically from the document itself.
8        Do you agree that a reader who is reading the
9   affidavit could not fully appreciate the allegations of the

5CESvilarf.txt
24  Defendant V and it has a number of yellow sticky tabs on the
25  right side.
              SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
                                                      160
     5CESVILAR          Feiter - redirect
1        MR. HOFFMAN:  For identification.
2        MR. LITT:  For identification.
3        MR. LITT:  For the court, that is 3505C.
4    Q.  Have you had a chance to look at that document?
5    A.  Yes.
6    Q.  Does that document refresh your recollection as to whether
7    individuals who participated in the arrest of Mr. Vilar and
8    Mr. Tanaka also participated in the search?
9    A.  I believe Inspectors Feeney and Wright and Roinstack were
10   all part of arrest teams and they all were then present at the
11   search.
12   Q.  What about Inspector Fraterrigo, was she part of the arrest
13   team?
14   A.  Yes.
15   Q.  Was she present at the search?
16   A.  Yes.
17   Q.  So is it your belief that at least those members or those
18   inspectors who participated in the search had access to the
19   complaints?
20   A.  Yes.
21   Q.  Finally, I would like to turn your attention to what I
22   believe has been marked as Defendant Exhibit E.  It's the
23   warrant and rider.
24       Do you have that?
25   A.  TA?
              SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
                                                      161
     5CESVILAR          Feiter - redirect
1    Q.  The document which is in your hand, what is that?
2    A.  This is not marked at all.
3    Q.  Handing you what has been marked as Defendant Vilar Exhibit
4    E, is that the search warrant and rider?
5    A.  Yes, it's the actual warrant and the rider attached to it,
6    yes.
7    Q.  And just turning your attention to paragraph 1 on the
8    attachment, in your view did that language permit postal
9    inspectors to seize every business document related to the 4
10   entities listed or was it limited by the examples of documents
11   that are included in paragraph one?
12   A.  I don't think it's a total limitation but it defines what
13   we should be looking for.
14       MR. LITT:  No further questions.
15       THE COURT:  I was going to ask this.  I thought when
16   you were asked by Mr. Kobre about this you said any documents
17   related to the Amerindo entities could be seized and I was
                         Page 90

```
                                                           5CESvilarf.txt
18   going to ask what that didn't mean but now you are saying you
19   think it's limited by the language?
20          THE WITNESS:  What is the best way to put it?  Without
21   a doubt anything that is listed here as a direct item obviously
22   is going and anything that is related to those is going too.
23          THE COURT:  Related to what?
24          THE WITNESS:  To the already-listed items.  It had to
25   be clearly a business record, a business document, something
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                     162
     5CESVILAR              Feiter - redirect
 1   related to these businesses, yes, then it's going.
 2          THE COURT:  The language says, "including but not
 3   limited to."
 4          THE WITNESS:  Right.
 5          THE COURT:  So it's not limited to the types of items
 6   listed there in paragraph one of the rider, correct?
 7          THE WITNESS:  Correct.
 8          THE COURT:  So anything that would have Amerindo
 9   Cayman stationery on it, would that be something that in your
10   words would go?
11          THE WITNESS:  As long as it had writing on it and it
12   wasn't just blank.
13          THE COURT:  Okay.
14          Any business cards that had Amerindo Cayman on it,
15   would those go?
16          THE WITNESS:  I probably would take one and leave the
17   other hundred.
18          THE COURT:  Any bills that are sent to Amerindo
19   Cayman, if they are addressed to Amerindo Cayman, would those
20   go?
21          THE WITNESS:  Yes.
22          THE COURT:  So what wouldn't go if it had some sort of
23   indication that it was an official business record?
24          THE WITNESS:  Probably all official business records.
25   I just put the limitation on it with the stationery, those type
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                     163
     5CESVILAR              Feiter - redirect
 1   of objects.
 2          THE COURT:  Go ahead, Mr. Litt, if you want to follow
 3   up.
 4          MR. LITT:  No further questions.
 5          THE COURT:  Any recross?
 6          MS. WOLFE:  Yes, your Honor, just a few questions.
 7   RECROSS EXAMINATION
 8   BY MS. WOLFE:
 9   Q.  Were there any other entities located on the premises other
10   than the 4 listed in paragraph one?
11   A.  When you --
                                  Page 91
```

5CESvilarf.txt

12  Q. Of the rider.
13  A. When you refer to premises do you mean the floor or the
14  area searched?
15  Q. The area authorized to be searched.
16  A. Not to my knowledge that I can remember now.
17  Q. And you mentioned that you searched only one position
18  yourself.
19  A. I think it was one or two.
20  Q. Do you remember what the positions consisted of?
21  A. I believe that they were like call it the secretary area
22  behind the main reception desk.
23          MR. LITT: Your Honor, this is beyond the scope.
24          THE COURT: Yes. In recross you can identify the
25  question asked on redirect and then take it from there.
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

164

5CESVILAR          Feiter - recross
1           MS. WOLFE: It was a question that Mr. Kobre asked but
2   in any event --
3           THE COURT: I am give you some leeway on that.
4   Q. You mentioned that some of the computers may have been
5   imaged on the premises?
6   A. I believe but, again, as I said, I am not a digital
7   evidence person. Our digital people would have handled that
8   and for me to tell you even what was imaged, how it was done or
9   where, I can't.
10  Q. Who were the digital people who were present at the search?
11  A. Inspector Jim Backman was the inspector in charge of that.
12  Q. And were there people working with him?
13  A. I believe Mike Ablazer out of our lab was there.
14  Q. Anyone else?
15  A. I would have to go back and look at the list.
16  Q. And how many agents in total were enlisted to conduct the
17  search?
18  A. I would have to go see the sign-in and count up. I don't
19  know offhand.
20  Q. Well, you were present at the morning briefing, right?
21  A. Yes.
22  Q. Was it more than 20 agents?
23  A. Once again, without seeing the sign-in list I don't
24  remember how many were there.
25          THE COURT: Do you have the sign-in, Mr. Litt?
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

165

5CESVILAR          Feiter - recross
1           MR. LITT: 3505A, your Honor.
2           THE COURT: If the number is relevant I imagine you
3   can get a stipulation on this before the speedy trial clock
4   expires.
5   Q. Let me show you a document that has been marked 3505A.
                        Page 92