Glenn C. Colton (GC-2493)
Jessica L. Margolis (JM-7786)
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Tel: 212.999.5800

*Attorneys for Defendant*
*Gary Alan Tanaka*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     - against -<br><br>ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA<br><br>                    Defendants. | S3 05 Cr. 621 (KMK)<br><br>ECF CASE |

**DEFENDANT GARY TANAKA'S MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTIONS (1) TO SUPPRESS EVIDENCE SEIZED FROM AMERINDO U.S., (2) TO SUPPRESS EVIDENCE SEIZED FROM THE UNITED KINGDOM, AND (3) TO QUASH THE SUBPOENA SERVED ON AMERINDO U.S.**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 5

ARGUMENT .................................................................................................... 5

I.     EVIDENCE SEIZED IN AMERINDO US SEARCH SHOULD BE
SUPPRESSED ........................................................................................ 5

    A.    SUPPRESSION IS REQUIRED BECAUSE INSPECTOR FRATERRIGO
INTENTIONALLY OR RECKLESSLY MISLED THE MAGISTRATE JUDGE TO
OBTAIN THE AMERINDO US WARRANT ................................................... 7

        1.    The Warrant Application Contained Numerous Intentional
Misstatements And Omissions Concerning The Mayer Family. ................ 8

        2.    The Warrant Application Contained Numerous Intentional
Omissions Concerning Lily Cates. ......................................................... 13

        3.    Agent Fraterrigo's Suggestion That The Above Omissions Were
Not "Intentional" Because She Simply "Did Not Think" To
Include Them Should Be Rejected. ......................................................... 15

        4.    Agent Fraterrigo's Misrepresentations And Omissions Were
Material. ............................................................................................... 18

            a.    A Truthful Warrant Application Provides No Basis Whatsoever
For Seizing Any Documents Related To The Pre-2002 Time
Period. .................................................................................... 19

            b.    With The Possible Exception of Documents Pertaining To Lily
Cates' SBIC Investment, A Truthful Warrant Application Fails To
Establish Probable Cause To Seize Any Documents Related To
The Period Between 2002 And The Date Of The Search. ............. 20

            c.    At Most, The Corrected Warrant Application Supports Seizing
Documents Relating To One Investment By One Investor. ......... 21

    B.    AGENT FRATERRIGO SUBMITTED THE AMERINDO U.S. WARRANT
APPLICATION DESPITE HER KNOWLEDGE AND BELIEF THAT THERE WAS
NO PROBABLE CAUSE TO SUPPORT THE WARRANT ............................... 22

        1.    Agent Fraterrigo Misled The Magistrate Judge About The
Existence Of Probable Cause ................................................................. 22

        2.    Agent Fraterrigo's Attempt To Write Off Her Own Testimony Is
Incredible And Provides Further Reason To Question Her Good
Faith. ................................................................................................... 24

C.      SUPPRESSION IS REQUIRED BECAUSE THE WARRANT AFFIDAVIT WAS SO
        DEVOID OF PROBABLE CAUSE THAT NO REASONABLE OFFICER COULD
        HAVE EXECUTED IT IN GOOD FAITH.................................................................. 26

D.      SUPPRESSION IS APPROPRIATE BECAUSE THE EXECUTING OFFICERS COULD
        NOT REASONABLY HAVE PRESUMED THE WARRANT TO BE VALID .................... 29

E.      THE AMERINDO U.S. WARRANT SHOULD BE SUPPRESSED IN ITS ENTIRETY ......... 34

        1.      Because The Warrant In Its Entirety Is Flawed, All Of The Fruits
                Of The Amerindo U.S. Search Must Be Suppressed. ................................ 34

        2.      Even If A Portion Of The Warrant Might Be Construed As Valid,
                Severance Is Not Justified. ......................................................................... 36

        3.      Complete Suppression Is Consistent With The Policy Behind The
                Exclusionary Rule. ..................................................................................... 38

II.     EVIDENCE SEIZED FROM THE UNITED KINGDOM STORAGE FACILITY
        SHOULD ALSO BE SUPPRESSED ................................................................................ 39

        1.      The Amerindo U.K. Search Must Be Suppressed Because It Is
                "Fruit Of The Poisonous Tree". .................................................................. 40

        2.      The Remaining Allegations In The MLAT Request, Although Not
                Derived From The U.S. Search, Were Also Tainted. ................................ 42

        3.      The Amerindo U.K. Search Violated Defendants' Fourth
                Amendment Rights. ..................................................................................... 44

III.    THE SUBPOENA SERVED ON AMERINDO US SHOULD BE QUASHED ............. 49

CONCLUSION.......................................................................................................................... 51

# TABLE OF AUTHORITIES

*Coolidge v. New Hampshire,*
    403 U.S. 443 (1971)........................................................................................36

*Franks v. Delaware,*
    438 U.S. 154 (1978)....................................................................................... *passim*

*Laaman v. United States,*
    973 F.2d 107 (2d Cir. 1992)............................................................................40

*Rivera v. United States,*
    928 F.2d 592 (1991)........................................................................................16

*United States v. Burke,*
    718 F. Supp. 1130 (S.D.N.Y. 1989).............................................................31, 34

*United States v. Canfield,*
    212 F.3d 713 (2d Cir. 2000)............................................................................18

*United States v. Debbi,*
    244 F. Supp. 2d 235 (S.D.N.Y. 2003)............................................................33

*United States v. Debbi,*
    258 F. Supp. 2d 313 (S.D.N.Y. 2003)............................................................49

*United States v. Eng,*
    971 F.2d 854 (2d Cir. 1992)............................................................................49

*United States v. Freeman,*
    685 F.2d 942 (5th Cir. 1982) ..........................................................................39

*United States v. George,*
    975 F.2d 72 (2d Cir. 1992)............................................................................ *passim*

*United States v. Harding,*
    273 F. Supp. 2d 411 (S.D.N.Y. 2003).........................................................16, 17

*United States v. Kow,*
    58 F.3d 423 (9th Cir. 1995) ......................................................................... *passim*

*United States v. Leon,*
    468 U.S. 897 (1984)..................................................................................... *passim*

*United States v. Marcus,*
    807 F. Supp. 934 (E.D.N.Y. 1992) .............................................................36, 39

*United States v. Ninety-Two Thousand Four Hundred Twenty-Two*
    *Dollars And Fifty-Seven Cents,*
    307 F.3d 137 (3d Cir. 2002)......................................................................35, 36, 37

*United States v. Perez*,
    247 F. Supp. 2d 459 (S.D.N.Y. 2003)...........................................................18

*United States v. Reilly*,
    76 F.3d 1271 (2d Cir. 1996)...........................................................6, 16, 17, 22

*United States v. Rettig*,
    589 F.2d 418 (9th Cir. 1978) .........................................................................33

*United States v. Rivera*,
    728 F. Supp. 250 (S.D.N.Y. 1990), *vacated on other grounds*.........................17

*United States v. Sells*,
    463 F.3d 1148 (10th Cir. 2006) .....................................................................36

*United States v. Shi Yan Liu*,
    239 F.3d 138 (2d Cir. 2000)................................................................33, 35, 38

*Wong Sun v. United States*,
    371 U.S. 471 (1963)........................................................................................40

Defendant Gary Alan Tanaka, by his attorneys, respectfully submits this memorandum in support of Defendants' motions (1) to suppress all evidence seized from the New York offices of Amerindo Investment Advisors Inc. ("Amerindo U.S."), located at 399 Park Avenue, New York, NY, (2) to suppress all evidence seized from the Cadogan Tate storage facility located at 239 Acton Lane, London, United Kingdom, and (3) to quash the subpoena served on Amerindo U.S. on May 26, 2005 (collectively, the "Pending Motions"). In addition, Mr. Tanaka joins in and hereby incorporates Defendant Alberto Vilar's Memorandum in Support of the Pending Motions, also dated December 13, 2006 ("Vilar Mem.").[1]

## PRELIMINARY STATEMENT

On May 26, 2005, nineteen armed federal agents entered the New York office of Amerindo U.S. and proceeded to execute a search warrant issued by a United States Magistrate Judge. At first glance, the scene at 399 Park Avenue might have appeared similar to that which has occurred countless times prior to and since the Amerindo U.S. search. In reality, however, something very different was going on: a complete and utter breakdown of the system, brought on by a combination of affirmative misconduct and other objectively unreasonable behavior on the part of the federal agent who swore out the warrant affidavit and the federal agents who carried out the search. Indeed, once the layers of deceit and dereliction are peeled away and the

---

[1] Mr. Vilar's memorandum of law addresses, among other things, the following arguments forwarded by Defendants: (1) the Amerindo U.S. warrant is unconstitutionally overbroad, (2) the seizure of Amerindo U.S.'s entire computer system without any established protocol for searching the system for relevant information was impermissible, and (3) the subpoena served on Amerindo U.S. is overbroad and oppressive, as well as an impermissible extension of an unconstitutional search.

truth exposed, what remains is a frightening yet quintessential example of the precise type of conduct the Fourth Amendment is intended to prevent.

The magnitude of the transgressions that surrounded the procurement and execution of the Amerindo U.S. warrant is nothing short of remarkable. These transgressions began with the Amerindo U.S. warrant application itself, which is filled with numerous intentional and material omissions and misstatements concerning the only two alleged victims in the warrant application. Among the critical facts misrepresented in or omitted from the Amerindo U.S. warrant application are: (1) from the beginning of their respective relationships with Amerindo, the two alleged victims received millions of dollars in payments, including significant payments during the years preceding the search; (2) throughout the years, the alleged victims continued to invest large sums of money with Amerindo, with one alleged victim re-investing over $11 million as recently as 2001; and (3) in the year prior to the search, Amerindo – and, in particular, Mr. Tanaka – had been attempting to negotiate a workout with one of the two alleged victims pursuant to which their full investment would be redeemed. Once the Amerindo U.S. warrant application is corrected to account for this critical information, there can be no dispute that the warrant application – which, even as written, falls far short of that which is required to demonstrate probable cause – is in fact *entirely* devoid of facts to support the all-inclusive warrant that was issued in this case.

Perhaps even more egregious than the intentional and material omissions and misrepresentations in the Amerindo U.S. warrant application, however, is the fact that the affiant and lead case agent on the investigation brought the application to Magistrate Judge Maas *despite her knowledge and belief that there was no probable cause to seize vast categories of documents called for by the warrant*. This startling admission by Agent Fraterrigo, repeated

throughout her testimony at the suppression hearing, confirms that which Defendants have been alleging since the Pending Motions were filed: The Amerindo U.S. warrant was obtained in bad faith.

The federal agents' misconduct does not end with the Amerindo U.S. warrant application, but rather extends to the actual execution of the warrant. In a complete abdication of their obligations, the executing officers (assisted by Agent Fraterrigo) carried out a grossly overbroad warrant that called for seizure of nearly every single business-related item on the premises, including *all* business records, *all* client files, *all* marketing materials, *all* correspondence sent to or received from clients, and *any* documents "reflecting the identities of and communications with clients who have investments managed or advised by Amerindo." Moreover, the officers executed this facially deficient warrant without *any* regard to the relatively bare-bones supporting Affidavit, which alleged only two "victims" who collectively invested in only three of the numerous investment vehicles offered or managed by the Amerindo entities. The result was a general search – wholly un-particularized and unsupported by probable cause – pursuant to which tens of millions of pages of documents were seized.

Indeed, the Amerindo U.S. warrant is so overbroad and the seizure so enormous that, despite having arrived at the site early in the morning, nineteen federal agents could not complete the task in one day. Accordingly, to prevent the agents from having to secure the site overnight and return the next day, the Government served a grand jury subpoena on Amerindo U.S. as the search was being conducted. This subpoena, which is at least equally overbroad and lacking in particularity as the Amerindo U.S. warrant, effectively served as an extension of the unconstitutional Amerindo U.S. search and therefore must be quashed. Were the Court to enforce the subpoena, it would set a precedent whereby the prosecutors could, on their own and

without any judicial involvement, effectively immunize unlawful searches by simply serving a subpoena during or after the fact. Such a result is contrary to the fundamental purpose of the Fourth Amendment and would completely eviscerate the exclusionary rule.

That the Amerindo U.S. search was a flagrant and bad faith violation of Defendants' Fourth Amendment rights is clear. To make matters worse, however, the Government relied on information obtained during this illegal search to procure a U.K. warrant authorizing the seizure of yet additional materials. Indeed, the fact that the U.K. warrant application incorporates information illegally obtained through the Amerindo U.S. search is just one of the U.K. warrant's many fatal flaws – each of which independently requires suppression of the evidence seized in the U.K. As with the Amerindo U.S. warrant application, the Government's MLAT Request (which was attached to the U.K. warrant application) contains numerous material misrepresentations and omissions, both concerning (a) the investors who allegedly were "victimized" by Defendants, and (b) the types of documents that were expected to fall within the U.K. warrant's incredibly broad terms. Moreover, also like its predecessor, the U.K. warrant is unconstitutionally overbroad in that it authorizes the seizure of virtually unlimited categories of documents – despite the fact that the supporting documentation references at most four alleged victims and only two investment vehicles. Finally, although the U.K. search was conducted at the request of U.S. authorities in connection with a U.S. investigation of U.S. citizens, the Government failed to procure a warrant or other authorization from an American court prior to the search.

At each stage of the process, the federal agents associated with this case engaged in conduct that ranges from objectively unreasonable to downright duplicitous – ***precisely the type of behavior that the exclusionary rule is designed to deter***. Accordingly, suppression of the

fruits of both the Amerindo U.S. and U.K. searches, as well as quashing of the Amerindo U.S. subpoena, are required.

## STATEMENT OF FACTS

The facts relevant to the Pending Motions are set forth in Defendant Alberto Vilar's Memorandum of Law in Support of the Pending Motions, and are incorporated by reference herein. Mr. Tanaka also refers the Court to the facts as set forth in Mr. Tanaka's Memorandum In Support of Motion for *Franks* Hearing, submitted on August 30, 2006.

## ARGUMENT

## I.    EVIDENCE SEIZED DURING THE AMERINDO U.S. SEARCH SHOULD BE SUPPRESSED

As demonstrated in Defendant Alberto Vilar's Memorandum in Support of the Pending Motions, there can be no serious dispute that the Amerindo U.S. warrant is vastly overbroad. *See* Vilar Mem. in Support of Pending Motions; *see also* Gov. Ex. 32.[2] Despite the fact that the Amerindo U.S. warrant is unconstitutionally overbroad, if the Government is able to prove that the overbroad warrant was nonetheless executed in good faith, suppression is not required. *See United States v. Leon*, 468 U.S. 897, 922 (1984); *see also United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992) ("the burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance" on an invalid warrant). The rationale behind this "good faith exception" is that the purpose of the exclusionary rule – namely, to deter police misconduct – is not furthered where it can be demonstrated that the offending officers "acted in the objectively

---

[2] "Gov. Ex." and "Def. Ex." refer to exhibits admitted by the Government and Defendants, respectively, during the course of the suppression hearings. "Gov. Franks Ex." and "Def. Franks Ex." refer to documents admitted by the Government and Defendants, respectively, during the Franks hearing held on November 15, 2006. A full set of the exhibits relied on by Defendants in their memoranda of law in support of the Pending Motions have been provided to the Court under separate cover.

reasonable belief that their conduct did not violate the Fourth Amendment." *Leon*, 468 U.S. at 918.

Where, however, the Government is unable to show that the officers in question acted in an objectively reasonable manner, suppression of the seized evidence is mandated. The Supreme Court has identified four specific instances in which the good faith exception does not apply to protect execution of a subsequently invalidated warrant: (1) where the issuing magistrate was misled by information in an affidavit that the affiant either knew was false or would have known was false except for her reckless disregard of the truth; (2) where the warrant is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" (3) where the issuing magistrate "abandoned his detached and neutral role;" and (4) where, "depending on the circumstances of the particular case, a warrant [is] so facially deficient – *i.e.*, in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." *Id*. at 923. In each of these instances, as with any scenario in which Government agents do not act in good faith, suppression of the seized evidence furthers the policy objective of the exclusionary rule by deterring officers from abdicating their duties or otherwise acting unreasonably. *Id*. at 918. As the Second Circuit stated in *United States v. Reilly*,

> "It bears emphasis…that the good faith exception requires a
> sincerely held and objectively reasonable belief that the warrant is
> based on a valid application of the law to all the known facts.
> Good faith is not a blanket excuse for any police behavior. A
> warrant is not a general hunting license, nor is it a mantle of
> omnipotence, which cloaks its holders in the King's power to 'do
> no wrong.'"

76 F.3d 1271, 1273 (2d Cir. 1996).

The conduct of law enforcement in this case is precisely the type that the exclusionary rule seeks to deter and prevent. **First**, Agent Fraterrigo, the lead case agent and affiant,[3] misrepresented and/or omitted numerous critical facts in the warrant application – facts which, had they been honestly represented, would have made clear that there is absolutely no probable cause to support the far-reaching Amerindo U.S. warrant. **Second**, at the time she was applying for the Amerindo U.S. warrant, Agent Fraterrigo knew that there was no probable cause – in the warrant application or otherwise – to support the warrant she was requesting. **Third**, the officers who executed the Amerindo U.S. warrant did so despite the fact that the supporting affidavit ("Affidavit") in its original form – i.e., without correcting for the critical omissions and misstatements alluded to above – is entirely devoid of probable cause to support such a broad, all-encompassing warrant. **Fourth**, the Amerindo U.S. warrant is so facially deficient – that is, it fails to particularize the items to be seized, instead purporting to authorize seizure of nearly every business document on the premises from the beginning of time to the present – that the executing officers could not reasonably have presumed the warrant to be valid. As discussed in detail below, each of these circumstances provides an independent basis for suppressing the evidence seized from Amerindo U.S.

### A. Suppression Is Required Because Agent Fraterrigo Intentionally Or Recklessly Misled The Magistrate Judge To Obtain The Amerindo US Warrant

It is well-settled that, where an affiant obtains a warrant through intentional or reckless material misrepresentations or omissions, suppression is required. More specifically, where a defendant demonstrates that the affiant intentionally or with reckless disregard for the truth

---

[3] Prior to the Amerindo U.S. search and until August 2006, Agent Fraterrigo was a United States Postal Inspector and went by the title "Inspector Fraterrigo."

included false statements or omissions in the supporting affidavit, and these false statements or

omissions were necessary to the finding of probable cause, "the search warrant *must* be voided

and the fruits of the search excluded to the same extent as if probable cause was lacking on the

face of the affidavit." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978) (emphasis added). For

the reasons stated below, Defendants in this case have clearly satisfied this standard.

      1. <u>The Warrant Application Contained Numerous Intentional Misstatements And
Omissions Concerning The Mayer Family</u>.

In the entire Amerindo U.S. warrant application, there is only one paragraph pertaining to

the Mayer family. In this paragraph, Agent Fraterrigo asserts that, beginning in or about 1987,

the Mayer family invested millions of dollars in "guaranteed fixed rate deposit accounts" or

"GFRDAs." Gov. Ex. 33 at ¶ 6.A. Agent Fraterrigo goes on to allege:

> "In or about 2003, when the Mayers attempted to redeem
> approximately $12 million invested in GFRDAs, Amerindo, Vilar,
> Tanaka, and Tanaka's wife . . . all rebuffed their efforts, and
> refused to release the funds. [Lisa] Mayer described years of
> begging Vilar to release some of their investment to pay for the
> care of her sick father – who Vilar had known for some 30 years,
> and who was one of Vilar's original investors – and Vilar's
> rejection of those requests. Mayer told me that Vilar and
> Amerindo were holding the family's money hostage, had
> threatened to create tax problems for the Mayers were they to fight
> him, and was dribbling out to them as little money from their
> multi-million dollar investment as possible."

*Id*. Based in significant part on these allegations, Agent Fraterrigo alleges that "[t]he totality of

the circumstances in this case . . . all suggest that there is reason to be concerned that other

investors are likewise being victimized by Vilar and Tanaka." *Id*. at ¶ 6.F.

In making the above representations, Agent Fraterrigo knowingly and intentionally

omitted several critical facts from the warrant application – facts which, had they been known to

Magistrate Judge Maas, would have made clear that there was no probable cause to believe

Mayers had been "victimized" by Defendants, let alone to seize every document relating to every investor and investment type from the beginning of time to the present. ***First***, it is undisputed that Agent Fraterrigo knowingly omitted from the warrant application the fact that, since their initial investment 1988 and until at least 2002, the Mayers received substantial and consistent payments from Amerindo.[4] This includes monthly interest payments on the Mayers' GFRDA investments of up to $200,549.78, as well as redemptions on their investments totaling in excess of $8 million. *See* Def. Franks Exs. P, Q, R, S, T, U, V, X, AA, AB, AC, AD, AF. These multi-million dollar payments were clearly evidenced in the documents received and reviewed by Agent Fraterrigo prior to her submitting the warrant application. To make matters worse, Agent Fraterrigo repeatedly testified that she was aware of these millions of dollars in payments at the time of the warrant application, yet knowingly withheld this information from Magistrate Judge Maas. *See* Margolis Decl., Ex. H at 76-102.

For example, Agent Fraterrigo testified as follows:

> Q: Agent Fraterrigo, you knew that the Mayers had received substantial payments from Amerindo during the time period of 1988 through – at least through 2003, correct?
>
> A: I recall from what the Mayers told me it was up until 2002.
>
> Q: In fact, in your interview with the Mayers, Lisa Mayer told you that she received regular payments in the late '80s and the 90's, correct?
>
> A: That's correct. That was involving their interest payments.
>
> Q: But you didn't tell Judge Maas that in the '80s and the '90s the Mayers received regular payments, did you?

---

[4] Defendants are not conceding that the payments to the Mayer family and to Lily Cates as described in this memorandum are the only payments made to these clients by Amerindo. To the contrary, Defendants maintain that both of the alleged victims received payments above and beyond those that are described herein. For the purposes of the Pending Motions, however, Defendants have focused on those payments that the Government clearly knew about prior to submitting the Amerindo U.S. search warrant application.

A:  No, I did not.

*Id*. at 76-77.

Agent Fraterrigo went on to testify:

> Q:  Did you know either at the time or any time before you swore out the search warrant affidavit on May 25, 2005, that in the '88 to '97 time period the Mayers received funds from Amerindo for redemptions or interest of at least $6 million?
>
> A:  Yes.
>
> Q:  You knew that.  And you didn't tell Judge Maas?
>
> A:  No.
>
> Q:  But you did tell Judge Maas that you thought there was probable cause to believe that you should have a right to search that '88 to '97 time period throughout all of Amerindo U.S.?
>
> . . .
>
> A:  Yes.

*Id*. at 88.

Agent Fraterrigo further testified:

> Q:  ". . . Agent Fraterrigo, each of these documents, AA, AB, AC, AD and AF, list redemptions or interest payments and result in cash paid by Amerindo to the Mayers during the '98 to 2000 time period, correct?
>
> A:  That is correct.
>
> . . .
>
> Q:  In fact, just by way of example, AC reflects a $1.7 million redemption, correct?
>
> A:  That's correct.
>
> Q:  And AD reflects a $2.35 million redemption, correct?
>
> A:  That's correct.
>
> Q:  $2.35 million that was sent from Amerindo to the Mayers bank, correct?
>
> A:  That's correct.
>
> Q:  And as to all the redemptions and interest payments and payments reflected in AA through AD and AF, you did not tell

> Judge Maas about any of those payments, redemptions or interest
> payments, correct?
>
> A:  That's correct.

*Id*. at 97-98.

Indeed, the significant payments received by the Mayer family over the years prompted

them to send Defendants a letter in 1997 stating: "Alberto and Gary, we are certainly most

appreciative and grateful for your years of fine work and excellent results."  Def. Franks Ex. AT.

As with all of the Mayers' positive experiences with Amerindo, however, while Agent Fraterrigo

was aware of this letter and its contents, she did not tell Magistrate Judge Maas that, in the tenth

year of their relationship, the Mayers were so pleased with Amerindo's performance.  *See*

Margolis Decl., Ex. H at 105, 110.

*Second*, at the time she swore out the Affidavit, Agent Fraterrigo knew that, since their

initial investment of $700,000 in or about 1988, the Mayer family continued to increase their

investment with Amerindo, including investing over $3.5 million in 1998 and over $1.5 million

in 2000.  *See* Def. Franks Exs. AJ, AK, AL, AM, AN, AQ, AR and AS.  Indeed, Agent

Fraterrigo was aware that, as recently as January 2001 – thirteen years after their initial

investment – the Mayers were so pleased with the services provided by Amerindo that they

decided to re-invest their funds, totaling approximately $11 million, in a three-year GFRDA.  *See*

Margolis Decl., Ex. H at 105; Ex. J.  Yet, despite requesting a warrant that covered at least

seventeen years, Agent Fraterrigo hid from Magistrate Judge Maas this telling evidence of client

satisfaction and appreciation over at least the first thirteen of those years.

*Third*, contrary to her suggestion in the Affidavit, Agent Fraterrigo knew that it was the

Mayers' 2001 GFRDA investment – and not the 1988 investment referenced in the warrant

application – that the Mayers allegedly had issues redeeming in 2003.  *See* Margolis Decl., Ex. H

at 73-75; Gov. Ex. 33 at ¶ 6.A.  More specifically, although the Affidavit alleges that the Mayer family "invested millions of dollars with Vilar and Amerindo beginning in or about 1987" only to have troubles redeeming in 2003, Agent Fraterrigo knew prior to obtaining the warrant that the Mayers' initial investment, which was for $700,000, was for a two-year duration.  In other words, this initial investment matured in 1990 – over a decade before the Mayers' allegedly had issues redeeming.  *See* Margolis Decl., Exs. H at 10, 101-02; Ex. N.

*Fourth*, Agent Fraterrigo knowingly misled the Magistrate Judge when she represented that, beginning in 2003, Amerindo was "dribbling out" as little money to the Mayers as possible. Gov. Ex. 33 at ¶ 6.A.  To the contrary, at the time she submitted the warrant application, Agent Fraterrigo knew that the Mayers received substantial payments from Amerindo in the two years prior to the search, including payments throughout 2003 of $50,000 each and payments in 2004 totaling at least $600,000.  *See* Margolis Decl., Ex. H at 17-19, 110-11.  Remarkably, Agent Fraterrigo offered no explanation for representing to Magistrate Judge Maas that money was "dribbling out" when she knew the so-called "dribbles" came in $50,000 monthly payments.

*Fifth*, Agent Fraterrigo knowingly lied to Magistrate Judge Maas when she represented that all of the Mayers' efforts to redeem their GFRDA investment beginning in 2003 were "rebuffed."  In reality, Agent Fraterrigo knew that Amerindo – and, in particular, Mr. Tanaka – was attempting to resolve the issue with the Mayers, ***even proposing a payment plan pursuant to which the Mayers' full investment would be redeemed***.[5]  *See* Margolis Decl., Ex. H at 19, 145-46; Def. Franks Ex. AY.  Not only was this critical information intentionally withheld from Magistrate Judge Maas, but in fact the warrant application was intentionally crafted to give the

---

[5] Pursuant to this payment plan, the Mayers were scheduled to receive $2.5 million at the end of the 2005 calendar year.

-12-

opposite and false impression – i.e., that Amerindo and Defendants were entirely non-responsive

to the Mayers' requests.  In other words, Agent Fraterrigo, in her zest to get approval for an

incredibly broad warrant, knowingly changed a workout negotiation with clients who had been

successful for over fourteen years into alleged theft.  After the *Franks* hearing, the truth is out.

    2.   The Warrant Application Contained Numerous Intentional Omissions
          Concerning Lily Cates.

    Agent Fraterrigo's representations in the warrant application as to Lily Cates were

similarly misleading.  In the Affidavit, Agent Fraterrigo asserts that, in or about 1988, Lily Cates

invested $1 million with Amerindo in an entity called Rhodes Capital.  Fraterrigo goes on to

allege that:

> "Although her account statements, which she received up until
> approximately 2002, reflected growth in the Rhodes investment,
> the investment was never described to her, she never has received a
> private placement memorandum, nor has she signed a subscription
> agreement for Rhodes, and her efforts to learn more about the
> investment were ignored or rejected by Vilar.  In approximately
> February 2005, Cates attempted to redeem her entire investment
> portfolio at Amerindo, including her SBIC investment described in
> the Vilar Criminal Complaint, Rhodes, and any other investment
> with Amerindo, but Amerindo and Vilar have refused to move her
> investment portfolio to [Bear Stearns] as requested."

Gov. Ex. 33 at ¶ 6.B.  The clear intended negative implication of Agent Fraterrigo's

representations in the warrant application is that, although account statements provided to Cates

between 1988 and 2002 "reflected" growth in her investment with Amerindo, Cates never

actually received any benefit from her investment.

    In making the above representations, Agent Fraterrigo misrepresented and/or withheld

from Magistrate Judge Maas critical information – information that Agent Fraterrigo conceded

she knew and that directly contradicts the intended negative impression left by the warrant

application.   More specifically, contrary to the suggestion in the warrant application that Cates

-13-

received no benefits from her Amerindo investment between 1988 and 2002, Fraterrigo knew

that Lily Cates in fact received millions of dollars in payments from Amerindo during this

period.  In particular, although Cates' initial investment in 1987 was for $1.2 million, Agent

Fraterrigo was aware that Cates had been paid over $3 million between 1990 and 2000.[6]  *See*

Def. Franks Ex. N; Margolis Decl., Ex. H at 69-73.  Moreover, although the Affidavit makes it

appear as if Cates used her own funds to invest in Rhodes Capital in 1989, Agent Fraterrigo

knew both that (a) the $1 million Cates used to purchase the Rhodes shares was in fact

***additional*** profit from Cates' initial $1.2 million investment with Amerindo, and (b) although

Vilar offered to have the profits wired directly to Cates, Cates herself made the determination to

re-invest the funds with Amerindo.  *See* Def. Franks Exs. B at FR2, D at FR16; Margolis Decl.,

Ex. H at 35-36.  Agent Fraterrigo was also aware that, as recently as 2002, Cates received

payments from Amerindo totaling $316,000.  *See* Def. Franks Ex. H at FR67-68; Margolis Decl.,

Ex. H at 60-63.

　　　　The fact is, Lily Cates clearly and unequivocally told Agent Fraterrigo that "[b]etween

1995 and 2001, she was able to obtain money from her account with AMERINDO" and "[i]t was

not until 2002 to 2004 [that] VILAR and GARY TANAKA were not forthcoming and it was a

challenge for her to get her money."  Def. Franks Ex. D at FR16; Margolis Decl. Ex. H at 48.

Agent Fraterrigo's suggestion in the warrant application that Cates had trouble with Amerindo

prior to 2002, therefore, was nothing less than an intentional (and ultimately successful) attempt

to mislead Magistrate Judge Maas into authorizing an unconstitutionally overbroad warrant.

---

[6] Lily Cates invested an additional $300,000 with Amerindo in August 2000.  *See* Def.
Franks Ex. D at FR15.

3. Agent Fraterrigo's Suggestion That The Above Omissions Were Not "Intentional" Because She Simply "Did Not Think" To Include Them Should Be Rejected.

When called upon to explain how she could omit such critical facts regarding the only two alleged victims specified in the warrant application – particularly where the requested warrant authorized seizure of all business documents without limitation as to time, client or investment type – Agent Fraterrigo repeatedly testified that she "just didn't think" to include this information. *See, e.g.*, Margolis Decl., Ex. H at 36-39, 71, 73, 85-86, 104. For example, at the *Franks* hearing, Agent Fraterrigo testified as follows:

> Q: Didn't you think the fact that Lilly [sic] Cates purchased her Rhodes Capital investment with a million dollars of profit from a previous Amerindo investment was a fact that the magistrate would want to know in assessing the search warrant application?
>
> A: I didn't think of it at the time. I didn't put it in. I didn't think of it at the time.
>
> Q: Would your answer as to all of the redemptions and all of the profits and all of the interest of Lilly [sic] Cates that she received over her 18-year history with Amerindo be the same, i.e., you never thought about it?
>
> A: That's correct.
>
> Q: And all of the money received from the Mayers – by the Mayers from Amerindo, all of the redemptions, all of the profits, you never thought about it?
>
> A: No, I didn't put it in. I put in what was facts that they did not receive their money.
>
> Q: And you knew when you swore out the search warrant affidavit you were requesting permission to search for documents, not just 2002 or 2003, but all the way back to 1987?
>
> A: That's correct.
>
> ….
>
> Q: You didn't think about whether it would be relevant to Judge Maas.

> A:  No, I just didn't think of it.  I didn't think whether it was
> relevant or it was not relevant, I just didn't think of it.

*Id*. at  36-37.

Agent Fraterrigo's testimony that she "did not think" to include the omitted facts in no way immunizes these omissions from being deemed intentional or reckless under *Franks*.  As an initial matter, Agent Fraterrigo's assertion that it "did not occur to [her]" to include the omitted information in the warrant application is simply not credible.  Agent Fraterrigo knew that – based on an application that identified only two alleged victims and the 2002 through 2005 time frame – she was asking the Magistrate Judge to authorize a warrant that called for the seizure of every single business-related document on the premises, without regard to when that document was created or to which client or investment it pertained.  Under such circumstances, Agent Fraterrigo's claim that she "just didn't think" whether the Magistrate Judge would want to know the full investment history of the only two alleged victims specified in the warrant application defies logic and should not be credited.

In any event, even suspending common sense and accepting Agent Fraterrigo's fanciful assertion as truthful, the fact that it may not have occurred to her to include the omitted information in the Amerindo U.S. warrant application is irrelevant to the determination of whether these omissions were reckless for the purposes of *Franks*.  Omissions are "reckless" where the affiant "withholds a fact in [her] ken that any reasonable person would have known [ ] was the kind of thing the judge would wish to know."  *United States v. Harding*, 273 F. Supp. 2d 411, 426 (S.D.N.Y. 2003) (internal quotations and citation omitted) (brackets in original).  Moreover, where the omitted information was "clearly critical" to the probable cause determination, recklessness may be inferred.  *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996); *Rivera v. United States*, 928 F.2d 592, 604 (1991).

-16-

Here, it cannot seriously be disputed that Magistrate Judge Maas would have wanted to know the full investment histories of the only two alleged victims in the warrant application prior to authorizing a warrant that called for seizure of nearly every business-related document on the premises. Indeed, not only was the omitted information "the kind of thing the [issuing] judge would wish to know," *see Harding*, 273 F. Supp. 2d at 426, but also this information – including the facts that both of the alleged victims received millions of dollars from Amerindo between 1989 and 2002, and that at least one of the two alleged victims continued to receive substantial payments between 2003 and 2005 (during which time the alleged victim and Amerindo were in the process of negotiating a workout pursuant to which the alleged victim would be fully redeemed) – was "clearly critical" to the determination of whether probable cause existed for such a sweeping warrant, such that an inference of recklessness is appropriate. *Reilly*, 76 F.3d at 1280; *see also infra* at 18-22 (discussing the materiality of Agent Fraterrigo's omissions and misrepresentations). Accordingly, given the critical nature of the omitted information, as well as the fact that Agent Fraterrigo's knowledge of this information is undisputed, her failure to include these facts in the warrant application was at the very least reckless, if not intentional.

The same holds true to the extent that Agent Fraterrigo misled Magistrate Judge Maas through affirmative misrepresentations (for example, Agent Fraterrigo's allegations in the warrant application that the Mayers' efforts to get money from Amerindo were entirely "rebuffed" and that Amerindo was "dribbling out as little money as possible"). *See supra*, pp. 12-13. It is well-settled that misrepresentations are reckless for the purposes of *Franks* where the allegations "failed to take account of the facts as [the affiant] knew them," or where there was obvious reason to doubt the veracity of the allegations. *United States v. Rivera*, 728 F. Supp. 250, 258 (S.D.N.Y. 1990) ("If [the affiant] made statements which failed to take account of the

facts as he knew them, or which he seriously doubted were true, that would show reckless

disregard for the truth."), *vacated on other grounds*; *see also United States v. Perez*, 247 F. Supp.

2d 459, 473 (S.D.N.Y. 2003) ("Because states of mind must be proved circumstantially, a fact

finder may infer reckless disregard from circumstances evincing obvious reasons to doubt the

veracity of the allegations.") (citation omitted).    Here, Agent Fraterrigo knew that the Mayers in

fact received substantial payments from Amerindo in 2003 and 2004, and that Amerindo had

offered to institute a plan pursuant to which the Mayers would be *fully redeemed*.  *See supra*, pp.

12-13.  Accordingly, the representations in the warrant application that the Mayers' redemption

efforts were snubbed and that they received little if any money from Amerindo post-2002 "failed

to account for the facts as [Agent Fraterrigo] knew them" and therefore were at the very least

reckless.

####        4.   Agent Fraterrigo's Misrepresentations And Omissions Were Material.

Agent Fraterrigo's intentional misrepresentations and omissions from the warrant

application were clearly material to Magistrate Judge Maas' determination that there was

probable cause for the Amerindo U.S. warrant.  Misrepresentations or omissions are "material"

where, after having corrected the warrant application to account for the alleged misstatements or

omissions, the application fails to support probable cause.  *See Franks*, 438 U.S. at 155

(suppression required when, "with the affidavit's false material set to one side, the affidavit's

remaining content is insufficient to establish probable cause"); *United States v. Canfield*, 212

F.3d 713, 718 (2d Cir. 2000) ("The ultimate inquiry is whether, after putting aside erroneous

information and material omissions, there remains a residue of independent and lawful

information sufficient to support probable cause.").  Once the Amerindo U.S. warrant application

is corrected to account for the misrepresentations and omissions described above, it becomes

abundantly clear that there was absolutely no probable cause for such a broad, all-encompassing warrant.

> a)  A Truthful Warrant Application Provides No Basis Whatsoever For Seizing Any Documents Related To The Pre-2002 Time Period.

Once the warrant application is corrected, it is entirely devoid of any allegations that would even suggest a basis for seizing ***any*** document created prior to 2002, regardless of the particular client or investment to which the documents pertain.   The omitted information confirms that, from the beginning of their respective relationships with Amerindo until at least 2002, the alleged "victims" received consistent and significant payments from Amerindo totaling over of $11 million, continued to invest significant sums of money with Amerindo (including the Mayers' re-investment of over $11 million in 2001), and in general expressed their satisfaction with the services and returns provided by Amerindo.  *See supra*, pp. 8-12, 13-14.

Although at the *Franks* hearing, Agent Fraterrigo testified that the Mayer family had "trouble" redeeming their GFRDA investment in 1997, *see* Margolis Decl., Ex. H at 11-12, this assertion is a red herring and only further calls into question Agent Fraterrigo's credibility.  As an initial matter, the Government did not include allegations relating to these supposed problems in the warrant application and therefore cannot now rely on them as evidence of probable cause. In any event, even if considered, these allegations are specious at best.  Prior to submitting the warrant application, as well as at the time she testified, Agent Fraterrigo knew that the supposed "problems" encountered by the Mayers in 1997 were directly due to the fact that the Mayers were attempting to redeem their GFRDA investment prematurely – i.e., before they had the right to redeem.  *See* Margolis Decl., Ex. H at 92-93; Def. Franks Ex. F at FR35.  Significantly, although the Mayers did not yet have a right to redeem their GFRDA investment, Agent Fraterrigo knew that the Mayers ***were*** able to redeem their ATGF investment in 1997, pursuant

to which they received over $4.6 million from Amerindo.[7]  *See* Margolis Decl., Ex. H at 83-85; Def. Franks Ex. X.

>    b) <u>With The Possible Exception of Documents Pertaining To Lily Cates' SBIC Investment, A Truthful Warrant Application Fails To Establish Probable Cause To Seize Any Documents Related To The Period Between 2002 And The Date Of The Search</u>.

Once the warrant application is corrected to account for Agent Fraterrigo's omissions and misstatements, it further becomes clear that, ***even after 2002***, the allegations in the warrant application do not support probable cause to seize documents relating to ***any*** Amerindo client or ***any*** Amerindo investment, other than possibly Lily Cates and her SBIC investment.  In addition to revealing years of consistent and significant payments to and investments by the Mayer family through 2002, the omitted information demonstrates that, even after 2002, Amerindo continued to make substantial payments to the Mayers, including at least $600,000 in 2004.  Indeed, it is undisputed that Amerindo – and, in particular, Mr. Tanaka – was attempting to negotiate a workout pursuant to which the Mayers' full investment would be redeemed over time.  *See* Margolis Decl., Ex. H at 19, 145-46; Def. Franks Ex. AY.  Once these critical facts are accounted for, it is entirely unclear precisely what criminal conduct the Government could even attempt to allege that Defendants engaged in with respect to the Mayer family – whether prior to or after 2002.  What is clear, however, is that the corrected warrant application completely fails to establish probable cause to seize documents relating to the Mayers, let alone to believe that "other investors are likewise being victimized" by Defendants.  Gov. Ex. 33 at ¶ 6.F.

---

[7] For the same reason, the Court should disregard Agent Fraterrigo's testimony as to alleged difficulties the Mayers had when the attempted to redeem their GFRDA investment  in 2002.  *See* Margolis Decl., Ex. H at 13-14.  Again, Agent Fraterrigo knew that the alleged "problems" suffered by the Mayers were because the investment had not yet matured.  *Id*. at 75.

Similarly, once the warrant application is corrected to reflect the truth about Lily Cates' $1 million investment in Rhodes Capital – including the fact that this investment was made with profits from Cates' earlier Amerindo investment and that, over the course of the following thirteen years, Cates received at least $3 million from Amerindo (*see supra*, pp. 13-14) – the only remaining allegations in the warrant application pertaining to Cates concern her June 2002 investment in SBIC.[8] Although the Affidavit suggests Cates may have had issues redeeming additional unspecified investments in February 2005, *see* Gov. Ex. 33 at ¶ 6.B., not only is this allegation too vague to support probable cause, but also the Government was aware at the time of the warrant application that in fact Cates was able to recover funds invested with Amerindo, totaling over $3 million.  *See* Def. Franks Ex. AZ at ES1000008.

c)  <u>At Most, The Corrected Warrant Application Supports Seizing Documents Relating To One Investment By One Investor</u>.

As discussed above, even under the most generous interpretation, once the warrant application is corrected to account for Agent Fraterrigo's intentional and reckless misrepresentations and omissions, the warrant application ***at most*** supports probable cause to seize documents relating to only one investor and investment type:  Lily Cates' 2002 SBIC investment.  Indeed, even if the Government somehow attempts to extrapolate from these bare-bones allegations – for example, by urging the Court to find probable cause with respect to other alleged SBIC investors – it cannot seriously be disputed that allegations with respect to a single investment by a single client are insufficient to support probable cause to seize documents

---

[8] Although the Affidavit also alleges that Cates' 1988 Rhodes investment "was never described to [Cates], she never has received a private placement memorandum, nor has she signed a subscription agreement," Gov. Ex. 33 at ¶ 6.B., the documents possessed by the Government prior to submitting the warrant application call these allegations into serious question.  *See* Def. Franks Ex. J; Margolis Decl., Ex. K.  In any event, the Government has conceded that these allegations, even if proved, do not constitute criminal behavior and therefore cannot in themselves support probable cause.  *See* Margolis Decl., Ex. G at 5-8.

relating to *all* clients or *all* investments over the entire twenty year history of the company, as was called for by the Amerindo U.S. warrant. Accordingly, because the corrected warrant application fails to support probable cause for the broad, all-inclusive warrant sought and obtained by the Government in this case, Agent Fraterrigo's misrepresentations and omissions must be deemed material.

### B. AGENT FRATERRIGO SUBMITTED THE AMERINDO U.S. WARRANT APPLICATION DESPITE HER KNOWLEDGE AND BELIEF THAT THERE WAS NO PROBABLE CAUSE TO SUPPORT THE WARRANT

#### 1. Agent Fraterrigo Misled The Magistrate Judge About The Existence Of Probable Cause.

The Second Circuit has made clear that the law does not tolerate law enforcement's failure to be "frank with the magistrate in proceedings to obtain [a] warrant – proceedings that are typically *ex parte*." *Reilly*, 76 F.3d at 1273. Specifically, the Court stressed: "[T]he good faith exception requires a *sincerely held* and objectively reasonable belief that the warrant is based on a valid application of the law to *all* known the facts." *Id* (emphasis added). In the instant case, however, *by her own admission*, Agent Fraterrigo had no "sincerely held" belief in the Amerindo U.S. warrant's validity. Throughout her testimony at the suppression hearing, Agent Fraterrigo repeatedly admitted to lying in the warrant application about the single most critical issue facing Magistrate Judge Maas: whether there was probable cause to seize the items called for by the warrant. These repeated admissions are further evidence of Agent Fraterrigo's bad faith and provide an additional reason why suppression of Amerindo U.S. warrant is required.

In the warrant application, Agent Fraterrigo unequivocally represented that there was probable cause to seize all of the items called for by the Amerindo U.S. warrant. *See* Gov. Ex.

33 at ¶ 5 ("Based on the facts set forth in this affidavit…there is probable cause to believe that there are presently concealed in the Premises, evidence and instrumentalities of violations of Federal law…consist[ing] of the items set forth in Schedule A."), ¶ 9 ("There is probable cause to believe that the following records and instrumentalities of the fraudulent schemes described above" – i.e., the records and instrumentalities listed in the warrant rider – "are located at the Premises.").  At the time she submitted the warrant application, however, Agent Fraterrigo knew that – contrary to her representations in the Affidavit – there in fact was ***no*** probable cause to seize large categories of documents called for by the Amerindo U.S. warrant.

Specifically, with the exception of documents relating to the five individuals and three investment types specifically identified in the Affidavit,[9] Agent Fraterrigo admitted that even ***she*** did not believe that there was probable cause in the warrant application to seize documents relating to any other clients or investments of Amerindo, including but not limited to client files, marketing materials, investment advisory agreements, correspondence sent to or received from clients, brokerage account documents (with the exception of documents relating to the accounts specifically noted in the affidavit), documents relating to securities transactions entered into by Amerindo on behalf of clients, records of expenses (such as copies of checks and/or wires sent to landlords, utility companies, counsel, or other organizations that provided goods or services to Amerindo) and documents reflecting communications with boards of directors.  *See* Margolis Decl., Ex. D at 30-34, 38, 49 and 52.

---

[9] In addition to the Lily Cates and the Mayer family, the Affidavit references three other individuals who Cates "believed to be investors with Amerindo, some of whom may have had trouble redeeming all or part of their investments."  Gov. Ex. 33 at ¶ 6.E.

Moreover, at the time she sought the warrant, Agent Fraterrigo **knew** there was no probable cause in the warrant application to support seizing these documents. For example, Agent Fraterrigo testified as follows:

> The Court: The question is, is it a fact that you knew you didn't have probable cause to get every client list at the time you went and got the warrant?
>
> Mr. Hoffman: Correct.
>
> The Witness: That's correct.
>
> Q: That's correct?
>
> A: Mm-hm.
>
> Q: It would be the same for all the other things that we asked you, the other categories, not just client lists, but we went through many categories, correct?
>
> A: That's correct.

*See* Margolis Decl., Ex. D at 94.

In fact, not only did Agent Fraterrigo admit that she knew there was no probable cause in the warrant application to seize large groups of items, but also she conceded that there was ***no probable cause whatsoever*** – whether included in the warrant application or otherwise – to seize certain items called for by the warrant, including client lists reflecting Amerindo U.S.'s current or former institutional clients, and items sent to or received from these clients, such as investment brochures, marketing materials, investment advisory agreements and general correspondence. *See* Margolis Decl., Ex. C at 149-56.

> 2. <u>Agent Fraterrigo's Attempt To Write Off Her Own Testimony Is Incredible And Provides Further Reason To Question Her Good Faith</u>.

During re-direct examination, Agent Fraterrigo attempted to backtrack on her testimony that there was no probable cause to seize countless documents called for by the Amerindo U.S. warrant. In her revised testimony, Inspector Fraterrigo asserted that there in fact ***was*** probable

cause in the Affidavit to seize all of the items called for by the warrant – a warrant which, according to Inspector Fraterrigo's own testimony, called for seizure of nearly every business-related document at Amerindo U.S.  In particular, Agent Fraterrigo maintained that, although the warrant application named only two alleged "victims," the allegations relating to these two individuals gave "probable cause" and "reason to believe" that other investors has similarly been defrauded by Defendants.  *See* Margolis Decl., Ex. E at 99, 104, 107, 121.  When asked why she had repeatedly testified that there was no probable cause only to reverse course and claim there was, Agent Fraterrigo testified that her prior answers had been the result of "confusion" and that she had misinterpreted questions as asking whether particular clients or investments were specifically identified in the warrant application, not whether the application set forth probable cause to seize documents relating to these clients or investments.  *See* Margolis Decl., Ex. E at 95, 97, 102-03, 107.

Agent Fraterrigo's revised testimony is simply not credible and only further demonstrates her lack of good faith.[10]  As an initial matter, as she herself admitted, Agent Fraterrigo revised her testimony only after a private meeting during which the Assistant United States Attorneys raised the very explanation subsequently offered by Agent Fraterrigo for the change in her position.  *Id*. at 95, 97, 99.  Moreover, Agent Fraterrigo's claim that the questions asked of her during cross-examination were "confusing" in the manner she described is simply not believable. The questions asked of Agent Fraterrigo were clear and straightforward, and were posed by both defense counsel as well as the Court itself.  Finally, Agent Fraterrigo's newfound explanation as to ***why*** there was probable cause to seize documents relating to every single client or investment

---

[10] *See generally* Defendant Gary Tanaka's Memorandum in Support of Motion for Franks Hearing, pp. 27-31.

of Amerindo from the beginning of time is itself flatly contradicted both by the Affidavit and

Agent Fraterrigo's own testimony, both of which support that regardless of whether there was

probable cause with respect to the individuals named in the warrant application, at most there

was "reason to believe" or "reason to be concerned" that other investors had been victimized.

*See* Margolis Decl., Ex. D at 18 (acknowledging that there is a significant difference between the

"higher" standard of probable cause and "reason to be concerned"); Ex. E at 97 (although she

had probable cause to believe certain particular clients were being defrauded, she had only

"reason to believe" that other victims existed), 105-06 ("probable cause" pertained to the

investors she specifically named in particular in the affidavit, though she had "reason to believe"

there could be other investors who were victims).  For all these reasons, any claim of post-facto

"confusion" by Agent Fraterrigo should be rejected.

In sum, Agent Fraterrigo's repeated admissions that she knowingly misled Magistrate

Judge Maas about the very issue he was charged with deciding – namely, whether there was

probable cause to support the Amerindo U.S. warrant – further demonstrates her bad faith and

provides an additional basis for suppressing evidence seized pursuant to the Amerindo U.S.

warrant.

### C. SUPPRESSION IS REQUIRED BECAUSE THE WARRANT AFFIDAVIT WAS SO DEVOID OF PROBABLE CAUSE THAT NO REASONABLE OFFICER COULD HAVE EXECUTED IT IN GOOD FAITH

Suppression is also required in this case because, even without correcting for Agent

Fraterrigo's intentional misrepresentations and omissions, the Affidavit is devoid of facts to

support probable cause for the Amerindo U.S. warrant.  *Leon* makes clear that, where the warrant

is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its

existence entirely unreasonable," suppression is appropriate.  468 U.S. at 923 (internal quotations

and citation omitted).  Although an executing officer is not required to perform his own probable

cause analysis and refuse to execute the warrant each time the officer's conclusion differs from

that of the issuing judge, *Leon* does require an executing officer to read the warrant and

supporting documentation, and, should the supporting documents clearly fail to support the

warrant (i.e., should belief in the existence of probable cause be objectively unreasonable),

decline to execute the warrant.

Applying the above standards, it is clear that, given the sparse allegations contained in the

Affidavit, no reasonable officer could have concluded that execution of the Amerindo U.S.

warrant was appropriate.  It is difficult to conceive of a greater disparity between warrant and

affidavit than that which is presented here.  Whereas the language of the Amerindo US warrant is

all-encompassing – by the Government's own witnesses' admissions, it permits seizure of nearly

every single Amerindo-related document on the premises, without limitation as to time, client or

investment type – the allegations in the Affidavit are remarkably narrow.  The Affidavit names

only two individual investors as alleged victims – Lily Cates and Lisa Mayer.[11]  Moreover,

according to the allegations in the Affidavit, these two individuals, who had approximately $17

million total invested with Amerindo,[12] were involved with only three specific types of

investments: an entity called Rhodes Capital, an SBIC investment (alluded to only in passing)

---

[11] The Affidavit also represents that, according to Lily Cates, other investors "***may have had
trouble*** redeeming all or part of their investments," including Brian Harvey, Joy Urich and Paul
Marcus.  Even the Government, however, has acknowledged the highly qualified nature of this
allegation, which in itself does nothing to enhance the allegations against Defendants.  *See* Gov.
Opp. Franks at 25 (allegation concerning the three other investors conveyed "that not only was it
not certain that the three named individuals were, in fact, investors with Amerindo . . . but that it
was also uncertain whether any of them had experienced difficulties in redeeming their
Amerindo investments.").

[12] This stands in stark contrast to the over $1 billion managed by Amerindo U.S. at the time
the search warrant was executed.  *See* Gov. Ex. 33-A at ¶6.

and a "guaranteed fixed rate deposit account" or "GFRDA."  Gov. Ex. 33 at ¶¶ 6.A. and 6.B.

The Affidavit does not name any of Amerindo's many other clients or investments as part of the

alleged "scheme," though it suggests – without any factual support whatsoever – that there may

be "reason to be concerned that other investors are likewise being victimized . . . ."  *Id.* at ¶ 6.F.

    The allegations in the Affidavit are further circumscribed in that they pertain only to a

two-year period, beginning in 2003 and extending to 2005.  Specifically, other than the vague

suggestion that Lily Cates may have had issues with an investment between 1988 and 2002,[13] the

Affidavit does not contain any allegation suggesting that Defendants engaged in misconduct until

2003, when the Mayer family allegedly attempted to redeem their GFRDA investment.  *See id.* at

¶ 6.A.  The Affidavit goes on to allege that, beginning in or about February 2005, Cates also had

difficulties redeeming her investments with Amerindo, including her SBIC investment, which is

referenced in passing but not described.[14]  *See id.* at ¶ 6.B.  Patently, no reasonable officer could

have concluded that an affidavit discussing only two out of scores of clients, only two years out

of the entire history of the firm, and only three out of a litany of investment vehicles, was

---

[13] Specifically, the Affidavit alleges that although account statements received by Cates
between 1988 and 2002 "reflected growth in [her] Rhodes investment, the investment was never
described to her, she never has received a private placement memorandum, nor has she signed a
subscription agreement for Rhodes, and her efforts to learn more about the investment were
ignored or rejected by Vilar."  Gov. Ex. 33 at ¶ 6.B.  As discussed above, this representation was
an deliberate attempt by Agent Fraterrigo to give the false impression that Cates received no
benefit from her Rhodes investment.  *See supra*, pp. 13-14.

[14] Although the criminal complaints against Mr. Vilar and Mr. Tanaka, referenced repeatedly
throughout the Affidavit, contain some additional allegations (in particular, with respect to
Cates' SBIC investment and Mr. Tanaka's alleged use of investor funds to purchase
thoroughbred racehorses), these complaints were not distributed to the officers executing the
search.  *See* Margolis Decl., Ex. I at 78, 128; Ex. C at 50-51.  Indeed, not only did the failure to
distribute the complaints prevent the executing officers from being apprised of the allegations
therein, but it also prevented these officers from fully comprehending the Affidavit.  *See*
Margolis Decl., Ex. E at 23.

anything other than lacking in probable cause to search all years, all investors and all investment vehicles.

Finally, and perhaps most significantly, Agent Fraterrigo – the lead case agent on the investigation and the individual responsible for briefing the executing offers and otherwise supervising the search – repeatedly testified that there was no probable cause in the Affidavit to seize countless documents called for by the Amerindo U.S. warrant. *See supra*, pp. 22-24; *see also* Defendant Gary Tanaka's Memorandum in Support of Motion for Franks Hearing, pp. 24-31. Given that the affiant herself conceded there is no probable cause set forth in the Affidavit to seize the vast majority of items called for by the Amerindo U.S. warrant, it is difficult to see how the Government could meet its burden of demonstrating that any reasonable officer could have executed the Amerindo U.S. warrant in good faith. Accordingly, suppression is appropriate.

### D.  SUPPRESSION IS APPROPRIATE BECAUSE THE EXECUTING OFFICERS COULD NOT REASONABLY HAVE PRESUMED THE WARRANT TO BE VALID

There is a fourth, independent reason why suppression is justified in this case: It was objectively unreasonable for the executing officers to rely on the face of the Amerindo U.S. warrant. It is well-settled that, "depending on the circumstances of the particular case, a warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923. Here, the sweeping, all-inclusive language of the Amerindo U.S. warrant, as well as the circumstances surrounding the search, make clear that no reasonable officer could have presumed the Amerindo U.S. warrant to be valid.

As discussed repeatedly herein, as well as in Vilar's Memorandum in Support of the Pending Motions (which Mr. Tanaka joins), there can be no serious dispute that the Amerindo

US warrant was so overbroad as to amount to a general warrant. According to the Government's own witnesses, the Amerindo U.S. warrant calls for seizure of nearly every business related item on the premises, regardless of the type of evidence (hard copy document, computer file, fax machine, photographs, etc.) or whether the evidence had any relation whatsoever to the allegations in the warrant application. *See United States v. George*, 975 F.2d 72, 77-78 (2d Cir. 1992) (warrant that calls for seizure of evidence without regard to type of evidence or alleged crime is impermissible general warrant); *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995) (warrant that described nearly every document on the premises with no limitations as to which documents within each category could be seized or how the documents related to specific criminal activity was "indistinguishable from the general warrants repeatedly held by this court to be unconstitutional").

Moreover, the Amerindo U.S. warrant has no restriction as to time frame, a fact that is particularly egregious considering that while Amerindo U.S. had been in existence for nearly two decades, the allegations in the warrant application pertain to (at most) the three years preceding the search. *See, e.g., Kow*, 58 F.3d at 427 (warrant general where the government "did not limit scope of the seizure to a time frame within which the suspected criminal activity took place, even though [the search warrant affidavit] indicates that the alleged criminal activity began relatively late in [the business's] existence"). Such a limitless, unrestricted warrant clearly constitutes an impermissible general warrant.

If the Government has any hope of saving the warrant, therefore, it must demonstrate that the circumstances surrounding the search somehow effected to narrow the scope of the warrant. *See, e.g., United States v. Burke*, 718 F. Supp. 1130, 1144 (S.D.N.Y. 1989). In *Burke*, Judge Mukasey held that, regardless of whether the language of warrants at issue was overbroad, the

-30-

particular circumstances surrounding the execution of the warrants supported a finding of good

faith.  In particular, Judge Mukasey noted that (1) the affiants were present during the searches,

(2) all executing officers were given copies of the supporting affidavits, and, perhaps most

importantly, (3) *the actual search did not extend beyond the limitations set out in the affidavits*.

*See id*. at 1141-46.  Judge Mukasey also noted that Second Circuit case law in 1985, when the

searches at issue took place, left considerable ambiguity as to the requirements of particularity

under the Fourth Amendment, and that "no fewer than three federal court magistrate judges" had

approved the warrants at issue.  *Id*.  Given the totality of these circumstances, Judge Mukasey

concluded that the executing officers "had taken every step that could reasonabl[y] be expected

of them to comply with the Fourth Amendment's requirements."  *Id*. at 1142 (internal quotations

and citation omitted).

   The instant case is clearly distinguishable from *Burke*.  Even if one looks beyond the face

of the Amerindo U.S. warrant to the circumstances surrounding execution of the search, it is

clear that these circumstances did nothing to mitigate the impact of the warrant's sweeping

language.  *First*, although Agent Fraterrigo and her supervisor, Postal Inspector John Feiter, gave

a briefing prior to the search and were available to answer questions at various times during the

search, this did not operate to limit the breadth of the Amerindo U.S. warrant.  Both Agent

Fraterrigo and Inspector Feiter testified that they read the Amerindo U.S. warrant as supporting

seizure of nearly every business-related document on the premises.[15]  *See* Margolis Decl., Ex. I

_____

[15] Although at one point during her testimony, Agent Fraterrigo suggested that she read the
subsequent paragraphs of the warrant as somehow limiting the scope of the all-encompassing
Paragraph 1, nothing in the Amerindo U.S. warrant supports this interpretation.  Indeed, as the
Court itself pointed out, were Agent Fraterrigo's interpretation correct, Paragraph 1 would serve
no purpose whatsoever and might as well have been left out of the warrant.  *See* Margolis Decl.,

at 161-63; Ex. C at 141-42.  Although Agent Fraterrigo testified that, while the broad language

of the warrant permitted seizure of "any business records in Amerindo," she seized only those

documents that she determined were "useful to the investigation," Agent Fraterrigo admitted that

she did not instruct the other executing officers to limit their search in this or any other manner.[16]

*See* Margolis Decl., Ex. D at 117-18; E at 130-38; Ex. F at 203-05.  Moreover, not only did at

least six of the executing officers fail to attend the briefing prior to the search,[17] but also Agent

Fraterrigo was unavailable for the entire morning while the officers were executing the

Amerindo U.S. warrant.  *See* Margolis Decl., Ex. E at 3-6, 16, 20-22.  Under such circumstances,

the fact that the affiant and her supervisor were present at certain points during the search is of

no comfort.

     ***Second***, although the executing officers were provided with copies of the search warrant

Affidavit (though not the complaints, which were repeatedly referenced in the Affidavits as a

source of further information concerning the allegations against Defendants), it is clear that the

Affidavit did not operate to narrow the scope of what was seized.  As an initial matter, because

the Amerindo U.S. warrant does not incorporate the Affidavit, the fact that the Affidavit may

---

Ex. E at 131-35.  In any event, the remaining paragraphs of the Amerindo U.S. warrant are
similarly overbroad.  *See* Vilar Mem. in Support of Pending Motions.

   [16] Agent Fraterrigo's testimony that she employed a two-step process to determine what to
seize – first determining whether the document fell within the scope of the Amerindo U.S.
warrant and then determining whether, in her view, it was "useful to the investigation" – is also
telling in that it acknowledges that the Amerindo U.S. warrant called for documents beyond that
which was even relevant to the ongoing investigation (let alone supported by the warrant
application).

   [17] Despite the fact that these officers failed to attend the morning briefing, they nonetheless
signed the briefing sign-in sheet, pursuant to which they certified (among other things): "[O]n
5/26/05 (date), I attended a briefing relating to the execution of a search warrant, and the possible
execution of supplemental search warrants at 399 Park Ave 22nd Floor NY NY."  Def. Ex. YY.

have been more specific in its content does not in itself operate to cure the overbroad warrant. *See George*, 975 F.2d at 76 ("Resort to an affidavit to remedy a warrant's lack of particularity is only available when it is incorporated by reference in the warrant itself and attached to it."). Moreover, the Government has offered absolutely no evidence that the executing officers actually limited their search based on the specific allegations in the Affidavit and, in fact, the evidence demonstrates otherwise. Whereas the allegations in the Affidavit were incredibly narrow, the executing officers seized mass quantities of documents, including approximately 170 boxes of hard copy documents and the entire Amerindo U.S. computer system (consisting of over 1.6 terabytes of information, roughly the equivalent of 125 million pages).[18] Significantly, the vast majority of this evidence had absolutely no relation to the specific factual allegations in the Affidavit. *See, e.g.*, Margolis Decl., Ex. D at 57-59, 66-78, 104-14; *see also* Vilar Mem. in Support of Pending Motions. Furthermore, the executing officers would have seized even more documents had the Government not believed it would receive the remaining documents at a later date. *See* Margolis Decl., Ex. I at 86, 101; Ex. A at 14. Thus, "[a]s interpreted and executed by the [searching] agents," it is clear that "th[e] warrant became an instrument for conducting a general search."[19] *United States v. Shi Yan Liu*, 239 F.3d 138, 141 (2d Cir. 2000) (quoting *United States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978)) (brackets in original).

---

[18] Notably, although over eighteen months has passed since the Amerindo U.S. search warrant was executed, the Government has yet to return a single electronic file as outside the scope of the search warrant or otherwise improperly seized. *See United States v. Debbi*, 244 F. Supp. 2d 235, 237-38 (S.D.N.Y. 2003) (Government's failure to return documents seized but beyond the scope of the search warrant indicative of bad faith).

[19] Indeed, not only does the vastly overbroad Amerindo U.S. warrant constitute a violation of Defendants' Fourth Amendment rights, but also the Government has used the fruits of this illegal search as a means to compromise Defendants' constitutional and statutory Speedy Trial rights. On at least two occasions, the Government has requested and been granted delays in this case, in part based on the Government's assertion that it needs to time to process the mountains of

*Third*, although there may have been some ambiguity as to the precise requirements of the particularity clause when the searches in *Burke* took place, at the time the Amerindo U.S. search took place – over twenty years later – no such ambiguity existed. Instead, cases like *United States v. George*, 975 F.2d at 77-78, decided after *Burke*, made clear – and any reasonable officer should have known – that the Amerindo U.S. warrant was tantamount to a general warrant and thus should not have been enforced.

In sum, neither the supporting Affidavit nor the other circumstances surrounding the search operated to limit the vastly overbroad warrant in this case. Accordingly, suppression is required.

### E.  THE AMERINDO U.S. WARRANT SHOULD BE SUPPRESSED IN ITS ENTIRETY

    1.  <u>Because The Warrant In Its Entirety Is Flawed, All Of The Fruits Of The Amerindo U.S. Search Must Be Suppressed</u>.

The appropriate remedy in this case is for the Court to suppress all of the evidence seized pursuant to the Amerindo U.S. search warrant. Not only is the Amerindo U.S. warrant, in both content and execution, a "general warrant," but also the invalidity permeates the warrant to such an extent that severance is neither possible nor justified. Nearly all of the paragraphs in the warrant purport to authorize seizure of broad categories of documents without any regard to the alleged criminal conduct. For example, in addition to the infamous Paragraph 1 – which purports to authorize seizure of every business-related document on the premises – Paragraph 2 calls for ***all*** documents relating to certain brokerage accounts through which Amerindo conducted its business. Similarly broad are Paragraphs 4 and 5; whereas Paragraph 4 calls for all

---

evidence seized pursuant to the unconstitutionally un-particularized and unsupported Amerindo U.S. warrant. Of course, had the Government sought a reasonably particularized warrant in the first place, or had the Government at the very least returned that which is outside the scope of the Amerindo U.S. warrant, such delays would not have been required.

documents concerning or reflecting the identities of and communications with clients who have

investments in the above-referenced brokerage accounts (including but not limited to client files,

investment brochures, marketing materials, etc.), Paragraph 5 calls for all documents concerning

or reflecting the identities of and communications with clients whose investments with Amerindo

utilize overseas accounts.

And so it goes, with each successive paragraph requesting an equally broad array of

documents bearing no relation whatsoever to any alleged crime. *See, e.g.*, Paragraph 10 (all

documents reflecting or relating to the cancellation of completed trades and rebooking of those

canceled trades in other accounts associated with Amerindo or its principals), Paragraph 12 (all

documents reflecting any brokerage accounts maintained by Amerindo at any broker-dealer),

Paragraph 14 (all documents relating to the running and supervision of Amerindo's business);

Paragraph 15 (all documents reflecting information about any current or former Amerindo

employee or had any contact with or responsibility for any current or former Amerindo client

with any interest whatsoever in the Amerindo Brokerage Accounts); Paragraph 16 (all fax

machines); Paragraph 17 (all computers, servers or other devises or equipment capable of storing

data). *See generally* Vilar Mem. in Support of Pending Motions (discussing how Amerindo U.S.

warrant is unconstitutionally overbroad).  To make matters worse, none of the paragraphs has

any time limitation, a clear indicator of an impermissible general warrant.  Under such

circumstances, full suppression of all of the evidence seized is required.  *See Shi Yan Liu*, 239

F.3d at 140 ("The cornerstone of the blanket suppression doctrine is the enduring aversion of

Anglo American law to so-called general searches."); *United States v. Ninety-Two Thousand*

*Four Hundred Twenty-Two Dollars And Fifty-Seven Cents*, 307 F.3d 137, 159 (3d Cir. 2002)

(where "no portion of the [ ] warrant is limited by reference to dates or criminal

activity…redaction is not only inappropriate, it is wholly unfeasible"); *Kow*, 58 F.3d at 428 ("[I]f no portion of the warrant is sufficiently particularized to pass constitutional muster, then total suppression is required.") (internal quotations and citation omitted).

> 2.   Even If A Portion Of The Warrant Might Be Construed As Valid, Severance Is Not Justified.

Even if one or two of the paragraphs could be construed as valid, severance would not be appropriate.  "When a warrant is severed (or redacted) the constitutionally infirm portion— usually for a lack of particularity or probable cause—is separated from the remainder and evidence seized pursuant to that portion is suppressed; evidence seized under the valid portion may be admitted."  *George*, 975 F.2d at 79; *Ninety-Two Thousand Four Hundred Twenty-Two Dollars And Fifty-Seven Cents*, 307 F.3d at 159 ("[B]y redaction, we mean *striking* from a warrant those severable phrases and clauses that are invalid for lack of probable cause or generality and *preserving* those severable phrases and clauses that satisfy the Fourth amendment.") (emphasis in original) (internal quotations and citation omitted).  Where, however, the portion of the warrant that is sufficiently particularized or supported by probable cause makes up such an "insignificant or tangential" part of the warrant, severance is not available and the entire warrant must be suppressed.  *George*, 975 F.2d at 79-80; *see also United States v. Sells*, 463 F.3d 1148, 1158-59 (10th Cir. 2006) ("Total suppression may still be required even where a part of the warrant is valid (and distinguishable) if the invalid portions so predominate the warrant that the warrant in essence authorizes a 'general, exploratory rummaging in a person's belongings.'") (*quoting Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)); *United States v. Kow*, 58 F.3d 423, 428 (9th Cir. 1995) ("severance is not available when the valid portion of the

warrant is a relatively insignificant part of an otherwise invalid search") (internal quotations and citation omitted); *United States v. Marcus*, 807 F. Supp. 934, 936 (E.D.N.Y. 1992) (same).

Here, even under the most generous interpretation, once the obviously invalid phrases and clauses are stricken from the Amerindo U.S. warrant, only an insignificant portion of the warrant remains. As discussed above, once the Amerindo U.S. warrant application is corrected to account for Agent Fraterrigo's intentional and material misrepresentations and omissions, the application at most supports probable cause to seize documents relating to alleged Lily Cates' 2002 SBIC investment. *See supra*, pp. 18-22. Clearly, documents pertaining to one investor's ***$5 million*** investment in a discrete vehicle in 2002 comprise an infinitesimal portion of a warrant that purports to authorize seizure of nearly all documents relating to all investors and all investment products of an almost twenty year old company that, at the time of the search, managed ***over $1 billion*** in assets. In fact, when the paragraphs of the Amerindo U.S. warrant are examined to discern which are sufficiently particular and supported by probable cause to survive, ***at most*** two out of the eighteen paragraphs – Paragraphs 6 and 7 (which call for, among other things, documents relating to Cates' investments and documents pertaining to Amerindo's efforts to obtain an SBIC license) – ***might*** be able to be salvaged with appropriate redactions. Significantly, while it is possible that other paragraphs of the warrant could be ***redrafted*** to target only those documents that pertain to Cates' 2002 SBIC investment, the law is clear that the severance doctrine permits ***striking only***. The severance doctrine does ***not*** permit the redrafting of paragraphs in the warrant – for example, to add time or criminal activity limitations – so that

these paragraphs are constitutionally valid.[20]  *See, e.g., Ninety-Two Thousand Four Hundred Twenty-Two Dollars And Fifty-Seven Cents*, 307 F.3d at 159.

      3.  <u>Complete Suppression Is Consistent With The Policy Behind The Exclusionary Rule</u>.

Finally, suppression of the entire search is necessary to effect the purposes of the exclusionary rule – namely, to deter unlawful and unreasonable conduct.  *Leon*, 468 U.S. at 918. Indeed, the instant case presents precisely the type of scenario that the exclusionary rule is intended to target: execution of a vastly overbroad, general warrant that was obtained through misleading the Magistrate Judge and that any reasonable officer should have known was both unsupported and invalid.  In fact, it is worse here – the affiant and case agent knew that vast portions of the warrant were unsupported by probable cause.  There can be little doubt that the law (as well as common sense) dictate that no benefit to law enforcement should be obtained by a search conducted by a case agent who, among other things, (a) misled the magistrate judge as to the existence of probable cause, (b) intentionally omitted and misrepresented critical information in the warrant application, and (c) executed the Amerindo U.S. warrant (and instructed others to do so) despite knowing that the search was, in vast majority, illegal and unsupported by probable cause.  Under such circumstances, the proper remedy – and the only way to ensure that such unlawful conduct is deterred in the future – is to suppress all of the fruits of the search. *See Shi Yan Liu*, 239 F.3d at 140 ("<u>The cornerstone of the blanket suppression</u>

---

[20] The same conclusion is reached even if the Court finds that the warrant application set forth probable cause to believe that Defendants engaged in criminal activity with respect to the Mayers' GFRDA investment post-2002.  Although the Government may attempt to argue that Paragraph 8 would also be salvageable (in addition to Paragraphs 6 and 7), Paragraph 8 contains no limitation as to time period or investors, and thus remains impermissibly broad.  In any event, even with Paragraph 8, the valid portions remain so insignificant and the invalid portions so predominant that severance cannot apply. *George*, 975 F.2d at 79-80

doctrine is the enduring aversion of Anglo American law to so-called general searches…Eliminating general searches was the basic impetus for the Fourth Amendment's Warrant Clause….") (emphasis added); *George*, 975 F.2d at 74 ("Because everyone has some kind of secret or other, most people are anxious that their personal privacy be respected. For that very human reason the general warrant, permitting police agents to ransack one's personal belongings, has long been considered abhorrent to fundamental notions of privacy and liberty.") (emphasis added); *Kow*, 58 F.3d at 428 ("[I]f no portion of the warrant is sufficiently particularized to pass constitutional muster, then total suppression is required. Otherwise the abuses of a general search would not be prevented.") (internal quotations and citation omitted) (emphasis added); *Marcus*, 807 F. Supp. at 936 ("[S]everability is not always possible, and should be granted only where the circumstances of the case reveal that legitimate fourth amendment interests will not be jeopardized.") (quoting *United States v. Freeman*, 685 F.2d 942, 952 (5th Cir. 1982)) (emphasis added).

## II. EVIDENCE SEIZED FROM THE UNITED KINGDOM STORAGE FACILITY SHOULD ALSO BE SUPPRESSED

On or about July 25, 2005, the Government submitted to the Central Authority of the United Kingdom a Request for Assistance ("MLAT Request"), in which the Government requested assistance in searching the offices of Amerindo Investment Advisors (U.K.) Ltd. ("Amerindo U.K."). *See* Gov. Ex. 13. Based upon this MLAT Request, as well as other representations contained in the warrant application, on or about October 10, 2005, a British magistrate issued a warrant to search a Cadogan Tate storage facility leased by Amerindo U.K.[21]

---

[21] A second warrant was issued on or about October 14, 2005, to permit the search to continue for a second day. Gov. Ex. 25. This warrant, collectively with the October 10, 2005 warrant, are referred to herein as the "U.K. warrant."

Gov. Ex. 24. Pursuant to the U.K. warrant, three United States Postal Inspectors, assisted by officers from the London Metropolitan Police, entered the locked storage facility and searched through 320 boxes of documents, from which they seized approximately 43 boxes worth of materials. *See* Gov. Exs. 26, 27; *see also* Margolis Decl., Ex. L. Seventeen computers were also seized.[22] Notably, the Government never obtained a warrant or otherwise sought authority from an American court to execute the search.

    1.  <u>The Amerindo U.K. Search Must Be Suppressed Because It Is "Fruit Of The Poisonous Tree".</u>

Because the MLAT Request, which was incorporated into the U.K. warrant application, relied on information obtained through the illegal Amerindo U.S. search, the evidence seized pursuant to the U.K. warrant must be suppressed. It is well-settled that, where a warrant is based in part on information obtained through a prior illegal search, the subsequent warrant must be deemed invalid unless it can be shown that the untainted evidence in the warrant application, standing alone, is sufficient to establish probable cause. *See Laaman v. United States*, 973 F.2d 107, 115 (2d Cir. 1992); *see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (suppression appropriate where, "granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality," rather than "by means sufficiently distinguishable to be purged of the primary taint").

Here, it cannot be disputed that the Amerindo U.S. search was invalid. *See supra*; *see also* Vilar Mem. in Support of Pending Motions. Nor can it be disputed that the U.K. warrant was based at least in part on information obtained from the Amerindo U.S. search. Indeed, the

---

[22] As with the Amerindo U.S. computers, to date not a single electronic file seized from the U.K. storage facility has been returned by the Government as outside the scope of the U.K. warrant.

MLAT Request submitted by the Government and attached to the U.K. warrant application

acknowledges this in no uncertain terms. *See* Gov. Ex. 13 at 5-6; Margolis Decl., Ex. F at 68-69.

Specifically, the MLAT Request states:

> "Based on interviews of current and former Amerindo employees
> and investors, ***as well as documents and files seized from
> Amerindo US's New York offices***, the U.S. law enforcement
> officers have also discovered (1) that numerous Amerindo Panama
> investors invested funds in an investment vehicle called the
> Amerindo Technology Growth Fund, (2) that Amerindo Panama
> deposited these funds into brokerage accounts at [Bear, Stearns &
> Co., Inc.], (3) that Tanaka directed all trading activity relating to
> these brokerage accounts from Amerindo UK's London office, and
> (4) that Renata Tanaka prepared financial statements and
> correspondence relating to the accounts at Amerindo UK's London
> office.

Gov. Ex. 13 at 5-6 (emphasis added). The MLAT Request goes on to allege that "the records

reflect" that Defendants withdrew and/or transferred millions of dollars from the above-

referenced brokerage accounts (presumably with nefarious intent). *Id.* Agent Fraterrigo also

conceded during her testimony that part of the information that formed the basis for the MLAT

was evidence obtained during the Amerindo U.S. search. *See* Margolis Decl., Ex. E at 68-96.

Given the Government's concession that certain allegations in the MLAT Request were based on

documents obtained as a result of the illegal Amerindo U.S., the only remaining question is

whether, in the absence of these allegations, the Amerindo U.K. warrant nonetheless could have

been issued. The answer to this question is clearly no.

As with the Amerindo U.S. warrant, the U.K. warrant was all-encompassing, purportedly

authorizing seizure of nearly every business document on the premises. *See* Gov. Exs. 24 and

25; *see also* Margolis Decl., Ex. E at 52, 71 (acknowledging that U.S. and U.K. warrants are

effectively of the same scope). In stark contrast to the sweeping language of the U.K. warrant,

however, the MLAT Request names only one alleged "victim," Beulah Birrd, whom the

-41-

Government acknowledged not only suffered no losses, but actually **profited** from her investment with Amerindo.[23]  *See* Gov. Ex. 13 at 2-4.  Aside from Ms. Birrd, the MLAT Request alludes to only three other unnamed investors as potential victims.  *Id*. at 4-5.  The four investors referenced in the MLAT Request were purportedly involved in two types of Amerindo investments, GFRDAs and Rhodes Capital, and allegedly lost a total of approximately $15 million.[24]  *Id*.  Although the Government attempts to broaden its allegations by referencing "numerous" other investors who participated in the much larger ATGF investment opportunity,[25] as well as tens of millions of dollars in supposedly suspect withdrawals or transfers, these allegations were derived from the illegal U.S. search and therefore cannot be relied on to support the U.K. warrant.  Although the MLAT Request did not support the all-encompassing U.K. warrant even with these tainted allegations, once these allegations are removed it is abundantly clear that the warrant application contains absolutely no support for such a broad warrant.

    2.   <u>The Remaining Allegations In The MLAT Request, Although Not Derived From The U.S. Search, Were Also Tainted</u>.

Suppression of the U.K. search is also appropriate because the remaining allegations in the MLAT Request, even if they are not the fruit of the unconstitutional Amerindo U.S. search,

---

[23] Of course, the fact that Ms. Birrd suffered no losses this begs the question whether she even qualifies as an alleged victim.

[24] By comparison, at the time the MLAT Request was drafted, the Government was aware that Amerindo U.S. alone managed **over $1 billion** in assets as of July 15, 2004.  Gov. Ex. 33-A at ¶ 6.

[25] In contrast with the broader ATGF investment vehicle, at the time the MLAT Request was drafted, the Government was aware that the GFRDA program was a limited investment option available to only certain clients.  *See* Margolis Decl., Ex. H at 94-95.  The Government was also aware that the Mayers, who were at the center of the U.S. warrant application, received substantial ATGF redemptions during the relevant time period.  See Margolis Decl. H at 81-87, 96-101; Def. Franks Ex. V, X, AD.  Ultimately, documents pertaining to ATGF were seized from Cadogan Tate pursuant to the U.K. warrant.  *See, e.g.*, Gov. Ex. 26.

are nonetheless "tainted" in that these allegations reflect numerous intentional and material misrepresentations and omissions by the Government. Specifically, the Government knew but omitted from the MLAT Request the fact that at least two of the four suggested "victims" – Lily Cates and the Mayer family – received significant and consistent payments from Amerindo until at least 2002. *See surpa*, pp. 8-11, 13-14. The Government was also aware that, between 2003 and 2005, not only did the Mayer family continue to receive significant payments from Amerindo, but also Amerindo was attempting to work out a full redemption of all of the Mayers' investments. *See supra*, pp. 12-13. Again, this information, although known to the Government, was omitted from the MLAT Request.

Perhaps most egregious, however, is the Government's blatantly false representation in the MLAT Request that Lily Cates "lost all of [her] investment funds." Gov. Ex. 13 at 5. Indeed, at the time the Government made this demonstrably false statement, it was well aware that not only had Lily Cates received millions of dollars of profits on an initial investment of $1.2 million, but also, as recently as February 2005, Cates recovered an additional $3 million of her investment funds. *See supra*, pp. 13-14; Def. Franks Ex. AZ at ES1000008. Once the MLAT Request is further corrected to account for these material misrepresentations and omissions, there can be no dispute that the entire U.K. warrant was both unsupported by probable cause and a product of bad faith, and therefore cannot be upheld.[26]

---

[26] Indeed, once the allegations concerning Lily Cates and the Mayer family are corrected, the only allegations that remain pertain to Ms. Birrd, who the Government acknowledges made money on her investment, and an unnamed investor who purportedly invested an unspecified amount of money in Rhodes Capital on an unspecified date. *See* Gov. Ex. 13 at 2-5.

3. <u>The Amerindo U.K. Search Violated Defendants' Fourth Amendment Rights</u>.

Suppression of the U.K. search is also required for the following additional reasons, discussed in detail in Mr. Tanaka's Memorandum of Law in Support of his Motion to Suppress Evidence Seized from the United Kingdom, dated March 9, 2006 ("Tanaka U.K. Mem."), and Mr. Tanaka's Reply Memorandum in Further Support of his Motion to Suppress Evidence Seized from the U.K., dated April 10, 2005 ("Tanaka U.K. Reply Mem.").[27] ***First***, the evidence seized from the U.K. storage facility should be suppressed because it was obtained through an unlawful, warrantless search. More specifically, although the search at Cadogan Tate was conducted at the request of U.S. authorities in connection with a U.S. investigation of U.S. citizens, the Government failed to procure a warrant or other authorization from an American court prior to executing the search. For this reason alone, suppression is appropriate. *See* Tanaka U.K. Mem. at 9-15; Tanaka U.K. Reply Mem. at 10-16.

***Second***, even aside from the failure to procure a U.S. warrant, the U.K. search was unreasonable (and therefore impermissible) under American law. It is well-settled that the Fourth Amendment prohibits general, overbroad searches in which officers indiscriminately rummage through items at the search site. *See, e.g.*, *George*, 975 F.2d at 75. Despite this prohibition against general searches, the U.K. warrant – like its predecessor, the Amerindo U.S. warrant – purported to authorize the seizure of virtually unlimited categories of documents. *See* Gov. Exs. 24 and 25; *see also* Margolis Decl., Ex. E at 52, 71. Moreover, Agent Fraterrigo did not instruct the other federal agents assisting in the U.K. search to limit the documents that they

---

[27] The Court has stated that it does not require any additional briefing on these issues. Accordingly, with respect to the general points articulated below, Defendants primarily rely on the aforementioned memoranda of law previously submitted by Mr. Tanaka on March 9, 2005 and April 10, 2005, respectively.

seized, despite the fact that she knew the warrant's overbroad language was likely to encompass documents that were not "useful" to the investigation.  *See* Margolis Decl., Ex. E at 51-56. Indeed, not only did the U.K. warrant authorize seizure of virtually every business-related document likely to be held by Amerindo U.K. (including all client files, operating documents, marketing materials and correspondence), but also the U.K. warrant (like the Amerindo U.S. warrant) authorized wholesale seizure of all computers, servers or other "equipment capable of storing data or text in any format," without any protocol for searching the electronic data for relevant information.  As discussed in Vilar's Memorandum in Support of the Pending Motions, such a warrant constitutes a blatant violation of Defendants' Fourth Amendment rights.  The vastly overbroad nature of the U.K. warrant provides an independent ground to suppress the U.K. search.

**Third**, the Government's search of the Cadogan Tate storage facility also violated British law in that the U.K. warrant was issued on the basis of a sworn information containing materially false statements.  Twice in the four-page information offered in support of the U.K. warrant, Detective Shaw falsely represented to the British magistrate that the material sought "does not consist of, or include items of legal privilege, excluded material or special procedure material."[28] Gov. Exs. 24 and 25.  In reality, the documents stored at Cadogan Tate *were* likely to contain both legally privileged and special procedure material.  *See* Margolis Decl., Ex. M; Ex. E at 73-76.

Although Detective Shaw attempted to defend his representation in the warrant application that there were no legally privileged or special procedure materials among the items

---

[28] Special procedure materials are materials that are confidential and held according to an express or implied agreement to maintain them in confidence.  *See* Margolis Decl., Ex. M at ¶ 13.

to be seized, the Court should not credit this self-serving testimony.  As an initial matter, by his own admission, Detective Shaw is not a legal expert, such that his opinion is only of limited utility.[29]  *See* Margolis Decl., Ex. B at 311-12.  More significantly, Detective Shaw's testimony that the items called for by the U.K. warrant did not include special procedure or legally privileged materials is contrary to both the weight of the evidence and common sense.

For example, although Detective Shaw testified that the items called for by the warrant did not encompass legally privileged materials, this was not based on any reasonable reading of the U.K. warrant or its supporting documentation, but rather on Detective Shaw's apparent conclusion that because British law does not permit seizure of legally privileged items, the warrant – no matter what its language – could not possibly have called for such documents.  *See* Margolis Decl., Ex. A at 250, 254; Ex. B at 417-18.  In reality, any objectively reasonable reading of the Amerindo U.K. warrant makes clear that privileged items are subsumed within its all-encompassing terms.  Gov. Exs. 24 and 25.

Moreover, Detective Shaw did not have to look any farther than the United States Postal Inspectors assisting him in the search to determine that his representation to the British magistrate was false.  Not only did Agent Fraterrigo, the lead U.S. case agent assisting Detective Shaw in the U.K. search, fully expect that there would be privileged documents among the items to be seized, but also Agent Fraterrigo put a plan in place for the identification and handling of privileged documents seized during the U.K. search.[30]  *See* Margolis Decl., Ex. E at 73-76.

---

[29] Indeed, Detective Shaw is not even authorized to make an application for a search warrant without the approval of an independent supervising police officer.  *See* Margolis Decl., Ex. A at 255.  Notably, the Government has not offered a U.K. legal expert opinion to contradict the expert opinion proffered by Defendants.

[30] That Agent Fraterrigo put a plan in place concerning the treatment of potentially privileged documents seized during the search is not surprising.  Agent Fraterrigo testified that the U.K.

Indeed, during first day of the search, the U.S. federal agents requested materials from the U.K. officers to permit the identification and segregation of potentially privileged materials. *See* Margolis Decl., Ex. C at 115-16. Ultimately, although privileged documents were seized from Cadogan Tate, these documents were not handled in accordance with Agent Fraterrigo's plan, partly because the Metropolitan Police did not have the necessary materials and partly because the Metropolitan Police did not want items separated from their original boxes. *Id.* The notion that Detective Shaw and the other U.K. officers assisting in the search did not know there were likely to be privileged documents among the items seized, therefore, is simply not credible. At the very least, it cannot be disputed that the U.K. officers were well aware of this fact prior to seeking the second (and equally misleading) U.K. warrant on October 14, 2005.

For similar reasons, Detective Shaw's testimony that the U.K. warrant did not call for the seizure of special procedure materials likewise should be rejected. The Government's own witness testified, and Detective Shaw did not dispute, that materials purportedly authorized by the U.K. warrant were likely to include confidential materials such as those that qualify as "special procedure materials" under U.K. law. *See* Margolis Decl., Ex. E at 76; Ex. B at 384-85; *see also* Margolis Decl., Ex. M at ¶ 13. According to Detective Shaw, however, under the circumstances presented here, these documents – although confidential – did not qualify as "special procedure materials" because the London officers were searching "premises controlled by named suspects for material that [these suspects] had used to facilitate their own criminal activity." *See* Margolis Decl., Ex. A at 246.

---

warrant was essentially co-extensive with the Amerindo U.S. warrant, pursuant to which the Government seized hundreds of thousands of potentially privileged documents and electronic files. *See* Margolis Decl., Ex. E at 52, 71.

Once again, Detective Shaw's testimony disregards the clear language of both the U.K. warrant and the MLAT Request based upon which the warrant was issued. A review of these documents clearly reveals that the U.K. warrant calls for seizure of documents pertaining to clients and investments well beyond the scope any allegations of criminality set forth in the MLAT Request. For example, although the U.K. warrant calls for seizure of documents pertaining to Amerindo Investment Advisors (Cayman) Limited ("Amerindo Cayman") – and, in fact, such documents were seized during the U.K. search – there is absolutely no mention of Amerindo Cayman in the MLAT Request. *See* Gov. Exs. 13, 24 and 25; *see also* Margolis Decl., Ex. B at 390-92 (acknowledging that Amerindo Cayman documents were called for by the U.K. warrant). Indeed, even a cursory comparison of the U.K. warrant with the allegations in the MLAT Request make clear that the vast majority of items called for by the U.K. warrant bear little or no relation to the narrow allegations against Defendants set forth in the MLAT Request. *See supra*, pp. 41-42. Accordingly, there was no reason to believe, as Detective Shaw suggests, that items to be seized pursuant to the U.K. warrant had been used to facilitate criminal activity on the part of Defendants so as to remove these items from the realm of "special procedure materials."[31]

Finally, even if the circumstances did not make Detective Shaw's misrepresentation apparent, his failure to consult the United States Postal Inspectors regarding these issues –

---

[31] Given that a significant portion of the items called for under the U.K. warrant were likely to qualify as special procedure materials, Detective Shaw should have followed the procedures set forth in a separate provision of the U.K. Police and Criminal Evidence Act of 1984, referred to as "Schedule 1." *See* Tanaka U.K. Mem. at 18-19.

particularly considering their importance to the U.K. warrant process – was unreasonable and precisely the type of conduct that the exclusionary rule is intended to deter.[32]

**Fourth**, the good faith exception described above cannot save the U.K. search. As an initial matter, this exception does not apply where, as here, the officers who executed the search were not proceeding pursuant to a warrant issued by a U.S. authority. Moreover, the circumstances presented here – including the failure to procure a U.S. warrant, the material misrepresentations and omissions in the MLAT Request, the misrepresentations in the information offered in support of the U.K. warrant and the dramatic overbreadth of the warrant – make clear that the Government cannot meet its burden of demonstrating good faith. *See supra*; *see also* Tanaka U.K. Mem. at 19-25; Tanaka U.K. Reply Mem. at 18-22. Accordingly, suppression is appropriate.

## III. THE SUBPOENA SERVED ON AMERINDO US SHOULD BE QUASHED

For the reasons stated in Defendant Vilar's Memorandum in Support of the Pending Motions, in which Mr. Tanaka joins, the Court should quash the Amerindo U.S. subpoena. *See* Vilar Mem. in Support of Pending Motions. The Amerindo U.S. subpoena is nothing more than an extension of an unconstitutionally impermissible search, and as such cannot stand. Indeed, were the Court to enforce the subpoena, it would set a precedent whereby the Government could effectively immunize unlawful searches by simply serving a subpoena during or after the fact. Clearly, such a result is unacceptable. *See, e.g., United States v. Eng*, 971 F.2d 854, 861 (2d Cir.

---

[32] At the same time, Agent Fraterrigo's failure to correct these misrepresentations – despite the fact that, having reviewed the U.K. warrant prior to the execution of the search, she knew (or at the very least should have known) the warrant was premised on affirmative misrepresentations as to the types of documents expected to be encountered and seized – is further evidence of her bad faith in executing the U.K. search. *See* Margolis Decl., Ex. E at 71-73.

1992) ("subpoenas must not serve as an after the fact 'insurance policy' to 'validate an unlawful search under the inevitable discovery doctrine.'") (internal citation omitted); *United States v. Debbi*, 258 F. Supp. 2d 313, 314 (S.D.N.Y. 2003) (quashing subpoena calling for items that had been suppressed).[33]  In any event, the Amerindo U.S. subpoena, which is essentially co-extensive with the Amerindo U.S. warrant, is both overbroad and oppressive, providing an independent basis for quashing the subpoena.  *See* Vilar Mem. in Support of Pending Motions; Gov. Ex. 12.

In the event that the Court does not quash the subpoena, it should at the very least (1) pare down the subpoena so that it is no longer grossly overbroad, but rather calls for only those documents relevant to the investigation, and (2) enforce the pared down subpoena only to those areas not covered by the Amerindo U.S. search warrant.

---

[33] Although these cases deal with the inevitable discovery doctrine, which the Government has conceded does not apply to preclude suppression here (*see* Gov. Mem. in Opp. to Motion to Quash, dated February 10, 2006), the cases are nonetheless instructive.

## CONCLUSION

For the reasons stated above, as well as in Alberto Vilar's memorandum in support of the pending motions, Mr. Tanaka respectfully requests that the Court grant Defendants' motions and (1) suppress all evidence seized from the New York offices of Amerindo Investment Advisors Inc., located at 399 Park Avenue, New York, NY, (2) suppress all evidence seized from the Cadogan Tate storage facility located at 239 Acton Lane, London, United Kingdom, and (3) quash the subpoena served on Amerindo Investment Advisors Inc. on May 26, 2005.

Dated: December 13, 2006          By:    s/  Glenn C. Colton
      New York, New York

Glenn C. Colton (GC-2493)
Jessica L. Margolis (JM-7786)
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
1301 Avenue of the Americas, 40th Floor
New York, New York  10019
Tel: 212.999.5800

*Attorneys for Defendant*
*Gary Alan Tanaka*