**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

**UNITED STATES OF AMERICA**

    **-against-**

                           **05 Cr. 621 (KMK)**

**ALBERTO WILLIAM VILAR and**
**GARY ALAN TANAKA,**

                  **Defendants.**

-------------------------------------------------------------x

**DEFENDANT ALBERTO VILAR'S MEMORANDUM**
**IN FURTHER SUPPORT OF MOTIONS**
**(1) TO SUPPRESS EVIDENCE SEIZED FROM AMERINDO US,**
**(2) TO SUPPRESS EVIDENCE SEIZED FROM THE**
**UNITED KINGDOM, AND (3) TO QUASH**
**THE SUBPOENA SERVED ON AMERINDO US**

                                  **HOFFMAN & POLLOK LLP**

                                  *Attorneys for Defendant*
                                  *Alberto Vilar*
                                  **260 Madison Avenue**
                                  **New York, NY  10016**
                                  **(212)  679-2900**
                                  **(212)  679-1844 (fax)**

## <u>TABLE OF CONTENTS</u>

Page

Preliminary Statement ……………………………………………………. 1

Statement of Facts…………………………………………………………… 1

A.  Procedural History of Defendants' Motion To Suppress………………… 1

B.  The Late Night Search Warrant Application……..…………………… 3

C.  The Allegations In The Amerindo U.S. Warrant Application…………… 4

D.  The Amerindo U.S Search Warrant…………………………………… 6

E.  The Execution of the Search Warrant……………………………… 9

F.  The Evidence Seized…………………………………………………… 11

G.  The Amerindo U.S. Subpoena………………………………………… 15

H.  The U.K. Search ……………………………………………………… 18

*Argument*

<u>Point I</u> --  The Search Warrant Is Unconstitutionally Overbroad …………… 21

A.  The Warrant is Unconstitutionally Overbroad…………………… 22

1.  Paragraph 1 of the Attachment ……………………….. 24

2.  Paragraph 16 of the Attachment to the
Warrant is Overbroad………………………………….. 28

3.  Paragraphs 10, 14 and 17 of the Attachment………………… 35

4.  Paragraphs 2 Through 9, 11, 12, 13 and 15 ………………… 37

5.  What the Government Seized………………………………… 38

B.  The "All-Records" Exception is Inapplicable…………………… 39

<u>Point II</u> -- The Seizure And Searching Of The Entire Amerindo U.S.
And U.K. Computer Systems Were Unconstitutional ……………… 42

1. The Amerindo U.S. Search Warrant ………………………… 43

2. The Supporting Affidavit ……………………………… 44

3. The U.K. MLAT and Warrant ……………………………… 45

4. The U.S. and U.K. Warrants To Search and
Seize the Computers Are Overbroad …………………………… 46

Point III  --  The Subpoena Is An Extension Of An Illegal Search
And Therefore Must Be Quashed………………………………… 51

Point IV  -- The Subpoena Should Be Quashed Because 1) It Was
Issued For An Improper Purpose, 2) It Is Overbroad,
Burdensome And Oppressive, And 3) It Is Unreasonable
Under The Fourth Amendment………………………………………… 55

A.  The Subpoena Must Be Quashed Because It Serves An
Improper Purposes…………………………………………………… 55

B.  The Subpoena Is Overbroad And Oppressive…………………… 56

1. The Subpoena Seeks Documents That Are Not Relevant……. 57

2. The Subpoena Fails to State With Particularity the
Documents to Be Produced  ………………………………….. 60

3. The Subpoena Does Not Specify a Time Period……………… 62

C.  The Subpoena Must Be Quashed Because It Is Unreasonable
Under The Fourth Amendment……………………………………… 64

D.  The Motion To Quash Was Submitted In A Timely Manner…… 65

Conclusion …………………………………………………………………… 67

# TABLE OF AUTHORITIES

Page

*CASES:*

*Andresen v. Maryland*, 427 U.S. 463 (1976)…………………………………    30

*Arizona v. Hicks,* 480 U.S. 321 (1987)…………………………………….    39, 54

*Coolidge v. New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022,
      29 L.Ed. 2d 564 (1971)…………………………………………………    22

*Davis v. Gracey,* 111 F.3d 1472 (10th Cir. 1997)……………………………    46

*Federal Trade Comm. v. Am. Tobacco Co.*, 264 U.S. 298, 44 S. Ct. 336,
      68 L.Ed. 696 (1924)…………………………………………………..    58

*Hale v. Henkel*, 201 US 43, 26 S. Ct. 370, 50 L.Ed. 652 (1906) ……………    64

*In re Certain Chinese Family Benevolent and Dist. Assocs.*,
      19 F.R.D. 97 (N.D. Cal. 1956)………………………………………..    58, 60

*In re 1979 Grand Jury Subpoena*, 478 F. Supp. 59
      (M.D. La. 1979)……………………………………………………….    61

*In Re Grand Jury Proceedings Witness Bardier*, 486 F. Supp.
      1203 (D. Nev. 1980)………………………………………………….    62

*In re Grand Jury Subpoena Duces Tecum*, 342 F. Supp. 709
      (D. Md. 1972)…………………………………………………………    62

*In re Grand Jury Subpoena Duces Tecum Addressed to*
      *Corrado Bros., Inc.*, 367 F. Supp. 1126 (D. Del. 1973) …………….    58, 59, 64

*In re Grand Jury Subpoena Duces Tecum Dated January 12, 1985 (Simels)*,
      767 F.2d 26 (2d Cir. 1985)……………………………………………    56

*In re Grand Jury Subpoena Duces Tecum Dated November 15, 1993*,
      846 F. Supp. 11 (S.D.N.Y. 1994)……………………………………    49, 59

*In re Grand Jury Subpoena Duces Tecum Served Upon Rabbinical*
      *Seminary Netzach Israel Ramailis*, 450 F. Supp. 1078
      (E.D.N.Y. 1978)………………………………………………………    57

*In re United Last Co.*, 7 F.R.D. 759 (D. Mass. 1947)…………………………    62

*Marron v. United States,* 275 U.S. 192 (1927)………………………………..    25

*Maryland v. Garrison,* 480 U.S. 79, 84, 107 S. Ct. 1013,
     94 L.Ed. 2d 72 (1987)………………………………………………    22

*National City Trading Corp. v. United States,* 635 F.2d 1020
     (2d Cir. 1980)  ………………………………………………………..    39, 40

*Oklahoma Press Pub. Co. v. Walling Adm'r, Wage and Hour Division,*
     *US Department of Labor*, 66 S. Ct. 494 (1946)………………………    64

*Premium Service Corp. v. Sperry & Hutchinson Co.,* 511 F.2d 225
     (9th Cir 1975)……………………………………………………………..    63

*United States v. Bianco,* 998 F.2d 1112 (2d Cir. 1993)………………………    31, *passim*

*United States v. Brien,* 617 F.2d 299 (1st Cir.), 446 U.S. 919 (1980)…………    40

*United States v. Burke*, 718 F. Supp. 1130 (S.D.N.Y. 1989)…………………    40

*United States. v. Calandra,* 441 U.S. 338, 94 S. Ct. 613 (1974)………………    64

*United States v. Carey*, 172 F.2d 1268 (10th Cir. 1999)………………………    49

*United States v. Center Art Galleries-Hawaii, Inc.,* 875 F.2d 747
     (9th Cir. 1989)……………………………………………………………    40

*United States v. Dardi,* 330 F.2d 316, 326 (2d Cir.), *cert. denied*,
     379 U.S. 45, 85 S. Ct. 50, 13 L. Ed.2d 50 (1964)……………………    56

*United States v. Eng,* 971 F.2d 854 (2d Cir. 1992)…………………………    54

*United States v. George,* 975 F.2d 72 (2d Cir. 1992)…………………………    25, *passim*

*United States v. Gurule*, 437 F.2d 239 (10th Cir. 1970)………………………    57

*United States v. Heard*, 952 F. Supp. 329 (N.D. W. Va. 1996)………………    66

*United States v. Hunter,* 13 F.Supp.2d 574 (D.Vermont)……………………    48

*United States v. Kleen Laundry & Cleaners, Inc.* 381 F. Supp. 519
     (E.D.N.Y. 1974)……………………………………………………..    65

*United States v. Klitzman,* 744 F.2d 955 (3rd Cir. 1984)………………………    27

*United States v. Kow*, 58 F.3d 423 (9th Cir. 1995)………………………………    27

*United States v. Lafayette Academy,* 610 F.2d 1, 4 (1st Cir. 1979)……………    26, 31, 33

*United States v. Leung*, 40 F.3d 577 (2d Cir. 1994)………………………………    56

*United States v. Maxwell,* 920 F.2d 1028 (D.C. Cir. 1990) …………………....    26, *passim*

*United States  v. Morton Salt*, 70 S. Ct. 357 (1950)…………………………....    64

*United States v Oloyede*, 982 F2d 133 (4th Cir, 1992) ……………………....    41

*United States Postal Service v. C.E.C. Servs.*, 1988 WL 81766
        (W.D.N.Y. August 3, 1988)………………………………………………    40

*United States v. R. Enters., Inc.*, 498 U.S. 292, 111 S. Ct. 722,
        112 L. Ed.2d 795 (1991) ………………………………………………    56, 61

*United States v. Rollack*, 90 F. Supp.2d 263 (S.D.N.Y. 1999)………………....    31

*United States v. Spilotro,* 800 F.2d 959 (9th Cir. 1986)………………………    27

*United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982)………………………    50

*OTHER AUTHORITIES:*

Federal Rules of Criminal Procedure
        Rule 17(c)……………………………………………………………    56, *passim*

Kerr, Searches and Seizures in A Digital World,
        9 Harv. L. Rev 531……………………………………………………    42, 43

Computer Crime and Intellectual Prop. Section, Crim. Div.,
        U.S. Dep't of Justice, Searching and Seizing
        Computers and Obtaining Electronic Evidence in
        Criminal Investigations (2002)………………………………………....    46, 47

## PRELIMINARY STATEMENT

Defendant Alberto Vilar respectfully submits this memorandum in support of Defendants' motions (1) to suppress all evidence seized from the New York offices of Amerindo Investment Advisors Inc. ("Amerindo U.S."), located at 399 Park Avenue, New York, NY, (2) to suppress all evidence seized from the Cadogan Tate storage facility located at 239 Acton Lane, London, United Kingdom, and (3) to quash the subpoena served on Amerindo U.S. on May 26, 2005 (collectively, the "Pending Motions"). In addition, Mr. Vilar joins in Defendant Tanaka's Memorandum in Support of the Pending Motions, also dated December 13, 2006.

## STATEMENT OF FACTS

A.    Procedural History Of Defendants' Motions To Suppress

On September 12, 2005, Defendant Vilar timely moved to suppress the evidence seized pursuant to the Amerindo U.S. search warrant, which motion was joined by Defendant Tanaka.

A hearing on the motions to suppress was held on December 14, 2005. At the hearing, the Government called only one witness with respect to the motion to suppress the Amerindo U.S. search, supervising Postal Inspector John Feiter, and moved to preclude Defendants from calling the Case Agent, former Postal Inspector Cynthia Freaterrigo (now "Agent Fraterrigo") to testify.[1]

On December 16, 2005, the Court ruled that Defendants could not call Agent Fraterrigo in support of their motion to suppress evidence seized pursuant to the Amerindo U.S. search warrant. On March 9, 2006, the Court held oral argument on the motion to suppress the fruits of

---

[1]    Subsequent to the suppression hearing, in August 2006, Agent Fraterrigo transferred from the U.S. Postal Inspection Service to the U.S. Postal Service Officer of Inspector General where she currently serves as a Special Agent. At this hearing, testimony was also heard on Alberto Vilar's motion to suppress his post-arrest statements. Although Gary Tanaka similarly moved to suppress his post-arrest statements, the night before the suppression hearing, AUSA Marc Litt informed Mr. Tanaka's counsel that the Government would not attempt to use Mr. Tanaka's alleged post-arrest statements. *See* Tr. 12/14/06 at 14-16.

the Amerindo U.S. search. The Court specifically noted that it was the Government's burden to show that the search was valid, and that the Government's decision not to call Agent Fraterrigo left the record either unfavorable or unclear on several issues relevant to this determination, including good faith. *See* Tr. 3/9/06 at 43-45, 77-78.[2] The following day, the Government requested that the hearing be reopened to permit Agent Fraterrigo to testify. By order dated April 4, 2006, the Court granted the Government's request and the hearing was re-opened.

The "second phase" of the suppression hearing, which began on May 31, 2006, took place on select days over the course of several months, ending on August 9, 2006. During this phase the Court addressed two additional motions filed by the Defendants: Defendants' motion to quash the subpoena served on Amerindo U.S. the day of the search, and Defendants' motion to suppress evidence seized from a Cadogan Tate storage facility in the United Kingdom in October 2005.

On August 30, 2006, pursuant to a schedule set by the court, the Defendants submitted a detailed motion for a *Franks* hearing. Defendants' motion was based in part on the extraordinary testimony of Agent Fraterrigo that, at the time she applied for the Amerindo U.S. warrant, she knew there was no probable cause to seize countless documents called for by the warrant. *See* Tr. 7/7/06 at 149-56; Tr. 7/10/06 at 30-38, 49-55 and 93-94. Defendants also asserted, among other things, that the warrant application contained intentional and material misrepresentations and omissions concerning the two alleged victims, Lily Cates and the Mayer Family. On October 25, 2006 the court granted a hearing and ruled that the Defendants' would be permitted to examine Agent Fraterrigo on issues related to the investment histories of Cates and the Mayer Family. The hearing was held on November 15, 2006.

---

[2]  Tr. Refers to the hearing transcript followed by the date and page reference. GX refers to government exhibits and DX refers to defense exhibits.

Throughout these proceedings, the Parties have submitted numerous written arguments. What follows is a comprehensive summary of the facts and a marshalling of those arguments as informed by the testimony taken at the hearings. Facts related the *Franks* hearing and Agent Fraterrigo's testimony about the execution of Amerindo U.S. warrant application, as well as arguments regarding the UK warrant, are contained in the Memorandum of Law submitted simultaneously herewith by Defendant Tanaka. Defendant Vilar joins in Defendant Tanaka's Memorandum.

B.     The Late Night Search Warrant Application

On May 25, 2005, at approximately 9:30 p.m., Assistant United States Attorney Marc Litt and Agent Fraterrigo, the case agent for the investigation, went to the home of United States Magistrate Judge Frank Maas to apply for a warrant to search the New York office of Amerindo Investment Advisors Inc. ("Amerindo U.S."), located at 399 Park Avenue, New York, New York. *See* Tr. 7/7/06 at 43. In support of the warrant, the Government presented Magistrate Judge Maas with an affidavit sworn to by Agent Fraterrigo ("Affidavit"), as well as copies of the criminal complaints against Alberto Vilar and Gary Tanaka (also sworn to by Agent Fraterrigo), which were incorporated by reference into the Affidavit. (*See* GXs 33, 33A and 33B).

After reviewing the Affidavit and complaints, and prior to signing the warrant, Magistrate Judge Maas noted the lack of direct evidence supporting the Government's contention that Mr. Tanaka improperly used client money to purchase horses, as is alleged in the criminal complaint. *See* Tr. 5/31/06 at 175. AUSA Litt responded that the allegation was based on "a series of inferences from certain paragraphs in the complaint" against Mr. Tanaka. *Id.* Neither Agent Fraterrigo nor AUSA Litt took notes or otherwise recorded the meeting at Magistrate Judge

Maas' apartment.  *See* Tr. 5/31/06 at 172, 191, 192.  Ultimately, at approximately 10:30 p.m.,

Magistrate Judge Maas signed the search warrant.  *See* Tr. 5/31/06 at 170-171; GX 32.

C.     The Allegations In The Amerindo U.S. Warrant Application

In contrast to the sweeping scope of the all-inclusive warrant presented to Magistrate Maas,

the allegations offered in support of the warrant were extremely narrow.  The warrant

application, which included the Affidavit as well as the criminal complaints incorporated by

reference herein, names only two individual investors as alleged victims – Lily Cates and the

Mayer family.  The warrant application further alleges that these two individuals had a total of

$17 million invested with Amerindo -- as compared with the over $1 billion managed by

Amerindo U.S. (*See* GX 33 at ¶ 6A, 6F; GX 33A at ¶ 6) -- and were involved with only three

discrete types of investments: an entity called Rhodes Capital, an SBIC investment and a

"guaranteed fixed rate deposit account" or "GFRDA."  (*See* GX 33 at ¶6A, 6B).  According to

the warrant application, both Cates and the Mayers allegedly had difficulties in redeeming their

investments with Amerindo, Cates in 2005 and the Mayers beginning in 2003.  *Id.*  The warrant

application also suggests that, according to one of the alleged victims, other investors "**may have**

**had trouble** redeeming all or part of their investments," including Brian Harvey, Joy Ulrich and

Paul Marcus. *Id.*  at ¶ 6.E. Based on these narrow allegations, the warrant application suggests

that there may be "reason to be concerned that other investors are likewise being victimized by

Vilar and Tanaka."  *Id.* at ¶ 6.F.[3]

The allegations in the application are also narrow in that they pertain only to a three-year

period, beginning in 2002 and extending to 2005.  More specifically, other than the vague

_____

[3]     Significantly, Agent Fraterrigo did not allege that there was *probable cause* to believe that other
investors were being defrauded and she acknowledged in her testimony the significant difference between
probable cause and "reason to be concerned."  *See* Tr. 7/10/06 at 18.

suggestion that Lily Cates received insufficient information about an investment she made in 1988 (an allegation that was refuted in the course of the *Franks* hearing and, in any event, does not constitute criminal conduct),[4] the application does not contain any allegations that Defendants engaged in any misconduct before June 2002, when Lily Cates allegedly invested $5 million in an SBIC investment. [5] *See* GX 33 at ¶ 6A, 6B.

With respect to the Mayer family, the application does not allege any wrongdoing by Defendants prior to 2003, when the Mayers allegedly had difficulties redeeming their GFRDA investments with Amerindo. Affidavit at ¶ 6.A.[6] Significantly, there was no allegation that the Mayers had or believed they had any investments handled by Amerindo U.S. Thus, the application identifies only a single investor who allegedly believed her investments were with Amerindo U.S.

Although the alleged criminal conduct purportedly took place in the three years prior to the search and the business whose office was to be searched had been in existence for over twenty years, the requested search warrant contained no time limitations whatsoever. *See* GX 33 and GX33A at ¶ 5.

Finally, the complaint against Tanaka, which was attached to the application, simply described a number of Letters of Authorization signed by Mr. Tanaka between November, 2003 and April, 2005 instructing the brokerage firm allegedly used by Amerindo to wire transfer funds

---

[4]     The Government conceded that the allegation in the Affidavit that Cates' Rhodes investment "was never described to [Cates], she never has received a private placement memorandum, nor has she signed a subscription agreement," even if proved, does not constitute criminal behavior. *See* 10/25/06 at 5-8.

[5]     Notably, Cates SBIC investment is only described in the Vilar criminal complaint which was not available to approximately 15 of the 19 Inspectors who searched the premises. *See* GX 33A; Tr. 12/14/05 at 123, 134-135; Tr. 7/7/06 at 49-51.

[6]     AUSA Litt acknowledged in his testimony that there was no evidence in the warrant application that the Mayers had any trouble accessing their investments before 2003 and no evidence in the application that Cates had any difficulty before 2005. *See* Tr. 8/9/06 at 292-293.

from certain accounts to other overseas and domestic bank accounts.  *See* GX 33B at ¶ 15(c),

15(d) and 15(e).  Each Letter of Authorization referenced in the Tanaka complaint allegedly

contained a reference to the name of a racehorse and a statement that the transfer "represents a

redemption by the above referenced equity partner."  *See* GX 33 at ¶ 15.  The fact that a principal

of a successful investment advisor firm took large redemptions is neither surprising nor

inherently suspicious.  The complaint alleged no facts showing that Tanaka was converting client

funds for his purchase of racehorses.

D.    The Amerindo U.S Search Warrant

It is difficult to conceive of a broader warrant than that which Agent Fraterrigo presented

to Magistrate Judge Maas.  Among the categories of documents called for by the warrant were

***all*** business records, ***all*** client files, ***all*** marketing materials, ***all*** correspondence sent to or

received from clients, and ***any*** documents "reflecting the identities of and communications with

clients who have investments managed or advised by Amerindo." (*See* GX 32 at ¶1).  Not only is

the language of the warrant extremely broad, but the warrant contained no time limitation

whatsoever, despite the fact that Amerindo U.S. had been in existence for approximately twenty

years.  As the Government's own witnesses conceded, the warrant called for seizure of nearly

every single document relating to any of the five Amerindo entities listed in the warrant created

from the beginning of time forward.  *See* Tr. 12/14/05 at 136, 161-63.  Indeed, as stated by

supervisory United States Postal Inspector Feiter at the first hearing session, as long as a

document was related to Amerindo and "had writing on it," it "would go."  *See* Tr. 12/14/05  at

161-62.  Case Agent Fraterrigo testified that, in her experience, there should be a time frame in a

warrant.  This warrant, however, did not have one.  As a result, she could seize "any business

records at Amerindo," no matter how old.  *See* Tr. 7/7/06 at 137-138, 140-141; Tr. 8/8/06 at 129.

That Agent Fraterrigo and her supervisor interpreted the Amerindo U.S. warrant as authorizing seizure of nearly every business-related document on the premises is not surprising. In the course of three pages and eighteen paragraphs, the warrant described every manner of document and business equipment that would be maintained in a financial services office. Paragraph 1 authorized the seizure of

> "Corporate Records concerning [each of the Amerindo entities] **including but not limited to** records concerning the formation of each of the above-listed Amerindo entities, its shareholders, principals, officers, directors, and employees, changes in ownership, bylaws, resolutions, client lists, client files, investment brochures, marketing materials, investment advisory agreements, copies of correspondence sent to or received from clients, and other documents concerning or reflecting the identities of and communications with clients who have investments managed or advised by Amerindo.

*See* GX32 at ¶ 1. This paragraph alone, putting aside the seventeen others, authorized the seizure of practically every piece of paper and computer file maintained by a financial services office, especially because the list of corporate records "includes but is not limited" to the broad categories specified.

The remaining paragraphs in the Amerindo U.S. warrant are similarly expansive and, as with Paragraph 1, cover virtually all corporate, brokerage, client investment, bank, personnel and accounting records. For example, paragraphs 2, 4, 12 and 13, taken together, call for the seizure of all Amerindo's brokerage account records at Bear Stearns or any other broker-dealer, as well as all records in any way pertaining to client investments. Paragraph 12 authorized the seizure of "documents reflecting brokerage accounts maintained by Amerindo at any broker-dealer other than Bear, Stearns & Co. . . .," a potentially very broad category (how many broker-dealers are there in New York alone?). *See* GX32 at pages 1, 2.

Moreover, Paragraph 14 calls for an exhaustive list of expense and accounting records, including "other documents relating to the running and supervision of the operations of the investment advisory businesses of Amerindo,"  while paragraph 15 calls for "documents reflecting information about any current of former Amerindo employee" who had any contact with any Amerindo client or was involved in the management of any account or preparation of account statements. *Id.* at pages 2, 3.

Paragraph 9 calls for the personal financial records of the Defendants, *i.e.*, documents regarding accounts held by Vilar and Tanaka at "any financial institution," without any time frame.

Similarly broad are Paragraphs 16, 16 [sic] and 17,[7] which described ever type of physical equipment that a typical office maintains: address books, rolodexes, calendars, travel documents, fax machines, computers, hard drives, cellular phones, pda's, and "any other storage media capable of containing date or text in magnetic electronic optical, digital, analog, or any other format . . ."

Finally, just to ensure that no stone remained unturned, the warrant concludes by requesting:

> . . . drafts and final versions of documents and correspondence prepared in connection with the running and supervision of the operations of the investment advisory business.

*Id* at 3. The described paragraphs, taken together with the others, are repetitive and exhaustive in the extreme.

---

[7]    The Amerindo U.S. warrant contains two paragraphs "16."  For the purposes of this memorandum, the first paragraph 16 will be referenced herein as "Paragraph 16," and the second will be referred to herein as "Paragraph 16A."

E.    The Execution Of The Search

The search warrant was executed at Amerindo U.S. on May 26, 2006.  *See* Tr. 12/14/05 at 85, 89-91.  During the approximately 12-hour search, the Government seized over 170 boxes of hard copy documents and approximately 30 computers and servers, (*see* GX32) containing over 1.6 terabytes of information – ***roughly the equivalent of 125 million hard-copy pages***.

At approximately six a.m. on the morning of the search, Inspector John Feiter, the supervising agent for the investigation, met with Agent Fratterigo and eleven of the seventeen other officers assisting in the execution of the Amerindo U.S. search warrant. *See* Tr. 12/14/05 at 93.  Inspector Feiter and Agent Fraterrigo gave those who attended the briefing a general overview of the case.  *See* Tr. 12/14/05 at 93-94.  The executing officers also received a copy of the warrant and the rider listing the items to be seized.  Inspector Feiter told the team members to read the rider before leaving the meeting and to refer to it during the actual search, and to ask him or the Case Agent if they had questions about whether something was covered under the search warrant.  *See* Tr. 12/14/05 at 78-79.  Although the executing officers allegedly were given copies of the Affidavit, other than Agent Fraterrigo and the officers who assisted in the Defendants' arrests, neither Inspector Feiter nor any of the other search team members were given the complaints attached to the search warrant affidavit, despite the fact that these complaints were necessary to understand the scope of the warrant application. *See* Tr. 12/14/04 at 78, 123, 128, 135; Tr. 8/8/06 at 23.

At approximately 8:15 a.m., Inspector Feiter and his team arrived at the Amerindo offices. *See* Tr. 12/14/05 at 79.   Agent Fraterrigo, however, did not arrive for another four hours, as she was participating in the arrest of Gary Tanaka.  (*See* Tr. 7/7/06 at 52)  When she arrived,

she discovered that additional inspectors, who were not at the morning briefing, had been called in to the search.  *See* Tr. 8/8/06 at 17-18.

Inspector Feiter claimed that he answered questions during the search from other inspectors about whether specific items were covered under the rider or he referred them to the Case Agent if he could not answer the question. (*See* Tr. 12/14/05 at 81)  During the first four hours of the search, however, the Case Agent was not there to answer questions and no one on the premises had a copy of the complaints attached to the warrant application.  The only question Inspector Feiter testified that he could recall was when searchers asked him how to handle requests by Amerindo employees to keep personal correspondence. (*See* Tr. 12/14/05 at 104, 119).  Inspector Feiter said he instructed the agents to "just take a quick look, make sure they are such, and it stays."  (*See* Tr. 12/14/05 at 104).

During the period of time that she was at the search location, Agent Fraterrigo answered questions from the other officers about whether to seize certain items, such as marketing materials.  She reviewed the marketing material and, although it was covered by the search warrant, she made a determination not to seize the material because "it was not useful to the investigation."  (*See* Tr. 7/7/06 at 55).  Indeed, in conducting the search, Agent Fraterrigo employed a two-step process, first determining whether the item in question was covered by the Amerindo U.S. warrant and, if it was, then determining whether the item was useful to the investigation.  Agent Fraterrigo did not, however, educate the other officers about the types of documents that would not be useful and thus could be left behind, nor did she otherwise instruct these officers to limit their search in any way.[8]  *See* Tr. 7/10/06 at 117-18; Tr. 8/8/06 at 135-39; Tr. 8/9/06 at 203-05.  Therefore, among the materials ultimately seized were items similar to

---

[8]    For example, although she was aware at the time that Amerindo had institutional clients, she did not advise the search team not to take records relating to those clients.  *See* Tr. 7/10/06 at 78.

those Agent Fraterrigo decided to leave behind, such as company profiles and interoffice analyst memos regarding investments. *See* Tr. 7/10/06 at 113-114; Tr. 8/8/06 at 23-28, 139-140; DXAAA; DXBBB; DXFFF. Similarly, although in response to a question regarding Federal Express receipts Agent Fraterrigo advised the agent to take all but blank ones, she later learned that other agents had in fact seized blank Federal Express receipts. *See* Tr. 7/7/06 at 82-83; Tr. 8/8/06 at 29-30.

The search lasted for approximately twelve hours and approximately 170 boxes were seized. *See* Tr. 7/7/06 at 85; Tr. 12/14/05 at 89. Two areas, a storage room and file banks, were searched and inventoried but no items were seized pursuant to an arrangement between the company's attorney and the prosecutor to produce materials in those areas by subpoena. *See* Tr. 12/14/05 at 86, 102, 112. The materials in those areas were searched and inventoried without any attention to whether they were called for by the search warrant. *See* Tr. 12/14/05 at 116. The inventory of items not seized, which was admitted into evidence as GX3, is 35 pages long and appears to specifically identify each document or group of documents located in those areas. (*See* Tr. 12/14/05 at 102.

Although his recollections regarding the search were vague at best, Inspector Feiter estimated that, from the areas that were completely searched, approximately 60 to 70 percent of the office contents were seized. *See* Tr. 12/14/05 at 89.

F.    The Evidence Seized

Inspector Feiter was the "inventory person" who cleared each room after it had been searched and made an inventory of items seized, noting the location where each item was seized. *See* Tr. 12/14/05 at 82. He identified a photocopied collection of the inventory sheets which were admitted into evidence as GX2. *See* Tr. 12/14/05 at 83.

The inventory is almost two inches thick (pages not numbered), including pages and pages of computer equipment seizures. The following list provides just a sampling of items noted in the inventory which are unrelated to the specific victims and investments alleged in the warrant application and/or they predate the earliest time that any victim was allegedly defrauded:[9]

    (i)    *Position E-5:*
        (a)"Paul Hastings Invoices '97-'04'
        (b)"1998 AIA Proxy Voting List"

    *(ii)*    *Position E-18:*
        (a)"Amerindo Internet Fund Files"
        (b)"Amerindo Internet Tech. Files"

    *(iii)*    *E-26:*
        (a)"Prof. Fees, Rent, Tel – Invoices
        (b)"Tel Bills 2003, Rent Bills, Legal Bills, 1099's – 1999-2003

    *(iv)*    *Position F-1:*
        (a)"Folder – Charlie Parker 2002 Questionnaire"
        (b)"John Rutledge – Rutledge Capital"
        (c)"2004 Electronic Delivery Consent"

    *(v)*    *Position K-4:*
        (a)"Legal Bills – 1999"
        (b)"1996 Amerindo Tax Return"

    *(vi)*    *Position ILLEGIBLE:*
        (a) "KODAK CD's containing photographs" "Book of photographs"
        (b)"Photograph enclosed in white cover / frame (paper)"
        (c)"Fold yellow report cover containing 7 pages of photographs"
        (d)"Clear, yellow folder containing misc. wedding related documents
          (Vilar) including purchasing / financial info using corporate account"

    *(vii)*    *Position B-8:*

---

[9]    These pages are part of GX2 and they are individually reproduced as excerpts from GX2 in the Appendix of Exhibits submitted simultaneously herewith by Defendant Tanaka. The Appendix also contains several other Government and Defense Exhibits cited throughout this Memorandum, including the Warrant and the Supporting Affidavit, the complaints and the Subpoena.

(a)"Folder marked AT&T / Cingular Wireless"
(b)"Folder marked AT&T"
(c)"Folder Federal Express New York"
(d)"Folder Federal Express San Francisco"
(e)"Folder Pacific Bell"
(f)"Folder Verizon Long Distance (212) 980-5286"

*(viii)*  *Position C-2:*
(a)"Terminated Employees' File"
(b)"Employee Handbook"

*(ix)*  *Position E-23:*
(a)"Accts Payable includ. Phone Records – 2001"
(b)"Accts Pay include. Phone Records – 2001 + Alberto Vilar file"

*(x)*  *Position E-25:*
(a)"Tel Bills – Amerindo"
(b)"Prof. Fees – Invoices + Wires, Legal, Rent, Consult."

*(xi)*  *Position H-7:*
(a)"Amerindo Employment Agreements (2 binders)"

*(xii)*  *Position J-4:*
(a)"Amerindo Technology Fund 1998 Annual report"
(b)"Amerindo Technology Fund 1999 Prospectus"

*(xiii)*  *Position T-3:*
(a) "US Trust Statements for Dextra 2000"

*(xiv)*  *Position T-4:*
*(a)* "Weekly Privates Report 1999"

*(xv)*  *Position O-3:*
(a) "Phone Service invoice for Amerindo – Comsec II, Inc."
(b) "Verizon Statements Vilar c/o AIA"
(c) "Bergdoff Goodman acct atmnt – Vilar c/o AIA"
(d) "T-Mobile invoice AIA"
(e) "Comcast invoice for AIA"
(f)  "Limo invoice"

*(xvi)*  *Position L-1:*
(a)"Orange hanging folder containing written speech by Vilar to Hispanic
    Federation"
(b)"Purple hanging folder containing Nat'l Ballet School fundraiser docs,
    Canadian Opera company docs"

13

(c)"Orange hanging folder containing interamerican dialogue fundraiser
    doc's with photo of Vilar & President Cardoso"
(d)"Email letter from American Friends of Salzburg Festival"
(e)"Yellow Folder titled Conde Nast Salzburg"

*(xvii)  Position L-3:*
(a)"Purple folder with resumes; clear folder titled 'Mike Rifle
    Correspondence' + other misc. documents relating to Vilar"
(b)"Purple hanging folder with former employee correspondence doc.'s
    including severance pay info & settlement info"

*(xviii)  Position L-4:*
(a)"Yellow clear folder title 'Rick Marshall'"
(b)"Packets (8) Re: Investment + Business Strategies – included is many
    pkts titled 'THS integration of next generation internet…' by Vilar"
(c)"Purple Folder with info on Biotech Investment, 'Acuity' docs & other
    investment info"

Agent Fraterrigo testified that she seized 23 notebooks because, in looking through two,

three or four of them, she saw a victim's name.  In other words, she seized all 23 notebooks

without looking through at least 19 of them to determine whether they were called for under the

warrant. *See* Tr. 7/10/06 at 101-102.   She also testified that she seized documents for which

there was no probable cause supplied in the application, concerning companies called Dextra,

Olafson , the Citibank Fund, the Amerindo Internet fund, and the Amerindo Technology Partners

LLP.  *See* Tr. 7/10/06 at 34-37, 67-72.[10]

The officers also seized obviously personal items, including letters from Mr. Vilar to a

woman, poems, a file regarding a personal investigation and a sealed compact disc about

teaching Spanish to children.  *See* Tr. 7/7/06 at 130-134.  Those items were contained in a box

which defense counsel had requested that the Government produce at the hearing for use during

cross-examination.  After the request was made but prior to the hearing, Agent Fraterrigo

---

[10]    At a certain point during the cross-examination of Agent Fraterrigo regarding specific materials that
were seized, the Court indicated that "the point" was made, and questioned the value of going through
more documents. *See* Tr. 7/10/06 at 110.

removed these items from the boxes and sent to Amerindo's counsel.  *See* Tr. 7/10/06 at 129-130.[11]

In addition, the agents searched and inventoried, but did not seize, materials in a storage room and in file banks, pursuant to an arrangement between the company's attorney and the prosecutor to produce materials in those areas by subpoena.  *See* Tr. 12/14/05 at 86, 102, 112. The materials in these areas were searched without any attention to whether they were called for by the search warrant. *See* Tr. 12/14/05 at 116; Tr. 7/10/06 at 45.

Finally, the agents seized and mirror-imaged the computers, including the server and several laptops.  Agent Fraterrigo testified that there has never been any effort to review the computer data to determine what was covered by the search warrant attachment.  *See* Tr. 7/10/06 at 57-59.  To date, not a single computer file has been returned to Amerindo U.S. as outside the scope of the warrant or otherwise unrelated to the investigation.

G.    The Amerindo U.S. Subpoena

On May 26, 2005, as the Amerindo U.S. search was taking place, the Government served a subpoena on Amerindo U.S.   According to Inpsector Feiter, "[t]here came a point early on in the search where discussions were engaged in between counsel that was there for the firm, myself, the case agent, and the US Attorney's office that some documents or a large amount of documents might be handled by subpoena." *See* Tr. 12/15/05 at 86.  Eugene Licker, Amerindo U.S. counsel, who arrived at the Amerindo offices between 10 and 11 a.m., similarly recalled that, after Agent Feiter expressed doubts about the Government's ability to complete the search,

---

[11]    Six days before the scheduled hearing date, Agent Fraterrigo went through the 12 boxes defense counsel requested and removed and returned to Amerindo U.S. material that should not have been seized. Although Agent Fraterrigo conceded that she had no authority to possess these or any other materials that fall outside the scope of the warrant, she did not go through any of the other boxes or the computers. *See* Tr. 7/10/06 at 123-129, 132.

someone suggested a continuing agreement to preserve documents and a grand jury subpoena. Although Mr. Licker believes he initiated the preservation notice procedure on his own, because that was his usual practice, he did not believe he suggested a subpoena because it would not have occurred to him. In particular, Mr. Licker testified that he had never before heard of – let alone experienced – service of a subpoena contemporaneously with a search. *See* Tr. 5/31/06 at 14, 31, 53.

Contrary to Mr. Licker's recollection, AUSA Litt testified that it was Mr. Licker who raised the notion of a subpoena, simply by asking if the Government intended to serve one. *See* Tr. 5/31/06 at 92. AUSA Litt testified that he consulted with his supervisor, David Esseks, regarding Mr. Licker's suggestion. Esseks advised him that a subpoena was routine and a good idea in case the agents overlooked any documents and to raise the specter of an obstruction charge in order to prevent destruction of documents. *See* Tr. 93-94, 145.

At approximately 1:30 p.m., AUSA Litt faxed a subpoena to Mr. Licker at his law firm. According to AUSA Litt, he drafted the subpoena so as to be "co-extensive with the search warrant." *See* Tr. 5/31/06 at 95. By accepting service of the subpoena on behalf of Amerindo U.S., Mr. Licker understood that he had reached an agreement that the agents would conclude the search that day. *See* Tr. 5/31/06 at 14, 16.

Although at the hearing AUSA Litt testified that he did not recall why the search ended, AUSA Litt drafted a declaration in February 2006 stating that he had agreed to inform the search team it could terminate the search because of the subpoena.[12] *See* Tr. 5/31/06 at 124-125, 134; Tr. 8/9/06 at 305-306. AUSA Litt acknowledged on cross-examination that, in the absence of an agreement, the search would have ended that day at 10:00 p.m. and commenced again the next

---

[12]   This declaration, though drafted by AUSA Litt, was never submitted to the Court.

day, requiring the securing of the premises overnight. *See* Tr. 5/31/06 at 139. Contrary to his initial testimony, AUSA Litt ultimately testified that he had spoken to a Postal Inspector who thought it was a good idea to discontinue the search, and Litt concurred. *See* Tr. 8/9/06 at 305. Both Mr. Licker and the agents left the premises at about 9:30 p.m., on May 26, 2005. *See* Tr. 5/31/06 at 16.

Both Inspector Feiter and Agent Fraterrigo testified that the subpoena was intended to cover areas at 399 Park Avenue that had not been thoroughly searched on May 26, 2005. Specifically, Mr. Feiter testified: "So while that conversation [about the subpoena] was going on I had people assigned there do a brief inventory on those positions for the documents we talked about." *See* Tr. 12/14/05 at 86. In particular, two areas, a storage room and file banks, were inventoried but the items were not seized due to the arrangement between the company's attorney and the prosecutor to handle the remaining materials by subpoena. *See* Tr. 12/14/05 at 86, 101- 102, 112. Inspector Fraterrigo also testified that the subpoena covered a specific area of the office. *See* Tr. 7/10/06 at 120.

Although Mr. Licker agreed to preserve documents and accept service of the subpoena, he did not agree to waive all objections to the content of the subpoena, nor did he agree to turn over every document called for by the subpoena. *See* Tr. 5/31/06 at 25-26, 45. AUSA Litt at first insisted that Licker never suggested that the subpoena was overbroad or burdensome. He later acknowledged that, on the date of the search, Licker expressed the view that more was asked for than what the Government needed. *See* Tr. 5/31/06 at 111; Tr. 8/9/06 at 282-285. Significantly, Mr. Licker testified that, had the Government proceeded by way of subpoena rather than a search warrant, Amerindo U.S. would potentially still be functioning. *See* Tr. 5/31/06 at 50.

As intended by AUSA Litt, the documents requested by subpoena were virtually identical to the attachment to the search warrant specifying the materials to be seized.  Indeed, Paragraphs 1 through 17 of the search warrant correspond to Paragraphs A through R of the subpoena.  The subpoena added another 8 paragraphs, several of them duplicative of the previous paragraphs,[13] including the even broader Paragraph "(Y)," calling for "Documents and records concering all current and former employees of Amerindo."  *See* GX 12 at ¶R.

Like the search warrant, the subpoena contained the same all-inclusive first paragraph, and it included the same paragraphs calling for all computer equipment, "as well as drafts and final versions of documents and correspondence prepared in connection with the running and supervision of the operations of the investment advisory business.  *See* GX 12.  Like the search warrant, the subpoena set forth no temporal parameters for the production.  In other words, on its face, the subpoena requires Amerindo to produce every responsive document or thing covering the period from the beginning of time to the present day.

H.    The U.K. Search

On July 25, 2005, the Government issued a request for assistance pursuant to the Mutual Legal Assistance Treaty between the United States and the United Kingdom.  *See* GX 13. Specifically, the MLAT Request sought the assistance of British authorities in conducting a search at the offices of Amerindo Investment Advisors (UK) Ltd. ("Amerindo U.K.").

In describing the allegations against Messrs. Vilar and Tanaka in the MLAT Request, the Government named only one alleged victim, Beulah Bird, whom the Government acknowledged actually *profited* from her investments with Amerindo Investment Advisors, Inc. ("Amerindo

---

[13]    For example, Paragraph A of the subpoena calls for all "client files," while Paragraph V calls for "Investment documents and records related to current and former Amerindo clients, other than those records that pertain solely to any publicly-traded Amerindo mutual fund."

Panama"). *See* GX 13 at pages 2-3. The MLAT Request specifies only three other investors as potential victims and does not provide their names. *See* GX 13 at pages 4-5. These four investors are alleged to have been involved with only two types of Amerindo investments: GFRDAs and an entity called Rhodes Capital. *See* GX 13 at pages 2-5.

Despite the limited nature of the allegations described in the MLAT Request, the Government indicated that "the prosecutor and the SEC need *all records, files, and other evidence in Amerindo UK's office that relate to Amerindo's investment services . . . .*" (*emphasis added*). S*ee* GX 13 at page 10. The Government explained that this request *included but was not limited to* the following expansive list of items:

- Corporate records relating to bylaws, resolutions, client lists, client files and marketing materials (Id. at 10, ¶ 1);

- Documents concerning communications with "any clients" (Id.);

- Documents reflecting any private bank accounts held by Messrs. Vilar and Tanaka (Id. at 11, ¶ 11);

- Documents relating to "the operation and supervision of Amerindo's investment advisory business(es)" (Id. at 12, ¶ 15);

- Documents relating to "any participants in the fraudulent investment schemes" (Id. at 12, ¶ 17);

- Computers, hard drives and "any other devices or equipment capable of storing data" (Id. at 12, ¶ 19);

- Documents relating to the "training and maintenance of thoroughbred horses" (Id. at 13, ¶ 21);

- Records identifying all current and former employees of Amerindo and "personal identifiers (e.g. date of birth, social security number, and passport number)" (Id. at 13, ¶ 22).

On September 8, 2005, the Government sent a letter asking the U.K. authorities to treat the MLAT Request as urgent. *See* Margolis Decl. at Ex. O. The Government reiterated its request that U.K. authorities search the London offices of Amerindo U.K. and seize "*all*

*documents records, files, computers, facsimile machines, photographs and other physical evidence* relating to [Amerindo U.K., Amerindo U.S. and Amerindo Panama]." *Id.*

On or about October 10, 2005, Detective Sergeant Howard Shaw of the Metropolitan Police in London submitted to a British magistrate a sworn information in support of the application to search Cadogan Tate. *See* GX 24. Detective Shaw explained in the Information that his application arose from "a formal request from the Judicial Authorities of the United States [*sic*]" and that "no separate UK investigation" was being conducted. *See* GX 24 at pages 2-3. The Information summarized the allegations in general terms and attached the Government's MLAT Request. In addition, Detective Shaw represented to the British magistrate that the material sought "is likely to be relevant and does not consist of, or include items of legal privilege, excluded material or special procedure material." *See* GX 24 at page 1. Detective Shaw restated this view on the last page of the Information: "I am satisfied that the material does not include items subject to legal privilege, excluded material or special procedure material." *See* GX 24 at page 4.

On October 10, 2005, based on the Information submitted by Detective Shaw, as well as the MLAT Request, a judge of a British court issued a warrant to search Cadogan Tate for "[d]ocuments relating to the activities of Amerindo (UK) and associated companies along with documents relating to the activities of Alberto Vilar (Vilar), Gary Tanaka (Tanaka), Renata Tanaka and James Stableford."[14] *See* GX 24. The warrant attached and incorporated the same expansive list of documents that was set forth in the MLAT Request. *See* GX 24. Finally, the

---

[14]    A second, identical warrant was issued on October 14, 2005 to permit the search to continue for a second day. *See* GX 25. This warrant, collectively with the October 10, 2005 warrant, will be referred to herein as "the UK Warrant."

U.K. Warrant purported to authorize three U.S. postal inspectors to participate in the search:

Cynthia Fraterrigo, Thomas Feeney and Annmarie Williamson.  *See* GX 24.

The three United States postal inspectors, with assistance from the London Metropolitan

Police, executed the search of Cadogan Tate on October 13 and October 14, 2005. *See* Tr.

5/31/06 at 279-280, 292.  The officers searched through 320 boxes of documents, from which

they seized approximately 43 boxes worth of materials.  *See* GXs 26 and 27; Margolis Decl. at

Ex. L.  Seventeen computers were also seized.[15]  Among the seized materials were attorney-

client correspondence, private financial data relating to investors, and documents, such as files

relating to institutional clients of Amerindo U.S., that were well beyond the scope of the

Government's allegations.  *See* GXs 26 and 27.

Although the Government has acknowledged that the search and seizure at Cadogan Tate

was conducted for the sole purpose of assisting the U.S. Government's criminal prosecution and

civil enforcement action against Defendants, both of whom are U.S. citizens, at no time in the

eight months between the initiation of the investigation and the execution of the search did the

Government ask the Court or any other magistrate of the United States for authority to conduct

the search.  *See* Tr. 2/9/06 at 29.

## ARGUMENT

### POINT I

### THE SEARCH WARRANT IS
### UNCONSITUTIONALLY OVERBROAD

The purpose behind the Fourth Amendment warrant clause is to ensure that "those

searches deemed necessary should be as limited as possible.  Here, the specific evil is the

---

[15]     As with the Amerindo U.S. computers, to date not a single electronic file seized from the U.K. storage facility has been returned by the Government as outside the scope of the U.K. warrant.

'general warrant' abhorred by the colonists, and the problem is not the intrusion *per se*, but of a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S. Ct. 2022, 2038, 29 L.Ed. 2d 564 (1971).   By limiting searches "to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison,* 480 U.S. 79, 84, 107 S.Ct. 1013, 1016, 94 L.Ed. 2d 72 (1987).

As demonstrated below, the warrant to search the premises of Amerindo U.S. (the "Warrant") was overly broad and permitted the seizure of all records of four large international entities without a commensurate showing of probable cause and without any temporal limitations.   As a result, the Warrant is invalid and all evidence seized and derived therefrom should be suppressed.  *See* GX 32.

A**.**   The Warrant is Unconstitutionally Overbroad

The supporting Affidavit of Agent Fraterrigo discusses two disgruntled investors. Although it mentions a hearsay statement that three other investors "may have had trouble redeeming all or part of their investments," *See* GX 33 at ¶ 6E, "may have had trouble" is not the stuff of probable cause.[16]  Looking at the Affidavit in the light most favorable to the Government, the Affidavit at most alleges probable cause to believe that some wrongdoing occurred with respect to two named investors, Lily Cates and the Mayer family, regarding two specific investments, SBIC and GFRDA.[17]   Clearly, such allegations do not amount to probable

---

[16]    Indeed, the Government itself has acknowledged the highly qualified nature of this allegation, apparently necessitated by Agent Fraterrigo's utter failure to take any steps to corroborate Cates' allegation.  *See* Gov. Opp. *Franks* at 25.

[17]    As set forth in the Memorandum submitted simultaneously by Gary Tanaka, in which Mr. Vilar joins, when the Amerindo U.S. warrant application is corrected to eliminate material misstatements and

cause to search and seize nearly every business-related item on the premises, including but not limited to *every* client file, *all* accounting, expense, banking, personnel and corporate records, and *all* computer, telephone and facsimile equipment.

The attachment to the Warrant authorized the wholesale seizure of essentially everything in the office, without regard to time frames, investors, investments or individual targets of the investigation. *See* GX 32. The attachment included generic categories, such as "corporate records," followed by a list of examples that are illustrative but not exhaustive (paragraph 1); all records of expenses, all accounting records and all documents relating to the running and supervision of the investment advisory business (paragraph 14); "documents reflecting information about any current or former Amerindo employee," (paragraph 15); "[c]omputers, hard drives, and any other devices or equipments capable of storing data or text in any format," (paragraph 17); and, all "drafts and final versions of documents and correspondence prepared in connection with the running and supervision of the operations of the investment advisory business," (paragraph 17). Also illustrative of just how broad the Warrant is, it authorized the seizure of evidence relating to any of four Amerindo entities, including Amerindo Cayman, with respect to which the Government **to this day** has not asserted any allegations of wrongdoing.

The Warrant also fails to provide any time-frame whatsoever. AUSA Litt acknowledged in his testimony that there was no allegation in the Affidavit that the Mayers had any trouble accessing their investments before 2003 and no allegation that Cates had any difficulty before

---

omissions regarding the Mayer Family, it utterly fails to establish probable cause to seize documents relating to the Mayers, let alone to believe that any "other investors are likewise being victimized" by Defendants. *See GX* Ex. 33 at ¶6F. In fact, even under the most generous interpretation, the corrected warrant application at most supports probable cause to take documents pertaining to Lily Cates' SBIC investment. *See* Tanaka Mem. In Support of Pending Motions, Section I.A.4.

2005. *See* Tr. 8/9/06 at 292-293.[18]   The allegations in the Tanaka complaint attached to the

warrant application are similarly limited to the period of November 2003 through April 2005,

and the alleged misconduct concerning Cates' SBIC investment began, according to the Vilar

complaint, in January 2002.[19]  *See* GXs 33A and 33B.  Agent Fraterrigo testified that, in her

experience, there should be a time frame in a warrant. *See* Tr. 7/7/06 at 137-138.  The Amerindo

U.S.Warrant, however, did not have one.  As a result, although the earliest alleged incidence of

any wrongdoing occurred in 2002, the Warrant authorized the seizure of all records of the

Amerindo entities no matter how old.

     1.    <u>Paragraph 1 of the Attachment</u>

     Paragraph 1 alone demonstrates that the Warrant (GX 32) is unconstitutionally overbroad.

Paragraph 1, by its terms, permitted the inspectors to seize all business records of the four

Amerindo entities.  While the paragraph provides examples of certain types of documents, the

examples are prefaced by the expansive phrase "including but not limited to. . . ."  Specifically,

Paragraph 1 authorized the seizure of:

> "Corporate Records concerning [each of the Amerindo entities]
> **including but not limited to** records concerning the formation of
> each of the above-listed Amerindo entities, its shareholders, principals,
> officers, directors, and employees, changes in ownership, bylaws,
> resolutions, client lists, client files, investment brochures, marketing
> materials, investment advisory agreements, copies of correspondence
> sent to or received from clients, and other documents concerning or
> reflecting the identities of and communications with clients who have
> investments managed or advised by Amerindo.

---

[18]     AUSA acknowledged upon questioning by the Court that the allegations about Rhodes Capital did
not constitute criminal conduct.  *See* Tr. 10/25/06 at 5-8.

[19]     Although the allegations pertaining to Cates' SBIC investment are set forth in some detail in the
Vilar complaint, the Affidavit only references Cates' SBIC investment in passing, alleging that she had
issues redeeming the investment in February 2005.  Notably, the executing officers were not provided
with copies of the criminal complaints, and therefore did not have the benefit of the more detailed
allegations.

The Second Circuit has held that "[a] failure to describe the items to be seized with as much particularity as the circumstances reasonably allow offends the Fourth Amendment because there is no assurance that the permitted invasion of a suspect's privacy and property are no more than absolutely necessary." *United States v. George,* 975 F.2d 72, 76 (2d Cir. 1992). According to the Supreme Court, the particularity requirement "makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States,* 275 U.S. 192, 196 (1927).

That paragraph 1 is impermissibly overbroad was confirmed by the testimony of the Government's witnesses. Inspector Feiter, who interpreted the paragraph as permitting the seizure of any items listed as well as "anything that is related to" the item, testified that the Warrant authorized the seizure of any and all business records on the premises. *See* Tr. 12/14/05 at 136, 161-163. In response to an inquiry by the Court, Inspector Feiter noted that as long as a document had "writing on it," it "would go." *See* Tr. 12/14/05 at 162. Inspector Feiter viewed the warrant as authorizing the seizure of any document containing letterhead of any one of the four entities, even business cards. *See* Tr. 12/14/05 at 136, 162. Agent Fraterrigo also testified that the reference to corporate records in paragraph one could mean any business records. *See* Tr. 8/8/06 at 132-134.

Paragraph 1 of the Warrant is precisely the type of provision that is prohibited because it is entirely un-particularized and bears no relation to the probable cause established in the Warrant. This paragraph, by the Government witness's own admission, permitted the carting off of all business records of all four Amerindo entities. *See* Tr. 8/8/06 at 134-35.

In *United States v. Lafayette,* 610 F.2d 1 (1st Cir. 1979), a vocational home-study school was under investigation for fraudulent practices in connection with a federal student loan program. The warrant authorized the seizure of a long list of documents, both generic and more specific:

> Books, papers, rosters of students, letters, correspondence, documents, memoranda, contracts, agreements, ledgers, worksheets, books of account, student files, file jackets and contents, computer tapes/discs, computer operation manuals, computer tape logs, computer tape layouts, computer tape print-outs, Office of Education (HEW) documents and forms, cancellation reports and directives, reinstatement reports or forms, Government loan registers, refund ledgers, reports and notes, administrative reports, financial data cards, lesson and grading cards and registers, registration (corporations) documents, student collection reports, financial documents (corporations), journals of accounts and student survey data, which are and constitute evidence of the commission of violations of the laws of the United States, that is violations of 18 U.S.C., Sections 286, 287, 371, 1001 and 1014.

*Id.* at 3. The Court found the warrant, which essentially instructed the executing officer to "cart away all documents," to be unconstitutionally broad as it "purport[ed] to authorize not just a search and seizure of [evidence of the specific crime] . . . but a general rummaging for evidence of any type of federal conspiracy or fraud." *United States v. Lafayette Academy,* 610 F.2d at 3, 5-6; *see United States v. George,* 975 F.2d 72, 76 (2d Cir. 1992); *United States v. Maxwell,* 920 F.2d 1028, 1032 (D.C. Cir. 1990) (overbroad warrant authorized seizure of appellant's business records). The *Lafayette* Court noted that, while some of the items listed may have been sufficiently particularized standing along, *e.g.* "rosters of student" and "student collection reports," they covered documents pre-dating the time frame of the alleged criminal conduct. Thus, no item satisfied the requirements of the fourth amendment. *Lafayette,* 610 F.2d at 6.

Neither the Amerindo U.S. Warrant nor the *Lafayette* warrant contain any time limitations. The Amerindo U.S. Warrant, however, is even more expansive and lacking in

particularity in that it includes the phrase "including but not limited to" and does not indicate anywhere on the face of the Warrant the nature of the alleged crime.  *See* GX 32 at ¶1.  The Second Circuit has made clear that such warrants "offend[ ] the Fourth Amendment."  *George,* 975 F.2d at 76.

Similarly, in *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995) the search warrant described nearly every document on the premises with no limitations as to which documents within each of 14 category could be seized or how the documents related to specific criminal activity.  It also failed to "limit scope of the seizure to a time frame within which the suspected criminal activity took place, even though [the search warrant affidavit] indicates that the alleged criminal activity began relatively late in [the business's] existence."  The Ninth Circuit found that it was "indistinguishable from the general warrants repeatedly held by this court to be unconstitutional."  *Id.* [20] *See also United States v. Spilotro,* 800 F.2d 959, 965 (9th Cir. 1986)("the authorization to seize 'gemstones and other items of jewelry' was far too broad, bearing no relation to whatever probable cause the government had to search the store for stolen gems or jewelry.").

*United States v. Klitzman,* 744 F.2d 955 (3rd Cir. 1984), is also instructive.  In *Klitzman,* a personal injury lawyer was under investigation for a scheme to defraud medical insurance companies. In finding that plaintiff was likely to succeed on the merits of its claim that the search warrant was overbroad, the Third Circuit noted that the warrants at issue:

> . . . authorized the postal inspectors to search *all* client files, open or closed, to determine which personal injury case files to seize. The warrants allowed the seizure of all of the firm's financial

---

[20]    The Ninth Circuit also noted that, to the extent it may have been difficult for the government to be more particular, the government may have been to blame for refraining from further investigation and then relying on a lack of specific information to justify a lack of particularity in the warrant. *Id.* at  428 fn.2.

> records, file lists, and appointment books regardless of whether
> those documents were connected in any way to the personal injury
> files sought by the grand jury. In effect, the warrants authorized
> virtually a wholesale search and seizure of the business records of
> the firm.

*Id.* at 960. The Amerindo warrant is overbroad for the same reasons.

According to the plain language of and testimony at the hearing about Paragraph 1, it authorized the seizure of all of the business records of not one, but four companies. Nothing in the text of the remainder of the Warrant limits the scope of this overly broad grant of authority.[21] Compounding the problem is that, as discussed more fully below, the broad provisions of paragraph 1 of the Warrant were not and cannot be cured by the extremely narrow supporting Affidavit because, among other reasons, (a) the Warrant fails to incorporate the Affidavit, and (b) the actual execution of the search was not limited by the terms of the Affidavit. *See* discussion, *infra*. Accordingly, based on Paragraph 1 alone, the Amerindo U.S. Warrant must be rejected as overbroad.

>    2.   Paragraph 16 of the Attachment to the Warrant is Overbroad

The first of the two paragraphs in the Warrant numbered "16" (hereinafter referred to as "paragraph 16") is similarly overbroad. Paragraph 16 permits the seizure of "Photographs, address books, Rolodex indices, diaries, calendars, identification documents, travel documents," and concludes with the catch-all phrase, "*and other documents concerning or reflecting*

---

[21]    Although at one point during her testimony, Agent Fraterrigo suggested that she read the subsequent paragraphs as somehow limiting the scope of Paragraph 1, nothing in the Warrant supports this interpretation. Indeed, as the Court itself pointed out, were Agent Fraterrigo's interpretation correct, Paragraph 1 however, would serve no purpose whatsoever and might as well have been left out of the Warrant. *See* Tr. 8/8/06 at 131-35. Basic principles of contract construction prohibit this result. In any event, Agent Fraterrigo testified that she did not instruct any of the other officers to adopt her interpretation or otherwise limit their search beyond the plain language of the Warrant. *See* Tr. 7/10/06 at 39; Tr. 8/8/06 at 23-24.

*information concerning the identities of participants in the fraud schemes." See* GX 32 at ¶16.

(*Emphasis added*).  The Warrant does not identify the *participants* or describe the *fraud schemes*.

Thus, the phrase "other documents concerning or reflecting information concerning the identities

of participants in the fraud scheme," could be construed as authorizing the seizure of every item

– whether business-related or personal – of every person who worked on the premises.  This is

precisely the kind of overbroad, un-particularized warrant provision that provides insufficient

guidance, leaves too much discretion to the searching agents and violates the Fourth

Amendment.  The Inspectors executing the Warrant were simply left to their own unfettered

discretion as to the identification of the participants of the alleged "fraud schemes," what crimes

allegedly were committed, and what would constitute evidence of them.

In *United States v. George,* 975 F.2d 72, 74 (2d Cir. 1992), the warrant listed specific

items stolen and used during a robbery, and "any other evidence relating to the commission of a

crime."  A shotgun, not specified in the warrant, was recovered during the search.  The Second

Circuit held that the warrant was overbroad because of the last, catch-all clause, which did not

specify any particular crime:

> The subject warrant is unconstitutionally overbroad and, unlike
> the situation in *Buck,* in light of the settled nature of the law
> concerning the failure for lack of particularity of warrants
> authorizing the search for "evidence" limited only by reference
> to "a crime," it is the type of facially invalid warrant that could
> not have been relied upon in good faith because "one who simply
> looked at the warrant . . . would . . . suspect that it was invalid."

*Id.* at 78 (citations omitted).  The Second Circuit found that the warrant "effectively granted the

executing officers' 'virtually unfettered discretion to seize anything they [saw].'"  Id. (citations

omitted).  Because authorization to search for evidence of  "a crime," *i.e.* any crime, provides no

readily ascertainable guidelines for the executing officers as to what items to seize, it is so broad as to constitute a general warrant."  Id. at 76.

As in *George*, nothing on the face of the Warrant in the case at bar informed the searching officers for what crime the search was being undertaken.  Only a single paragraph out of 18 contained the generic term "fraud" – the catch-all phrase of paragraph 16, which authorizes seizure of "other documents concerning or reflecting information concerning the identities of participants in the fraud schemes."  It was left entirely to the officers' discretion to determine what the alleged "fraud schemes" were, as well as who were the alleged participants, in order to determine which photographs, address books, diaries, calendars "and other documents" to seize.[22]  Clearly, such a vague and ambiguous allusion to "fraud" is insufficient to satisfy the constitutional requirements discussed in *George*.  *See also United States v. Maxwell*, 920 F.2d 1028 (D.C. Cir. 1990)("[r]eferences to broad statutes realistically constitute no limitation at all on the scope of an otherwise overbroad warrant and therefore cannot save it").  Moreover, the remaining seventeen paragraphs of the Warrant, which collectively call for nearly every item on the premises, are entirely devoid of **any** reference to the particular crime alleged.

Predictably, as the Government did in *George*, the Government here attempts to "blunt" the implications of this indiscriminate Warrant by arguing that it should be read "in context" with the Affidavit.  As in *George*, consideration of the supporting Affidavit as a limitation on the

---

[22]    In *Andresen v. Maryland*, 427 U.S. 463, 480-81 (1976), the Court was able to limit the scope of the catch-all phrase in the text of the Warrant as the phrase specifically referred to one particular crime. *Andresen v. Maryland* involved a fraud investigation concerning the sale of a certain parcel of real estate. The warrant authorized a search for items pertaining to that parcel, listed several categories and types of evidence separated by semicolons, and concluded with the phrase "together with other fruits, instrumenta- lities and evidence of crime [which is unknown at this time]."  *Id.*  The Supreme Court held that the last catch-all phrase did not convert the warrant into a general warrant as the phrase "pertaining to [the parcel]" was followed by a colon and the clauses that followed were separated by semicolons so they were appropriately limited.  *Id.* at 480-82. Here, not only is paragraph 16 not limited as in *Andresen,* but rather the entire warrant does not disclose a crime that was committed – either directly or by reference.

scope of the Warrant is not permissible in this case, because the Warrant did not incorporate the Affidavit. "Resort to an affidavit to remedy a warrant's lack of particularity is only available when it is incorporated by reference in the warrant itself and attached to it." *George*, 975 F.2d at 76. "The recitation in the instant warrant that it is 'issued upon the basis of an application and affidavit[] of' [the patrolman] does not direct the executing officers to refer to the affidavit for guidance concerning the scope of the search and hence does not amount to incorporation by reference." *Id.* at 76; *United States v. Maxwell,* 920 F.2d 1028, 1032 (D.C. Cir. 1990) ("something more is required than a boilerplate statement that the affidavit . . . presented to the magistrate constitute[s] probable cause for issuing the warrant."); *United States v. Lafayette Academy,* 610 F.2d 1, 4 (1st Cir. 1979) (warrant did not use suitable words incorporating affidavit and affidavit was not served with the warrant, as such, it constitutes an impermissible grant of authority). The Warrant here does not incorporate the search warrant Affidavit and, therefore, the Affidavit cannot save the Warrant. *United States v. Lafayette Academy*, 610 F.2d at 7 (Kunzig, J., concurring) ("too many errors (such as failure to incorporate the affidavit in the warrant)" prevent a narrower interpretation of the Fourth Amendment to save warrant); *see United States v. Rollack*, 90 F. Supp.2d 263, 273-74 (S.D.N.Y. 1999) (warrant that failed to incorporate affidavit and did not specify nature of the crimes investigated was overly broad).

While the Second Circuit has held that actual incorporation and attachment are not necessarily required where, under the circumstances of the case, the functional purposes of those two requirements may be deemed fully satisfied, a warrant lacking particularity can be saved only if "the involved parties were aware of the scope of and limitations on the search." *United States v. Bianco,* 998 F.2d 1112, 1116-17 (2d Cir. 1993). In *Bianco*, the court upheld the search based upon an overly broad warrant because the circumstances indicated that the searching

officers were aware of the scope of and limitations on their search as set forth in the supporting affidavit. *United States v. Bianco,* 998 F.2d at 1116-17. The Court identified as important the fact that both the federal agents and the defendant were apprised of the scope of **and limitations on** the search. In *Bianco*, the affidavit was present at the time of the search and clearly spelled out the nature and purpose of the search, as well as the nature of the documents sought. The Court also relied on the fact that the supervising agent on site had read the affidavit, was aware they were searching for evidence of loansharking, **and approved each and every seizure**, such that the Court was confident the limitations included in the affidavit were actually observed. *Bianco*, 998 F.2d at 1117.

The facts of the instant case fall far short of providing the protections identified in *Bianco*. First, while in *Bianco* it was "quite clear" that the defendant was apprised of the contents of the affidavit, counsel for Amerindo U.S., who was present at the search, testified that he was not provided with a copy of the Affidavit at the time of the search. *See* Tr. 5/31/06 at 23.

Second, although the executing officers allegedly were given copies of the Affidavit, with the exception of the few officers who also participated in Defendants' arrests, none of the officers had reviewed the criminal complaints, which were attached to and incorporated by reference in the Affidavit. The Affidavit continuously references the complaints, especially with respect to the nature of the alleged SBIC scheme which is not described in the Affidavit. Indeed, Agent Fraterrigo herself admitted that the complaints were **necessary to understand the scope of the warrant application**, and that her failure to distribute them was a mistake. *See* Tr. 8/8/06 at 23; Tr. 7/7/06 at 50-51. Operating without having seen the complaints, the majority of the officers were in the dark about the nature and purpose of the search. Standing alone, the Affidavit certainly does not narrow the scope of Paragraph 16, for example, of the attachment,

which called for all documents "*concerning the identities of participants in the fraud schemes.*"

Paragraph 3 of the Affidavit states that "there is probable cause to believe that certain

individuals, including the principals *and other employees of [the four Amerindo companies],*

including Alberto William Vilar, a/k/a Albert Vilar, and Gary Alan Tanaka, have been engaged

in a fraudulent scheme . . . "Aff. at ¶3 (*emphasis added*).  Since the "employees" were not

identified, the Postal Inspectors were authorized to seize any document containing any

information about the identities of any employee of any of the four Amerindo entities, including

Amerindo Cayman, about which no allegations have ever been made.  Indeed, Inspector Feiter

conceded that the combination of the Warrant and the Affidavit could lead an Inspector

executing the search warrant to seize evidence concerning any employee of any of the four

Amerindo entities. [23]  *See* Tr. 12/14/05 at  131-133.  Nor does the Affidavit sufficiently narrow

or identify what is meant by the reference in Paragraph 16 to "fraud schemes," particularly as the

Affidavit relies heavily on the criminal complaints, which were withheld from the executing

officers.  *See United States v. Lafayette Academy,* 610 F.2d  at 3 ("Here, at a minimum, the

precise nature of the fraud and conspiracy offenses for evidence of which the search was

authorized fraud and conspiracy . .. needed to be stated in order to delimit the broad categories of

documentary material and thus to meet the particularity requirement.").

   Third, even taking the Warrant, Affidavit and criminal complaints together, they could

hardly be described as spelling out "quite clearly the nature and purpose of the proposed search."

---

[23]    No comfort can be drawn from the presence of the case agent at the search location, as she was not
there for the first four hours and she provided no meaningful guidance to the other inspectors during the
search.  Although Agent Fraterrigo testified that she discussed the investigation during the pre-search
briefing, (*see* Tr. 7/7/06 at 46-51), several of the searching officers were not there and her testimony about
the briefing was not corroborated by Inspector Feiter, who could not recall what was said. *See* Tr.
12/14/05 at 130; Tr. 8/8/06 at 16-17.  In any event, Agent Fraterrigo stated definitively that she did not
instruct the executing officers regarding any limitations to the language of the Warrant.

*See Bianco*, 998 F.2d at 1117.  As an initial matter, the Tanaka complaint was so unclear that Magistrate Judge Maas needed the Government to explain the inferences to be drawn from it.  At the hearing AUSA Litt stated that Judge Maas asked questions "with respect to the Tanaka complaint" and had the Government "walk[] through the chain of inferences that it was investor funds, that there was probable cause to believe that investor funds were being used to purchase the horses.".  Judge Maas was left to ask whether the Government was essentially drawing a chain of inferences.  *See* Tr. 5/31/05 at 175, 189-191.   If Judge Maas had trouble, federal agents carrying out the search certainly could not be counted upon to grasp the allegations in the Tanaka complaint as a means of limiting the search authorization.

Fourth, neither Inspector Feiter nor Agent Fraterrigo approved each seizure, as occurred in *Bianco*.  Inspector Feiter simply walked through the premises, answered questions without having read the complaints, and did not review each document seized but rather inventoried the amount of documents seized.  *See* Tr. 12/14/05 at 81-82, 115.   Agent Fraterrigo testified that only when she was asked questions by other federal agents executing the search did she review the contemplated seizure, making her own judgment about what would be useful to the investigation.  She did not educate the other agents about the types of documents that would not be useful and could be left behind.  Among the seized materials were items similar to ones she had decided not to seize, such as, for example, company profiles and interoffice analyst memos regarding investments.  Even blank Federal Express receipts were seized, despite her claim that she instructed the inspectors not to take blank ones. *See* Tr. 7/10/06 at 111, 113-114; Tr. 8/8/06 at 23-33, 137-140; DXAAA; DXBBB; DXFFF.  In any event, Agent Fraterrigo was not even present at the search site for a large portion of the search, during which time the executing offers made countless determinations without the "benefit" of her guidance.  *See* Tr. 8/8/06 at 16.

Fifth, and perhaps most importantly, the Government has presented no evidence that the Affidavit actually operated to limit the scope of the Warrant. As an initial matter, Agent Fraterrigo testified that she did not instruct the executing officers to limit their search in any way. *See* Tr. 8/8/06 at 23-28. Even a cursory examination of the documents seized pursuant to the Warrant reveals that the officers did not on their own initiative limit the scope of the Warrant, whether based on the extremely narrow allegations in the Affidavit or otherwise. The agents seized approximately 170 boxes of hard copy documents and the entire Amerindo U.S. computer system, consisting of an astonishing 1.6 terabytes of data. *See* Tr. 12/14/05 at 8, 89. Indeed, the agents did search and would have seized ***even more*** documents had the Government not chosen to serve a subpoena on Amerindo U.S. in lieu of completing the search.

In *Bianco*, the Court found, based upon the documents and testimony, that "the agents *knew* what they were looking for, and that in executing the search ***they took only that which they needed and which was contemplated by the authorizing papers***." *Bianco*, 998 F.2d at 1117 (emphasis added). In this case, only four of the nineteen Inspectors even had a complete version of the Affidavit. *See* Tr. 12/14/05 at 160, 165. The officers took documents that went far beyond what was contemplated by any probable cause assertion in the Affidavit and complaints. *See pages 12 - 14, supra.* There is no evidence in this case that the "involved parties were aware of the scope of and limitations on the search." Therefore, there is no basis to conclude that the Affidavit or anything else had any limiting effect on the Warrant.

    3.    Paragraphs 10, 14 And 17 Of The Attachment

Paragraphs 14 and 17 provide similarly impermissible broad grants of authority for the Government to seize evidence. Specifically, those two paragraphs permit the Government to take, among other things, "documents relating to" and "prepared in connection with" the

"running and supervision of the operations of the investment advisory business(es)" of

Amerindo. *See* GX 32 at ¶14, 17.   Since the business of Amerindo was providing investment

advisory services, these catch-all paragraphs authorize the seizure of all operating records of the

four Amerindo entities. *See* GXs 33A and 33B at ¶4.

Paragraph 17 begins by authorizing seizure of "[c]omputers, hard drives, and any other

devices or equipments capable of storing data or text in any format," and ends with the following

all-encompassing line:

> . . . as well as drafts and final versions of documents and
> correspondence prepared in connection with the running
> and supervision of the operations of the investment advisory
> business.

In an effort to circumscribe paragraph 17, the Government has argued that the language

at the end of the paragraph was meant to apply only to electronically stored drafts of the

documents.  The problem with the Government's analysis is two-fold:  first, it is contrary to the

plain meaning of the provision, and second, the Warrant begins with a general grant of authority

to seize all corporate and business documents of the four Amerindo entities and ends with

another broad provision, clarifying that the seizure is to include drafts of such documents as well.

Interpreting the Warrant to support a broad reading is consistent with its clear text.  In any event,

no matter how the Government urges the Court to construe this concluding clause, no amount of

explanation can save the first portion of Paragraph 17, which permits seizure of all computer data

accessible from Amerindo U.S.'s New York office without any limitation whatsoever.  *See* Point

II, *infra.*

A perfect, additional example is Paragraph 10, which authorized the seizure of

"documents reflecting or relating to the cancellation of completed trades and rebooking of those

canceled trades in other accounts . . . ."  There are no allegations in the criminal complaints or

the Affidavit of such conduct.  While this may be a common practice of "boiler room" operations, there are no allegations suggesting that Amerindo was a "boiler room" or that it engaged in the conduct described in this paragraph.

      4. <u>Paragraphs 2 Through 9, 11, 12, 13 and 15</u>

None of the other paragraphs of the attachment GX 32 contain any time frame whatsoever.  They are each subsets, all overly broad themselves, of the even broader paragraphs set forth above.  Paragraph 2 calls for ***all*** documents relating to certain brokerage accounts through which Amerindo conducted its business, and Paragraph 13 repetitively calls for all documents related to the movement of funds into or out of those accounts.  Similarly broad are Paragraphs 4 and 5; whereas Paragraph 4 calls for all documents concerning or reflecting the identities of and communications with clients who have investments in the above-referenced brokerage accounts (including but not limited to client files, investment brochures, marketing materials, etc.), Paragraph 5 calls for all documents concerning or reflecting the identities of and communications with clients whose investments with Amerindo utilize overseas accounts.

Each successive paragraph requests an equally broad array of documents bearing no relation whatsoever to any alleged crime.  *See, e.g.*, Paragraph 12 (all documents reflecting any brokerage accounts maintained by Amerindo at any broker-dealer); Paragraph 15 (all documents reflecting information about any current or former Amerindo employee or had any contact with or responsibility for any current or former Amerindo client with any interest whatsoever in the Amerindo Brokerage Accounts).

Paragraphs 3 and 6 are unsupported by the probable cause allegations in the Affidavit. Paragraph 8 is not limited to the one investor who allegedly had trouble with GFRDAs  and <u>none</u> of the paragraphs contains a limiting time frame.

As a result, the Warrant was impermissibly broad and the evidence seized and derived therefrom should be suppressed.

5.  <u>What the Government Seized</u>

Not only are the provisions of the Warrant grossly overbroad, but an examination of the items seized confirms that the Warrant was executed in accordance with its broad language and without limitation.  A review of the evidence seized provides numerous examples of items seized beyond the scope of any probable cause established in the Affidavit.  *See* Tr.  7/7/06 at 149-156; Tr. 7/10/06 at 29-38, 51-54; s*ee pages 12 - 14, supra.*.

The Warrant provided blanket authority to the Postal Inspectors, as evidenced by Inspector Feiter's interpretation, to seize all of Amerindo's business records.[24]  The scope of such a seizure was not supported by the probable cause showing in the Affidavit.  With three exceptions, Inspector Feiter could not recall any items or categories of items that were *not* seized; the exceptions being personal correspondence specifically identified by an Amerindo employee who asked to keep it, blank stationary, and duplicate business cards.  *See* Tr. 12/14/05 at 104-105.  He testified that, from the 20 rooms/areas actually searched, 60 to 70 percent of the office contents were taken.  Given that most business work spaces include items such as blank paper, stationary, envelopes, phone books, computer software guides, *etc.*, 60 to 70% of a 20-room office is an extraordinary amount of material.[25]   Moreover, the Government also took *the whole computer system.  See* Tr. 12/14/05 at 156; Tr. 7/10/06 at 57-59.  The Government proposed and the magistrate imposed no limitations as to the searches that the Government could do in that system.  *See* Point   , *infra.*

---

[24]    The portions of Paragraph 17 regarding the computers is also addressed separately in Point II, *infra.*

[25]    The officers searched rooms A through V, excluding the two storage areas covered by the subpoena, which were searched but from which items were not seized. *See* Tr. 12/14/05 at 98.

In addition, while the Government did not physically take the documents in a storage room and a bank of file cabinets, it searched the room and the file banks and made a detailed inventory, therefore seizing significant information about the materials.  *See* GX 3; Tr. 12/14/05 at 89.   In *Arizona v. Hicks,* 480 U.S. 321 (1987), the Supreme Court held that the movement of stereo equipment to look at the serial number constituted a search.  Similarly, the opening of file cabinets and boxes in a storage room in order to inventory them constituted a search.  Thus, it is clear that the Government searched the entire Amerindo premises.  Under the unconstitutionally overbroad warrant in this case, no stone was left unturned.

B.    The "All-Records" Exception is Inapplicable

The Government has conceded that the "all-records exception" is "not their strongest argument."  *See* Tr. 7/10/06 at 84.

The allegations in the Affidavit do not even come close to the standard necessary to show that Amerindo, however it is defined, was permeated by fraud.[26]  Indeed, perhaps most revealing, the Government did not contend in the Affidavit that the companies were permeated by fraud or constituted a pervasively fraudulent enterprise.  *United States v. Maxwell,* 920 F.2d at 1033 (affidavit "made no assertions concerning the nature or extent of appellant's business dealings as a whole"); *National City Trading Corp. v. United States,* 635 F.2d 1020, 1024-26 (2d Cir. 1980).  Indeed, throughout this litigation, far from trying to justify a broad grant of authority to take all records of the fraudulent enterprise, the Government has taken pains to try to limit the scope of the provisions of the Warrant to certain business records.

When reviewing whether a business was so permeated by fraud, courts look to such factors as whether there was "evidence of "a large number of fraudulent transactions or of

---

[26]   Throughout the Amerindo U.S. warrant application, the Government lumps four Amerindo entities into one and refers to this omnibus entity as simply "Amerindo."  *See* GX 33.

documentation – in the form of information gleaned from interviews with former employees or

from undercover surveillance of the operation – that the entire operation is a scam,"  and

whether the allegedly fraudulent operations were inseparable from the other business operations.

*See United States v. Burke*, 718 F. Supp. 1130, 1140- 1141 (S.D.N.Y. 1989).  Here, the

Amerindo warrant application supplied no such evidence.

The substantive allegations in the Affidavit relate only to two investors, the Mayer

Family and Lily Cates, in two investment vehicles, SBIC and GFRDA. The Affidavit and the

criminal complaints do not refer to any other victims who allegedly lost money.  Indeed, the

application does not even contain any evidence that any other clients of the Amerindo entities

had complained to any government authority regarding their investments.

In *Burke,* the affidavit described fraudulent transactions involving seven customers who

purchased allegedly fake Salvador Dali prints.  The Court concluded that the evidence was

insufficient to show that the entire business was permeated with fraud. *Id.* at 1141[27]; *compare*

[where courts concluded businesses were permeated by fraud] *National City Trading Corp. v.*

*United States,* 635 F.2d 1020, 1021-22 (2d Cir. 1980)(affidavit listed over 40 complaints;

undercover agents visited the company three times); *United States v. Brien,* 617 F.2d 299, 309

(1st Cir.), 446 U.S. 919 (1980)(affidavit described 250 complaints and interviews with 20 former

employees);  *United States Postal Service v. C.E.C. Servs.*, 1988 WL 81766 (W.D.N.Y. August

---

[27]    In another fake Dali case, the Ninth Circuit found a similar search warrant overbroad, where only
20% of the Galleries' business was Dali related. *United States v. Center Art Galleries-Hawaii, Inc.,* 875
F.2d 747, 751 (9th Cir. 1989).  In the case at bar, the total investments of Cates and the Mayer family
constituted far less than 20% of the company's business.  *Burke* disagreed with the result (suppression) in
*Center Art* on the issue of good faith.  In *Burke,* Judge Mukasey agreed that the all-records exception did
not apply but concluded that the search was conducted in good faith because the Affidavits limited the
scope of the search and there was no claim that a general search was in fact conducted. *Burke*, 718 F.
Supp. at 1141-1142.

3, 1988) (affidavits alleged that all or most of company's activities were illegal); *United States v Oloyede*, 982 F2d 133 (4th Cir, 1992)(documentation in over 50 cases, two confidential informants outlined in great detail procedures associated with attorney's operation, and review of 26 of attorney's files disclosed that each file contained fraudulent documents).

The affidavit in this case does not support the "all-records" exception to the Fourth Amendment's probable cause and particularity requirements.

As such, the warrant is unconstitutionally overbroad and all evidence and fruits thereof should be suppressed.

*    *    *    *

Within the myriad of documents and computer files seized, there are also, for example, personal correspondence, emails to friends, family and romantic interests, and personal mementos from past professional achievements. For individuals who started and built a thriving investment advisor firm over a span of twenty years, it is reasonable to assume, as shown by the examples cited above, that a great many materials found in the Defendants' office drawers and on their office computers contain private information – information that they reasonably believed was private and protected.  The Amerindo office was not simply a place where they worked, but the concrete manifestation of their life's work and ambition. To have such a place thoroughly combed and materials removed, relevant or not, private or not, was a forbidden general rummaging, and a profound invasion of privacy.

## POINT II

### THE SEIZURE AND SEARCHING OF THE ENTIRE
### AMERINDO U.S. AND U.K. COMPUTER SYSTEMS
### WERE UNCONSITUTIONAL

During the Amerindo U.S. search, the Postal Inspectors not only seized 170 boxes of hard copy documents, but they also took approximately 30 computers and servers containing over 1.6 terabytes of information – roughly the equivalent of 125 million hard-copy pages.[28]

The Government proposed and the Magistrate imposed no limitations as to the searches that the Government could do on the computers.  Indeed, Agent Fraterrigo testified that there has never been any effort to review the computer data to determine what was and was not covered by the search warrant attachment or what was or was not otherwise relevant to the Government's investigation.  *See* Tr. 7/10/06 at 57-58; 7/10/06 at 128-129.  To date, not a single computer file has been returned to Amerindo U.S. or U.K. as outside the scope of the warrant or otherwise improperly seized.

There can be no dispute that not all of the information on the numerous computers and servers seized by the Government would be subject to search and seizure under the terms of the Warrant attachment if the information existed in paper form.  The fact that information exists in virtual form does not exempt it from the particularity requirement of the Fourth Amendment. We live in an age where documents are routinely either generated electronically or scanned into and stored in electronic format (*e.g.* on computers or disks), and where computers are often used to record the minute details of daily life.  Computer browsers used to search the internet store vast amounts of information about the users' identity, interests and habits, including music,

---

[28]    "Computer hard drives sold in 2005 generally have storage capacities of about eighty gigabytes, roughly equivalent to forty million pages of text – about the amount of information contained in the books of one floor of a typical academic library."  Kerr, Searches and Seizures in A Digital World, 119 Harv. L. Rev 531 at 542 (December, 2005).

shopping, movies and dating activities.  In a networked world, "a single storage device can store the private files of thousands of different users."  *See* Kerr, Searches and Seizures in A Digital World, 119 Harv. L. Rev 531 at 556, 569.  If the Government is permitted to seize computer hardware with unfettered access to all of the information contained therein, the Fourth Amendment is meaningless.

In a traditional search of  business premises, Government agents look at documents, files and papers only long enough to make a determination as to whether the document, file or paper falls into a category for which probable cause to search and seize has been established.  If it fits into any of the specified categories, it is seized; if not, it should be left.  In the case of the Amerindo U.S. warrant, however, no such limitation was proposed by the Government or imposed by the Magistrate when it came to electronic evidence, and no such procedure was adopted by the Government in conducting its searches of the computers.   Just as searches of physical premises are circumscribed by the probable cause showing giving rise to them, searches of computerized information must be similarly circumscribed.  The Warrants in this case contained no such limitations and, as such, and in addition to and for the same reasons set forth in Point I, the Warrants are unconstitutionally overbroad.

1.     The Amerindo U.S. Search Warrant

The first page of the Amerindo U.S. Warrant simply identifies the premises to be searched and refers to "Attachment A," without specifying the crimes or code sections concerning which evidence may be seized.  The preface to the Attachment's 18 paragraphs simply states "Property to be seized at the Premises [described], and within closed and/or locked containers, briefcases, safes and other containers kept within the premises."  *See* GX 32. Paragraph 17 authorizes the search for and seizure of:

> Computers, hard drives, and any other devices or equipments
> capable of storing data or text in any format, including but not
> limited to cellular telephones, personal digital assistants, and any
> other storage media capable of containing data or text in magnetic,
> electronic, optical, digital, analog, or any other format, used to store
> information described above . . . .

In a footnote, the Magistrate authorized the Government to "create mirror images of the

computers' hard disk drives" and to return the original devices within ten days, or make a further

application.[29]

Rather than authorizing the Government to seize any materials identified in the

Paragraphs 1 through 16 located within the electronic devices listed in Paragraph 17, the Warrant

simply permits the seizure of all such devices "used to store information described above,"

without in any way limiting the searching of those devices or the seizures from them.

2.  The Supporting Affidavit

In the portions of Agent Fraterrigo's Affidavit purporting to establish probable cause, there is no

specific mention of the use of computers in connection with the allegedly criminal activities she

describes.  Agent Fraterrigo simply sates that she saw "at least one computer," and that Cates has

seen numerous computers during her visits to the Premises.  *See* GX 33 at ¶7.  In the final pages

of the Affidavit, Agent Fraterrigo states that it may be necessary to seize computer equipment,

including laptops, for processing by a computer specialist because: 1) computer storage devices

can store thousands of pages of information, and the users "may" have taken steps to conceal

evidence of criminal activity by storing it "in random order with deceptive file names,"

necessitating a sorting process  than can take weeks or months and making it impractical to do

the data analysis on-site; 2) analyzing computer systems for evidence of criminal activity is an

---

[29]    Upon a further application by the Government, at least some of the computers were ultimately
returned 19 days after the computer were seized. *See* Memorandum In Support of Motion to Suppress
Computer Files, filed by Defendant Tanaka, dated October 5, 2005.

highly technical process requiring an expert skilled in the particular systems and applications seized, which cannot be known prior to the search; 3) the anticipated volume of data usually requires that the devices be seized and processed by an expert in a laboratory setting; and 4) with respect to smaller laptop computers, seizing them is more practical and "less intrusive" than analyzing them on-site.  Finally, Agent Fraterrigo listed the possible techniques to be used to analyze the computers:

> Such techniques **may include, but shall not be limited to,** surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files)' "opening' or reading the first few "pages" of such files in order to determine their precise contents' "scanning" storage areas to discover and possibly recover recently deleted date; scanning storage areas for deliberately hidden files; and performing electronic "key-word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist **that are related to the subject matter of the investigation.**

*See* GX 33 at ¶10F.  The proposed search techniques contain the same expansive language as Paragraph 1 of the Attachment -- "including but limited to."   Moreover, although one of the stated techniques includes running key word searches, the proposed key word searches are not limited in any clear or defined way, but rather are described vaguely as "related to the subject matter of the investigation."  The Affidavit does not propose any method to minimize the intrusions into the computer system and individual laptops or otherwise circumscribe them.

3.   The U.K. MLAT and Warrant

As with the Amerindo U.S. Warrant, the U.K. warrant was all-encompassing, purportedly authorizing seizure of nearly every business document on the premises.  *See* GX. 24 and 25; Tr. 8/8/06 at 52, 71 (acknowledging that U.S. and U.K. warrants are effectively of the same scope). *See* Tanaka Memorandum at p. 45.  The U.K. Warrant contains the same paragraph authorizing the seizure of computers and electronic devices as the U.S. Warrant. GX 24, ¶19; GX32, ¶17.

Indeed, the MLAT request, which was attached the Warrant, includes the following paragraph as a preface to the 24 paragraphs describing the items to be seized:

> Please search the offices of Amerindo UK's office at 43 Upper Grosvenor Street and seize all documents, records, files, computers, facsimile machines, photographs and other physical evidence relating to Amerindo U.S., Amerindo U.K., and Amerindo Panama including but not limited to: [24 paragraphs]

*See* GX 13 at page10.  Neither the MLAT request nor the U.K. Warrant application (GX 24 and GX25) contain any explanation of the how computers would be searched.   Rather than authorizing the seizure of any materials identified in Paragraphs 1 through 24 of the Warrant that may be contained in the electronic devices listed in Paragraph 19, the Warrant simply permits the seizure of all such computers and electronic devices, without in any way limiting the searching of those devices or the seizures from them. Seventeen computers were seized.[30]

4.   The U.S. and U.K. Warrants To Search and Seize the Computers Are Overbroad

In July of 2002, the United States Department of Justice, Criminal Division, published a manual addressing at length the issues that arise when the Government seeks to search and seize computers.  *See* Computer Crime and Intellectual Prop. Section, Crim. Div., U.S. Dep't of Justice, Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations(2002), available at  www.cybercrime.gov/s&smanual2002.htm,  (hereinafter referred to as the "DOJ Manual").  The DOJ Manual advises federal prosecutors that, when computer hardware is itself contraband or the instrumentality of the crime, such as when it is stolen or used to distribute child pornography, "the focus of the warrant should be on the computer hardware itself and not on the information it contains."  *Id.* at ¶(II)(B)(1)(a), page 42 of 96, *citing Davis v. Gracey,* 111 F.3d 1472, 1480 (10th Cir. 1997)(computer equipment used to

---

[30]    As with the Amerindo U.S. computers, to date not a single electronic file seized from the U.K. storage facility has been returned by the Government as outside the scope of the U.K. warrant.

distribute and display pornography was more than a "container for files; it was an instrumentality of the crime").   However, if the allegations of probable cause in the warrant application "relate[] in whole or in part to information stored on the computer, the warrant should focus on the content of the relevant files rather than on the storage devices which  may happen to contain them." DOJ Manual at ¶(II)(B)(1)(a), page 42 of 96 (citation omitted).   The DOJ Manual includes an appendix (Appendix F) which provides federal prosecutors with "Sample language for Search Warrants and Accompanying Affidavits to Search and Seize Computers."  The Appendix specifically states that, when computer hardware is merely a storage device for electronic files, "the warrant should request authority to search and seize the information itself, not the storage devices that the agents believe they must seize to recover the information."  *Id.* at Appendix F; www.cybercrime.gov/s&sappendix2002.htm. at page 25-26 of 39.

The Appendix even contains the specific language prosecutors should use after particularizing the records and information sought:

> The terms "records" and "information" include all of the
> foregoing items of evidence in whatever form and by whatever
> means they may have been created or stored, including any electrical,
> electronic, or magnetic form (such as any information on an electronic
> or magnetic storage device, including floppy diskettes, hard disks, ZIP
> disks, CD-ROMs, optical disks, backup tapes, printer buffers, smart
> cards, memory calculators, pagers, personal digital assistants such as
> Palm Pilot computers . . . .

*Id.*  at page 25-26 of 39.

In the case at bar, neither the Amerindo U.S. warrant nor the Amerindo U.K. warrant authorize the seizure of information on the computers; instead, they authorize the seizure of all manner of electronic devices, without providing any limitation on the searches for records and information that may be conducted on those devices once they were seized.

Citing some of the very same cases Defendants rely on in this case, the DOJ Manual put prosecutors on notice that "[a]gents should be particularly careful when seeking authority to seize a broad class of information," such as when agents plan to search business computers. www.cybercrime.gov/s&smanual2002.htm, ¶(II)(B)(1)(a), page 42 of 96(citing, *inter alia, United States v. Kow,* 58 F.3d at 427 and *Lafayette Academy,* 610 F.2d at 3-4).  The DOJ Manual recommends that warrants include limiting language stating the crime under investigation, the suspects and the time frame of the records involved.  *Id.*

The Government in this case violated all of these directives set forth in its own Manual on the subject.  The U.S. and U.K. Warrants authorize the seizure of a comprehensive array of electronic devices, rather than the seizure of particularized records and information contained in those devices.  The Warrants provide no limitations on the searching of those devices or the seizures from them.  *See* GX 33 at ¶10F.[31]  Moreover, Paragraph 17 of the U.S. Warrant contains no limiting language in terms of crimes under investigations or time frame.  The MLAT request attached to the U.K. Warrant application contains no proposal whatsoever regarding computer analysis.  *See* GXs 25 and 13.

In *United States v. Hunter,* 13 F.Supp.2d 574, 584 (D.Vermont), the warrant authorized the seizure of all computers and computer storage devices and the district court stated

> To withstand an overbreadth challenge, the search warrant itself, or materials incorporated by reference, must have specified the purpose for which the computers were seized and delineated the limits of their subsequent search.

---

[31]     Under the circumstances of the instant case, even if the computer analysis were limted to target only those electronic files that are otherwise responsive to the search warrant, the computer searching would be impermissibly overbroad.  *See* Point I, *supra.*  The fact that there was absolutely no content-based limitation placed on the computer analysis authorized by the warrants is this case makes the Fourth Amendment violation indisputable.

The court held that the section of the warrant authorizing seizure of computer equipment was insufficiently particularized, and the seizures violated the Fourth Amendment's particularity requirement. *Id.; see also In re Grand Jury Subpoena Duces Tecum,* 846 F. Supp. 11, 12-13 (S.D.N.Y. 1994)( the court quashed a subpoena that called for computer hard drives and floppy disks "that contain some data concededly irrelevant to the grand jury inquiry.").  The *Hunter* court upheld the warrant under the good faith exception because, unlike the warrant in the case at bar, the attachment to the warrant there identified the records sought by time period, individual, entity and property involved.  More importantly, "the warrant application included a detailed set of instructions to the searching agents, to the AUSA, and to the computer analysts, all designed to limit invasion of confidential or privileged or irrelevant material."  *Id.* at 582-583.  The court concluded that "the instructions and the evidence before the Court are convincing proof of the government's intention to search computers and storage devices only for the records as particularized in the first three sections of Attachment C." *Id.* at 585.  In the case at bar, not only are the provisions of the other sections of the Attachment to the U.S. Warrant overbroad, but neither the warrant nor the application contains any instructions to limit the invasion.  The same problem exists with the U.K. Warrant.

Similarly, in *United States v. Carey*, 172 F.2d 1268, 1276 (10th Cir. 1999), officers searched a computer for evidence related to narcotics dealing without limiting their search to items specified in the warrant.  When they came across child pornography, they did not seek to obtain a new warrant authorizing a search for such evidence.  The Court concluded that the search for additional evidence was improper and advised: "When officers come across relevant documents so intermingled with irrelevant documents that they cannot feasibly be sorted at the site, the officers may seal or hold the documents pending approval by a magistrate of the

conditions and limitations on a further search through the documents. *See [United State*s v. *Tamura*, 694 F.2d 591, 595-6 (9th Cir. 1982)]. The magistrate should then require officers to specify in a warrant which types of files are sought." *Id.* at 1275.

According to the case law and fundamental tenets of Fourth Amendment jurisprudence, the provisions of the Warrants regarding seizure of computer equipment in this case were unconstitutionally overbroad.  Given that the terms of the Warrants and the supporting applications fail to follow the advice, which is based on extensive legal analysis, of the Government's own Manual, there can be no dispute that the Government *did not* act in good faith.  The Warrants provide no instructions to the searching agents regarding computer searching and no limitations were adopted in practice once the computers were seized.[32]

The Government's seizure of the computers with purported authority to access every corner and crevice of the entire body of computer information that existed at the Amerindo U.S. and U.K. offices put the Defendants to the extraordinary and time-consuming expense of doing a privilege review on hundreds of thousands if not millions of pages of computer information, much of which the Government is not entitled to have.  The costs, financially and to the personal integrity and privacy rights of the Defendants, have been devastating.   All computer equipment, and evidence and leads obtained therefrom should be suppressed.[33]

---

[32]    In response to Defendants' submissions, the Government has never argued that its searches of the computers are circumscribed by the probable cause allegations in the applications.

[33]    Given the circumstances presented here, even if the computer searches were limited by the language of the other provisions of the Warrants, these searches would be unconstitutional for the reasons set forth in Point II and Defendant Tanaka's Memorandum in Support of the Pending Motions.

## POINT  III

## THE SUBPOENA IS AN EXTENSION OF AN ILLEGAL SEARCH AND THEREFORE MUST BE QUASHED

In its response to the Defendants' motion to quash the subpoena that was served on Amerindo U.S. during the execution of the search warrant, the Government argued that "the relevant question in a motion to quash a grand jury subpoena is the purpose of the grand jury subpoena when it was issued, not when it is challenged."  Govt. Memo In Opposition dated February 1, 2006 at p. 7.  Here, the evidence overwhelmingly demonstrates that the Government's decision to serve a subpoena on Amerindo U.S. the afternoon of May 26, 2005 was nothing more than an attempt by the Government to effectively continue execution of the Amerindo U.S. search warrant without the need to secure the site overnight and have a team of federal agents return to the search site the following day.  Because the Amerindo U.S. subpoena is merely an extension of the unconstitutionally impermissible Amerindo U.S. search, the subpoena should be quashed.

The evidence elicited at the suppression hearing – including the testimony of the Government's own witnesses – clearly demonstrates that the Amerindo U.S. subpoena served no purpose other than to permit the Government to continue to effectuate the Amerindo U.S. search warrant without having to secure the site and return the following day.  As an initial matter, it is clear that the idea of a subpoena was not something the Government had pondered prior to the Amerindo U.S. search, but rather was a direct reaction to the massive quantities of documents federal agents were encountering as responsive to the vastly overbroad Amerindo U.S. warrant.  Indeed, AUSA Litt himself testified that the Government had not even contemplated the use of a subpoena prior to the commencement of the search.  *See* Tr. 5/31/06 at 92, 146.  Moreover,

counsel for Amerindo U.S. Eugene Licker, who was present during part of the search, testified that the grand jury subpoena was suggested only *after* Supervising Inspector Feiter expressed doubts about the Government's ability to complete execution of the Amerindo U.S. warrant (hardly surprising considering that the warrant authorized seizure of nearly every business document on the premises). *See* Tr. 5/31/06 at 14. Inspector Feiter similarly testified that the Amerindo U.S. subpoena was intended as a means to procure documents that otherwise would have been seized pursuant to the Amerindo U.S. warrant. Specifically, Inspector Feiter testified: "There came a point early on in the search where discussions were engaged in between counsel that was there for the firm, myself, the case agent, and the US Attorney's office that some documents or a large amount of documents might be handled by subpoena. So while that conversation was going on I had people assigned there do a brief inventory on those positions for the documents we talked about." *See* Tr. 12/14/05 at 86. Agent Fraterrigo also confirmed that during the search, certain federal agents stopped executing the warrant and instead turned their attention to preparing an inventory of items that would be left behind and produced in accordance with the Amerindo U.S. subpoena. *See* Tr. 7/10/06 at 120-121.

In fact, the evidence shows that the Amerindo U.S. subpoena was part of an arrangement pursuant to which Amerindo U.S. would accept service of the subpoena and, in turn, the Government would halt the search at the conclusion of the first day (even though additional documents responsive to the vastly overbroad warrant remained on the premises). According to Mr. Licker, it was his understanding that, by accepting service of the subpoena on behalf of Amerindo U.S., an agreement had been reached pursuant to which the Government would cease execution of the search after the first day. *See* Tr. 5/31/06 at 14, 16. Although at the suppression hearing AUSA Marc Litt testified that, he "did not know" why the search ended after the first

day, the Government has previously represented to the Court that "the [Amerindo U.S.] search team was informed that it need not complete the search because Amerindo U.S. had agreed to comply with the subpoena." *See* Tr. 5/31/06 at 136. The same point was made in a draft declaration prepared by AUSA Litt in February 2006, in which AUSA Litt represented that, as a result of Amerindo U.S.'s compliance with the subpoena, he agreed to inform the search team that it could terminate the search. *See* GX 49; Tr. 5/31/06 at 124-125. Indeed, despite his protestations, AUSA Litt acknowledged on cross-examination that, in the absence of an agreement, the search would have ended at 10:00 p.m. that day and commenced again the next, requiring the securing of the premises overnight. *See* Tr. 5/31/06 at 138-140.

In reality, neither Amerindo U.S., nor its counsel, were ever in a position to dictate to the Government in what manner, or for how long, to conduct the search. The subpoena served that afternoon was nothing more than a substitute for continuing the search into a second day -- an alternative that the Government ultimately decided was preferable to securing the site overnight and having nineteen federal agent return the next morning. Indeed, AUSA Litt testified that he intentionally drafted the Amerindo U.S. subpoena to be "at least co-extensive" with the search warrant, which is unsurprising considering that the entire purpose of the subpoena was to shift the burden of effecting the Amerindo U.S. search warrant to the company.[34] *See* Tr. 5/31/06 at 95.

---

[34]    At a Court conference in November 2006, the Government suggested for the first time that the subpoena covered not only the remaining materials on the premises of the Park Avenue Office, but also all materials from any other Amerindo offices and storage facilities. As discussed above, however, the evidence overwhelmingly shows that, at the time the subpoena was issued (the relevant period, according to the Government) the subpoena had no purpose other than to effectively complete the search. The Government's post facto assertion – first raised nearly thirteen months after the search took place and the subpoena was served – that the subpoena was intended to apply to areas beyond 399 Park Avenue is therefore contrary to the weight of the evidence and should be disregarded.

Having established that the Amerindo U.S. subpoena was merely a continuation of the Amerindo U.S. search, and that there is no meaningful distinction between the two, it becomes clear that the Amerindo U.S. subpoena cannot stand. As discussed in detail both above and in Mr. Tanaka's Memorandum in Support of the Pending Motions, the Amerindo U.S. search was patently illegal and must be suppressed in its entirety. Permitting the Government to effectively side-step this result through enforcement of the Amerindo U.S. subpoena would completely eviscerate the protections the Fourth Amendment and the related exclusionary rule were intended to confer. Moreover, it would set a precedent pursuant to which the Government could effectively immunize unlawful searches by simply serving a subpoena during or after the fact.

Moreover, although the Government suspended seizure of documents pursuant to the Amerindo U.S. search warrant after the first day, the inspectors nonetheless had **searched the entire office.** The fact that certain materials were not seized, but instead inventoried, does not change the Fourth Amendment analysis. *See Arizona v. Hicks,* 480 U.S. 321 (1987)(the movement of stereo equipment to look at the serial number constituted a search). The opening of file cabinets and boxes in a storage room in order to inventory them constituted a search. The Government cannot obtain by subpoena materials that it unlawfully searched but left behind either inadvertently or by design.[35]

---

[35]     The Government has conceded that it cannot rely on the subpoena to avoid suppression of the evidence seized during the search under the inevitable discovery doctrine, Defendants. *See* Govt. Memo in Opp. to Motion to Quash, dated 2/10/06 at p. 7 ("The Government has never sought to use the existence of the Subpoena to make such an 'inevitable discovery' argument."). In any event, the "inevitable discovery" doctrine cannot save the unconstitutional, bad faith Amerindo U.S. search. *See also United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992)("Particular care is appropriate where, as here, subpoenas are issued after or at the time of the unlawful search . . . . [S]ubpoenas must not serve as an after the fact 'insurance policy' to validate an unlawful search under the inevitable discovery doctrine."). Just as the subpoena cannot the save the materials seized, it cannot save the materials searched but not seized.

Had the Government determined to proceed by subpoena in the first instance it was free

to do so.  But the Government rejected this option, instead choosing to send nineteen federal

agents to barge into Amerindo U.S.'s New York office and wreak havoc on a nearly twenty year

old, SEC regulated company, seizing not only its business and operating records but also its

entire computer system, effectively shutting it down.  Having made its choice, the Government

must live with the consequences.

**POINT  IV**

**THE SUBPOENA SHOULD BE QUASHED BECAUSE
1) IT WAS ISSUED FOR AN IMPROPER PURPOSE,
2) IT IS OVERBROAD, BURDENSOME AND OPPRESSIVE, AND
3) IT IS UNREASONABLE UNDER THE FOURTH AMENDMENT**

In the event the Court declines to quash the subpoena as an extension or fruit of the

illegal Amerindo U.S. search, it should nevertheless be quashed for the reasons set forth below.

A.    The Subpoena Must Be Quashed Because It Serves An Improper Purposes

The Government obtained the original and superseding indictments without the evidence

called for by the subpoena.  The Government has nevertheless argued that a grand jury

investigation is still "ongoing" and that the documents are sought for a proper investigative

purpose. The trouble with this argument is that it can be too handily employed whenever the

Government wishes to obtain additional evidence as they ready themselves for trial.

Enforcement of the subpoena now would only serve to provide the government with

evidence for use at trial.  Paragraphs G and H of the Subpoena, for example, explicitly seek

production of documents reflecting the SBIC and GFRD investments.  Since those investments

are the subject of the superseding indictment, there would be no legitimate investigatory purpose

for demanding those documents now; however, they could conceivably be useful to the

government in preparing for trial, which is an improper purpose for a subpoena.

55

As the Second Circuit stated, "[t]he law is settled in this circuit and elsewhere that 'it is improper to utilize a Grand Jury for the sole or dominating purpose of preparing an already pending indictment for trial,' *United States v. Dardi*, 330 F.2d 316, 326 (2d Cir.), *cert. denied*, 379 U.S. 45, 85 S. Ct. 50, 13 L. Ed.2d 50 (1964)." *In re Grand Jury Subpoena Duces Tecum Dated January 12, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir. 1985). *Accord, United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994) ("[i]t is, of course, improper for the Government to use the grand jury for the sole or dominant purpose of preparing for trial under a pending indictment"). While the courts have not specified what is meant by a "dominant purpose," there is sufficient evidence now, many months post indictment and long past the deadline for filing a superseding indictment, that the government would be using the grand jury to obtain trial discovery.

The Subpoena should be quashed and the government precluded from issuing a replacement subpoena.

B.    <u>The Subpoena Is Overbroad And Oppressive</u>

The language of the subpoena is identical in almost all respects to the language of the vastly overbroad Amerindo U.S. search warrant, except that – to the extent possible given the nearly limitless nature of the warrant – the subpoena is even more extensive.

The Supreme Court stated, in *United States v. R. Enters., Inc.*, 498 U.S. 292, 299, 111 S. Ct. 722, 727, 112 L. Ed.2d 795 (1991), that "[g]rand juries are not licensed to engage in arbitrary fishing expeditions . . . ." It is well settled that the following factors must be present for a grand jury subpoena to avoid being quashed as "unreasonable or oppressive" under Fed.R.Cr.P. 17(c)(2):

> (1) [T]he subpoena may command only the production of things relevant to the investigation being pursued; (2) specification of

56

> things to be produced must be made with reasonable particularity;
> and (3) production of records covering only a reasonable period of
> time may be required.

*United States v. Gurule*, 437 F.2d 239, 241 (10th Cir. 1970). *Accord, In re Grand Jury*

*Subpoena Duces Tecum Served Upon Rabbinical Seminary Netzach Israel Ramailis*, 450 F.

Supp. 1078, 1084 (E.D.N.Y. 1978).

The Subpoena is defective as to each of the above factors, requiring the Court to quash it at least

with respect to its numerous overbroad elements.

      1.    <u>The Subpoena *Seeks* Documents That Are Not Relevant</u>

While the government has and undoubtedly will contend that it is continuing to conduct an

investigation of Amerindo, that is not sufficient to require production of every scrap of paper in

Amerindo's possession. Defendants, of course, cannot know the exact parameters of a

government investigation. The Government, however, has had the benefit of a mountain of

search materials and a year and a half to review them. The superseding indictment alleges

misconduct with respect to two investment vehicles (SBIC and GFRDA) and four investors. The

government has identified ten additional GFRDA investors upon whom it may rely at trial.

Assuming that these are the parameters of the government's current investigation, vast categories

of documents demanded in the Subpoena are entirely irrelevant to that investigation. The grand

jury subpoena is not tailored to obtain documents concerning investors or potential investors in

the SBIC and GFRDA investment funds which are alleged in the indictment. Rather, the

Subpoena, as with the Amerindo U.S. search warrant, demands production of every type of

document that an investment advisory firm such as Amerindo would be expected to maintain.

(*See* Tr. 12/14/05 at 161-63 )(interpreting language identical to that included in the subpoena as

covering nearly every business-related document at Amerindo U.S.); (*See* Tr. 7/7/06 at 141-42) (same).

Indeed, it is difficult to conceive what documents would *not* be required to be produced pursuant to the Subpoena. Like the Amerindo U.S. search warrant, the subpoena was intentionally drafted to sweep as broadly as possible so that the Government could search Amerindo's records for any evidence of any criminal violation whatsoever by anyone, regardless of how remote it was from any good-faith basis the Government had for investigation. That kind of subpoena is the exemplar of a fishing expedition and, by definition oppressive. *See, e.g., In re Grand Jury Subpoena Duces Tecum Addressed to Corrado Bros., Inc.*, 367 F. Supp. 1126, 1131 (D. Del. 1973) ("[n]o document no matter how remote from the nature of an investigation, would be spared seizure on the basis that it *might* possibly contain important information. It is just this type [of] grand scale dragnet approach that Justice Holmes condemned when he said: 'It is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up . . . .'") (quoting *Federal Trade Comm. v. Am. Tobacco Co.*, 264 U.S. 298, 44 S. ct. 336, 337, 68 L. Ed. 696 (1924)); *Certain Chinese Family Benevolent and Dist. Assocs.*, 19 F.R.D. at 101 ("[t]he broad demand smacks more of the fishing expedition which was condemned in *Federal Trade Comm. v. Am. Tobacco Co.* . . .").

Even if the Government claims that its investigation extends beyond the two investment types and four investors referenced in the superseding indictment, it cannot be disputed that – at the very least – certain categories of items responsive to the subpoena are irrelevant to the Government's investigation. For example, the Government cannot dispute that, with respect to nearly all (if not all) of the approximately $1.2 billion in assets managed by Amerindo U.S.,

Defendants could not have engaged in the misconduct alleged in the indictment.  As discussed in

Mr. Tanaka's Memorandum in Support of Defendants' Motion for a Franks Hearing, dated

August 30, 2006, the assets managed by Amerindo U.S. fell into two general categories:  funds

for which Amerindo U.S. served as an investment advisor, such as the Amerindo Technology

Fund, and institutional client accounts that were individually managed by Amerindo U.S.  In

both cases, the assets managed by Amerindo U.S. were custodied at well-known financial

institutions, where the assets were held in "closed-loop" brokerage accounts.  That is, although

Amerindo U.S. in some instances had the power to direct trades in these accounts, Amerindo

U.S. did not have the authority to withdraw or otherwise transfer funds out of or among these

accounts.  Clearly, there can be no justification for enforcing a subpoena that covers documents

pertaining to clients and accounts with respect to which Defendants could not have engaged in

the misconduct alleged.  Yet that is precisely what the Government urges the Court to do.

Even under the most generous interpretation, therefore, the Subpoena sweeps up a vast

number of documents that are irrelevant (*e.g.,* GX 12 at ¶N: records of all expenses and "other

documents relating to the running and supervision of the operation of the investment advisory

business(es) of Amerindo") with a limited number of documents that may be relevant.[36]  That

approach is improper.  For example, in a strikingly similar case, Judge Mukasey quashed as

overbroad a subpoena which sought, *inter alia*, the production of computers, hard drives and

disks that contained both relevant and irrelevant documents.  *In re Grand Jury Subpoena Duces*

*Tecum Dated November 15, 1993*, 846 F. Supp. 11, 12-14 (S.D.N.Y. 1994).  *See also In re*

*Corrado Bros., Inc.*, 367 F. Supp. at 1130-31 (court quashed subpoena to the extent it sought

---

[36]    Indeed, the Case Agent on the investigation acknowledged that the search warrant – the language of which is at least as broad as that of the subpoena – called for documents that are irrelevant to the Government's investigation.  *See* Tr. 8/8/06 at 23-24; Tr. 7/7/06 at 55.

production of private party communications, which were irrelevant to government's

investigation); *In re Certain Chinese Family Benevolent and Dist. Assocs.*, 19 F.R.D. 97, 101

(N.D. Cal. 1956) (court quashed grand jury subpoena to the extent it required production of all

documents of associations which went well beyond parameters of government's investigation).

In sum, even assuming that (1) the Government is currently undertaking an investigation

of Defendants, and (2) some portion of documents within the scope of the vastly overbroad

Amerindo U.S. Subpoena may be deemed relevant to this investigation, neither the Court nor

Amerindo should be required to redraft the Subpoena so as to limit it to a demand for the

production of relevant documents.  Thus, the subpoena should be quashed.[37]

2.     The Subpoena Fails to State With
       Particularity the Documents to Be Produced

The Subpoena also fails to satisfy the second required element, that it specify with "reasonable

particularity" what categories of documents are to be produced.  In fact, the subpoena is so

overbroad that it lacks any particularity whatsoever, instead calling for nearly every business-

related document held by Amerindo U.S.  For example, Paragraph A of the Subpoena calls for

production of

> Corporate records concerning [Amerindo U.S. and other entities
> that share the Amerindo name], *including but not limited to* records
> concerning the formation of each of the above-listed Amerindo
> entities, its shareholders, principals, officers, directors, and
> employees, changes in ownership, bylaws, resolutions, client lists,
> client files, investment brochures, marketing materials, investment
> advisory agreements, copies of correspondence sent to or received
> from clients, and other documents concerning or reflecting the
> identities of and communications with clients who have
> investments managed or advised by Amerindo.

---

[37]     In the alternative, Defendant requests that the Court examine, *in camera* if necessary, the premises of
the government's current investigation and determine whether the challenged provisions of the Subpoena
are relevant.

GX 12 at 1-2 (*emphasis added*).  As if the sweeping categories listed in Paragraph A were not broad enough, the paragraph's breadth is expanded to infinity by the phrase "including but not limited to."  Thus, Amerindo would arguably be in contempt under the Subpoena even if it produces all the categories of documents listed, if there is another "record" of a different type than those specified that "concerns" Amerindo.[38]   In fact, the Government's own witnesses confirmed that this paragraph covers essentially every business document with writing on it. *See* Tr. 12.14.05 at 161-63; Tr. 7/7/06 at 141-142.

The other paragraphs raise the same or similar problems.  See, e.g., Paragraph D (requesting all documents concerning or reflecting the identities of and communications with clients who have investments in certain brokerage accounts through which Amerindo conducted its business), Paragraph L (requesting all documents reflecting any brokerage accounts maintained by Amerindo at any broker-dealer with the exception of Bear Stearns), Paragraph N (requesting all documents related to the running and supervision of Amerindo's business) and Paragraph Q (requesting all fax machines).  These paragraphs make clear that either the subpoena is actually intending to ask for everything, or the categories are drafted in such an overbroad and all-inclusive manner that it is impossible to distinguish between what is responsive and what (if anything) is excludable.  Either way, the subpoena cannot stand.

The courts indicate that the test for whether a subpoena should be enforced is whether it is "reasonable."  *United States v. R. Enters., Inc.*, 111 S. Ct. at 727.  It would not be reasonable for the Court to read this Subpoena as identifying its objects with particularity where its terms clearly state "give us everything."  *See In re 1979 Grand Jury Subpoena*, 478 F. Supp. 59, 62 (M.D. La. 1979) (quashing subpoena because, *inter alia*, subpoena was "extremely vaguely

---

[38]    The Subpoena defines the terms "records" and "documents" as meaning "any and all tangible forms of expression in your possession, custody or control . . . " . *See* GX 12 at ¶ 1.

worded and demands that the witness produce numerous documents which may or may not

properly be the subject of a subpoena *duces tecum*").  Accordingly, for these reasons, the

Subpoena should be quashed.

     3.    <u>The Subpoena Does Not Specify a Time Period</u>

Nor does the Subpoena pass muster with respect to the requirement of a time period.  As

noted above, the Subpoena does not specify any time period at all, thus requiring Amerindo to

produce responsive documents dating from the beginning of time to the present.

This is *per se* overbroad and oppressive.  *See, e.g., In re Grand Jury Subpoena Duces

Tecum*, 342 F. Supp. 709, 711-13 (D. Md. 1972) (where subpoena demanded production of

documents going back over ten years, court quashed subpoena as overbroad); *In re United Last

Co.*, 7 F.R.D. 759 (D. Mass. 1947) (subpoena seeking documents created during six-year period

quashed as oppressive) (*In Re Grand Jury Proceedings Witness Bardier*) 486 F. Supp. 1203

(D.Nev. 1980) (finding a request for an accountant's records regarding fourteen individuals over

a six-year period was not reasonable).

The Government's failure to include any time limitation in the Amerindo U.S. subpoena

is particularly egregious considering that (1) Amerindo has been in business for approximately

twenty years, and (2) the alleged misconduct took place only since 2002.  Under such

circumstances, it would be highly oppressive and entirely unjustified to require Amerindo to

search long-dormant records to produce documents unbounded by time limitations.  Rather, the

Subpoena should be quashed (in whole or in part), or, in the alternative, the government should

be required to specify a reasonable production period specific to each request.

*     *     *     *

In sum, the Defendants have pursued this litigation as expeditiously as possible, hampered from a resources perspective by having to conduct a massive attorney-client privilege review of all of the physical evidence and computer files seized – despite the fact that large quantities of this information were seized pursuant to an illegal search and/or fall outside the scope of the Amerindo U.S. search warrant.  At the same time, the Government has requested and been granted several delays, in part to permit it to process the mountains of evidence that was seized during the unconstitutionally overbroad Amerindo U.S. search.  Now, the Government again seeks to inflict additional delays and burdens on the Defendants by requesting that the Court enforce a patently overbroad and unjustified subpoena.  Indeed, in order to comply with the subpoena as drafted, untold person-hours would be required to sift through some 700 boxes of documents, without justification and without sufficient notice as to which documents are required.

The Government has already effectively shut down a business by executing an overbroad search warrant, and put the company and the defendants to the exorbitant expense of conducting an unnecessarily broad attorney-client privilege review of all physical and computer data seized, an expense that depleted the company of virtually all remaining operating funds.  To add to the already overwhelming costs occasioned by the search, the costs of  again searching through everything located at the search site in case the government missed anything as well as producing everything else that may have been located elsewhere at the time of the search, is the definition of oppressive and burdensome. *Cf. Premium Service Corp. v. Sperry & Hutchinson Co.,* 511 F.2d 225 (9th Cir 1975) (plaintiff's requests were so sweeping  that compliance would require extensive sifting and analysis by corporation's employees; plaintiff's "need for these

documents was not sufficient to outweigh the burden and invasion of corporate privacy which

would have resulted . . . .").

C.    The Subpoena Must Be Quashed Because It Is
      Unreasonable Under The Fourth Amendment

The Supreme Court has held that "the reach of a subpoena *duces tecum* is not without

limit.  It may be so broad and sweeping that it violates the Fourth Amendment's prohibition of

*unreasonable* searches." *Hale v. Henkel*, 201 US 43, 76, 26 S.Ct. 370, 50 L.Ed. 652 (1906)

(*emphasis added*).  Almost 70 years later, in *United States v. Calandra,* 441 U.S. 338, 346, 94 S.

Ct. 613 (1974), the Supreme Court reaffirmed *Hale*:

> The grand jury is also without power to invade a legitimate
> privacy interest protected by the Fourth Amendment. A grand jury's
> subpoena duces tecum will be disallowed if it is 'far too sweeping in
> its terms to be regarded as reasonable' under the Fourth Amendment.
> *Hale v. Henkel*, 201 US 43, 76, 26 S.Ct. 370, 50 L.Ed. 652 (1906).
> Judicial supervision is properly exercised in such cases to prevent
> the wrong before it occurs.

This grand jury subpoena is overbroad and, as such, it is unreasonable under the Fourth

Amendment.  In *Oklahoma Press Pub. Co. v. Walling Adm'r, Wage and Hour Division, US

Department of Labor*, 66 S. CT. 494 (1946), the Supreme Court, in considering the constitutional

validity of an administrative subpoena, held that "the gist of the [Fourth Amendment] protection

is in the requirement, expressed in terms, that the disclosure sought shall not be *unreasonable*"

(Emphasis added).  *See United States v. Morton Salt*, 70 S.Ct. 357 (1950)(administrative

subpoena analogous to grand jury subpoena).

The same three factors that define reasonableness under Rule 17(C ) are also the three

factors that define reasonableness under the Fourth Amendment.  As the district court stated in *In

Re Corrado Bros., Inc*. 367 F. Supp. at  29 **--** "a subpoena *duces tecum* is not without limit. It

may be so broad and sweeping that it violates the Fourth Amendment's prohibition of

unreasonable searches…three interrelated requirements appear critical (1) that the subpoena command only the production of materials relevant to the investigation; (2) that the subpoena specify the materials to be produced with reasonable particularity and (3) that the subpoena command production of materials covering only a reasonable period of time."

Examining this subpoena for reasonableness applying the above three-part test, and as demonstrated above, the conclusion is inescapable that this subpoena is unreasonable.

In sum, the broad wording of the subpoena renders it unreasonable and violates the Defendants' legitimate privacy interests.  For this reason as well, the subpoena in consideration before this Court must be quashed under the Fourth Amendment.

D.    The Motion To Quash Was Submitted In A Timely Manner

The Government acknowledged in its memorandum opposing the motion that there is no dispositive case law on the definition of "promptly" as contained in Rule 17(C)(2).  The Government cited a thirty year old decision in *United States v. Kleen Laundry & Cleaners, Inc.* 381 F. Supp.519 (E.D.N.Y. 1974), in which the defendants moved to dismiss the indictment and suppress evidence under the Forth Amendment prohibition against unreasonable searches and seizures. The Court held that, despite the fact that the subpoena was issued in the name of a grand jury which was not in session, not consulted, and not notified of the subpoena, the indictment was valid.  *Id*. at 522.  On the issue of timeliness, the court held that "such motions [to quash] should be made when the abuse becomes apparent." *Id.* at 523.

The "abuse" in the case at bar became apparent only after defense counsel had an opportunity to review the search warrant, research the law and examine the inventories cataloguing both the documents seized and those not seized.   The latter inventory was not turned over until December 8, 2005.  The "abuse" was initially addressed in the defendant's motion to

suppress and addressed further after counsel came to understand all of the facts pertinent to the subpoena and its relationship to the search.

The only other case cited by the Government was *United States v. Heard*, 952 F. Supp. 329 (N.D. W. Va. 1996), where the Court rejected the defendants' argument that their submission constituted a proper response to the Government's subpoena. The subpoena in question requested that the defendants appear and testify before a grand jury the following week. *Id.* at 330, 331. Less than a day before they were due to appear before the grand jury, the defendants sent documents entitled "non-statutory abatement" forms in response to the subpoena. *Id.* at 331. The Court held that the aforementioned documents did not constitute an appropriate response to the subpoena. *Id.* at 335. In addition, the Court held that "even if construed as a motion to quash [these forms] were not under the circumstances "promptly made" as required under Fed.R.Crim.P. 17(c) and do not even suggest, much less prove, to this Court, or any other, that compliance would be "unreasonable or oppressive" as is also required under Rule 17(c)." *Id* at 335. The case does not purport to establish a definition of "promptly." Indeed, it does not appear that any court has established a timetable or fleshed out the parameters of a time frame within which a motion to quash would be considered "promptly" made.

The execution of the search warrant in May, 2005 deprived the company of its physical records and computer system. Messrs. Vilar and Tanaka were arrested and under house arrest (Mr. Vilar spent the first several weeks in jail). The company was thrown into utter chaos. In addition to dealing with bail, emergency corporate matters, and filing the motion to suppress, counsel were attempting to understand the charges. The Government had provided thousands of documents in its first discovery production. Under the complex, chaotic and probably unique

circumstances of this case, which involves a search that shut down a business and a related, timely filed motion to suppress, the motion to quash was promptly filed.

## CONCLUSION

For the reasons stated above, as well as in Gary Tanaka's memorandum in support of the pending motions, Mr. Vilar respectfully requests that the Court grant Defendants' motions and (1) suppress all evidence seized from the New York offices of Amerindo Investment Advisors Inc., located at 399 Park Avenue, New York, NY, (2) suppress all evidence seized from the Cadogan Tate storage facility located at 239 Acton Lane, London, United Kingdom, and (3) quash the subpoena served on Amerindo Investment Advisors Inc. on May 26, 2005.

Dated:  New York, New York
        December 13, 2006

Respectfully submitted,

HOFFMAN & POLLOK, LLP

By: _S/_____
        Susan C. Wolfe

*Attorneys for Defendant Alberto Vilar*
260 Madison Avenue
New York, NY  10016
(212)  679-2900
(212)  679-1844 (fax)