Court Cop.
269/a



# IN THE GREATER LONDON COMMISSION AREA

Bow Street Magistrates' Court     (Code 2641)

To each and all of the Constables of the Metropolitan Police Force.

On this day an application, supported by an information on oath, was made by:

**Detective Sergeant Howard Shaw**
**Metropolitan Police**

For the issue of a warrant under:

**Section 16 Crime (International Co-operation) Act 2003 and**
**Section 8 Police and Criminal Evidence Act 1984**

To enter and search premises situated at:

**Cadogan Tate**
**Cadogan House**
**239 Acton Lane London NW10**

And search for: (identify as far as possible, the articles or persons sought)

**Documents relating to the activities of AMERINDO (UK) and associated**
**companies along with documents relating to the activities of Alberto VILAR**
**(VILAR), Gary TANAKA (TANAKA), Renata TANAKA and James**
**STABLEFORD.**

**A full detailed list is attached to and forms part of this warrant.**

Authority is hereby given for any constable accompanied by Cynthia FRATERRIGO, Thomas FEENEY and Annmarie WILLIAMSON, to enter the said premises on one occasion only within one month from the date of issue of this warrant and to search for the articles or persons in respect of which the above application is made

Date: 14th October 2005

And I certify that the copy warrants marked A and B are true copies of this warrant.

(Senior) District Judge.

Distribution:
This original warrant to enter and search premises, for endorsement, see back.
Copy A, to be left with the occupant or on the premises.
Copy B to be retained by police.
M.C.A. 156. Warrant to enter and search premises. S. 15 PACE.

GOVERNMENT
EXHIBIT
25
S2 05 Cr. 621 (KMK) (ID)

To be printed on back of original warrant

### ENDORSEMENT TO BE MADE BY CONSTABLE EXECUTING THE WARRANT.

1.  The following articles or persons sought were found: (list)

    *large quantity of documents*

2.  The following articles other than articles which were sought were seized: (list)

    *nil*

~~3. No article or person was found or seized~~

*A copy was handed to the occupier
~~*A copy was left on the premises (specify where on the premises)~~
*Delete as appropriate

Signature(s) of Constable(s) executing the Warrant ...............................................
*DS Shaw*
*180339*

Date and time of execution:    *14/7/05    11.30 am*

1.  Corporate records relating to (a) the formation of the foregoing entities; (b) their shareholders, principals, officers, directors, and employees; (c) changes in ownership; (d) bylaws, resolutions, client lists and client files; (d) investment brochures; (e) marketing materials and investment advisory agreements; (f) copies of correspondence sent to – or received from – clients; and (g) other documents concerning or reflecting the identities of, and communications with, any clients;

2.  Documents reflecting financial transactions between and among Amerindo U.S., Amerindo U.K., and Amerindo Panama;

3.  Documents concerning the following brokerage accounts at Bear, Stearns & Company Inc.: Amerindo Management Inc., sub a/c M26, Amerindo Technology Growth Fund Inc., Amerindo Technology Growth Fund II, and, Techno Raquia, SA (collectively, the "Amerindo Brokerage Accounts"), including account opening documents, account statements, wire transfer requests, correspondence, electronic mail messages, trade tickets, trade blotters, trade confirmations, trade allocation sheets, trade memoranda, trade notes, client account statements, memoranda and notes and other documents reflecting or relating to investment performance, and other documents reflecting or relating to securities transactions entered into on behalf of clients, by any current or former Amerindo entity, affiliate, principal, officer and employee;

4.  Current and former client lists, client files, investment brochures, marketing materials, investment advisory agreements, copies of correspondence sent to or received from clients, including redemption requests received from clients, and other documents

concerning or reflecting the identities of, and communications with, clients who have investments in the Amerindo Brokerage Accounts;

5.    Current and former client lists, client files, investment brochures, marketing materials, investment advisory agreements, copies of correspondence sent to or received from clients, and other documents concerning or reflecting the identities of, and communications with, clients who have investments managed or advised by Amerindo Panama;

6.    Documents concerning Rhodes Capital, including copies of prospectuses, private placement memoranda, subscription agreements, descriptions of Rhodes Capital, lists of investors, and the allocation and distribution of returns;

7.    Documents concerning investments in Guaranteed Fixed Rate Deposit Accounts, including lists of investors, account statements, documents pertaining to certificates of deposit, government securities, or other debt instruments held by Amerindo entities, and documents reflecting securities underlying any such investment;

8.    Documents concerning PTC Management Limited, including all documents reflecting the relationship between any Amerindo entity, principal or employee and PTC, instructions given by any Amerindo entity, principal or employee to PTC, and any investor receiving redemptions of Amerindo investments through PTC;

9.    Documents concerning account number 3308442 at Barclays Bank PLC, Nassau, Bahamas, and/or FirstCaribbean International Bank Limited, Nassau, Bahamas, including any account opening documents, monthly statements, documents pertaining to any deposits, withdrawals, and wire-transfers, and any documents regarding the beneficial owners of the account;

10.    Documents reflecting any effort made by any Amerindo entity, including Amerindo SBIC Venture Fund LP, to obtain an SBIC license from the U.S. Small Business Administration, including correspondence, Management Assessment Questionnaires, license applications, documents reflecting efforts to obtain investor funds or commitments from investors to invest funds, capital commitments and investments, investments undertaken prior to licensure and the investment of funds received prior to licensure were invested pending licensure;

11.    Documents reflecting any private bank, brokerage account or any other account with any financial institution held by Amerindo principals, including Vilar and Tanaka;

12.    Documents reflecting any direct financial or beneficial ownership interest held by Vilar or Tanaka in Amerindo and the Amerindo Brokerage Accounts;

13.    Documents reflecting brokerage accounts maintained by Amerindo at any broker-

dealer other than Bear, Stearns & Co. Inc., including documents reflecting trades conducted "away" from Bear, Stearns, and settled in Amerindo Brokerage Accounts at Bear, Stearns;

14. Bank account statements, brokerage account statements, transaction records, wire transfer instructions and records, copies of checks sent to or received from clients, notes, ledgers, cash receipt journals, deposit tickets and records, and other documents reflecting or relating to movements of funds into or out of the Amerindo Brokerage Accounts;

15. Records of expenses, including copies of checks and wire-transfers to landlords, employees, counsel, accountants, brokers, utility companies, and other organizations and individuals who provide goods and services to Amerindo; incorporation and governance documents relating to various entities through which Amerindo, Vilar and Tanaka conduct business (including Amerindo U.S., Amerindo U.K., and Amerindo Panama); accounting records; documents relating to any communications with accountants, boards of directors, and the operation and supervision of Amerindo's investment advisory business(es);

16. Documents reflecting information about any current or former Amerindo employee who had any contact with, or responsibility for, the management of, redemptions from, or preparation of account statements for, any current or former Amerindo client that had a direct or indirect interest in the Amerindo Brokerage Accounts;

17. Photographs, address books, Rolodex indices, diaries, calendars, identification documents, travel documents, and other documents relating to any participants in the fraudulent investment schemes;

18. Facsimile machines to determine the telephone numbers used to send and receive documents;

19. Computers, hard drives, and any other devices or equipment capable of storing data or text in any format, including but not limited to cellular telephones, personal digital assistants, and any other storage media capable of containing data or text in magnetic, electronic, optical, digital, analog, or any other format, used to store information described above, as well as drafts and final versions of documents and correspondence prepared in connection with the running and supervision of the operations of the investment advisory business;

20. Any device (mechanical or electronic, including stamps, electronic signatures, etc.) by which the signature of any current or former client or current or former employee has been or may be affixed to a document by a person other than the individual whose signature is contained on or in the device;

21.   Documents concerning the purchase of thoroughbred horses, or goods and services related to the training and maintenance of thoroughbred horses;

22.   Documents and records identifying all current and former employees of Amerindo and their contact information (e.g., addresses and telephone numbers) and personal identifiers (e.g., date of birth, social security number, and passport number);

23.   Documents related to any audited financial records relating to Amerindo advised accounts other than the audited financial records for any publicly traded Amerindo mutual fund; and

24.   Documents related to the withdrawal of funds from the Amerindo Brokerage Accounts for the direct or indirect benefit of Vilar, Tanaka, Ms. Tanaka, or any individual or entity other than an investor in the accounts.



## IN THE GREATER LONDON COMMISSION AREA

Bow Street Magistrates' Court (Code 2641)

Application is today made before me the undersigned by:

Detective Sergeant Howard Shaw

For a warrant to search:

Cadogan Tate
Cadogan House
239 Acton Lane London NW10

The applicant says on oath that there are reasonable grounds for believing that the serious arrestable offence underlined overleaf has been committed and that it is necessary to enter the above mentioned premises to search for material which is likely to be relevant evidence and be of substantial value to the investigation of the offence and that such material does not consist of or include items subject to legal privilege, excluded material or special procedure material. The material sought is:

Documents relating to the activities of AMERINDO (UK) and associated companies along with documents relating to the activities of Alberto VILAR (VILAR), Gary TANAKA (TANAKA), Renata TANAKA and James STABLEFORD.

A full detailed list is attached to and forms part of this warrant.

And that
(a)* ~~it is not practicable to communicate with any person entitled to grant entry to the premises.~~
(b)* ~~it is practicable to communicate with a person entitled to grant entry to the premises but it is not practicable to communicate with any person entitled to grant access to the evidence.~~
(c)* entry to the premises will not be granted unless a warrant is produced.
(d)* ~~the purpose of a search may be frustrated or seriously prejudiced unless a Constable arriving at the premises can secure immediately entry to them~~

Date: 14\10\05

Signature of Applicant

Taken and Sworn before me

Nicola Evans

(~~Senior~~) District Judge.

*Delete as appropriate
M.C.A. 1A Information. Search warrant. Serious Arrestable Offence.

The applicant must underline the serious arrestable offence alleged

A
1. Treason.
2. Murder
3. Manslaughter
4. Rape
5. Kidnapping
6. Incest with a girl under the age of 13
7. Buggery with a person under the age of 16
8. Indecent assault which constitutes an act of gross indecency.
9. Being knowingly concerned in the importation of indecent or obscene articles

B
1. Causing explosion likely to endanger life or property
2. Intercourse with a girl under the age of 13
3. Possession of firearms with intent to injure
4. Use of firearms and imitation firearms to resist arrest
5. Carrying firearms with criminal intent
6. Hostage taking
7. Hi-jacking
8. Torture
9. Causing death by dangerous driving
10. Causing death by careless driving when under the influence of drink or drugs
11. Endangering safety at aerodromes
12. Hijacking of ships
13. Seizing or exercising control of fixed platform
14. Indecent photographs of and pseudo-photographs of children. S.1 Protection of Children Act 1978.
15. Hijacking of Channel Tunnel trains.
16. Hijacking or seizing control of the tunnel system.
17. Publication of obscene matter. Section 2 Obscene Publications Act 1959.

C. The arrestable offence of (specify) **Obtaining Property by Deception**
Has been committed and has led to/is intended to lead to/is likely to lead to one or more of the following consequence (please underline), or which consists of making a threat, if carrying out the threat would be likely to lead to any of the following consequences (please underline)
1. ~~Serious harm to the security of the state or to public order~~
2. ~~Serious interference with the administration of justice or with the investigation of offences or of a particular offence~~
3. ~~The death of any person~~
4. ~~Serious injury to any person~~
5. Substantial financial gain to any person
6. Serious financial loss to any person
   (N.B. loss is serious if, having regard to all the circumstances, it is serious for the person who suffers it; and "injury" includes any disease or any impairment of a person's physical or mental condition.)

**Bow Street Magistrates' Court (2641)**
**INFORMATION IN SUPPORT OF AN APPLICATION FOR WARRANT OF**
**ENTRY TO SEARCH**

Date:    14th October 2005

**This is the Application on oath by**:

Detective Sergeant Howard Shaw

Under Section 16 of the Crime (International Co-operation) Act 2003
and Section 8 of the Police and Criminal Evidence Act 1984.

**To search Premises:**

Cadogan Tate, Cadogan House, 239 Acton Lane, London NW10

**Material Sought:**

For all documents and computer records relating to the various investment schemes
described below and in the Appendixes. The evidence sought should include but is not
limited to, all correspondence and agreements, both draft and final, relating to:

1. Financial movements between AMERINDO UK and other companies and
   corporate entities controlled by the named suspects.
2. Client lists and correspondence with clients.
3. Documents showing control and influence over activities by VILAR and
   TANAKA.

   A full list of items sought is provided at pages 10 through 13 inclusive of the
   Letter of Request.

I have reasonable grounds to believe that such material may be found on the premises,
which is likely to be of substantial value to the investigation of the offence. I am
further satisfied that the material is likely to be relevant and does not consist of, or
include items of legal privilege, excluded material or special procedure material.
Finally I am satisfied that entry and access to the material will not be granted unless a
warrant is produced.

1

This application is made following a formal request from the Judicial Authorities of the United States to the United Kingdom Central Authority of the Home Office (copy attached at Annex A). The Secretary of State has issued a Direction under Section 13 Crime (International Cooperation) Act 2003 dated 10th October 2005 (copy attached at Annex B). A supplementary Letter of Request from the US authorities is attached at Annex C.

**A full explanation of the investigation is contained within the International Letter of Request (Annex A), which forms part of this application. A synopsis of the investigation is given below:-**

a) The US Authorities are investigating the activities of Alberto VILAR (VILAR), Gary TANAKA (TANAKA), Renata TANAKA and James STABLEFORD. The alleged offences include Mail Fraud, Wire Fraud, Money Laundering and Investment Advisor Fraud.

b) VILAR and TANAKA are Directors, Officers and Shareholders of AMERINDO US and subsidiary companies including AMERINDO Advisors (UK) Limited registered at 43 Upper Grosvenor Street, London.

c) Between 1987 and 2002 VILAR and TANAKA met and encouraged international investors to make investments in various 'investment funds' including, amongst others, funds supposedly operated by AMERINDO Panama. The investors were led to believe that their investments would be used to purchase short-term high quality deposits.

d) At least eight investors placed some USD 30 million into funds operated by AMERINDO Panama.

e) It is alleged that TANAKA and VILAR misappropriated much of the investments and used the remainder to purchase high-risk Stock.

f) It is alleged that some USD 15 million has been lost to these particular investors.

g) The attached Letter of Request also details a 'PONZI' scheme whereby investors are paid 'returns' using their own investments and/or the deposits of later investors. It is alleged that the named suspects operated an entity titled Rhodes Capital, in part from the London offices of AMERINDO for this purpose.

h) It is alleged that millions of dollars have been fraudulently obtained by the named individuals and used to purchase such things as racehorses.

i) In May 2005 VILAR and TANAKA were arrested in the United States and subsequently indicted by a Grand Jury.

2

**Information concerning the address:**

The US authorities initially requested that the offices of AMERINDO UK be searched. However enquiries revealed that the company had vacated the property and that the contents of the office (some 320 boxes) are now held in a storage facility.

A supplementary Letter of Request has now been received correctly identifying this storage facility (copy at Annex C).

Contact has been made with the Storage Company, who will facilitate execution of any warrant.

**Human Rights Act considerations:**

The premises to be searched are a storage facility company. Contact has been made with the company and the warrant will be executed in full cooperation with the company itself. It will take place during office hours and minimal disruption is anticipated. This is not a residential site.

The issue of a warrant is both necessary and proportionate.

**Additional information**

To assist with the review of material held by the storage company three US investigators have travelled to the UK. This warrant seeks permission for the named investigators to attend the execution of the warrant. This will ensure that only documents relevant to the investigation are seized.

Cynthia FRATERRIGO
Thomas FEENEY
Annmarie WILLIAMSON

The FSA has assisted the US authorities with obtaining banking evidence relating to AMERINDO UK. Although no separate UK investigation is being conducted by the FSA contact continues between the FSA and lawyers for AMERINDO/TANAKA.

On 10th October 2005 Bow Street Magistrate's Court issued a similar search warrant based upon the same information. That warrant was executed on 13th October 2005 and a large amount of documentary material has been seized. This material has been secured at the search site and it is intended to return to the venue and complete the search. It is hoped that the search can be completed today, although a further application may become necessary. Although the storage company are fully cooperating with the execution of the search entry will not be granted without the production of a warrant. It is my view that this search is not a continuing event and consequently I respectfully make this further application.

**Comments of Officer Authorising the application**

This application arises from a Letter of Request issued by the authorities of the United States and a subsequent Direction made by the United Kingdom Central Authority of the Home Office.

It is requested that a search takes place to recover evidence likely to be of substantial value to a major fraud investigation and prosecution in the United States.

I am satisfied that there is sufficient evidence to suggest that the offence is of a serious nature, involving considerable financial gain for the suspects and serious financial loss to the Investors.

I am also satisfied that there may well be relevant material at the address, which will be of substantial value to the investigation in the United States.

I am satisfied that the material does not include items subject to legal privilege, excluded material or special procedure material. Finally, I am satisfied that it would not be practicable to communicate with any person entitled to grant entry to the premises.

**This application has been authorised by Detective Inspector Paul Fuller of the Metropolitan Police Extradition and International Assistance Unit (SCD6).**

Howard Shaw
Detective Sergeant
14th October 2005

Marcus Evans
District Judge cf,

4

# Annex A

1A.



**U.S. Department of Justice**

Criminal Division

*Washington, D.C. 20530*
*July 25, 2005*

JUL 2 5 2005

O:        The Central Authority of the United Kingdom

JBJECT:    Urgent Request for Assistance in the Prosecution and Investigation of Alberto
William Vilar, also known as Albert Vilar, and Gary Alan Tanaka

The Central Authority of the United States requests the assistance of the appropriate

:horities in the United Kingdom pursuant to the Treaty Between the Government of the United

:ates of America and the Government of the United Kingdom of Great Britain and Northern Ireland

:~ Mutual Legal Assistance in Criminal Matters.  The United States Attorney for the Southern

istrict of New York is prosecuting and investigating Alberto William Vilar, also known as Albert

:lar, Gary Alan Tanaka, and others (the subjects) for fraud in connection with a fraudulent

vestment scheme involving three entities – Amerindo Investment Advisors Inc. (Amerindo US),

merindo Investment Advisors (UK) Ltd. (Amerindo UK), and Amerindo Investment Advisors, Inc.

merindo Panama) (collectively, Amerindo).  In addition, the U.S. Securities and Exchange

ommission (SEC) has filed a civil enforcement action against the subjects and the foregoing

tities for violating federal securities laws.  To further the prosecution and the civil action, the

osecutor and the SEC need business records from Amerindo UK's office in London, England.  The

osecutor expects Amerindo UK to vacate its office on or before August 1, 2005.  Accordingly, we

k that this request be treated as urgent.

### The Facts

In 1985, Alberto William Vilar and Gary Alan Tanaka founded Amerindo US, a U.S.

pany that provides investment advice and related services for numerous institutional clients and

least one publicly traded mutual fund. Several years later, Vilar founded Amerindo UK, a U.K. company that handles off-shore accounts and administrative functions for other Amerindo entities, including Amerindo US and Amerindo Panama, a Panamanian company that provides investment advice and related services for private individuals. Vilar and Tanaka are directors, officers and shareholders of all three entities.

Between 1987 and 2002, Vilar and Tanaka met with prospective investors at various locations, including Amerindo UK's London office, located at 43 Upper Grosvenor Street, and encouraged many of them to invest funds in, inter alia, Amerindo Panama's Guaranteed Fixed Rate Deposit Accounts. While doing so, Vilar and Tanaka represented orally and/or in writing (1) that these accounts would provide a fixed rate of interest for a fixed term, (2) that the majority of each investor's funds would be invested in high quality short-term deposits such as U.S. Treasury bills, government bonds, and certificates of deposit, and (3) that approximately one-quarter of each investor's funds would be invested in publicly traded high technology and biotechnology stocks. Based on these representations, at least eight investors invested more than $30 million in Guaranteed Fixed Rate Deposit Accounts. Despite the representations made by Vilar and Tanaka, however, the investors' funds were not invested in high quality short term deposits such as U.S. Treasury bills, government bonds, and certificates of deposit. Instead, Vilar and Tanaka misappropriated millions of dollars and invested the remaining funds in high technology and biotechnology stocks. As a result, investors lost more than $15 million.

In or about December 2000, for instance, Vilar and Tanaka met with Beulah Bird in Amerindo UK's London office and persuaded her to invest $6 million in a Guaranteed Fixed Rate Deposit Account. While doing so, they represented orally and/or in writing that Amerindo Panama

2

...uld invest approximately three-quarters of her funds in high quality short-term investments such

...U.S. Treasury bills, government bonds, and certificates of deposit, and approximately one quarter

...her funds in publicly traded high technology and biotechnology stocks. They also represented that

...merindo Panama would guarantee her 10% interest during the first year and 11% interest during

... second year, and that it would make these payments semi-annually. Based on these

... presentations, in December 2000, Ms. Birrd wire-transferred $6 million to a brokerage account

... ld by "Techno Raquia, S.A," a Panamanian entity, at Bear, Stearns & Co. Inc. (BSC), in New

... rk, New York.

Shortly thereafter, Ms. Birrd's lawyer repeatedly asked Amerindo principals for an executed

...arantee, but they failed to provide it. As a result, Ms. Birrd demanded that Amerindo Panama

...turn her investment funds – with interest. Over one year later, between on or about July 2, 2002,

...d July 23, 2002, Amerindo Panama wire-transferred approximately $6.3 million from three other

...C brokerage accounts to Ms. Birrd's account, held in the name of Lynx Investments Ltd., at

...oyd's TSB Bank (Luxemburg).[1] Although Ms. Birrd did not suffer any loss, financial records

...flect that Vilar and Tanaka did not invest her funds in high quality short-term investments such as

...S. Treasury bills, government bonds, and certificates of deposit, but rather used them to purchase

... sitions (long and short) in high technology and biotechnology stocks. The records also reflect (1)

...at within approximately one month of the deposit of Ms. Birrd's funds into the Techno Raquia

... count, James Stableford, an Amerindo UK employee, transferred approximately $5 million from

...Techno Raquia account at BSC to an account held by the Private Trust Corporation Management

---

[1] The brokerage accounts were held by three Panamanian entities affiliated with

...merindo – Amerindo Management Inc., Sub A/C M26, Amerindo Technology Growth Fund

...., and Amerindo Technology Growth Fund II.

3

mited (PTC), account number 3308442, at Barclays Bank PLC, in Nassau, Bahamas,[2] (2) that $3.5

:llion of these funds were subsequently transferred from the foregoing PTC account to one of

: lar's personal checking accounts in the United States, and (3) that Vilar used approximately

:.575 million of these funds to make a charitable contribution to the Metropolitan Opera

ssociation.[3] Financial records also reflect that $3 million of the funds Amerindo Panama returned

:. Ms. Birrd were funds that had been invested on or about June 20, 2002, by an Amerindo investor

: ho had invested $5 million in an Amerindo entity called Amerindo SBIC Venture Fund LP [4] – a

:ct that indicates that Amerindo was operating a Ponzi scheme, i.e., a fraudulent investment scheme

aintained and promoted by paying returns to early investors from the investor's own funds or those

:. other investors.

On December 31, 2000, a group of long-term Amerindo investors also invested funds, i.e.,

:: woximately $11,066,713, in a three-year Guaranteed Fixed Rate Deposit Account. At the time

:: their investment, Vilar and Tanaka represented orally and/or in writing that Amerindo Panama

: ould invest approximately three-quarters of their funds in high quality short-term investments such

:. U.S. Treasury bills, government bonds, and certificates of deposit, and approximately one quarter

:: their funds in publicly traded high technology and biotechnology stocks. They also represented

:at Amerindo Panama would guarantee them 11% interest and that they could redeem their

---

[2] As a result of a merger, Barclays Bank is now part of FirstCaribbean International
ank.

[3] Vilar is a self-proclaimed billionaire philanthropist and has pledged millions of dollars
charitable contributions to numerous organizations, including the Royal Opera House, the
etropolitan Opera Association, and his alma mater, Washington & Jefferson College.

[4] Vilar represented that this entity would be licensed by the U.S. Small Business
dministration as a Small Business Investment Corporation.

4

vestment at the end of the three-year term. Shortly before the expiration of the three-year term, the investors sent a letter to Amerindo UK's London office stating that they wanted to redeem their investment. In a letter dated November 7, 2003, Tanaka's wife, Renata Tanaka, characterized their decision to redeem their investment as "incredibly abrupt and insensitive to [their] lengthy relationship." In addition, Renata Tanaka threatened to disclose their identity to U.S. authorities, and noted that "such a disclosure would create enormous problems beyond description for [them] vis-a-vis federal and state taxation both present and for the past some 15 years." To date, the investors have been unable to redeem their investment.[5]

While investigating this case, U.S. law enforcement officers have discovered that in or about 1987 another investor, through Amerindo Panama, invested $1 million in an entity called Rhodes Capital. In the fall of 2004, Vilar told this investor that his investment was sound and that Rhodes Capital had not been affected by the downturn in equity markets. This information, however, directly conflicted with statements Renata Tanaka, who prepared financial reports and correspondence for Rhodes Capital at Amerindo UK's London office, made to another Rhodes Capital investor in May 2005, i.e., that Rhodes Capital had "wound down" in 2003 and that the investor's funds had been placed in a fixed rate investment. Both of these Rhodes Capital investors subsequently demanded that Amerindo Panama return their investment funds, but it failed to do so. These investors lost all of their investment funds.

Based on interviews of current and former Amerindo employees and investors, as well as documents and files seized from Amerindo US's New York offices, U.S. law enforcement officers

---

[5] This matter is currently in civil litigation in the New York State Supreme Court in Manhattan.

ve also discovered (1) that numerous Amerindo Panama investors invested funds in an investment

icle called the Amerindo Technology Growth Fund, (2) that Amerindo Panama deposited these

ds into brokerage accounts at BSC, (3) that Tanaka directed all trading activity relating to these

kerage accounts from Amerindo UK's London office, and (4) that Renata Tanaka prepared

ncial statements and correspondence relating to the accounts at Amerindo UK's London office.

hough Vilar and Tanaka claimed that they did not have any ownership interest in the brokerage

counts – except for the fees they charged for their services, financial records reflect that between

00 and 2005, Vilar and Tanaka withdrew millions of dollars from those accounts. Specifically, the

ords reflect (1) that Tanaka withdrew approximately $3.3 million from the brokerage accounts and

d the funds to purchase at least 5 thoroughbred race horses, (2) that Vilar withdrew approximately

million from the brokerage accounts and w re-transferred the funds into his personal bank account,

that Vilar and/or Tanaka wire-transferred approximately $173.8 million from the brokerage

counts to PTC account number 3308442 in the Bahamas, and (4) that approximately $19 million

the funds transferred into the PTC account were wire-transferred into Vilar's personal bank

counts at the following four banks -- Wilmington Trust Company, JP Morgan Chase, the Bank of

ston, and the Royal Bank of Scotland. Finally, U.S. law enforcement authorities have discovered

t documents relating to the foregoing wire transfers were signed by Tanaka or James Stableford

d that many of these documents were faxed via a London telephone number.

On or about May 26, 2005, U.S. law enforcement authorities arrested Vilar and Tanaka. Vilar

charged with investment adviser fraud, mail fraud, and wire fraud; Tanaka was charged with

ee counts of wire fraud. On June, 2005, a federal grand jury in the Southern District of New York

urned an eight count indictment charging Vilar with investment advisor fraud, securities fraud, mail

6

ud, and money laundering.

U.S. law enforcement authorities have been informed that Amerindo UK's office at 43 Upper

osvenor Street was occupied through on or about May 26, 2005 – the date Vilar and Tanaka were

ested. That day, the Financial Services Authority sent a letter to the Chief Executive of Amerindo

K advising the company to preserve all documents and records, including computer records

taining to Amerindo UK.

### The Offenses

**U.S.C. § 1341.  Mail Fraud**

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, [uses the mails] . . . shall be . . . imprisoned not more than 20 years . . . .

**U.S.C. Code § 1343.  Wire Fraud**

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication . . . any writings, signs, pictures, or sounds for the purpose of executing such scheme or artifice, shall be . . . imprisoned not more than 20 years . . . .

**U.S.C. § 1956.  Money Laundering**

Whoever, knowing that the property involved in a financial transaction represents the proceeds of . . . unlawful activity, conducts . . . a financial transaction . . . to promote the . . . unlawful activity . . . [or] to conceal or disguise the . . . location, the source, the ownership or the control of the proceeds . . . shall be imprisoned for not more than twenty years.

**U.S.C. § 80b-6.  Investment Adviser Fraud**

It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly —

7

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business, which operates as a fraud or deceit upon any client or prospective client;

. . . .

(4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. . . .

### Persons and Entities Involved

**Alberto William Vilar (also known as Albert Vilar)**

| | |
|---|---|
| Date of Birth: | █████████ |
| Place of Birth: | United States |
| Citizenship: | United States |
| █████████████ | |
| Passport Number: | |
| Last Known Address: | 860 United Nations Plaza New York, New York |

**Gary Alan Tanaka**

| | |
|---|---|
| Date of Birth: | █████████ |
| Place of Birth: | United States |
| Citizenship: | United States |
| Social Security Number: | |
| Passport Number: | █████████ |
| Last Known Address: | 7 High Combe Place Warren Cutting, Kingston Upon Thames Surrey, KT2 7HH United Kingdom |

**Renata Tanaka**

| | |
|---|---|
| Date of Birth: | Unknown |
| Place of Birth: | Unknown |
| Citizenship: | Unknown |
| Social Security Number: | Unknown |
| Passport Number: | Unknown |
| Last Known Address: | 7 High Combe Place |

8

Warren Cutting,
Kingston Upon Thames
Surrey, KT2 7HH
United Kingdom

**James Stableford**

| | |
|---|---|
| Date of Birth: | Unknown |
| Place of Birth: | Unknown |
| Citizenship: | Unknown |
| Social Security Number: | Unknown |
| Passport Number: | Unknown |
| Last Known Address: | 43 Upper Grosvenor Street |
| | London, W1X 9PG |
| | United Kingdom |

**Amerindo Investment Advisors Inc.**

| | |
|---|---|
| Incorporation: | California |
| Address: | 399 Park Avenue |
| | 22nd Floor |
| | New York, New York |
| | U.S.A. |
| Status: | Active |

**Amerindo Investment Advisors, Inc.**

| | |
|---|---|
| Incorporation: | Panama |
| Address: | Sucre Building |
| | Calle 48 Este Bella Vista |
| | P.O. Box 5168 |
| | Panama 5, Panama |
| Status: | Active |

**Amerindo Investment Advisors (U.K.) Ltd.**

| | |
|---|---|
| Incorporation: | England |
| Address: | 43 Upper Grosvenor Street |
| | London, W1X 9PG |
| | United Kingdom |
| Status: | Active |

9

10 14:44 FAX

### Assistance Requested

The prosecutor and the SEC need all documents, records, files, and other evidence in

nerindo UK's office that relate to Amerindo's investment services to prove that Vilar and Tanaka

ade fraudulent misrepresentations to investors and misappropriated their funds.

### Assistance Requested

Please search the offices of Amerindo UK s London office at 43 Upper Grosvenor Street and

ize all documents, records, files, computers, facsimile machines, photographs and other physical

idence relating to Amerindo U.S., Amerindo U.K., and Amerindo Panama including, but not

nited to:

1.  Corporate records relating to (a) the formation of the foregoing entities; (b) their shareholders, principals, officers, directors, and employees; (c) changes in ownership; (d) bylaws, resolutions, client lists and client files; (d) investment brochures; (e) marketing materials and investment advisory agreements; (f) copies of correspondence sent to – or received from – clients; and (g) other documents concerning or reflecting the identities of, and communications with, any clients;

2.  Documents reflecting financial transactions between and among Amerindo U.S., Amerindo U.K., and Amerindo Panama;

3.  Documents concerning the following brokerage accounts at Bear, Stearns & Company Inc.: Amerindo Management Inc., sub a/c M26, Amerindo Technology Growth Fund Inc., Amerindo Technology Growth Fund II, and, Techno Raquia, SA (collectively, the "Amerindo Brokerage Accounts"), including account opening documents, account statements, wire transfer requests, correspondence, electronic mail messages, trade tickets, trade blotters, trade confirmations, trade allocation sheets, trade memoranda, trade notes, client account statements, memoranda and notes and other documents reflecting or relating to investment performance, and other documents reflecting or relating to securities transactions entered into on behalf of clients, by any current or former Amerindo entity, affiliate, principal, officer and employee;

4.  Current and former client lists, client files, investment brochures, marketing materials, investment advisory agreements, copies of correspondence sent to or received from clients, including redemption requests received from clients, and other documents

concerning or reflecting the identities of, and communications with, clients who have investments in the Amerindo Brokerage Accounts;

5. Current and former client lists, client files, investment brochures, marketing materials, investment advisory agreements, copies of correspondence sent to or received from clients, and other documents concerning or reflecting the identities of, and communications with, clients who have investments managed or advised by Amerindo Panama;

6. Documents concerning Rhodes Capital, including copies of prospectuses, private placement memoranda, subscription agreements, descriptions of Rhodes Capital, lists of investors, and the allocation and distribution of returns;

7. Documents concerning investments in Guaranteed Fixed Rate Deposit Accounts, including lists of investors, account statements, documents pertaining to certificates of deposit, government securities, or other debt instruments held by Amerindo entities, and documents reflecting securities underlying any such investment;

8. Documents concerning PTC Management Limited, including all documents reflecting the relationship between any Amerindo entity, principal or employee and PTC, instructions given by any Amerindo entity, principal or employee to PTC, and any investor receiving redemptions of Amerindo investments through PTC;

9. Documents concerning account number 3308442 at Barclays Bank PLC, Nassau, Bahamas, and/or FirstCaribbean International Bank Limited, Nassau, Bahamas, including any account opening documents, monthly statements, documents pertaining to any deposits, withdrawals, and wire-transfers, and any documents regarding the beneficial owners of the account;

10. Documents reflecting any effort made by any Amerindo entity, including Amerindo SBIC Venture Fund LP, to obtain an SBIC license from the U.S. Small Business Administration, including correspondence, Management Assessment Questionnaires, license applications, documents reflecting efforts to obtain investor funds or commitments from investors to invest funds, capital commitments and investments, investments undertaken prior to licensure and the investment of funds received prior to licensure were invested pending licensure;

11. Documents reflecting any private bank, brokerage account or any other account with any financial institution held by Amerindo principals, including Vilar and Tanaka;

12. Documents reflecting any direct financial or beneficial ownership interest held by Vilar or Tanaka in Amerindo and the Amerindo Brokerage Accounts;

13. Documents reflecting brokerage accounts maintained by Amerindo at any broker-

11

dealer other than Bear, Stearns & Co. Inc., including documents reflecting trades conducted "away" from Bear, Stearns, and settled in Amerindo Brokerage Accounts at Bear, Stearns;

14. Bank account statements, brokerage account statements, transaction records, wire transfer instructions and records, copies of checks sent to or received from clients, notes, ledgers, cash receipt journals, deposit tickets and records, and other documents reflecting or relating to movements of funds into or out of the Amerindo Brokerage Accounts;

15. Records of expenses, including copies of checks and wire-transfers to landlords, employees, counsel, accountants, brokers, utility companies, and other organizations and individuals who provide goods and services to Amerindo; incorporation and governance documents relating to various entities through which Amerindo, Vilar and Tanaka conduct business (including Amerindo U.S., Amerindo U.K., and Amerindo Panama); accounting records; documents relating to any communications with accountants, boards of directors, and the operation and supervision of Amerindo's investment advisory business(es);

16. Documents reflecting information about any current or former Amerindo employee who had any contact with, or responsibility for, the management of, redemptions from, or preparation of account statements for, any current or former Amerindo client that had a direct or indirect interest in the Amerindo Brokerage Accounts;

17. Photographs, address books, Rolodex indices, diaries, calendars, identification documents, travel documents, and other documents relating to any participants in the fraudulent investment schemes;

18. Facsimile machines to determine the telephone numbers used to send and receive documents;

19. Computers, hard drives, and any other devices or equipment capable of storing data or text in any format, including but not limited to cellular telephones, personal digital assistants, and any other storage media capable of containing data or text in magnetic, electronic, optical, digital, analog, or any other format, used to store information described above, as well as drafts and final versions of documents and correspondence prepared in connection with the running and supervision of the operations of the investment advisory business;

20. Any device (mechanical or electronic, including stamps, electronic signatures, etc.) by which the signature of any current or former client or current or former employee has been or may be affixed to a document by a person other than the individual whose signature is contained on or in the device;

12

21.   Documents concerning the purchase of thoroughbred horses, or goods and services related to the training and maintenance of thoroughbred horses;

22.   Documents and records identifying all current and former employees of Amerindo and their contact information (e.g., addresses and telephone numbers) and personal identifiers (e.g., date of birth. social security number, and passport number);

23.   Documents related to any audited financial records relating to Amerindo advised accounts other than the audited financial records for any publicly traded Amerindo mutual fund; and

24.   Documents related to the withdrawal of funds from the Amerindo Brokerage Accounts for the direct or indirect benefit of Vilar, Tanaka, Ms. Tanaka, or any individual or entity other than an investor in the accounts.

### Procedures To Be Followed

Please have the seizing officials complete an Attestation With Respect to Seized Articles in he form attached hereto and forward the seized articles with the Attestation to the appropriate authorities for transmittal to the United States. If it should become necessary, please invite the official producing the seized articles to appear at some future date in the United States, at the expense f the United States government, to testify in proceedings related to this case.

Thank you for your assistance in this matter.

July 25, 2005
Date

Lisa C. Burnett
Deputy Director
Office of International Affairs

13

@015

**Attestation With Respect To Seized Articles**

, _____, attest on penalty of criminal
    (Name)

punishment for false statement or attestation that my position

with the Government of _____
                        (Country)

is _____ .  I received custody of the articles
    (Title)

listed below from _____ on _____,
               (Name of Person)         (Date)

at _____.  I relinquished custody of the articles
    (Place)

listed below to _____ on _____
         (Name of Person)      (Date)

at _____ in the same condition as when I received
  (Place)

them (or, if different, as noted below).


Description of Articles (attach separate page):

Changes in condition while in my custody (attach separate page if
necessary):


Official Seal         _____
                         Signature

                         _____
                         Title

                         _____
                         Place

                         _____
                         Date

# Annex B



**Home Office**

Crime Reduction and Community Safety Group
Judicial Co-operation Unit

463, 50 Queen Anne's Gate, London SW1H 9AT
Switchboard 0870 0001585    Fax 0207-273-4400    Direct Line 020 7273 4086
Pager 07623-523523 (657782)    E-mail stuart.blackley2@homeoffice.gsi.gov.uk    www.homeoffice.gov.uk

DS Howard Shaw
Extradition and International Assistance Unit
Metropolitan Police
Wellington House
67-73 Buckingham Gate
LONDON SW1E 6BE

| | |
|---|---|
| Our Ref | MLI05/221/1782 |
| Your Ref | |
| Date | 10th October 2005 |

Dear Howard

**US REQUEST FOR LEGAL ASSISTANCE: VILAR & TANAKA**

You have now seen the supplemental request from the US in connection with this case. The US authorities are seeking the search of premises located in the UK in connection with an investigation into fraud.

The request is for the search of the following address:

- Cadogan Tate, Cadogan House, 239 Acton Lane, London NW10 7NP

The specific evidence to be seized is as follows:

- All documents, records, files, computers, facsimile machines, photographs and other physical evidence relating to Amerindo US, Amerindo UK, and Amerindo Panama but not limited to the records and documents set out on pages 10 – 13 of the original request dated 25 July 2005

In pursuance of Sections 13 and 16 of the Crime (International Co-operation) Act 2003, the Secretary of State by this letter directs that an application be made for a search warrant under Section 8 of the Police and Criminal Evidence Act 1984. The evidence uplifted should include only that which is relevant to the offences set out in the letter of request i.e. fraud..

**Section 19 of PACE only permits the extension of a search relating to material of other alleged offences that have been committed with the jurisdiction England and Wales. It does not extend to any evidence relating to other offences that may have taken place outside the jurisdiction.**

Once the search has taken place, please liaise with me to discuss handling and transmission of the evidence.

C:\Sect 4 & 7\Section 17 letter - vilar.doc

Yours sincerely

Stuart Blackley
Deputy Head – United Kingdom Central Authority
For the Secretary of State

G:\Sect 6 & 7\Section 17 letter -
Vilar.doc

# Annex C



**U.S. Department of Justice**



Criminal Division

---

*Washington, D.C. 20530*
*September 8, 2005*

Stuart Blackley
Deputy
United Kingdom Central Authority
For Mutual Assistance in Criminal Matters
Home Office
50 Queen Anne's Gate
London SW1H 9AT

      Re:    Urgent Supplemental Request for Assistance in the Prosecution and Investigation of Alberto William Vilar, also known as Albert Vilar, and Gary Alan Tanaka

Dear Mr. Blackley:

On July 25, 2005, the United States submitted a "Request for Assistance in the Prosecution and Investigation of Alberto William Vilar, also known as Albert Vilar, and Gary Alan Tanaka" ("Original Request"). In that request, the United States asked U.K. authorities to search Amerindo Investment Advisors (UK) Ltd.'s London office at 43 Upper Grosvenor Street, and seize all documents, records, files, computers, facsimile machines, photographs and other physical evidence relating to that entity and two other entities – Amerindo Investment Advisors Inc. and Amerindo Investment Advisors, Inc. On or about September 5, 2005, U.K. authorities informed U.S. authorities that the foregoing materials had been moved from 43 Upper Grosvenor Street to Cadogan Tate, Cadogan House, 239 Acton Lane, London NW10 7NP. In light of this fact, we request that U.K. authorities search the premises located at Cadogan Tate, Cadogan House, 239 Acton Lane, London NW10 7NP, and seize all of the foregoing materials, including the materials set forth on pages 10-13 of the Original Request. In addition, three of the following U.S. Postal Inspectors would be available to travel to the United Kingdom and provide assistance if U.K. authorities would like them to do so:

      1.     Thomas F. Feency;
      2.     Cynthia M. Fraterrigo;
      3.     Adam J. Golden;
      4.     Pankaj Sharma; and
      5.     Annmarie Williamson.

Finally, the prosecutor is required to gather all evidence from the United Kingdom by November 30, 2005, and provide all relevant evidence to the defense promptly thereafter. Given this fact and the fact that U.K. authorities found 320 boxes of materials at the Cadogan Tate location, we ask that this request be treated as urgent and that the search be conducted on September 15, 2005, or as soon thereafter as possible.

Thank you for your continued assistance with this matter.

Sincerely,

Mary Ellen Warlow
Director

By:

Mary E. McLaren
Trial Attorney

2