

Approved: _____/s/ Marc Litt_____
MARC LITT
Assistant United States Attorney

**05 MAG      937**

Before:   HONORABLE FRANK MAAS
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - - - - - - x
                                              :   SEALED
UNITED STATES OF AMERICA                      :   COMPLAINT
                                              :
            -v-                               :   Violations of
                                              :   15 U.S.C. §§ 80b-6 and 80b-17
                                              :   18 U.S.C. §§ 1341, 1343, and 2
                                              :
ALBERTO WILLIAM VILAR,                        :   COUNTY OF OFFENSE:
   a/k/a ALBERT VILAR,                        :   NEW YORK
                                              :
            Defendant.                        :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

      CYNTHIA M. FRATERRIGO, being duly sworn, deposes and says that she is a Postal Inspector with the U.S. Postal Inspection Service and charges:

### COUNT ONE

      From in or about 1987, up to and including the present, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, acting as an investment adviser to investors and prospective investors, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, directly and indirectly, did: (a) employ devices, schemes, and artifices to defraud clients and prospective clients; (b) engage in transactions, practices, and courses of business which operated as a fraud and deceit upon clients and prospective clients; and (c) engage in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative; to wit, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, by use of means and instrumentalities of interstate commerce, including interstate wires, U.S. mails, and interstate mailings via private commercial carriers, induced one and more individuals to entrust him with millions of dollars for

GOVERNMENT EXHIBIT 33 A   S2 05 Cr. 621 (ID)      3501-H

investments by his firm, Amerindo Investment Advisors Inc. and its affiliated and formerly affiliated entities, which funds VILAR converted to his own use, and the use of others, without the permission and authorization of the investors.

(Title 15, United States Code, Sections 80b-6 and 80b-17;
and Title 18, United States Code, Section 2).

## COUNT TWO

On or about December 10, 2004, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did cause to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, and took and received therefrom, any such matter and thing; to wit, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, sent and caused to be sent and delivered by Federal Express a false and fradulent account statement to one and more investors.

(Title 18, United States Code, Sections 1341 and 2.)

## COUNT THREE

On or about September 26, 2003, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice; to wit, on or about September 26, 2003, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, caused approximately $250,000.00 of investor funds to be sent by wire from within New York State, to a bank in Delaware, which funds were subsequently converted to the defendant's own use without the knowledge, authorization, or permission of the investor.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

1.  I have participated in the investigation and I am familiar with the facts and circumstances of the charged offenses. Because this affidavit is being submitted for a limited purpose, I have not included details about every aspect of this investigation. Where conversations or statements of others are related herein, they are related in substance and in part.

2

2.  In the course of my investigation, I have interviewed witnesses, reviewed documents, and spoken with colleagues who have spoken with witnesses and reviewed documents.

### Background on the Defendant and the Amerindo Entities

3.  According to Amerindo's website (www.amerindo.com), and a document filed with the Securities and Exchange Commission in or about May 2003, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, is, along with his Partner (the "Partner") one of the original founders of Amerindo Investment Advisors Inc. ("Amerindo U.S."), a California corporation, and is a shareholder, officer and director of Amerindo U.S. According to an SEC filing dated on or about September 4, 2002, VILAR and his Partner were also all of the shareholders, directors and officers of Amerindo Investment Advisors (Cayman) Limited ("Amerindo Cayman"), Amerindo Investment Advisors (U.K.) Limited ("Amerindo U.K."), and Amerindo Investment Advisors (Panama), Inc. ("Amerindo Panama"). (Amerindo U.S., Amerindo Cayman, Amerindo U.K. and Amerindo Panama are hereinafter referred to collectively as "Amerindo.") One or more of the Amerindo entities serves as the investment advisor to Amerindo Technology D – a mutual fund which, according to Morningstar.com, currently has approximately $99 million in assets.

4.  According to documents issued by Amerindo, and ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, and a Brokerage Firm used by Amerindo, VILAR and his Partner in connection with their investment advisory services business, Amerindo also historically has offered investment services for institutional clients and high net worth individuals through hedge funds, "guaranteed fixed rate deposit accounts," and other investment vehicles. According to an Amerindo website (www.amerindo.com), as of May 24, 2005, inquiries concerning private equity investments were directed to Amerindo U.S., located at 399 Park Avenue, 22nd Floor, New York, NY 10022, and One Embarcadero Center, Suite 2300, San Francisco, CA 94111-3162. The Amerindo website provides a list of three private equity professionals including VILAR ("Co-Founder, President and Portfolio Manager; Investment Committee Member").

5.  According to documents obtained from the Securities and Exchange Commission, Amerindo U.S. has been a registered investment adviser since approximately August 1985.

6.  According to a document filed by Amerindo with the SEC on or about July 15, 2004, Amerindo then had approximately $1.2 billion of assets under management.

7.  As of approximately December, 2004, ALBERTO WILLIAM VILAR, the defendant, had a reported personal net worth of approximately $950 million. According to numerous published reports, VILAR has made charitable contributions of more than approximately $200 million to a variety of entities, including various opera organizations around

3

the world, medical institutions, and his college alma mater, Washington and Jefferson College, among others.

8. During the course of my investigation, for the reasons set forth in more detail below, I have probable cause to believe that ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, while acting as an investment advisor, induced an individual to invest $5 million with VILAR and Amerindo in a Participating Securities Small Business Investment Company ("SBIC") to be licensed by the Small Business Administration ("SBA"), converted the investor's $5 million to his own personal use and that of others, and subsequently made numerous misrepresentations to the investor about the status of the investment and Amerindo's efforts to obtain the necessary SBIC license from the SBA.

### The Victim's Investment In An Amerindo SBIC

9. I, and other U.S. Postal Inspectors, have spoken to an individual (the "Victim") who invested millions of dollars with ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, and Amerindo, over approximately the past two decades. According to the Victim, in approximately June, 2002, VILAR advised the Victim to invest in an Amerindo venture designed to take advantage of a government program to promote venture capital investment in small businesses involving the U.S. government and small business (the "Amerindo SBIC"). The Victim agreed to invest approximately $5 million in the Amerindo SBIC based solely on VILAR's oral description of the investment opportunity, including VILAR's representation that the Victim would earn approximately $250,000 per quarter through the venture, thereby replacing the Victim's approximate otherwise expected income from the invested principal. The Victim's investment of approximately $5 million in an Amerindo SBIC on or about June 20, 2002, is reflected in records received from a brokerage firm at which Amerindo and the Victim have accounts (the "Brokerage Firm") and documents sent by VILAR and Amerindo to the Victim.

### The SBA's SBIC Program

10. According to documents received from the SBA, and interviews conducted with representatives of the SBA, during a period between in or about 2000 and on or about September 30, 2004, the SBA provided funding for the Participating Securities SBIC Program (the "SBIC Program"). Under the SBIC Program, a qualified private venture capital firm that had received an SBIC license from the SBA was eligible to receive matching funds through SBA guarantees. Those matching funds allowed the SBICs to gain the benefits of "leverage" of up to twice the invested private capital.

11. I have also learned from representatives of the SBA that:

    a. An SBIC must be licensed by the SBA.

4

    b.  The first step in the SBIC licensure process is to complete a Management Assessment Questionnaire ("MAQ"), which must be completed and certified as being accurate by the principals and control persons of the applicant. The MAQ form includes a warning that an individual who knowingly makes false statements in the MAQ is subject to criminal prosecution under various statutes, including 18 U.S.C. § 1001. As part of the MAQ, the applicant must identify, among other things, the principals of the applicant, and the private funds raised from, and committed by the applicant's principals, institutional investors and individual investors.

    c.  If a MAQ satisfies the SBA's criteria, an applicant may receive a "go forth" letter, inviting the applicant to apply for an SBIC license within the following 18 months. If an applicant does not receive a "go forth" letter, it may not apply for an SBIC license.

    d.  If an applicant is invited to apply for an SBIC license, the applicant must submit with the application commitment letters from institutions and individuals that have agreed to invest a minimum of $10 million in the SBIC if it is licensed, of which no more than 30% may come from the principals or affiliated or associated individuals or entities.

    e.  After an applicant applies for an SBIC license, but prior to that application being approved, the applicant must demonstrate that it has $2.5 million of the $10 million minimum deposited in a separate bank account set up for the SBIC.

<u>Amerindo's Application for an SBIC License</u>

  12.  According to documents received from the SBA, and interviews conducted with representatives of the SBA:

    a.  Amerindo first submitted a MAQ to the SBA in or about January, 2000. Although Amerindo received a "go forth" letter in or about April 2000, based on a presentation made by VILAR to the SBA Investment Committee on or about April 18, 2000, its license application was rejected.

    b.  Amerindo submitted a second MAQ in or about May 2002.

    c.  Amerindo submitted a third MAQ in or about September 2002. The third MAQ listed ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant as one of the the four principals of the proposed Amerindo SBIC, and did not include Victim on that list. In response to a question about its then current fund-raising commitments to date, the form reflected only that one principal had committed an amount "up to $7 million" to the venture, and the MAQ did not reflect the $5 million investment by Victim which had been received by Amerindo on or about June 20, 2002.

    d.  On or about December 27, 2002, the Chief Administrative Officer of the SBA's Investment Division sent a letter to VILAR in which she stated, among other

5

things, "Review of the third MAQ by the Investment Committee produced numerous areas of concern." Those concerns included, among other things, the facts that the principals were located in three different geographic areas (New York, London, and Virginia), and the fact that VILAR would be spending a small fraction of his time on the Amerindo SBIC compared to his interest in the SBIC. That letter concluded, "I am sorry to have to write this letter to you, but we feel that if we proceeded, after receiving three submissions to date, that it would be at considerable time and expense to your team (as well as ourselves), and that ultimately, the Agency Licensing Committee would reject your application."

    e.  Amerindo did not receive a "go forth" letter as a result of its submission of the third MAQ.

    f.  In or about January, 2004, VILAR and Amerindo filed a fourth MAQ with the SBA. Each of the MAQs submitted by VILAR and Amerindo, including the fourth MAQ, noted that they were represented by counsel experienced with the SBIC licensing process.

    g.  In or about February, 2004, the SBA posted on its website a notice indicating that, due to a lack of funding by Congress of the SBIC Program, there was no guarantee that applications submitted after approximately the end of March, 2004, would be eligible to receive leverage funding. This fact was well known within the SBIC community, and was something which Amerindo's counsel should have known.

    h.  In or about April, 2004, following the receipt of an e-mail indicating that one of the principals of the Amerindo SBIC Venture Fund was resigning, an SBA representative conveyed to VILAR by telephone that the MAQ did not meet the criteria to be presented for consideration by the Investment Committee.

    i.  On or about May 28, 2004, an Amerindo employee sent an e-mail message to an SBA employee. The subject line of the e-mail read: "From Alberto Vilar - Amerindo Investment Advisors." The text of the e-mail stated, in part, that "Amerindo remains keenly interested in learning about the status of the MAQ that was filed during the winter," and asked that the SBA take a telephone call from a former senior policy adviser in the SBA's investment division, who was assisting Amerindo with the licensing process.

    j.  The SBA received no further written or oral communication from VILAR or any other representative of Amerindo after the May 28, 2004 e-mail described above.

    k.  Neither VILAR, Amerindo, nor any of the Amerindo entities that had sought to obtain permission to apply for an SBIC Program license ever received the license required to apply for leverage funds under the SBIC Program.

### The Use Of The Victim's $5 Million SBIC Investment

13. I have examined records from the Brokerage Firm which reveal that the Victim's $5 million investment in the Amerindo SBIC was deposited into a brokerage account used by ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, as a personal piggy bank to pay personal expenses and make charitable contributions, without the knowledge, consent, or authorization of the Victim. Specifically, the Brokerage Firm records demonstrate that:

    a. The Brokerage Firm's account into which Victim's SBIC investment was deposited on or about June 20, 2002, was opened by VILAR in or about the Fall of 1987, in the name of a Panamanian entity called "Amerindo Management Inc." (the "AMI Account").

    b. On or about June 20, 2002, the AMI Account held numerous equity positions in technology stocks, and had a negative cash balance of approximately $428,122, prior to the incoming transfer of the Victim's $5 million SBIC investment.

    c. On or about June 25 and June 26, 2002, the Brokerage Firm received letters of authorization ("LOAs") directing the Brokerage Firm to transfer by wire approximately:

        i. $1 million to an account at Chase Manhattan Bank held in the name of "A.W. Vilar";

        ii. $650,000 to an account at Chase Manhattan Bank held in the name of Amerindo Investment Advisors Inc.; and

        iii. $500,000 to a trust account at Bank of New York;

    d. Each of the June 25, 2002, and June 26, 2002, LOAs stated that, "This wire transfer represents redemption by the above referenced equity partner," apparently referring to the owner of the account designated to receive the requested transfer.

    e. According to other documents produced by the Brokerage Firm, a letter authorizing an additional wire transfer was received by the Brokerage Firm on or about July 9, 2002, directing the Brokerage Firm to transfer a sum of approximately $3,102,958.85 million to an overseas account located in Luxemburg. That LOA contained the same language described in subparagraph (d), above. The AMI Account received an incoming wire deposit of approximately $500,000.00 on or about July 10, 2002, and ended the July 2002 statement period with a cash balance of approximately $555,222.63.

14. According to records received from JP Morgan Chase, the account into which $1 million of the Victim's purported $5 million investment in an Amerindo SBIC was transferred was a personal checking account held in the name of "Alberto W. Vilar" (the "Vilar

7

Chase Account"). According to records covering the period between on or about June 9, 2002, through July 8, 2002, the Vilar Chase Account had a balance of approximately $87,564.46 immediately prior to the incoming wire transfer of one million dollars from the AMI Account on or about June 25, 2002. No other funds were deposited in the Account during the statement period, and the closing balance of the Vilar Chase Account was approximately $132,677.72. Thus, all but approximately $45,000 of the funds wired into the Vilar Chase Account from Victim's SBIC investment were dissipated within two weeks of their deposit. The withdrawals from the Vilar Chase Account during that two-week period included:

    a.    An electronic check in the amount of approximately $540,000.00, made payable to "Washington and Jefferson";

    b.    A check in the amount of approximately $177,000.00, made payable to "American Academy in Berlin";

    c.    An electronic check in the amount of approximately $17,000.00, made payable to Alberto Vilar;

    d.    A check in the amount of approximately $14,640.08, made payable to what appears to be a catering service, with a memo line which reads: "AV Party 4/18");

    e.    A transfer in the amount of approximately $10,000.00 for the benefit of "Albert W. Vilar";

    f.    A check in the amount of approximately $7,000.00, made payable to an individual with the last name "Vilar," with a memo line which reads: "Allowance-May";

    g.    A check in the amount of approximately $255.56, payable to an appliance service for "Dishwasher Repair" for an address where VILAR, the defendant, is known to reside; and

    h.    Approximately $1,000 in ATM cash withdrawals.

15. According to records received from JP Morgan Chase, the account into which approximately $650,000 of the Victim's purported investment in an Amerindo SBIC was transferred on or about June 26, 2002, was a business checking account held in the name of Amerindo Investment Advisors Inc. (the "Amerindo Chase Account"). Those records further reflect that the approximately $650,000 that was wire transferred into the Amerindo Chase Account on or about June 26, 2002, was spent within approximately one month on what appear to be business expenses incurred by Amerindo based on the descriptions of outgoing wire transfers.

16. According to records received from the Bank of New York, the account into which approximately $500,000 of the Victim's purported investment in an Amerindo SBIC

8

was wire transferred on or about June 25, 2002 (the "Bank of New York Account"), ~~the Bank of New York Account~~ was a lawyer's escrow account. Those records further show that at least approximately $400,000 of those funds were used to make an investment on behalf of the Victim which investment was unrelated to the Amerindo SBIC, and which investment the Victim believed would be paid for by funds invested with Amerindo separate and apart from the $5 million investment the Victim had made in the Amerindo SBIC. The Bank of New York records further show that on or about July 23, 2002, a check in the amount of approximately $100,000 was drawn on the Bank of New York Account and was subsequently deposited into the Victim's Brokerage Firm account from which the Victim's $5 million investment was originally transferred.

17.  The Victim has informed me that:

   a.  The Victim did not authorize the transfer of one million dollars of the Victim's investment in the Amerindo SBIC to the personal account of the defendant, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant;

   b.  The Victim has never given a gift or loan of any money to VILAR; and,

   c.  The Victim has never authorized VILAR to make any charitable contributions on Victim's behalf.

18.  According to a July 31, 2003 article in the Pittsburgh Post-Gazette (www.pittsburgpost-gazette.com/ae/20030731 vilarae4.asp), "[Alberto Vilar] initiated the Vilar Distinguished Artist Series [at Washington & Jefferson College] three years ago. He also is the largest contributor to the Vilar Technology Center, scheduled to open on campus this fall." According to an undated document posted on the internet at www.washjeff.edu, VILAR has pledged $18.1 million toward the construction of the Vilar Technology Center.

19.  According to information posted on internet at www.sourcewatch.org, the American Academy in Berlin was founded in 1998, and "Alberto W. Vilar" has contributed $1 million or more to is the Academy. The Academy's website, www.americanacademy.de, lists "Alberto Vilar" in the "Presidents Circle" of individuals who donated to the Academy during its first five years of opertion, and lists "Alberto Vilar" as among the "Patrons" who had made donations between January 2004 and March 2005.

Vilar's False and Misleading Statements
Concerning Victim's $5 Million SBIC Investment

20.  Several Amerindo account statements, including a statement received by the Victim in New York City on or about December 10, 2004, via a Federal Express delivery sent from London, described Victim's $5 million investment as "FUNDS ON DEPOSIT WITH SBIC."

9

21.     On or about March 13, 2003, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, wrote a letter to the Victim in which he stated that although there had been an "unprecedented bear market [for] the last three years . . . the monies put into escrow for the new SBIC fund remain at full value." Later in the same letter he stated that, "We are now awaiting permission to commence investing the funds we have placed into escrow, which we expect to happen fairly soon." In fact, as described above, Amerindo and VILAR had been repeatedly rebuffed in their efforts to obtain an SBIC license, the Victim's funds were not placed in escrow, and VILAR had long since spent nearly all of the Victim's entire $5 million investment on personal expenses, business expenses, and purported equity redemptions by other investors.

22.     On or about March 25, 2004, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, signed a letter to the accountant of the Victim in which he stated in part that had been required "to deposit the requisite key money" in connection with Amerindo's efforts to obtain an SBIC license. In that letter, VILAR also stated that while waiting for the license, "the prices of technology private-placements continued to decline . . . . This means that we did not use a single penny of [Victim's] investment during this declining period, and if and when, as expected, we start to make investments upon securing the renewal of our license later this year, we will be looking at the best prices probably ever seen in the four decade plus history of technology based venture capital." At the time VILAR signed this letter, and as described above: (a) an applicant at the MAQ stage of the SBIC licensing process need not have capital on deposit until it is invited to apply for a license, which Amerindo was never invited to do during the period following the Victim's $5 million investment; (b) Amerindo's third and fourth MAQs did not report the investment of $5 million by the Victim in the Amerindo SBIC; and (c) VILAR had long since spent nearly all of the Victim's entire $5 million investment on personal expenses, business expenses, and purported equity redemptions by other investors.

21.     On or about October 25, 2004, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, signed a memo written to Victim's lawyer, in which he wrote in part: "Funds on deposit with SBIC, for $5 million. Technically this represents an escrow deposit for a technology-based SBIC. [Victim] has effectively coinvested with [me] in a new fund that has been approved for investment, but the actual funding leverage-supplement has been delayed owing to budgetary problems in Washington, due to the increase in the deficit and the Iraqi war." In fact, as described above, the Victim's $5 million investment in the Amerindo SBIC had been converted to the use of VILAR and others, and was not being held in escrow; (b) Amerindo had not received an SBIC license and was not likely to receive such a license in the near future; (c) SBA funding for the SBIC Program was not "delayed," but rather had been canceled – a fact of which VILAR and his representatives should have been well aware.

### The Defendant's Conversion of Additional Funds Invested by Victim

22.     I have examined records from the Brokerage Firm which further show that:

10

      a. On or about September 25, 2003, the Brokerage Firm received a wire transfer instruction from Amerindo, and purportedly signed by the Victim, which requested the transfer of approximately $250,000.00 from an account held by the Victim at the Brokerage Firm (and managed on Victim's behalf by Amerindo) to an account held at the Brokerage Firm in the name of "Amerindo Technology Growth Fund I" ("ATGF I").

      b. Prior to the transfer of $250,000.00 from the Victim's account to ATGF I, ATGF I had a cash balance of approximately $382,514.71.

      c. On or about September 26, 2003, the Brokerage Firm received another wire transfer instruction from Amerindo requesting that approximately $250,000.00 be transferred immediately from ATGF I to a personal account held at Wilmington Trust Company, in Wilmington, Delaware (the "Wilmington Trust Account") by ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant.

      d. On or about September 26, 2003, following instructions on an LOA received from Amerindo, the Brokerage Firm wired approximately $300,000.00 to an offshore account apparently held by a private trust corporation in the Bahamas, leaving ATGF I with a cash balance of approximately $82,514.71.

      23. I have reviewed certain documents concerning the Wilmington Trust Account related to the months of September and October of 2003. Those documents show that:

      a. $250,000.00 was wire transferred into the Account on or about September 26, 2003;

      b. The Account received another wire transfer in the amount of $53,042.83 on or about September 29, 2003, which was immediately wired out of the Account on the same day that it was received;

      c. Four wire transfers totaling approximately $138,491.15 were sent out of the Account on or about September 29 and 30, 2003;

      d. Checks and other debits totaling approximately $112,709.24 were drawn on the Account through October 31, 2003, leaving the Account with a period ending balance of approximately $253.49.

      24. The Victim informed me that the purported signature of the Victim which appears on the wire transfer instruction described in paragraph 25(a), above, is not genuine and was not authorized by the Victim. The Victim also informed me that the transfer of approximately $250,000 on or about September 26, 2003, from the Victim's account at the Brokerage Firm to a personal account held by ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, was not authorized by Victim. The Victim also informed me that the Victim did not authorize the use of any of the Victim's funds to pay for the personal expenses of

11

VILAR and his associates, and was unaware of any funds being transferred to an off-shore bank account.

WHEREFORE, deponent prays that a warrant be issued for the arrest of the above-named individual and that he be arrested and imprisoned, or bailed, as the case may be.

_____
CYNTHIA FRATERRIGO
UNITED STATES POSTAL INSPECTOR
U.S. POSTAL INSPECTION SERVICE

Sworn to before me this 25th day of May, 2005

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK