UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -v- | Case No. S3 05-CR-621 (KMK) |
| ALBERTO WILLIAM VILAR and | OPINION AND ORDER |
| GARY ALAN TANAKA, | |
| Defendants. | |

Appearances:

Michael J. Garcia, Esq.
United States Attorney
Marc O. Litt, Esq.
Dierdre Ann McEvoy, Esq.
Assistant United States Attorneys
U.S. Attorney's Office, Southern District of New York
*Counsel for the Government*

Jeffrey C. Hoffman, Esq.
Susan C. Wolfe, Esq.
Hoffman & Pollack LLP
New York, New York
*Counsel for Defendant Alberto William Vilar*

Glenn Charles Colton, Esq.
Jessica Leigh Margolis, Esq.
Wilson Sonsini Goodrich & Rosati
New York, New York
*Counsel for Defendant Gary Alan Tanaka*

KENNETH M. KARAS, District Judge:

Defendants Alberto William Vilar ("Vilar") and Gary Alan Tanaka ("Tanaka") are

charged with an alleged fraud scheme involving investors' funds. The Superseding Indictment

(the "Indictment"), filed on August 15, 2006, charges Defendants with conspiracy to commit

securities, mail, wire, and investment advisor fraud and money laundering. They are also

charged in separate substantive counts with securities fraud, investment advisor fraud, mail fraud, two counts of wire fraud, and four counts of money laundering.  The Indictment also includes forfeiture allegations.

Each Defendant has filed a Motion to Suppress the fruits of two searches – one conducted pursuant to a warrant (the "Warrant" or "Search Warrant") in the United States on May 26, 2005, and one conducted at the Government's request, pursuant to a Mutual Legal Assistance Treaty and two U.K. search warrants, in the United Kingdom on October 13 and 14, 2005 (the "U.K. Search").  Each Defendant also has filed a Motion to Quash a Grand Jury Subpoena (the "Subpoena") issued on May 26, 2005.  For the reasons stated herein, the motions to suppress the search in the United States and the motions to quash the Subpoena are granted in part and denied in part.  The motions to suppress the U.K. search are denied.

I.  Background

A.  The Defendants and the Amerindo Entities

Defendants Vilar and Tanaka are principals at three entities which are the subjects of the Indictment, the searches, and the Subpoena.  Those entities are Amerindo Investment Advisors Inc. ("Amerindo U.S."), which has its principal offices in San Francisco and New York; Amerindo Investment Advisors, Inc. ("Amerindo Panama"), an off-shore Panamanian investment fund; and Amerindo Investment Advisors (UK) Ltd. ("Amerindo U.K."), which had an office in London.  (Indictment ¶¶ 1-3.)  Together, Vilar and Tanaka founded Amerindo U.S., and were two of its shareholders, officers, and directors.  (*Id*. ¶¶ 4-5.)  Vilar and Tanaka were also the only two shareholders, directors, and officers of Amerindo Panama and Amerindo U.K.  (*Id.*)

B.  The Alleged Schemes to Defraud

The following allegations are taken from the Superseding Indictment which alleges that from July 1986 to May 26, 2005, Defendants perpetrated a scheme to defraud investors by soliciting victims to invest in fraudulent investment products, with promises of high rates of return with little or no risk.  (*Id.* ¶ 6.)  The investment products included the Amerindo SBIC Venture Fund LP (the "SBIC Fund") and the Guaranteed Fixed Rate Deposit Account Program (the "GFRDAs").  (*Id.*)  The Indictment charges that Victim No. 1, later identified as Lily Cates ("Cates"), began investing funds with Vilar and Amerindo in 1987.  (*Id.* ¶ 7.)  Her investments peaked at $18 million in September 2000 and then dropped sharply over the next two years.  (*Id.* ¶ 8.)  From 1987 to 1995, Cates received account statements from Amerindo U.S. with the Amerindo U.K. address.  (*Id.*)  In October 1995, Cates began receiving account statements from Amerindo Panama with the address of a post office box in Panama.  (*Id.*)

Vilar allegedly solicited Cates to invest in the SBIC Fund in June 2002.  (*Id.* ¶ 9.)  SBIC funds were monitored by the United States Small Business Administration ("SBA") and were designed to promote venture capital investment in small businesses by granting licenses to qualified private venture capital firms.  (*Id.*)  Obtaining an SBA license was a multi-stage process.  Amerindo U.S. made four unsuccessful attempts to obtain a license between 2000 and January 2004.  (*Id.* ¶¶ 13-16.)  Its fourth and final application was abandoned on May 28, 2004.  (*Id.* ¶ 16.)  Nevertheless, Vilar allegedly told Cates that he and Tanaka were personally investing in the SBIC, which he asserted had been approved by the government, and that Cates would receive $250,000 quarterly for her investment.  (*Id.* ¶ 17.)  Cates agreed to invest $5 million.  (*Id.*)

Cates' $5 million SBIC investment was deposited on June 20, 2002, in the "Amerindo

Management Inc." account (the "AMI Account"), which at that point allegedly had a negative

balance of $428,122.  (*Id.* ¶ 18.)  On June 25 and 26, 2002, Tanaka directed that $1 million be

transferred from the AMI Account to an account at Chase Manhattan Bank held in the name of

A.W. Vilar (the "Vilar Account").  (*Id.* ¶ 19.)  All but $45,000 of that money was allegedly spent

by Vilar within two weeks of the transfer on charitable contributions and personal expenses.  (*Id.*

¶ 22.)  Tanaka also directed that $650,000 be transferred from the AMI Account to an account at

Chase Manhattan Bank held in the name of Amerindo U.S.  (*Id.* ¶ 19.)  That money was allegedly

spent on Amerindo U.S.'s business expenses.  (*Id.* ¶ 23.)  Tanaka further directed that $500,000

be transferred to a trust account at the Bank of New York.  (*Id.* ¶ 19.)  Approximately $400,000

of the $500,000 was invested on Cates' behalf in another account.  (*Id.* ¶ 24.)  Finally, the

remaining $2.85 million of the SBIC investment was allegedly transferred to a Luxembourg

Account and used to redeem another alleged victim's investment.  (*Id.* ¶ 25.)  In addition, on

September 25, 2003, Defendants allegedly directed that $250,000 be transferred from one of

Cates' accounts at a New York City brokerage firm (the "Brokerage Firm") to another account at

the Brokerage Firm in the name of "Amerindo Technology Growth Fund Inc" ("ATGF I").  (*Id.* ¶

28.)  The letter of authority included Tanaka's signature and an alleged forgery of Cates'

signature.  (*Id.* ¶ 28.)  On September 26, 2003, another letter of authority was signed by Tanaka

directing $250,000 to be transferred from ATGF I to one of Vilar's personal accounts.  (*Id.* ¶ 29.)

This money was allegedly spent on Vilar's personal expenses.  (*Id.* ¶ 30.)

To execute this scheme, during this period Vilar allegedly made false and misleading

statements to Cates concerning her SBIC investment.  For example, Vilar allegedly asserted that

Cates' funds had been placed in escrow and not spent, that her funds had not been used during a period of declining stock prices, that the SBIC license had been approved, and that Cates had been accruing interest on her SBIC investment.  (*Id.* ¶ 26.)  All of these statements are alleged to have been fraudulently made.

Defendants are also alleged to have used Amerindo's GFRDA products to defraud investors.  Beginning in 1986, Defendants allegedly solicited investments in these GFRDAs, describing the instruments as primarily low-risk, short-term debt funds, with a fixed interest rate of return substantially above the prevailing rates.  (*Id.* ¶ 31.)  Defendants allegedly prepared and distributed offering circulars in 1986, 1988, 1998, and 2002, which contained false and misleading statements about the GFRDAs.  (*Id.* ¶ 32.)  Among the misrepresentations allegedly included in these offering circulars were false statements about the identities of the offeror and the guarantor of the GFRDA investment products, as well as about the rates of return and liquidity of the investments.  (*Id.*)

Defendants are alleged to have intentionally misled GFRDA investors as to which Amerindo entity controlled their investments.  (*Id.* ¶ 33.)  For example, through September 1995, Amerindo's GFRDA account statements contained Amerindo U.S. letterhead.  But beginning in October 1995, the statements were printed on Amerindo Panama letterhead.  (*Id.*)  Moreover, when investors sought to redeem their GFRDA investments, Defendants allegedly changed the terms of the GFRDA program, discouraged investors from redeeming, and diverted funds from other Amerindo clients to pay the GFRDA investors.  (*Id.* ¶ 34.)

The Indictment identifies, as "Victim No. 3," a group of investors who were allegedly defrauded as part of Defendants' GFRDA scheme.  (*Id.*)  These investors were later identified as

the Mayer family.  According to the Indictment, the Mayer family made repeated attempts to

redeem their GFRDA investments, but were discouraged from redeeming and were informed that

redemption was impossible.  In January 2003, Defendants allegedly also unilaterally and

retroactively lowered the interest rate on the Mayer family's GFRDA investment.  (*Id.*)

C.  The U.S. Search

1.  Supporting Affidavit

On May 25, 2005, the Government applied for a warrant to search the New York offices

of Amerindo U.S. at 399 Park Avenue, 22nd floor.  The supporting affidavit (the "Affidavit")

was sworn to by United States Postal Inspector Cynthia Fraterrigo ("Inspector Fraterrigo"), the

case agent.  In addition to the facts set forth directly in the document, the Affidavit also

"incorporates by reference" the criminal complaints filed against Tanaka and Vilar (the

"Complaints").  (Affidavit ¶ 6.)  The Affidavit further states:  "Because this affidavit is submitted

for the limited purposes of establishing probable cause to search the premises described below . .

. I have not included the details of every aspect of the investigation."  (*Id.* ¶ 2.)  Probable cause in

the Affidavit is based primarily on three allegations wrongdoing.  These allegations are

summarized below.

a.  The Mayer Family's Investments in GFRDAs

Inspector Fraterrigo attests in the Affidavit that she interviewed Lisa Mayer, "an

individual who has known Alberto Vilar for approximately two decades, who dated him on and

off over the course of approximately a decade, and who, along with her family, invested millions

of dollars with Vilar and Amerindo beginning in or about 1987."  (*Id.* ¶ 6.A.)  Among their other

investments with Amerindo, the Affidavit states that the Mayer family invested in GFRDAs,

which Vilar "described in correspondence as being . . . 'absolutely safe and liquid.'"  (*Id.*)  The

Affidavit further states that in 2003, according to Lisa Mayer, "Amerindo, Vilar, Tanaka, and

Tanaka's wife . . . refused to release [the Mayers'] funds" invested in GFRDAs, and instead

"threatened to create tax problems for the Mayers . . . and dribbl[ed] out to them as little money .

. . as possible."  (*Id.*)  According to the Affidavit, "Mayer described years of begging Vilar to

release some of their investment," to little or no effect.  (*Id.*)

b.  Lily Cates' Investments

The Affidavit and the incorporated Vilar Complaint also discuss two investments made

by Cates.[1]  According to the Affidavit, in 1988, Cates invested $1 million through Amerindo in

an entity called Rhodes Capital.  In connection with this investment,

> [Cates] received a stock certificate for two shares of stock, which
> was signed by Vilar and Tanaka.  Although her account statements,
> which she received up until approximately 2002, reflected growth
> in the Rhodes investment, the investment was never described to
> her, she never has received a private placement memorandum, nor
> has she signed a subscription agreement for Rhodes, and her efforts
> to learn more about the investment were ignored or rejected by
> Vilar.

(*Id.* ¶ 6.B.)  In February 2005, Cates tried to redeem her investment in Rhodes Capital, but

"Amerindo and Vilar . . . refused to move her investment portfolio to Bear, Stearns & Co . . . as

requested."  (*Id.*)

The Vilar Complaint also describes the alleged SBIC scheme discussed above.

According to the Complaint, in June 2002, Vilar advised Cates to invest $5 million in the

Amerindo SBIC fund, representing that Cates would earn approximately $250,000 per quarter

---

[1]In the Vilar Complaint, Cates is identified as "the Victim."

through this investment.  (Vilar Compl. ¶ 9.)  The Vilar Complaint alleges in detail that within a

week of receiving Cates' June 2002 investment, Vilar transferred much of the $5 million into

accounts held for his personal use, including a $1 million transfer to a Chase Manhattan Bank

checking account held in the name "A.W. Vilar."  (*Id.* ¶ 13.)  According to the Complaint, at no

point did Cates authorize Vilar or Amerindo to use any of her funds to pay for Vilar's personal

expenses.  (*Id.* ¶ 24.)  From 2000 through 2004, the Affidavit alleges that Amerindo was

repeatedly denied a license from the SBA, and therefore did not make, and indeed was never

legally entitled to make, the promised SBIC investment.  (*Id.* ¶ 12.)

The Vilar Complaint further alleges that on September 25, 2003, a brokerage firm at

which Cates held an account received a wire transfer instruction, purportedly signed by Cates,

instructing the brokerage firm to transfer $250,000 from Cates' account into the ATGF I account

described above.  (*Id.* ¶ 22.)  Cates claims never to have authorized this transfer.  (*Id.* ¶ 24.)  The

following day, the money was wired from the ATGF I account into a personal account controlled

by Vilar.  (*Id.* ¶ 22.)

c.  Tanaka's Alleged Purchases of Thoroughbred Horses

The Tanaka Complaint, which is incorporated by the Affidavit, alleges, among other

things, that Tanaka "convert[ed] investor funds to his own personal use for the purchase of

thoroughbred horses."  (Tanaka Compl. 1.)  Specifically, the Complaint identifies six letters of

authorization ("LOAs"), signed by Tanaka, that authorize the transfer of as much as $1 million

into overseas banks from Amerindo client accounts in which Tanaka had no "direct or indirect

. . . beneficial interest."  (*Id.* ¶¶ 9, 15.)  Indeed, the Complaint alleges that Tanaka signed a

document submitted to the Securities and Exchange Commission in which he claimed that

8

neither he, his wife, nor any Amerindo employee had any interest, other than fees, in any client account managed by Amerindo.  (*Id.* ¶ 9.)  As identified in the Tanaka Complaint, the Amerindo accounts from which the funds were transferred were ATGF I, Amerindo Technology Growth Fund II ("ATGF II"), and the AMI Account.  (*Id.* ¶¶ 8, 15.)  Each of the LOAs includes a reference to the name of a race horse allegedly owned by Tanaka.  (*Id.* ¶ 15.)  The earliest LOA identified in the Complaint is dated June 29, 2001.  (*Id.*)

### d.  Nonspecific Allegations of Broader Malfeasance

In addition to the three alleged schemes discussed above, the Affidavit makes passing reference to other Amerindo investors who may have been injured by Vilar and Tanaka, stating that "Cates told me about other individuals who she believed to be investors with Amerindo, some of whom may have had trouble redeeming all or part of their investments, including Brian Harvey, Joy Urich, and Paul Marcus."  (Affidavit ¶ 6.E.)  No other information is provided in the Affidavit or the incorporated Complaints about these other investors and the Affidavit makes no particularized allegations regarding these investors.  However, the resulting warrant specifically authorized the seizure of documents "reflecting all investments in which . . . Brian Harvey, Joy Urich, or Paul Marcus have a beneficial interest . . . ."  (Warrant, Attach. A ¶ 6.)

### 2.  The *Franks* Hearing

On November 15, 2006, a hearing was held pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).  The scope of the *Franks* hearing was restricted to ascertaining whether Inspector Fraterrigo knew of, and improperly omitted from the Affidavit, information indicating that Cates and the Mayer family successfully redeemed significant portions of their investments during the period in question.  Inspector Fraterrigo was the sole witness at this hearing, and the Court found

her testimony to be credible.

Inspector Fraterrigo testified that as early as 1997, the Mayer family had difficulty

redeeming their investments with Amerindo.  At that time, they attempted to redeem their

GFRDA investment but were discouraged by Vilar from doing so because the investment was not

yet mature.  However, Inspector Fraterrigo testified that during the same period in 1997, the

Mayer family was able to successfully redeem another investment.  In December 2000, the Mayer

family again tried to redeem their GFRDA investment, but, according to Inspector Fraterrigo,

Vilar informed them that they had not given the "proper 30-day notice" necessary to redeem the

investment.  Because they felt they had no choice, the family renewed their GFRDA investment

for another three-year term.

In the Spring of 2002, when the Mayers sought to redeem their GFRDA investment, they

were told that they would incur a forty-five percent penalty, despite having previously been told

by Vilar that the penalty would be twenty percent.  Then, according to Inspector Fraterrigo, in

January 2003, Lisa Mayer received a letter from Tanaka's wife informing her, without

explanation, that her monthly interest on the GFRDA investment would be reduced from $96,000

to $50,000.  In response, after several months of negotiations, the Mayers sought to redeem all of

their Amerindo investments in November 2003.  However, from that date through the date of

their arrests, Defendants released only $600,000 of the Mayers' investments which were valued

at approximately $11 million.

Inspector Fraterrigo also testified, however, that at the time she executed the Affidavit,

she knew that from 1998 to 2000 the Mayer family had received redemptions and interest

payments from Amerindo valued at more than $5 million.  This information was not included in

the Warrant application.  Inspector Fraterrigo also knew, and omitted from the Affidavit, that prior to 1998 the Mayer family had received redemptions and interest payments of at least $6 million, and that in 2004 Amerindo paid the Mayers $600,000.  Inspector Fraterrigo further testified that with respect to at least one investment vehicle, she knew at the time of the Warrant application that the Mayer family had no difficulty redeeming their investment.

During the *Franks* hearing, Inspector Fraterrigo also testified about Cates' investment and redemption history with Amerindo.  According to Inspector Fraterrigo, in June 2002, on Vilar's recommendation, Cates agreed to invest $5 million in the Amerindo SBIC fund on the condition that Vilar send her $250,000 quarterly from her other Amerindo investments to use for her living expenses.  Cates never received any of the promised quarterly payments.  In February 2005, Cates requested the redemption of all of her Amerindo investments, but according to Inspector Fraterrigo, this request was refused.  However, Inspector Fraterrigo admitted during the *Franks* hearing that at the time she swore out the Affidavit, she knew that "according to Lily Cates, she had no difficulty redeeming investments prior to 2002."  Specifically, Inspector Fraterrigo knew that prior to making the SBIC investment in 2002, Cates had received in redemptions more than twice what she had invested with Amerindo to that point, and that from 1990 to 1999, Cates received approximately $3 million in Amerindo redemptions.

With respect to the scope of the Warrant, Inspector Fraterrigo testified that she knew at the time she made the Warrant application that she was requesting documents from as far back as 1987.  When asked why she did not include in the Affidavit any information regarding Cates' and the Mayers' successful redemptions, Inspector Fraterrigo repeatedly stated that she simply "never thought of it," but that she in no way intended to mislead Magistrate Judge Maas.

11

Finally, there is the issue of Inspector Fraterrigo's acknowledgment that she and other inspectors seized documents during the search which were not specifically identified in the Affidavit. For example, during her *Franks* hearing testimony, Inspector Fraterrigo appeared to admit that she and other Postal Inspectors seized certain items during the Amerindo U.S. search despite that fact that there were no specific allegations establishing probable cause to seize those items. Based on this testimony, Defendants argue that Inspector Fraterrigo admitted that she executed the Amerindo U.S. search despite the knowledge that she lacked probable cause for a search of that scope. (Tanaka Post-Hr'g Mem. 26.)[2] In making this claim, Defendants dismiss Inspector Fraterrigo's testimony, *on cross-examination and re-direct examination*, that she was confused by the questions posed to her regarding certain documents. (*Id.* 25-26.) Defendants derisively label Inspector Fraterrigo's attempt to clarify her testimony an "epiphany," a "newfound explanation," and a "backtrack."

The Court is unpersuaded by Defendants' claims. Mindful of how Inspector Fraterrigo's testimony might be viewed (and spun) on the basis of a transcript, the Court, having observed her extensive testimony, finds that her testimony on this point was credible and genuine. It was clear to the Court that, as early as cross-examination, Inspector Fraterrigo realized that she was, in fact, confused when she was asked if there was probable cause to seize certain items during the search. By saying that there was not probable cause to seize some of those items, Inspector Fraterrigo merely meant that there was no direct mention of those items in her Affidavit, or in the

---

[2]On December 13, 2006, approximately one month after the final pretrial hearing, Vilar, Tanaka, and the Government each filed an omnibus memorandum of law addressing the issues covered by this Order. These memoranda shall be cited herein as Vilar Post-Hr'g Mem., Tanaka Post-Hr'g Mem., and Gov't Post-Hr'g Mem., respectively.

accompanying Complaints.  For example, towards the beginning of her cross-examination, Inspector Fraterrigo stated that, while she did not list files for any clients other than the five mentioned in her Affidavit, she believed that she nonetheless had probable cause to seize files for other clients.  (Tr. 27-28, July 10, 2006.)  Later, in response to inquiry about another document, Inspector Fraterrigo testified that the document "falls along the part of the affidavit that I did not specifically put this item in, have evidence specifically for this," but that "there was probable cause that this was covered under."  (*Id.* 97-98.)  Inspector Fraterrigo explained further that "I think I need to clarify my answers that I have said before," because she thought that there was a basis to seize certain materials even though they were not mentioned in her Affidavit.  (*Id.*)  Thus, for example, even though her Affidavit identified five named victims of Defendants' alleged fraud, she swore in her Affidavit that this established probable cause to believe that others might have been victimized by Defendants and, therefore, that there was a lawful basis to review and seize other client files.  (*Id.*)

This testimony, which preceded both the re-direct testimony and a meeting that Inspector Fraterrigo had with the prosecutors before her re-direct testimony, persuades the Court of Inspector Fraterrigo's sincere belief that she conveyed accurate facts to the magistrate judge and that those facts adequately supported the search warrant that he issued.[3]  Indeed, on re-direct examination, Inspector Fraterrigo testified that she had tried to explain while on cross-examination the difference between saying that she had not identified any clients other than the

---

[3]The AUSAs requested the meeting with Inspector Fraterrigo, after the cross-examination was completed, to satisfy their ethical obligations not to elicit anything other than truthful testimony.  The discussions during that meeting were fully explored during Inspector Fraterrigo's subsequent testimony.

five mentioned in her Affidavit, and saying that she had no legal basis to seize files belonging to clients other than these five.  That Inspector Fraterrigo was confused was both obvious and understandable given the nature and form of some of the questions asked of her.  Moreover, the Defendants' notion that Inspector Fraterrigo freely admitted, under oath, that she lied to a magistrate judge and then executed what she knew to be a patently invalid warrant by seizing items that she had no basis to take is too fanciful even for a bad Hollywood courtroom drama.  Thus, the Court rejects Defendants' claim that Inspector Fraterrigo, in open court, admitted to intentionally misleading a magistrate judge in order to obtain and execute an illegal warrant.  She testified to just the opposite, and the Court found this testimony to be credible.

 3.  The Warrant

 Magistrate Judge Frank Maas signed the Warrant on May 25, 2005, at 10:30 p.m.  The Warrant included a three-page rider (the "Rider"), which identified in separate, numbered paragraphs the material to be seized.  Among the items whose seizure the Warrant authorized were documents concerning the individuals and investments specifically identified in the Affidavit, including the Rhodes Capital investment, the SBIC investment, and the GFRDAs, as well as documents related to Cates, the Mayer family, Brian Harvey, Joy Urich, and Paul Marcus. The Warrant also authorized the seizure of less narrowly defined categories of documents, including corporate records, client files, communications with clients, documents related to the movement of funds in Amerindo accounts, address books, photographs, and travel documents. Additionally, the Warrant authorized the seizure of electronic material, including "[c]omputers, hard drives, and other devices . . . capable of storing data or text in any format."  (Warrant Rider ¶ 17.)  Nowhere in the Warrant or the attached Rider are the seizures limited in any way to a

specific time frame.

Postal Inspector Feiter, a supervisor who participated in the search, testified that he interpreted the Warrant to grant the power to seize extremely broad categories of documents. According to Inspector Feiter, the Warrant permitted the Postal Inspectors to seize any business-related document as "long as it had writing on it and it wasn't just blank." (Tr. 162, Dec. 14, 2005.) Inspector Fraterrigo, who also took part in the search, testified that she understood the Warrant to contain absolutely no time-frame restriction on the material that could be seized. (Tr. 142, July 4, 2006.)

### 4.  Execution of the Search

The search was executed at the New York offices of Amerindo U.S. on May 26, 2005, beginning at 8:15 a.m. (Tr. 79, Dec. 14, 2005.) The search was conducted pursuant to the Warrant issued on May 25, 2005, which Inspector Feiter, the team leader and supervisor for the Church Street fraud team, and Inspector Fraterrigo presumed to be valid based on the fact that it was signed by Magistrate Judge Maas. (*Id.* at 91.) Neither Inspector Feiter nor Inspector Fraterrigo believed it was their responsibility to review the Affidavit and Warrant to make an independent determination as to whether they were supported by probable cause. (*Id.* at 126.) The search lasted approximately twelve hours. (*Id.* at 85.) Inspector Feiter was present during the entire search. (*Id.* at 119.) The Postal Inspectors seized approximately 170 cartons, taking sixty to seventy percent of the materials that were searched and were not slated to be addressed by the Subpoena. (*Id.* at 89.) The items that were to be addressed by the Subpoena were generally inventoried. (*Id.* at 102.)

On the morning of the search, at approximately 6 a.m., Inspectors Feiter and Fraterrigo

briefed the inspectors who would be conducting the search on the allegations in the case and search protocol.  (*Id.* at 79, 93.)  Prior to the search, the inspectors were given and instructed to review the Affidavit and the Warrant Rider, which listed the items to be seized.  (*Id.* at 77, 79.) The inspectors assigned to the arrest team were also given the Complaints which comprised part of the Affidavit.  The arrest team was present at the search after carrying out their assigned arrests.  (*Id.* at 78, 160.)  The inspectors assigned to the search team were not given the Complaints, nor was Inspector Feiter.  (*Id.* at 78, 123.)  Therefore, to the extent there was information in the Complaints which was not contained in the Affidavit, the search team would not have learned that information from reading the Affidavit.  (*Id.* at 129.)  Indeed, Inspector Feiter conceded that it was possible that members of the search team would believe there were additional people involved in the alleged fraud scheme beyond Vilar and Tanaka as a result of the language of the Affidavit.  (*Id.* at 133.)  However, Inspector Feiter testified that he read the names of some of the victims to the inspectors at the briefing as well as the names Vilar and Tanaka.  (*Id.* at 95, 131.)  The names of Lisa Mayer, Lily Cates, Brian Harvey, Joy Urich, and Paul Marcus were included in the Affidavit.  (*Id.* at 139.)  He also testified that Inspector Fraterrigo was present during some of the search and had the Complaints in her possession.  (*Id.* at 134.)  The search team was instructed to ask questions of Inspectors Feiter and Fraterrigo.  (*Id.* at 79.)  They were also instructed that if they encountered potentially privileged documents, they were to isolate them in an envelope identifying them as privileged.  (*Id.*)  Finally, the search team was instructed to keep the Search Warrant Rider with them as a reference throughout the search. (*Id.*)  Inspector Feiter could not recall whether the inspectors asked any questions during the briefing.  (*Id.* at 95.)

16

Upon arriving at the premises, the search team secured and labeled the areas to be searched.  Each room and each item within a room was assigned an identifying label.  (*Id.* at 80.)  The rooms were labeled A through V.  (*Id.* at 98.)  A videotape was taken of the premises before and after the search was conducted.  (*Id.*)  Members of the search team were assigned areas to search.  Inspector Feiter, who arrived with the search team in the morning, supervised the process, coordinated with Eugene Licker, Amerindo's lawyer, and answered questions from inspectors.  (*Id.* at 80-81.)  Additionally, Inspector Feiter served as an "inventory person," clearing each room once it had been searched and making an inventory of items seized from each location.  (*Id.* at 82.)  Inspector Feiter observed the inspectors searching the items within the rooms and referencing the Rider to determine which items to seize.  (*Id.* at 81.)  He also recalls referring questions to Inspector Fraterrigo and seeing her fielding questions from other inspectors.  (*Id.* at 120.)  However, Inspector Feiter does not recall any answers that Inspector Fraterrigo may have given.  (*Id.* at 156.)

Each inspector was given the Search Warrant Rider to assist them in determining which items to seize.  Inspector Feiter interpreted the Rider to cover any Amerindo stationery with writing on it, business cards, and "all official business records."  (*Id.* at 162.)  According to Inspector Feiter, it would not cover blank paper or employees' personal items such as personal correspondence or family pictures unrelated to the investigation.  (*Id.* at 104.)  Because there was no time frame identified in the Rider, Inspector Feiter interpreted it to mean that any documents from any date could be seized, so long as the subject matter of those documents fell within the scope of the Rider.  (*Id.* at 117-18.)  Moreover, Inspector Feiter interpreted the Rider to include documents from all of the Amerindo entities.  (*Id.* at 136.)

17

D.  The Grand Jury Subpoena

At some point during the search, a discussion ensued between Marc Litt, the Assistant United States Attorney assigned to the case, Eugene Licker, counsel to Amerindo U.S., Inspector Feiter, and Inspector Fraterrigo regarding the use of a grand jury subpoena to seize some documents.  (*Id.* at 86.)  Licker had been counsel to Amerindo U.S. since May 2003.  (Tr. 24, May 31, 2006.)  On the day of the search he had resigned from Kirkpatrick & Lockhart and was moving to Loeb & Loeb.  (*Id.* at 28.)  Licker had arrived at the premises between 10 and 11 a.m. (*Id.* at 12; Tr. 96, Dec. 14, 2005.)  He observed the Postal Inspectors searching the premises, reviewed the Warrant, and satisfied himself that they had authority to be there.  (Tr. 13, 29, May 31, 2006.)  Licker had several conversations with Litt throughout the day.  According to Litt, the first conversation occurred at 10:30 a.m. and the second around 10:50 a.m.  (*Id.* at 89.)  They discussed the fact that Tanaka had been arrested earlier that morning, whether Amerindo employees could call Vilar, which Litt indicated he would prefer they did not do, and various conflict issues arising from Kirkpatrick & Lockhart's representation of Amerindo U.S.  (*Id.* at 30-31, 90.)  Licker indicated that he would cooperate fully with the Government in its investigation and offered to put into place a preservation policy for Amerindo U.S. documents. (*Id.* at 14, 16, 19, 31, 92.)  He testified that he would have issued a preservation notice regardless of whether a subpoena had been issued.  (*Id.* at 46.)

Prior to returning to his office at 1 p.m., however, Licker had another conversation with Litt during which the subpoena was discussed.  Because Inspector Feiter did not believe that the search would be completed in one day, it was suggested, as an alternative, that Amerindo agree to accept service of a grand jury subpoena.  (*Id.* at 14, 53.)  Licker does not remember who first

18

suggested issuing a subpoena (*id.*), but Litt credibly testified that the suggestion of a subpoena was initially raised by Licker.  (*Id.* at 92-93.)  Licker, on his own initiative, also agreed to preserve relevant documents, whether hard copy or electronic.  (*Id.* at 14, 16, 19.)  The testimony of Litt and Licker regarding the execution of the search and the issuance of the subpoena was largely consistent.  However, to the extent that there were inconsistencies, the Court found Litt's testimony to be the more credible of the two, owing in large part to Licker's acknowledgment during his testimony that his memory of the day's events was less than clear.  (*Id.* at 53.)

At 1:37 p.m. on May 26, 2005, the Grand Jury Subpoena was faxed to Licker at his office.  (*Id.* at 15.)  Licker testified that the Subpoena was similar to the Rider that was attached to the Warrant.  (*Id.*)  In return for accepting service of the Subpoena, the Postal Inspectors agreed to cease their search.  (*Id.* at 16.)  Licker left the premises shortly after the Postal Inspectors, and he arrived at his office approximately one block from the premises at 9:30 p.m. (*Id.* at 16.)

To this date, Amerindo U.S. has not complied with the Subpoena.  Licker testified that he was under the impression from Litt that the return date on the subpoena, which was June 16, 2005, was not binding.  (*Id.* at 19.)  However, Licker and his team spent several months reviewing documents and identifying those which were responsive to the Subpoena.  (*Id.* at 34.) They have reviewed approximately half of the documents remaining on the premises.  (*Id.* at 50.) At no point did Licker indicate to Litt that the Subpoena was overly broad or that he needed clarification on the scope of the Subpoena.  (*Id.* at 35.)

Licker spoke with Vilar's counsel throughout the day on May 26, 2005.  Although he did not recall whether he informed them that a search was being conducted at the premises, he would

be "shocked if [he] didn't." (*Id.* at 37-38.) Licker also could not recall whether he discussed the Subpoena with Vilar's counsel. (*Id.* at 41-42.) However, in June or July 2005, Licker met with Tanaka's attorneys and discussed the Subpoena with them. (*Id.* at 36-37.) Licker and his team stopped reviewing documents when they learned that a motion to quash the Subpoena had been filed, reasoning that it would be unwise to expend the resources of a defunct company complying with a subpoena that might be moot. (*Id.* at 51.)

### E. The U.K. Search

#### 1. Detective Sergeant Shaw's Perception of U.K. Law Regarding Search Warrants

The Court also heard testimony from Detective Sergeant Shaw, whose testimony the Court found to be credible. Detective Sergeant Shaw is a 23-year veteran of the Metropolitan Police in London, England, who has spent much of his law enforcement career investigating white collar crime. In this capacity, Detective Sergeant Shaw has received training in financial investigations, as well as in obtaining and executing search warrants. In fact, the Detective Sergeant has taken many courses on search warrant law in England and has received training regarding "special procedure material." Also, during his career, Detective Sergeant Shaw has participated in approximately 30 major fraud investigations, has supervised approximately 100 other major fraud cases, and has applied for and/or executed approximately 100 search warrants. Many of the searches executed pursuant to these warrants involved business premises.

At the time of the contested search, Detective Sergeant Shaw was assigned to the International Assistance Unit. Among other things, this Unit processes foreign evidence requests made of the United Kingdom through a Mutual Legal Assistance Treaty ("MLAT"). It is pursuant to such a treaty, for example, that a foreign government agency can request that United

Kingdom law enforcement officials conduct a search of a business premises.  According to Detective Sergeant Shaw, any such request must come from the proper authority and otherwise comport with the terms of the particular MLAT.  Among other such terms, the U.K.'s MLATs require that the requested search be part of an investigation of conduct that is a crime under British law.  A MLAT request to search a premises is first reviewed by the United Kingdom Central Authority ("UKCA"), which vets the request to determine if it comports with the MLAT and British law.  If the request is satisfactory, it then is assigned to the appropriate U.K. law enforcement agency.

Detective Sergeant Shaw testified that when he receives a MLAT request to conduct a search from the UKCA, he first reviews the request to determine if the request, in his view, is based on sufficient information to justify a warrant.  In his experience, he has rejected many requests for a search at this stage of the process.  If, however, the request appears to be substantiated, Detective Sergeant Shaw then conducts a background inquiry by, for example, investigating the target premises.[4]  Once Detective Sergeant Shaw determines that the request is in order and completes his own inquiry, Detective Sergeant Shaw then awaits a "direction" from the Home Office specifically authorizing him to conduct the search.  From there, U.K. law requires Detective Sergeant Shaw to submit his search warrant request to a senior police officer unconnected to the investigation.  This is yet another stage where the request can be rejected.  If, however, the senior officer approves the search request, then Detective Sergeant Shaw formally applies for the search warrant through the "clerk of the Court," a court staff person who advises

---

[4] In the course of his own investigation, Detective Sergeant Shaw does not have direct contact with the requesting law enforcement agency.  Instead, he communicates with the foreign government officials only through the UKCA.

his view of the validity of the warrant.  According to Detective Sergeant Shaw, it is not uncommon for the court clerk to recommend rejecting a search warrant request.  If, however, the clerk recommends approval of the warrant, the clerk will initial the request and make arrangements for the Detective Sergeant to formally apply for the warrant before the duty judge.

Detective Sergeant Shaw testified that there are three different types of search warrants under U.K. law.  One category involves warrants for contraband, which includes narcotics, firearms and the like.  A second category includes warrants to search for evidence of a "serious arrestable offense," which covers, among other offenses, fraud.  This is known as a "Section 8 warrant," as it derives from Section 8 of U.K. legislation passed in 1984.  The final category is known as a Schedule I warrant, also from the same 1984 legislation, and involves circumstances where the law enforcement officer expects to seize, among other things, "special procedure material."[5]  According to Detective Sergeant Shaw, "special procedure material" includes records created in the ordinary course of business and held (by law) in confidence.  One example of special procedure material is personal banking records.[6]  According to Detective Sergeant Shaw, all warrants can be authorized by magistrates, except Schedule I warrants and/or production

_____

[5] Under Schedule I, a law enforcement officer may also obtain an order requiring the production of "special procedure materials," but this order may be obtained only after notice of the request is provided to the party in possession of the material.  If the law enforcement officer believes that notice of the request might undermine the investigation, the officer then is permitted to seek a search warrant under Schedule I.

[6] Detective Sergeant Shaw testified that he has experience in applying for all three types of search warrants and estimates that approximately 50 of the searches in which he has participated involved contraband warrants; 40 involved section 8 warrants; and less than 10 involved Schedule I warrants.  He also stated that he also has obtained information from approximately 100 Schedule I orders.  Also, Detective Sergeant Shaw testified that he has been turned down only once on a request for a Schedule I order and that he has never been turned down for a Schedule I warrant.

orders, which must be approved by the Crown Court.  An investigator does not have a duty to obtain more than one type of warrant or order to search one premises.  Rather, an investigator is required to obtain a warrant or production order which is proper for the materials which are primarily sought.  According to Detective Sergeant Shaw, if during the search, an investigator unexpectedly finds materials that are within the scope of the warrant that turn out to be special procedure materials, the investigator is not required to obtain a warrant to review or even to seize them.

        2.  The Warrant Application

Detective Sergeant Shaw testified that he was the Metropolitan Police official who was assigned the American government's request to conduct a search of Amerindo U.K.'s premises.  According to Detective Sergeant Shaw, he received a telephone call from the UKCA in July 2005 regarding an urgent request from American law enforcement officials to search the business premises of Amerindo, U.K.  Following the procedure he had described, Detective Sergeant Shaw reviewed the MLAT request to determine if there was a valid basis to apply for a search warrant of Amerindo's business premises.  In his words, he believed the request to be "comprehensive and sound."  (Tr. 228, May 31, 2006.)  As a result, he conducted some background inquiries, including some research on Amerindo and the individuals named in the request.  His research about the premises revealed that it was a converted house which appeared to be occupied by a number of different companies.  Eventually, Detective Sergeant Shaw spoke to an individual on the premises who advised him that Amerindo U.K. had moved.[7]

_____

[7] Detective Sergeant Shaw did some additional investigation about Amerindo U.K. and learned that the company was trading at loss (based on publicly available information) and had two county court judgments against it.  Detective Sergeant Shaw also called the Amerindo U.K.

Subsequent investigation revealed that the materials in Amerindo's office had been moved in late August to the Cadogan Tate Warehouse ("Cadogan Tate").  Further digging by Detective Sergeant Shaw revealed that there were eight crates of materials from the Amerindo U.K. office premises that consisted of approximately 320 boxes.  Detective Sergeant Shaw subsequently informed the Home Office that he had located the sought-after material and asked the Home Office to inform the American authorities of the results of his investigation and request that they correct the address in their MLAT request.

Detective Sergeant Shaw learned that the American officials had supplemented their MLAT request in late September 2005.  At the time, however, British law enforcement resources were strained due to the investigation into the July 2005 terrorist attacks directed at the London Underground.  Notwithstanding these resource limitations, Detective Sergeant Shaw conducted a follow-up investigation and determined that he was ready to proceed with the application for the warrant.  He then requested the necessary direction to proceed from the Home Office, which he received in draft.  Subsequently, Detective Sergeant Shaw prepared the search warrant application.  (*Id.* at 238.)  Because of manpower limitations, Detective Sergeant Shaw requested, through the UKCA, that law enforcement officials from the United States come to England to assist in the search.  (*Id.* at 236.)  In fact, Detective Sergeant Shaw testified that he regularly invites the officials from the requesting country to assist in the execution of a search, as they are in the best position to provide advice on which materials to seize.  (*Id.* at 237; Tr. 318, June 1, 2006.)  However, had American authorities been unable to attend, Shaw would have executed the

―――――――――――――

office number during normal business hours, but got only a voicemail greeting.  Detective Sergeant Shaw viewed all of this information as further reason to be suspicious of Amerindo U.K.

24

search with the manpower available to him, as he has done on past occasions.  (Tr. 320, June 1, 2006.)  Moreover, American authorities could not have gained access to the Cadogan Tate facility on their own with only a U.S. warrant.  (*Id.* at 433.)

Detective Sergeant Shaw had earlier made an arrangement with one of the managers at Cadogan Tate to provide seventy-two-hour notice before executing a search warrant.  (Tr. 239, May 31, 2006.)  This would permit the staff to move Amerindo U.K.'s crates to the viewing area where the search could be conducted.  (*Id.*)  Shaw recognized in making this arrangement, that he risked tipping off the suspects.  (Tr. 363, June 1, 2006.)  As a client of Cadogan Tate, Amerindo U.K. could have requested access to its crates during normal business hours.  (*Id.*)  Because the American authorities sought to have the search executed as soon as possible, Detective Sergeant Shaw scheduled the first available viewing date at Cadogan Tate for Monday, October 10, 2005. He also reserved Tuesday, October 11.  (Tr. 240, May 31, 2006.)  Detective Sergeant Shaw then asked the Home Office to inform the American authorities of the dates of the search.  (*Id.*)  When he received no response for several days, Detective Sergeant Shaw contacted the Home Office again on approximately October 3, 2005.  (*Id.*)  At that point he discovered that the Home Office had neglected to forward the information to the American authorities.  (*Id.* at 241.)  The Home Office stated that it would inform the Americans that day, but Detective Sergeant Shaw assumed that the American authorities would be unable to make their travel arrangements in time to conduct a search on October 10.  Consequently, he canceled the reservations at Cadogan Tate for October 10 and 11.  (*Id.* at 242.)

During the week of October 3, 2005, Detective Sergeant Shaw traveled to Leeds for work and did not have access to email.  (*Id.* at 241.)  He returned to London on Sunday October 9 and

25

went to work at approximately 6 a.m. on October 10.  Upon arriving at the office, to his

considerable surprise, he had an email informing him that the American authorities had arrived in

London on October 9.  (*Id.* at 242.)  Detective Sergeant Shaw immediately prepared the search

warrant application so that he could present it to a judge that day.  He was concerned that the

judge would reject the application and the Americans would have made a wasted trip.  (Tr. 314,

June 1, 2006.)

 In determining which type of warrant he would seek, Detective Sergeant Shaw relied

primarily upon the MLAT request itself and his background research.  (Tr. 242, May 31, 2006.)

He also relied to some extent upon the direction from the Home Office, which he had received in

final form on October 10, instructing him to seek a search warrant.[8]  (*Id*. at 243.)  However,

based on his understanding of the case law, Detective Sergeant Shaw felt that he must make a

determination as to which type of warrant to seek independent of the Home Office direction.  (*Id.*

at 245.)  Prior to making his decision, Detective Sergeant Shaw had not had any conversations

with American authorities regarding the substance of the U.S. investigation or what types of

documents they expected to find at Cadogan Tate because he felt that he had sufficient

information from the MLAT request.  (*Id.* at 244.)  Detective Sergeant Shaw decided to seek a

Section 8 warrant.  (*Id.* at 245.)

---

 [8]The transcript reads that Detective Sergeant Shaw was instructed to obtain a warrant
"under Section 16 of the Crimes National Corporation Act and Section 8 of the Police Riders
Act."  (Tr. 243, May 31, 2006.)  The transcript appears inaccurate to the extent it reflects that it
was Section 8 of the "Police Riders Act," and probably should read the "Police and Criminal
Evidence Act."  First, in his answer to the next question, Detective Sergeant Shaw confirmed that
what he meant was a warrant pursuant to Section 8 as he had described earlier.  (*Id.*)  Indeed,
every other time he referred to Section 8, Detective Sergeant Shaw was referring to the Police
and Criminal Evidence Act.  Second, the phrase "Police Riders Act" does not make sense on its
face.

Detective Sergeant Shaw rejected seeking a Schedule I order or warrant because he was not primarily looking for special procedure material.  (*Id.* at 246.)  Nor did Detective Sergeant Shaw expect there to be legally privileged materials at Cadogan Tate.  In explaining how he reached this decision, Detective Sergeant Shaw referenced a well-known quote from a case discussing special procedure material – "there is no confidence in iniquity."  (*Id.* at 247.)  He explained that, in layman's terms, the quote means that "there is no lawful client confidentiality in material held for the purpose of criminal conduct."  (*Id.*)  By way of example, Detective Sergeant Shaw discussed two search warrants he had sought earlier in the year.  They involved a lawyer who was allegedly acting unlawfully in the U.K. and in Italy.  The Italian government requested that the British authorities search the lawyer's London home and office.  (*Id.* at 248.) Detective Sergeant Shaw obtained a Section 8 warrant to search the lawyer's home because it was controlled by him and because the Detective was looking for evidence of the lawyer's criminal conduct.  (*Id.*)  After careful consideration and discussion with the Home Office, however, Detective Sergeant Shaw sought a Schedule I warrant for the lawyer's business premises.  (*Id.* at 249.)  This was because the lawyer shared the business premises with another company which was not implicated in any unlawful activity.  (*Id.*)  They shared a computer server and filing cabinets.  Detective Sergeant Shaw anticipated that he would be searching the documents of a legitimate business not engaged in criminal conduct which had an expectation of confidentiality.  (*Id.*)  Therefore, in his view, a Schedule I warrant was called for in that instance. (*Id.*)

Detective Sergeant Shaw also provided an example of the type of scenario that would call for a Schedule I order.  According to the Detective Sergeant, a Schedule I order might be called

for if the British authorities wanted access to a suspect's bank records.  If there were no allegation that the bank was involved in the alleged criminal conduct, in Detective Sergeant Shaw's view, British authorities would need a Schedule I order before inspecting the records of an innocent, legitimate business.  (*Id.*)  Because he was searching materials belonging to a company controlled by Defendants for evidence of their criminality, he did not think he needed a Schedule I order or warrant.[9]  (*Id.* at 246.)  Although Amerindo U.K. had shared office space within a building with other companies, Detective Sergeant Shaw did not believe that there would be materials belonging to those companies within the crates at Cadogan Tate that were to be searched.  (Tr. 367-68, June 1, 2006.)  Detective Sergeant Shaw had spoken with representatives at Cadogan Tate who stated that they had moved the boxes of materials from Amerindo U.K.'s offices under the direction of Mrs. Tanaka.  (*Id.* at 368.)  Detective Sergeant Shaw assumed that Mrs. Tanaka would not have moved materials belonging to other businesses. (*Id.*)  Moreover, although Detective Sergeant Shaw anticipated that there would be documents containing private client information among the crates at Cadogan Tate, he did not consider them to be special procedure materials.  (*Id.* at 386.)  Because Detective Sergeant Shaw was looking for evidence of Amerindo U.K.'s fraud against its clients, neither Amerindo U.K. nor its clients could have any expectation that those materials would be held in confidence.  (*Id.*)

---

[9]Additionally, Detective Sergeant Shaw did not anticipate encountering legal privilege material among the documents at Cadogan Tate.  (Tr. 253-54, May 31, 2006.)  According to Detective Sergeant Shaw, there is no authority for obtaining a warrant to search for legal privilege material.  (*Id.* at 254.)  If an investigator anticipates there will be legal privilege material among the documents searched, he must make arrangements to deal with those documents, such as bringing independent legal counsel.  (Tr. 417-18, June 1, 2006.)  If, however, an investigator does not anticipate the presence of legal privilege material and comes across it during the course of the search, he does not have a duty to take additional steps.  (*Id.* at 401.)

Prior to making the warrant application, Detective Sergeant Shaw had been in contact with Matthew Fann of the Financial Services Authority ("FSA").  (*Id.* at 325.)  Fann had informed Shaw that the FSA had provided banking records to the Securities and Exchange Commission ("SEC") pursuant to a bilateral agreement.  (*Id.* at 326.)  He also informed Shaw that the SEC had served notice on the lawyers for Amerindo U.K. to preserve their documentation and that lawyers for Amerindo U.K. had moved its documents to Cadogan Tate.  (*Id.* at 327, 333.)  The FSA sought permission to be present at the search, but it was ultimately decided that they did not have a legal entitlement to be present.  (*Id.* at 335.)  Shaw also knew, from the MLAT request, that Defendants had been arrested and were currently under house arrest, although he did not recall if he knew that a search warrant had been executed at Amerindo U.S.  (*Id.* at 329, 331.)

After preparing the application, Detective Sergeant Shaw presented it to a senior police officer, Detective Inspector Fuller, for consideration.  (*Id.* at 243.)  Detective Inspector Fuller asked logistical questions regarding manpower for the search, but Detective Sergeant Shaw did not recall him expressing any concerns regarding the application.  (*Id.* at 256.)  Detective Inspector Fuller wrote a few paragraphs at the end of the application expressing his views and then signed it.  (*Id.* at 256.)  Detective Sergeant Shaw did not show the application to any American authorities prior to or immediately after presentation of it to a U.K. judicial officer.  (*Id.* at 275.)  Thereafter, Detective Sergeant Shaw went to Bow Street Magistrate's Court.  He chose that court because it is the premier magistrate's court for MLAT requests and it is close to his office.  (*Id.* at 255.)

The search warrant application consisted of a template application that Detective Sergeant

Shaw filled in, a typed rider that came directly from the MLAT request, and the information in support of the warrant application which Shaw typed himself.  (*Id.* at 261-62.)  In the application, Detective Sergeant Shaw swore under oath that he was "satisfied that the material [at Cadogan Tate] does not consist of or include items of legal privilege, excluded material, or special [procedure] material."  (*Id.* at 259, 262.)  This statement was based on the fact that he was not searching for those three types of materials, and if he found any documents that fell into those categories, they would be ancillary to the search.  (*Id.* at 262-63.)

Upon arriving at Bow Street Magistrate's Court, Detective Sergeant Shaw handed the application to Mrs. Elizabeth Franey, a senior legal adviser at the court with approximately twenty years of experience.  (*Id.* at 264-66.)  Detective Sergeant Shaw left the application with Mrs. Franey after requesting that he be permitted to make the application to a judge later that day. (*Id.* at 266.)  Approximately five hours later, Detective Sergeant Shaw returned to the Bow Street Magistrate's Court hoping to be able to make his application to a judge.  (*Id.*)  Mrs. Franey informed him that she had reviewed the application and passed it to a judge, thereby indicating her approval of the application.  (*Id.* at 267.)  Then Detective Sergeant Shaw made his application to the senior district judge at the court, Timothy Workman, who was the "duty judge" that day.  (*Id.* at 268.)  Judge Workman is the most senior district judge in England and Whales, with the power to issue Schedule I orders and warrants.  (*Id.* at 269-70.)  Judge Workman asked Detective Sergeant Shaw a series of questions including questions about the nature of the premises, whether the search would extend beyond Amerindo U.K.'s eight crates, the anticipated length of the search, the nature of the property where the materials had previously been located, and whether that property had been shared.  (*Id.* at 271-73.)  Detective Sergeant Shaw responded

to these questions under oath for approximately ten minutes.  (*Id.* at 271, 274.)  The Judge did

not ask specific questions about special procedure materials, but Detective Sergeant Shaw

inferred that several of the Judge's questions were designed to satisfy the Judge that there was no

need for a Schedule I order.  (*Id.* at 272-73.)  Judge Workman then stated that he was satisfied

with the application, which was kept at the court, and signed the warrant.  (*Id.* at 274, 277.)

Detective Sergeant Shaw believed he was then in possession of a lawfully-obtained, lawfully-

issued warrant.  (*Id.* at 274-75.)

      After obtaining the warrant, Detective Sergeant Shaw met with the American authorities,

including Inspector Fraterrigo.  While he had the warrant with him, he does not recall showing it

to the Americans.  However, Detective Sergeant Shaw doubted that he would have shown it to

them because it is unnecessary and not his normal practice.  (*Id.* at 278.)  At that meeting,

Detective Sergeant Shaw explained that the warrant had been granted, and consequently that the

Americans had not wasted their trip over.  (*Id.* at 276.)  He also explained that the search had

been postponed until October 13 as a result of the earlier miscommunication.  (*Id.*)  They then

discussed their respective roles during the execution of the search.  Detective Sergeant Shaw

explained that the Americans were entitled to assist in the search, but that they remained under

British supervision and that the ultimate decision regarding whether to seize particular items

would rest with the British authorities.  (*Id.* at 278.)

               3.  The Cadogan Tate Search

      The warrant signed by Judge Workman was executed on Thursday, October 13, 2005.

Detective Sergeant Shaw was not present during the October 13 search because he had a prior

commitment to attend a conference.  (*Id.* at 279.)  In his stead, Detective Constable Bonafont was

responsible for making the final determination on what to seize.  (*Id.* at 285.)  However, Detective Constable Bonafont could consult the American authorities on what was relevant.  (*Id.* at 285-86.)  Detective Constable Durrant was the exhibits officer.  (*Id.* at 280.)  Detective Constable Bonafont and Detective Constable Durrant each had approximately seven years of experience on white collar crime investigations.  (*Id.* at 281.)  Prior to the execution of the warrant, Detective Sergeant Shaw briefed them on their roles and responsibilities, and instructed them to follow normal search method.  (*Id.*)

During the course of the search, Detective Sergeant Shaw checked in with Detective Constable Bonafont and Detective Constable Durrant to see if there were any difficulties.  (*Id.* at 284.)  Although he did not inquire specifically as to whether they had encountered special procedure or legal privilege material, he assumed that they would interpret his general question to include that specific question as well.  (*Id.*; Tr. 390, June 1, 2006.)  When it became apparent that the search would not be completed in one day, Detective Sergeant Shaw determined that they would secure the crates and return the next day.  (Tr. 283, May 31, 2006.)  To do so, he was required under U.K. law to secure a second search warrant, which he did the next day.  (*Id.* at 283, 286.)  Detective Sergeant Shaw did not show the application for the second search warrant to the American authorities prior to presenting it at Bow Street Magistrate's Court on October 14.  (*Id.* at 288.)  The second warrant application was presented to Mrs. Franey and then to Judge Nicholas Evans.  (*Id.* at 289.)  Judge Evans approved the second warrant.  (*Id.* at 291.)  Once again, Detective Sergeant Shaw believed he was in possession of a lawfully-obtained, lawfully-issued warrant.  (*Id.* at 292.)

After obtaining the second search warrant, Detective Sergeant Shaw picked up the three

U.S. Postal Inspectors and Detective Constable Durrant and went to Cadogan Tate where they resumed the search.  (*Id.* at 292.)  During the course of the search on the second day, the U.S. Postal Inspectors identified to Detective Sergeant Shaw items that they believed were relevant to their investigation.  (*Id.* at 293.)  If Detective Sergeant Shaw was satisfied that an item identified fell within the scope of the warrant, he would approve its seizure and Detective Constable Durrant would mark it in the exhibits book.  (*Id.* at 294.)  Then the items would be sealed in exhibit bags and replaced in the crates.  (*Id.* at 301.)  Detective Sergeant Shaw admits that he did not review every single piece of paper in making his determinations.  (*Id.* at 296.)  Indeed, some documents that did not fall within the scope of the warrant were inadvertently seized.  (Tr. 381-82, June 1, 2006.)  Detective Sergeant Shaw also recalled refusing to seize items that the Postal Inspectors believed were relevant, such as banking ledgers which did not fall within the scope of the warrant.  (Tr. 301, May 31, 2006.)

Detective Sergeant Shaw also testified about judicial review – the process by which someone may challenge police conduct.  Judicial review may be sought at any stage of the conduct – in anticipation of the conduct, in the course of the conduct, or up to three months thereafter.  (*Id.* at 304-05.)  He had informed a private investigator in mid-October that the search had been executed and was later informed by Inspector Fraterrigo that the Defendants were aware that a search had been conducted.  (Tr. 414, June 1, 2006.)  Detective Sergeant Shaw was surprised that Amerindo U.K.'s lawyers never contacted him to request copies of the inventory sheets.  (*Id.*)

F.  Procedural History

The two omnibus motions that are addressed by this Opinion relate to the Subpoena and

the searches conducted in the United States and the United Kingdom.  The many complex issues set forth in those motions were unfortunately raised by the Parties piecemeal, often months apart, over the course of more than a year.  It is not surprising, then, that the relevant factual record was only fully developed after multiple hearings and voluminous submissions to this Court.  For this reason, before addressing the merits, it is helpful to briefly outline the relevant procedural history of the case.

On August 12, 2005, both Defendants filed motions to suppress the materials seized in the May 26, 2005 search of Amerindo U.S., and Vilar filed a motion to suppress his post-arrest statements.[10]  A hearing was held on these suppression motions on December 14, 2005.  Among others, Inspector Feiter testified at this hearing.  On December 15, 2005, Defendants filed a motion to quash the May 26, 2005 subpoena.  On January 19, 2006, the Court denied Vilar's motion to suppress his post-arrest statements.  On March 9 and March 13, 2006, Defendants filed motions to suppress evidence seized during the U.K. search of the materials stored at Cadogan Tate.  On March 10, 2006, over Defendants' opposition, the Government moved to reopen the suppression hearing as to the materials seized in the U.S. search in order to call additional witnesses.  The Court granted this motion on April 4, 2006, and additional suppression hearings on the U.K. and U.S. searches were held on May 31, June 1, July 7, July 10, August 8, and August 9, 2006, on which dates the Court heard extensive testimony from Eugene Licker, Marc Litt, Detective Sergeant Shaw, and Inspector Fraterrigo.

On August 30 and August 31, 2006, Tanaka and Vilar respectively filed motions seeking

_____

[10]Tanaka also filed a motion to suppress his post-arrest statements, but that motion was made moot by the Government's decision not to use any of those statements in its case-in-chief.

34

a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).  The motions were fully briefed

on September 28, 2006, and oral argument was held on October 25, 2006.  The Court granted, in

part, Defendants' motion for a *Franks* hearing and the hearing was held on November 15, 2006,

during which the Court heard further testimony from Inspector Fraterrigo.

On November 21, 2006, Vilar filed a motion to expand the *Franks* hearing, which was

joined by Tanaka.  On November 27, 2006, in a ruling from the bench, the Court denied

Defendants' motion to expand the *Franks* hearing.  The Parties were then instructed to file

omnibus memoranda of law addressing all of the outstanding suppression issues in the case.

These filings were completed on December 13, 2006.

## II.  Discussion

### A.  The U.S. Search[11]

#### 1.  Probable Cause

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation, and particularly describing the place to be searched, and the

persons or things to be seized."  U.S. Const. amend. IV.  A reviewing court shall uphold "an

issuing magistrate's probable cause determination . . . so long as the magistrate has a 'substantial

basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing."  *Illinois v.*

*Gates*, 462 U.S. 213, 236 (1983) (quoting *Jones v. United States*, 362 U.S. 257 (1960)); *see also*

*United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) ("[T]he duty of a court reviewing the

validity of a search warrant is simply to ensure that the magistrate had a substantial basis for . . .

---

[11]This Section does not address the search of electronic materials, which is addressed in
Section II.B, below.

conclud[ing] that probable cause existed." (quotations omitted)); *United States v. Hickey*, 16 F. Supp. 2d 223, 238 (E.D.N.Y. 1998) (noting that there is probable cause when "there is a fair probability that contraband or evidence of a crime will be found in a particular place" (quotations omitted)).  In assessing probable cause, courts are to look at the "totality of the circumstances," *Gates*, 462 U.S. at 230-31, and should apply a "flexible, common-sense" approach.  *Texas v. Brown*, 460 U.S. 730, 742 (1983).  "[T]he evidence . . . must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Gates*, 462 U.S. at 231-32.  "Finally, in considering an attack on a search warrant, great deference should be afforded to a probable cause determination made by the magistrate judge. . . . That deference, however, is obviously 'not boundless.'"  *Hickey*, 16 F. Supp. 2d at 238 (quoting *United States v. Leon*, 468 U.S. 897, 914 (1984)).

In deciding whether there exists a "substantial basis" that a particular search will turn up contraband or evidence of wrongdoing, the strength of the evidence presented in the warrant application must necessarily be compared to the scope and intrusiveness of the search.  Here, the Affidavit and incorporated Complaints describe in detail several instances of suspected illegal conduct and sufficiently establish that evidence of this wrongdoing might be found at the Amerindo U.S. offices.  Specifically, the Affidavit alleges wrongdoing involving three investment vehicles – the GFRDA, Rhodes Capital, and the Amerindo SBIC funds – and three potentially tainted accounts – ATGF I, ATGF II, and AMI.  It also identifies two suspects and two groups of alleged victims.  The warrant application further sets forth facts suggesting that the improper activities involved three of the Amerindo entities, namely, Amerindo U.S., Amerindo U.K. and Amerindo Panama.  Notably, however, the warrant application does not mention

36

Amerindo Investment Advisors (Cayman) Limited ("Amerindo Cayman") in conjunction with any of the substantive allegations.  Reading the Affidavit broadly, and aggregating the alleged schemes, the Affidavit describes the potential misuse of tens of millions of dollars of Amerindo investor funds.

Clearly, then, there was probable cause to conduct some form of search of the Amerindo U.S. offices.  The search ultimately authorized by the Warrant, however, was more extensive than what was supported by the warrant application.  First, although the Warrant specifically calls for the seizure of documents relating to the three allegedly misused investment funds, the three suspicious accounts, and the two groups of victims, it does not *restrict* the seizures to those funds, accounts and individuals.  Instead, the very first paragraph of the Warrant Rider authorizes the seizure of, among other items, *all* client files, *all* investment advisory agreements, and *all* documents concerning communications with Amerindo clients, regardless of whether those documents had any relation to the funds, accounts, and individuals addressed by the Warrant application.  The overbreadth of such a warrant relative to the underlying affidavit is particularly apparent when one compares the monetary value of the alleged misappropriations with the amount of assets managed by Amerindo.  While the Warrant application alleges that Vilar and Tanaka misused approximately $25 million in funds, the Warrant Rider authorizes the search and seizure of documents relating to all $1.2 billion in assets managed by Amerindo.

Second, the Warrant authorizes the seizure of documents relating to the investments of Brian Harvey, Joy Urich, and Paul Marcus, as well as Cates' investment in Rhodes Capital.  As noted, with respect to these three individuals, the Affidavit states merely that "Cates told me about other individuals who she believed to be investors with Amerindo, some of whom may

have had trouble redeeming all or part of their investments, including Brian Harvey, Joy Urich, and Paul Marcus." (Affidavit ¶ 6.E.) Such an uncertain and uncorroborated hearsay allegation is insufficient to establish probable cause. *See Gates*, 462 U.S. at 239 ("A sworn statement of an affiant that 'he has cause to suspect and does believe that' [contraband] is located on certain premises will not do. . . . [The Magistrate's] action cannot be a mere ratification of the bare conclusions of others."). Similarly, the Affidavit presents no probable cause indicating that Defendants did anything illegal with respect to the Rhodes investment, as the Government conceded during a conference. (Tr. 5-8, Oct. 25, 2006.)

Third, although the allegations of wrongdoing in the warrant application date back to no earlier than 2001, the Warrant itself contains no time limitation. The Vilar and Tanaka Complaints state that "Amerindo U.S. has been a registered investment advisor since approximately August 1985." A search without a time restriction would therefore have been expected to result in the seizure of documents from at least that date. Yet, the warrant application presents little cause to search Amerindo's documents dating back so far, at least with respect to those documents that are unrelated to the specific funds, accounts, and individuals mentioned in the warrant application.

The Government attempts to justify the breadth of the Warrant by arguing that the warrant application establishes that Amerindo was permeated by fraud and therefore that the "all-records" exception applies. *See Nat'l City Trading Corp. v. United States*, 635 F.2d 1020, 1026 (2d Cir. 1980) (applying all-records exception when there was probable cause to believe the defendant's business was "permeated with fraud"); *United States v. Burke*, 718 F. Supp. 1130, 1139 (S.D.N.Y. 1989) ("When there is probable cause to believe that a business is pervaded with

38

fraud, seizure of all records is appropriate and, thus, a broad warrant would pass constitutional scrutiny." (citing *U.S. Postal Serv. v. C.E.C. Servs.*, 869 F.2d 184, 187 (2d Cir. 1989))).  Here, however, the warrant application fails to establish that the evidence presented in the application is "just the tip of the iceberg," *Burke*, 718 F. Supp. at 1140, or that "[Defendant's] operation was, solely and entirely, a scheme to defraud."  *United States v. Brien*, 617 F.2d 299, 307 (1st Cir. 1980).  On the contrary, the Affidavit itself makes no explicit allegation that the Amerindo entities were permeated with fraud.  As noted, the Amerindo entities managed approximately $1.2 billion in assets, and it appears that the Government does not contest that some portion of these assets, if not a substantial majority of them, were managed lawfully.  Yet, the wrongdoing alleged in the Affidavit touches on but a fraction of those assets.  Moreover, the Warrant application sufficiently identifies only two victims of Defendants' alleged conduct.  This falls far short of the evidence presented in cases where the all-records exception has been applied, as those cases involved rampant misconduct and little, if any, legitimate business activities.  *See, e.g., United States v. Oloyede*, 982 F.2d 133, 140 (4th Cir. 1992) ("[Affidavit presented d]ocumentation in over 50 cases . . . , two confidential informants outlined in great detail the procedures associated with appellants' operation, and a review of 26 files disclosed that *each file* contained fraudulent documents." (emphasis added)); *Nat'l City Trading Corp.*, 635 F.2d at 1021-22 (the affidavit listed forty complaints about the enterprise, twenty of which had been investigated, and a pattern of conduct was identified by the investigator); *Brien*, 617 F.2d at 309 (warrant application listed 250 complaints about the enterprise and the affiant interviewed twenty former employees); *Hickey*, 16 F. Supp. 2d at 241 ("The Fourth Amendment requires more than mere extrapolation to activate the [all-records] principle.").

39

2.  Particularity

A warrant must not only be founded in probable cause, but it must also state *with particularity* "the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "This particularity requirement serves three related purposes:  preventing general searches, preventing the seizure of objects upon the mistaken assumption that they fall within the magistrate's authorization, and preventing the issuance of warrants without a substantial factual basis."  *United States v. Young*, 745 F.2d 733, 758-59 (2d Cir. 1984).  A warrant is sufficiently particular if it "enable[s] the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize."  *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992); *see also United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000) ("A warrant must be sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." (quotations omitted)).  Ideally, as little as is possible should be "left to the discretion of the officer executing the warrant," and in this manner the particularity requirement should "prevent[] the seizure of one thing under a warrant describing another."  *United States v. Buck*, 813 F.2d 588, 590-91 (2d Cir. 1987) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)).  However, "[c]ourts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant." *Id.*; *see also Hickey*, 16 F. Supp. 2d at 238 ("[T]he search warrant must delineate the specific area to be searched, as well as the particular items to be seized, with as much particularity as the circumstances reasonably permit.").

Although there is no fixed test for determining whether a warrant satisfies the particularity requirement, the cases addressing this issue have considered two factors that, above others, tend to define a warrant's insufficient particularity.  First, warrants are generally found to be insufficiently particular where "[n]othing on the face of the warrant tells the searching officers for what crime the search is being undertaken."  *George*, 975 F.2d at 76; *see also United States v. Bianco*, 998 F.2d 1112, 1116 (2d Cir. 1993) (warrant lacked particularity where it did not describe "the possible crimes involved"); *Hickey*, 16 F. Supp. 2d at 240 (invalidating several warrants on particularity grounds where "none identified the nature of the suspected wrongdoing triggering the searches"); *Roberts v. United States*, 656 F. Supp. 929, 935 (S.D.N.Y. 1987) (warrant insufficiently particular where, among other omissions, the warrant contained "no restriction to any specific wrongful transaction to which documents were related"), *rev'd on other grounds*, 852 F.2d 671 (2d Cir. 1988).

Second, warrants will frequently lack particularity where they include a general, catch-all paragraph or provision, often one authorizing the seizure of "any or all records" of a particular type.  *See, e.g., Bianco*, 998 F.2d at 1115 (warrant lacked particularity where it authorized the seizure of all "[N]otes, Ledgers, Envelopes, Papers, and Records"); *Buck*, 813 F.2d at 590 (warrant insufficiently particular where it authorized the seizure of "any papers, things or property of any kind," despite the fact that the warrant contained a description of the crime); *Hickey*, 16 F. Supp. 2d at 240 (offending warrants "directed the seizure of 'all business records'"); *United States v. Gigante*, 979 F. Supp. 959, 966-67 (S.D.N.Y. 1997) (finding a general warrant where warrant authorized seizure of all "financial, banking, safe deposit, investment, asset, tax, bookkeeping, and accounting records").

Here, the challenged Warrant suffers from both of these deficiencies.  To begin, nowhere does the Warrant indicate what specific acts of wrongdoing are being investigated.  Paragraph 16 of the Warrant Rider contains an oblique reference to "participants in the fraud schemes," but this would have been unhelpful to the Inspectors executing the search, as the Warrant does not identify those participants or explain the referenced fraud schemes, nor does it identify the particular transactions and illicit activities upon which the Warrant was founded.[12]  Moreover, this omission cannot be cured by reference to the supporting warrant application.  The Second Circuit has held that a "sufficiently specific affidavit will not itself cure an overbroad warrant . . . [unless] it is incorporated by reference in the warrant itself and attached to it," neither of which occurred here.[13]  *George*, 975 F.2d at 76; *see also Groh*, 540 U.S. at 557-58 (refusing to

---

[12]The Rider contains two paragraphs numbered sixteen.  This sentence references the first of those paragraphs, which has been described by the Parties as paragraph 16A.

[13]The Warrant does not incorporate any documents.  Although some of the officers who took part in the search were provided with the Affidavit, they were not provided with the Complaints, which were referenced by the Affidavit and which contain much of the detail concerning the allegations that supported the Warrant.  (Tr. 78, 123, Dec. 14, 2005.)
    The Court notes that the Second Circuit has held that, under narrow circumstances, the "formal requirements of incorporation and attachment" can be excused.  *Bianco*, 998 F.2d at 1116.  However, this exception, to the extent it survives, is unavailable to the Government.  Incorporation and attachment may only be omitted where "it is clear that the involved parties were aware of the scope of and limitations on the search."  *Id.* at 1116.  Such is not the case here.  Inspector Feiter admitted that the scope and limitations of the Warrant were unclear, testifying that it was possible that members of the search team believed that there were additional people involved in the alleged fraud scheme beyond Vilar and Tanaka (Tr. 133, Dec. 14, 2005), and that he himself believed that the Warrant authorized the seizure of practically any business-related record as "long as it had writing on it and it wasn't just blank."  (*Id.* at 162.)  Also, some Postal Inspectors who were added to the search team had not attended the pre-search briefing, and Inspector Fraterrigo was not present to assist during the first several hours of the search.  Thus, there is no certainty that all members of the search team were aware of the limits, if any, to be read into the Warrant from the supporting documents.
    Moreover, on this point, *Bianco* is of questionable use to the Government.  The Supreme Court in *Groh v. Ramirez*, held that the "Fourth Amendment by its terms requires particularity in

consider warrant application where the "warrant did not incorporate [the application] by

reference, nor did . . . the application . . . accompany the warrant"); *cf. United States v. Walker*,

No. 06 Crim. 48E, 2006 WL 3150977, at *4 (W.D.N.Y. Nov. 1, 2006) (reading warrant as

including facts set forth in affidavit where warrant stated, "see *attached* Affidavit as to of [sic]

Items to be Seized, all of which are fruits, evidence and instrumentalities of violations of 18

U.S.C. § 922(g)(1) all of which are more fully described in the affidavit filed in support of this

warrant which is incorporated herein by reference" (emphasis added)).

    The Warrant also contained a general, catch-all provision.  As noted, paragraph one of the

Rider authorizes the seizure of all "[c]orporate records" concerning any of the Amerindo entities,

including Amerindo Cayman.  Although the Warrant explains that this catch-all provision

"includes" items such as "records concerning the formation of . . . the Amerindo entities," "client

lists, client files, investment brochures," and "correspondence," the Warrant explicitly states that

the seizure power is "not limited to" such items.  Indeed, nowhere is this catch-all provision in

any way circumscribed, a problem that is amplified by the fact that other paragraphs in the

Warrant do contain limitations – for example, to documents related to the fraud schemes

(paragraph 16) or to specific individuals (paragraph 6) – which would indicate to a reasonable

officer that paragraph one, lacking such explicit restrictions, is therefore unbounded.  Moreover,

this patent lack of particularity is only compounded by the absence of any date restriction on the

items to be seized.  *See Roberts*, 656 F. Supp. at 935 (noting the absence of a "limit as to the

_____

the warrant, *not in the supporting documents*."  540 U.S. 551, 557 (2004) (emphasis added).
While the *Groh* Court held that a warrant may explicitly "cross-referenc[e] other documents," its
holding sheds doubt on whether an *unincorporated* document may ever be used to satisfy the
particularity requirements of the Fourth Amendment.  *See id.* at 557-58.

dates of the documents to be seized" in determining lack of particularity).

At bottom, the Warrant, most notably in the first paragraph of the Rider, provides for the seizure of a virtually unlimited body of documents. As such, it left unacceptably broad discretion to the officers executing the search. As the *Roberts* court held, "[w]ith no limit as to the owners of the documents, no limit as to the dates of the documents to be seized, and no restriction to any specific wrongful transaction to which the documents were related, the warrant in this case authorized a general, exploratory rummaging in a person's belongings." *Roberts*, 656 F. Supp. at 935 (internal citations and quotations omitted). The Court therefore finds that portions of the Warrant violated the particularity requirement of the Fourth Amendment.

### 3. Good Faith

A finding that the Warrant was invalid does not end the inquiry. If the executing officers conducted the search "in good faith and in objectively reasonable reliance on the warrant," the evidence produced by that search will not be suppressed. *Buck*, 813 F.2d at 592. This so-called "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23. The "standard of reasonableness . . . is an objective one, . . . [that] requires officers to have a reasonable knowledge of what the law prohibits." *George*, 975 F.2d at 77 (quoting *Leon*, 468 U.S. at 919-20). In assessing the good-faith exception, "[t]he burden is on the government to demonstrate the objective reasonableness of the officers' good-faith reliance." *United States v. Santa*, 180 F.3d 20, 25 (2d Cir. 1999); *accord George*, 975 F.2d at 77.

In *Leon*, the Supreme Court identified four circumstances under which the good-faith

exception will not apply.  The *Leon* court held that suppression remains appropriate if:  (1) the magistrate "was misled by information in an affidavit that the affiant knew was false;" (2) "the issuing magistrate wholly abandoned his judicial role;" (3) the supporting affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or (4) the warrant is "so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid."  *Leon*, 468 U.S. at 923.[14]

In *Buck*, the Second Circuit addressed the application of the good-faith exception under circumstances similar to those here.  There, the court invalidated a warrant for failure to meet the Fourth Amendment's particularity requirement.  813 F.2d at 591-92.  Unlike the Warrant here, the warrant in *Buck* included a description of the crime; however, it also authorized the broad seizure of "any papers, things or property of any kind relating to the previously described crime." *Id.* at 590.  The Second Circuit held that such a warrant "left it entirely to the discretion of the officials conducting the search to decide what items were to be seized, and thus was not permissible under the Fourth Amendment."  *Id.* at 592.  The *Buck* court then addressed the good-faith exception.  Reasoning that the executing officers could not have "anticipate[d the court's] holding . . . that the particularity clause of the Fourth Amendment prohibits the use of a catch-all description in a search warrant," the court applied the good-faith exception and did not suppress the evidence.  *Id.* at 593.  Relevant to the pending motion, however, the *Buck* court added the following words of guidance:  "Of course, our decision today means that, with respect to

---

[14]Tanaka has asserted, without any basis whatsoever, that the magistrate judge who signed the Warrant wholly abandoned his judicial role.  Lacking any support for this claim, the Court has no hesitation in rejecting it.

searches conducted hereafter, police officers may no longer invoke the reasonable-reliance

exception to the exclusionary rule when they attempt to introduce as evidence the fruits of

searches undertaken on the basis of warrants containing only a catch-all description of the

property to be seized." *Id.* at 593 n.2.

This instruction is applicable here, as the catch-all language found in the Warrant

similarly offends the Fourth Amendment's particularity requirement, and indeed is so broad that

a "well-trained officer would have known that the search was illegal despite the magistrate's

authorization." *Leon*, 468 U.S. at 922 n.23.  On this point, Inspector Feiter's testimony is

particularly illuminating.  Inspector Feiter testified that, in effect, he viewed paragraph one of the

Warrant Rider as authorizing the seizure of any document with Amerindo letterhead and writing

on it, or, as he put it, "anything with writing on it" would "go."  (Tr. 162, Dec. 14, 2005.)  In

short, Inspector Feiter, the on-site supervisor of the search team, believed that the search team

was permitted to seize "all official business records" of an enterprise managing $1.2 billion in

assets, irrespective of whether those records were related to the alleged victims, suspects, or

illegal activities.  (*Id.* at 162-63; *see also* Tr. 141-42, July 7, 2006 (Inspector Fraterrigo testifying

on cross-examination that any corporate record could be seized under the Warrant, regardless of

date or subject matter).)[15]  Thus, it does not help the Government that the inspectors left behind

30%-40% of the materials in the Amerindo offices, as there is every reason to believe that this

estimate includes things like blank paper, duplicates of other materials taken, and personal items

of Amerindo's employees.  This is particularly true given that the Government took

---

[15]Inspector Fraterrigo also acknowledged that she believed the Warrant authorized the
seizure even of items that were "not useful to the investigation."  (Tr. 146, July 7, 2006.)

approximately 170 boxes of hard-copy materials and millions of pages worth of electronically stored materials.  As the Second Circuit has held, "[s]ince it was quite clear when this warrant was executed that 'limits' to a search consisting only of a broad criminal statute were invalid, *a fortiori*, a warrant not limited in scope to *any crime at all* is so unconstitutionally broad that no reasonably well-trained police officer could believe otherwise."  *George*, 975 F.2d at 77; *see also United States v. One Parcel of Property*, 774 F. Supp. 699, 707 (D. Conn. 1991) ("Courts commonly refuse to find good faith reliance when the warrant is too broadly worded or its terms so vague or unspecific that it fails to distinguish adequately between items that are evidence of a crime and innocent possessions." (internal quotations omitted)).  Accordingly, it was not objectively reasonable for the executing Postal Inspectors in this case to have relied on a warrant that they believed authorized the seizure of every Amerindo business record without restriction, and, therefore, the good-faith exception cannot be applied.

### 4.  Defendants' *Franks* Claims

Defendants further argue that the evidence seized during the U.S. search should be suppressed because Inspector Fraterrigo deliberately, or with reckless disregard for the truth, misled the magistrate judge to obtain the Warrant.  Specifically, according to Defendants, Inspector Fraterrigo intentionally or recklessly misled the magistrate judge when she stated that beginning in 2003, Amerindo was "dribbling out" returns on the Mayers' investments and when she represented that all of the Mayers' efforts to redeem their investment in 2003 were "rebuffed."  According to Defendants, these representations were false, as Inspector Fraterrigo knew that the Mayers were receiving monthly payments and that Defendant Tanaka was attempting to resolve the redemption issue by proposing a payment plan.  Defendants also claim

that Inspector Fraterrigo deliberately or recklessly disregarded the truth when she omitted from the warrant application information that: (1) the Mayers received "substantial and consistent payments from Amerindo" from 1988 until at least 2002; (2) the Mayers increased their investments with Amerindo from 1988 until 2000; (3) the redemption difficulties the Mayers had with Amerindo involved their 2001 GFRDA investment, not the 1988 investment referenced in the Affidavit; and (4) Lily Cates in fact redeemed profits from her various Amerindo investments, including from Rhodes Capital, between 1988 and 2002 and she reinvested some of these profits in Amerindo products.

In *Franks*, the Supreme Court held that where an affiant deliberately or recklessly disregards the truth in a warrant application, and where the application's "remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." 438 U.S. at 156; *see also United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) ("To suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: '(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding.'" (quoting *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998))). "[E]very statement in a warrant affidavit does not have to be true," *Canfield*, 212 F.3d at 718, and "[a]n inaccuracy that is the result of negligence or innocent mistake is insufficient." *United States v. Perez*, 247 F. Supp. 2d 459, 472-73 (S.D.N.Y. 2003) (citing *Franks*, 438 U.S. at 171). The Second Circuit in fact has made clear that "the mere intent to exclude information is insufficient." *United States v. Awadallah*,

349 F.3d 42, 67 (2d Cir. 2003).  Indeed, "every decision not to include certain information in the

affidavit is 'intentional' insofar as it is made knowingly."  *United States v. Colkley*, 899 F.2d

297, 300 (4th Cir. 1990).  Thus, under *Franks*, the intent of the misstatement or omission must be

to mislead the judicial officer into approving the requested warrant.

       "The meaning of an intentional falsehood is self-evident," *United States v. Kunen*, 323 F.

Supp. 2d 390, 395 (E.D.N.Y. 2004), but the definition of "reckless disregard" in the *Franks*

context is less clear.  *See United States v. Harding*, 273 F. Supp. 2d 411, 426 (S.D.N.Y. 2003)

("The *Franks* Court failed to flesh out the [reckless disregard] standard directly, though it stated

that information put forth in an affidavit must be 'appropriately accepted by the affiant as

true.'");  *Rivera v. United States*, 728 F. Supp. 250, 258 (S.D.N.Y. 1990) ("Judicial precedent has

established this standard of deliberate falsehood and reckless disregard to support a Franks

challenge, but research has disclosed no case defining 'reckless disregard' in this setting."), *aff'd*

*in relevant part*, 928 F.2d 592, 604 (2d Cir. 1991).  While the Parties have spent little time on

this question, they have suggested (citing two district court cases), at least in the context of an

alleged omission, that reckless disregard for the truth means to "withhold[] a fact [in the agent's]

ken that any reasonable person would have known [ ] was the kind of thing that the judge would

wish to know."  (Gov't Post-Hr'g Mem. 97 (quoting *Harding*, 273 F. Supp. 2d at 416; *Perez*, 247

F. Supp. 2d at 474); Tanaka Post-Hr'g Mem. 16 (same)).  The Parties also cite the Second

Circuit's decision in *Rivera*, 928 F.2d 592, but differ as to its holding.  In *Rivera*, the Second

Circuit stated that "recklessness may be inferred where the omitted information was 'clearly

critical' to the probable cause determination," 928 F. 2d at 604, but the Government writes this

comment off as dicta.  (Gov't Post-Hr'g Mem. 97 n.31).  However, citing *Rivera*, the Second

Circuit has observed that it had "previously *held* that recklessness may be inferred when omitted information was 'clearly critical' to assessing the legality of a search." *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) (quoting *Rivera*, 928 F.2d at 604) (emphasis added).

While *Rivera* and *Reilly* offer guidance as to how reckless disregard for the truth may be proved, they do not define what "reckless disregard" means. Indeed, the Court has been referred to no Second Circuit case, nor is it aware of one, that explicitly defines what it means to recklessly disregard the truth in the *Franks* context. *See Kunen*, 323 F. Supp. 2d at 395 (noting that the Second Circuit has not addressed this issue).[16] However, most circuits that have considered the question have embraced a subjective test for recklessness similar to that used in First Amendment libel cases, namely, that one "recklessly disregards" the truth when one makes allegations while entertaining serious doubts about the accuracy of those allegations. *See, e.g., Miller v. Prince George's County, Md.*, 475 F.3d 621, 627 (4th Cir. 2007) (noting that an affiant recklessly disregards the truth when the affiant entertains "serious doubts" as to the accuracy of the information in the affidavit); *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002) (holding that to establish reckless disregard for the truth, a defendant must show that the affiant had "serious doubts" about veracity of the allegations); *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994) (adopting "serious doubts" definition); *United States v. Williams*, 737 F.2d 594, 602 (7th Cir. 1984) (noting that "the First Amendment should be applied by analogy in the *Franks* setting," and that "[a]ccordingly, to prove reckless disregard for the truth, the defendants

---

[16] In *Rivera*, which involved a civil rights action, the Court noted that an officer would lose any claim of qualified immunity, where that officer "knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause." 928 F.2d at 604.

had to prove that the affiant 'in fact entertained serious doubts as to the truth of his' allegations."
(quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968))); *United States v. Davis*, 617 F.2d
677, 694 (D.C. Cir. 1979) (applying First Amendment libel test in *St. Amant* to *Franks* claims).
Lower courts in the Second Circuit have adopted the same test in several cases, including the
very case decided on appeal in *Rivera*.  *See, e.g., Kunen*, 323 F. Supp. 2d at 395; *Perez*, 247 F.
Supp. 2d at 473; *United States v. Markey*, 131 F. Supp. 2d 316, 324 (D. Conn. 2001); *Rivera*, 728
F. Supp. at 258.

While the "serious doubt" standard appropriately is a subjective one, and focuses on the
affiant's state of mind at the time the affidavit was sworn, courts also recognize that often "states
of mind must be proved circumstantially."  *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir.
2001).  Thus, it is unsurprising that the Second Circuit's observation regarding a means of
*proving* reckless disregard for the truth is similar to that of the other circuits that have adopted
the serious doubt test.  *Compare Rivera*, 928 F.2d at 604 (recklessness may be inferred where the
omitted information was "clearly critical" to the probable cause determination), *with Miller*, 475
F.3d at 627 (recklessness may be inferred where affiant omitted information that affiant knew
"would negate probable cause" (quoting *Beauchamp v. City of Noblesville, Inc.*, 320 F.3d 733,
743 (7th Cir. 2003))), *and Ranney*, 298 F.3d at 78 (reckless may be inferred from "circumstances
evincing obvious reasons to doubt the veracity of the allegations" (quoting *Williams*, 737 F.2d at
602)).

The Court is aware, in part by the briefing of the Parties here, that at least the Third
Circuit has held that "reckless disregard for the truth means different things when dealing with
omissions and assertions."  *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000).  While the Third

Circuit applies the "serious doubt" test to false assertions in a search warrant affidavit, *id.*, it has held that "omissions are made with reckless disregard if an officer withholds a fact in his ken that '[a]ny reasonable person would have known was the kind of thing the judge would wish to know.'"  *Id.* at 787-88 (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).[17] It is this paradigm that the Parties urge the Court to follow here.  However, a test that invokes the mystical "reasonable person" speaks the language of negligence.  Yet, as noted, "[a]llegations that amount to negligence or innocent mistake do not constitute the required [*Franks*] showing." *Markey*, 131 F. Supp. 2d at 324.  Thus, under *Franks*, "the question is not what a reasonably prudent person would have appreciated given the attendant circumstances but rather whether" the affiant at least had reason to seriously doubt the truth of the allegations.  *Kunen*, 323 F. Supp. 2d at 395.

Moreover, the materiality component of the *Franks* analysis focuses on whether the

_____

[17]The *Wilson* court's reliance on the Eighth Circuit's decision in *Jacobs* is interesting because in other cases the Eighth Circuit has described the proof of reckless omissions in a manner identical to that of the Second Circuit.  In *Jacobs*, the court did not purport to conduct a comprehensive analysis of the meaning of "reckless disregard for the truth," but only commented that certain omitted information in the affidavit at issue in that case was something that "[a]ny reasonable person" would have known the "judge would wish to know."  986 F.2d at 1235.  Just two years later, however, in *United States v. Ozar*, the Eighth Circuit faulted a lower court for "broadly read[ing]" its prior cases "as equating material falsehoods and material omissions for purposes of establishing a *Franks* . . . violation."  50 F.3d 1440, 1445 (8th Cir. 1995).  Quoting a case pre-dating *Jacobs*, the *Ozar* court went on to note that "recklessness may be inferred from the fact of omission of information from an affidavit . . . only when the material omitted would have been 'clearly critical' to the finding of probable cause."  *Id.* (quoting *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)).  Just last month, the Eighth Circuit noted that it has "acknowledged that recklessness may be 'inferred from the fact of omission of information from an affidavit when the material omitted would have been "clearly critical" to the finding of probable cause.'"  *United States v. Williams*, 477 F.3d 554, 559 (8th Cir. 2007) (quoting *Reivich*, 793 F.2d at 961-62).  However, right after its quotation of *Reivich*, the court added the *Jacobs* case as an additional cite, with a parenthetical comment regarding the "reasonable person" analysis used in that case.

omitted information was "*necessary* to the finding of probable cause," *Franks*, 438 U.S. at 156

(emphasis added), and not just what might have been relevant to that finding, let alone of interest

to a magistrate judge. *See Colkley*, 899 F.2d at 301. "All storytelling involves an element of

selectivity," *Wilson*, 212 F.3d at 787, so it is not shocking that "[e]very affidavit will omit facts

which, in retrospect, seem significant." *United States v. Domitrovich*, 852 F. Supp. 1460, 1465

(E.D. Wash. 1994). Thus, courts have recognized that *Franks* claims based on omissions are less

likely to justify suppression than claims of intentionally or recklessly false assertions. *See, e.g.*,

*United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997) (noting that "an allegation of

omission potentially opens officers to endless conjecture about investigative leads, fragments of

information, or other matters that might, if included, have redounded to defendant's benefit."

(internal quotations omitted)); *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980) (noting

that "it will often be difficult for an accused to prove that an omission was made intentionally or

with reckless disregard rather than negligently unless he has somehow gained independent

evidence that the affiant acted from bad motive or recklessly in conducting his investigation and

making the affidavit"). This is not to say, of course, that omissions are immune from *Franks*

scrutiny, only that an affiant is not required to share all that he or she knows about the

investigation in an affidavit in support of a search warrant. *See United States v. Burnes*, 816 F.2d

1354, 1358 (9th Cir. 1987) ("The mere fact that the affiant did not list every conceivable

conclusion does not taint the validity of the affidavit."). That affiant, however, cannot

intentionally or recklessly hide from the magistrate judge that which would be critical to the

probable cause determination. And, if a defendant shows by a preponderance of the evidence

that an affiant did just that, then the first prong of the *Franks* analysis will have been met. *See*

*Franks*, 438 U.S. at 156 (noting that the defendant bears burden of showing deliberateness or reckless disregard for the truth by a preponderance of the evidence).

Even if a defendant demonstrates that an affiant deliberately or with reckless disregard for the truth misled the magistrate judge, the *Franks* motion will not be granted unless the purported misrepresentations or omissions were material, that is, necessary to the probable cause finding. *See Salameh*, 152 F.3d at 113; *United States v. Millar*, 79 F.3d 338, 342 (2d Cir. 1996); *Bianco*, 998 F.2d at 1125. Put another way, while a warrant affidavit may contain both tainted and untainted allegations, a warrant based on such an affidavit survives if probable cause can be established based on an independent consideration of only the untainted information in the affidavit. *See Franks*, 438 U.S. at 170-71; *Awadallah*, 349 F.3d at 68; *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985).

Beginning with the first part of the *Franks* analysis, the Court finds that Defendants have failed to establish that Inspector Fraterrigo displayed deliberate or reckless disregard for the truth in the warrant application. As a general matter, Inspector Fraterrigo testified that she proofread the final version of the Warrant, going line by line; that she verified each of the allegations in the Affidavit based on her investigation; and that, at the time the Affidavit was submitted to the magistrate judge, she believed it to be accurate. She also generally testified that she did not intend to mislead the magistrate judge when she submitted the Affidavit. The Court found this testimony to be entirely credible, as it was clear to the Court that Inspector Fraterrigo sincerely believed that she diligently assisted in the preparation and verification of the allegations in the Affidavit. Equally clear to the Court is that Inspector Fraterrigo harbored no serious doubts about the accuracy of the claims of misconduct by the Defendants in the Affidavit.

The Court finds no more compelling Defendants' specific claims about the two assertions it contends were false:  the "dribbling" of investment returns to the Mayer family beginning in 2003, and the Defendants' "rebuffing" of the Mayers' request to redeem the GFRDA investment beginning in 2003.  According to Defendants, the use of the word "dribbling" is misleading because it fails to mention that the Mayers received $50,000 in monthly payments in 2003, and payments totaling approximately $600,000 in 2004 (the equivalent of $50,000 per month).  Yet, when one considers that the Mayers allegedly were told in 2003 that the $50,000 monthly interest payments were, in fact, a reduction from $96,000 payments, that there allegedly was no explanation for the reduction, and that the $600,000 they received in 2004 was approximately 5% of their total $12,000,000 investment, the use of the word "dribbling" seems entirely appropriate.  Moreover, there is no evidence that Inspector Fraterrigo deliberately lied when she approved this choice of words, or that she had serious doubts about their accuracy.  Indeed, it cannot even be said that Inspector Fraterrigo's choice of words was negligent, let alone reckless.

Inspector Fraterrigo's statement regarding Defendants' rebuffing of the Mayers' efforts to redeem their entire GFRDA investment in 2003 also was consistent with the information available to her when she swore out the Affidavit.  Defendants claim otherwise, principally pointing to a February 2004 letter from Renata Tanaka, Defendant Tanaka's wife, to the Mayer Family proposing a redemption schedule that would not have returned the entirety of the GRFDA investment until December *2008*.[18]  Somehow, the Defendants think that this "proposal"

---

[18]In fact, the letter, which was known to Inspector Fraterrigo, describes a payment schedule that would have provided the Mayers with only about 5% of their investment within 18 months of their request.  The significant redemptions would not be made until December 31, 2005, over two years after they requested full redemption.

undercuts the statement in the Affidavit that the Mayers' efforts to redeem the entire $12 million investment in what was represented to them to be an "absolutely safe and liquid" investment in *2003* were rebuffed (by Defendants and Renata Tanaka).  Again, Defendants are attempting to meet their heavy burden under *Franks* through a game of semantics.  In their view, the request for a full redemption, to which the Mayers believed they were entitled in 2003, was not "rebuffed" as long as the Defendants promised to pay off the investment at some point.  On this logic, an investor's request for a full redemption of an investment is only "rebuffed" if it is met with an absolute refusal to return any money at any time.  This is an argument that rebuts itself, but in any event is not evidence that Inspector Fraterrigo entertained serious doubts about the accuracy of her allegations on this point.  Therefore, this claim provides no basis to grant a *Franks* motion.

Similarly unpersuasive are Defendants' claims that Inspector Fraterrigo deliberately, or with reckless disregard for the truth, failed to tell the magistrate judge that:  (1) the Mayers received "substantial and consistent payments from Amerindo" from 1988 until at least 2002; (2) the Mayers increased their investments with Amerindo from 1988 until 2000; (3) the redemption issues the Mayers had with Amerindo involved their 2001 GFRDA investment, not the 1988 investment referenced in the Affidavit; and (4) Lily Cates in fact redeemed profits from her various Amerindo investments, including from Rhodes Capital, between 1988 and 2002 and that she re-invested some of these profits in Amerindo products.  These four points basically boil down to one theme:  that Inspector Fraterrigo misled the magistrate judge when she failed to tell him that Cates and the Mayers did not have major problems with Amerindo investments until 2002.

It is true that the Affidavit did not explicitly identify when the allegedly jilted investors began having difficulties with their investments, let alone that they re-invested the profits they made from some of their investments.  But, as was true in *Awadallah*, 349 F.3d at 67, Inspector Fraterrigo made clear in the Affidavit that she was not including all that she knew about the investigation in the Affidavit.  The Defendants' claim, in any event, falls short from its lack of evidence to show that Inspector Fraterrigo omitted this information with the intent to deny the magistrate judge information that was critical to the probable cause finding.  At the hearing, when asked repeatedly why she failed to include information regarding pre-2002 redemptions in the warrant application, she stated that she simply "never thought of it."  (Tr. 36, Nov. 15, 2006.)  From Inspector Fraterrigo's perspective, she did not believe, to the extent she thought about it at all, that this information was relevant to the allegations in the Affidavit regarding the more recent failure of Defendants, allegedly, to redeem the investors' money.  The Court found this testimony to be entirely credible.[19]  Moreover, to the extent Defendants believe that Inspector Fraterrigo exercised poor judgment in not considering to include this information, that would, at best,

---

[19]Defendants claim otherwise, arguing that Inspector Fraterrigo knew that the Affidavit's allegations were being proffered in support of a broad search warrant that would authorize seizure of voluminous records that would pre-date the time when the subject investors began to experience redemption problems.  This, however, is not proof that Inspector Fraterrigo intended to mislead through these omissions.  The judgment about what the scope of the search warrant would be was not made by Inspector Fraterrigo, but by AUSA Litt, and she gave no indication that she had any basis to question that legal judgment.  Moreover, it has been clear to the Court that Inspector Fraterrigo, along with others on the prosecution team, genuinely believe that the fact that Defendants allegedly would defraud long-time investors such as Cates and the Mayers is itself proof that Defendants' fraudulent conduct likely involved other investors and pre-dated the redemption difficulties these investors had.  While that belief objectively may not justify reliance on the all-records doctrine, or even the good-faith reliance on the Warrant itself, it is more than enough to undermine Defendants' claim about Inspector Fraterrigo's intentions regarding what she included in and omitted from the Affidavit.

support a claim of negligence.  But, such a finding, even if the Court were inclined to make it, would not get Defendants over the first *Franks* hurdle.  *See Perez*, 247 F. Supp. 2d at 472-73.

Moreover, even considering the omitted information, the Warrant still would be valid. The Affidavit and accompanying Complaints state that the Mayers had described "years of begging Vilar to release some of their investment to pay" for medical care.  (Affidavit ¶ 6.A.) This statement is literally true; as of May 2005, the Mayers allegedly had been attempting to redeem their GFRDA investment since 2002 and some of these attempts included a visit to Vilar's residence to plead with him to release the money.  Yet, Defendants attempt to score points by noting that the Affidavit explicitly mentioned neither that the GFRDA redemptions they sought related to a 2001 investment, rather than a 1987 investment, nor that the Mayers were able to redeem their investments before 2003.  These claims fail.  First, by *not* claiming in the Affidavit that the Mayers had difficulties redeeming their investments as far back as the 1980s or 1990s, it is implicit that they had no such difficulties.  Taken as a whole, the Warrant application does not leave the impression that these investors had difficulty redeeming their investments since the time Amerindo opened its doors.  Instead, it is reasonable to assume that, because the Government did not present evidence of earlier wrongdoing, it did not yet have such evidence to present.  Thus, there was no misleading of the magistrate judge on this point and the Warrant application established probable cause (at least with respect to the GFRDA investment) even when one considers the omitted information.  Second, Inspector Fraterrigo did not state or even suggest that the problematic GRFDA investment was the original investment in 1987.  It is only Defendants' interpretation of the allegations in the Affidavit that suggest such a reading, and therefore the alleged omissions were not material to the probable cause finding.

58

Finally, Defendants' claims regarding the Cates allegations are even less convincing. According to Defendants, it was materially misleading for Inspector Fraterrigo to omit the fact that Cates redeemed profits from her various Amerindo investments, including from Rhodes Capital, between 1988 and 2002 and that she re-invested some of these profits in Amerindo products. Yet, the Affidavit explicitly advised the magistrate judge that account statements reflected growth in the Rhodes investment, and mentioned that Cates was denied her request for redemption in February 2005. These allegations are entirely consistent with what was not included in the Affidavit, thus there is no basis to believe that they were necessary to the probable cause determination. Put another way, all of the alleged omissions (regarding Cates and the Mayers) were not "clearly critical" to the probable cause finding, and therefore it cannot be inferred from their omission that Inspector Fraterrigo recklessly disregarded the truth in the Affidavit. Accordingly, Defendants' *Franks* motion is denied.

### 5. Severance

As a last line of defense, the Government argues that even if portions of the Warrant are unconstitutionally broad or otherwise insufficiently particularized, and even if the good-faith exception does not apply, the Court should, at most, sever the invalid portions of the Warrant and permit it to keep items seized pursuant to the valid portions. This the Court will do.

In *George*, the Second Circuit adopted the doctrine of severance: "When a warrant is severed (or redacted) the constitutionally infirm portion – usually for lack of particularity or probable cause – is separated from the remainder and evidence seized pursuant to that portion is

suppressed; evidence seized under the valid portion may be admitted." 975 F.2d at 79.[20]  The premise behind this doctrine is that "[t]he cost of suppressing all the evidence seized, including that seized pursuant to the valid portions of the warrant, is so great that the lesser benefits accruing to the interests served by the Fourth Amendment cannot justify complete suppression." *United States v. Christine*, 687 F.2d 749, 758 (3d Cir. 1982); *see also United States v. Riggs*, 690 F.2d 298, 301 (1st Cir. 1982) ("From a policy perspective a rule requiring blanket invalidation of overbroad warrants would seem ill advised.").  However, severance of a warrant "is not always possible, and should be granted only where . . . legitimate fourth amendment interests will not be jeopardized." *United States v. Marcus*, 807 F. Supp. 934, 936 (E.D.N.Y. 1992).  Accordingly, severance "is not available where no part of the warrant is sufficiently particularized, where no portion of the warrant may be meaningfully severed, or where the sufficiently particularized portions of the warrant make up only an insignificant or tangential part of the warrant." *George*, 975 F.2d at 79-80 (internal citations omitted); *accord Marcus*, 807 F. Supp. at 936 (same).  Moreover, a warrant will not be severed when the legitimate portions of the warrant "were 'included by the Government as a pretext to support an otherwise unlawful seizure.'" *Marcus*, 807 F. Supp. at 937 (quoting *United States v. Cook*, 657 F.2d 730, 735 n.6 (5th Cir. 1981)).

Here, the Court concludes that severance is appropriate.  The Warrant is organized into eighteen well-delineated paragraphs, thereby simplifying the task of redaction.  *See Sells*, 463 F.3d at 1158 ("Where, as here, each of the categories of items to be seized describes distinct

---

[20]"[E]very federal court to consider the issue has adopted the doctrine of severance, whereby valid portions of a warrant are severed from the invalid portions and only materials seized under the authority of the valid portions, or lawfully seized while executing the valid portions, are admissible." *United States v. Sells*, 463 F.3d 1148, 1155 (10th Cir. 2006).

subject matter in language not linked to language of other categories, and each valid category retains its significance when isolated from [the] rest of the warrant, then the valid portions may be severed from the warrant."); *United States v. Leeper*, No. 05-10250-01, 2006 WL 3457221, at *5 (D. Kan. Nov. 29, 2006) ("To determine whether severability is applicable, the court first divides the warrant into individual clauses, portions or categories, and then examines the constitutionality of each part.").  Many of these paragraphs, or substantial portions thereof, are both sufficiently particularized and firmly rooted in probable cause.  Taken together, these valid paragraphs make up a substantial portion of the Warrant and thus do not constitute an "insignificant or tangential" part of that document.  Moreover, there is no reason to believe that the valid portions of the Warrant were included merely as a pretext to support an overly broad search.  The Government witnesses all credibly testified that they believed the Warrant was proper in its entirety.

Accordingly, with the above principles in mind, the Court finds that paragraphs 2, 7, 8, and 16B are valid in their entirety.  Thus, materials seized pursuant to these paragraphs may be retained by the Government.  The Court further finds that substantial portions of paragraphs 1, 5, 6, 9, 10, 11, and 16A are valid and should remain.  Finally, the Court finds that redaction from the Warrant of paragraphs 3, 4, 12, 13, 14 and 15 in their entirety is appropriate.[21]

With regard to the paragraphs that survive in their entirety, the Court finds that they are amply supported by probable cause.  Paragraph 2 asks for documents concerning certain accounts

---

[21]Paragraph 17, which deals with computer equipment and other means of electronic storage, is discussed below.  However, to the extent the Warrant is otherwise severed herein, then the retrieval of any documents from computers based on these paragraphs will be similarly limited.

at Bear Stearns.  These accounts were allegedly used to convert Cates' investments in 2002 and 2003, to purchase five thoroughbred horses by Tanaka between 2001 and 2005, and to transfer millions of dollars to a Bahamian bank account used by Vilar as an investment vehicle for the Mayers.  Paragraph 7 calls for the seizure of documents related to the SBIC venture that is at the heart of the $5 million investment that Vilar allegedly induced Cates to make.  Paragraph 8 requests documents related to the GFRDAs.  The Court recognizes that the most specific allegation regarding the GFRDA involves the Mayers, but given these allegations, along with the allegations regarding Cates and the Tanaka horses, there is enough information to justify preserving this paragraph.  Paragraph 16B (the second of the two paragraph 16s) remains untouched as it is supported by the claim that faxes likely were used to commit some of the fraud specifically alleged in the affidavit.  Finally, each of these paragraphs is sufficiently particularized such that an officer executing the search would be able to "ascertain and identify with reasonable certainty those items that the magistrate ha[d] authorized him to seize." *George*, 975 F.2d at 75.

The paragraphs that should be redacted in part all contain readily identifiable portions or phrases that are supported by probable cause and are sufficiently particularized, and portions that are beyond the scope of the probable cause established in the supporting documents.  Read in its entirety, paragraph 1 calls for virtually every business record of the four Amerindo entities, but this paragraph also cleanly breaks out some specific categories that are substantiated by the allegations in the supporting documents.  For example, while there is no basis to seize all "client lists, client files, investment brochures, copies of correspondence sent to or received from clients, and other documents concerning or reflecting the identities of and communications with clients

who have investments managed or advised by Amerindo," there is sufficient cause to seize other categories of documents identified in paragraph 1, namely, "records concerning the formation of" all the Amerindo entities except Amerindo Cayman, as well as documents describing the shareholders, principals, officers, directors, and employees, changes in ownership, bylaws, and resolutions of these entities. Seizure of these categories of documents is justified by the allegations that Vilar used Amerindo Panama to effectuate the alleged theft of Cates' SBIC investment, and that at least two of the other entities were involved in the alleged fraud. Thus, salvaging these clearly delineated, valid portions of paragraph 1 from the invalid portions of that paragraph is appropriate. *See United States v. Joe*, No. C 06-0428, 2007 WL 108465, at *6 (N.D. Cal. Jan. 10, 2007) (holding that it was proper to sever a sentence from invalid sentences of warrant); *Leeper*, 2006 WL 3457221, at *5 (noting that it is proper to separate valid "clauses" and "portions" in warrant from invalid ones).

Paragraph 5 principally requests documents related to the PTC Management Limited Trust Account, and a specified Bahamas Bank account. These off-shore accounts were allegedly involved in the Mayers' GFRDA investment. This paragraph needs only to be rid of the reference to "investment brochures" and "marketing materials," and to be limited solely to the two accounts specifically named therein. Paragraph 6 also is easily mended by limiting it to the documents relating only to Lily Cates, Lisa Mayer, Debra Mayer, and Herbert Mayer, but removing the reference to Harvey, Urich, and Marcus. Simply put, there is sufficient probable cause as to the former group, but not as to the latter. Paragraph 9 focuses on documents relating to private accounts held by "Amerindo principals *including*" Vilar and Tanaka. If "including" is removed from this paragraph, there is an abundance of probable cause to substantiate that

paragraph given the allegations that these two individuals used private accounts to transfer, or spend, investors' money.  A similar limitation only to Vilar and Tanaka also is appropriate in paragraph 16A.

Paragraph 10 requires no modification as it is amply supported by the allegation in the Tanaka Complaint regarding the cancellation and re-booking of trades to buy a thoroughbred horse.  Similarly, paragraph 11 deals only with "documents reflecting any direct financial or beneficial ownership interest held by" Vilar and Tanaka in "Amerindo and the Amerindo [Brokerage] Accounts."  This paragraphs deals directly with the Tanaka claim that no Amerindo employee had any interest in any client account managed by Amerindo or its affiliates, other than a fee interest.  The only limitation appropriate to these two paragraphs (and with paragraphs 5 and 9) is to require production of documents only back to 2001, as there are no allegations in this regard that go back further.  *See United States v. Ninety-Two Thousand four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F.3d 137, 151 (3d Cir. 2002) ("[T]he inclusion of those years [1984-1997] simply authorized a search for documents as to which there may not have been probable cause . . . [T]he proper remedy for this putative defect was simply to excise the years for which there was no probable cause.").

Regarding the paragraphs that should be severed in their entirety, the Court finds that they are beyond the reach of the Government's allegations.  Paragraph 3 deals with the Rhodes investment, but the Government has conceded that the allegations in the supporting affidavit do not establish that a crime was committed in connection with that product.  Suspicion though there may be, the seizure of records under this paragraph of the Warrant was inappropriate. Paragraphs 4, 12, and 13 all are too general to be substantiated by the allegations in the

supporting documents.  While these materials may be relevant to the investigation, the Government simply did not provide a basis to seize all the documents in those listed categories pursuant to a search warrant.  Paragraph 14 similarly suffers from a lack of probable cause as it appears to be based on the assumption that Amerindo benefitted from the alleged misconduct by Vilar and Tanaka, and that the documents sought in that paragraph will bear this out.  However, the allegations simply do not support collection of *all* documents listed in this paragraph, and there is no logical way to sever any portions of this paragraph.  Finally, paragraph 15 should be severed from the Warrant as it generally deals with employees involved in redemptions or preparation of account statements.  Beyond the specific redemptions and accounts described in the Affidavit, there is not an adequate basis to seize this category, or a sub-category, of these documents.

The Court is not unconcerned that, even after performing the above redactions, portions of the Warrant remain without any limitation as to the dates of the documents to be seized. However, given the narrow focus of the resulting Warrant, this is not fatal.  In the case of several of the funds and accounts addressed by the Warrant, there is evidence that they never had a legitimate purpose, even from their inception.  For example, the SBIC fund was never licensed by the SBA and was thus improper from its release; and given the allegations in the warrant application, the *original* ownership of the ATGF and AMI accounts was a legitimate focus of the search.  (*See* Tanaka Compl. ¶ 10 (noting that Tanaka represented that the "beneficial owners of the AMI Account and the ATGF II Account were identical, and that those common beneficial owners were off-shore Panamanians").)  Moreover, there is some evidence that Defendants were playing a shell game with the various Amerindo entities from at least as far back as Cates' first

investment with Amerindo in 1988.  (*See* Affidavit ¶ 6.D (noting that "Vilar wrote that Cates had always been a client of Amerindo [Panama]," not Amerindo U.S., as had been represented).) These facts are not changed even when one considers the information regarding redemptions that Defendants allege that Inspector Fraterrigo omitted from the warrant application, as the corporate formation documents relate to the alleged corporate shell game purportedly played by Vilar.

Finally, the Court has carefully considered Defendants' argument that severance of the Warrant will jeopardize Fourth Amendment interests.  For example, by severing the invalid portions of the Warrant from the valid sections, the Government in future cases might be emboldened to be more rather than less inclusive in search warrants on the theory that it would have nothing to lose if some portions were later excised by a court.  Indeed, if the Government was so motivated, then severance would be inappropriate.  *See George*, 975 F.2d at 79-80.  Here, however, the Court finds that severance is consistent with the law governing suppression of court-approved searches.  Only 6 of the 17 paragraphs of the Warrant are completely invalid, several are entirely valid, and the majority of those that are modified are done so only slightly. Thus, it cannot be said that the valid portions of the Warrant are "insignificant" or "tangential." In part, this reflects both the leeway given to the Government in complex investigations such as this one, *see United States v. Regan*, 706 F. Supp. 1102, 1114 (S.D.N.Y. 1989), and, as here, in cases where there is an utter lack of evidence that the Government took a cavalier attitude towards its obligations under the Fourth Amendment.  Thus, because suppression is to be the remedy of last resort, *see Hudson v. Michigan*, --- U.S. ---, 126 S. Ct. 2159, 2163 (2006), it is consistent with Fourth Amendment interests that the Warrant be severed in the manner described above.  *See Christine*, 687 F.2d at 758 ("Redaction of a warrant containing valid severable

66

phrases or clauses is consistent with [the] . . . purposes of the warrant requirement.").  Evidence recovered pursuant to the redacted sections of the Warrant will be suppressed.  All other evidence will be admissible.

B.  Electronic Material

Defendants also challenge the constitutionality of the seizure and subsequent search of the Amerindo computers.  Though not entirely clear, Defendants appear to object to the absence of a sufficiently specific search protocol in the Warrant, and repeat their overbreadth/lack of particularity objections to the Warrant.

A number of courts and academic commentators have suggested that searches of computers raise unique Fourth Amendment issues.  *See, e.g., United States v. Carey*, 172 F.3d 1268 (10th Cir. 1999); *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982); Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531 (2005).  For example, a single computer is capable of storing immense amounts of information:  "Computer hard drives sold in 2005 generally have storage capacities of about eighty gigabytes, roughly the equivalent to forty million pages of text – about the amount of information contained in the books on one floor of a typical academic library."  Kerr, *supra*, at 542.  Computers also often contain significant "intermingling" of relevant documents with "documents that the government has no probable cause to seize."  *In the Matter of the Search of:  3817 W. West End, First Floor Chicago, Illinois 60621*, 321 F. Supp. 2d 953, 958 (N.D. Ill. 2004); *see also* Ralph Winick, *Searches and Seizures of Computers and Computer Data*, 8 Harv. J.L. & Tech. 75, 104 (1994).  Increasingly, even office computers are used as "postal services, playgrounds, jukeboxes, dating services, movie theaters, daily planners, shopping malls, personal secretaries, virtual diaries, and more," Kerr,

*supra*, at 569, a phenomenon that is only compounded in a networked world, where a "single

physical storage device can store the private files of thousands of different users." *Id.* at 556.

Another potential complication regarding computer searches is the fact that often,

because of time restraints and insurmountable technical limitations, such searches cannot be

carried out at the time the warrant is executed at the premises.  *See United States v. Hill*, 459

F.3d 966, 974-75 (9th Cir. 2006) (observing that "there is a serious risk that the police might

damage the storage medium or compromise the integrity of the evidence by attempting to access

the data at the scene," and that taking the time needed to search a computer at the scene "would

not only impose a significant and unjustified burden on police resources, it would also make the

search more intrusive").  Instead, "it is frequently the case with computers that the normal

sequence of 'search' and then selective 'seizure' is turned on its head," as computer hardware is

seized from a suspect's premises before its content is known and then searched at a later time.

*3817 W. West End*, 321 F. Supp. 2d at 958; *see also Hill*, 459 F.3d at 974 (holding that "the

police were not required to bring with them equipment capable of reading computer storage

media and an officer competent to read it").  Moreover, as was the case here, computer searches

are often not executed on a seized computer itself, but rather on a government computer that

contains a "mirror-image" copy of a target machine, copies that can generally be made without

exposing the underlying data to the eyes of government agents.  *See* Kerr, *supra*, at 560.[22]  Thus,

the fear of some is that law enforcement officers, unencumbered by the type of time pressures

---

[22]A "mirror image," also known as a "bitstream copy," duplicates every "bit and byte on
the target drive including all files, the slack space, Master File Table, and metadata in exactly the
order they appear on the original."  Kerr, *supra*, at 541.  This copy is saved as a "read only" file
so that analytical work on the drive will not change it.  *Id.*

attendant to doing a search of a physical premises, might be tempted to rummage through a computer's files well beyond the scope of a warrant.  *See id.* at 571 ("Many computers may contain a wealth of evidence of low-level crimes, and probable cause to believe a person has engaged in a minor offense may justify an exhaustive search of his hard drive that will expose a great deal to government observation.").

On the other hand, the computer has become the modern criminal's best friend.  It is used to communicate to cohorts, ensnare victims, and generally to prepare and orchestrate criminal conduct.  The computer facilitates the terrorist organization's ability to train its members, spread propaganda and case its targets, just as it helps the identity thief locate his victims, the pornographer to collect and view child pornography, and the fraudster to generate fake documents.  And, it is precisely because computer files can be intermingled and encrypted that the computer is a useful criminal tool.  Nefarious documents can be given innocuous names, or can be manipulated, hidden or deleted with great ease.  *See Hill*, 459 F.3d at 978 ("Criminals will do all they can to conceal contraband, including the simple expedient of changing the names and extensions of files to disguise their content from the casual observer."); *United States v. Hunter*, 13 F. Supp. 2d 574, 583 (D. Vt. 1998) ("Computer records are extremely susceptible to tampering, hiding, or destruction, whether deliberate or inadvertent.").  It therefore is unsurprising that some of the most important evidence of criminal conduct is often found buried in computers.  As a result, it also should not be surprising that a person who uses a computer, or any electronic device, as an instrumentality of crime might discover that a magistrate judge would find probable cause to search that computer, just as it should not shock the user of a telephone that a judge would approve interceptions of calls over that telephone or the home

owner that a judge would approve a search throughout a house believed to contain evidence of a crime. *See United States v. Gray*, 78 F. Supp. 2d 524, 528 (E.D. Va. 1999) (noting that "agents authorized by warrant to search a home or office for documents containing certain specified information are entitled to examine all files located at the site to look for the specified information").

The Second Circuit has yet to comprehensively address the unique issues raised by computer searches, and few district courts in this circuit have had occasion to address the topic. Nevertheless, some guiding precepts have emerged in this circuit and others. As an initial matter, although searches of computers present unique constitutional challenges, the ultimate Fourth Amendment standard is the same for both computer and hard-copy searches: reasonableness. *See Hill*, 459 F.3d at 974 ("As always under the Fourth Amendment, the standard is reasonableness."). At bottom, then, there is neither a heightened nor a reduced level of protection for information stored on computers, as there is "no justification for favoring those who are capable of storing their records on computer over those who keep hard copies of their records." *Hunter*, 13 F. Supp. 2d at 584; *accord Gray*, 78 F. Supp. 2d at 529.

The cases and commentary also draw a distinction between the electronic storage device itself and the information which that device contains. Thus, when the government seeks to seize the information stored on a computer, as opposed to the computer itself, that underlying information must be identified with particularity and its seizure independently supported by probable cause. *See Carey*, 172 F.3d at 1275 ("Officers [should] specify in a warrant which type of files are sought."); *United States v. Riccardi*, 405 F.3d 852, 862-63 (10th Cir. 2005) (holding that warrant which "permitted the officers to search for anything – from child pornography to tax

returns to private correspondence," was "precisely the kind of wide-ranging exploratory search that the Framers intended to prohibit" (internal quotations omitted)); *Hunter*, 13 F. Supp. 2d at 584-85 (invalidating a warrant for failure to identify with particularity the underlying information to be seized); *In re Grand Jury Subpoena Duces Tecum Dated Nov. 15, 1993*, 846 F. Supp. 11, 12 (S.D.N.Y. 1994) (holding, in the context of a grand jury subpoena, that specificity is required with respect to the categories of information requested, not merely the storage devices).  This is consistent with the Government's own published practices, as set forth in a 2002 manual issued by the United States Department of Justice, Criminal Division.  *See* Computer Crime and Intellectual Prop. Section, Crim. Div., U.S. Dep't of Justice, Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations (2002), available at www.cybercrime.gov/s&smanual2002.htm, (hereinafter "DOJ Manual").  The DOJ Manual instructs agents that "[i]f the probable cause relates only to the information . . . the warrant should describe the information, rather than the physical storage devices which happen to contain it."  *Id.* at 42.

This is not a new rule, but merely an application of the traditional Fourth Amendment requirement that the Government establish that there is probable cause that the materials sought will contain evidence of crime, and then specify with reasonable particularity the materials to be seized.  *See United States v. Brooks*, 427 F.3d 1246, 1253 (10th Cir. 2005) (upholding warrant "that authorized officers to search through computer files for particular items specifically related to child pornography").  In meeting this burden, the Government obviously will need to persuade an issuing magistrate judge that there is reason to believe that the target computer was used to facilitate the crime, or otherwise will contain evidence of that crime.  *See Hill*, 459 F.3d at 975

("Although computer technology may in theory justify blanket seizures for the reasons discussed above, the government must still demonstrate to the magistrate *factually* why such a broad search and seizure authority is reasonable in the case at hand.").  However, this does not require the Government to establish that a majority of the computer files are related to the suspected criminal conduct, as long as what is to be seized is set forth with sufficient particularity.  *See Gray*, 78 F. Supp. 2d at 528; *Hunter*, 13 F. Supp. 2d at 583.  Indeed, given all the operating software and other basic files stored on most computers, it should not be expected that most files will be suspicious.  *See Hill*, 459 F.3d at 974 (noting that "computers in common use run a variety of operating systems – various versions of Windows, Mac OS and Linux, to name only the most common").

Relatedly, to "withstand an overbreadth challenge, the search warrant itself, or materials incorporated by reference, must have specified the purpose for which the computers were seized and *delineated the limits of their subsequent search*."  *Hunter*, 13 F. Supp. 2d at 584 (emphasis added).  Thus, for example, a warrant to search a computer for evidence of narcotics trafficking cannot be used as a blank check to scour the computer for evidence of pornographic crimes.  *See Carey*, 172 F.3d at 1276.  While a law enforcement officer might, in the course of a search for certain itemized categories of materials, inadvertently find evidence of other crimes, that officer is required to procure a second warrant to continue searching the computer for additional evidence of that other crime.  *See id.*

However, while the warrant must state with particularity the materials to be seized from a computer, the warrant need not specify *how* the computers will be searched.  This is the view of the vast majority of courts to have considered the question.  *See, e.g.*, *Hill*, 459 F.3d at 978

72

("[T]here is no case law holding that an officer *must* justify the lack of a search protocol in order to support issuance of the warrant."); *Brooks*, 427 F.3d at 1251 ("At the outset, we disagree with [defendant] that the government was required to describe its specific search methodology."); *United States v. Upham*, 168 F.3d 532, 537 (1st Cir. 1999) ("The . . . warrant did not prescribe methods of recovery or tests to be performed, but warrants rarely do so. The warrant process is primarily concerned with identifying *what* may be searched or seized – not how – and *whether* there is sufficient cause for the invasion of privacy thus entailed."); *United States v. Cartier*, No. 2:06-cr-73, 2007 WL 319648, at *3 (D.N.D. Jan. 30, 2007) ("[T]he warrant is not defective because it did not include a computer search methodology."); *United States v. Kaechele*, 466 F. Supp. 2d 868, 889 (E.D. Mich. 2006) (rejecting claim that warrant was overbroad because it lacked a search protocol); *United States v. Shinderman*, No. CRIM. 05-67-P-H, 2006 WL 522105, at *19 (D. Me. Mar. 2, 2006) ("[T]here is no Fourth Amendment requirement that search warrants spell out the parameters of computer searches where the warrant provides particularity as to what is being searched for."); *United States v. Lloyd*, No. 98 Crim. 529, 1998 WL 846822, at *3 (E.D.N.Y. Oct. 5, 1998) (rejecting claim that warrant should have described computer search method). *But see 3817 W. West End*, 321 F. Supp. 2d at 960-62 (requiring that computer search warrant include a search protocol). Indeed, outside the computer context, the Supreme Court has held that "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Dalia v. United States*, 441 U.S. 238, 257 (1979). The majority view rejecting a protocol requirement makes good sense as there is no principle in the law that requires law enforcement officers to limit their investigative techniques *ex ante*, before conducting any kind of search. *Id.* ("Nothing

in the language of the Constitution or in this Court's decisions interpreting that language suggests

that . . . search warrants also must include a specification of the precise manner in which they are

to be executed.").  Nor does such a rule give investigators free reign, as their conduct will always

be subject to a subsequent reasonableness review.  *See Hill*, 459 F.3d at 978 ("The

reasonableness of the officer's acts both in executing the warrant and in performing a subsequent

search of seized materials remains subject to judicial review.").

Moreover, a rule that does not require a computer search protocol avoids the courts

getting into the business of telling investigators how to conduct a lawful investigation, something

the courts are ill-equipped to do.  *See Hill*, 459 F.3d at 978 ("Forcing police to limit their

searches to files that the suspect has labeled in a particular way would be much like saying police

may not seize a plastic bag containing a powdery white substance if it is labeled 'flour' or

'talcum powder.'"); Kerr, *supra*, at 575 ("[M]agistrate judges are poorly equipped to evaluate

whether a particular search protocol is the fastest and most targeted way of locating evidence

stored on a hard drive.").  Searching a computer for evidence of a crime "can be as much an art

as a science."  *Brooks*, 427 F.3d at 1252.  This is particularly true in a complex, white collar case

such as this one.  *See United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982) ("[I]n

cases . . . involving complex financial transactions and widespread allegations of various types of

fraud, reading the warrant with practical flexibility entails an awareness of the difficulty of

piecing together the 'paper puzzle.'"); *Shinderman*, 2006 WL 522105, at *18 ("There can be

little doubt that the electronic puzzle in a so-called white collar crime is even more puzzling than

the proverbial paper puzzle of old.").  Thus, for example, it seems manifestly obvious that any

requirement that a computer search be confined by a key-word search protocol would inevitably

immunize criminals.  Such a simplistic search paradigm would of necessity leave out any

encoded documents, or any documents that used acronyms or other abbreviations in place of the

"key words."  Moreover, there may be numerous "documents" that are not word-searchable and

would therefore not be discovered in a search restricted to key-word inquiries.

It bears noting that the Affidavit in support of the Warrant here *does* contain a list of

methods, albeit not an exhaustive one, that the Government told the magistrate judge that it

might use to search computers.  Defendants argue that this list is insufficient because it is not

exhaustive, and because it permits agents to search for electronically-stored materials that are

"related to the subject matter of the investigation."  The search protocol is largely irrelevant

because the Warrant did not incorporate the Affidavit, but it is significant because it at least

provided some information to the magistrate judge about the types of methods the Government

contemplated using.  Thus, while the suggested protocol is not perfect, it is comprehensive and is

far more than the Constitution required.  Accordingly, the Court finds no infirmity in the Warrant

on the basis of an inadequate computer search protocol.

Regarding the Defendants' claims of lack of particularity and overbreadth as to paragraph

17, the Court notes that this paragraph can be read to restrict the search of computers to the

"information described above [i.e., the other paragraphs in the Warrant], as well as drafts and

final versions of documents and correspondence prepared in connection with the running and

supervision of the operations of the investment advisory business."  The latter phrase is too

broad, but is easily excised.  The remaining portions of the paragraph survive to the extent they

are limited to the items adequately particularized in the other paragraphs, including those severed

as described above, in the Warrant.  Accordingly, the motion to suppress, in their entirety, all

electronic materials described in paragraph 17 is denied.[23]

C.  The Subpoena

1.  The Purpose of the Subpoena

a.  The Grand Jury's Broad Subpoena Power

Defendants move to quash the Subpoena issued at Amerindo's request during the execution of the search on May 26, 2005.  In considering this question, some basic principles governing grand jury investigations are worth noting.

The grand jury "occupies a unique role in our criminal justice system," *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991), and is a "constitutional fixture," which is "[r]ooted in long centuries of Anglo-American history."  *United States v. Williams*, 504 U.S. 36, 47 (1992). The Supreme Court long ago described the grand jury as a "grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation."  *Blair v. United States*, 250 U.S. 273, 282 (1919).  "All are agreed that a grand jury has both the right and the duty to inquire into the existence of possible criminal conduct."  *Marc Rich & Co. v. United States*, 707 F.2d 663, 665 (2d Cir. 1983).  Indeed, a "grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.'"  *Branzburg v. Hayes*, 408 U.S. 665, 701 (1972) (quoting *United States v. Stone*, 429 F.2d 138, 140 (2d Cir. 1970)).

The "scope of the grand jury's broad investigative powers is aptly described by the

---

[23]This ruling applies as well to the objections regarding the identical paragraph in the U.K. search warrants.

'longstanding principle that the public has . . . the right to every man's evidence.'" *In re Grand Jury Subpoena Dated Aug. 9, 2000*, 218 F. Supp. 2d 544, 551 (S.D.N.Y. 2002); *see also In re Grand Jury Proceedings*, 219 F.3d 175, 186 (2d Cir. 2000) ("'[N]owhere is the public's claim to each person's evidence stronger than in the context of a valid grand jury subpoena.'" (quoting *In re Sealed Case*, 676 F.2d 793, 806 (D.C. Cir. 1982))).  Thus, the grand jury "may 'inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred.'" *In re Grand Jury*, 286 F.3d 153, 159 (3d Cir. 2002) (quoting *R. Enters.*, 498 U.S. at 297).  "A grand jury subpoena is thus much different from a subpoena issued in the context of a prospective criminal trial, where a specific offense has been identified and a particular defendant charged." *R. Enters.*, 498 U.S. at 297.  "[T]he identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning." *Blair*, 250 U.S. at 282.[24]

The grand jury "belongs to no branch of the institutional Government, serving as a kind of buffer or referee between the Government and the people." *Williams*, 504 U.S. at 47.  Consistent with this notion, courts exercise limited control over the grand jury's proceedings and "extend great deference to this historic institution and its broad powers." *In re Grand Jury*, 286 F.3d at 159.  As the Supreme Court has observed, "[g]iven the grand jury's operational separateness from its constituting court, it should come as no surprise that [the courts] have been

---

[24]The leeway given to the grand jury to issue subpoenas extends to prosecutors who are conducting an investigation on behalf of the grand jury. *See First Nat'l Bank of Tulsa v. U.S. Dep't of Justice*, 865 F.2d 217, 220 (10th Cir. 1989) ("[A] United States Attorney has the authority to obtain a blank grand jury subpoena form, fill in the blanks, and serve the subpoena without the authorization (or even knowledge) of the grand jury." (citing *United States v. Kleen Laundry*, 381 F. Supp. 519 (E.D.N.Y. 1974))).

reluctant to invoke the judicial supervisory power as a basis for prescribing modes of grand jury procedure." *Williams*, 504 U.S. at 49-50.  Thus, the "grand jury process is marked by '1) its independence from the court's supervision; 2) its broad investigatory powers; 3) the presumption of validity accorded its subpoena; 4) the secrecy of its proceedings; and 5) its general freedom from procedural detours and delays.'"  *In re Grand Jury Subpoena Dated Aug. 9, 2000*, 218 F. Supp. 2d at 550 (quoting *Whitehouse v. U.S. Dist. Court for the Dist. of R.I.*, 53 F.3d 1349, 1357 (1st Cir. 1995)); *see also United States v. Dionisio*, 410 U.S. 1, 17 (1973) ("Any holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws.").

The investigatory powers of the grand jury, of course, are not limitless:  "Grand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass."  *R. Enters.*, 498 U.S. at 299.  Nor, for example, may the grand jury's work violate an individual's rights under the Fourth and Fifth Amendments.  *See Calandra*, 414 U.S. at 346.  The grand jury's subpoena authority is further circumscribed by Fed. R. Crim. P. 17(c), which permits a court to quash a grand jury subpoena when compliance therewith would be "unreasonable or oppressive."

### b.  The Subpoena Was Not Issued for an Improper Purpose

Defendants summarily contend that the Government seeks the subpoenaed information for the improper purpose of collecting evidence for trial.  As Defendants correctly note, it is "improper for the Government to use the grand jury for the sole or dominant purpose of preparing for trial under a pending indictment."  *United States v. Leung*, 40 F.3d 577, 581 (2d

Cir. 1994); *accord United States v. Dardi*, 330 F.2d 316, 326 (2d Cir. 1964).  However, "[b]ecause a presumption of regularity attaches to grand jury proceedings, a defendant seeking to exclude evidence obtained by a post-indictment grand jury subpoena has the burden of showing that the Government's use of the grand jury was improperly motivated."  *Leung*, 40 F.3d at 581. Other than a conclusory declaration that "[e]nforcement of the subpoena now will only serve to provide the government with evidence for use at trial" (Vilar Post-Hr'g Mem. 55), Defendants make no showing whatsoever that the Subpoena was issued primarily for the improper purpose of trial preparation.  Indeed, the claim borders on frivolous, as the Subpoena was issued before any indictment was filed.  *See Leung*, 40 F.3d at 581 (upholding subpoena even though it was issued five weeks after indictment was filed); *cf. In re Grand Jury Subpoena Duces Tecum Dated Jan. 12, 1985*, 767 F.2d 26, 29-30 (2d Cir. 1985) (quashing grand jury subpoena where grand jury subpoena was substituted for a trial subpoena which "was served solely for evidentiary purposes").  While the precise contours of the investigation are not known to the Court, it is clear from the sequence of events, and from unchallenged representations from the Assistant United States Attorneys handling the case that, even to this day, the investigation is a work in progress, and was in its early stages on May 26, 2005.  This investigation involves suspicions of financial fraud potentially involving other Amerindo investment products and clients.  Thus, the fact that the Government has yet to receive the information subpoenaed is not a reflection of the sole (or primary) desire to obtain trial evidence from the Subpoena, but the delays attendant in the filing of the motion to quash.[25]  Defendants therefore have failed to meet their burden of demonstrating

---

[25]The Court rejects the Government's claim that the motion to quash was untimely. While somewhat late in the game, the objection came after Defendants' counsel took a reasonable amount of time to study the validity, or lack thereof, of both the Warrant and the

that the Subpoena was issued for an improper purpose and the Subpoena will not be quashed on this ground.

c.  The Subpoena Was Not an Improper Extension of the Search

Defendants further argue that "the subpoena was an extension of an illegal search and therefore must be quashed."  (Vilar Post-Hr'g Mem. 51-55.)  In Defendants' view, "[p]ermitting the Government to effectively side-step [an illegal search] through enforcement of the Amerindo U.S. subpoena would completely eviscerate the protections the Fourth Amendment and the related exclusionary rule were intended to confer," and therefore the subpoena must be quashed. (*Id.* at 54.)  This argument is devoid of both factual and legal support.

Defendants assert that the Government issued the Subpoena in an effort to protect itself from what it knew was an illegal search.  However, the facts simply do not support this claim. Instead, it is clear that the issuance of the Subpoena did not stem from illicit motives.  As the Court has found, the idea of a subpoena was first proposed by Mr. Licker, counsel for Amerindo U.S., not by the Government.  Indeed, AUSA Litt had never considered using a subpoena prior to Mr. Licker's suggestion, as evidenced by the fact that only after his discussion with Mr. Licker did AUSA Litt seek the guidance of his supervisor in the Securities and Commodities Fraud Unit.  (Tr. 92-93, May 31, 2006.)[26]  From the supervisor's (and AUSA Litt's) standpoint, the

---

Subpoena.  Given the depth of these issues, let alone the case in general, the Court finds that Defendants did not unreasonably delay the filing of their motion.  Indeed, as the Court has remarked on several occasions, counsel for both sides have diligently worked to advance this case, even in the face of an extraordinary volume of materials and numerous complex legal issues.

[26]This is corroborated by the evidence from AUSA Litt's hard drive, which shows that he did not create the first version of the Subpoena until late in the morning of May 26, 2005, several hours after the search of Amerindo's office had begun.

Subpoena was advisable not to cure any defects in the Warrant, but to provide an added incentive

to Amerindo to provide the sought-after materials and to obtain materials that may have been

missed during the search.  The extensive hearing testimony made clear that the Government

officials involved in the preparation of the warrant application, as well as those who carried out

the search, firmly believed, and still firmly believe, in the Warrant's legality.[27]  Counsel for

Amerindo said nothing to disabuse the Government officials of this view during the execution of

the search.

The fact that the Subpoena may have enabled the Government to discontinue the search

of the Amerindo offices – the very result sought by counsel to Amerindo – does not render it

improper.  If nothing else, AUSA Litt's willingness to trust counsel for Amerindo (something

that in hindsight he might be regretting), and wait at least three weeks for the subpoenaed

materials (the subpoena was returnable on June 16, 2005), shows that he did not intend to use the

Subpoena as an improper means of gaining immediate access to Amerindo's offices and

circumvent the probable cause requirement necessary to obtain the search warrant.  Thus, there is

nothing to Defendants' suggestion that denial of the motion to quash will allow the Government

to "sidestep" the requirements of the Fourth Amendment.  To enter the Amerindo offices without

alerting the targets of its investigation, the Government needed to convince a United States

Magistrate Judge that there was probable cause that they would find evidence of a crime.  A

subpoena is simply not an equivalent investigative tool; it is far less intrusive and thus need not

---

[27]On this point, it bears noting that in its initial response to Defendants' motions to
suppress the search, the Government made no mention of the Subpoena as a means of defeating
the motion.  Thus, contrary to the Defendants' insinuations, it is beyond dispute that the
Government has never viewed the Subpoena as some sort of an insurance policy against a shaky
warrant.

be bolstered by a finding, *ex ante*, of probable cause, and it does not provide the same tactical advantage to investigators.  Simply put, while the Government need not have run the Subpoena by a judicial officer, service of it may not, by itself, have been as effective a means of procuring the sought-after materials.  Here, the Government first sought a warrant which, in the Court's view, entitled the Government to be in Amerindo's offices (even if not to look for all the items listed in the Warrant Rider), and then issued the Subpoena at the request of Amerindo's experienced counsel (and after determining that it would advance the investigation).  Accordingly, Defendants' claim that the Government intended to use the Subpoena to insure against a suppression motion is factually wanting.

Defendants' claim also finds no ally in the law.  The primary case cited by Defendants in support of their position is *United States v. Eng*, 971 F.2d 854 (2d Cir. 1992).  In *Eng* – which addressed a motion to suppress the fruits of a search, not a motion to quash a subpoena – the Second Circuit held that the Government could not rely on a subpoena issued after an illegal search in order to establish the "inevitable discovery" exception to the exclusionary rule.  *Id.* at 860-61.  The decision in *Eng* was motivated by a concern that a subpoena might "serve as an after the fact 'insurance policy' to 'validate' an unlawful search under the inevitable discovery doctrine."  *Id.* at 861.  However, noting that the "subpoena power . . . serves important purposes as an investigative tool and as a method of obtaining evidence," the Second Circuit explicitly rejected a proposed *per se* rule under which the Government would never be permitted to rely on a subsequent subpoena to make out the inevitable discovery exception.  *Id.* at 860.  Thus, at best, *Eng* supports a case-by-case analysis into whether a subpoena was issued for improper purposes.  As discussed above, the Court finds that there is no basis whatsoever for finding that the

Government had an improper motive for issuance of the Subpoena here.  Indeed, the Government, consistent with its obligations to investigate a suspected crime, merely followed the suggestion of Amerindo's counsel, who himself had expressed no objection to the Search Warrant, in serving the Subpoena when it did.

Even if the Court found that the Subpoena was intended to be, even in part, a hedge against a potentially illegal search, it is questionable whether *Eng* is applicable, beyond the realm of the inevitable discovery doctrine, to a motion to quash a subpoena.  In fact, other courts have held that the issuance of even a forthwith subpoena at or near the time of a court-ordered search is no basis to quash the subpoena.  *See, e.g., In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 854 (9th Cir. 1991) (rejecting the "novel proposition" that a subpoena served at the same time as a search was executed should be quashed on the basis that it was the "functional equivalent" of the search warrant).  And the Supreme Court has made clear that there is no probable cause requirement that the grand jury must meet before issuing a subpoena.  *See R. Enters.*, 498 U.S. at 297 ("[T]he Government cannot be required to justify the issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause because the very purpose of requesting the information is to ascertain whether probable cause exists.").  Thus, the twin pursuits of a grand jury subpoena and a court-ordered search, especially where, as here, the Subpoena gives the recipient at least several weeks to comply, is not by itself unreasonable and therefore does not implicate the Fourth Amendment.  *See United States v. Comprehensive Drug Testing, Inc.*, 473 F.3d 915, 930 (9th Cir. 2006) ("We are aware of no authority that the simultaneous pursuit of search warrants and subpoenas in aid of an ongoing grand jury investigation constitutes a violation of the Fourth Amendment."); *In re Grand Jury Subpoenas*

*Dated Dec. 10, 1987*, 926 F.2d at 854 ("Subpoenas are not search warrants.  They involve

different levels of intrusion on a person's privacy. . . . Furthermore, the person served with a

subpoena determines whether he will surrender the items identified in the subpoena or challenge

the validity of the subpoena prior to compliance."); *United States v. Triumph Capital Group,*

*Inc.*, 211 F.R.D. 31, 54 (D. Conn. 2002) (holding that issuance of forthwith subpoena did not

impinge on the Fourth Amendment where there was no coercion or compulsion).[28]  This rule is

unchanged by the mere fact that the subpoena accompanies what proves to be an invalid search

warrant.  *See In re Grand Jury Proceedings*, 115 F.3d 1240, 1244 (5th Cir. 1997) ("[E]ven if the

search warrant was defective, there is no probable cause requirement for the issuance of a grand

jury subpoena.  Issues of probable cause relate solely to the validity of the search warrant, not the

subpoenas.").  As the Ninth Circuit, in rejecting the same claim made by Defendants here, held

just a few months ago:

> The subpoenas were not returnable on the same day that the search
> warrants were executed. . . . [T]he return dates on the subpoenas
> were over a month from the dates on which the warrants were
> executed.  The district court declared the May 6 subpoenas an
> "unreasonable insurance" policy, but it failed to recognize the
> different purposes and requirements of the warrant as compared to
> the subpoena and the legitimate concern that production of relevant
> evidence to the grand jury would be unduly delayed.  It was error to
> conflate the distinct tools.  Insurance it may have been; but, under
> the Fourth Amendment, unreasonable it was not.

*Comprehensive Drug Testing*, 473 F.3d at 941-42.  Accordingly, Defendants' effort to quash the

subpoena on the claim that it was an improper extension of the search warrant is rejected.

---

[28]*See also Dionisio*, 410 U.S. at 9 ("It is clear that a subpoena to appear before a grand
jury is not a 'seizure' in the Fourth Amendment sense, even though that summons may be
inconvenient or burdensome.").

2.  As Modified, the Subpoena is Reasonable

a. General Principles

Defendants also argue that the subpoena should be quashed because it is unreasonable.

According to Defendants, the Court has the authority to quash an "unreasonable" subpoena under

both Rule 17(c) and the Fourth Amendment.  It cannot be disputed that a grand jury subpoena

*duces tecum* must be reasonable, as the Supreme Court has repeatedly affirmed.  *See R. Enters.*,

498 U.S. at 299 (Rule 17(c) requires that grand jury subpoenas be reasonable); *United States v.*

*Morton Salt Co.*, 338 U.S. 632, 652 (1950) (finding an administrative subpoena valid because

"the demand is not too indefinite and the information sought is reasonably relevant"); *Oklahoma*

*Press Pub. Co. v. Walling*, 327 U.S. 186, 208-09 (1946) (holding that while subpoenas are not

searches or seizures under the Fourth Amendment, they must be "reasonable").  The trajectory of

the Supreme Court's application of the Fourth Amendment as a basis to limit the grand jury's

subpoena power, however, has been uneven at best.  Initially, the Supreme Court held that court-

ordered production of "private papers" violated the Fourth Amendment (and the Fifth

Amendment).  *See Boyd v. United States*, 116 U.S. 616, 621-22 (1886).[29]  Just two decades later,

the Supreme Court re-considered this view and held "it quite clear that the search and seizure

clause of the 4th Amendment was not intended to interfere with the power of the courts to

compel, through a *subpoena duces tecum*, the production upon a trial in court, of documentary

evidence."  *Hale v. Henkel*, 201 U.S. 43, 73 (1906).  Nonetheless, the Fourth Amendment was

deemed not to tolerate an "unreasonable" subpoena, which in *Hale* included a subpoena that was

---

[29]"The Fourth Amendment portion of the *Boyd* decision was surely not based on the
overbreadth of the Government's demand; the Government sought only a single invoice of
unquestionable relevance."  *In re Horowitz*, 482 F.2d 72, 75 (2d Cir. 1973).

"far too sweeping in its terms." *Id.* at 76. Four decades later, the Supreme Court suggested yet

another shift in its view. In *Oklahoma Press*, Justice Rutledge "raised doubts whether the Fourth

Amendment was properly applicable to judicial enforcement of subpoenas at all." *Horowitz*, 482

F.2d at 77 (citing *Oklahoma Press*, 327 U.S. at 195). In the end, Justice Rutledge concluded that

"the Fourth [Amendment], if applicable, at the most guards against abuse only by way of too

much indefiniteness or breadth in the things required to be 'particularly described.'" *Oklahoma

Press*, 327 U.S. at 208. Three decades later, the Supreme Court, in a pair of cases which dealt

with the legality of subpoenas that required voice and handwriting exemplars, held that a

personal appearance subpoena was not a "'seizure' under the Fourth Amendment." *Dionisio*,

410 U.S. at 9; *United States v. Mara*, 410 U.S. 19, 21 (1973). The Court also held that the

"Government was under no obligation . . . to make a preliminary showing of 'reasonableness.'"

*Mara*, 410 U.S. at 22. According to Judge Friendly, *Dionisio* and *Mara*, "and the reasoning

behind them, suggest that the Court may be moving toward the position . . . strongly intimated in

[*Oklahoma Press*] that restriction on overbroad *subpoenas duces tecum* rests not on the Fourth

Amendment but on the less rigid requirements of the due process clause." *Horowitz*, 482 F.2d at

79; *see also* Floralynn Einesman, *Vampires Among Us – Does a Grand Jury Subpoena For

Blood Violate the Fourth Amendment?*, 22 Am. J. Crim. L. 327, 345 (1995) (noting that the

Supreme Court has indicated that certain subpoenas may not implicate the Fourth Amendment).[30]

---

[30]Of course, this analysis may not exclude the applicability of the Fourth Amendment to
subpoenas that, for example, call for bodily invasions such as the taking of blood or saliva. *See*
Einesman*, supra*, at 345-71; *see also Schmerber v. California*, 384 U.S. 757, 767 (1966); *Henry
v. Ryan,* 775 F. Supp. 247, 253-56 (N.D. Ill. 1991) (holding that extraction of saliva samples
pursuant to a grand jury subpoena constituted a "search" under the Fourth Amendment).

"However great the intellectual interest of this question," *Horowitz*, 482 F.2d at 79, the Supreme Court has made clear that Rule 17(c) itself imposes a reasonableness requirement on the grand jury's subpoena power. *See R. Enters.*, 498 U.S. at 299; *see also In re Rabbinical Seminary Netzbach Israel Ramailis*, 450 F. Supp. 1078, 1084 (E.D.N.Y. 1978) ("Whether limitations on the scope of the grand jury subpoena power stem from the Fourth Amendment, the Due Process clause of the Fifth Amendment, or Rule 17 of the Federal Rules of Criminal Procedure presents an interesting question which the court need not decide."). Reasonableness, not surprisingly, is context specific. *See R. Enters.*, 498 U.S. at 299. To determine what is reasonable in each case, courts evaluate whether: (1) the materials demanded by the subpoena are relevant to the subject matter of the grand jury's investigation; (2) the subpoena describes the materials to be produced with reasonable particularly; and (3) the subpoena requires production of records reasonably limited in time so that compliance is not unduly burdensome or oppressive. *See Horowitz*, 482 F.2d at 79; *In re Grand Jury Proceedings*, 857 F.2d 707, 709 (10th Cir. 1988); *Rabbinical Seminary*, 450 F. Supp. at 1084; *In re Grand Jury Subpoena Duces Tecum Addressed to Provision Salesmen and Distribs. Union*, 203 F. Supp. 575, 578 (S.D.N.Y. 1961). Because of the presumptive validity of duly issued grand jury subpoenas, "the burden of showing unreasonableness must be on the recipient who seeks to avoid compliance." *R. Enters.*, 498 U.S. at 301. Only in the "clearest case of abuse," should a court disrupt the "inquisitorial power of the grand jury." *In re Grand Jury Proceedings*, 857 F.2d at 709; *see also In re Grand Jury Subpoenas Duces Tecum Addressed to Certain Exec. Dir. of the M.G. Allen & Assocs.*, 391 F. Supp. 991, 1000 (D.R.I. 1975) (noting that a court should quash a subpoena only in the "most extreme case of a clear showing of unreasonableness" (internal quotations omitted)).

87

b.  Relevance

Defendants argue that the Subpoena should be quashed because it seeks information that is not relevant to the grand jury's investigation.  To prevail on this claim, Defendants "must carry the burden of showing that the information sought bears 'no conceivable relevance to any legitimate object of investigation by the federal grand jury.'"  *In re Liberatore*, 574 F.2d 78, 83 (2d Cir. 1978) (quoting *In re Morgan*, 377 F. Supp. 281, 284 (S.D.N.Y. 1974)); *see also R. Enters.*, 498 U.S. at 301 (noting that while grand juries "are not licensed to engage in arbitrary fishing expeditions," a subpoena will be upheld as relevant unless "there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation"); *In re Grand Jury Subpoena Duces Tecum to John Doe Corp.*, 570 F. Supp. 1476, 1480 (S.D.N.Y. 1983) (noting that challengers to a subpoena bear the burden of "com[ing] forward with enough information to prove that it is unlikely that the materials sought are relevant to the investigation").  Thus, the Government need not "demonstrate the relevance of each particular document."  *Rabbinical Seminary*, 450 F. Supp. at 1084 n.4.  If the Government has any burden, it is "merely a showing that each general category of subpoenaed documents bears some possible relationship to said grand jury investigation."  *M.G. Allen*, 391 F. Supp. at 998.

The thrust of Defendants' claim is that to the extent the subpoena calls for production of virtually every corporate document, it far exceeds the "parameters" of the Indictment.  (Vilar Post-Hr'g Mem. 57.)  While a blanket demand for all corporate records could very well be unreasonably beyond the scope of a grand jury's investigation, *see In re Subpoena to Testify Before Grand Jury Numbered S286-4-7*, 630 F. Supp. 235, 237 (N.D. Ind. 1986), there is no per

88

se rule proscribing such a subpoena. *See In re The August, 1993 Regular Grand Jury*, 854 F.

Supp. 1392, 1401 (S.D. Ind. 1993) ("[T]hree years of corporate records, even assuming every

record of the corporation is subpoenaed (and these records are relevant to the investigation) is not

unreasonable in light of the subjects of the investigation – wire and mail fraud, money

laundering, and medicare and medicaid fraud.").  The keystone of the analysis is not the quantity

of the documents sought, nor the link between the grand jury's demands and the charges

ultimately brought, but the potential connection between the materials requested and the

investigation at the time the subpoena is issued. *See Provision Salesmen*, 203 F. Supp. at 579

("The rules governing the subpoena duces tecum must be applied realistically.  Whether a crime

has been committed, who has committed it and what the crime is are normally determined at the

end of the grand jury's proceedings, and not at the beginning.").  Thus, viewing the relevance of

the subpoena in this case based on what charges have thus far been brought is akin to saying that

hindsight is 20-20.  Similarly, it is of no import that the subpoena largely tracks the Rider to the

Search Warrant, even if the latter is overbroad and insufficiently particularized in certain parts,

because the reasonableness of the Subpoena is not measured by probable cause. *See R. Enters.*,

498 U.S. at 300.

     Viewed at the time the Subpoena was issued, and leaving aside the question of whether

there was probable cause supporting the various items listed in both the Warrant and the

Subpoena, it seems unarguable that the investigation into Amerindo (as of May 2005) included

the following topics:  (1) misrepresentations regarding the Rhodes Capital and SBIC

investments; (2) refusal to redeem millions of dollars of investments of at least two groups of

long-time Amerindo clients (Cates and the Mayers); (3) misrepresentations regarding the

GFRDA investments; (4) misrepresentations regarding which Amerindo entity was responsible for certain investments for at least one long-term client; (5) the use of Amerindo U.S., Amerindo U.K., and Amerindo Panama to carry out some of these schemes; (6) theft of investors' money and improper transfer and use of that money by two of Amerindo's principals and founders; (7) suspicions that at least three investors (other than the two groups of long-time investors described above) had difficulty redeeming their investments; (8) use of brokerage and off-shore accounts to carry out some of the above-described schemes; (9) misrepresentations to the SEC about some of the above-described schemes; and (10) forgery of the signature of at least one of the long-time investors.  Furthermore, while most of the alleged illegal conduct occurred within three to fours years of the issuance of the Subpoena, some conduct allegedly dates back to the time when the two long-time investors (Cates and Mayers) first began their investments with Amerindo.

It is true, as noted above, that the Subpoena mirrors the Rider to the Warrant, and that fairly construed, both the Subpoena and the Search Warrant seek virtually every corporate document of the Amerindo entities.  However, this does not mean that even most of the categories sought in the Subpoena are irrelevant.  Thus, while Defendants meet their burden of showing the irrelevance of some of the categories of documents sought by the Subpoena, they fail to invalidate the Subpoena as a whole.  To begin, paragraph II.A of the Subpoena, which mirrors the broad paragraph one of the Warrant, calls for all corporate records of the Amerindo entities, "including but not limited to" several categories of documents.  Among those documents requested are documents "concerning the formation of each of the . . . Amerindo entities," as well as documents listing the "principles, officers, directors and employees" of the Amerindo entities, and documents reflecting "changes in ownership, bylaws, [and] resolutions."  Given that

the grand jury suspected at least some fraud going back nearly twenty years by at least two of the

principals and founders of Amerindo, Defendants cannot say that these documents have "no

conceivable relevance" to the investigation.  Moreover, Defendants' alleged attempts to mislead

Cates as to which Amerindo was managing her investments makes these documents highly

relevant.  Paragraphs II.B, II.C, II.D, II.E, II.F, II.G, II.H, II.I, II.J, II.K, II.L, II.P, II.Q, II.R, II.S,

and II.T all are relevant to the investigation as they either:  (1) mention by name the investment

vehicles under scrutiny or the investors believed to have been the victims of Defendants'

suspected fraud; (2) relate to suspect conduct by Vilar or Tanaka; or (3) relate to data storage

equipment that might reasonably contain information relevant to the investigation.  With respect

to these paragraphs, Defendants have failed to demonstrate the irrelevance of the documents

requested, but, as detailed below, the Court believes that some of these paragraphs should

nevertheless be modified so as to include a temporal limit on the documents to be produced.

Other paragraphs should be limited to sub-categories to limit them to what could conceivably be

relevant to the investigation.  Thus, the requests in paragraphs II.A, II.D, and II.E for "investment

brochures" and "marketing materials" are too broad and are hereby excised.  Similarly too broad

are the requests for all correspondence between Amerindo and all of its clients in paragraph II.A.

Furthermore, beyond the scope of the investigation are the extensive requests in

paragraphs II.M., II.N., and II.O for items such as all bank account statements, copies of checks,

and documents for "any current or former Amerindo client that had a direct or indirect interest in

the Amerindo Brokerage Accounts," as well as the request in paragraph II.X for documents

"related to any financial activity of Amerindo."  These paragraphs must be excised in their

entirety.  Also too broad are paragraphs II.U and II.V, in their entirety, as they seek all documents

related to broad categories of Amerindo clients.

### c.  Particularity

A finding of relevance does not end the inquiry, however.  A subpoena may be quashed or modified pursuant to Federal Rule of Criminal Procedure 17(c)(2) if the subpoena fails to identify with particularity the documents to be produced.  *See Oklahoma Press*, 327 U.S. at 209 ("[T]he requirement is reasonableness, including particularity in describing the place to be searched, and the persons or things to be seized." (internal quotations omitted)); *In re Subpoena Duces Tecum*, 228 F.3d 341, 347 (4th Cir. 2000) ("Articulating a standard for evaluating whether an administrative subpoena satisfies the Fourth Amendment, the Supreme Court has stated that the subpoena must be 'sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.'" (quoting *See v. City of Seattle*, 387 U.S. 541, 544 (1967))); *Horowitz*, 482 F.2d at 77 ("The requirement of reasonableness, including particularity in 'describing the place to be searched, and the persons or things to be seized,' also literally applicable to warrants, comes down to specification of the documents to be produced adequate, but not excessive, for the purposes of the relevant inquiry.").

This inquiry "cannot be reduced to a formula; for . . . adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry." *Oklahoma Press*, 327 U.S. at 209; *see also In re Subpoena Duces Tecum*, 228 F.3d at 347 (same); *Horowitz*, 482 F.2d at 77 ("[S]pecification of the documents to be produced [must be] adequate, but not excessive, *for the purposes of the relevant inquiry*." (emphasis added)); *Provision Salesmen*, 203 F. Supp. at 578 ("What is required by way of particularity in describing the things which must be produced is specification of the documents to be produced adequate,

but not excessive, for the purposes of the relevant inquiry." (internal quotations omitted)). Applying this case-by-case approach, courts have held, for example, that greater particularity is required where the documents sought were not restricted by a time frame. *See, e.g., United States v. Law Firm Z*, 857 F.2d 707, 709 (10th Cir. 1988) ("Because the requested papers were fairly recent, less specificity was required."); *Provision Salesmen*, 203 F. Supp. at 578-79 ("[A]s the period of time covered by the subpoena lengthens, the particularity with which the documents are described must increase.").

Although much of the Subpoena is sufficiently particular, several paragraphs are imprecise to the point where compliance with the subpoena would be difficult.  Setting aside for the moment the paragraphs dealing with electronic material, the Court finds that the Paragraphs II.A, II.D, II.E, II.K, and II.P must be modified, and that Paragraphs II.U, II.V, and II.X must be excised on this ground (above and beyond the relevance objection).  Addressing these in turn, paragraph II.A should be modified to exclude the requests for everything except the corporate governance documents ("records concerning the formation of each of the above-listed Amerindo entities, its shareholders, principals, officers, directors, and employees, changes in ownership, bylaws, [and] resolutions").  Paragraph II.D and II.E should be modified to exclude the demand for "investment brochures" and "marketing materials," as those are hardly well-defined (or relevant beyond those given to the named victims), and Paragraphs II.K and II.P should be limited only to Vilar and Tanaka.

Paragraphs II.U and II.V may be addressed together.  II.U calls for "[d]ocuments related to current and former Amerindo clients, other than those records that pertain solely to any publicly traded Amerindo mutual fund."  II.V seeks "[i]nvestment documents and records related

to current and former Amerindo clients, other than those records that pertain solely to any publicly traded Amerindo mutual fund." Looked at together, the lack of particularity is apparent. Under the plain meaning of the two paragraphs, the documents sought in II.V are merely a subset of those identified in II.U. Presented with two such broad, redundant and unspecific requests, Amerindo would be hard pressed to understand what is required of it "with enough precision to make compliance with the subpoena possible." *Provision Salesmen*, 203 F. Supp. at 578. And if these paragraphs are read in their broadest sense, the burden involved in producing every document "related to" an Amerindo client, without time limitation, would be immense. Finally, paragraph II.X calls for documents "related to any financial activity of Amerindo." Like the sweeping phrase "related to . . . Amerindo clients," the phrase "related to any financial activity" is fatally imprecise, particularly in the context of a large *financial* institution. Moreover, in that context, the extent of the documents that might be encompassed by this request is so broad as to be unduly burdensome.

The remaining paragraphs seek relevant documents and are both reasonable and sufficiently particular given the nature of the investigation. The result is a broader set of documents than that permissible under the severed Warrant. Such a result is unsurprising, however, given the more relaxed relevancy requirements applied in evaluating a subpoena. Thus, as one example, although the warrant application did not present probable cause to seize documents related to Harvey, Urich, and Marcus, these individuals were nonetheless relevant objects of the grand jury investigation and therefore appropriate subjects of the Subpoena. The same logic applies to the other paragraphs that were redacted from the Warrant but approved in the Subpoena.

d.  Burdensomeness

A subpoena also may be quashed or modified pursuant to Federal Rule of Criminal Procedure 17(c)(2) if compliance therewith would be overly burdensome.  *See Horowitz*, 482 F.2d at 77 ("The requirement of reasonableness, including particularity in 'describing the place to be searched, and the persons or things to be seized,' also literally applicable to warrants, comes down to specification of the documents to be produced adequate, but not excessive, for the purposes of the relevant inquiry.").  The burden of compliance often derives from the time period covered in the subpoena.  *See Provision Salesmen*, 203 F. Supp. at 578 ("The subpoena may order the production of records covering only a reasonable period of time.").  With respect to the burdensomeness inquiry, before a movant may seek to quash a subpoena on this basis, courts may require the movant to first seek "reasonable conditions from the government to ameliorate the subpoena's breadth."  *In re Subpoena Duces Tecum*, 228 F.3d at 349; *see also Morton Salt Co.*, 338 U.S. at 653 ("Before the courts will hold an order seeking information reports to be arbitrarily excessive, they may expect the supplicant to have made reasonable efforts before the Commission itself to obtain reasonable conditions.").  The Government argues that because no such application was made here, "Defendants' motion to quash must fail."  (Gov't Post-Hr'g Mem. 50.)  However, the requirement that a movant first seek to modify the subpoena before moving to quash is applied at the discretion of court.  *See Morton Salt Co.*, 338 U.S. at 653 (stating that courts "*may* expect the supplicant to have made reasonable efforts" to modify the subpoena (emphasis added)).  And strict application of this requirement would be inappropriate here, where:  (1) the movants were not themselves the subpoenaed party and were therefore not directly in a position to seek modification of the subpoena; and (2) Amerindo had already shut its

doors and thus faced no further threat that compliance with the Subpoena would be so

burdensome as to "put a stop to the business," a consideration that the Supreme Court has

stressed.  *Horowitz*, 482 F.2d at 79 (quoting *Henkel*, 201 U.S. at 76-77).

   This is not to say, however, that Amerindo's initial failure to object to the breadth of the

subpoena, let alone the Defendants' six-month delay before moving to quash, is irrelevant to this

inquiry.  Rather, the failure to object is some evidence that counsel for Amerindo U.S. did not in

fact find the subpoena burdensome.  Nevertheless, looking at the totality of the circumstances,

the Court finds that the Subpoena here, in its entirety, was unduly burdensome.  As noted, the

Subpoena called for the production of every business record possessed by Amerindo U.S., a

company that managed $1.2 billion in assets, and nowhere does the Subpoena contain any

restrictions based on time frame.  *See Law Firm Z*, 857 F.2d at 709 ("[P]roduction of records

covering only a reasonable period of time may be required.").  In fact, the Subpoena's broadest

paragraphs make no restrictions even as to content.  While it cannot be said that the Subpoena

sought wholly irrelevant documents, given the relatively well-defined focus of the Government's

investigation and the resulting indictments, a number of paragraphs in the Subpoena were

nevertheless "excessive."  *In re Subpoena Duces Tecum*, 228 F.3d at 349.

   Under the circumstances, however, it is more appropriate to modify the Subpoena than to

quash it.  *See In re Grand Jury Subpoena Duces Tecum Addressed to Corrado Bros., Inc.*, 367 F.

Supp. 1126, 1132 (D. Del. 1973) ("Only in the most extreme case of a clear showing of

unreasonableness, of Government abuse of power, will the Court be induced to quash an

otherwise valid grand jury subpoena on the basis that it was overly burdensome.").  It must be

remembered that the grand jury's investigation included financial fraud and misuse of client

funds involving long-time clients over several years.  Accordingly, the grand jury is properly

given some leeway to seek documents pre-dating the earliest known fraud, as well as documents

that may enlighten the grand jury about other potential fraud victims.  *See In re the August 1993*

*Regular Grand Jury*, 854 F. Supp. at 1401 (holding that subpoena demanding "airplane, real

estate and vehicle records" not unduly burdensome in investigation of suspected wire and mail

fraud and money laundering); *Rabbinical Seminary*, 450 F. Supp. at 1085 n.5 ("That some of the

requested documents are so old as to be beyond the potentially applicable statute of limitations

does not render the subpoena unreasonable.").

      As noted, courts permit the severance of invalid portions of search warrants under certain

circumstances.  *See Sells*, 463 F.3d at 1155 (noting unanimity among federal courts to permit

severance of search warrants).  With respect to subpoenas, Rule 17(c) explicitly permits a court

to "modify" the subpoena to avoid compliance that would be "unreasonable or oppressive."  *See*

*In re Subpoena to Testify Before Grand Jury Numbered S286-4-7*, 630 F. Supp. at 237.  Pursuant

to this authority, courts have modified subpoenas by category of information and by imposing a

time limit.  For example, one court has excised categories of documents "other than those

specifically set forth in the clauses following '*included but not limited to* . . . .'"  *Id.* at 237-38.

Other courts have reduced the reach of a subpoena from 18 to 10 years, *see Provision Salesmen*,

203 F. Supp. at 580, and from 23 to 7 years, *see Horowitz*, 482 F.2d at 79-80.  Here, the Court

finds it appropriate to limit the categories of information discussed above on relevance and

particularity grounds in Paragraphs II.A, II.D, and II.E,, and to require the production of

documents in Paragraphs II.D, II.E, II.J, II.L, II.W, II.Y, and II.Z only as far back as five years

before the Subpoena was issued.  All of the remaining paragraphs that the Court has not excised

completely (II.B, II.C, II.F, II.G, II.H, II.I, II.K, II.P, II.S, and II.T) are unaffected by this ruling. Of course, all of these limitations are without prejudice to the extent that the grand jury investigation is continuing and, for example, it can be established that going further back in time would be reasonable.

With respect to the two paragraphs in the Subpoena that seek the production of electronic material – paragraphs II.Q and II.R – the Court is guided by Judge Mukasey's opinion in *In re Grand Jury Subpoena 1993*. There, the subpoena was "not framed in terms of specified categories of information. Rather, it demand[ed] specified information storage devices – namely, particular computer hard drives and floppy disks that contain[ed] some data concededly irrelevant to the grand jury inquiry." *Id.* at 12. Reasoning that the object of the subpoena is properly "the various types of documents contained on these devices" rather than the devices themselves, Judge Mukasey found that the subpoena was overly broad in that it sought the production of irrelevant data. *Id.* at 12-13.

Here, the subpoena similarly seeks information storage devices. Unlike the subpoena in *In re Grand Jury Subpoena 1993*, however, the subpoena here specifies, albeit broadly, the information that is sought. Paragraph II.Q seeks "telephone numbers to and from which documents have been sent." This information is relevant to a grand jury that was investigating, among other crimes, wire fraud; and it is neither burdensome nor insufficiently particular. This paragraph will therefore not be modified.[31]

---

[31]It bears noting that while the Subpoena's scope mirrors the Warrant, it is broader in two respects. First, it contains demands not included in the Warrant, such as documents concerning the purchase of thoroughbred horses (paragraph II.T). Second, unlike the Warrant, the Subpoena's list of requested documents is not limited only to those documents found on the premises searched, but is instead addressed to Amerindo Investment Advisors Inc. Thus, if there

Paragraph II.R of the Subpoena mirrors paragraph 17 of the Warrant.  Like its Warrant counterpart, although this paragraph requires the production of "any . . . devices or equipments capable of storing data," it restricts the subsequent search of those devices to the "information described above [i.e., the preceding paragraphs in the Subpoena], as well as drafts and final versions of documents and correspondence prepared in connection with the running and supervision of the operations of the investment advisory business."  While this restriction was insufficient in the context of a warrant's requirement of probable cause, in the less stringent context of a subpoena, it adequately restricts the production to relevant documents.  Accordingly, Amerindo U.S. must produce either the storage devices described in paragraph II.R of the subpoena, or the information contained on those devices in so much as that information is responsive to the Subpoena as modified above.

D.  The U.K. Search

As outlined above, in addition to the material that was seized in the United States, a search was conducted in the United Kingdom.  Defendants move to suppress the evidence obtained in this search on three grounds.  First, Defendants claim that the U.K. search violated the Fourth Amendment because it was not supported by a warrant issued by an American judicial official, and because it otherwise was unreasonable.  Second, Defendants argue that the same misrepresentations and omissions that tainted the U.S. search invalidate the U.K. search.  Third, Defendants contend that the U.K. search is the fruit of the poisonous tree, claiming that a substantial amount of the allegations submitted to U.K. officials in support of the search request

_____

are documents responsive to the Subpoena at locations other than that searched, the Subpoena would require their production.

derived from the illegal U.S. search.

### 1.  The U.K. Warrant Complied with the Fourth Amendment

#### a.  The Applicability of the Warrant Clause to Extraterritorial Searches

Defendants claim that the U.K. search was invalid because it was not executed pursuant to a valid warrant issued by a United States judicial officer, and was otherwise unreasonable. Defendants' train of logic is as follows:  (1) American officials are required to comport their investigative activities with the Bill of Rights; (2) the Bill of Rights governs the conduct of American officials even when they operate abroad; (3) there is caselaw applying the Bill of Rights and the Fourth Amendment to extraterritorial conduct by or on behalf of American officials; and (4) because there was no warrant signed by an American judicial officer based on an individualized showing of probable cause that Defendants violated American laws, the U.K. search executed by Metropolitan Police officers at the American Government's request was "warrantless," even though it was conducted pursuant to two warrants signed by U.K. judicial officials.

The missing link in Defendants' chain is any authority holding that the Warrant Clause of the Fourth Amendment applies to extraterritorial searches conducted by, or at the request of, American Government officials.  While neither the Supreme Court nor the Second Circuit has squarely addressed the issue, the Supreme Court has strongly hinted that it takes a dim view of the suggestion that the Warrant Clause applies to extraterritorial searches.  In fact, the Supreme Court discussed the reach of the Fourth Amendment to extraterritorial searches while reversing the very case cited by Defendants in support of their claim.  The Defendants cite to the Ninth Circuit's opinion in *United States v. Verdugo-Urquidez*, 856 F.2d 1214, 1230 (9th Cir. 1988),

which stated that "we cannot relieve the government from its obligation to obtain a search warrant simply because the place to be searched by the government is outside this country.  To do so would be to treat foreign searches differently from domestic searches just because they are foreign."  While Defendants acknowledge that the Supreme Court reversed the Ninth Circuit in *Verdugo-Urquidez*, they claim that the Supreme Court did not address the above-quoted conclusion of the Ninth Circuit.

But Defendants reading of *Verdugo-Urquidez* is off the mark.  While the Court split on whether the Fourth Amendment applied to extraterritorial searches involving non-citizens, seven of the nine Justices expressly stated or implicitly agreed that the *Warrant Clause* did not apply to extraterritorial searches.  Chief Justice Rehnquist, writing for the four-Justice plurality, specifically observed that an American warrant "would be a dead letter outside the United States."  *Verdugo-Urquidez*, 494 U.S. at 274.  In his concurrence, Justice Kennedy similarly noted that the "absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials all indicate that the Fourth Amendment's warrant requirement should not apply in Mexico as it does in this country."  *Id.* at 278 (Kennedy, J., concurring).

Holding the same view as the Chief Justice and Justice Kennedy, Justice Stevens, in his concurring opinion noted that he did "not believe the Warrant Clause has any application to searches of noncitizens' homes in foreign jurisdictions because American  magistrates have no power to authorize such searches."  *Id.* at 279 (Stevens, J., concurring).  Finally, in dissent, Justice Blackmun commented that he "agree[d] with the Government . . . that an American

magistrate's lack of power to authorize a search abroad renders the Warrant Clause inapplicable to the search of a noncitizen's residence outside this country."  *Id.* at 297 (Blackmun, J., dissenting).  What all of these comments share in common is the belief that the reach of the Warrant Clause stops at the border because American magistrates lack the power to issue extraterritorial warrants.  While sometimes couched in terms of the issue presented in that case, there is not a hint in these comments that the power of magistrates to issue warrants to permit extraterritorial searches somehow exists when the search would be of an American citizen's property.  *See Bin Laden*, 126 F. Supp. 2d at 276 ("Despite El-Hage's assertions to the contrary . . . the language employed by the Justices in *Verdugo-Urquidez* who challenged overseas application of the warrant requirement does not suggest that the criticisms were limited to cases involving noncitizens.  The Justices' skeptical remarks were universally critical of the impotence of American warrants overseas and were not explicitly limited to application to noncitizens.").[32]

---

[32]Similarly off target is Defendants' claim that, in *Bin Laden*, Judge Sand "ruled that the Warrant Clause of the Fourth Amendment *applied* to searches executed by the U.S. Government against an American citizen living in Kenya."  (Mem. of Law In Support of Tanaka's Motion to Suppress Evidence Seized From The U.K. 10 ("Tanaka Mem. to Suppress U.K. Search").).  In fact, Judge Sand held that "even though the searches at issue in this case occurred in Kenya, El-Hage can bring a Fourth Amendment challenge.  However, the extent of the Fourth Amendment protection, in particular, the applicability of the Warrant Clause, is unclear." *Bin Laden*, 126 F. Supp. 2d at 270-71.

Defendants further claim that while Judge Sand held that the Government was "not required to obtain a warrant from a U.S. magistrate before searching the defendant's [Kenyan] residence," he "agreed with the defendant that the Government *was required to obtain a warrant* before conducting electronic surveillance of the defendant's telephone calls because the Government had failed to obtain authorization from the President or Attorney General."  (Tanaka Mem. to Suppress U.K. Search 10-12.)

The actual holding in *Bin Laden* was that because the Government knew its electronic surveillance would target a U.S. citizen, it was required to obtain the prior approval of the President or the Attorney General for the search to be lawful.  126 F. Supp. 2d at 281-82.  In other words, it was the failure to secure the approval of the President or the Attorney General (and not a magistrate judge) that made the electronic surveillance unreasonable under the Fourth

Since *Verdugo-Urquidez*, the Ninth Circuit has observed, "foreign searches have neither been historically subject to the warrant procedure, nor could they be as a practical matter." *United States v. Barona*, 56 F.3d 1087, 1093 n.1 (9th Cir. 1995).  The Court agrees.  First, as other courts have observed, there is no statutory basis for a magistrate judge in the Southern District of New York to issue a search warrant in a non-terrorism case targeting property even in the Eastern District of New York, let alone to issue such a warrant to be executed in London, England.  *See Bin Laden*, 126 F. Supp. 2d at 275 n.13 (noting that Rule 41(a) limits a magistrate judge's authority to issue domestic warrants, and that the Supreme Court considered but did not adopt an amendment to Rule 41 that would have permitted extraterritorial searches).[33]  Second, even if a magistrate judge took the view that he or she had such authority, as Detective Sergeant Shaw made quite clear, an American law enforcement officer would not be permitted under British law to waltz into a London premises and execute the search authorized by the American magistrate judge.  Indeed, it takes little to imagine the diplomatic and legal complications that would arise if American government officials traveled to another sovereign country and attempted to carry out a search of any kind, professing the authority to do so based on an

---

Amendment.  The failure to get such prior approval, contrary to Defendants' claim, did not require the Government to get a warrant.  Thus, the absence of a warrant in support of the electronic surveillance simply was not dispositive.  Also, it bears noting that even though the Government was deemed to have been required to get prior approval from the President or the Attorney General for the electronic surveillance, Judge Sand did not suppress the fruits of that surveillance, in part on the finding that the officials acted in the good faith belief that their actions were legal.  *Id.* at 283-84.

[33]Rule 41 was amended by the Patriot Act to permit a magistrate judge in a domestic or international terrorism case to issue a search warrant within or without that district.  *See* Fed. R. Crim. P. 41(b)(3).  However, nothing in the language of that amendment remotely suggests that the power was extended to extraterritorial searches.

American-issued search warrant.  *See Verdugo-Urquidez*, 494 U.S. at 275 ("If there are to be restrictions on searches and seizures which occur incident to . . . American action, they must be imposed by the political branches through diplomatic understanding, treaty, or legislation.").

Defendants counter by arguing that the impracticality of enforcing a constitutional right is no excuse to permit a violation of that right.  In the abstract, there is some strength to that argument.  But here we are dealing with the exclusionary rule, which is to be applied only where there is value from deterring conduct that law enforcement officers know or have reason to believe is improper.  *See United States v. Peltier*, 422 U.S. 531, 542 (1975) ("[E]vidence . . . should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."); *Michigan v. Tucker*, 417 U.S. 433, 447 (1974) ("The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct.").  Where law enforcement officers act in the reasonable, good-faith belief that their actions are lawful, courts have declined to apply the exclusionary rule as there would be no deterrent purpose in suppression.  *See Leon*, 468 U.S. at 922.

In this case, given the plain language of Rule 41 and the caselaw to date, there can be no serious doubt that the Postal Inspectors here relied, in reasonable good faith, on the legal and practical limitations on their ability to obtain an American warrant to be executed in a foreign nation.  Indeed, Inspector Fraterrigo repeatedly testified that she believed she had no authority to obtain a U.S. search warrant for a search abroad.  If law enforcement officers may carry out a warrantless search in a good-faith reliance on a statute which is later declared to be unconstitutional, *see Illinois v. Krull*, 480 U.S. 340 (1987), then they certainly can be excused for

104

the fact that they neither sought nor obtained a warrant in the United States to be executed in the United Kingdom where there is no clear legal mechanism for such a warrant.

### b.  The Exclusionary Rule Applied to Foreign Government Searches

Even if the Warrant Clause does not apply to searches conducted by foreign governments, the question remains whether the Fourth Amendment's reasonableness requirement can limit the use of evidence seized by a foreign government from United States citizens.  And, even if a foreign search must be reasonable, there is the question of whether there is a remedy in American courts for an unreasonable search.  In answer to the latter question, the courts have consistently held that the exclusionary rule does not govern the conduct of foreign government officers.  *See United States v. Janis*, 428 U.S. 433, 455 n.31 (1976) ("It is well established, of course, that the exclusionary rule, as a deterrent sanction, is not applicable where a private party or a foreign government commits the offending act."); *United States v. Hensel*, 699 F.2d 18, 25 (1st Cir. 1983) ("[T]he exclusionary rule does not require the suppression of evidence seized by foreign police agents, for the actions of an American court are unlikely to influence the conduct of foreign police."); *United States v. Cotroni*, 527 F.2d 708, 712 (2d Cir. 1975) ("The exclusionary rule is intended to inculcate a respect for the Constitution in the police of our own nation.  Since it has little if any deterrent effect upon foreign police, it is seldom used to bar their work product." (citations omitted)).

However, the Second Circuit has recognized two exceptions to this rule.  "First, where the conduct of foreign officials in acquiring the evidence is 'so extreme that they shock the judicial conscience' a federal court in the exercise of its supervisory powers can require exclusion of the evidence so seized.'"  *United States v. Maturo*, 982 F.2d 57, 61 (2d Cir. 1992)

(quoting *Stowe v. Devoy*, 588 F.2d 336, 341 (2d Cir. 1978)).  "Second, where cooperation with foreign law enforcement officials may implicate constitutional restrictions, evidence obtained by foreign officials may be excluded."  *Id.* (citing *United States v. Paternina-Vergara*, 749 F.2d 993, 998 (2d Cir. 1984)).  "Within the second category for excluding evidence, constitutional requirements may attach in two situations:  (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials."  *Id.* (citations omitted); *accord United States v. Restrepo*, No. S101 Crim. 1113, 2002 WL 10455, at *6 (S.D.N.Y. Jan. 3, 2002).[34]

There is no claim here, nor could there be, that the conduct of the Metropolitan Police officials "shocked the conscience."  "Circumstances that will shock the conscience are limited to conduct that 'not only violates U.S. notions of due process, but also violates fundamental international norms of decency.'"  *United States v. Mitro*, 880 F.2d 1480, 1483-84 (1st Cir. 1989)

---

[34]Other circuits, including the Ninth, have framed the second exception as one involving a "joint venture" between American and foreign government officials in conducting the search. *See, e.g., United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987) ("If . . . United States agents' participation in the investigation is so substantial that the action is a joint venture between United States and foreign officials, the law of the foreign country must be consulted at the outset as part of the determination whether or not the search was reasonable."); *United States v. Vatani*, No. 06-20240, 2007 WL 789038, at *7 (E.D. Mich., Mar. 14, 2007) ("Courts have found American officers' involvement in a search conducted by foreign officers sufficient to satisfy the joint venture exception where the American officers asked or urged the foreign officers to conduct the search, provided back-up protection while the search was conducted, and/or participated in the search itself."); *United States v. Scarfo*, CRIM.A. No. 88-00003-1-19, 1988 WL 15805, at *2 (E.D. Pa. Oct. 26, 1988) (recognizing "joint venture" exception in refusal to apply exclusionary rule to foreign government search).  The Second Circuit, however, "has not adopted the 'joint venture' theory advanced by the Ninth Circuit in . . . *Peterson*."  *Maturo*, 982 F.2d at 61-62.

(quoting Stephen A. Salzburg, *The Reach of the Bill of Rights Beyond the Terra Firma of the United States*, 20 Va. J. Int'l L. 741, 775 (1980)).  Here, a Metropolitan Police officer sought the permission of two U.K. judicial officials to get a search warrant.  This is conduct that soothes, rather than shocks, the conscience.  Nor could there be a claim that the American Government's request for the Metropolitan Police to seek such a warrant was part of an effort to evade American legal restraints.  As just noted, given the plain limits on the authority of American judicial officials to issue extraterritorial warrants, and given the limits on Postal Inspectors in unilaterally executing such warrants abroad, there was no basis for the Postal Inspectors here to think that they had any choice other than to make a treaty-based request for U.K. officials to carry out the search in London.  Thus, the only question is whether the warrants which the Metropolitan Police officials executed are invalid.

To begin, there is no dispute that the Metropolitan Police officers were acting as the agents of the American Government when they sought the warrants for the search they executed at the Cadogan Tate facility on October 13 and 14, 2005.  Indeed, the Government has conceded that in the absence of its MLAT request, British law enforcement officials likely would not have sought a warrant to search and seize the Amerindo U.K. records.  Thus, the question is whether the exclusionary rule should be used to suppress the fruits of this American-induced search in the U.K.  The answer to this question, as it is with the legality of any search, depends on whether the search was reasonable.  *See United States v. Juda*, 46 F.3d 961, 968 (9th Cir. 1995) (noting that "the Fourth Amendment's reasonableness standard applies to United States officials conducting a search affecting a United States citizen in a foreign country").  While the Second Circuit has not addressed this issue, other courts have held that a foreign search is reasonable if it meets the

107

requirements of the law of the nation in which the search is executed, as long as those

requirements do not permit conscious-shocking conduct.  *See Juda*, 46 F.3d at 968 (noting that "a

foreign search is reasonable if it conforms to the requirements of foreign law"); *Peterson*, 812

F.2d at 491 (noting that "local law of the Philippines governs whether the search was

reasonable"); *United States v. Castro*, 175 F. Supp. 2d 129, 134 (D.P.R. 2001) (upholding use of

wiretaps, even though they would be illegal in the United States, because they complied with the

law in the Dominican Republic).  As such, Defendants' claims that the U.K. search was

unreasonable under American standards because, for example, it was a general warrant that

permitted seizure of virtually all Amerindo U.K. records or because it was not based on a finding

of probable cause, are not dispositive.  Indeed, Defendants cite to no authority to support this

novel position.

 As an alternative, Defendants spend a great deal of energy attempting to explain why the

Cadogan Tate search contravened British law, but to no avail.[35]  The crux of Defendants' claim is

---

[35]Each side elected to fight the battle over U.K. law with expert opinion.  Defendants
relied on a thoughtful "Report by English Counsel Instructed on Behalf of Mr. Tanaka."  (Decl.
of Justin M. Sher, Ex. G.)  This report, prepared by English Barrister Clare Sibson, is a synopsis
of U.K. law on searches.  One obvious and admitted limitation of this report, however, is that
Ms. Sibson had "not been made aware of the facts of the matter concerning Mr. Tanaka in New
York."  Therefore, among other things, Ms. Sibson offers no opinion about the legality of the
warrants issued in connection with the Cadogan Tate search, nor does she say anything about the
propriety of the statements Detective Sergeant Shaw made in support of the warrant applications.
The Government countered by offering the testimony of Detective Sergeant Shaw.  This
testimony was helpful in the sense that it was based on the actual events of this case, but of
course is limited by the fact that Detective Sergeant Shaw is neither a solicitor nor a barrister.
That said, Detective Sergeant Shaw impressed the Court with his grasp of U.K. search and
seizure law.
    Though foreign law once was treated as an issue of fact, it now is viewed as a question of
law and may be determined through the use of any relevant source, including expert testimony.
*See Peterson*, 812 F.2d at 490; Fed. R. Crim. P. 26.1.

that because it was likely that the Amerindo U.K. materials at Cadogan Tate would include

legally privileged and "special procedure material," Detective Sergeant Shaw should have

obtained a "Schedule 1" order or warrant, instead of the "Section 8" warrant he twice obtained

from British judges.  The provision invoked by Detective Sergeant Shaw can be summarized as

follows:

> Section 8 of the Police and Criminal Evidence Act 1984 ["PACE"]
> empowers magistrates to issue search warrants at the request of the
> police if certain conditions have been fulfilled.  These conditions
> fall into two categories.  The first category, in section 8(1),
> concerns the nature of the material sought.  Generally speaking, the
> material has to relate to a serious arrestable offence and has to be
> likely to assist the investigation or to constitute relevant evidence.
> The second category, in section 8(2), describes the circumstances
> in which resort to a warrant is justified.  They are:  either that it is
> impractical to contact the person in charge of the premises, or that
> such person is unlikely to allow access without a warrant, or that
> alerting such person in advance may frustrate the investigation.  A
> search warrant is issued ex parte on the basis of information
> provided by the police on oath . . . ."

Adrian A.S. Zuckerman, *The Weakness of the PACE Special Procedure for Protecting

Confidential Material*, Crim. L. Rev. 472, 472 (1990).  The House of Lords has made clear that

Section 8 "does not apply where the material consists of or is likely to include items subject to

legal privilege, excluded material or special procedure material."  *R v. Manchester Stipendiary

Magistrate*, [2001] 1 A.C. 300, 307.  "Special procedural material," a statutorily defined term, is

"material acquired or created in the course of any trade, business, profession or other occupation

which is held subject to an express or implied undertaking to hold it in confidence."  *Id.*; *see also*

PACE § 14(2)(b).[36]  "Most details connected with bank accounts will be 'special procedure

---

[36]Though not at issue here, "excluded material" includes things such as human tissue fluid
and "journalistic material which a person holds in confidence."  *R v. Manchester Stipendiary

material.'"  Clive Walker & Christine Graham, *The Continued Assault on the Vaults – Bank Accounts and Criminal Investigations*, Crim. L. Rev. 185, 187 (1989).

"To obtain access to special procedure material the police must make an application in accordance with the terms set out in schedule 1 of the 1984 [PACE] Act."  Zuckerman*, supra*, at 472.  "An application under Schedule 1 must be made to a circuit judge and it is made inter partes.  There are two sets of . . . conditions.  The first, which is set out in paragraph 2 of the Schedule, is appropriate for applications which involve special procedure material."  *R v. Manchester Stipendiary Magistrate*, [2001] 1 A.C. 300, 307.  "The circuit judge must be satisfied that there are reasonable grounds for believing that a serious arrestable offence has been committed, and that there is material on premises specified in the application which is likely to be of substantial value to the investigation in connection with which the application is made."  *Id.*  If these conditions are met, the circuit judge must then determine whether other methods of obtaining the special privilege material have been tried, and must determine whether it is in the public interest that the police gain access to these materials, balancing the value of the information to the investigation and the "circumstances under which the person in possession of the material holds it."  *R. v. Central Criminal Court ex parte Abedbesan and Others*, [1986] 1 W.L.R. 1292, 1295-96 (quoting paragraph 2 of Schedule 1).

Thus, there are some critical distinctions between the means and methods by which the police may obtain evidence under Section 8 and Schedule 1.  A Section 8 warrant application is made *ex parte* and hinges on whether the police make a showing that there are "reasonable grounds for belief" that the conditions required by Section 8 have been met, including that the

_____

*Magistrate*, [2001] 1 A.C. 300, 307; PACE § 11(1)(c).

materials sought by the police are "likely to be of substantial value to the investigation of the

offence."  Under Schedule 1, the police normally do not obtain a search warrant, but rather an

order of production requiring the keeper of subject materials (which need not be the target of the

criminal investigation) to produce them to the police.  *See R (Bright) v. Central Criminal Court*,

[2001] 1 W.L.R. 662, 677 (Judgment of Judge, L.J.) (noting that under Schedule 1, "[a]

successful application results in an order by the judge which is directed to the person who

appears to be in possession of the relevant material.  Entry to his premises is not immediately

authorised."); Ruth S. Costigan*, Fleet Street Blues: Police Seizure of Journalists' Material*,

Crim. L. Rev. 231, 233 (1996) (discussing conditions under which police may obtain a Schedule

1 order of production).  Interestingly, notice need only be provided to the keeper of the

documents, and not to the person or entity whose documents are to be produced.  *See* Zuckerman*,

supra*, at 473 (citing *R. v. Crown Court at Leicester, ex parte Dir. of Public Prosecutions*, [1987]

1 W.L.R. 1371).  However, British law allows the police, under certain circumstances, to seek,

upon *ex parte* application, a warrant under Schedule 1.  *See R (Bright) v. Central Criminal Court*,

[2001] 1 W.L.R. at 696 (noting that "the warrant procedure may be adopted in situations which

might otherwise call for a production order if 'service of notice of an application for an order

under paragraph 4 . . . may seriously prejudice the investigation.'") (Judgment of Gibbs, J.);

Zuckerman, *supra*, at 475 (commenting that police may obtain an *ex parte* warrant if they

establish that notice under paragraph 4 of Schedule 1 would "seriously prejudice the

investigation").

    As Detective Sergeant Shaw testified, under English law, "there is no confidence as to the

disclosure of iniquity."  *The Queen v. Cox and Railton*, [1884-1885] LR 14 Q.B.D. 153, 169

(Statement of Grove, J.).  Thus, while no warrant or production order may issue for legally privileged material, "items held with the intention of furthering a criminal purpose are not subject to legal privilege."  Lynne Knapman, *Case Comment*, Crim. L. Rev., 448, 449 (1989); *see also* PACE, § 10(2).  Moreover, the English courts have held that Section 8 "does not debar a magistrate from issuing a search warrant because there may be [special privilege] material (or legally privileged or excluded material) on the premises to be searched."  *R v. Chief Constable of the Warwickshire Constabulary and Another ex parte*, [1999] 1 W.L.R. 564, 573.  It is only when a police officer believes that the special procedure material "forms part of the subject matter of the application that a warrant cannot be issued under section 8(1)."  *Id.*  Thus, as long as the police officer applying for the Section 8 warrant in good faith believes that the materials he or she intends to seize are not privileged, the mere possibility that such materials may be on the premises does not invalidate that warrant.  *See R v. Chesterfield Justice and Another, ex parte Bramley*, [2000] Q.B. 576, 585 ("[I]t is the knowledge available to the officer which has to be considered, and it will only inhibit his powers of seizure if it constitutes reasonable grounds for believing the item in question to be in fact subject to legal professional privilege.  It is not sufficient that it raises that possibility.").  From the officer's perspective, a document may not be privileged either on its face or because it is used by its keeper as part of the alleged crime.  *Id.* at 583 (noting that materials held to further a criminal purpose are not privileged and may be subject to seizure under a Section 8 warrant).  Furthermore, in executing a Section 8 warrant, an officer is permitted to sift through the materials on site to determine both whether they may be seized under the warrant and whether they are privileged.  *Id.*  586-87.  And, even if a police officer seizes materials that are later determined to be privileged, the officer, assuming that

112

officer made a good-faith mistake about the privileged nature of the document, is merely required

to return the privileged document.  The whole warrant itself is not invalidated.  *Id.* at 588.

Whether the officer acted reasonably is a question of fact to be determined in each case.  *Id.* at

587.[37]

Applying these principles to this case, the Court rejects the claim by Defendants that the

search of the Cadogan Tate facility violated U.K. law, or otherwise was unreasonable.  In

Detective Sergeant Shaw's view, there are three types of warrants under U.K. law; one permits

seizure of contraband, another permits seizure of evidence of a crime, while the third addresses

"special procedure material," which can involve, *inter alia*, legally privileged  material.  The first

category was not in play here and there is no claim that it was.  The only question, then, is

whether Detective Sergeant Shaw should have gone the Section 8 or Schedule 1 route.

Detective Sergeant Shaw, a 23-year veteran, knew full well that if he intended to seize "special

procedure material," he would need to procure a Schedule 1 order or warrant.   In fact, Detective

Sergeant Shaw persuasively testified that it would not have been a bother at all to obtain the

materials pursuant to Schedule 1.  As he put it, "I would have no hesitation and no fear in

applying for a Schedule 1 warrant at all.  It was only filling out separate pieces of paper and

going to the court 10 minutes further down the road.  If that was proper – if I honestly believe[d]

that to be the proper course of action, that's what I would have done."  (Tr. 388, May 31, 2006.)

This credible testimony undermines any suggestion by Defendants that Detective Sergeant Shaw

chose to obtain a Section 8 warrant as a way to cut corners.

---

[37]As a general matter, as long as it can be said that the officer's seizure of materials
beyond the scope of the warrant was de minimis, the warrant is not invalidated in its entirety.
*See R v. Chief Constable of the Warwickshire Constabulary*, [1999] 1 W.L.R. at 573.

Moreover, Detective Sergeant Shaw's choice of obtaining a Section 8 warrant, which he made based on his two decades of experience and which was approved by the U.K. Central Authority, a detective inspector, a senior legal advisor to the Magistrate's Court in London, and two judges, is consistent with English law.  Try as they did, Defendants were unable to discredit Detective Sergeant Shaw's testimony that he did not expect to find any legally privileged material at Cadogan Tate.  From his vantage point, the search involved records of an investment company, not a solicitor's office.  Thus, whatever privilege review was going on in the United States of the materials seized from the Amerindo U.S. office (about which Detective Shaw knew nothing), Detective Sergeant Shaw was never led to believe by the Americans, and himself had no reason to believe, that there were privileged materials that he would be seizing at Cadogan Tate.[38]  This state of mind is fatal to Defendants' claim.  *See R v. Chesterfield Justices*, [2000] 2 W.L.R. at 585 (noting that police officer's good faith belief that materials are not privileged permits their seizure under Section 8).  Similarly, Detective Sergeant Shaw believed that the financial records Amerindo U.K. had in its possession were not "special procedure materials," as they were being held or used to further the fraud allegedly being committed by Defendants.  Thus, under these circumstances, the warrants signed by two different U.K. judges pursuant to Section 8 to search the Cadogan Tate facility were entirely lawful.  *See R v. Chief Constable of the Warwickshire Constabulary*, [1999] 1 W.L.R. at 573-74 (in financial fraud case, rejecting special procedure materials objection to broad warrant authorizing seizure of computers,

---

[38]Both Inspector Fraterrigo and Detective Sergeant Shaw credibly testified that:  (1) they had no conversations about the process that Detective Sergeant Shaw went through to get the warrants; (2) Detective Sergeant Shaw never showed Inspector Fraterrigo the applications in support of the warrants; and (3) Inspector Fraterrigo never informed Detective Sergeant Shaw of the potentially legally privileged materials found during the search of Amerindo U.S.

correspondence, diaries, appointment books and banking/financial documentation, and

specifically holding that the financial records of the customers were seizable under Section 8).[39]

Even if the U.K. search somehow contravened British law, however, suppression would

be required only if it could be said that the Postal Inspectors could not reasonably and in good

faith rely on the representations made to them by Detective Sergeant Shaw that the warrants were

lawfully obtained.  "Where . . . a foreign agent represents to an American official that their

---

[39]Defendants offer two other reasons for why the Court should find the U.K. search to be unreasonable.  First, Defendants claim that the search was executed "without any restriction." (Tanaka Mem. to Suppress U.K. Search 17.)  Yet, as Defendants concede, the officers only seized about 43 out of the 320 Amerindo boxes at the Cadogan Tate facility.  While the computers also were seized, English law allows law enforcement officers considerable latitude in the seizure of computers.  *See R v. Chesterfield Justices*, [2000] Q.B. at 585 (noting that Section 8 gives law enforcement officers "a wide power to obtain access to relevant information stored in computers").  And, while some irrelevant materials (such as personal items) may have been seized, Defendants have not demonstrated that there was so much of these items to justify suppression.  *See R v. Chief Constable of the Warwickshire Constabulary*, [1999] 1 W.L.R. at 579 ("There are clearly some items, e.g., a waistcoat and pens and some family photographs, which could not have been seen to fall within the permitted scope of the search but I would regard these, when seen in context, as de minimis.").  Moreover, credible testimony established that the decision of what items to seize was made solely by Metropolitan Police officers and not by U.S. Postal Inspectors.  Thus, American law enforcement officials did not act unreasonably.

Second, Defendants assert that Detective Sergeant Shaw made a false representation to the two judges who approved the Cadogan Tate search when he stated in his application that "it would not be practicable to communicate with any person entitled to grant entry to the premises." Defendants, pointing to the fact that local counsel for Amerindo U.K. had been in touch with British authorities to provide information about the location of Amerindo U.K.'s documents, insists that the Detective Sergeant lied in making this statement.  The Court is unpersuaded. First, there is no evidence that Detective Sergeant Shaw was aware of local counsel's statements to others in the U.K. government.  Second, Detective Sergeant Shaw testified, truthfully in the Court's view, that when he said it was not "practicable" to communicate with Amerindo U.K. officials, he meant that it was not the proper course of action to take.  Thus, while it was *possible* to communicate to Amerindo U.K. representatives, Detective Sergeant Shaw believed that it was not *proper* or *advisable* to alert the target of a search to the possibility of that search.  Third, Detective Sergeant Shaw also accurately represented that entry into the Cadogan Tate premises would not happen in the absence of a search warrant, as he indicated had been made clear to him by Cadogan Tate officials.  Thus, Defendants' contention that Detective Sergeant Shaw misled the judges who authorized the Cadogan Tate search is not supported by the record.

activity is lawful, and the American reasonably relies on it, the exclusionary rule does not serve its purpose as a deterrent." *Scarfo*, 1988 WL 115805, at *4.  This is just an offshoot of the good-faith exception to the exclusionary rule recognized in *Leon*.  In a typical extraterritorial search, as was the case here, "American law enforcement officers [are] not in an advantageous position to judge whether the search was lawful," and "[h]olding them to a strict liability standard for failings of their foreign associates would be even more incongruous than holding [them] to a strict liability standard as to the adequacy of domestic warrants." *Peterson*, 812 F.2d at 492. Moreover, requiring American law enforcement officials to make extensive pre-search inquiries about the legality of a foreign government official's conduct would be diplomatically delicate, to say the least.  *See Scarfo*, 1988 WL 115805, at *4 (noting the "difficulties inherent in conducting a search in a foreign country").  "[P]ermitting reasonable reliance on representations about foreign law is a rational accommodation to the exigencies of foreign investigations." *Peterson*, 812 F.2d at 492.

Here, Detective Sergeant Shaw represented to Inspector Fraterrigo and the other Postal Inspectors in London that he had a court-approved warrant to search the Cadogan Tate facility. There is nothing in the record to establish that Inspector Fraterrigo or any other American official had any reason to question, or in fact did question, this representation.  Moreover, there is no basis in the law to have required Inspector Fraterrigo, even if she had the slightest clue as to the difference between "Section 8" and "Schedule I" warrants, to make a potentially undiplomatic inquiry into the propriety of Detective Sergeant Shaw's decision (and that of each judge who approved of his decision) to obtain a "Section 8" warrant, or to demand that she see the application papers.  Accordingly, the Court finds that it was objectively reasonable for Inspector

Fraterrigo to believe in good faith, which she did, that the U.K. search was lawfully approved by

the British courts.  *See Juda*, 46 F.3d at 968 ("The DEA agent reasonably relied on [the

representation of the Australian Federal Police], and accordingly, the good faith exception to the

exclusionary rule applies."); *Peterson*, 812 F.2d at 492 (finding it reasonable for American

officials to rely on representations from law enforcement authorities that all legal requirements of

Philippine law had been met, particularly where "search and seizure law in the Philippine is less

than completely clear"); *United States v. Lau*, 778 F. Supp. 98, 101 (D.P.R. 1991) ("[T]he

evidence was admitted properly because the federal officials reasonably relied [i]n good faith on

the representations of Dutch officials as to the requirements of Netherlands Antilles search and

seizure law."); *Scarfo*, 1988 WL 115805, at *4 (finding it reasonable for American officials to

rely on representations regarding requirements of Dominican law regarding searches).  Thus, the

application to suppress the fruits of the U.K. search on Fourth Amendment grounds is denied.[40]

---

[40]Defendants attempt to rebut the good faith of Inspector Fraterrigo and the other Postal
Inspectors based on claims that the MLAT request for the search intentionally omitted or
misrepresented certain key facts.  Many of these allegations merely repeat those made by
Defendants in support of the *Franks* motion, for example, the omissions regarding the pre-2003
redemptions received by Cates and the Mayers and the post-2003 partial payments the Mayers
received.  These claims are equally unpersuasive here because the MLAT request does not
remotely suggest that these investors had difficulties redeeming their investments before 2003.
In fact, the claim in the MLAT about the Mayers redemption difficulties specifically tied these
redemption issues to a December 2000 investment.
        Another statement Defendants claim is an "egregious" misrepresentation is that investors
in Rhodes Capital "lost all of their investment funds."  Defendants insist that this is demonstrably
false as it is contradicted by the fact that Cates received "millions of dollars of profits" on her
initial investment in Amerindo, and that, as recently as February 2005, she was able to recover an
additional $3 million of her investment funds.  Defendants claim fails for two reasons.  First, the
statement they quote is taken out of context in that it was preceded by a statement that Vilar had
told another investor that Rhodes was a "sound" investment at the same time that Renata Tanaka
was informing another investor that Rhodes had "wound down" in 2003.  Thus, while Cates
might have seen the value of her Rhodes investment grow between 1987 and 2003, it is clear that
the MLAT alleges that the investment cratered by 2003.  Thus, the statement in context does not

## 2.  The Fruit of the Poisonous Tree

Defendants also argue that the MLAT request included information obtained through the illegal search of the Amerindo U.S. offices, and that because this request was incorporated into the U.K. warrant application, any evidence obtained as a result of that warrant must be suppressed as the "fruit of the poisonous tree."  (Tanaka Post-Hr'g Mem. 40.)[41]  It is axiomatic that the "exclusionary prohibition extends as well to the indirect as the direct products of" illegal police activity.  *Wong Sun v. United States*, 371 U.S. 471, 485 (1963); *accord New York v. Harris*, 495 U.S. 14, 19 (1990) (noting the "familiar proposition that the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality").  However, "evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence."  *Segura v. United States*, 468 U.S. 796, 815 (1984).  Moreover, "[a]lthough the Government bears the burden of proving that illegally obtained evidence is not fruit of the poisonous tree, the defendant bears the initial burden of establishing a nexus between the illegality and the challenged evidence."  *United*

---

appear egregiously false.

Second, the fact that Cates was able, through her own efforts, to recover some of her investment, does not gut the MLAT request.  Indeed, as was discussed extensively at the numerous hearings the Court held, the fact that Cates engaged in self-help to recover what she could from her Amerindo investments does not change the fact that Defendants allegedly blocked her efforts to redeem those investments.  Thus, at most the statement is a slight exaggeration, but given the many other allegations in the MLAT request, this defect hardly is fatal to the bona fides of the request for the search of Amerindo U.K.'s records.

[41]The Government argues that this claim is untimely as it was not raised until after the hearings were completed.  As with the other claims of untimeliness, the Court finds no fault in counsel for Defendants in raising this argument when they did.  Again, the timing of Defendants' claim is less the result of any unreasonable or tardy activity by counsel than it is a reflection of the complexity of this case.

*States v. Hall*, 419 F. Supp. 2d 279, 289-90 (E.D.N.Y. 2005); *see also Alderman v. United States*, 394 U.S. 165, 183 (1969) ("[Defendants] must go forward with specific evidence demonstrating taint.").

Here, Defendants fail to meet their initial burden.  To begin, Defendants have not identified which allegations in the MLAT request are the fruits of the purportedly poisonous tree. Instead, Defendants only generally allege that the request for the U.K. warrant "was based at least in part on information obtained from the Amerindo U.S. search."  (Tanaka Post-Hr'g Mem. 40.) Indeed, the closest Defendants come to identifying the poisonous tree is the statement in the MLAT request that "[b]ased on interviews of current and former Amerindo employees and investors, *as well as documents and files seized from Amerindo U.S.'s New York offices*, the U.S. law enforcement officers have *also* discovered . . . ."  (MLAT Request at 5-6 (emphasis added).) But a close reading of the MLAT request reveals that it relies, if at all, on very little information that was derived from the Amerindo U.S. search.  First, a vast majority of the allegations supporting the MLAT request also appear in the U.S. warrant application (comprising the Affidavit and the two Criminal Complaints).  These include the allegations regarding the SBIC and GFRDA investment vehicles, the AMI, Techno Raquia S.A., and ATGF accounts, the Mayer family, Cates, and the brokerage accounts allegedly used by Defendants to misappropriate funds. Second, and more particularly, the Government represents that the only search-derived information included in the MLAT was that Vilar transferred approximately $19 million into personal accounts at four banks.  (Gov't Post-Hr'g Mem. 140.)  Without the search information, it has been represented that the Government knew of about $8 million of such transfers to only one personal bank account.  Given this representation, which Defendants have not contested and

which makes sense given the close temporal proximity between the U.S. search and the submission of the MLAT request (approximately 2 months), it cannot be said that the MLAT request contains fruit from any poisonous tree.  At most, there is one piece of bad fruit from a perfectly healthy tree.[42]   Thus, Defendants have failed to establish that the allegations in the MLAT request are tainted by the illegal fruits of the Amerindo U.S. search, even assuming the entire U.S. Warrant pursuant to which that search was executed was invalid.

### III.  Conclusion

Accordingly, for the reasons stated herein, the motions to suppress the search conducted in the United States and the motions to quash the Subpoena are granted in part and denied in part. The motions to suppress the evidence obtained in the United Kingdom search are denied.

SO ORDERED.

Dated:         April 4 , 2007
               New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[42]Moreover, given that the Court has found that the Warrant's demand for personal bank records of Vilar were proper, it is unlikely that even this tidbit of information is tainted.

120