UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA            :

            -v.-                    :        S3 05 Cr. 621 (RJS)

ALBERTO WILLIAM VILAR,              :        ECF CASE
    a/k/a, "Albert Vilar," and
GARY ALAN TANAKA,                   :

                Defendants.         :
------------------------------------------------------x


## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO EFFECTUATE ORDER OF SUPPRESSION


MICHAEL J. GARCIA
*United States Attorney for the*
*Southern District of New York*

*Attorney for the United States of America*


Marc Litt
Deirdre A. McEvoy
Benjamin Naftalis
*Assistant United States Attorney*
*Of Counsel*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Point I:      The Government Did Not Waive Its Right To Oppose
                 Defendants' Motion To Preclude . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Point II:     The Government Is Entitled To Retain And Use The Challenged
                 Documents Because It Would Have Inevitably Received Them
                 Pursuant To The Lawfully Issued Subpoena . . . . . . . . . . . . . . . . . . . . . 12

                 A.     Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                 B.     Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    Point III:    Even If The Government Would Not Have Inevitably Received
                 The Challenged Documents Pursuant To The Subpoena,
                 The Government Is Still Entitled To The Documents Pursuant To
                 The Revised Subpoena And The Prior Orders Of This Court . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## TABLE OF AUTHORITIES

*Hudson* v. *Michigan*, 126 S. Ct. 2159 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Murray* v. *United States*, 487 U.S. 533 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Nix* v. *Williams*, 467 U.S. 431 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Silverthorne Lumber* Co. v. *United States*, 251 U.S. 385 (1920) . . . . . . . . . . . . . . . . . . . . . 17-18

*United States* v. *Eng*, 971 F.2d 854 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States* v. *Eng*, 997 F.2d 987 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States* v. *Heath*, 455 F.3d 52 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States* v. *Mendez*, 315 F.3d 132 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States* v. *Roberts*, 852 F.2d 671 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x

UNITED STATES OF AMERICA    :

      -v.-           :     S3 05 Cr. 621 (RJS)

ALBERTO WILLIAM VILAR,    :
  a/k/a, "Albert Vilar," and
GARY ALAN TANAKA,     :

        Defendants.    :
-----------------------------------------------------x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EFFECTUATE ORDER OF SUPPRESSION

### PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to

defendants' motion to preclude the Government from using at trial certain documents seized by

the Government during the search conducted at the Amerindo U.S. offices on May 26, 2005.

Specifically, defendants seek to prevent the Government from using at trial documents seized

during that search that lie outside the scope of the warrant as revised by the Court's April 4, 2007

order (the "Revised Warrant" and the "Order," respectively) yet fall within the scope of the grand

jury subpoena as modified by the Order (the "Revised Subpoena").[1]  Defendants contend that the

---

[1]      For the convenience of the Court, the Government adopts defendants' appellation of the "Challenged Documents" for this category of seized documents. "Warrant" refers to the search warrant that was reviewed and approved by Magistrate Judge Frank Maas on May 25, 2005, and executed at Amerindo U.S.'s New York office on May 26, 2005. "Subpoena" refers to the grand jury subpoena issued and served on Amerindo U.S. on May 26, 2005. "Tanaka Mem." refers to the August 17, 2007 Memorandum of Law filed by defendant Tanaka in connection with this motion. "Vilar Mem." refers to the August 20, 2007 Memorandum of Law filed by defendant Vilar in connection with defendants' motion for a taint hearing. "5/31 Tr.," "8/9 Tr.," "4/13 Tr.," "4/27 Tr.," and "7/17 Tr." refer to the transcripts of hearings and conferences held on May 31, 2006, August 9, 2006, April 13, 2007, April 27, 2007, and July 17, 2007, respectively. "Litt Decl." refers to the October 4, 2007 Declaration of Assistant United States Attorney Marc

Government should be precluded from raising any argument in opposition to their motion as a consequence of its alleged waiver. Defendants further claim that, even were the Court to allow the Government to oppose their motion, it cannot satisfy the requirements of the inevitable discovery exception to the Exclusionary Rule.

Defendants are wrong on both scores. In their zeal to preclude the Government from using the Challenged Documents, defendants ignore the procedural background related to this issue, and rely on a hollow semantic argument in an effort to resist the enforcement of the valid Revised Subpoena and the prior orders of this Court. First, the category of documents at issue did not exist prior to the issuance of the Order, and the Government did not fail to preserve its right to oppose defendants' motion by failing to make contingent arguments in anticipation of all possible outcomes of the interrelated motions litigated by defendants over the past two years. Second, the Government should not be precluded from opposing defendants' motion when it has done nothing more than follow the briefing schedule established by the Court after defendants first raised the possibility of making the instant motion on April 13, 2007. Third, the Government should be permitted to keep and use the seized Challenged Documents because the Government would inevitably have obtained the Challenged Documents in response to the Subpoena, even had the warrant that was executed conformed in all respects with the Fourth Amendment. Finally, even were the Court to find that the Government is not entitled to retain the Challenged Documents pursuant to the inevitable discovery doctrine and to require the Government to return to Amerindo U.S. the Challenged Documents, the Government would nevertheless be entitled to immediate enforcement of the Revised Subpoena pursuant to the prior

---

Litt filed in support of this memorandum.

orders of this Court. As a consequence, Amerindo U.S. would be required to redeliver the Challenged Documents to the Government forthwith. Accordingly, defendants' motion should be denied.

## Background

On April 4, 2004, after extensive litigation concerning four interrelated issues raised by defendants (suppression of evidence obtained through execution of the Warrant, suppression of evidence seized in the United Kingdom, a motion for a *Franks* hearing, and a motion to quash the Subpoena), the Court issued the Order.[2] Separate sections of the Order denied in part, and granted in part: (a) defendants' motion to suppress the evidence seized during the execution of the Warrant; and (b) defendants' motion to quash the Subpoena. (*See* Order at 35-66, 76-99). The Court narrowed the permissible scope of the Warrant and, to a lesser extent, narrowed the scope of the overlapping Subpoena. In so doing, the Court explicitly rejected defendants' contention that the Subpoena was an improper extension of an unlawful search. Specifically, the Court found that "there is no basis whatsoever for finding that the Government had an improper motive for issuance of the Subpoena here. Indeed, the Government, consistent with its obligations to investigate a suspected crime, merely followed the suggestion of Amerindo's counsel, who himself had expressed no objection to the [] Warrant, in serving the Subpoena when it did." (Order at 82-83).

The Court based its finding primarily on the testimony of Assistant U.S. Attorney Marc

---

[2]     In the interest of brevity, the Government will not here re-address the irrelevant and spurious claim made by defendants concerning the alleged "devastating" effect of the search on Amerindo U.S. (Tanaka Mem. at 2). Likewise, in light of the extensive prior briefing and argument in this case, the Government limits its recitation of the facts to those with a bearing on the issues raised by defendants.

Litt and that of Eugene Licker, Esq., counsel for Amerindo U.S., a summary of which follows:[3]

On May 26, 2005, U.S. Postal Inspectors conducted a search at the offices of Amerindo

U.S. at 399 Park Avenue in New York, New York, pursuant to the Warrant.  The search began at

approximately 8:15 a.m.  (5/31 Tr. 133-34).  Eugene R. Licker, Esq., outside counsel for

Amerindo U.S., arrived at the scene between 10:00 and 11:00 a.m., and spoke to AUSA Litt by

telephone on at least two occasions between approximately 10:30 and 11:00 a.m.  Among other

things, Mr. Licker assured AUSA Litt that Amerindo U.S. wanted to cooperate with the

Government in its investigation, and told AUSA Litt that he would issue a preservation notice

and promised to implement policies and procedures that would prevent the company's

documents from being destroyed.  (5/31 Tr. 16, 18-19, 26, 30-32, 92).

AUSA Litt testified that he distinctly remembered that during one of the two telephone

calls he had with Mr. Licker in the morning of May 26, 2005, Mr. Licker asked him whether the

Government intended to serve Amerindo with a grand jury subpoena.  (5/31 Tr. 92; Litt Decl.

¶ 1, Ex. A).  AUSA Litt responded that he did not know and that he would have to get back to

him with a response.  (*Id.*).  In contrast to Mr. Licker who testified that he "c[ould]n't say one or

way or another" who proposed the idea of the grand jury subpoena (5/31 Tr. 53), AUSA Litt had

a specific and clear recollection that it was Mr. Licker who first raised the issue of a grand jury

---

[3]       Mr. Licker candidly testified that his recollection of these events in question was
"not great."  (5/31 Tr. 33).  The Court found that "[t]he testimony of Litt and Licker regarding the
execution of the search and the issuance of the subpoena was largely consistent.  However, to the
extent that there were inconsistencies, the Court found Litt's testimony to be the more credible of
the two, owing in large part to Licker's acknowledgment during his testimony that his memory of
the day's events was less than clear."  (Order at 19).

4

subpoena. (5/31 Tr. 92, 8/9 Tr. 251, 275).[4] AUSA Litt testified that prior to his mid-morning discussion with Mr. Licker, he had not considered or consulted with anyone about issuing a grand jury subpoena to Amerindo. (5/31 Tr. 93; Litt Decl. ¶ 1, Ex. A).

AUSA Litt subsequently relayed the substance of his conversation with Mr. Licker to his supervisor, AUSA David Esseks, then chief of the Securities and Commodities Fraud Task Force at the U.S. Attorney's office, and consulted with him about whether to issue a grand jury subpoena. (5/31 Tr. 93). AUSA Esseks told AUSA Litt that issuing grand jury subpoenas was done routinely in cases like this one and suggested two reasons why it was appropriate to issue a grand jury subpoena under the circumstances. (5/31 Tr. 94). First, AUSA Esseks explained that if searching agents missed items that were covered under the search warrant, those items could be obtained pursuant to a grand jury subpoena. (*Id.*). Second, a grand jury subpoena would create a disincentive for the destruction of documents since an individual who destroys a document that is subject to a grand jury subpoena may face a criminal charge for obstruction of justice. (*Id.*). After receiving this advice, AUSA Litt drafted a grand jury subpoena for Amerindo U.S. (the "Subpoena"), relying in the first instance on the rider for the Warrant. (5/31 Tr. 94-95).[5] AUSA Litt faxed the Subpoena to Mr. Licker's office (then at Kirkpatrick and Lockhart) at approximately 1:37 p.m. that day. (5/31 Tr. 15, 98, 102-03; GX 12).

---

[4]     Inspector John Feiter, who supervised the execution of the Warrant, also testified that he recalled that it was Mr. Licker who first raised the issue of the grand jury subpoena. (12/14 Tr. 86).

[5]     AUSA Litt's computer records corroborated his recollection of the timing of that initial conversation because they reflect that the Subpoena was created at approximately 11:36 a.m. on May 26, 2005 and was last modified at approximately 1:27 p.m, and that the rider to the Subpoena was created at approximately 12:15 p.m. (5/31 Tr. 98; GX 11).

5

AUSA Litt testified that he issued the Subpoena to Amerindo U.S. to achieve the two objectives outlined by AUSA Esseks in their conversation earlier that day, and testified that he did not issue the Subpoena to cure any defects in the Warrant or to serve as a substitute for the Warrant. (5/31 Tr. 100-01, 8/9 Tr. 276). Indeed, at the time that he issued the Subpoena, AUSA Litt did not perceive there to be any defects in the Warrant. (5/31 Tr. 100). The Court explicitly credited that testimony. (*See* Order at 81) ("The extensive hearing testimony made clear that the Government officials involved in the preparation of the warrant application, as well as those who carried out the search, firmly believed, and still firmly believe, in the Warrant's legality."). Mr. Licker testified that he never challenged the search warrant on May 26, 2005, nor did he ever discuss its "breadth, enforceability or legality" with AUSA Litt on May 26, 2005. (5/31 Tr. 42).

AUSA Litt testified that at some point later that day, Mr. Licker suggested to him that it would be more efficient for the Government to collect the remaining documents it sought from Amerindo U.S. through the grand jury subpoena process rather than by completing the as yet unfinished search. According to AUSA Litt, Mr. Licker pointed out that it had been a long day, that he was tired and that it would take considerable time for the Postal Inspectors to complete the search. (5/31 Tr. 106-07; 8/9 Tr. 239-41; Litt Decl. ¶¶ 1-2, Exs. A, B; GX 48A, 49). Mr. Licker also reminded AUSA Litt that he had accepted service of the Subpoena and that he had implemented a document preservation policy that would ensure that no documents or other evidence would be destroyed were the search to be halted. (5/31 Tr. 107; GX 48A, 49). Mr. Licker further noted that not only would it be less disruptive to Amerindo U.S. to proceed via the Subpoena, but that the Government would be able to get more efficiently "what it really wanted" through the company's cooperation with the grand jury subpoena process. (5/31 Tr. 108; Litt

Decl. ¶ 1, Ex. A; GX 49).

Although it is unclear precisely when this conversation occurred, it *is* clear that it

occurred several hours after the morning conversation in which Mr. Licker asked AUSA Litt

whether the Government intended to serve a grand jury subpoena on Amerindo U.S.  AUSA Litt

testified that he believed that the conversation happened in the late afternoon or early evening,

based on his review of telephone records and in light of his firm recollection that Mr. Licker

prefaced his suggestion by stating, among other things, that it had been a long day and that

everyone was tired.  (5/31 Tr. 105; 8/9 Tr. 239-41; Litt Decl. ¶¶ 1-2, Exs. A, B).  It would have

been incongruous for Mr. Licker to have made such a statement during the mid-morning

conversation that prompted AUSA Litt to seek supervisory advice, and then draft, and serve the

Subpoena.[6]

---

[6]    Even Mr. Licker testified on cross examination that, prior to seeing the time stamp
on the faxed Subpoena, he would have said that the conversation in which he suggested
proceeding by way of subpoena had occurred later in the day:

> Q.    It's your testimony that you believe a conversation about terminating the
> search in lieu of the grand jury subpoena happened at approximately 1 o'clock
> that day, is that right?
>
> A.    I don't remember exactly when it did happen.  Frankly, had I not seen the
> time stamp on the grand jury subpoena, I would have placed it later. . . .

(5/31/06 Tr. at 32).  Having previously testified that he had arrived at Amerindo between 10 and
11 a.m., that he was at his law office between 1 and 2 p.m., and that he spent the rest of the day,
until 9 or 9:30 p.m. back at the Amerindo offices, Mr. Licker continued his answer, testifying
that his first conversation with AUSA Litt "about it" occurred between 1 and 2 p.m. while he was
at his office at Kirkpatrick & Lockhart.  (*Id.* at 12, 13, 14, 16, 29, 32).  In the very next question
and answer, however, Mr. Licker further demonstrated his confusion about where he was and
when that conversation occurred:

> Q.    So your testimony is that that was your first conversation about it.
>
> A.    I believe it was not our first conversation about it.  I believe our first
> conversation took place at Amerindo.

More than six months after the Subpoena was served, and after Amerindo U.S. had produced only a handful of documents responsive to the Subpoena, defendants moved to quash the Subpoena. The Order granted in part and denied in part defendants' motions to suppress and to quash. Because the Revised Warrant allowed the seizure of a subset of the documents responsive to the Revised Subpoena, the Order implicitly created the category of Challenged Documents.

At the April 13, 2007 pretrial conference, counsel for Tanaka first raised the possibility that the defendants might seek to preclude the Government's use of the Challenged Documents:

> MR. COLTON: I guess in the interests of trying to make sure all the issues are before the Court, I imagine that we may have a debate and will have a debate on the usability and admissibility of documents your Honor has suppressed but yet ordered produced pursuant to the subpoena. So if the government is going to take the position that the vast quantity of documents that were suppressed but yet responsive to the brief form subpoena are somehow unsuppressed because they would have been received through the subpoena, I would like to know that because that informs the massive evidence that's potentially usable in the trial, the potential length of the trial and how much work is to be done. And if the government has a position, please tell us. If they don't, please ask the government to give you a position by April 27th.
>
> THE COURT: It's pretty clear to me that the government's view is, even if something is suppressed by the modified search warrant, they get to use it if it's responsive to the subpoena. Am I wrong on that, AUSA Litt?
>
> AUSA Litt: No.
>
> THE COURT: So you're saying you're going to challenge

---

Q.     When you were at Amerindo?

A.     Correct.

(*Id.* at 32-33).

the use of materials that are suppressed under the warrant but
responsive to the subpoena, is that what you're saying?  You may
challenge the admissibility of those materials.

        MR. COLTON: Yes.

  . . . .

        THE COURT: You've heard their position.  Anything they
think is responsive to the subpoena, even if it was suppressed
under the warrant, they think they get to use at trial.

        MR. COLTON: Well, we will decide by April 27th whether
to file such a motion. . . .

(4/13/07 Tr. 24-27;  Litt Decl. ¶3, Ex. C).  When the issue was next raised by Ms. Margolis at the

April 27, 2007 conference, the Court declined to decide the question without briefing, and

invited the defendants to brief the issue.  (4/27/07 Tr. 66-67;  Litt Decl. ¶ 4, Ex. D).  At no time

did defendants object to that procedure; indeed, they did not definitively indicate that they would

oppose the use of the Challenged Documents until April 27 – long after the passage of the ten-

day period within which motions for reconsideration must be filed.   The Court subsequently

established a briefing schedule for both the instant motion, and the taint motion, pursuant to

which defendant Tanaka filed his motion on August 17, 2007.[7]

## ARGUMENT

## I.

## THE GOVERNMENT DID NOT WAIVE
## ITS RIGHT TO OPPOSE DEFENDANTS' MOTION TO PRECLUDE

Defendants' principal argument is that the relief they seek – preclusion of the use by the

Government of the Challenged Documents – is mandated by the Order and that the Government

waived its right to make any argument to the contrary by failing to ask to reopen the hearing,

---

[7]      Defendant Vilar joined Tanaka's motion. *See* Vilar Mem. at 19, n.3.

9

failing to move for reconsideration within ten days of the issuance of the Order, and failing to

offer the inevitable discovery exception to the Exclusionary Rule as a defense to suppression of

the Challenged Documents prior to the issuance of the Order.  In fact, the issue was not ripe until

April 4, when the Order was issued.  Prior to that date, the category of Challenged Documents

did not exist, and there was no need to engage in briefing of issues that might hypothetically

arise.[8]  Notwithstanding that fact, the Government did assert, in the opening paragraph of the

argument section of its omnibus post-hearing memorandum that,

> In the Government's view, defendants' motions can most
> efficiently be handled by dealing first with their motion to quash
> the grand jury subpoena.  Because the grand jury subpoena was in
> large part co-extensive with the search warrant, were the Court to
> deny defendants' motion to quash – as the Government submits it
> should – the Court would not need to decide the defendants'
> motions concerning the breadth and particularity of the Warrant,
> the applicability of the Leon good faith exception and the related
> Franks issue.

(Gov't Dec. 13, 2006 Mem. at 38).  That statement made clear the Government's pre-Order view

that it would be able to use whatever seized documents were responsive to the lawfully issued

grand jury subpoena, regardless how the Court decided the suppression motions.  Defendants

---

[8]      The Court rejected an analogous waiver argument when advanced by the
Government in connection with defendants' post-Order taint claims, and should likewise reject
defendants' waiver argument here.  See 4/27/07 Tr. 57;  Litt Decl. ¶ 4, Ex. D ("THE COURT:
No.  No.  No.  Because if I had denied the motions in their entirety, people would have wasted a
lot of time and money mak[ing] motions for taint that would be like contingent motions.  And to
the extent that the motion to suppress was granted in its entirety, there likely would have been an
appeal to the circuit.  To the extent the motion to suppress was granted in part, it makes the taint
a moving target.  So from counsel's standpoint, I don't know how they file a motion for taint.  If
you are suggesting it has been waived, I can't see that that is at all possible.").

never rebutted, nor sought clarification of, that position prior to the entry of the Order.[9]

Within nine days of the entry of the Order, and within minutes of the defendants first raising the prospect of disputing the Government's right to use the Challenged Documents, the Government announced its disagreement with Tanaka's position in response to the Court's inquiry. (4/13/07 Tr. 24-25; Litt Decl. ¶ 3, Ex. C). At that point, Mr. Tanaka's counsel stated that he would let the Court know by April 27 if Mr. Tanaka intended to file any motion. At no time did counsel for Mr. Tanaka suggest that the Government should bear the burden of going forward on the motion. Indeed, counsel for Mr. Tanaka explicitly stated that he was not even certain whether Mr. Tanaka would pursue his (to that point) hypothetical opposition to the use of the Challenged Documents. (*See id*. at 26) ("Well, we will decide by April 27th whether to file such a motion."). In these circumstances, there was no need for the Government to brief the issue. Finally, there is no prejudice to the defendants to the issue being briefed on the current schedule. The issue is capable of being resolved based on the evidence in the record and, as a consequence, defendants' citation to cases limiting the right to seek to reopen hearings is misplaced.

What the defendants have raised through their motion is, in essence, an issue created by the Order that defendants believe requires clarification. On April 13, the Government stated that it interpreted the Order as allowing the Government to retain and use the Challenged Documents without restriction.[10] It was not until Tanaka's counsel floated a different interpretation of the

---

[9]     Although the post-hearing briefing schedule did not provide for the filing of reply papers, defendants never sought leave to do so.

[10]     The reasonableness of the Government's perception of the Court's intent was supported by the Court's non-binding, preliminary, observation on April 27 that, "I understand

11

Order that the Government was aware of an opposing point of view. In light of the background of this motion, defendants' contention that the Government has waived its right to oppose the motion rings hollow. First, the issue now raised was resolved by the Order. The Order provides that the Government is entitled to documents responsive to the Revised Subpoena, and makes no exception for any responsive documents that were seized pursuant to the Warrant. Second, because of the clear ruling in the Order, the Government saw no need for clarification of the Order until Tanaka's counsel first raised the issue on April 13. Third, the Government immediately expressed its opposition to Tanaka's interpretation of the Order (nine days after the Order was entered). Fourth, the defendants volunteered to decide within two weeks whether to pursue the motion and then did not object to the briefing schedule established by the Court. In those circumstances, the cases and Rule cited by defendants related to reconsideration and reopening are inapposite. Accordingly, defendants' waiver argument should be rejected.

## II.

### THE GOVERNMENT IS ENTITLED TO RETAIN AND USE THE CHALLENGED DOCUMENTS BECAUSE IT WOULD HAVE INEVITABLY RECEIVED THEM PURSUANT TO THE LAWFULLY ISSUED SUBPOENA

The Challenged Documents should not be suppressed because they are responsive to the valid portions of a grand jury subpoena that was issued for lawful purposes. The evidence in the record establishes by more than a preponderance the facts that the subpoena would have been issued and that the Challenged Documents inevitably would have been obtained by the

---

the difference of opinion and [that is] fine. My reaction is that they get it because they get it under the subpoena, but you will educate [] me as to why that is wrong." (4/27/07 Tr. 67; Litt Decl. ¶ 4, Ex. D).

Government through the Subpoena even if the warrant approved by Magistrate Judge Maas had been coextensive with the scope of the Revised Warrant. Accordingly, the Challenged Documents should not be suppressed, and the Government should be permitted to use them at trial.

A.    **Applicable Law**.

"Under the 'inevitable discovery' doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded 'if the government can prove that the evidence would have been obtained inevitably' without the constitutional violation." *United States* v. *Heath*, 455 F.3d 52, 55 (2d Cir. 2006) (quoting *Nix* v. *Williams*, 467 U.S. 431, 447 (1984)); *see also United States* v. *Mendez*, 315 F.3d 132, 137-138 (2d Cir. 2002) ("evidence that was illegally obtained will not be suppressed 'if the government can prove that the evidence would have been obtained inevitably' even if there had been no statutory or constitutional violation") (quoting *United States* v. *Roberts*, 852 F.2d 671, 675-76 (2d Cir. 1988) (quoting *Nix* v. *Williams*, 467 U.S. at 447)). *United States* v. *Eng*, 997 F.2d 987, 990 (2d Cir. 1993) (inevitable discovery doctrine "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred" (emphasis in original) (internal quotation marks omitted)). As the Second Circuit crystallized the issue: "Would the disputed evidence inevitably have been found through legal means 'but for' the constitutional violation? If the answer is 'yes,' the evidence seized will not be excluded." *Heath*, 455 F.3d at 55.

Where the Government argues that it would have inevitably discovered documents that were seized during an unlawful search through responses to a grand jury subpoena, the

13

Government must show by a preponderance "that both issuance of the subpoena, and a response to the subpoena producing the evidence in question, were inevitable." *United States* v. *Eng*, 971 F.2d 854, 860 (2d Cir. 1992). The Second Circuit has held that,

> [t]he mere fact that the government serves a subpoena, however, does not mean that it will obtain the documents it requests. A subpoena can be invalid for a variety of reasons, as when it is unduly burdensome, Fed. R. Crim. P. 17(c), when it violates the right against self-incrimination, *United States* v. *Doe*, 465 U.S. 605, 610-12 (1984), or when it calls for privileged documents. *In re Grand Jury Subpoena Dated Sept. 15, 1983*, 731 F.2d 1032, 1036-37 (2d Cir. 1984). Moreover, we can deplore but not ignore the possibility that the recipient of a subpoena may falsely claim to have lost or destroyed the documents called for, or may even deliberately conceal or destroy them after service of the subpoena.

*United States* v. *Roberts*, 852 F. 2d 671, 676 (2d Cir. 1988).

**B.     Discussion**.

Defendants claim that the Government cannot show that the Subpoena would have been issued but for the execution of the overbroad Warrant. In support of that contention, defendants mischaracterize the testimony of AUSA Litt, which testimony was credited by the Court, and blend into one conversation two distinct conversations between AUSA Litt and Mr. Licker that were in fact separated by several hours. Specifically, they argue that the Government would not have issued the Subpoena had Mr. Licker not suggested it, and that Mr. Licker would not have made that suggestion had the Government not executed an overbroad warrant. In fact, the record clearly demonstrates that, although Mr. Licker asked a question that prompted the Government to serve the Subpoena, that question had nothing to do with the breadth of the Warrant.

Mr. Licker asked AUSA Litt whether the Government intended to issue a grand jury subpoena during one of two telephone conversations that occurred between approximately 10:30

14

and 11:00 a.m. on May 26.  (5/31/06 Tr. 92; GX 31).  At that time, the Postal Inspectors had been

on the premises for less than three hours, and Mr. Licker had been there for less than one hour.

(5/31/06 Tr. 12, 13, 14, 16, 29, 32).  According to AUSA Litt, there was at that time no

discussion of fatigue, a desire to go home, an inability to complete the search during the day, or a

suggestion that a subpoena could be more targeted than a search.  AUSA Litt simply told Mr.

Licker that he didn't know the answer to his question, and that he would discuss it with him later.

AUSA Litt consulted a supervisor, and was advised of two sound reasons to issue a grand jury

subpoena.  Notably, AUSA Litt and the supervisor had no discussion about the advisability of

terminating the search at 11 a.m. and proceeding instead by means of a subpoena.  And the

reason for that is simple.  That suggestion was not made until the afternoon or early evening.

(5/31/06 Tr. 105; 8/9 Tr. 239-41; Litt Decl. ¶¶ 1-2, Exs. A, B).  Thus, although it is unclear why

Mr. Licker asked the question about the Government's intent, the record demonstrates that his

reason for doing so had nothing to do with the scope of the warrant that was being executed.

There is likewise no reason to think that the supervisory advice received by AUSA Litt

would have been any different had the Revised Warrant been executed because that advice was

given without consideration to the breadth of the Warrant.  Accordingly, the record evidence

demonstrates by far more than a preponderance that AUSA Litt would have drafted and served

the Subpoena regardless of the scope of the warrant that was to be executed.

With respect to the second requisite showing – demonstrating that the Government

inevitably would have received the Challenged Documents had a narrower warrant been executed

– many of the concerns raised by the Second Circuit in *Roberts* (*e.g.*, that the subpoena may be

challenged for being unduly burdensome, that the recipient may destroy documents, etc.) have

been addressed through the pretrial motions filed by defendants, or may be allayed by examining the historical conduct of Amerindo U.S. First, the parts of the Subpoena to which the Challenged Documents are responsive have been challenged and found to be valid and enforceable by the Court. Second, Amerindo U.S., through its counsel, Mr. Licker, has consistently indicated its intent to be cooperative with the Government's investigation and its willingness to produce responsive documents. (*See, e.g.*, 5/31/06 Tr. 19-20, 23-26, 30, 31, 92). Third, the fact that Amerindo U.S. has maintained approximately 900 boxes of business documents in storage for the past two years, and recently produced to the Government for its review approximately 170 boxes of documents pursuant to the Revised Subpoena, is powerful evidence that the company would not have destroyed the documents and would, in fact, have produced them. (*See* Litt Decl. ¶ 5, Ex. E). Finally, the fact that the defendants – the sole shareholders and officers of Amerindo U.S. – maintain that they intend to revive the company following their hoped-for acquittal in this case provides additional evidence that they would not have destroyed the very documents whose removal was, according to the defendants, so "devastating" to the operations of their company.

In sum, there is every reason to believe that the Subpoena would have been issued had the Revised Warrant been executed. Likewise, there is powerful evidence that Amerindo would have produced the Challenged Documents pursuant to that Subpoena had those materials not already been seized during the search. Accordingly, the legal requirements for application of the inevitable discovery exception to the Exclusionary Rule have been met, and the Challenged Documents should not be suppressed.

### III.

### EVEN IF THE GOVERNMENT WOULD NOT HAVE INEVITABLY RECEIVED THE CHALLENGED DOCUMENTS PURSUANT TO THE SUBPOENA, THE GOVERNMENT IS STILL ENTITLED TO THE DOCUMENTS PURSUANT TO THE REVISED SUBPOENA AND THE PRIOR ORDERS OF THIS COURT

Even were the Court to determine that the Government may not here rely on the inevitable discovery doctrine, the Government is still entitled to receive the Challenged Documents from Amerindo U.S. through the operation of the lawful Revised Subpoena. Defendants claim that once a seized document is "suppressed," the Government may not use that document at trial because the remedy of suppression attaches to the document regardless of whether the Government has a right to the document through a lawful mechanism wholly separate and unaffected by the constitutional violation that resulted in that document's suppression. Defendants' semantic game – claiming that a suppressed document cannot be "unsuppressed" – flies in the face of the "independent source" doctrine. It is black letter law that

> the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred. *See Murphy* v. *Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 79 (1972); *Kastigar* v. *United States*, 406 U.S. 441, 457, 458-59 (1972). When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

*Nix* v. *Williams*, 467 U.S. 431, 443 (1984). The independent source doctrine clearly applies to evidence acquired during the course of an illegal search. *See Murray* v. *United States*, 487 U.S. 533, 540-41 (1988); *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385, 392 (1920)

17

(referring specifically to evidence seized during an unlawful search). In *Murray*, the Supreme

Court rejected petitioners' argument that while the independent source doctrine "does apply to

independent acquisition of evidence previously derived indirectly from the unlawful search, [it]

does not apply to what [petitioners] call 'primary evidence,' that is, evidence acquired during the

course of the search itself." *Murray*, 487 U.S. at 540-41. Specifically, the Court stated,

> In addition to finding no support in our precedent, . . . this strange
> distinction would produce results bearing no relation to the policies
> of the exclusionary rule. It would mean, for example, that the
> government's knowledge of the existence and condition of a dead
> body, knowledge lawfully acquired through independent sources,
> would have to be excluded if government agents had previously
> observed the body during an unlawful search of the defendant's
> apartment; but not if they had observed a notation that the body
> was buried in a certain location, producing consequential discovery
> of the corpse.

*Id*. at 541 (internal citation omitted).

Defendants' argument that the Challenged Documents may not be retained, even though

they would be lawfully acquired through the independent source of the Revised Subpoena,

because they were seized pursuant to an invalid portion of the Warrant, is contrary to the clear

holding of *Murray*, and should be rejected. The Court should instead enforce its prior orders that

validated the Revised Subpoena, and that require the immediate production to the Government of

documents responsive to the Revised Subpoena. (*See* May Order at 4; June Order at ¶¶ 1, 7; Litt

Decl. ¶¶ 6-7, Exs. F, G, respectively). Because the Government already has in its possession the

Challenged Documents, it would be a pointless formalism to require the Government to return

those documents to Amerindo U.S., only to require Amerindo U.S. to produce them immediately

to the Government.

The Court found revised versions of both the Warrant and Subpoena to be lawful. The Court further found that the Subpoena was issued for a proper purpose, was not an extension of an illegal search, and was not issued to serve as an insurance policy against a challenge to the legality of the search. (Order at 80, 82, 83). On May 23, 2007, the Court issued an order requiring Amerindo U.S. "to produce to the Government documents responsive to the [Revised] Subpoena as soon as is practicable after the limited waiver agreement is signed by the Parties and the Court." (May Order at 4; Litt Decl. ¶ 6, Ex. F). On June 6, 2007, the Court filed a Stipulation and Order establishing a limited waiver agreement in which the defendants, among other things, agreed to comply with the Revised Subpoena, and to waive the right to challenge the May Order and the June Order. (June Order at ¶¶ 1, 7; Litt Decl. ¶ 7, Ex. G).[11]

In these circumstances, and in light of the absence of any legal authority to the contrary, the Government should be permitted to retain and use the seized Challenged Documents. The Revised Subpoena constitutes an "independent source" for the Challenged Documents: a source "untainted" by any illegality associated with the Warrant or the Subpoena. *See Silverthorne*, 251 U.S. at 392 (facts obtained unlawfully do not "become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others . . . ."). Extending the sanction of suppression imposed to deter the Government from engaging in unconstitutional searches to documents that fall squarely within a lawfully issued grand jury subpoena would serve no legitimate deterrent purpose and would run counter to the express teachings of the Supreme Court concerning proper application of the Exclusionary Rule. As the Supreme Court

---

[11]     Both defendants acknowledged under oath their understanding and acceptance of the terms of that Stipulation, at a July 17, 2007 pretrial conference. (*See* 7/17/07 Tr. 9, 11; Litt Decl. ¶ 8, Ex. H).

19

recently reiterated in declining to extend operation of the Exclusionary Rule to a violation of the

knock and announce rule, the Exclusionary Rule is a rule of last resort, which should only be

applied when its deterrent benefits outweigh the substantial social costs attendant to its

application:

> Suppression of evidence, . . . has always been our last resort, not
> our first impulse.  The exclusionary rule generates "substantial
> social costs," *United States* v. *Leon*, 468 U.S. 897, 907, 104 S. Ct.
> 3405 (1984), which sometimes include setting the guilty free and
> the dangerous at large.  We have therefore been "cautio[us] against
> expanding" it, *Colorado* v. *Connelly*, 479 U.S. 157, 166, 107 S. Ct.
> 515, 93 L.Ed.2d 473 (1986), and "have repeatedly emphasized that
> the rule's 'costly toll' upon truth-seeking and law enforcement
> objectives presents a high obstacle for those urging [its]
> application," *Pennsylvania Bd. of Probation and Parole* v. *Scott*,
> 524 U.S. 357, 364-365, 118 S. Ct. 2014, 141 L.Ed.2d 344 (1998)
> (citation omitted).  We have rejected "[i]ndiscriminate application"
> of the rule, *Leon*, *supra*, at 908, 104 S. Ct. 3405, and have held it to
> be applicable only "where its remedial objectives are thought most
> efficaciously served," *United States* v. *Calandra*, 414 U.S. 338,
> 348, 94 S. Ct. 613, 38 L.Ed.2d 561 (1974) – that is, "where its
> deterrence benefits outweigh its 'substantial social costs,'" *Scott*,
> *supra* at 363, 118 S. Ct. 2014 (quoting *Leon*, *supra*, at 907, 104
> S. Ct. 3405).

*Hudson* v. *Michigan*, 126 S. Ct. 2159, 2163 (2006).  Here, suppressing the Challenged

Documents because they were seized pursuant to provisions of a search warrant subsequently

determined to be unconstitutionally broad –  when the Government is nevertheless entitled to

them pursuant to lawful portions of a grand jury subpoena which was issued for reasons

independent of the search –  would frustrate the investigatory power of the grand jury without

providing any additional deterrent to the conduct of unconstitutional searches, and would be

contrary to the rationale underlying the Exclusionary Rule.  Accordingly, the Court should

enforce its orders and compel the production of the Challenged Materials to the Government.

## CONCLUSION

For the foregoing reasons, defendants' motion to preclude the Government from using the

Challenged Documents at trial should be denied.

Dated: October 4, 2007
       New York, New York

Respectfully submitted,

MICHAEL J. GARCIA,
United States Attorney for the
Southern District of New York,
*Attorney for the United States of America*

By: _____/s/_____
     Marc Litt
     Deirdre A. McEvoy
     Benjamin Naftalis
     Assistant United States Attorneys
     (212) 637-2295 /-2309 /-2456

21