# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

───────────────

№ 05 Crim. 0621 (RJS)

───────────────

UNITED STATES OF AMERICA,

AGAINST

ALBERTO WILLIAM VILAR AND GARY ALAN TANAKA,

Defendants.

───────────────

MEMORANDUM AND ORDER
January ___, 2008

───────────────

RICHARD J. SULLIVAN, District Judge:

Defendants Alberto William Vilar ("Vilar") and Gary Alan Tanaka ("Tanaka") are charged with conspiracy to commit securities fraud, as well as substantive counts alleging securities fraud, investment adviser fraud, mail fraud, wire fraud, and money laundering. The parties to this action now seek a finding as to whether the Government may offer at trial certain documents recovered from the New York office of Amerindo Investment Advisors Inc. ("Amerindo"), of which Defendants were co-founders and two of its shareholders, officers, and directors. Specifically, the parties dispute whether the inevitable discovery and independent source exceptions to the exclusionary rule permit the Government to offer the documents at trial notwithstanding the fact that they were seized from Amerindo's office during an unlawful search. In addition, Defendants seek to obtain certain disclosures from the Government relating to its purported use of unlawfully obtained evidence in procuring additional, "tainted" evidence, and assert that this Court must resolve any issues relating to such evidence *prior* to trial, rather than after the trial and verdict in this action.

For the reasons set forth below, the Court finds that the documents at issue in this action may be offered at trial by the Government on the basis of the inevitable discovery and independent source doctrines. In addition,

Defendants' specific requests for disclosures from the Government are denied. However, prior to the trial in this action, the Government is directed to disclose to Defendants lists of the witnesses, the exhibits, and the Rule 404(b) evidence that it intends to offer at trial, upon which Defendants may rely in moving to suppress tainted evidence. Finally, although the Court reserves decision on the question of when it will resolve any taint motions filed in this action, it rejects Defendants' assertion that, as a matter of law, all such motions must be resolved prior to trial. Rather, this Court may, for good cause shown, resolve such motions after the trial and verdict in this action.

## I. BACKGROUND

The Court presumes the parties' familiarity with the facts and procedural history of this action, and, therefore, recites only those facts necessary to resolve the instant motions.[1] In addition, in the body of the "Discussion" section, the Court recites certain additional facts relevant to specific portions of this opinion.

On May 26, 2005, at 8:15 a.m., the Government executed a search warrant (the "Warrant") at the New York office of Amerindo. (April 4, 2007 Order (hereinafter, the "Order") at 15.) The ensuing search lasted approximately twelve hours, and, as a result, the Government seized approximately

170 boxes of documents and 30 computers containing 1.6 terabytes of information. (*Id.*)

As discussed in greater detail below, at some point during the search, Marc Litt ("Mr. Litt"), the Assistant United States Attorney assigned to this case, had a conversation with Eugene Licker ("Mr. Licker"), Amerindo's counsel, wherein Mr. Licker asked whether the Government intended to serve a grand jury subpoena upon Amerindo. (Order at 18.) Subsequent to that conversation, Mr. Litt drafted a grand jury subpoena (the "Subpoena") that was coextensive with the provisions of the Warrant. (*Id.* at 19; May 31 Tr. at 95.) Mr. Litt faxed the Subpoena to Mr. Licker at approximately 1:37 p.m. on May 26, 2005. (*Id.* at 19.)

At some point later that day, after Mr. Litt had already served the Subpoena on Mr. Licker, the two individuals had another conversation, wherein Mr. Licker stated that, because the search would not be completed in one day, Amerindo would produce documents pursuant to the Subpoena if the Government would cease its search of Amerindo's office. (*Id.* at 18-19; May 31 Tr. at 106-07.) Shortly thereafter, the Government ceased its search of Amerindo's office. (Order at 19.)

On August 12, 2005, both Defendants filed, *inter alia*, motions to suppress the materials seized pursuant to the Warrant. (*Id.* at 34.) On December 14, 2005, the Honorable Kenneth M. Karas, District Judge, held a hearing regarding Defendants' motions. (*Id.*) On December 15, 2005, Defendants filed a motion to quash the Subpoena. (*Id.* at 34.) Judge Karas conducted additional hearings regarding the motions to suppress and to quash on May 31, June 1, July 7, July 10, August 8, and August 9, 2006. (*Id.*)

---

[1] In an Order dated April 4, 2007, the Honorable Kenneth M. Karas, District Judge, set forth specific findings of fact as they related to Defendants' earlier suppression motions. *See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The Court relies on those facts in resolving the instant motions, and notes that neither party has offered any basis to revisit or to question the accuracy of Judge Karas' findings.

On April 4, 2007, Judge Karas issued the Order denying in part and granting in part both (1) Defendants' motions to suppress the evidence seized pursuant to the Warrant, and (2) Defendants' motion to quash the Subpoena. (*See* Order at 35-66, 76-99.) Pursuant to the Fourth Amendment's probable cause, particularity, and reasonableness requirements, Judge Karas narrowed the scope of the Warrant, and, to a lesser extent, narrowed the scope of the Subpoena. (*See id.*)

Accordingly, Judge Karas found that the documents seized from Amerindo's office pursuant to the invalid portions of the Warrant could not be offered at trial by the Government. (*Id.* at 67.) Nevertheless, Judge Karas found that, "given the more relaxed relevancy requirements applied in evaluating a subpoena," there was a "broader set of documents" that could be lawfully pursued by means of the Subpoena rather than by means of the Warrant. (*Id.* at 94.) As a result, Judge Karas' modifications of the Warrant and the Subpoena, respectively, created a category of documents that, although they were illegally seized from Amerindo's office pursuant to the invalid portions of the Warrant, fell within the scope of the valid portions of the Subpoena.[2]

On August 17, 2007, defendant Tanaka filed a "Motion to Effectuate the Court's April 4, 2007 Order of Suppression," wherein he argued that the Challenged Documents should be suppressed. On August 20, 2007, defendant Vilar filed a "Motion to Suppress Fruits of Unlawful Search, and Related Relief," seeking (1) discovery from the Government regarding its use, if any, of illegally seized evidence, and (2) a finding that Defendants' anticipated "taint" motion should be resolved prior to trial in this action.[3] The Court heard oral argument regarding Defendants' motions on December 17, 2007.[4]

## II. DISCUSSION

### A. The Challenged Documents

Judge Karas held in the Order that the Government seized the Challenged Documents pursuant to portions of the Warrant that were later found to be invalid. (Order at 67.) As such, Judge Karas suppressed the Challenged Documents on the basis of the exclusionary rule. (*Id.*) At the same time, Judge Karas found, as noted above, that the Subpoena contained lawful requests for "a broader set of documents than that permissible under the severed Warrant" — namely, the requests for the Challenged Documents — and deemed that result "unsurprising . . . given the more relaxed relevancy requirements applied in evaluating

---

[2] Hereinafter, the Court refers to this category of documents as the "Challenged Documents." To date, neither party has specified the number of Challenged Documents at issue in this action. With regard to the entirety of the documents seized from Amerindo, the Government has represented to the Court that, as of October 4, 2007, it had "segregated and returned to Amerindo . . . the non-electronic suppressed materials," but was "still in the process of segregating the validly seized [electronic] data from the seized electronic media . . . ." (Gov't's Taint Mem. at 17 & n.10.)

[3] Although Tanaka and Vilar have filed separate motions, each defendant has joined in the other's application. Thus, the Court refers to Defendants' respective motions and arguments as "Defendants' motions" and "Defendants' arguments."

[4] The action was reassigned to the undersigned on September 7, 2007.

a subpoena." (*Id.* at 94.) Ultimately, however, Judge Karas did not resolve — or even reach — the question of whether the Challenged Documents should be suppressed pursuant to the Warrant or deemed admissible as evidence obtained pursuant to the lawful portions of the Subpoena. It is left to this Court to do so.

The Government now asserts that the Challenged Documents are admissible on the basis of the inevitable discovery and independent source exceptions to the exclusionary rule.[5] By contrast, Defendants assert that the Challenge Documents must be excluded from use at trial because: (1) the Government has failed to assert in a timely fashion its arguments relating to the inevitable discovery and independent source doctrines and, thus, has waived its right to do so; and, (2) even assuming *arguendo* that the Government had properly asserted such arguments, the Government has failed to

---

[5] The Court notes that the parties differ as to which is the "moving party" with regard to the instant motion. Defendants characterize the motion as an attempt by the Government to "unsuppress" the Challenged Documents. (*See* Tanaka Mem. at 4.) By contrast, the Government asserts that Defendants have moved to suppress the Challenged Documents, and point to the fact that Defendants previously requested time to consider "whether to file . . . a motion" relating to suppression of the Challenged Documents. (Gov't Supp. Mem. at 11 (quoting April 13 Tr. at 26.) Based on the parties' appearances before Judge Karas prior to filing this motion, it appears that *Defendants* (1) raised the issue of the admissibility of the Challenged Documents, and (2) requested leave to file the instant motion. (*See* April 13 Tr. at 24-25.) However, the Court need not resolve this dispute, as the legal standards and the evidentiary burdens discussed herein apply regardless of who is characterized as the "moving party."

establish that those exceptions to the exclusionary rule apply in the instant case.

For the following reasons, the Court rejects Defendants' waiver argument, and holds that the Challenged Documents may be offered at trial pursuant to the inevitable discovery and independent source doctrines.

### 1. Timeliness of the Government's Arguments Relating to Suppression

The Court rejects Defendants' assertion that the Government has waived its ability to raise arguments regarding the admissibility of the Challenged Documents by failing to assert arguments relating to that issue in response to Defendants' initial suppression motion. (*See* Tanaka Mem. at 4-5.)

Indeed, the Government promptly presented arguments relating to the admissibility of the Challenged Documents at the appropriate stages of this case. On December 13, 2006, prior to issuance of the Order, the Government relayed its position as to the admissibility of evidence obtained pursuant to the Subpoena by asserting that:

> Because the grand jury subpoena was in large part co-extensive with the search warrant, were the Court to deny defendants' motion to quash [the Subpoena] . . . the Court would not need to decide the defendants' motion concerning . . . the Warrant . . . .

(Gov't Dec. 13, 2006 Post-Hr'g. Mem. at 38.) This argument unambiguously conveyed to the Court and to Defendants the Government's view that the Subpoena constituted a lawful method of procuring

evidence from Amerindo's office, and that the Government should be permitted to offer at trial any evidence within the scope of the Subpoena, notwithstanding the admissibility of evidence seized pursuant to the Warrant. Of course, the Government's argument did not address any issues specifically relating to the Challenged Documents, as they did not exist as a class of documents prior to the issuance of the Order.

Subsequently, Judge Karas did not address the issue raised by the Government regarding the admissibility of documents requested in the Subpoena notwithstanding the validity of the Warrant. Rather, in the Order, Judge Karas simultaneously suppressed the Challenged Documents pursuant to the Warrant, and deemed them discoverable pursuant to the Subpoena (*see* Order at 67, 94), and did not even attempt to resolve the tension between the invalid portions of the Warrant and the valid portions of the Subpoena. Instead, Judge Karas and the parties addressed this issue at a conference held on April 13, 2007, nine days *after* the Order had been issued. (*See* April 13 Tr. at 24.)

At that time, Tanaka's counsel indicated that any issues regarding suppression of the Challenged Documents had not been determined during the prior proceedings and would be the subject of a *forthcoming* debate:

I imagine that we . . . *will have a debate* on the usability and admissibility of documents your Honor has suppressed but yet ordered produced pursuant to the subpoena . . . . [I]f the government has a position [on this issue], please tell us. If they

don't, please ask the government to give you a position by April 27.

(April 13 Tr. at 24 (emphasis added).) Judge Karas then confirmed that this issue presented, at that time, an open question:

JUDGE KARAS: It's pretty clear to me that the government's view is, even if something is suppressed by the modified search warrant [as it exists following the Order], they get to use it if it's responsive to the subpoena. Am I wrong on that . . . ?

THE GOVERNMENT: No.

JUDGE KARAS [to Tanaka's counsel]: So you're saying you're going to challenge [the Government's] use of materials that are suppressed under the warrant but responsive to the subpoena, is that what you're saying? You may challenge the admissibility of those materials.

TANAKA'S COUNSEL: Yes. (*Id.* at 24-25.)[6]

---

[6] Similarly, at a conference held before Judge Karas on April 27, 2007, Tanaka's counsel stated:

These [Challenged Documents] were suppressed by your Honor's decision. They cannot be used at trial. . . . [The inevitable discovery doctrine] was not raised in the government's responses to the briefing on the [initial] suppression issues and it hasn't been raised [to] date.

(April 27 Tr. at 66.) Judge Karas responded:

I am not going to decide it now . . . . I

Therefore, although the Government "may lose its right to raise" issues relating to the suppression of evidence "when it has acquiesced in contrary findings" — such as a suppression order — "or when it has failed to raise such questions in a timely fashion during the litigation," the Court finds that the instant case does not present such a situation. *Steagald v. United States*, 421 U.S. 204, 209 (1981); *see United States v. Persico*, 832 F.2d 705, 714 & n.2 (2d Cir. 1987) ("[T]he government apparently concedes that it did not raise this issue in the district court, and has offered no justification for its failure to do so. Therefore, we deem the issue to be waived.") (collecting cases); *accord United States v. Head*, 737 F. Supp. 1287, 1288 (W.D.N.Y. 1990) ("The government's present constitutional argument may well have merit. But the fact remains that it was not raised before, and it would be exceptionally unfair to the defendant to allow the government, with the benefit of hindsight after having lost based on its original arguments, to . . . raise a new argument that should have been raised in the first instance.") (citing *Steagald*, 421 U.S. at 209).

In this case, the Government did not "acquiesce[] in contrary findings" on the issue of its ability to offer evidence sought in the Subpoena notwithstanding the validity of the Warrant. *Steagald*, 421 U.S. at 209. Indeed, as discussed above, although Judge Karas acknowledged that the Order created a

_____

understand the difference of opinion and [that is] fine. My reaction is that they [the Government] get it [the Challenged Documents] because they get it under the subpoena . . . .

(*Id.* at 67.)

class of documents that appeared to be simultaneously admissible and inadmissible, he did not resolve that issue — as is evident from Judge Karas' and the parties' statements following issuance of the Order.

In addition, throughout the instant litigation, the Government has "raise[d] questions" relating to the admissibility of documents sought by the Subpoena — including the Challenged Documents — "in a timely fashion . . . ." *Id.* Indeed, nearly five months *prior* to issuance of the Order, the Government asserted that such documents were admissible notwithstanding the validity of the Warrant. In addition, following issuance of the Order, the Government promptly and vigorously asserted the argument that it may use the Challenged Documents at trial on the basis of the Subpoena and the two exceptions to the exclusionary rule discussed herein.[7]

Thus, this Court rejects Defendants' contention that the Government has waived its ability to assert arguments relating to the admissibility of the Challenged Documents. The fact that, prior to issuance of the Order, neither party nor the Court fully anticipated the contours of the Order — which created a class of Challenged Documents that were simultaneously suppressed under the Warrant and deemed discoverable under the Subpoena

_____

[7] Specifically, the Government first addressed the issues relating to the admissibility of the Challenged Documents at a conference before the Court on April 13, 2007 — only nine days after issuance of the Order. Since that time, the Government has asserted the applicability of the inevitable discovery and independent source doctrines both during appearances before the Court and in its submissions relating to the instant motion.

— does not establish that any party should "lose its right" to address issues arising from the Order. *See id.*

Defendants cite *United States v. Nezaj*, 668 F. Supp. 330, 334 (S.D.N.Y. 1987), in support of their assertion that "the Government's arguments in favor of admitting the Challenged Documents "must be rejected as untimely." (Tanaka Mem. at 6.) However, in *Nezaj*, the district court denied, in part, the Government's request to reopen a suppression hearing in order to present previously undisclosed "facts that were known to [the Government] at the time of the initial hearing through . . . witnesses who were available to the government at the time of the hearing," and to raise "a legal issue that the government chose not to raise at the prior hearing." *Nezaj*, 668 F. Supp. at 334.

Here, by contrast, the Government does not seek to reopen the suppression hearing, nor does it seek to present additional facts or a new legal theory relating to a suppression issue already decided by the Court. Instead, the Government seeks only to make arguments relating to an unresolved issue that was not addressed in Judge Karas' Order regarding the prior motions to suppress and to quash.

In addition, there is no indication in this case that the Government elected to omit the arguments at issue during the prior suppression hearing. Rather, as discussed above, the Government raised the issue of the admissibility of documents sought in the Subpoena *prior* to issuance of the Order, and presented arguments specifically tailored to the Challenged Documents shortly after the

Order created that class of documents. Thus, the holding of *Nezaj* is inapplicable to the instant case, wherein the Government, rather than asking this Court to reopen the suppression hearing or to reconsider the suppression order, merely seeks a determination as to an issue arising from, and left unresolved by, the initial suppression order in this case.

Accordingly, because Defendants have failed to present any persuasive arguments or authority in support of their waiver claim, the Government may invoke the inevitable discovery and independent source doctrines in support of the admissibility of the Challenged Documents.

## 2. Admissibility of the Challenged Documents

The Government contends that the Challenged Documents may be offered at trial based on the inevitable discovery and the independent source exceptions to the exclusionary rule. For the reasons set forth below, the Court concurs.

### a. Inevitable Discovery

#### i. Legal Standard

The doctrine of inevitable discovery provides that "evidence obtained during the course of an unreasonable search and seizure should not be excluded 'if the government can prove that the evidence would have been obtained inevitably' without the constitutional violation." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006) (citing *Nix v. Williams*, 467 U.S. 431, 447 (1984), and *United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993)

(hereinafter, "*Eng II*")). "In essence, the inevitable discovery doctrine's application turns on a central question: Would the disputed evidence inevitably have been found through legal means 'but for' the constitutional violation? If the answer is 'yes,' the evidence seized will not be excluded." *Id.*; *see also United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002). Thus, illegally-obtained evidence will be admissible only where the Court can find "with a high degree of confidence . . . that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *Heath*, 455 F.3d at 60. The Government bears the burden of proving by a preponderance of the evidence that discovery of the challenged items "would inevitably have happened," *id.* at 58 n.6 (citing *United States v. Cabassa*, 62 F.3d 470, 474 (2d Cir. 1995)), by pointing to "demonstrated historical facts capable of ready verification or impeachment," *United States v. Eng*, 971 F.2d 854, 859 (2d Cir. 1992) (hereinafter, "*Eng I*") ("[P]roof of inevitable discovery 'involves no speculative elements . . . .'") (quoting *Nix*, 467 U.S. at 444 n.5) (emphasis in original).

In *Eng I*, the Second Circuit specifically addressed the circumstances under which the Government may "rely upon the subpoena power" as a means of "proving inevitable discovery." 971 F.2d at 860. The Second Circuit advised district courts to take "[p]articular care" in assessing the applicability of the inevitable discovery doctrine where, as here, the Government seeks to rely upon a subpoena "issued after or at the time of the unlawful search"; the court was especially concerned with the need to guard against the use of such subpoenas "as

an after the fact 'insurance policy' to 'validate' an unlawful search under the inevitable discovery doctrine." *Id.* at 861 (quoting *Center Art Galleries-Hawaii, Inc. v. United States*, 875 F.2d 747, 754-55 (9th Cir. 1989), *overruled on other grounds*, *J.B. Manning Corp. v. United States*, 86 F.3d 926, 927 (9th Cir. 1996)). Thus, the Second Circuit directed district courts to conduct a two-step "inevitable discovery analysis" in such situations. *Id.*

First, the district court must look to "the progress of the investigation at the time of the government misconduct." *Id.* at 861. Specifically, to satisfy this step, the Government must establish that there was an "active and ongoing investigation" of the target of the unlawful search at the time of that search. *Id.* at 862; *see Nix*, 467 U.S. at 444. Thus, the Government must establish that the investigation was not "'trigger[ed]' . . . by the information unlawfully gained by the illegal search," *Eng II*, 997 F.2d at 992 (quoting *Eng I*, 971 F.2d at 871) (additional internal quotation marks and citation omitted), but, rather, that "'[t]he alternate means of obtaining the [challenged] evidence" was, "at least to some degree, imminent, if yet unrealized,'" at the time of the unlawful search. *Eng I*, 971 F.2d at 861 (quoting *United States v. Falley*, 489 F.2d 33, 41 (2d Cir. 1973) and *United States v. Cherry*, 759 F.2d 1196, 1205 n. 10 (5th Cir. 1985)).

Second, with regard to "each particular piece of evidence" that the Government asserts would have been inevitably discovered, the district court must "specifically analyze and explain how, if at all, discovery of that piece of evidence would have been more likely than not inevitable

absent the [unlawful] search . . . ." *Eng I*, 971 F.2d at 862 (citing *Nix*, 467 U.S. at 444) (internal quotation marks omitted). Thus, to satisfy this second step of the inquiry, the Government must show by a preponderance that "both issuance of the subpoena, and a response to the subpoena producing the evidence in question, were inevitable." *Eng I*, 971 F.2d at 860.

Ultimately, "where the government can demonstrate a substantial and convincing basis for believing that the requisite information would have been obtained by subpoena . . . there is no reason why the government may not rely upon the subpoena power as one way it might meet the burden of proving inevitable discovery by a preponderance of the evidence." *Id.*

### ii. Analysis

It is undisputed that the Challenged Documents were illegally seized pursuant to the invalid portions of the Warrant. However, the Government asserts that it should be permitted to offer the Challenged Documents at trial because they would have been inevitably discovered pursuant to the lawful portions of the Subpoena even if the "government misconduct" at issue in this action had "never occurred." *Id.* at 862.

As an initial matter, the Court specifies the government misconduct at issue here. At this stage of the case, it is clear that only certain portions of the Warrant were unlawful. Specifically, in accord with Judge Karas' findings in the Order, only six of the original Warrant's seventeen paragraphs are completely invalid, "several are entirely valid, and the majority of those that are modified are

done so only slightly." (*See* Order at 66.) Therefore, for the purposes of the inevitable discovery analysis in this case, the relevant government misconduct is the Government's execution of those portions of the Warrant that were later found to be invalid. Thus, in order to establish the applicability of the inevitable discovery doctrine, the Government must show by a preponderance of the evidence that the Challenged Documents would have been inevitably discovered pursuant to the Subpoena if the Government had executed a warrant that omitted the invalid portions of the original Warrant.

However, Defendants argue that the Subpoena would not have issued — and, in turn, the Challenged Documents would not have been inevitably discovered — absent the invalid portions of the Warrant. (*See* Tanaka Mem. at 7-8; Tanaka Reply Mem. at 6-8.) Specifically, Defendants assert that the overbroad provisions of the Warrant and the prospect of the forthcoming search spurred Amerindo's counsel, Mr. Licker, to ask the Government whether it intended to issue a grand jury subpoena, and that Mr. Licker's question actually prompted the Government to issue the Subpoena. (Tanaka Mem. at 6-8.) Therefore, in Defendants' view, because the unlawful search triggered — by means of Mr. Licker's question — the issuance of the Subpoena, the Challenged Documents would *not* have been discovered absent the Warrant's invalid provisions.

For the following reasons, the Court finds that the Government has met its burden of establishing the inevitable discovery of the Challenged Documents. Specifically, the Government has established by a preponderance of the evidence that (1) the

issuance of the Subpoena was not "triggered" by information unlawfully gained from Amerindo; (2) the Subpoena was the product of an active and ongoing investigation; (3) absent the unlawful portions of the Warrant, the Government's investigation would have inevitably prompted Mr. Licker to raise the issue of a grand jury subpoena, which, in turn, would have caused the Government to issue the Subpoena; and (4) Amerindo would have inevitably responded to the portions of the Subpoena calling for production of the Challenged Documents.

First, the Court finds that the Subpoena was not issued on the basis of information unlawfully gained from Amerindo. As an initial matter, the Court notes that, in addressing this point, Defendants have mischaracterized the question before the Court. The critical inquiry is not whether the Government can establish the absence of *any* causal connection between the initial search and the Government's subsequent decision to issue a subpoena. (*See* Tanaka Reply Mem. at 6.) Rather, the Government's burden is to establish by a preponderance that it would have inevitably discovered the Challenged Documents without relying upon "*information* unlawfully gained" during the course of the initial, unlawful search. *Eng I*, 971 F.2d at 861 (emphasis added).

For instance, in *Eng I*, the Second Circuit vacated the district court's application of the inevitable discovery doctrine based, in part, on its concern that, in drafting grand jury subpoenas, the Government had impermissibly relied on information unlawfully gained from a warrantless search. *See* 971 F.2d at 861. There, the court specifically noted that the documents

obtained by the Government during its initial, unlawful search may have been the "only" source of information for evidence relating to, *inter alia*, bank accounts held by the defendant, the defendant's ownership interest in certain real estate properties, and the defendant's financial dealings with other individuals — all of which were the subject of subsequent subpoenas issued by the Government. *See Eng I*, 971 F.2d at 862. Thus, the Second Circuit found that the Government had failed to establish that it would have inevitably discovered the challenged evidence by means of the subpoena power. *Id.* at 862.

In the instant case, there is no concern that, in determining the contents of the Subpoena, the Government relied upon *information* obtained during the course of the initial search. Indeed, the record in this case offers absolutely no indication — and Defendants do not argue — that, at the time the Government decided to seek the Subpoena, drafted the document, and served it upon Defendants, the Government had reviewed even a *single piece of evidence* obtained pursuant to the invalid portions of Warrant. (*See, e.g.*, Order at 18-19; Tanaka Mem. at 7-8.) Thus, the Subpoena in this case was not "trigger[ed] or 'catalyzed by information unlawfully gained" as a result of the invalid portions of the Warrant. *Eng I*, 971 F.2d at 861 (internal quotation marks omitted). Instead, it is clear, as discussed below, that the Subpoena was prompted by a query from Amerindo's counsel as well as the Government's internal discussions regarding the investigative benefits of a grand jury subpoena.

Second, the Government has established by a preponderance of the evidence that the Subpoena was the product of an "active and ongoing investigation" into suspected wrongdoing by Defendants, and that, absent the invalid portions of the Warrant, the Government would have inevitably conducted a substantial search of Amerindo's office. *Id.* at 862. Specifically, it is beyond doubt that the Government had a lawful basis to be present in Amerindo's office on the date of the search in order to execute the lawful portions of the Warrant. As Judge Karas observed, there was "[c]learly . . . probable cause to conduct some form of search of the Amerindo [] offices" relating to the alleged "misuse[]" of "approximately $25 million in funds" during the period from 2001 through May 2005. (Order at 37-38.)

Indeed, the lawful portions of the Warrant permitted the Government to execute a search for, among other things, the following:

Records concerning the formation of the various Amerindo entities, except Amerindo Cayman, as well as documents describing their shareholders, principals, officers, directors, and employees, changes in ownership, bylaws, and resolutions.

Documents concerning four accounts held by Amerindo at Bear, Stearns & Company Inc.

Documents reflecting all investments in which four individual Amerindo clients have a beneficial interest, including descriptions of the investment, account statements, and returns on the investment.

Documents reflecting any effort made by any Amerindo entity to obtain a Small Business Investment Company license from the United States Small Business Administration.

Documents reflecting any Amerindo investment in Guaranteed Fixed Rate Deposit Accounts ("GFRDAs"), including lists of clients with investments in GFRDAs, account statements reflecting investments in GFRDAs, documents reflecting the holdings of any Amerindo entity in certificates of deposit or government securities, and documents reflecting all securities underlying any investment in a GFRDA.

Documents reflecting any private bank, brokerage or other account with any financial institution held by Vilar and Tanaka since 2001.

Documents reflecting or relating to the cancellation of completed trades and rebooking of those canceled trades in other accounts managed or controlled by Amerindo, or in which Amerindo or its principals have a beneficial ownership interest, and which occurred in 2001 or later.

Documents reflecting any direct financial or beneficial ownership interest held by Vilar or Tanaka in Amerindo and the Amerindo Brokerage Accounts.

Photographs, address books, Rolodex indices, diaries, calendars, identification documents, travel

11

documents, and other documents concerning or reflecting information concerning Vilar and Tanaka.

(*See* Order at 61-64; Warrant ¶¶ 1, 2, 6, 7, 8, 9, 10, 11, 16A.) Accordingly, the Government has established by a preponderance of the evidence that, even absent the invalid portions of the Warrant, it would have inevitably been present in Amerindo's office in order to conduct an extensive search of the premises relating to an active and ongoing investigation of the company.

Third, the Government has demonstrated by a preponderance of the evidence that, absent the invalid portions of the Warrant, Mr. Licker would have inevitably raised the issue of a grand jury subpoena with Mr. Litt, and the Government would have inevitably issued the Subpoena.

Indeed, based on the testimony offered at the suppression hearing, it is clear that Mr. Licker first raised the issue of a grand jury subpoena during one of two telephone conversations with Mr. Litt that took place between approximately 10:30 a.m. and 11:00 a.m., after the search had already commenced.[8]    (May 31 Tr. at 89, 92.) Specifically, according to the uncontroverted hearing testimony of Mr. Litt, during one of those conversations,

> Mr. Licker asked me whether the government intended to serve

Amerindo with a grand jury subpoena. . . .  I responded that I didn't know, and that I'd have to get back to him.

(May 31 Tr. at 92.)[9]  In addition, Mr. Licker testified that, during his conversations with the Government on the day of the search, he did *not* discuss the "breadth, enforceability or legality" of the Warrant (May 31 Tr. at 42), but, instead, declared his intention to "cooperate fully with the Government in its investigation . . . ." (Order at 18; May 31 Tr. at 16-19, 26, 30-32, 92.)

Thus, the sole evidence in the record regarding these events shows that Mr. Licker raised the issue of a grand jury subpoena as a reaction to the mere fact that the Government was conducting a search of Amerindo's

---

[8] At that time, federal agents had been conducting a search of Amerindo's offices for, at most, three hours, and Mr. Licker had been present at the premises for approximately one hour.  (*See id.* at 12-16, 29, 32.)

[9]  The Court fully credits Mr. Litt's recollection of his mid-morning conversations with Mr. Licker regarding the Government's investigation and a potential grand jury subpoena.  As noted above, Judge Karas had the opportunity to observe contemporaneously Mr. Litt's testimony at the suppression hearing, and, subsequently, found Mr. Litt's version of events to be fully credible.  (*See* Order at 19.)  In any event, this Court is bound by the law of the case doctrine — at least where, as here, Defendants have failed to offer any reason to revisit Judge Karas' rulings — to adhere to Judge Karas' finding that, "to the extent that there were inconsistencies" between Mr. Litt's and Mr. Licker's testimony regarding their conversations, Mr. Litt's testimony is "the more credible of the two, owing in large part to [Mr. Licker's] acknowledgment . . . that his memory of the day's events was less than clear" (Order at 19 (citing May 31 Tr. at 53)).  *See, e.g.*, *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 7-8 (2d Cir. 1996) ("The law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'") (quoting *DiLaura v. Power Auth.*, 982 F.2d 73, 76 (2d Cir. 1992))

offices. The record offers absolutely no support for the proposition that the *invalid portions* of the Warrant caused Mr. Licker to ask about a grand jury subpoena. Thus, a preponderance of the evidence demonstrates that, absent the invalid portions of the Warrant, Mr. Licker would have inevitably raised the issue of a grand jury subpoena during his conversations with Mr. Litt.

Furthermore, the Court finds by a preponderance of the evidence that, absent the invalid portions of the Warrant, the Government would have inevitably issued the Subpoena in response to Mr. Licker's question. It is undisputed that, following his mid-morning conversations with Mr. Licker, Mr. Litt spoke with his supervisor in the U.S. Attorney's Office regarding the propriety of issuing a grand jury subpoena. (May 31 Tr. at 105.) The supervisor indicated that a grand jury subpoena would aid in the Government's investigation of Amerindo because (1) if agents executing the search at Amerindo's office missed items to which the Warrant applied, such items could be recovered at a later date pursuant to a subpoena; and (2) the prospect of a criminal charge for obstruction of justice would deter individuals from destroying or concealing items within the scope of a subpoena. (May 31 Tr. at 94.) On the basis of this discussion, Mr. Litt prepared the Subpoena and faxed a copy to Mr. Licker's office at approximately 1:37 p.m. on

the day of the search.[10] (*Id.* at 15, 94-95, 98, 102-03.)

Mr. Litt testified that, after Mr. Licker raised the idea of a subpoena, the Government issued the Subpoena for the sole purpose of achieving the two objectives outlined by Mr. Litt's supervisor. (May 31 Tr. at 100.) Indeed, in the Order, Judge Karas specifically found that the Government issued the Subpoena "not to cure any defects in the Warrant, but to provide an added incentive to Amerindo to provide the sought-after materials [including the Challenged Documents] and to obtain materials that may have been missed during the search," and rejected Defendants' assertion that the Government "viewed the Subpoena as some sort of an insurance policy against a shaky warrant." (Order at 81 & n.27.) This Court joins in Judge Karas' finding on the basis of both the law of the case doctrine as well as the uncontroverted evidence in the record supporting that finding. Accordingly, the Court finds that, subsequent to Mr. Litt's conversation with Mr. Licker, the Government would have inevitably issued the Subpoena even absent the invalid portions of the Warrant.

Defendants assert that certain comments made by Mr. Licker to the Government *following* service of the Subpoena on Mr.

---

[10] Mr. Litt's computer records corroborate his recollection of the sequence of events relating to the preparation of the Subpoena. Specifically, according to those records, Mr. Litt created the file containing the first draft of the Subpoena at approximately 11:36 a.m. on the day of the search — following his conversations with Mr. Licker and his supervisor — and the file was last modified at approximately 1:27 p.m. on that day. (May 31 Tr. at 98; Gov't's Ex. 11.)

Licker demonstrate that Mr. Licker's earlier question regarding a subpoena was, in fact, "triggered" by the invalid portions of the Warrant. Specifically, Defendants point to Mr. Licker's post-service comments on May 26, 2005, stating his views (1) that a grand jury subpoena — as opposed to a search warrant — was a more "efficient" means for the Government to collect the evidence it sought, and (2) that proceeding by subpoena, rather than continuing to execute the Warrant, would cause a relatively less significant disruption to "Amerindo's business."[11] (Tanaka's Reply Mem. at 6 (quoting May 31 Tr. at 108).)

The Court rejects Defendants' argument on the ground that any comments made by Mr. Licker *following* service of the Subpoena are immaterial to the critical issue here — namely, whether the Government would have *issued* the Subpoena calling for the Challenged Documents absent the initial, unlawful search. Whatever the substance or implications of Mr. Licker's post-service statements, they have no bearing upon the analysis set forth above regarding the facts and circumstances that led the Government to prepare and to issue the Subpoena. *See Eng I*, 971 F.2d at 861 (internal citation omitted).

In any event, even assuming *arguendo* that Mr. Licker's post-service comments had some bearing on the inevitable discovery inquiry in this case, the Court finds that Mr. Licker's statements provide absolutely no support for Defendants' assertion that the

invalid portions of the Warrant actually triggered Mr. Licker's query regarding a grand jury subpoena. Indeed, it is self-evident that the execution of *any* search warrant listing a significant number of documents would be more disruptive to a business than a subpoena calling for the same documents due to the fact that, in order to execute a warrant, agents must physically enter the premises of the target business. *See In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 854 (9th Cir. 1991) ("Subpoenas are not search warrants. They involve different levels of intrusion on a person's privacy. A search warrant allows the officer to enter the person's premises, and to examine for himself the person's belongings. . . . Service of a forthwith subpoena does not authorize an entry into a private residence. Furthermore, the person served determines whether he will surrender the items identified in the subpoena or challenge the validity of the subpoena prior to compliance."); *Matter of Establishment Inspection of Skil Corp.*, 846 F.2d 1127, 1133 (7th Cir. 1988) ("[A] subpoena *duces tecum* . . . is less intrusive than a search warrant, since it involves no entry.") (internal citation omitted). Therefore, Mr. Licker's comment that a subpoena would be a relatively more "efficient" means of obtaining evidence than would the Warrant does not establish that the invalid portions of the Warrant actually caused him to raise the issue of a subpoena, nor does it undermine the Government's evidence indicating that Mr. Licker would have raised the issue absent the invalid portions of the Warrant.

Fourth, and finally, the Government has established by a preponderance of the evidence that Defendants would have inevitably produced the Challenged

---

[11] At the suppression hearing, Mr. Litt testified as to the substance of Mr. Licker's comments; Mr. Licker could not recall making such comments. (*See* May 31 Tr. at 105-08.)

Documents in response to the relevant portions of the Subpoena. As noted above, the Government must establish that "a response to the subpoena producing the evidence in question [was] inevitable" absent the invalid portions of the Warrant. *Eng I*, 971 F.2d at 860. In *United States v. Roberts*, 852 F.2d 671, 676 (2d Cir. 1988), the Second Circuit addressed this step of the inevitable discovery analysis:

> The mere fact that the government serves a subpoena . . . does not mean that it will obtain the documents it requests. A subpoena can be invalid for a variety of reasons, as when it is unduly burdensome, Fed. R. Crim. P. 17(c), when it violates the right against self-incrimination, *United States v. Doe*, 465 U.S. 605, 610-12 (1984), or when it calls for privileged documents. *In re Grand Jury Subpoena Dated Sept. 15, 1983*, 731 F.2d 1032, 1036-37 (2d Cir. 1984). Moreover, we can deplore but not ignore the possibility that the recipient of a subpoena may falsely claim to have lost or destroyed the documents called for, or may even deliberately conceal or destroy them after service of the subpoena.

Here, the Government has established by a preponderance of the evidence that, absent the invalid portions of the Warrant, (1) Defendants would have inevitably produced the Challenged Documents in response to the Subpoena, and (2) none of the concerns listed in *Roberts* would have presented an obstacle to the discovery of the Challenged Documents.

The Government has shown by a preponderance of the evidence that, absent the illegal search, Amerindo would not have "lost . . . [,] concealed [nor] destroy[ed]" the Challenged Documents, *Roberts*, 852 F.2d at 676, but, rather, would have inevitably complied with the requests contained in the Subpoena for production of the Challenged Documents. Specifically, the Government has pointed to multiple instances — both before, during, and after the Government's search of Amerindo's office — wherein Amerindo, through its counsel, and Defendants repeatedly and unambiguously stated their intention to cooperate with the Government's lawful requests for documents in this case. (*See, e.g.,* May 31 Tr. at 19-20 (The Government: "[A]fter accepting service of the subpoena, employees of Amerindo and yourself were being cooperative with the government in their investigation, correct?" Mr. Licker: "Yes."), 23-26 (Mr. Licker: "My intent was only to cooperate with the government's investigation."), 30-31 (Mr. Licker: "I had made it clear to [Mr. Litt] that we intended to cooperate . . . ."), 92 (Mr. Litt: "Mr. Licker indicat[ed] to me that he wanted to be cooperative with the government . . . .").)

In addition, since the search of Amerindo's office in May 2005, Amerindo has maintained approximately 900 boxes of documents relating to its business in storage for over two years, and has reviewed a significant portion of such documents to determine whether they should be produced in response to the revised Subpoena. (*See* Litt Decl. ¶ 5; Ex. E; Gov't's Supp. Mem. at 16.)

Most recently, in a Stipulation and Order dated June 6, 2007 — and signed by Judge

Karas, the Government, and each defendant — Defendants and Amerindo agreed to "comply with the [revised Subpoena] by providing documents" to the Government. (June 6, 2007 Order ¶ 1; *see also* May 23, 2007 Order at 2 ("Amerindo [through its counsel] has stated its desire to comply with its obligations under the Subpoena.").)

Accordingly, on the basis of these undisputed facts, the Court finds that the Government has established by a preponderance that Defendants would have inevitably responded to a lawful request for the Challenged Documents.

Moreover, in the Order, Judge Karas affirmed the lawfulness of those portions of the Subpoena to which the Challenged Documents are responsive. (*See* Order 89-99.) Therefore, the concerns noted in *Roberts* regarding the possibility that a subpoena may be "unduly burdensome," "violate[] the right against self-incrimination," "call[] for privileged documents," or otherwise violate the law, are inapplicable in the instant case. *Roberts*, 852 F.2d at 676 (internal citations omitted).

Defendants assert in a conclusory manner that the Government has failed to establish that Defendants would have inevitably "produc[ed] the evidence in question" in response to the Subpoena. (Tanaka Mem. at 8.) However, there is nothing in the record to suggest that Amerindo intended anything other than its steadfast cooperation and compliance with the Subpoena. Accordingly, the Court finds that Defendants would have inevitably responded to the Government's request for the Challenged Documents by means of the Subpoena.

In sum, the Court finds that the Government has established by a preponderance of the evidence, and by pointing to demonstrated historical facts found in the record, that the Challenged Documents would have been inevitably discovered by means of the Subpoena even if the unlawful search had never occurred. Accordingly, because the Challenged Documents would have been inevitably obtained as a result of "the normal output of [the Government's] investigation" *Eng I*, 971 F.2d at 861, the Government may offer the Challenged Documents at trial pursuant to the inevitable discovery exception to the exclusionary rule.

### b. The Independent Source Doctrine

Because the Court has found that the Government may offer the Challenged Documents at trial pursuant to the inevitable discovery doctrine, it need not reach the issue of whether the independent source doctrine applies in this case. Nevertheless, for the reasons that follow, the Court finds that the independent source doctrine provides an alternative justification to permit the Government to offer the Challenged Documents at trial.

"When the challenged evidence has an independent source," such evidence is not subject to the exclusionary rule because the "exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." *Murray v. United States*, 487 U.S. 533, 537 (1988) (quoting *Nix*, 467 U.S. at 443) (internal quotation marks omitted); *see, e.g., United States v. Demosthene*, No. 03 Crim. 1409 (VM), 2004 WL 1243607, at *5

16

(S.D.N.Y. June 4, 2004). "The ultimate question" is whether the later, purportedly lawful search — as compared to the initial, unlawful search — "was in fact a genuinely independent source of the information and tangible evidence at issue here." *Murray*, 487 U.S. at 542. If so, the independent source doctrine "allows the government to use evidence that it obtained both illegally and legally . . . ."[12] *United States v. Johnson*, 380 F.3d 1013, 1014 (7th Cir. 2002) (Posner, J.) (citing *Murray*, 487 U.S. at 537).

As an initial matter, the Court rejects Defendants' assertion that the independent source doctrine *only* applies where the challenged evidence was "not actually seized in the first instance." (Tanaka's Reply Mem. at 8 (internal citation omitted).)[13] Rather, it is well-settled that the independent source doctrine may apply where, as here, the Government executed a later, lawful "reseizure" of evidence that was originally seized by means of an unlawful search. *See Murray*, 487 U.S. at 541-42. Indeed, in *Murray*, the Supreme Court specifically rejected the proposition "that objects 'once seized cannot be cleanly reseized without returning the objects to private control.'" *Id.* (quoting *United States v. Silvestri*, 787 F.2d 736, 739 (1st Cir. 1986)). Thus, because the Government may, pursuant to the independent source doctrine, "reseize" tangible evidence already seized without returning the evidence to private control, the independent source doctrine should apply "[s]o long as [the] later, lawful seizure is genuinely independent of an earlier, tainted one."[14] *Id.* at 542; *see, e.g.*, *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993) (applying the independent source doctrine to audio tapes that were reviewed unlawfully, and remained in the possession of the Government for six months before the Government obtained a lawful warrant to review the tapes).

Here, the Court finds that the Challenged Documents may be offered at trial pursuant to

---

[12] By contrast, as discussed above, the inevitable discovery doctrine "allows the government to use evidence that it obtained illegally but *would have* obtained legally in any event." *Id.* at 1014 (emphasis added).

[13] The Court notes that Defendants appear to have retreated from this position. During oral argument regarding the instant motion, Defendants conceded that, if the Government were to establish that the Subpoena was issued independently of the unlawful search, the independent source exception would apply to the Challenged Documents notwithstanding the fact that the Documents were actually seized by the Government during the initial, unlawful search. (*See* Dec. 17 Tr. at 48.) Nevertheless, in an abundance of caution, the Court addresses Defendants' original argument presented in their moving papers.

[14] The Court notes that the two doctrines at issue here are often applied at the same time. As the Seventh Circuit observed in *Johnson*, "[t]he independent-source and inevitable-discovery doctrines are easily collapsed into the familiar rule of tort law that a person can't complain about a violation of his rights if the same injury would have occurred even if [his rights] had not been violated." 380 F.3d at 1014; *cf. United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996) ("The inevitable discovery doctrine is conceptually more problematic than the independent source doctrine because it involves a degree of deducing what would have happened rather than simply evaluating what actually happened."). Similarly, in *United States v. Alvarez-Porras*, 643 F.2d 54, 59-60 (2d Cir. 1981), the Second Circuit noted the fundamental similarity of the two doctrines (as well as the "attenuation doctrine"): "despite the identification of discrete headings for the various exceptions, their applications and rationales overlap enough that we view them more as helpful guides than as rigid tests."

the independent source doctrine. Specifically, the Court finds that the Subpoena provided "a genuinely independent source"— separate and apart from the invalid portions of the Warrant — to obtain the Challenged Documents. *Murray*, 487 U.S. at 542.

First, as discussed above, the Subpoena was issued independently of any information obtained by means of the unlawful portions of the Warrant. Second, it is undisputed that the lawful portions of the Subpoena called for production of the Challenged Documents. Third, in the Order, Judge Karas affirmed the lawfulness of those portions of the Subpoena relating to the Challenged Documents. (Order at 89-99.) Fourth, by Order dated May 23, 2007, Judge Karas directed Amerindo "to produce to the Government documents responsive to the Subpoena as soon as is practicable after [a] limited waiver agreement is signed by the Parties and the Court." (May 23, 2007 Order at 4.) Fifth, as noted *supra*, by Stipulation and Order dated June 6, 2007, Defendants and Amerindo executed a limited waiver agreement, wherein they agreed to "comply with the Subpoena by providing documents" to the Government. (June 6, 2007 Order ¶ 1.) Finally, it is undisputed that the Challenged Documents are in the possession of the Government, as they have been since the search of Amerindo's office, and, therefore, have been effectively "reseized" by the Government pursuant to the lawful portions of the Subpoena. *Murray*, 487 U.S. at 542.

Thus, it is clear that the portions of the Subpoena calling for the production of the Challenged Documents are "genuinely independent" of the unlawful portions of the

Warrant. *Murray*, 487 U.S. at 542. Accordingly, the Court finds that the Challenged Documents may also be offered at trial pursuant to the independent source exception to the exclusionary rule.

### B. Taint

The parties have raised three issues with respect to Defendants' anticipated motion to suppress "tainted" evidence — namely, evidence that was purportedly obtained through the Government's use of items acquired during the unlawful search of Amerindo's office. First, Defendants seek to obtain certain disclosures from the Government relating to its purported use of unlawfully obtained evidence. Second, the Government asserts that Defendants are barred from litigating issues of taint because they have failed to satisfy their initial burden of showing taint in a substantial portion of the Government's case. Third, Defendants argue that this Court is *required* to resolve issues of taint prior to trial, rather than after the trial and verdict in this action. The Court will address each issue in turn.

#### 1. Disclosures from the Government

Defendants ask this Court to direct certain disclosures by the Government in anticipation of Defendants' motion to suppress tainted evidence in this case. Defendants argue that, given the initial, illegal search in this action, they are *entitled* to disclosures from the Government that would effectively require the Government to specify the evidence that it intends to use at trial. According to Defendants, such disclosures would help Defendants to demonstrate that the Government has used unlawfully seized

evidence to obtain additional, "tainted" evidence.[15]

For the reasons set forth below, the Court finds that the Government is not required to produce the specific disclosures requested by Defendants, but directs the Government to produce a witness list, an exhibit list, and a list of 404(b) evidence prior to trial.

### a. Mandatory Disclosures

Defendants assert that the Government must immediately disclose a substantial amount of materials relating to their purported use of evidence unlawfully obtained from Amerindo. Specifically, Defendants ask that the Government:

1. Identify all agents or prosecutors who had access to the unlawfully seized materials, or who read or otherwise reviewed the unlawfully seized materials;

2. Identify any documents that were unlawfully seized that were segregated from documents to be reviewed by government agents and prosecutors and that were not in fact reviewed;

3. Identify all documents obtained subsequent to the May 26, 2005, search that the Government contemplates offering into evidence at trial, and identify which, if any, of these documents were mentioned in any document that was illegally seized;

4. Identify all individuals who were contacted or interviewed subsequent to the May 26, 2005, search and whom the government contemplates calling as trial witnesses;

5. As to all such potential witnesses, specify any use by a government prosecutor or agent of information derived directly or indirectly from the unlawfully seized documents;

6. Disclose any subpoenas issued to obtain documents or other materials that were mentioned or referenced in the unlawfully seized materials;

7. Disclose any internal notes, correspondence, or memoranda relating to use of the suppressed material in connection with the Government's ongoing investigation;

8. With regard to items that were unlawfully seized from computers, specify all particular files and documents that were accessed by Government agents or prosecutors, and identify any use made of those files or documents in acquiring other evidence or communicating with witnesses; and

---

[15] Although Defendants have titled their motion as one for "Suppression of the Derivative Fruit of An Unlawful Search . . . And for Related Relief" (Defs.' Mem. at 1), it is clear that Defendants' motion is one for preliminary relief related to an *anticipated* motion to suppress purportedly tainted evidence. Indeed, at this time, Defendants concede that they cannot even identify the evidence that is likely to be the target of a motion to suppress the "fruits" of the initial, illegal search. (Dec. 17 Tr. at 23.)

9. Disclose any other information relevant to the issue of whether evidence to be presented at trial is tainted by the illegal seizure.

(*See* Vilar Mem. at 19-20.)

Defendants assert that the production of materials in response to the above-cited requests will permit Defendants to provide "specific evidence" as to "the manner in which the trial evidence has been tainted," and, thus, permit "meaningful litigation of [] taint issues . . . ." (Vilar Mem. at 21.) The Government opposes Defendants' request for discovery, characterizing the request as an attempt by Defendants to rummage through the Government's work product and as wholly lacking support in the law. For the following reasons, the Court rejects Defendants' assertion that the Government is *required* to disclose the requested material at this juncture of the case pursuant to (1) the Supreme Court's holding in *Brady v. Maryland*, 373 U.S. 83 (1963); and/or (2) Rule 12(b)(4) of the Federal Rules of Civil Procedure.

First, Defendants have failed to cite any authority in support of the proposition that the Government's *Brady* obligations require the disclosure of the requested material prior to trial. Indeed, contrary to Defendants' assertion, the Second Circuit in *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001), specifically rejected such a proposition, and, instead, found that

[A] rule that makes the timing of disclosure dependent on the defendant's demand is directly contrary to the principle that a

prosecutor's *Brady* obligation is independent of a defendant's request for *Brady* materials. Accordingly, we reiterate the longstanding constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use [at trial], the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner.

(internal citations omitted). Thus, because the Government's obligation under *Brady* to disclose material, exculpatory evidence "that, if suppressed, would deprive the defendant of a fair trial," *United States v. Bagley*, 473 U.S. 667, 675 (1985), does not *mandate* disclosure of *any* materials at this juncture of the case, the Court denies Defendants' request for discovery on this ground.[16] *See United States v. Carrington*, No. 02 Crim. 897 (LTS), 2002 WL 31496199, at *3 (S.D.N.Y. Nov. 7, 2002) ("The trial of this matter has not yet been scheduled. Defendant has not shown that general *Brady* disclosure so far in advance of the trial is necessary to ensure due process of law and [the] Court sees no reason to so conclude."); *United States v. Sanchez*, No. 01 Crim. 277 (RCC), 2003 WL 1900851, at *5

---

[16] Moreover, the Court notes that it is the Government's — rather than Defendants' or the Court's — responsibility to determine what evidence is material and when such evidence should be disclosed in time for its effective use at trial. *See Coppa*, 267 F.3d at 143 ("The prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' [of affecting the outcome at trial] is reached.") (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

(S.D.N.Y. April 17, 2003) ("*Brady* establishes no general right to pretrial discovery, and gives rise to no pretrial remedies.").

Second, the Court finds that Rule 12(b)(4) does not require disclosure of the requested materials. Rule 12(b)(4)(B) provides:

At the arraignment or as soon afterward as practicable, the defendant may, in order to have an opportunity to move to suppress evidence under Rule 12(b)(3)(C), request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16.

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure requires the Government to provide, prior to trial, three categories of documents in its possession, including documents (1) "material to preparing the defense," (2) that the Government intends to use as evidence in its case-in-chief at trial, and (3) that was "obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E). Defendants assert that at least some of their requests fall within the scope of the mandatory disclosures compelled by the second provision of Rule 16(a)(1)(E), relating to documents to be used in the Government's case-in-chief.

However, it is well-settled that Rule 16(a)(1)(e) "does not *require* the Government to identify specifically which documents it intends to use as evidence . . . . It merely requires that the Government produce documents falling into the three enumerated categories." *Carrington*, 2002 WL 31496199, at *2; *see, e.g., United States v. Giffen*, 379 F.

Supp. 2d 337, 344 (S.D.N.Y. 2004); *United States v. Falkowitz*, 214 F. Supp. 2d 365, 394-95 (S.D.N.Y. 2002). Therefore, the Court rejects Defendants' assertion that Rules 12 and/or 16 require the Government to comply with their requests for specific disclosures listing the evidence the Government intends to use at trial. Nevertheless, as set forth below, the Court exercises its discretionary authority and directs the Government to disclose certain items prior to trial. *See Carrington*, 2002 WL 31496199, at *2.

b. Discretionary Disclosures

Although the Government is not *required* by the Constitution or the Federal Rules to produce the requested materials, the Court directs, for the reasons that follow, the Government to disclose (1) a list of all witnesses that the Government intends to call at trial, (2) a list of all exhibits that the Government intends to offer at trial, and (3) a letter detailing the 404(b) evidence it intends to offer at trial.

i. Witness List

The Court has the discretion to compel pretrial disclosure of the Government's witnesses, at least where the defendant makes "a specific showing that disclosure [is] both material to the preparation of his defense and reasonable in light of the circumstances surrounding his case." *Cannone*, 528 F.2d at 300-01 ("[D]istrict courts have authority to compel pretrial disclosure of the identity of government witnesses."); *accord United States v. Bejasa*, 904 F.2d 137, 139-40 (2d Cir. 1990). Thus, the burden is on the defendant to make "some particularized showing of need," *United States v. Kelly*, 91

F. Supp. 2d 580, 586 (S.D.N.Y. 2000) (internal quotation marks and citation omitted), which "should be balanced against the possible dangers accompanying disclosure (i.e. subornation of perjury, witness intimidation, and injury to witnesses)," *United States v. Cafaro*, 480 F. Supp. 511, 520 (S.D.N.Y. 1979) (quoting *Cannone*, 528 F.2d at 302).[17]   Here, Defendants have made a particularized showing of need — namely, that disclosure is necessary both (1) to aid in the litigation of potential taint issues, and (2) to permit Defendants' to prepare for trial in this action — that outweighs the Government's purported interests in efficiency and in preventing Defendants from obtaining an inequitable preview of the "expected testimony or evidence."   (*See* Gov't Taint Mem. at 19.)

In conducting this analysis, district courts in this Circuit have frequently looked to the factors set forth in *United States v. Turkish*:

(1) Did the offense alleged in the indictment involve a crime of violence?

(2) Have the defendants been arrested or convicted for crimes involving violence?

(3) Will the evidence in the case largely consist of testimony relating to documents (which by their nature are not easily altered)?

(4) Is there a realistic possibility that supplying the witnesses' names prior to trial will increase the likelihood that the prosecution's witnesses will not appear at trial, or will be unwilling to testify at trial?

(5) Does the indictment allege offenses occurring over an extended period of time, making preparation of the defendants' defense complex and difficult?

(6) Do the defendants have limited funds with which to investigate and prepare their defense?

458 F. Supp. 874, 881 (S.D.N.Y. 1978); *see, e.g.*, *United States v. Washington*, 947 F. Supp. 87, 88 (S.D.N.Y. 1996); *United States v. Upton*, 856 F. Supp. 727, 750-51 (E.D.N.Y. 1994); *Falkowitz*, 214 F. Supp. 2d at 394-95; *United States v. Feldman*, 731 F. Supp. 1189, 1199 (S.D.N.Y. 1990).   Negative answers to the first, second, and fourth questions, and affirmative answers to the third, fifth, and sixth questions favor the disclosure of a witness list.

Here, as to the first two factors, the offenses alleged in the indictment do not involve a crime of violence, and there is no suggestion that Defendants have been arrested

---

[17] In *Cannone*, the Second Circuit noted that

The most potent argument for compulsory disclosure of the identity of the prosecution's witnesses is that, without the benefit of such disclosure, the defense may be substantially hampered in its preparation for trial.   At a minimum, pretrial ignorance of the identity of the prosecution's witnesses tends to detract from the effectiveness of the defense's objections and cross-examination. . . .

528 F.2d at 301 (internal citation omitted)

or convicted of such crimes in the past, or pose a risk of such conduct in the future.

As to the third factor, given the nature of the offenses charged and the volume of documents at issue in this case, it is clear that documentary evidence will be of critical importance to the Government's evidence in this case, thus favoring the disclosure of witnesses. *See, e.g.*, *United States v. Chalmers*, 474 F. Supp. 2d 555, 572-73 (S.D.N.Y. 2007); *United States v. Nachamie*, 91 F. Supp. 2d 565, 578 (S.D.N.Y. 2000) (ordering the disclosure of a witness list in a Medicare fraud case based on the volume and importance of documentary evidence); *Turkish*, 458 F. Supp. at 881.

As to the fourth factor, there is absolutely no basis to conclude that disclosure of the Government's witnesses will increase the likelihood that the they will not appear at trial, or will be unwilling to testify at trial. In any event, the Court hereby directs that, to the extent any communications with witnesses are attempted by Defendants, only defense counsel may engage in such communications. *See Turkish*, 458 F. Supp. at 881 & n.1.

As to the fifth factor, the indictment in this case alleges wrongdoing over an extended period of time — namely, July 1986 to May 2005 — and implicates a substantial amount of documentary evidence, thus making preparation of a defense in this case exceedingly "complex and difficult." *Turkish*, 458 F. Supp. at 881. In the context of responding to Defendants' mandatory disclosure argument, the Government points out that it has previously provided to Defendants "itemized inventories" of the evidence seized in this case and contends,

therefore, that Defendants have been "sufficiently alerted" to the Government's evidence in order to prepare for trial. (Gov't's Taint Mem. at 17-18.) However, even with the inventories, it is apparent that, absent additional disclosure, an overwhelming amount of time and effort on the part of defense counsel will be required to review the materials in this case.

Finally, as to the sixth factor, Defendants have not indicated that they lack funds to prepare their defense. Accordingly, this factor is either neutral or, in fact, weighs against disclosure of a witness list.

On balance, the above-cited factors weigh strongly in favor of directing the Government to produce a witness list. In addition, the Court notes that, in the instant case, the additional factor of the need to provide Defendants with a realistic opportunity (1) to uncover any taint issues in this case, and (2) to satisfy their burden at a potential taint hearing, also weighs in favor of ordering such a disclosure. Therefore, because "the defense may be substantially hampered" absent disclosure of a witness list in this case, the Court finds that Defendants' "need for [] disclosure outweigh[s] the possible dangers accompanying disclosure . . . ." *Cannone*, 528 F.2d at 302.

Accordingly, the Court hereby orders the Government to produce a witness list to Defendants not less than 60 days prior to the commencement of trial, unless the Government, as to any particular witness, demonstrates that such disclosure may endanger the witness or increase the likelihood that such witness will not appear at trial, or that disclosure otherwise will be

significantly prejudicial to the orderly prosecution of the Government's case.

## ii. Exhibit List

As noted above, Rule 16(a)(1)(E) requires the Government to provide, prior to trial, three categories of documents in its "possession, custody, or control," including documents that "the [G]overnment intends to use . . . in its case-in-chief at trial."[18]    Fed. R. Crim. P. 16(a)(1)(E); *see Chalmers*, 474 F. Supp. 2d at 572-73; *Falkowitz*, 214 F. Supp. 2d 365, 392 (S.D.N.Y. 2002).    Thus, pursuant to Rule 16(a)(1)(E), the Government must, at a minimum, *produce* to Defendants all of the items it intends to use at trial.

Furthermore, while there is some divergent authority among courts in this Circuit as to whether a district court may compel the Government to *specify* the sub-set of items produced pursuant to Rule 16 that it intends to offer at trial, *see Nachamie*, 91 F. Supp. 2d at 569, the overwhelming majority of district courts, in accord with Second Circuit authority, favor the view that "it is within a district court's authority to direct the Government to identify [prior to trial] the documents it intends to rely on in its case in chief."    *Giffen*, 379 F. Supp. 2d at 344 ("[B]ased on the policy concerns of Rule 16 and principles of fairness, it is within a district court's authority to direct the Government to identify the documents it intends to rely on in its case in chief.") (citing *Upton*, 856 F. Supp.

at 748 (directing the Government to "provide a list of all documents to be referred to or relied upon by government witnesses"); and *Turkish*, 458 F. Supp. at 882 (directing the Government "to identify to the defendants those documents it intends to offer, or to use or to refer to in connection with the testimony of any witness, on its case in chief")); *see, e.g., Chalmers*, 474 F. Supp. 2d at 572-73 (directing the Government to disclose an exhibit list prior to trial based on, *inter alia*, "the large volume of documents produced by the Government thus far . . . ."); *United States v. McDonald*, No. 01 Crim. 1168 (JS), 2002 WL 2022215, at *3 (E.D.N.Y. Aug. 6, 2002); *see also Cannone*, 528 F.2d at 298 ("It is recognized that wide latitude is reposed in the district court to carry out successfully its mandate to effectuate, as far as possible, the speedy and orderly administration of justice.").[19]

Thus, while no statute or rule specifically mandates disclosure of an exhibit list, the Court finds that it is reasonable, under the circumstances of this case, to order production of the Government's exhibit list prior to trial.    *See* Fed. R. Crim. P. 57(b) ("A judge may regulate practice in any manner

---

[18] The two other categories of documents listed in Rule 16(a)(1)(E) are (1) items "material to preparing the defense," and (2) any item that "was obtained from or belongs to the defendant."    Fed. R. Crim. P. 16(a)(1)(E).

[19] In *Turkish*, the Court directed the Government to identify the documents it intended to use at trial because the 25,000 documents it produced during discovery merely "bur[ied] the defendant in paper." Similarly, in *United States v. Feldman*, the Court found that, in a complex tax evasion case "where all concede that a significant number of documents have been produced by the government and will presumably be used at trial, it is right to narrow the field before trial in order to allow more effective case preparation by the defense."    731 F. Supp. 1189, 1200 (S.D.N.Y. 1990). Here, there is no dispute that the universe of documents and computer data currently produced far exceeds the quantity of information at issue in *Turkish*.

consistent with federal law, [the criminal rules], and local rules of the district."); Fed. R. Crim. P. 16 advisory committee's note ("The rule is intended to prescribe the minimum amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order broader discovery in appropriate cases.").

The early disclosure of an exhibit list will serve two significant interests relating to the fair and efficient administration of this case. First, based on the large number of documents at issue in this case, and the likelihood that the Government will rely to a significant extent on only a portion of those documents at trial, the Court finds that pre-trial disclosure of an exhibit list best serves Defendants' right to a fair trial, and is likely to aid in the orderly presentation of the Government's and the Defendants' respective cases at trial. Second, the disclosure of an exhibit list will aid in the fair and efficient resolution of taint issues, if any, in this case by (1) permitting Defendants to evaluate whether any of the Government's proffered exhibits raise issues of taint; and (2) narrowing the number of documents and/or witnesses that may be the subject of inquiry at a pre-trial taint hearing in this action, if the Court finds that such a hearing is necessary.

Accordingly, the Government is directed to provide Defendants with a detailed list of exhibits it anticipates presenting at trial. The Government shall produce the list not less than 60 days prior to the commencement of trial, unless the Government, as to any particular document, demonstrates by convincing evidence that disclosure may endanger any witness or other person, or would otherwise be significantly prejudicial to

the orderly prosecution of the Government's case.

### iii. Rule 404(b) Evidence

Rule 404(b) of the Federal Rules of Evidence directs the Government to provide "reasonable notice in advance of trial" of any evidence that it intends to introduce pursuant to the Rule. "The purpose of Rule 404(b)'s notice provision is 'to reduce surprise and promote early resolution' of any challenge to admissibility of the proffered evidence. Rule 404(b) does not define 'reasonable notice' but leaves that determination to the sound discretion of the Court." *Nachamie*, 91 F. Supp. 2d at 577 (quoting Fed. R. Evid. 404(b) advisory committee's note (1991 amdt.); *see, e.g.*, *United States of America v. Taveras*, No. 94 Crim. 766 (LAP), 1995 WL 600860, at *8 (S.D.N.Y. Oct.11, 1995).

While notice is typically provided no more than two to three weeks before trial, the Court finds that a longer notice period is appropriate here given the absence of any threat to the safety of prospective witnesses and, due to the likelihood that taint issues will be litigated in this action, the need to "promote early resolution" of challenges to the admissibility of the proffered evidence. Fed. R. Evid. 404(b) advisory committee's note (1991 amdt.). Accordingly, the Government is directed to provide Defendants with a letter detailing the Rule 404(b) evidence that it intends to introduce at trial. The Government shall produce the letter not less than 60 days prior to the commencement of trial, unless the Government, as to any particular item, demonstrates by convincing evidence that disclosure may endanger any witness or other person, or would otherwise

be significantly prejudicial to the orderly prosecution of the Government's case.

\*\*\*

For the reasons stated above, the Government is to produce the above-referenced materials not less than 60 days prior to the commencement of trial. Thereafter, defendants may — based upon their review of these materials — request a pre-motion conference before the Court in anticipation of filing a motion to suppress tainted evidence.

### 2. Defendants' Pre-Hearing Burden

The Government also seeks to litigate an issue relating to Defendants' anticipated taint motion. Specifically, the Government argues that, on the current record, Defendants are barred, as a matter of law, from litigating issues of taint at an evidentiary hearing because they have failed to satisfy their initial burden of showing taint in a substantial portion of the Government's case. (*See, e.g.*, Gov't Taint Br. at 2-3 ("[D]efendants cannot meet their burden . . . and their motion for a 'taint' hearing should be rejected."). However, for the following reasons, the Court rejects the Government's assertion and, instead, finds that, given the illegal search in this case, Defendants are entitled to some opportunity — either during trial or at a pre- or post-trial hearing — to demonstrate taint.

It is well-settled that, given an illegal search, evidence that "has been come at by exploitation of that illegality" is "taint[ed]" and must be excluded from use at trial. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). In *Alderman v. United States*, 394 U.S. 165, 183 (1969), the Supreme Court,

"endorsed an allocation of the burdens of proof between the parties" litigating claims of taint. *United States v. Magaddino*, 496 F.2d 455, 459 (2d Cir. 1974). Here, the Government asserts that the first step of these "burdens of proof," *id.*, is a *pre-hearing* requirement, and, therefore, if Defendants fail to satisfy this burden, they have "failed to meet their initial burden of *justifying the need* for a taint hearing . . . ." (Gov't's Mem. at 1 (emphasis added).)

The Court rejects this argument. The overwhelming weight of authority favors the view that, given a "primary illegality," *Wong Sun*, 371 U.S. at 488, the defendant must be given some opportunity to resolve issues of taint — either during a "full evidentiary hearing" or at a trial on the merits. For instance, in *Nardone*, 308 U.S. at 341, the Supreme Court characterized the burdens of proof in this context as follows:

> The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed. Once that is established — as was plainly done here — the trial judge *must give opportunity*, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin.

(emphasis added); *accord Magaddino*, 496 F.2d 459-460. Thus, it is clear that, once the defendant establishes that an illegal search has occurred, the Court "must" give some sort of

"opportunity" for the defendant to satisfy his initial burden of showing taint in a "substantial portion" of the Government's case. *Id.* Therefore, the case law makes clear that, contrary to the Government's position, there is no *pre-hearing* burden on the defendant to demonstrate taint in a substantial portion of the Government's case. *See United States v. Apple*, 915 F.2d 899, 906 (4th Cir. 1990) ("*At the taint hearing*, the claimant has the initial burden of coming forward with specific evidence demonstrating taint.") (emphasis added) (citing *Alderman*, 394 U.S. at 183, and *United States v. Buck*, 548 F.2d 871, 874 (9th Cir. 1977) (noting that "the Alderman *hearing procedure* is to first allow the defendant to go forward with specific evidence demonstrating taint and then to shift the burden to the government to show that it acquired its evidence from an independent source . . .") (emphasis added)).

Furthermore, binding Second Circuit authority also makes clear that the defendant's "opportunity" to satisfy his initial burden need not take the form of a full evidentiary hearing, nor must this "opportunity" be provided to Defendants immediately upon their request. For instance, in *United States v. Leong*, the Second Circuit rejected the defendant's claim that, following a "four-week" jury trial, the trial court "erroneously failed" to conduct a post-trial taint hearing. 536 F.2d 993, 997 (2d Cir. 1976). Instead, the Second Circuit found that the defendant was not entitled to a post-trial taint hearing where, during the trial, the defendant had "failed to sustain his initial burden of making some showing of the existence of taint." *Id.* Thus, while a pre- or post-trial evidentiary hearing may prove to be the appropriate vehicle for resolving claims of taint in this case — and, indeed, appears to be

the most common vehicle for doing so in this District[20] — it is beyond doubt that such a hearing need not be convened upon Defendants' request, if at all. *See, e.g., id.*; *Buck*, 548 F.2d at 874 (finding that "[t]he purpose of the *Alderman* hearing" was "fully served . . . by the trial court" where it deferred, over the defendant's objection, a taint hearing until after trial); *see also United States v. Bissell*, 634 F.2d 1228, 1233 (9th Cir. 1981) ("The cases make it evident that when it is so clear that the evidence introduced at trial was obtained independently of any illegal wiretap, the court may . . . refuse to hold an adversary hearing.").

In sum, although the Court declines, at this time, to convene a taint hearing, it finds that Defendants need not satisfy an initial evidentiary burden in order to have the opportunity to demonstrate taint.

### 3. Timing

Finally, the Court rejects Defendants' assertion that this Court must, as a matter of law, resolve Defendants' anticipated taint motion prior to trial. Although the Court

---

[20] In *Alderman*, the Supreme Court emphasized the value of an adversary proceeding in resolving such claims:

> Adversary proceedings will not magically eliminate all error, but they will substantially reduce its incidence by guarding against the possibility that the trial judge, through lack of time or unfamiliarity with the information contained in and suggested by the materials, will be unable to provide the scrutiny which the Fourth Amendment exclusionary rule demands.

384 U.S. at 184.

declines, at this time, to specify precisely when Defendants' motion should be resolved, it finds that resolution of the motion may, for good cause shown, be deferred until after the trial in this action.

Defendants assert that Rule 12(d), and the advisory committee's note relating thereto, provide that a district court must resolve a taint motion prior to trial. Rule 12(d) states, in relevant part, that

> The court must decide every pretrial motion before trial unless it finds good cause to defer a ruling. The court must not defer ruling on a pretrial motion if the deferral will adversely affect a party's right to appeal.

Fed. R. Crim. P. 12(d). Further, the portion of the advisory committee's note cited by Defendants advises district courts as follows:

> [S]ubdivision (b) [of Rule 12] declares that motions to suppress 'must' be made before trial, and subdivision [d] says such motions cannot be deferred for determination at trial 'if a party's right to appeal is adversely affected,' which surely is the case as to suppression motions.

Fed. R. Crim. P. 12 advisory committee's note (1983 amdt). Thus, Defendants argue, Rule 12(d) bars this Court from deferring resolution of the anticipated taint motion until after trial because it would adversely affect

the Government's right to appeal a post-trial suppression order.[21]

However, it is clear that, if this Court were to defer resolution of the taint motion until after a trial in this action, it would not "adversely affect" the Government's right to appeal.[22] Fed. R. Crim. P. 12(d). The Government's right to appeal is set forth in the Criminal Appeals Act, 18 U.S.C. § 3731, which provides, in relevant part:

> An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence . . . not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information . . . .

*See generally United States v. Aslam*, 936 F.2d 751, 754 (2d Cir. 1991) ("[I]t is well settled that 'the United States cannot appeal in a criminal case without express congressional authorization'; so the issue becomes whether the requisite authority for a Government appeal is provided by section 3731, the provision according the Government appellate rights in criminal cases.") (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 568 (1977)) (internal citation omitted).

---

[21] Defendants do not, and, indeed, cannot, argue that deferring resolution of the taint motion would adversely affect *Defendants'* right to appeal. (*See* Dec. 17 Tr. at 14.)

[22] This discussion assumes *arguendo* that there is "good cause" for this Court to defer resolution of the taint motion, as required by Rule 12(d).

In *United States v. Ceccolini*, 436 U.S. 268, 271 n.1 (1978), the Supreme Court specifically held that the Government may appeal post-trial suppression rulings: "[i]f Congress had intended only pretrial suppression orders to be appealable [by the Government], it would not have added [to Section 3731] the phrase 'and before the verdict or finding on an indictment or information.'"[23] (quoting 18 U.S.C. § 3731). Therefore, if this Court were to suppress some amount of "tainted" evidence following trial, the Government would retain the right — pursuant to Section 3731 and *Ceccolini* — to appeal that ruling.

In addition, the Government's right to appeal a post-trial suppression order in this case would not be limited by the Double Jeopardy Clause. *See* 18 U.S.C. § 3731 (stating that "an appeal by the United States shall lie . . . except . . . where the double jeopardy clause of the United States Constitution prohibits further prosecution").

First, if the trial resulted in an acquittal as to both Defendants, the Court would not need to resolve the taint motion and, thus, there would be no suppression order for the Government to appeal.

Second, if the trial resulted in a guilty verdict as to any defendant, and the Court issued a post-trial suppression order, the Court would either order a new trial wherein the suppressed evidence could not be used by the Government, or enter a judgment of acquittal based on the insufficiency of the evidence. In either of those situations, the Government would retain the right to appeal the suppression order as well as the new trial order or judgment of acquittal. *See* 18 U.S.C. § 3731 (stating that "an appeal by the United States shall lie" of an order "dismissing an indictment or information or granting a new trial after verdict or judgment" or "suppressing or excluding evidence"); 15B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3919.7 ("Now that [a district court's] new trial order is independently appealable [following the 1984 Amendment of Section 3731], there should be no difficulty in combining review of orders that simultaneously or separately direct dismissal of part of a prosecution, order exclusion of evidence in further proceedings, and direct a new trial."); *see generally United States v. Wilson*, 420 U.S. 332, 339 (1975) (finding that, in enacting Section 3731, "Congress intended to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit," and, therefore, pursuant to that statute, orders in criminal cases are "appealable unless the appeal is barred by the Constitution").

For instance, in *United States v. Horwitz*, 622 F.2d 1101, 1104-06 (2d Cir. 1980), the Government appealed the district court's order, following a jury's guilty verdict, that (1) granted the defendant's motion for a new trial and (2) suppressed certain evidence from use at the new trial.[24] The Second Circuit

---

[23] The 1994 amendment to Section 3731 corrected the error in the text that was identified by the court in *Ceccolini*. *See* 18 U.S.C. § 3731 (2006).

[24] Specifically, the district court in *Horwitz* had ordered the Government to immunize defense witnesses, and had provided that, in case of noncompliance, it would exclude the testimony of immunized witnesses for the Government. *Id.* at 1102. In response to that direction,

found that, pursuant to Section 3731, the Government had the right to appeal the district court's "suppression order" prior to the commencement of the second trial, and that such an appeal would not violate the protections of the Double Jeopardy Clause. *Id.* at 1105-06; *see also United States v. Morrison*, 429 U.S. 1, 3-4 (1976) (finding that the Government's appeal of a post-verdict suppression order did not run afoul of the Double Jeopardy Clause because "success on that appeal would result in the reinstatement of the general finding of guilt, rather than in further factual proceedings relating to guilt or innocence. . ."). Furthermore, in the event that this Court issued a post-verdict suppression order and then entered a judgment of acquittal based on the insufficiency of the remaining evidence, the Government would also retain its right to appeal. *See, e.g., United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) ("The Double Jeopardy Clause presents no bar to the review of an acquittal based upon the insufficiency of the evidence and granted following a jury verdict of guilty."); 15B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3919.7.

Thus, in the instant case, the Double Jeopardy Clause would not limit the Government's right, pursuant to Section 3731, to appeal a post-trial suppression order.

---

the Government had "steadfastly maintained" in the district court and on appeal that it would not comply. Accordingly, the Second Circuit found that the district court's order was effectively a "suppression order" and, therefore, appealable because "the government, the defense, and the district court have embarked upon a collision course that will almost certainly result in the suppression of the testimony." *Id.* at 1105.

The advisory note relied on by Defendants does not undermine the Court's findings on this issue. Indeed, the note has no bearing on the issue of whether a district court may defer ruling on a suppression motion until *after* trial. Section 3731 expressly permits the Government to appeal any order "suppressing or excluding evidence" *except* for those "made *after* the defendant has been put in jeopardy and *before* the verdict or finding on an indictment or information." 18 U.S.C. § 3731 (emphasis added). Put simply, the statute permits the Government to appeal any suppression order other than one issued *during* a trial. *See id.*; *United States v. Fatico*, 579 F.2d 707, 711 (1978) ("The amended Criminal Appeal Act [Section 3731] is intended to be liberally construed so as to effectuate its purpose of permitting the Government to appeal from dismissals of criminal prosecutions by district courts in all cases where the Constitution permits, and from all suppressions and exclusions of evidence in criminal proceedings, except those ordered *during trial* of an indictment or information.") (emphasis added); *see also United States v. Harshaw*, 705 F.2d 317, 319 (8th Cir. 1983) (finding that, pursuant to Section 3731, "no government appeal may lie if the appeal would interrupt an ongoing trial").

The advisory note relied on by Defendants merely reflects this limitation on the Government's right to appeal — specifically, the note states that "motions cannot be deferred for determination *at trial* 'if a party's right to appeal is adversely affected,' which surely is the case as to suppression motions." Fed. R. Crim. P. 12 advisory committee's note (1983 amdt.) (emphasis added). Notably, however, the advisory note fails to

caution against deferral of a suppression motion until *after* trial.

Accordingly, it is clear that Rule 12(d), Section 3731 and the Double Jeopardy Clause permit the deferral of a determination as to Defendants' anticipated taint motion until *after* the trial in this action. Indeed, there is absolutely no basis to conclude that such a deferral would adversely affect the Government's right to appeal a post-trial suppression order.[25]

In sum, although the Court declines, at this time, to determine whether resolution of Defendants' taint motion should be deferred until after trial, it finds that such a deferral would not adversely affect the Government's right to appeal under Section 3731 or the Double Jeopardy Clause, and, therefore, is permissible under Rule 12(d).

## III. CONCLUSION

For the foregoing reasons, the Court finds that the Government may offer the Challenged Documents at trial on the basis of the inevitable discovery and independent source doctrines, and, thus, Defendants' motion to suppress the Challenged Documents is DENIED.

Defendants' application for an order requiring the production of specific items relating to the Government's alleged use of illegally obtained evidence is DENIED. However, the Government is hereby ORDERED to produce (1) a witness list, (2) an exhibit list, and (3) a 404(b) letter, in accord with the directives contained herein.

The Clerk of the Court is directed to terminate the motions docketed as Documents 208, 212, and 213.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: January 2008
New York, New York

[25] The Court also notes that, in resolving claims that the Government violated a defendant's Fourth Amendment rights, district courts routinely hold evidentiary hearings regarding issues of taint *after* trial. *See, e.g., United States v. Ostrer*, 481 F. Supp. 407, 414-15 (S.D.N.Y. 1979) (deferring resolution of taint hearing until after trial where, among other things, the defendants, prior to trial, "ha[d] not pointed to specific evidence which is tainted"); *United States v. Birrell*, 269 F. Supp. 716, 728 (S.D.N.Y. 1967) ("Defendant's right to be tried solely on the basis of constitutionally pure evidence can and will be vindicated more effectively at a post-trial hearing than at a pretrial hearing.") (addressing a prior version of Rule 12); *see also Bissell*, 634 F.2d at 1233-34; *Buck*, 548 F.2d at 874 ("The propriety of holding such hearings post-trial has been recognized widely and is within the trial court's discretion."); *United States v. Gray*, No. 04 Crim. 580 (JSG), 2005 WL 3059482, at *4 (S.D. Ohio 2005) ("[C]ourts routinely conduct post-trial taint hearings . . . .").

31

\*\*\*

Defendant Vilar is represented by Ivan S. Fisher, Esq., 251 East 61st Street, New York, New York 10021, and William Joseph Davis, Esq., Scheichet & Davis, P.C., 767 Third Avenue, New York, New York 10017. Defendant Tanaka is represented by Glenn Charles Colton, Esq., and Jessica L. Margolis, Esq., Wilson Sonsini Goodrich & Rosati, P.C., 12 East 49th Street, New York, New York 10017. The United States of America is represented by Marc O. Litt, Esq., Deirdre A. McEvoy, Esq., and Benjamin Naftalis, Esq., United States Attorney's Office, Southern District of New York, One St. Andrew's Plaza, New York, New York 10007.