UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 05-CR-621 (RJS) |
| v. | : | MOTION FOR BAIL PENDING |
| ALBERTO VILAR  and | : | APPEAL |
| GARY TANAKA | | |
| | : | |
| Defendants. | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Vivian Shevitz, under penalty of perjury, hereby declares:

1.  This is a renewed motion for bail pending appeal.  It is made at the suggestion of the United States Court of Appeals after it heard oral argument on August 21, 2012.

2.  In a highly unusual Order dated August 28, 2012 (Doc. 428, Appeal 10-521), the Court of Appeals denied defendants' motions for bail without prejudice to renewal before this Court.  The Court thus chose not to apply the deferential "clearly erroneous" standard of review to, and did not uphold either of, this Court's findings -- that there was no substantial issue for appeal and that the defendants were likely to flee.  Rather, the Court of Appeals provided the defendants the opportunity to renew their bail

applications in the District Court, and provided this Court with an opportunity to reconsider its prior findings in light of new information; only if the District Court again denies bail will the panel hearing the appeal announce whether or not the District Court's findings are clearly erroneous.

3. Specifically, the Court wrote:

> The defendants' motions for bail are hereby DENIED without prejudice to renewal before the District Court.  If the defendants choose to renew their applications, they shall bring to the District Court's attention any information that was not before that Court at the most recent bail proceeding in May 2012. *See United States v. Vilar*, No. 05 Cr. 621 (RJS), Docket Entry 527 (May 22, 2012) (Order Denying Application for Bail Pending Appeal). They may then take a new appeal from any adverse determination of the District Court.   Any such further proceedings shall be assigned to this panel.

4. For the reasons set forth below, we believe that, by this Order, the Court of Appeals is sending a strong signal that, contrary to this Court's previous ruling, the "*Morrison*" issue is indeed a substantial one likely to result in reversal, and, therefore, this Court should now give more attention to the risk of flight component.  Perhaps better equipped than the appeals court to explore the factual issues inherent in any risk of flight determination, this Court can hear evidence if necessary and determine the gravity of the risk and decide in the first instance

2

whether conditions of release can be fashioned that would alleviate any perceived risk.

5. The Court of Appeals routinely applies the "clearly erroneous" standard to district court bail and detention orders, see *United States v. London-Villa,* 898 F.2d 328, 331 (2d Cir. 1990) (Newman, J., dissenting), and is not in the habit of encouraging the waste of judicial resources – either in the District Court or in the Circuit.  It would not have directed bail proceedings here – and assigned itself another appeal -- if it were of the view that *Morrison* did not present a substantial issue or that this Court's secondary findings of risk of flight could be upheld as not clearly erroneous.

6. This motion is made by counsel on behalf of both defendants. However, while much of what we have to add in this application applies to both defendants, their circumstances are unique and different.  While we believe (as stated to the Court of Appeals) that conditions can be appropriately crafted for both defendants, the Court should obviously determine each defendant's bail application separately.

7. Before turning to the specifics, we note that we asked the prosecutors to discuss and consider bail conditions, but they declined to engage in conversation, responding, "The Government's position remains that bail is not appropriate in this case for either defendant." (Email communication from Benjamin Naftalis to Vivian Shevitz, August 30, 2012)

Overview

8. This Court should reconsider its determination that *Morrison* does not present a substantial issue on appeal in light of the oral argument before the Circuit in this case on August 21, 2012, as well as the Circuit's granting of bail to the defendant in *United States v. Mandell*, 09 Cr 0662 (PAC) (a case raising the identical *Morrison* issue and one on which this Court relied in denying bail when it found the issue insubstantial).

9. In addition, the Court should reconsider its prior finding that defendants are not likely to prevail on the *Morrison* issue in light of two Circuit decisions.  First, contrary to the arguments made by the Government on appeal that the "plain-error" standard of review applies, in *United States v. Mahaffy*, Docket No. 09-5349-

4

cr(L) (2d Cir. August 2, 2012), the Circuit reconfirmed the applicability of the "modified plain-error" standard of review in a case such as this when the source of the error derives from a supervening decision; under this standard, the burden is on the government to demonstrate that the error (in allowing the jury to convict without proof of domestic securities transactions) was harmless. Second, in *Absolute Activist Value Master Fund Limited*, 672 F.3d 143 (2d Cir. 2012), the Circuit held that, to state a claim under §10(b) involving securities *not* listed on a domestic exchange, a complaint "must allege facts suggesting that irrevocable liability was incurred or title was transferred with the United States"; the Court in *Absolute* (like the Supreme Court in *Morrison*) rejected the argument (made by the Government here and, again, apparently adopted by this Court in denying bail) that it would be enough if some deceptive "conduct" or "effects" relating to a claimed fraud occurred in the United States even if the purchases and sales of the securities did not occur here.

10. This powerful indication by the Circuit that, in its view, the *Morrison* issue is substantial and that defendants are likely to

prevail on appeal, as well as the Government's concession on appeal that the forfeiture orders must be vacated because they improperly included the forfeiture of (at least) $36.7 million, also throw a different light on defendants' "incentive to flee":  to the extent that defendants believe their chance of success on appeal is substantial and are aware that they will lose their right to appeal and all the moneys ordered forfeited if they flee, their incentive is not to flee, but, rather to see the appeal through.

11. The defendants have been fully advised of the consequences of flight, including advice about the "fugitive disentitlement doctrine." This doctrine, developed in line of cases not previously called to the attention of this Court, recognizes the Court of Appeals' discretion to dismiss the appeal of a party who becomes a fugitive from justice during the pendency of his appeal, see *Ortega-Rodriguez v. United States*, 507 U.S. 234, 239 (1993); *United States v. Zedner*, 555 F.3d 68, 75 (2d Cir. 2008); *United States v. Matista*, 932 F.2d 1055, 1056 (2d Cir. 1991).

12. Given this doctrine, and the stakes at issue *aside* from "merely" being in jail, the incentive for the defendants actually goes the

other way:   to stay put and see their appeals come to fruition, not
flee and throw it all away.   The Court's previous determination
that the defendants have a strong incentive to flee must be
reassessed in light of the event in the Court of Appeals.

13. We believe that if the Court fairly considers this, it will conclude
that defendants actual have a disincentive to flee, and ask that the
Court grant bail based on assurances of appearance by the
defendants, based on their appreciation of the doctrine.   Further,
to strengthen in Your Honor's mind that they have a *dis*incentive
to flee each defendant (I am authorized to say) waives (1) any
argument against a motion by the government to dismiss his
appeal on the basis of the fugitive disentitlement doctrine should
either flee; and (2) any interest in any substitute assets that the
Government has conceded were improperly forfeited as a result of
the court's $36.7 million mistake should they flee.   Further, each
defendant waives any opposition to extradition should he flee.

 Substantial Issue

14. This Court, in its order denying bail dated May 22, 2012, focused
principally on the substantial issue component of the equation,

7

ruling, "Second, and more importantly, the Court finds that Defendants have not raised a substantial question of fact or law on appeal that is likely to result in reversal or a new trial."  In this connection, this Court discussed only one argument – whether the Supreme Court's holding in *Morrison v. National Australia Bank Ltd., 130 S.Ct. 2869* (2010), that the securities fraud statute did not have extraterritorial application -- applied to this criminal case.   Among other authorities this Court cited in support of its conclusion that the holding in *Morrison* did not apply to this case was *United States v. Mandell*, no. 09 Cr 0662 (PAC), 2011 WL 924891, at *5 (SDNY Mar. 16, 2011).

15. To our knowledge, *Mandell* is the only reported case dealing specifically with the presumption against extraterritoriality in the context of securities fraud, the statute at issue here and the very same statute at issue in *Morrison.*   (The only other case post-*Morrison* upon which this Court relied, *United States v. Weingarten*, 632 F.3d 60, 66 (2d Cir. 2011), involved 18 U.S.C. §§ 2423(b), which prohibits travel *in foreign commerce* with intent to engage in illicit sexual conduct with a minor.  *Weingarten* does not

8

answer whether the presumption against extra-territoriality applies in a criminal securities fraud case, and does not support the finding that the presumption does not apply.  To the contrary, *Weingarten* acknowledged the "well-established" presumption against extra-territoriality reiterated in *Morrison*; it did not hold that the presumption has no application in criminal cases across the board – the argument the Government makes here; rather, it held only that the presumption had been overcome in that case because there was a "clear and affirmative indication" in the language of §2423(b) that Congress intended that particular statute to have extra-territorial application.  The Supreme Court in *Morrison* did not find such a clear and affirmative indication that Congress intended the securities fraud statute to apply extra-territorially.)

16. Significantly, after this Court issued its order denying bail in this case, the Second Circuit *granted* bail to Mandell and expedited his appeal.  (See Order July 19, 2012, *United States v. Mandell,* Docket No. 12-1967).   While *Morrison* was not the only issue Mandell claimed was substantial and while the Court of Appeals

did not specifically identify *Morrison* in its order granting bail, it is reasonable to deduce that the Court of Appeals found the *Morrison* issue to be the substantial one justifying Mandell's bail:  *Morrison* was the first and principal issue discussed by the parties and received the most attention.   See, e.g., Affirmation of Katherine Goldstein, AUSA, in opposition to Mandell's motion for bail pending appeal; 15 paragraphs (and 9 pages) of argument devoted to *Morrison* issue, 14 paragraphs (and 7 pages) devoted to three other issues combined.   (The same panel that decided Mandell's bail motion and expedited his appeal referred defendants' bail motions to the panel hearing oral argument and expedited their appeal; Judge Cabranes served on both panels and, it is reasonable to assume, was fully aware that the two cases shared the novel and substantial *Morrison* issue.)

17. *Morrison* also received considerable attention at the oral argument in this case: Judge Straub in particular questioned vigorously about the fact that many transactions were on their face not domestic.   Judge Straub also challenged the government by asking whether, if the Court rejects the government's position that

*Morrison* does not "apply" in a criminal case, there will need to be at least a new trial.  (In arguing to the panel that *Morrison's* presumption against territoriality did not apply to criminal cases, the prosecutor relied principally on *United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011), and *United States v. Bowman*, 260 U.S. 94 (1922).  For the reasons set forth in the footnote below, neither case provides persuasive authority against applying the presumption against extra-territoriality to the criminal securities and investor fraud statutes.[1])

---

[1] First, the defendants in *Al Kassar* (who were convicted of conspiring to kill U.S. officers, to acquire and export anti-aircraft missiles, and to knowingly provide material support to a terrorist organization), framed the issue as one of "**subject-matter jurisdiction**" and this is how the Court of Appeals decided it; the Court was not deciding as a matter statutory interpretation and thus did not decide that the presumption against extra-territoriality – a traditional canon of statutory construction -- does apply in criminal cases when a statute's meaning is at issue; nor did it decide the reach of the securities fraud statute.  *Morrison* makes clear, moreover, that deciding the extraterritorial reach of a statute as a question of subject-matter jurisdiction is a "threshold error" in analysis.    130 S. Ct. at 2876-7.    Second, the Government's view of *Bowman* – that the presumption against territoriality *never* applies in a criminal case, that (to the contrary) *Bowman* creates a presumption "in favor of " of extraterritoriality in criminal cases, and that a statute can be applied extraterritoriality in criminal cases even if the same statute cannot be so applied civilly – is not supported by *Bowman,* and cannot be squared with *Morrison. Bowman* very explicitly *acknowledges* the presumption's applicability to

18. Besides the Circuit's concern with the *Morrison* issue at oral argument, and its grant of bail to Mr. Mandell, there is another reason for this Court to reconsider its reliance on the District Court's decision in *Mandell* for its finding that there was not a substantial issue in this case.  *Mandell* was decided a year before the Circuit decided *Absolute Activist Value Master Fund Limited*, 672 F.3d 143 (2d Cir. 2012), and is inconsistent with the Circuit's holding that, to state a claim under §10(b) involving securities *not* listed on a domestic exchange, a complaint "must allege facts suggesting that irrevocable liability was incurred or title was transferred with the United States."  If the securities fraud statute does not apply extraterritorially, it is not enough that "fraudulent conduct" occurs in the United States (as this Court stated in its

---

criminal cases, 260 US at 95-96; it holds merely that the unique context of the statute at issue in that case gave rise to a clear indication of extraterritorial applicability; this is entirely consistent with *Morrison*'s statement that a clear indication of extraterritorial coverage can be inferred contextually. *Morrison* did not find that clear indication when it construed the securities fraud statute; it also held that courts must "apply the presumption [against extraterritoriality] in *all* cases, preserving a stable background against which Congress can legislate with predictable effects." 130 S.Ct. at 2881 (emphasis added).

order denying bail). Rather, the purchase and sale transaction must occur domestically.

19. In its briefs, the Government pointed to *conduct* in the United States (like the writing of a check or the residency of an alleged victim); it did not prove at trial or point to evidence on appeal that irrevocable liability or title was transferred here domestically.

Risk of Flight Is De Minimus; The Defendants' Incentive Is To Stay Not Flee

20. The Second Circuit's order denying bail without prejudice to renewal in the district court suggests that the issue is not whether there is a substantial issue under *Morrison*, but whether appropriate conditions can be fashioned to mitigate or alleviate the perceived flight risk; the Circuit is, in effect, giving this Court the first opportunity to do try to do so.

21. We believe that this Court's earlier findings that defendants posed a flight risk were overstated, and insufficiently supported to justify denial of bail. Some of the reasons are stated in the footnote below.[2]

---

[2] Apparently, because it determined that "more importantly" the defendants had not raised a substantial issue on appeal, the Court did

22. Now, there is more reason to question the conclusion of flight risk:
The defendants are at the cusp of a significant victory in the Court
of Appeals.    Not only has the Government agreed that the

---

not devote much attention to the risk of flight issue; the Court simply
stated that any risk of flight that previously existed is "now magnified"
by the fact that each defendant is serving a substantial sentence, and
added that Vilar has "ties abroad and has lived abroad in the past," and
that Tanaka has family abroad.    The Court did not identify any
evidence of the type traditionally relied upon by courts finding or
upholding risk of flight, such as a history of using aliases or false
names, use of doctored passports, use of safe-houses and counter-
surveillance techniques to avoid detection and proven familiarity with
clandestine foreign airstrips, see *e.g., United States v. Melendez-
Carrion,* 790 F.2d 984 (2d Cir. 1986), *United States v. Claudio,* 806 F.2d
334 (2d Cir. 1986), *United States v. Jackson,* 823 F.2d 4, 6-7 (2d Cir.
1987), *United States v. Londono-Villa,* 898 F.2d 328, 329 (2d Cir. 1990);
prior fugitive status, see *United States v. Coonan,* 826 F.2d 1180, 1186
(2d Cir. 1987); access to substantial assets to finance flight, continuing
and active business operations abroad, see *e.g., United States v.
Sabhani,* 493 F.3d 63 (2d Cir. 2007), *United States v. Londono-Villa,*
898 F.2d at 329.    In cases concerning risk of flight, the Court of Appeals
has required more than evidence of the commission of a crime and the
fact of a long sentence to support a finding of risk of flight.    See, *United
States v. Friedman,* 837 F.2d 48, 49-50 (2d Cir. 1988)  (Court holds that
district court's finding with regard to risk of flight was clearly erroneous
where finding based only the nature of the charges against him, the
strength of the government's case, the long sentence of incarceration he
may receive, his age and the obloquy that he faces in his community.
Court found it significant that, among other things, Friedman had no
prior criminal record, no passport or known ability to evade
surveillance, and apparently took no steps to leave the jurisdiction after
federal agents executed a search warrant at his home and after he was
arrested at home on state charges three weeks later).

forfeiture is invalid to the tune of $36.7 million, but there appears to be agreement from the Court of Appeals that there is substantial likelihood of reversal -- if the fraud counts are not dismissed outright for insufficient evidence, at a minimum, a new trial will be ordered.

23. In these circumstances, any risk of flight has been significantly diminished because defendants have too much to lose if they flee and much to gain if they stay.  If they flee, they will risk having the appeal dismissed and the invalid forfeiture orders kept in effect.

24. Other conditions exist to demonstrate that there is little actual risk of flight.

<u>Gary Tanaka</u>

25. Gary Tanaka was not deemed a flight risk throughout the trial, or pending sentence, though he lived in London and had family there. He lived by bail conditions at the time the Court granted bail, and especially given the Second Circuit's apparent agreement that at least some of appellants' legal contentions have substantial merit,

15

there is little reason to believe that he will violate bail conditions merely because of his "international" connections.

26. Most significantly, as Gary Tanaka states in a sworn declaration submitted pro se in the Court of Appeals, his incarceration halted in its tracks reconstructive cancer treatments that four doctors wrote about in 2010 to urge that the treatment be continued.

27. In connection with his bail appeal, Mr. Tanaka wrote in a sworn declaration about his cancer diagnosis and two surgeries, the recommended continuing treatment, none of which is available in the facility, and of his intention to seek such treatment when released, specifically in New York's Memorial Sloane Kettering and Boston's Dana Farber Institute.

28. I attach Mr. Tanaka's declaration, together with the Doctors' reports appended thereto, as Exhibit A.   He states:

1.  I am defendant / appellant in U.S.  Vilar and Tanaka, 05 cr621 (RJS), and 10-521 (L) (Second Circuit).

2. I make this declaration in the hope of obtaining bail pending appeal.

3.    I am a stage 3 cancer survivor, having had two surgeries (2003, 2004) on my mouth and jaw. I had tumors removed, my jaw excised with a replacement jaw constructed from my right leg, and extensive post-surgical radiation

treatments. This was through the joint efforts of Mount Sinai Hospital and Memorial Sloan-Kettering Cancer Center.

4.    The follow-up treatments included extensive dental and oral-facial reconstruction.

5.    The ensuing periodontal damage from the cumulative effects of the radiation treatment caused ongoing oral disturbances. In 2008 my Sloan-Kettering maxiofacial team proscribed, in conjunction with their efforts, a 12-24 month specialized orthodontic treatment to arrest further loss and shifting of my teeth.

6.    Predictably, I have not been given the necessary treatment at Terminal Island FCI. It has minimal dental and medical facilities. During my two-year incarceration, I have had two cursory ten-minute oral 'cancer' examinations, with none of my prior closely-monitored screenings (specialized blood marker tests, X-ray, MRI, PEP scans) which I received previously. I have had no access to any qualified specialists who deal with patients with complications of major prosthetic jaw implants.

7.    "I have had a serious further failing and infection of my teeth while at Terminal Island FCI (all three of my remaining lower molars and one in my upper jaw) because of the progressive periodontal deterioration which was exacerbated by the radiation-induced weakness to my jaw bone tissue. My lower dentures are now 'freefloating' (unattached, as they have not been modified to adhere to my lower jaw) The staff here have been unable to assist me at all towards my anticipated need for eventual dental resection and prosthesis. I am unable to effectively chew my meals, and frequently am at risk of choking during the brief dining hall hours allotted to me.

8.    On arrival at Terminal Island I was given the choice of total removal of my dental braces because it was stated the staff "do not engage in orthodontic services", although, in my case, they are not for cosmetic enhancement Since then, my braces have remained, basically; frozen mid-course in my course of my original treatment, and the final retainers were never constructed.

9.    If I am released on bail I will continue my dental-surgical treatment program at Sloan-Kettering or at Dana Farber Cancer Institute. Without a doubt, my course of care was interrupted at a critical time in the two-years since my self-surrender to Terminal Island in May 2010. I will have to reassess the deterioration I have suffered in the interim, compensate for my medical/dental setbacks, and to essentially start anew my orthodontic program.

    I declare under penalty of perjury the foregoing is true and correct.

    [signed under penalty of perjury by Gary A. Tanaka]

(Doc. 359, p.4, appeal 10-521)

29.  While the government usually claims that the Bureau of Prisons medical facility can treat almost any condition, the type of reconstructive surgeries Gary Tanaka needs are simply not available in a Federal Correctional Facility, and indeed, taxpayers would surely rebel before funding such expensive and lengthy treatment.    Further, Mr. Tanaka would have to be taken in

shackles to any outside facility, if any provided such services to an FCI. (We know of none.)

30. Mr. Tanaka was convicted of only three counts, and all three are implicated by *Morrison*. Further, if there were to be a retrial, it would look a lot different because of witness statements and other information that has come to light only since the trial in 2008.

31.   For a case in which there is no demonstrable "loss" to any investor – only delay in getting back their investments --, the 2 ½ years' incarceration Gary Tanaka has already served, preceded by over 4 years' of home incarceration and governmental conduct that stripped him of his reputation, his livelihood, and his ability to work, the notion that Mr. Tanaka would now jump bail is irrational.

32. Respectfully, the Court should grant bail for Gary Tanaka and allow him to be released on his own recognizance, subject to his waiver of the fugitive entitlement doctrine, and allow him to start his reconstructive recovery while awaiting the Second Circuit's decision.

Alberto Vilar

33. As we noted in discussing the issue with the Court of Appeals, though Alberto Vilar was convicted of all counts, the *Morrison* issues pervade, and a new trial is very likely.

34. Though the government argued in opposition to bail for Mr. Vilar that he is a "liar" and so should not be trusted to comply with any bail condition, the FACT is, Mr. Vilar was the same person when he came before this Court and, from 2005-2008, plainly did comply with bail conditions. His pretrial officer, Mr. Barrios, indeed *endorsed* bail pending sentence and assured the Court that in his view, Mr. Vilar was a *good* candidate for bail.

35. At this stage, we respectfully suggest, this Court should think of Alberto Vilar's pretrial compliance with bail conditions, not "his character," in deciding whether bail pending appeal should be granted or denied.

36. But more to the point, the government's "assessment" of Alberto Vilar, which it got this Court to accept in deeming him a "flight risk", is simply faulty. Alberto Vilar has no money, no property, no family, nowhere to run, and no desire to do so.

37. Underlying the Government's insistence that Mr. Vilar poses an unmanageable risk of flight is its wholly unsubstantiated claim that Vilar has millions of dollars of hidden assets and thus, not only the incentive to flee, but also the "wherewithal to live abroad." The Government thus leveled the baseless accusation that Vilar withdrew "tens of millions of dollars from Amerindo" in 2000-2001 (if not earlier) that the government has not been able to account for. (Affirmation of Benjamin Naftalis In Opposition To Vilar's Motion For Pending Appeal, dated June 14, 2012, *United States v. Vilar*, Docket No. 10-521(L), ¶ 16).

38. The Government did not present an iota of evidence to support this claim. It scoured the world looking for "substitute assets" to support its extravagant and (now concededly erroneous) forfeiture award, and found nothing more than what has already been restrained.

39. The Government has had some seven years, since 2005, to "find" all the money it claims was "withdrawn" and "unaccounted for." It has HELD all the defendants' funds since 2005; it has notified banks to withhold moneys belonging to defendants; it has had

investigators and agents "trace" moneys.   It has not found "withdrawn" moneys because none exists.

40. It is, of course, impossible for Alberto Vilar to negate something that has and had no substance in the first instance.   Vilar should not be deemed a bail risk simply because the government hypothesizes that "tens of millions of dollars" of funds are missing.

41. At one time Alberto Vilar was on top of the world and had millions of dollars.   He was the largest classical music philanthropist in the world, and gave it all away. If Alberto Vilar had had the wherewithal in 2000 and 2001 and still had it through 2005, he would not have failed on his charitable pledges, the most important thing to Vilar and a failing that humiliated him.

42. He certainly does not have the wherewithal now.   Again, the government has held the Amerindo funds that were the source of income for the defendants since 2005 and it has restrained every other "substitute asset" it could find around the world since 2010.

43. Importantly, *the Court of Appeals* did not recognize that Vilar had any financial wherewithal when it granted Mr. Vilar CJA status in 2010.   It found then (without any protest from the government)

that he has *no* resources sufficient to pay counsel.  This Court, too, extended my CJA representation to the district court proceedings in connection with the ongoing forfeiture proceedings. The finding of this Court and the Court of Appeals that Alberto Vilar is indigent should be sufficient to satisfy prosecutorial skepticism now.

44. But we offer, to buttress the fact that Mr. Vilar has nowhere to go and no way to get there, as Exhibit B, a sworn declaration of Walter Pfaeffle, a journalist who became Alberto Vilar's friend and, in essence, his "keeper" because Vilar has been abandoned by many who had previously supported and befriended him.

45. Mr. Pfaeffle states that he met Alberto Vilar for the first time in June 2005 following his release from the MCC.  Feeling sorry for Alberto Vilar, who could not even post bail, Pfaeffle put up his property as part of his bail package.

46. After Vilar's incarceration, Pfaeffle, somewhat by default, was left in charge of emptying Vilar's apartment at 860 UN Plaza. In arranging for contents of the apartment to be moved, Pfaeffle states, he looked at every piece of paper, every letter, and all the

documents that had been in the apartment.  Pfaeffle states that he found absolutely nothing establishing that Vilar had any assets stashed away in either offshore or onshore accounts.  There was no bank statement, no other relevant correspondence, not even a checking account in London.

47. Many months during Vilar's incarceration, Mr. Pfaeffle contributed his own money to Mr. Vilar for commissary items and to pay for email and phone calls.

48. Pfaeffle states that he has had many conversations with Vilar, both before and after his incarceration, and has visited Vilar about once a month.  Given what he knows, Pfaeffle wonders why the government believes that Vilar is a flight risk.  Vilar spends many hours per day tutoring other inmates and preparing them for the high school equivalency tests. He reads books. He is pursuing his study of languages and says he is writing a book on technology. Pfaeffle states that he is convinced, knowing Vilar as he does, that Vilar would never take a risk of violating bail.

49. When Pfaeffle heard about the government's renewed concern about bail a few weeks ago, he decided to bring up the subject with

Vilar during his last visit.  Vilar's response assured him that Vilar would not violate his trust.  Vilar told Pfaeffle he would not hurt anyone who helped him and signed for him.  Vilar has no outside assets.  He has no passport.  He is 72 years old and doesn't want to be a fugitive from justice for the rest of his life, looking over his shoulder.  And he added, "And where would I want to flee to? I have neither money nor family abroad."

50.  Pfaeffle is prepared to offer Vilar a place to stay at least for a while, while he gets his bearings, if and when he gets out on bail.

51. Alberto Vilar has nowhere to go and no way to "flee." His passport expired.  His life trajectory cannot get worse than it has been.  His motivation is to remain here to overturn the conviction, not to give up his appellate claims and flee.

52. The Government points to various civil claims and/or judgments against Vilar by the SEC, the IRS, and private plaintiffs, and submits that – but does not explain why -- this "exposure to millions of dollars of additional liability" magnifies the flight risk. All of Vilar's assets are subject to forfeiture and/or restraint –

though the forfeiture order must be vacated according to the government's appellate concession.

53. To flee would not relieve Alberto Vilar of the civil exposure; it would magnify the exposure and impair his ability to defend against it – something he has been hampered from doing because of the *de facto* restraint of all Amerindo funds.

54. Mr. Vilar has been incarcerated even longer than Mr. Tanaka, since December 2008. He too spent many *years* in home detention. He should be released on bail. If he fails to abide by bail conditions, his appeal can be dismissed.

CONCLUSION

55. The government has "achieved" the debilitation *and incarceration* of these two men for more than seven years.

56. They are still under the cloud of this indictment, though the SEC Monitor made clear that their US Advisory business was "squeaky clean" but was shut down anyway.

57. *Even if* these men were to "flee", the government would have achieved more than "just punishment" for the "crimes" they committed, when factoring in that the money they allegedly

obtained through fraud did not disappear but is sitting in frozen accounts unmanaged as the "victims" await a final plan for distribution.

58. We believe, when push comes to shove, that there is no incentive for either defendant to flee.  We thus offer a waiver of their right to object to application of the fugitive disentitlement doctrine, if either defendant fails to appear as required, pending appeal.

59. Should the defendants fail to appear, the government will have what it wants:  the pool of "all moneys" that it can then use, without the defendants' interference, in either the criminal case or the SEC case.

60. At the same time, as the defendants know, even if they were to fail to appear the case might still go on *in absentia*, and so the government would be able to garner convictions *and* "keep" "the forfeiture " and all monetary penalties.

61. Though the prosecutor did not even want to *discuss* any bail condition, and so has not considered this, we believe that an agreement to waive challenge to "the fugitive disentitlement doctrine", which will result in giving up "the forfeiture" *if* the

defendants fail to appear, is the only bail condition needed here, given the 7 years of restriction on their liberty already and the financial ruin that has been visited on their successful company.

62. If there is any doubt, the Court should order a public hearing concerning the supposed wherewithal to flee. Such a hearing is necessary for a defendant who seeks to establish that he meets the requirements for release after conviction. *See United States v. Abuhamra*, 389 F.3d 309 (2d Cir. 2004) (Raggi, J.) ("The Parties' Competing Post-Verdict Interests in Liberty and Detention Require that Abuhamra Be Afforded Some Opportunity to Demonstrate that He Satisfies the Bail Release Conditions Established in § 3143(a)(1)").

WHEREFORE, THIS COURT SHOULD GRANT BAIL and release defendants on their own recognizance pending appeal, subject to their signing a waiver of challenge to the fugitive disentitlement doctrine. The Court should find that neither defendant poses a "risk of flight" that overpowers his demonstrated incentive to remain. The Court should instruct the prosecutors to assure, through dealing with the Bureau of Prisons,

28

that release comes about immediately.    Any condition of release should allow travel freely.   The defendants have every reason to appear at any further proceeding in this case, as required.

Dated:  Portland, Maine
        September 4, 2012

        __/s/_____
        Vivian Shevitz

29