UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

```
---------------------------------------------------------   x
    UNITED STATES OF AMERICA,                                :
                         Appellee,                           :
                                                             :
                                                             :
           - v -                                             :   AFFIRMATION
                                                             :
                                                             :
    ROSS MANDELL,                                            :   Docket No. 12-1967(L)
                                                             :
                         Defendant-Appellant.                :
                                                             :
---------------------------------------------------------   x
```

| | | |
|---|---|---|
| STATE OF NEW YORK | ) | |
| COUNTY OF NEW YORK | : | ss.: |
| SOUTHERN DISTRICT OF NEW YORK | ) | |

      KATHERINE R. GOLDSTEIN, pursuant to Title 28, United States Code, Section 1746, hereby affirms under penalty of perjury:

      1.      I am an Assistant United States Attorney in the Office of Preet Bharara, United States Attorney for the Southern District of New York. I represented the Government in the proceedings below, and I represent the Government in this appeal. I submit this affirmation in opposition to defendant-appellant Ross Mandell's motion for bail pending appeal. In addition, the Government seeks leave to file an oversize response.

## PRELIMINARY STATEMENT

      2.      Mandell appeals from a judgment of conviction entered on May 8, 2012, in the United States District Court for the Southern District of New York, by the Honorable Paul A. Crotty, United States District Judge, following a jury trial.

3.      Mandell and co-defendant Adam Harrington (collectively, the "defendants") were charged in Superseding Indictment S1 09 Cr. 662 (PAC) (the "Indictment") with four crimes: (1) conspiracy to commit securities fraud, wire fraud and mail fraud; (2) securities fraud; (3) wire fraud; and (4) mail fraud.

4.      Trial began on June 20, 2011, and lasted approximately five weeks.  On July 26, 2011, after less than two days of deliberations, the jury convicted both defendants of all counts in the Indictment.

5.      On May 3, 2012, the District Court sentenced Mandell to concurrent terms of 144 months' imprisonment, to be followed by three years' supervised release, forfeiture in the amount of $50 million, a $10,000 fine, and a $400 mandatory special assessment.  The District Court denied Mandell's motion for bail pending appeal on June 14, 2012.  Mandell is currently at liberty, pending resolution of the instant motion.[1]

## STATEMENT OF FACTS

**A.      The Government's Case at Trial[2]**

6.      At trial, the Government conclusively demonstrated that the defendants perpetrated an elaborate, eight-year scheme to defraud investors and enrich themselves.   The defendants executed their scheme from two different Wall Street brokerages, The Thornwater Company ("Thornwater") and Sky Capital, LLC ("Sky Capital").  Mandell ran both firms;

---

[1] On May 4, 2012, the District Court sentenced Harrington to 60 months' imprisonment, three years' supervised release, forfeiture in the amount of $20 million, and a $400 mandatory special assessment.  Harrington has appealed to this Court from his conviction, but does not appeal from the District Court's denial of his application for bail pending appeal.

[2] In the remainder of this Affirmation, "Tr." refers to the trial transcript; "GX" refers to a Government exhibit introduced at trial; and "Br." refers to the brief in support of Mandell's motion for bail pending appeal.

Harrington was a senior broker at, and later became the manager of, Sky Capital.[3]

7.     The defendants used these brokerage firms to deceive both domestic and foreign investors into giving them millions of dollars to purchase securities in United States companies. In furtherance of that fraud, the defendants – and brokers acting at their direction – made materially false and misleading statements to these investors in order to induce them to invest in, among other things, private placement offerings in several United States-based companies controlled by Mandell, as well as publicly-traded securities in those companies.[4]  All told, the defendants earned millions of dollars in compensation and other perquisites, while nearly all of the investors who were deceived into investing in private placements offered by Thornwater and Sky Capital lost all of their money.

8.     The evidence at trial included the testimony of four cooperating witnesses who were brokers at Thornwater and Sky Capital and, at the defendants' direction, participated in the scheme to defraud; seven investors from the United States and abroad; numerous inculpatory documents; and consensual recordings that captured Mandell and others talking explicitly about the scheme to defraud investors and the defendants' roles in that scheme.

**B.     The Thornwater Phase of the Scheme**

9.     The charged scheme began in or about 1998 at Thornwater.  During this part of the scheme, which lasted until approximately 2001, Mandell used Thornwater to conduct private placement offerings, several of which purported to raise money directly to bring companies

---

[3] The Thornwater phase of the scheme took place outside of the statute of limitations.  While substantial evidence of this aspect of the scheme was presented at trial, for purposes of this Affirmation the Government focuses on the facts adduced to prove the Sky Capital component of the scheme.

[4] As the jury learned at trial, stock sold through private placements carries a high degree of risk for an investor, because shares in a private company cannot readily be sold (and thus the investor cannot make money) unless the company goes public on a stock exchange or is acquired.  (Tr. 2336).

public (GX 103-A, 103-B), and several of which sought to raise money for Thornwater itself, ostensibly so the firm could bring affiliated companies public (GX 102, 102-A, 105, 138; Tr. 2321).  Mandell directed Thornwater brokers to solicit investments in these offerings, and held regular meetings in his office in which he directed the brokers to make material misrepresentations to investors and prospective investors, including misrepresentations concerning : (1) the certainty of the private companies going public; (2) the guaranteed returns; and (3) the intended disposition of the proceeds.  (Tr. 2321-23).  Mandell knew that these representations were lies when he presented them to the brokers and/or investors, as demonstrated by, among other evidence, a consensual recording in which Mandell admitted to another broker that the chances of an investor making a profit by investing in a private placement were like "a World Series lucky" or "almost equivalent to buying a lottery ticket."  (GX 1009-T).[5]

## C.    The Transition from Thornwater to Sky Capital

10.    By the beginning of 2000, Thornwater was running out of money and facing increasing investor complaints regarding losses from private placements.  (Tr. 420-21).  At or around this time, Mandell decided to wind down Thornwater's operations and open a new brokerage firm, which he called Sky Capital, directly across the street from Thornwater, at 110 Wall Street in Manhattan.  Mandell wanted Sky Capital to appear unrelated to Thornwater – in order to prevent the Government and investors from imputing the problems of Thornwater to Sky Capital.  The evidence showed, however, that while he purported to divorce himself from Thornwater, Mandell hired its brokers for Sky Capital (Tr. 456-57, 2386, 2392), and entered into phony agreements with Thornwater to be paid for work that he never did, thereby arrogating

---

[5] Moreover, when regulators sought sworn testimony from brokers regarding Mandell's control of Thornwater, Mandell directed them to lie – and they did.  (Tr. 356-60, 2390-91; GX 125, 125-A).

Thornwater's dwindling funds for himself. (GX 107, 107A). The evidence also showed that Mandell orchestrated a series of private placements during this time period, including for Sky Capital Holdings, the parent company of the Sky Capital brokerage, each of which relied on fraudulent misrepresentations in order to raise more money from investors and to enrich the defendants.

**D.     The Sky Capital Phase of the Scheme**

11.     From in or about January 2003 through in or about 2006, the defendants continued to lie to investors to raise money for Sky Capital and themselves through private placements. In this phase of the scheme, Mandell, who was in charge of all the Sky companies (Tr. 2389-90), and Harrington, who was the sales manager for the brokerage firm in New York, reporting directly to Mandell (Tr. 1196-97, 2392), raised money from investors with private placements for two house stocks: Sky Capital Holdings ("Holdings"), discussed above, and Sky Capital Enterprises ("Enterprises"), which purported to be a venture capital firm in the business of raising funds for promising companies to bring them public. As the cooperating witnesses explained at trial, however, the defendants faced a problem: while private placements continued to be the most important way in which they raised money (Tr. 1225), the two Sky Capital stocks came to be listed on the Alternative Investment Market ("AIM") in London, which is a smaller market of the London Stock Exchange designed for emerging companies. (Tr. 698). This meant that there was no incentive for an investor to purchase a share of *private* stock in those companies, which could not be readily sold, when they could theoretically purchase the same share on the open market.

12.     To perpetuate the scheme, the defendants priced the private placement shares at a "discount" to the publicly traded shares, and then directed the brokers to market the private

placement shares to investors as such.  (Tr. 472-73, 1283-84, 1708-09, 2398).  At the defendants'
direction, investors were told that by buying the shares at a discount, they were guaranteed
profits, because when the private shares became public, they would be able to recognize the
profit between the purchase price and the trading price of the stock.  In point of fact, the concept
of the discount was fundamentally flawed, because it only worked if the price of the Sky Capital
stocks did not fall.  The value of the stocks, in turn, was connected to investor demand.  But
there was virtually no genuine demand for Sky Capital stock, as the cooperating witnesses
explained at trial.  (Tr. 1257-58, 1718-20, 2397).  Rather, far more investors sought to sell than
to buy the stocks, including investors who had purchased shares in private placements before
Holdings and Enterprises went public, as well as disgruntled former Thornwater investors who
received Sky Capital stock to make up for their losses.  (Tr. 1722-23).

13.     As selling pressure mounted and it became clear that there was no outside demand
for the Sky Capital stocks, the defendants implemented a "no net sales" policy, pursuant to
which the brokers were required to match all sell orders with corresponding buy orders in order
to artificially maintain the stock price.[6]  That way, selling pressure on the stock would not cause
the price to drop, as in normal market conditions.  (Tr. 473-74, 1729-32, 2396).  The brokers
called this practice "supporting" or "crossing" the stock, and they did it at the direction of the
defendants.  (Tr. 1213-16, 1737-38, 1730-31, 1742, 1748-50, 2339-40, 2395-97, 2405, 2408; GX
1008-T).  When brokers could not find a buyer, they would sometimes "park" the stock in
another client's account, without that client's permission, until a willing buyer could be found

---

[6] Mandell rewarded brokers who "supported" the fraudulent stock prices with company-paid
perks, such as cold-callers to generate additional business, cellphone bills, and parking spots, and
punished those who did not (Tr. 1222-23, 1230-35, 1730-33, 1743-44, 2419-20); and he had final
say about whether a trade could be executed (Tr. 2402).  Harrington, who acted as Mandell's
right-hand man, kept a ledger of the buying and selling in Sky stock, and patrolled Sky Capital's
offices, directing brokers to find buyers when there was selling pressure on the stock.  (Tr. 1264-
65, 1720-21, 2403-04).

(Tr. 2413-15; GX 1008-T), and they would sometimes decline to execute the sell order (Tr. 2405). If the seller absolutely insisted on selling stock and no buyer could be found, Mandell or Harrington had to approve the sale. (Tr. 2401-02). The "no net sales" policy was put in place when the Sky stocks started trading, and it remained in effect until Sky Capital closed. (Tr. 1217, 1722-23). Virtually all of this fraudulent conduct took place in New York, at Sky Capital's headquarters.

14.     In addition to deceiving investors with lies about the "discount" in price, brokers, at Mandell's direction, also told investors that a "liquidity event" – something that would cause Sky Capital's stock price to go up dramatically – was right around the corner. Mandell held closed-door meetings at Sky Capital – just as he had at Thornwater – in which he gave the brokers pitches to use in selling the various Sky Capital private placements to investors. (Tr. 1280, 1709, 1737, 2393-94). These pitches included (fraudulent) liquidity events that were tailored to the particular private placement. With respect to Enterprises, for example, brokers were instructed to focus on the "virtual certainty" that the companies affiliated with it, including Global Secure, which was a privately-held company funded by Enterprises that had its own private placement, would go public within a specific period of time. (*See e.g.*, Tr. 1023-24, 1289, 1598-99, 2910). At Mandell's direction, brokers even made predictions about the price at which these companies would list on an exchange, suggesting to investors that they were going to make huge returns. (*See, e.g.*, Tr. 1321-22; GX 217-T at 6; GX 135-T at 7).[7]

15.     Finally, Mandell and Harrington bribed the brokers to sell Sky Capital stock and thereby prop up Sky's stock price. Mandell rewarded the brokers who were "team players" with

---

[7] The jury heard a recording of Mandell – in the process of instructing a broker how to pitch a new Sky Holdings deal – admitting that there was a difference between the truth and "what you could tell the customer." (GX 1011-T at 3-4). The Government also introduced a recording in which Mandell told a broker, who did not want to pitch a new Sky Capital deal to investors, that he had no choice but to "paint a rosy picture" and to lie. (GX 1023-T at 6-7).

company-paid perks, like staying at the finest hotels in London (Tr. 1350; GX 13), and going to strip clubs and brothels (Tr. 1352-54, 2430-36; GX 14). By contrast, brokers who declined to participate in the scheme were punished, both with ridicule and by having perks taken away. And, as discussed below, the defendants paid the brokers cash bribes to sell Sky stock to keep the stock price up. This part of the scheme began with a secret meeting, led by Harrington, in which Harrington informed the assembled brokers that they were going to get paid for buying Sky stock, and that the payments were going to be disguised as "bonuses" for innocuous conduct such as dressing nicely and showing up for work on time. (Tr. 474-77, 1721-22, 2437-39). Following this meeting, Mandell and Harrington offered bribes to brokers on numerous occasions for the illicit purpose of buying Sky stock to manipulate the stock price. (Tr. 1268-70, 1273, 2440). Bribes were especially prevalent when the stock price was being pressured. (Tr. 1757-58, 2443). As the cooperators explained, Sky stock was so illiquid – it was like "pouring concrete into your book" of business (Tr. 1261) – that the only reason they would ever purchase the stock for a client, outside of a cross-trade, was in order to receive the secret bribe. (Tr. 2455-56). Of course, the evidence showed, none of the bribes were ever disclosed to investors. (Tr. 1277, 2456). At times, the bribes to the brokers amounted to almost 500 percent more than the commission disclosed to the investor. (Tr. 944-50; GX 852).

## ARGUMENT

16.     The Government respectfully submits that Mandell's motion for bail pending appeal should be denied because he can articulate no substantial question of law or fact for appeal that is likely to lead to a reversal of his conviction or a new trial.

A.    **Applicable Law**

17.    The standards governing release pending appeal are set forth in Title 18, United States Code, Section 3143(b), which provides that a judicial officer "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment" be detained pending appeal unless the judicial officer finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community if released," and "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in — (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process."  18 U.S.C. § 3143(b).

18.    That provision gives effect to Congress's view that "once a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even to permit it in the absence of exceptional circumstances."  *United States* v. *Miller*, 753 F.2d 19, 22 (3d Cir. 1985) (quoting H. Rep. No. 907, 91st Cong., 2d Sess. 186-87 (1970)). Following a guilty verdict and sentencing, there is a "presumption in favor of detention."  *United States* v. *Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).

19.    A "substantial question" is "'one of more substance than would be necessary to a finding that it was not frivolous.  It is a 'close' question or one that very well could be decided the other way.'"  *United States* v. *Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (quoting *United States* v. *Giancola*, 754 F.2d 848, 901 (11th Cir. 1985)).  "If a court does find that a question raised on appeal is 'substantial,' it must then consider whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.'"  *Id.* (quoting *United States* v.

*Miller*, 753 F.2d at 23).  Further, if a defendant fails to establish the existence of a substantial

question likely to result in the reversal on *all* counts on which he is incarcerated, bail may not be

granted.  *See United States* v. *Randell*, 761 F.2d at 125.  With respect to all these issues, "the

burden of persuasion rests on the defendant."  *Id.*

> 20.     On appeal, this Court gives great deference to the district court's bail decisions,

and will reverse only where there is "clear error" – that is, only if "on the entire evidence," the

Court is "left with the definite and firm conviction that a mistake has been committed."  *United

States* v. *Sabhnani*, 493 F.3d 63,75 (2d Cir. 2007) (quoting *United States* v. *Shakur*, 817 F.2d

189, 195 (2d Cir. 1987)).

**B.     Discussion**

> 21.     In support of his motion, Mandell claims that (i) the District Court improperly

permitted the jury to consider evidence of fraudulent securities transactions that took place

abroad, in contravention of *Morrison* v. *National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010);

(ii) the District Court's jury instructions with respect to Counts Three and Four were improper;

and (iii) there was insufficient evidence adduced at trial to support his conviction on a material

omission theory.  As detailed in the remainder of this Affirmation, none of the claims raises a

substantial issue of law or fact likely to result in reversal, an order for a new trial, or a

substantially reduced sentence, and Mandell's motion should thus be denied.

**1.  The District Court's Rulings on the Applicability of *Morrison* Were Correct**

> 22.     Mandell first claims that he is entitled to bail pending appeal because the

Government was allowed to present evidence at trial relating to fraudulent transactions that

occurred abroad.  Mandell believes that, under *Morrison*, the jury was not permitted to consider

this evidence, and that therefore his convictions cannot stand.  (Br. 10-21).  He is mistaken.

*Morrison* was a civil case, and the presumption against extraterritorial application of federal statutes that lies at the heart of *Morrison* does not apply in this type of criminal prosecution. Moreover, even if *Morrison* did apply in the criminal context, its strictures were more than satisfied here.

### a. Relevant Facts

23.     The evidence at trial made plain that Mandell's fraudulent scheme was based in the United States.  It was hatched, plotted, and executed by U.S. citizens from within two New York-based brokerages; it involved the private placement of stock of three U.S.-based companies; and it targeted, in part, U.S. citizens.  Mandell and his co-conspirators, operating from New York and Florida, utilized the instrumentalities of interstate commerce, including telephones to solicit investors and communicate with them, as well as faxes and the U.S. mails to send and receive documents critical to the fraud.  The defrauded investors' money was wired to Sky Capital bank accounts here in the United States.

24.     While the jury heard evidence regarding the defendants' manipulation of Sky Capital stock on the AIM exchange in London, the Government presented evidence to prove that this manipulation was done to perpetuate the fraud committed in the United States, and specifically to ensure that the defendants could continue to raise money based on false and misleading representations regarding private placements in the Sky Capital companies.  With respect to Count Two (the securities fraud count), the Government argued to the jury that it could only convict if it found fraud in connection with private placements of U.S. stock after June 30, 2004, and not with respect to any purchase or sale of stock on the AIM.  (Tr. 3511-12).  The District Court so charged the jury.  (Tr. 3858).

25.     Thus, pursuant to the Government's argument and the District Court's instructions, only the private placement offerings for Sky Capital Holdings (GX 143-44), Sky Capital Enterprises (GX 146-47), and Global Secure (GX 142), which were offered after June 30, 2004, could be considered fraudulent for purposes of voting to convict on Count Two. Three of these private placements were offered exclusively to U.S. citizens pursuant to Regulation D of the Securities Act of 1933 (GX 142, 144, 146), *see* 17 C.F.R.§ 230.501, and the remaining two (GX 143, 147) were made exclusively to non-U.S. citizens pursuant to Regulation S of the Securities Act, *see* 17 C.F.R. §§ 230.902(h), 230.903(a).

**b.  Applicable Law**

26.     In *Morrison*, the Supreme Court considered "whether § 10(b) of the Securities Exchange Act of 1934 provides a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges." 130 S. Ct. at 2875. In that civil action, foreign plaintiffs sued foreign defendants for misconduct in connection with securities traded on a foreign exchange. The Supreme Court upheld the dismissal of the action, reasoning that, for a securities transaction to give rise to civil liability under U.S. law, the purchase or sale must be made inside the United States or the security involved must be listed on a domestic exchange. *Id.* at 2884. The basis for this holding was the Court's application of a presumption against the extraterritorial application of U.S. statutes in civil litigation. The Court explained that "unless a contrary intent appears, [a statute] is meant to apply only within the territorial jurisdiction of the United States." *Id.* at 2877.

27.     A different rule applies in criminal cases. In *United States* v. *Bowman*, 260 U.S. 94, 98 (1922), the Supreme Court held that the presumption against extraterritoriality "should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for

the government's jurisdiction." *Id.* at 98 (1922). This Court, following *Bowman*, has repeatedly

held that the presumption against extraterritoriality does not apply to criminal statutes. *See, e.g.*,

*United States* v. *Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) ("The presumption that ordinary

acts of Congress do not apply extraterritorially does not apply to criminal statutes." (internal

citation omitted)); *United States* v. *Yousef*, 327 F.3d 56, 86 (2d Cir. 2003) ("[T]he presumption

against extraterritorial application does not apply to those criminal statutes which are, as a class,

not logically dependent on their locality for the Government's jurisdiction." (internal quotation

marks and citation omitted)).

### c. *Morrison* Does Not Apply to the Offenses Charged in this Case

28.     Mandell's argument assumes that *Morrison* applies in the criminal context, which

is far from clear. In a concurring opinion in *Morrison*, Justice Breyer observed that "the

fraudulent activity alleged," while not giving rise to civil liability, may nevertheless violate

criminal statutes. *See id.* at 2888 (Breyer, J., concurring). Justice Stevens similarly observed in

his concurrence, without drawing comment from the other justices, that the holding of *Morrison*

would "not . . . foreclose the [Securities Exchange] Commission from bringing enforcement

actions in additional circumstances, as no issue concerning the Commission's authority [was]

presented by this case." *Id.* at 2894 n.12 (Stevens, J., concurring).

29.     Most important, the Supreme Court in *Morrison* did not even mention, let alone

discuss, its prior decision in *Bowman*, which expressly addressed extraterritoriality in connection

with criminal statutes. As this Court has noted, *Bowman* stands for the proposition that

"Congress is presumed to intend extraterritorial application of criminal statutes where the nature

of the crime does not depend on the locality of the defendants' acts and where restricting the

statute to United States territory would severely diminish the statute's effectiveness." *United*

*States* v. *Weingarten*, 632 F.3d 60, 66 (2d Cir. 2011) (discussing *Bowman*). Because the

*Morrison* Court did not even suggest that it was reconsidering the *Bowman* holding – or that its

decision would call into question longstanding precedent arising in the criminal context – there is

no reason to believe that the Supreme Court intended to abrogate *Bowman sub silentio*. To the

contrary, the Supreme Court has long cautioned courts against drawing such sweeping

conclusions from its silence. *See, e.g.*, *Rodriguez de Quijas* v. *Shearson/Am. Express, Inc.*, 490

U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to

rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the

case which directly controls, leaving to this Court the prerogative of overruling its own

decisions."). In short, *Morrison* should not be read to secretly undo a near-century of law.

*Bowman* remains the law of the land.

      30.     Indeed, this Court has repeatedly invoked *Bowman* in post-*Morrison* decisions.[8]

*See United States* v. *Weingarten*, 632 F.3d at 66; *United States* v. *Al Kassar*, 632 F.3d at 118.

Other courts have expressly held that *Bowman* was not abrogated by *Morrison*. *See, e.g.*, *United*

*States* v. *Carson*, No. SACR 09-00077-JVS, 2011 WL 7416975, at *7 (C.D. Cal. Sept. 20, 2011)

("*Morrison* does not mention *Bowman*, nor does it explicitly overrule it." (citations omitted));

*United States* v. *Campbell*, 798 F. Supp. 2d 293, 303-04 & n.3 (D.D.C. 2011) ("*Bowman* has not

been overruled or explicitly limited by any subsequent Supreme Court decision, and it has been

---

[8] Mandell cites a Third Circuit decision for the proposition that "[b]ecause this is a novel issue
which has not been decided by controlling precedent, it constitutes a 'substantial question' for
purposes of bail pending appeal." (Br. 12 (citing *United States* v. *Miller*, 753 F.2d 19, 23 (3d
Cir. 1985))). But even assuming this Court were to adopt that principle, it is of little use to
Mandell. The law is clear that bail pending appeal is only to be granted if the defendant presents
a "substantial question" *and* that question is likely to result in "(i) reversal, (ii) an order for a new
trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a
term of imprisonment less than the total of the time already served plus the expected duration of
the appeal process." 18 U.S.C. § 3143(b)(1)(B). Mandell's argument is novel, but it is also
wrong. It does not satisfy the requirements of the statute and, accordingly, cannot justify bail
pending appeal.

cited and applied by circuit courts multiple times in recent years." (collecting cases)); *United States* v. *Hijazi*, No. 05-40024-02, 2011 WL 2838172, *9-10 (C.D. Ill. July 18, 2011) (recognizing the continued force of *Bowman* notwithstanding *Morrison*). Mandell identifies no authority to the contrary.[9]

      31.    Applying *Bowman* to the securities fraud charges here, there can be no doubt that "the nature of the crime does not depend on the locality of the defendants' acts" and that "restricting the statute to United States territory would severely diminish the statute's effectiveness." *Weingarten*, 632 F.3d at 66. Section 10(b) of the Exchange Act prohibits "any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange" to use fraudulent practices "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." 15 U.S.C. § 78j(b). Rule 10b-5, in turn, makes it "unlawful for any person, directly or indirectly," to use an "instrumentality of interstate commerce, . . . the mails or . . . any facility of any national securities exchange," to engage in "any device, scheme, or artifice to defraud," or "to engage in any act, practice, or course of business which operates . . . as a fraud or deceit upon any person in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

      32.    This broad language nowhere suggests that the nature of the crime turns on where the transactions in question are executed. The text of the statute and corresponding regulations

---

[9] Mandell claims that the presumption against extraterritoriality has always applied to criminal statutes, and that the holding in *Bowman* only governs "crimes committed against the Government of the United States (as opposed to its private citizens)." (Br. 13). In support of this proposition, he cites a law review article and a New York Law Journal article. (*Id.*). What he does not cite are the numerous decisions of this Court holding squarely to the contrary, and applying *Bowman* to crimes committed against private citizens. *See, e.g.*, *United States* v. *Cohen*, 427 F.3d 164, 168 (2d Cir. 2005) (narcotics trafficking); *Yousef*, 327 F.3d at 86 (commercial airline bombing); *Weingarten*, 632 F.3d at 66-67 (travel with intent to engage in illicit sexual conduct).

reaches fraudulent securities schemes that have effects in the United States, and Mandell's scheme falls well within that prohibition. Mandell and his co-conspirators worked out of U.S. offices, and instructed clients to wire money to U.S. banks for private placements in U.S. companies. The victims of this scheme were both U.S. citizens and foreigners. Consequently, even if the transactions at issue were executed overseas – and as set forth below, they were not – that fact would not alter the illegality of the scheme under the U.S. securities laws. Conversely, were the defendants' nearly decade-long scheme to defraud investors held to fall outside the purview of Section 10(b) because some acts in furtherance of the scheme occurred abroad (even though most occurred here), or because some of those defrauded lived outside of this country (even though some lived here as well), it would "severely diminish the statute's effectiveness." *Weingarten*, 632 F.3d at 66.

33.    And this analysis applies all the more to the mail fraud and wire fraud statutes. While Mandell blithely states that these statutes are subject to a presumption against extraterritoriality (Br. 19), he offers no authority in support of this proposition, and Supreme Court precedent is precisely to the contrary. In *Pasquantino* v. *United States*, 544 U.S. 349, 371 (2004), the Supreme Court upheld the use of the wire fraud statute in the prosecution of a U.S. citizen's scheme to smuggle cheap liquor into Canada, thus depriving Canada of tax revenues. The fact that conduct occurred overseas as well as in the United States, or that the effects of this scheme were felt abroad, was irrelevant:

> Petitioners used U.S. interstate wires to execute a scheme to defraud a foreign sovereign of tax revenue. Their offense was complete the moment they executed the scheme inside the United States; the wire fraud statute punishes the scheme, not its success. This domestic element of petitioners' conduct is what the Government is punishing in this prosecution, no less than when it prosecutes a scheme to defraud a foreign individual or corporation, or a foreign government acting as a market participant. In any event, the wire fraud statute punishes frauds

16

executed in interstate or foreign commerce, so this is surely not a statute in which Congress had only domestic concerns in mind.

*Id.* (internal quotation marks and citations omitted). Thus, there is no presumption against extraterritoriality; on the contrary, this is "surely not a statute in which Congress had only domestic concerns in mind." And the same analysis applies to mail fraud. *See United States* v. *Trapilo*, 130 F.3d 547, 552-53 (2d Cir. 1997) ("Under both the mail fraud and wire fraud statutes, the thing which is condemned is (1) the forming of the scheme to defraud, however and in whatever form it may take, and (2) a use of mail and wire communications in its furtherance. If that is satisfied, more is not required."). *Morrison* cannot be read to disable the Government from prosecuting criminal schemes that use domestic wires and mails, simply because those schemes also have extraterritorial components. *See United States* v. *Coffman*, 771 F. Supp. 2d 735, 738 (E.D. Ky. 2011) (holding that *Morrison* does not apply to mail and wire fraud statutes).

### d. The Evidence at Trial Satisfied *Morrison*

34.     Even if this Court were to apply *Morrison* to the crimes at issue here, Mandell's convictions would still stand. As to the securities fraud count, the jury was instructed that it could only consider the private placements, rather than the transactions on the AIM exchange, and the jury is presumed to have followed that instruction. *See United States* v. *Snype*, 441 F.3d 119, 129-30 (2d Cir. 2006). Thus, while Mandell makes much of the evidence presented to the jury regarding fraudulent conduct overseas (and, indeed, grossly overstates its significance, *see* Br. 14-15), this is irrelevant. The question is whether the private placements in Sky Capital Holdings and Enterprises and in Global Secure, offered under Regulation D and Regulation S, satisfy *Morrison*. They do.

35.     Under *Morrison*, § 10(b) applies to "transactions in securities listed on domestic exchanges[ ] and domestic transactions in other securities," *Morrison*, 130 S. Ct. at 2884, and

"[w]ith regard to securities not registered on domestic exchanges, the exclusive focus [is] on domestic purchases and sales." *Id*. at 2885. Interpreting this very language, this Court recently held that "the act of purchasing or selling securities is the act of entering into a binding contract to purchase or sell securities" and that "transactions involving securities that are not traded on a domestic exchange are domestic if irrevocable liability is incurred or title passes within the United States." *Absolute Activist Value Master Fund Ltd.* v. *Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012). Here, the Regulation D offerings were made by individuals in the United States (the conspirators) exclusively to individuals within the United States. These private placements were, by definition, within the United States. And as to the Regulation S offerings made to non-U.S. citizens overseas (GX 143,147), the pertinent offering books state that, after receipt of an investor's application and funds, the company had "absolute discretion to reject in whole or in part" any investor's application for any reason, including a determination that the application was for a nominee or a finding that the investor's check had not cleared "on first presentation" (GX 143 at 66; GX 147 at 115). Because the decision whether to accept an application rested solely with the company, and the company was indisputably controlled by Mandell and located in New York, it necessarily follows that irrevocable liability was incurred, and title passed, within the United States.

36.     The same is clearly true for Counts Three and Four, the mail and wire fraud counts. As but one example, the calls placed to solicit foreign investors, or to lull them into retaining their investments, were placed from the United States. For all of these reasons, even if *Morrison* somehow applies, Mandell's convictions would stand.

**2. The District Court's Instructions with Respect to Counts Three and Four Were Proper**

37.     Mandell next argues that the Court erred in instructing the jury that it need not find that the defendants actually made a material misrepresentation in order to convict on either Count Three or Four.  (Br. 22).  The claim, which is premised on a cramped reading of the Court's instruction with respect to the first element of each offense, should be rejected.

**a. Relevant Facts**

38.     Counts Three and Four, which charged mail and wire fraud, respectively, each required to the Government to establish, among other things, the existence of a scheme or artifice to defraud.  (Tr. 3858-59).  With respect to that element, the Court instructed the jury, in relevant part, that:

> The first element the government must prove beyond a reasonable doubt for this count is the existence of a scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representations or promises.
>
> What's a scheme or artifice?  Well, it's simply a plan for the accomplishment of an object.  The scheme to defraud is any plan, device or course of action to obtain money or property by means of false or fraudulent pretenses, representations or promises. . .
>
> A scheme to defraud is simply a plan to obtain something of value by trick, deception, swindle or other departure from basic standards of honesty and fair dealing. . .
>
> *In order to establish a scheme to defraud, the government need not show that the defendant you are considering made a misrepresentation.  A scheme to defraud can exist even if the scheme did not progress to the point where misrepresentations would be made*. . .

(Tr. 3859-60 (mail fraud); *see also* Tr. 3867 ("The first and second elements for mail fraud are the same as they are for wire fraud.")).

### b. Applicable Law

39.     An appellant challenging a jury instruction faces a heavy burden: he must establish both that he requested a charge that "accurately represented the law in every respect" and that the charge delivered was erroneous and caused him prejudice. *United States* v. *Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004). In reviewing jury instructions, the Court does not look only to the particular words or phrases identified by the defendant, but must "review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *United States* v. *Carr*, 880 F.2d 1550, 1555 (2d Cir. 1989) (quoting *California* v. *Brown*, 479 U.S. 538, 541 (1987)). "Often isolated statements taken from the charge, seemingly prejudicial on their face, are not so when in the context of the entire record of the trial." *United States* v. *Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990) (internal quotation marks omitted). Even if there is error in the giving of a particular type of charge and a timely objection is made, reversal is not warranted if the trial court's error was harmless. *United States* v. *Amuso*, 21 F.3d 1251, 1260-61 (2d Cir. 1994).

### c. Discussion

40.     Mandell's claim fails for at least three reasons. First, as the District Court noted in rejecting his claim of error at the charging conference, the challenged instruction accurately reflects the law: the fact that a defendant never actually succeeds in making a material misrepresentation does not bar a conviction for wire or mail fraud. (Tr. 3424-25). *See United States* v. *Trapilo*, 130 F.3d at 552 ("[A]s the statute plainly states, what is proscribed is use of the [mail or wires] of the United States in furtherance of a scheme whereby one *intends* to defraud another of property. Nothing more is required." (emphasis in original)); *Gregory* v. *United States*, 253 F.2d 104, 109 (5th Cir. 1958) ("The scheme [to defraud through the use of the mails]

20

exists although no misrepresentation of fact is made.  Success of the scheme is not essential to completion of the offense and it is not necessary to prove communication of the alleged false representation to the victims." (internal quotations omitted)).

41.  Second, even if the few phrases highlighted by the defendants were somehow to be found erroneous, the charge, taken as a whole, unquestionably correctly instructed the jury on the essential elements of the offenses.  *See United States* v. *Weintraub*, 273 F.3d 139, 151 (2d Cir. 2001) ("We do not review portions of the instructions in isolation, but rather consider them in their entirety to determine whether, on the whole, they provided the jury with an intelligible and accurate portrayal of the applicable law.").  Even with respect to the remainder of the charge regarding the existence of a scheme to defraud, the Court instructed the jury at length as to what constituted a false or fraudulent misrepresentation (Tr. 3860), the requirement of materiality with respect to the false statement (Tr. 3861), and finally that, "[i]n addition to proving that a statement was false or fraudulent and related to a material fact, in order to establish a scheme to defraud, the government must prove that the alleged scheme contemplated depriving another of money or property" (Tr. 3861).  Here, the District Court's charge considered as a whole clearly and unequivocally instructed the jury that the "government had to prove beyond a reasonable doubt . . . the existence of a scheme or artifice to defraud," the first element of the crimes charged in Counts Three and Four.  *See Fountain* v. *United States*, 357 F.3d 250, 255 (2d Cir. 2004) ("[t]he 'essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." (internal quotation and citation omitted)).  Mandell does not and cannot argue otherwise.

21

42.     Third, even assuming an error was made, any such error was harmless, and thus could not be a basis for reversal on appeal.  *Cf. United States* v. *Quinones*, 511 F.3d 289, 313-14 (2d Cir. 2007) ("To secure reversal based on a flawed jury instruction, a defendant must demonstrate both error and ensuing prejudice."); *United States* v. *Pimentel*, 346 F.3d 285, 302 (2d Cir. 2003) (erroneous jury instruction harmless if "it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error" (internal citations omitted)).  As set forth above, the evidence adduced at trial of Mandell's guilt was overwhelming:  witnesses, documents, and consensual recordings all established beyond a reasonable doubt that Mandell made and caused to be made repeated, material misrepresentations to investors.  Indeed, it is hard to imagine how the scheme could have lasted for nearly a decade without nearly constant false and misleading statements to investors – as the evidence proved there was.  In its summation, accordingly, the Government did not argue for conviction because of *contemplated* material misrepresentations, but rather based on the numerous material misrepresentations that were directed to investors and that harmed investors.  And Mandell's primary defense was not that the representations were never made, but rather that, if they were made, he did not know about them, or that, if he knew about them, they did not constitute material misrepresentations or otherwise violate the law.  Thus, it is overwhelmingly likely that the jury voted to convict because it concluded that representations were, in fact, made to investors, and that those representations were fraudulent.

### 3.   The Defendant's Material Omissions Argument Fails

43.     Finally, Mandell argues that he is entitled to bail because, "given the complete dearth of evidence regarding the existence of a fiduciary relationship between the brokers and customers, there is . . . a substantial question as to whether the evidence was sufficient to support

the Defendants' convictions under a 'material omission' theory." (Br. 27). On this issue, there is not only no substantial question of law; there is no question at all. Under the law of this Circuit, the evidence was more than sufficient to support the convictions on a material omission theory.

### a. Relevant Facts

44.    Sky Capital brokers called customers and solicited them to buy Sky stock, s*ee, e.g.*, Tr. 1215-16 (Q. "Were you soliciting shares for the purpose of matching them to the sell order?" A. "Yes."), and made material misrepresentations to customers regarding the future performance of that stock, *see, e.g.*, Tr. 2406-07 (Q. "What if anything did you tell your buyers about the price of Sky stock when you solicited them for these kinds of trades?" A. "That it was going higher.")). More pointedly, as set forth above, Mandell and Harrington offered bribes to brokers on numerous occasions for the illicit purpose of buying Sky stock to manipulate the stock price. (Tr. 1268-70, 1273, 2440). Because the brokers were well aware of the illiquidity of Sky stock – it was like "pouring concrete into your book" of business (Tr. 1261) – that the only reason they would ever purchase the stock for a client, outside of a cross-trade, was in order to receive the secret bribe (Tr. 2455-56). None of the bribes, which were almost 500 percent more than the disclosed commission, were ever disclosed to investors. (Tr. 1277, 2456).

### b. Applicable Law

45.    A defendant challenging the sufficiency of the evidence "bears a heavy burden," *United States* v. *Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (quoting *United States* v. *Aguilar*, 585 F.3d 652, 656 (2d Cir. 2009)), as the standard of review is "exceedingly deferential," *United States* v. *Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). Specifically, the Court must "view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of witnesses' credibility." *United*

23

*States* v. *Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010) (quoting *United States* v. *Parkes*, 497 F.3d 220, 225 (2d Cir. 2007)).  The verdict must be upheld if "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States* v. *Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (quoting *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979)).

### c.  Discussion

46.     This Court has explained that while "there is no general fiduciary duty inherent in an ordinary broker/customer relationship, we have also recognized that a relationship of trust and confidence does exist between a broker and a customer with respect to those matters that have been entrusted to the broker."  *United States* v. *Wolfson*, 642 F.3d 293, 295 (2d Cir. 2011) (per curiam) (internal quotation marks omitted).  While Mandell claims that such a relationship "usually exists only where the broker is vested discretionary authority over the account" (Br. 26), this is simply not so.  On the contrary, while "the presence of a discretionary account automatically implies a general fiduciary duty between a broker and customer . . . the absence of a discretionary account does not mean that no fiduciary duty exists."  *Id.*

47.     Under the law of this Circuit, a jury is to be instructed – as the jury was here – that "[w]hether a fiduciary relationship exists is a matter of fact for you, the jury, to determine. At the heart of the fiduciary relationship lies reliance and *de facto* control and dominance.  The relationship exists when confidence is reposed on one side and there is resulting superiority and influence on the other."  *Id.* at 296; *see* Tr. 3849.  Moreover, this Court has held that sufficiently exorbitant payments to be received by brokers on their sales *must* be disclosed to clients.  *United States* v. *Szur*, 289 F.3d at 212 ("[E]ven in the absence of any general fiduciary duty resulting from discretionary authority, we hold that [the brokerage firm] was under a duty to disclose these exorbitant commissions . . . .").

24

48.     *Szur* control this case.  There, one of the defendants, the president of a company

known as U.S. Asset, convinced brokers to market his stock in exchange for up to a 50 percent

commission.  289 F.3d at 205.  The brokers did not disclose the commission to their clients. *Id*.

On appeal, the defendants argued that the evidence was insufficient to support their convictions

for wire fraud, because the brokers for non-discretionary accounts did not owe their clients a

duty to disclose commissions.  *Id*. at 208.  This Court disagreed, noting that brokers on non-

discretionary accounts have an affirmative duty "to use reasonable efforts to give [the customer]

information relevant to the affairs that [have] been entrusted to them."  *Id*. at 211 (quoting *Press*

v. *Chem*. *Inv*. *Servs*. *Corp*., 166 F.3d 529, 536 (2d Cir. 1999) (internal quotation marks omitted)).

Although "[s]ome information borders on insignificant minutia" and is not subject to a duty to

disclose, this Court held that a 50 percent commission "qualifies as information that is 'clearly

significant and must be disclosed accurately.'"  *Id.* at 212 (quoting *Press*, 166 F.3d at 536).

Thus, the *Szur* Court held that the jury was entitled to find that the non-discretionary brokers had

a fiduciary relationship with their clients requiring them to disclose their commissions.  *Id*.; *see*

*also United States* v. *Santoro*, 302 F.3d 76, 80 (2d Cir. 2002) (citing *Szur* for the proposition that

"[e]ven where a broker lacks discretionary investment authority . . . [he] has an affirmative duty

to disclose all relevant information, including the receipt of excessive commissions").

49.     Here, the bribes were not 50 percent more than the disclosed commissions; they

were *500 percent* more.  Thus, a rational jury could easily have concluded that there was "a duty

to disclose these exorbitant commissions because the information would have been relevant to a

customer's decision to purchase the stock."  *Szur*, 289 F.3d at 212.  More broadly, given the

evidence that the brokers were soliciting trades in Sky Capital in order the manipulate its price

and fraudulently misrepresenting the prospects of Sky Capital stock – for which there was, in

25

fact, no actual demand – a rational jury could have found full-blown fiduciary relationship resulting from the confidence that customers reposed in their brokers and the resulting superiority and influence that those brokers had over their unwitting victims.  Accordingly, there can be no claim of insufficient evidence, let alone a substantial question justifying bail.[10]

### <u>CONCLUSION</u>

50.     Having failed to identify a substantial question of law or fact, Mandell's motion for bail pending appeal should be denied.

51.     Pursuant to the Local Rules of the Second Circuit and the Federal Rules of Appellate Procedure, a response to a motion may exceed 20 pages upon permission of the Court. Responding to Mandell's brief has required extensive discussions of the evidence admitted at trial and portions of the procedural history of the case.  In order to respond adequately to the issues raised by the defendant and adequately set forth the factual and legal background necessary to decide his motion, it is respectfully submitted that the length of the Government's

---

[10] Mandell also suggests that there is a substantial question as to whether the testimony of cooperating witness Michael Passaro that the payments to brokers were called bonuses "because it is illegal or against the rules" was admissible, and whether a mistrial should have been granted after that testimony.  (Br. 26-27).  The claim is meritless.  Even if Mandell could establish error, he has not remotely met his burden of demonstrating that this stray sentence in over five weeks of testimony is "so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal or a new trial." *Randell*, 761 F.2d at 125 (internal quotation marks omitted).

brief should not be limited to 20 pages.  I have consulted with counsel for the defendant, who

advises that the defense consents to the Government's motion.


Dated: July 5, 2012
       New York, New York


                                                         /s/

                                         _____

                                         Katherine R. Goldstein
                                         Assistant United States Attorney
                                         Southern District of New York
                                         Telephone: (212) 637-2262

<u>CERTIFICATE OF SERVICE</u>

Katherine R. Goldstein affirms, under penalty of perjury, that she is employed in the Office of the United States Attorney for the Southern District of New York, and that, on July 5, 2012, she caused a copy of the within Affirmation in Opposition to Defendant's Motion for Bail Pending Appeal to be served by electronic mail and this Court's electronic filing system on:

Matthew W. Brissenden, P.C.
666 Old Country Road, Suite 501
Garden City, NY 11530


Dated: July 5, 2012
       New York, New York




                                        /s/
                                        _____
                                        Katherine R. Goldstein
                                        Assistant United States Attorney