Vivian Shevitz
Attorney at Law
46 Truesdale Lake Drive
South Salem, New York 10590
(914) 763 2122
vivian@shevitzlaw.com

September 23, 2013

Hon Richard J. Sullivan (email)
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

       Re:  United States v. Vilar and Tanaka (05 cr 621 RJS)
       <u>RESPONSE TO GOVERNMENT *CURCIO* LETTER
       AND CONCERNING CJA APPOINTMENT</u>

Dear Judge Sullivan:

      I write in response to AUSA Naftalis's letter proposing questions for Mr. Vilar and Mr. Tanaka at a *Curcio* hearing.  I was just informed of the Friday September 27, 2013 hearing date, and was asked to respond to the Order of September 13, 2013 (which I had not seen previously) why I should be appointed CJA counsel and will do so briefly herein.  I first ask for a one-week adjournment of any hearing:  though we physically moved, my office is not completely set up (there are issues and I must find a 'computer professional') and I have to wait for services like the boiler company and other services appointments (door locks, etc.) necessary to get the house/office operational.  We plan to have Mr. Vilar and Mr. Tanaka meet with Mr. Dratel too, but the scheduling of appointments here (much less in NYC) has been overwhelming for a sole-practitioner such as me.

      While it appears that pursuant to *Curcio* there might have to be an inquiry if I am to represent both defendants, as I am willing to do,[1] Mr. Tanaka prefers that

---

[1] The Court asked me to respond as to why I should be appointed to represent Mr. Tanaka pursuant to the CJA.  Although I am not a member of the SDNY panel, because I have never had the ability to respond on a monthly basis to arraignments and other proceedings.  That is why I have limited panel membership to the Second Circuit panel, where I have been a member since the early 1980's.  I have, however, been appointed by District Court Judges in the Eastern District of New York (Judges Korman and Block come to mind) to represent defendants pursuant to the CJA for "special" cases or where I have developed expertise that would save the

1

the Court appoint another lawyer for him to help shoulder some of the load. But before going forward, I need to address on my clients' behalf certain issues raised by Mr. Naftalis' letter. Both Mr. Vilar and Mr. Tanaka are aware of this letter-response and want me to file it on behalf of each of them.

First, let me assure that Mr. Vilar and Mr. Tanaka are both fully aware of my "personal relationship" (however the government seeks to define it)[2] and the "conflict" theoretically, or actually, arising therefrom. Neither has an intention of arguing "relative culpability" or "blame." Both have previously signed waivers in February and April 2012, which I believe were submitted to the court when I first began to represent both men. Subject to their consultation with Mr. Dratel, they have told me they wish to sign waivers again.

Comparative culpability is not the point when the biggest thing these men face in a criminal (re)sentencing is the mistaken notion – upon which they were judged and already have been punished harshly including incarceration amounting to a combined *six years of their lives* – that they "lost" or "stole" client funds in the millions for a universe of unknown clients, when they did not. Disturbingly, except for Mr. Marks, defendants' counsel accepted and acted on the prosecutor's position that there were "losses" and that the funds in Bear Stearns accounts some of which contain what is referred to as "investor assets" (together with fees owed to the asset management company), were "irrelevant" and ought to be forgotten". How can it be irrelevant that there were funds in Amerindo Panama accounts sufficient to pay out all Amerindo Panama investors even considering there had been a concocted, coerced, unnatural "run on the bank" caused by the government's conduct? Should

---

court and parties time. I believe that I have also on occasion been appointed in the SDNY for a habeas matter, though I cannot recall the details now. Indeed, this Court appointed me for the "substitute asset" forfeiture matters after Mr. Jon Marks withdrew. At this time, it is unlikely that anyone *without* knowledge of this case *could* get "up and running" quickly. I thus am willing to and assume I will still be representing Mr. Vilar in these resentencing proceedings pursuant to my previous CJA appointment in this Court in 2010, regardless of representation also of Mr. Tanaka – though as I write, we *would* prefer separate counsel.

[2] Mr. Tanaka has, for ten years, been prevented from returning to his home in the UK. He is 70 years old and is still undergoing treatment (interrupted while he was incarcerated) for jaw cancer and oral reconstruction. I offered him accommodations when he was released on bail (as I did for a former Israeli client who was released on bail by the Second Circuit in 2008 and then had his conviction reversed on remand from the Supreme Court) because of his financial distress (as was Mr. Vilar by Mr. Pfaeffle). The personal "relationship" between us is not germane to the situation at hand except to the extent it affects both clients. And as I stated, both are fully aware of the "conflict-producing" circumstances of any septuagenarian ( I am 69 years old) relationship that has developed.

2

the jury not have heard this?  Is this not a *fact* that should be considered for sentencing "loss" analysis even if it was not before the jury?

Even when this Court (on January 29, 2010) ordered the prosecutor to respond to David Ross' evaluation (a highly professional analysis never challenged on its accuracy or merits) with the observation that this might be "relevant" to 3553 factors, Mr. Tanaka's counsel *distanced* himself from the Ross report and, further, did *not* challenge the prosecutor's dismissive attitude toward the facts that showed an absence of loss as of the date of the shutdown. Nor did he argue Mr. Tanaka's severe and debilitating "loss" of substantial Amerindo US with *no* cause.  And though Mr. Marks' instinct was valid, he abandoned the fight and "confessed" in the gamble to plead leniency against the "losses."

Mr. Tanaka and Mr. Vilar (and I) have learned through the process of my representing both and "putting pieces together" as no counsel has done previously that it was not attributed to a failure to argue against the government's positions at trial that caused them harm.  While matters we have been learning go to the very propriety of the convictions and demonstrate that trial counsel compromised their defenses in serious ways, the defendants seemingly do not have the "luxury" of waiting for the moment to file a 2255 to raise these issues:   Instead, the necessity of defending against a sentencing proceeding, should it occur after the Court of Appeals evaluates a rehearing petition, requires us to at least note relevant facts that should have, and should, inform the process of getting to truth and a "just" sentence.

Something happened on "Day One" here (Day One of the SEC case, which affected this case too) which no one bothered learning about it until – now.  Unlike SAC Capital, in which prosecutors solicitous of SAC, its investors, its employees, and the investment world, "allowed" $20 billion asset SAC to operate even though proclaiming it is in essence "permeated with fraud", in 2005 prosecutors and the SEC decided to precipitously shut the once $9+ billion asset Amerindo US down by a broad all-records search, the arrest of Mr. Vilar and Mr. Tanaka, and a barrage of adverse publicity before asking cogent questions.

After Mr. Tanaka and Mr. Vilar were incarcerated on arrest warrants and the New York SEC lawyers who had not yet commenced a "civil" case, found out there was no one with authority to run Amerindo -- whose institutional investors (Amerindo US) were pressing with their needed answers and help.  Two SEC lawyers (Mr. Gizzi and Ms. Lackey) sought, by *ex parte emergency* TRO, returnable June 1 and June 2, 2005, a Receiver and other relief on the ground that there was no one to operate Amerindo, a US Advisory firm with satisfied institutional clients who were now panicked by the negative press reports fanned by the SDNY that Mr. Vilar and Mr. Tanaka had stolen millions and millions of dollars of clients funds.

3

Mr. Vilar and Mr. Tanaka were not told about the SEC hearing or the charge. They were still incarcerated. They were *unrepresented* in the SEC case. (They had counsel solely for bail purposes in the district court and had not appointed anyone to represent Amerindo US, a decision that had to be made only by Mr. Vilar and Mr. Tanaka.)

On June 1, 2005 Ms. Lackey read the criminal charges to Judge Swain. These charges, we see, in essence alleged domestic wrongdoing with an alleged client of Amerindo US and the fear of damages to a multitude of clients who by extrapolation must have been similarly defrauded.

No one with any knowledge of the facts was present on June 1, 2005. Because Mr. Tanaka and Mr. Vilar were *not represented* at the hearing they did not even *have the opportunity to say: "Hey, you have the wrong company !"* They did not have an opportunity to deny the charges. *They did not have an opportunity to even explain that there were separate companies* and to tell the Court that the SEC had conducted examinations as early as 1992 and as late as 2005, "passing inspection" of Amerindo US with full knowledge of the separate Panama operation that dealt with individual clients.[3] They had no knowledge, were not present, and had no representation at the hearings on June 1 and 2, 2005.

No other lawyer for Mr. Tanaka or Mr. Vilar looked at the minutes of the June 1 or 2, 2005 TRO/Injunction hearing. In a recent (needed) respite from the relentless "civil" litigation that has consumed Mr. Vilar's and Mr. Tanaka's resources and attention and has demanded mine as well, I ordered and obtained the June 1 and June 2 transcripts at my expense (after asking Mr. Jacobson to provide it, which he refused because the SEC doesn't need it at this stage, so he said.)

I pursued all of the avenues that have led here, and "involved myself" as counsel in the SEC and "related" matters, solely by reason of where my CJA

---

[3] It is apparent from Mr. Litt's comments at Mr. Vilar's bail hearing before Judge Baer on June 3, 2005, that Mr. Litt had never seen the SEC San Francisco files that contain almost two decades' worth of information concerning the separate existences of Amerindo US, Amerindo UK, and Amerindo Panama. These files also contain information the SEC obtained from Amerindo US relating to the *fact* that the "SBIC venture" did not require a license from the SBA – based on documents we recently uncovered from Mr. Colton's files, which he apparently did not review or consider. We are looking into this further and have already advised the SEC that we believe that this is an issue akin to that the Second Circuit condemned in *United States v. Mahaffey*, (2d Cir. August 2, 2012) (Appellate court finds misconduct by SEC and U.S. Prosecutors in "Squawk Box Case," http://wallstreetonparade.com/2012/08/appellate-court-finds-misconduct-by-sec-and-u-s-prosecutors-in-squawk-box-case-overturns-convictions/).

4

representation of Mr. Vilar in the criminal case led me -- to the further litigation involving "control" over the "forfeited assets" that this Court in August of 2010 conceded was erroneous (and the Court of Appeals has now agreed was wrongly imposed and ordered vacated). It is because the SEC, nonetheless, asserted its "rights" to control those substitute assets, that I have been forced, as an incident of representing my client's criminal case interests, that I have participated in the "civil" case(s). Simply, the SEC and the Court have acted as if this was the "usual" "parallel" case where a defendant loses at trial, loses or agrees to a "forfeiture", and then the SEC can take control because not only are defendants' property rights extinguished but title can revert to the United States pursuant to a "final order of forfeiture."

This is *not* a "usual" case. There was no preliminary order of forfeiture. There was no final order of forfeiture. And substitute asset forfeiture is also vacated. We are back in a position where title reverts. If there is to be any forfeiture in a resentencing proceeding, Mr. Vilar and Mr. Tanaka assert their rights to a jury trial. (See Federal Rule of Criminal Procedure 32.2).

Mr. Tanaka's counsel purported to waive a jury, when the Court asked him whether he was asserting it. Shockingly, he said explicitly that he was relying on the prosecutor's representation that the defendants did not need or were entitled to a jury trial. (Tr.5633-34).

Mr. Vilar's counsel and Mr. Tanaka's counsel did not appreciate forfeiture law. They relied on Mr. Litt's representation that there were losses (repeated, indeed, in a February 3, 2010 "pre-sentencing" letter not filed) beyond calculation, and the government did not know them all but they existed so it was useless to evaluate claims. The defense lawyers did not even counter the February 3, 2010 letter – which contained accusations about ATGF clients made for the first time the day before sentencing. Mr. Colton did not address these "charges" because he never investigated client claims or assets. To the contrary, *accepting* Mr. Litt's "word" that "they" would find "losses" beyond the amount of "all" assets, defense counsel ineffectively and incompetently *consented*, without argument much less informed analysis, to 1) the *de facto* forfeiture of all defendants' assets, then 2) the actual restraint, *plus* 3) defendants' property right in managing their assets, of which they were seemingly stripped at the June 1, 2005 SEC hearing at which they were not present or represented.

While we realize that the Court does not like to countenance "negative" comments about a former colleague in the Southern District of New York U.S. Attorney's office, this is not an invalid accusation, an assertion without grounds. The *fact* is: Mr. Tanaka's lawyer had never prepared for any "forfeiture", and consequently had not delved into what Mr. Tanaka was trying to tell him about assets -- for example, Mr. Tanaka had to himself borrow money to commission the

5

Ross report and to do so on his own volition because Mr. Colton thought it a waste of time and would sacrifice funds from his legal funding bottom line; and Mr. Tanaka had to confirm the payment of the approximately $20 million redemption to Dextra Bank, when Mr. Litt continued to insist on listing Dextra in his restitution and forfeiture demands as recently as the sentencing proceeding. (Mr. Colton evidently feared "going there" because, as he said, Mr. Litt was alleging that he was not pursuing ATGF claims for now but might pursue it later. In fact as we now see from the Receiver's "concession" the ATGF clients' funds are intact too).

Mr. Tanaka has also learned (incredulously) that between the trial conviction and the sentencing, Mr. Colton even gave a quote to the press praising his former colleague Marc Litt when the article was *about* Litt's "victory" against Gary Tanaka. *Time*, January 14, 2009, *The Man Who Will Prosecute The Bernard Madoff Case,*http://content.time.com/time/business/article/0,8599,1871570,00.html.[4]

Mr. Tanaka did not know about this public statement of respect for Marc Litt at the time, nor knew of the *fact* of the cozy relationship of mutual respect and admiration among former prosecutors and apparently more so between Mr. Colton and Mr. Litt. If Mr. Tanaka had known this, he would not have taken on Mr. Colton for sentencing – a sentencing that will be vacated entirely once the mandate issues. (In fact, Mr. Tanaka would not have hired Mr. Colton at the beginning of the case if he had disclosed his conflicted attention *vis-a-vis* a Marc Litt prosecution. Mr. Tanaka states that he considers this a bigger conflict than anything on the table now.)

Mr. Tanaka also did not know that Mr. Colton was not conversant with federal criminal forfeiture, but should have been. Forfeiture is a sentence that a defense lawyer *must* prepare for, at the beginning of the case. There are fundamental principles and there are rules. Inquiry into "proceeds" and "forfeiture" principles would have led counsel to the realization that -- contrary to AUSA Litt's initial charges, charges on which the government still wants to sentence these men – there are no forfeitable proceeds since moneys into the Amerindo account were exchanged for credits, which are then the proceeds. *See generally United States v. Banco Cafetero Panama*, 797 F.2d 1154 (2d Cir. 1986) (a case involving forfeiture of

---

[4] "Litt, 46, is in fighting trim. In November he won a hard-fought case against former technology investor (and longtime opera fan) Alberto Vilar, who was convicted of stealing his investors' money. The trial took nine weeks, which is long for a fraud case. **"He is very much a no-nonsense prosecutor who does the right thing without excess flash or showmanship," says Colton, who represented Gary Tanaka**, Vilar's partner, who was also found guilty in the case."

a bank account with drug proceeds "in" it;[5] *United States v. Porcelli*, 865 F.2d 1352 (2d Cir. 1989). The accounts are fully actionable and satisfiable. It has taken the government almost ten years to learn that the Amerindo Panama credits are backed by funds, albeit through the facilities of an expensive Receiver in the "parallel" "SEC" case. Clients' funds could have been paid back through a liquidation -- but most of the clients did not want that to happen. (Indeed, *none* of them, all of whom knew they were "ahead of the game" in terms of long term returns on their investments. The government, without a doubt, forced a classic 'run on the bank.')

     Mr. Colton, furthermore, failed to act in Mr. Tanaka's behalf competently in that he was retained not only for the criminal case, but for the SEC case as well. He did nothing for five years then backed out of the case in 2010 when the case "awoke" with the prospect of heaps of work. Despite representing Mr. Tanaka in that proceeding (and in the criminal proceeding for that matter) Mr. Colton never ordered or obtained the transcripts of the very first SEC TRO hearing, on June 1 and 2, 2005. As noted above, I ordered these transcripts recently (at my expense, hopefully to be defrayed by CJA expense funds or the government).

     SEC attorneys and Mr. Eugene Licker, from Loeb & Loeb, were the only lawyers at the hearing in that action commenced by the SEC on June 1, 2005 and in which the SEC sought a Receiver and injunctions. Worse, however, they sought to put Alberto Vilar and Gary Tanaka out of business, and succeeded in doing so without their presence, or the presence of any lawyer representing them. (Bizarrely, Licker was leaving the firm that represented Amerindo US on the day of the search, May 25, 2005; though he *never spoke to Gary Tanaka or Alberto Vilar*, he purported to "take" the client, Amerindo US, to Loeb & Loeb, bill the client, then, together with the SEC Monitor "call the shots". No wonder Mr. Licker never ordered the transcript. He also never reported what happened back to Mr. Tanaka and Mr. Vilar, whose ownership rights he seemingly gave away without further discussion or disclosure to them.

---

[5] *Banco Cafetero*, an early case on "traceable proceeds", observes that "assets" deposited in a bank become a "credit" (which is therefore also the proceed). It began the discussion:

> Appellants rely on the realities of banking practice and the law that has developed as a result. When a customer deposits funds into a bank account, his bank credits the account in an amount equal to the deposit. At any given moment, the credit balance of an account is the cumulative result of all transactions affecting the account. Banks are not bailees of their depositors' money, and a depositor may not replevy his money as a specific res or follow it into the hands of another bank customer, ... .

7

By seeming agreement between 'lawyer' Mr. Licker and SEC Counsel Lackey after the Court declined a Receiver a Monitor was installed.  The June 1, 2005 record alarmingly reveals that Licker (*qua* Amerindo US) agreed that Mr. Tanaka was to be "replaced" at Amerindo. Indeed that happened.  Mr. Tanaka has been shunned *incommunicado* since that time onward – with the acquiescence of his criminal defense/ SEC counsel, convinced to not question it.[6]

Not even when Monitor Knuts reported in December 2005 that Amerindo US was "clean" and its clients paid, did defense counsel challenge the government's assumptions or invoke *Morrison* principles to challenge the SEC's role in delving into *anything* to do with the offshore investment business.

Instead, with Mr. Tanaka *assuming* all the while that Mr. Colton was protecting him and his assets,[7] Amerindo US sat by as the SEC and US Attorney gave away the $120 million asset Amerindo Technology Fund, a public mutual fund that Amerindo owned and managed.  At this, defense counsel fully acceded to final

---

[6] At the sentencing hearing (Tr.113) the Court asked Mr. Colton why the money was not managed or steps taken to pay it out.  Mr. Colton "reported" that there had been some "concession" at the beginning of the SEC case, but as we now see (having looked into this because Mr. Tanaka had had no knowledge of this "concession" nor by whom it was made), in fact Mr. Colton (though representing Mr. Tanaka in the SEC proceeding) also had no knowledge or it and did not seek to find out what it is.  Mr. Tanaka *was not present* during this part of the sentencing because Mr. Colton had told him to stay away from Mr. Vilar's sentencing.  In Mr. Tanaka's absence, Mr. Colton made this statement at sentencing:

"MR. COLTON:  ...  What happened in this case is that the SEC brought their own civil case, as they are of course permitted to do. They sought a receiver for the Amerindo entities. Judge Swain denied it but appointed a monitor and extracted -- I'm not saying wrongly; just that's the way it happened -- extracted a representation from the defendants that they would not manage money, would not act as investment advisors and would not be in the business.  So, they couldn't. And the SEC would have never allowed it."  [Sen. Tr.113-14).

[7] Mr. Colton stated on the record that he did not know about "forfeiture", purported to waive a jury on Marc Litt's say-so, (Tr. 5633-34), and later, in a video-recorded CLE presentation for *Lawline* on July 1, 2011, concerning "Parallel Prosecutions", admitted (as did another presenter) that he too was "confused" about criminal forfeiture ("if I wasn't on camera I'd admit that [confusion] too").  We do not say all this to ascribe blame or throw stones.  We cite this because Gary Tanaka and Alberto Vilar are entitled to the effective assistance of counsel, not counsel who followed the government's script without question.

8

destruction of the entire income stream that had served as the basis for the guarantees Amerindo had given its early private clients for their investments.

It is certainly refreshing that nearly ten years after, the government has so much solicitude for the defendants' rights to effective representation. The government questions whether Mr. Vilar and Mr. Tanaka want to waive the "right" to ask for consideration of "comparative fault", to pursue defenses such as we have uncovered by actually talking about facts and not assumptions or fears of clients "out there" whom the government does not know about but must exist ... (There are none). They are willing to waive my "conflict" in being unable to argue "comparative fault" (and the other unknowns).

Although I have asked for (a) CJA funds to continue defending my client's interests in this continuing "civil" aspect of the criminal case,[8] and (b) the appointment of counsel for Mr. Tanaka here and in the Court of Appeals, no one has addressed the CJA request. Though the Court of Appeals in denying mandamus acted on the understanding that this Court would decide the issue promptly, this Court has not decided (and instead inquires as to why I should be appointed). Simply put, although I have been running on "empty" fees-wise because all the litigation has been shifted to the "civil" case (where "substitute assets" are the *res* ), I have been nonetheless willing to represent Mr. Tanaka *and* Mr. Vilar in that *every single lawyer* aside from me has refused to work without being paid currently (or paid more), and these defendants' offshore funds and U.K. pension funds have been held (and are being held now) illegally. While the government is self-funding for this endless prosecution exercise, it has drained the defendants and their counsel of resources. Since Mr. Vilar and Mr. Tanaka have no choice but to accede to the enormous power of the prosecutor and the SEC, and the court, to haul them into court repeatedly, the Court should order CJA funds for my work, and should appoint counsel for Gary Tanaka at this time.

In the alternative the Court should stay proceedings (in the SEC case as well as this; there is no "forfeiture" to control and no disgorgeable sums ever proven), pending rehearing, and allow the defendants to manage their funds and empower

---

[8] In reciting the history here Mr. Naftalis wrongly characterizes the work for which I was appointed in the district court as "post conviction" work. ("On June 28, 2010, this Court appointed Ms. Shevitz and Ms. Wolfe to represent Vilar in post-conviction forfeiture matters.", Letter p.2). This forfeiture litigation was part of the sentencing, not a post-conviction matter. Because Mr. Marks had already been relieved, there was no other counsel to do this sentencing work dealing with Mr. Litt's motion for substitute asset forfeiture (and the government's requests for a "final order of forfeiture", which the government later effectively withdrew, and now is moot, with the Court of Appeals' vacatur of all forfeiture orders.

9

them to be able to *direct* JP Morgan to credit interest and reverse "abandoned accounts".

The Proposed Questions: If the Court goes forward with the *Curcio* hearing instead of awaiting the mandate after a proper rehearing proceeding, I point out an error in the premise of the prosecutor's proposed question 3. It asks:

3. Are you aware that Ms. Shevitz has previously stated that your attorney at trial was ineffective for failing to argue that Tanaka is more to blame for this offense than you are?

A similar question is posed for each of the two defendants.

The question assumes an argument I did not make. At that time, early in my representation and formulating my client's defense on appeal while still learning about the case, I argued that facts should have been developed but not to ascribe "more blame." Rather, I argued that as an incident of effective representation counsel for Mr. Vilar should have rebutted the continued accusation that actions were his, and not Mr Tanaka's, with evidence raising the consideration that Tanaka committed "conduct" that Mr. Vilar did not know about. There was delineation of duties and functions in the Amerindo partnership, a gulf between the two "parts" of the company. The jury should have known about the complete split between roles. This was meant to enlighten issues of "conspiracy", "knowledge", and "intent", not to ascribe "blame."

Nor did I argue that Mr. Vilar's trial lawyer was ineffective (or could be deemed so) solely by reason of his "failing" to blame (to use the government's inapt word) of Mr. Tanaka (or highlight conduct), but on the complete failure of a defense to every aspect of the case.

If *any* counsel had defended – that is, defended what now is apparent to be a charge of conducting "domestic transactions" with offshore clients, a charge never made in any charging instrument but on which the defendants' convictions are sustained (pending rehearing) – counsel would have learned that Mr. Tanaka, in London, was running the separate offshore investment management business for individual clients who chose to invest in privacy jurisdictions, that Mr. Vilar had no knowledge of how LOA's were created nor concerned himself with the securities 'back-office' and banking end of the operation, and that, likewise, Mr. Tanaka rarely interfaced with clients and did not really relish it, so left those tasks to Mr. Vilar or to Renata Tanaka.

In sum, Mr. Vilar and Mr. Tanaka both understand that they *could argue* "comparative culpability" but choose to not do so.

      My clients ask the Court to stay the proceedings and to await rehearing. (At the least I ask the Court for an additional week to get organized, and ask that this hearing be re-scheduled for the following week). If the Court wishes to get investors paid it should tell the parties to work out a way to oversee Mr. Vilar and Mr. Tanaka liquidating funds but allowing the Amerindo Panama investors to determine for themselves how, and where (onshore or offshore) they want those funds paid (or if indeed they want the funds invested further). Management rights should be restored in accordance with the vacatur of forfeiture and restitution orders.

                                          Very truly yours,
                                          /s/
                                          Vivian Shevitz

Cc: All counsel and the press