UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -
UNITED STATES OF AMERICA

    -against-

ALBERTO VILAR and GARY TANAKA,

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - -

05 cr 621 (RJS)

DECLARATION IN OPPOSITION TO GOVERNMENT'S LETTER-MOTION (DOC 602) TO REVOKE BAIL PENDING RESENTENCING

    Vivian Shevitz, under penalty of perjury hereby declares:

1. I am counsel to Alberto Vilar (and appeared previously in the district court for Gary Tanaka, for bail purposes, as well).

2. Seeking to lock both defendants up *now*, the prosecutor argues that this Court should jail the defendants based on "findings" that the defendants had contacts abroad and would flee – conclusions with which the Court of Appeals disagreed when it granted bail a year ago.

3. It then discounts Mr. Vilar's (and Mr. Tanaka's) true relationships in New York and argues that unknown "international contacts and resources" that the government has supposed for years, would "kick in" if they were to remain on bail to entice and support them to flee.

4. The only (substitute for) "hard evidence" on which the prosecutor relies to support its notion of "international" ties and/or personal resources (not "found" "yet" by the prosecutor), is an email communication to the Court from John Burke, a nephew of Mr. Vilar, who also wrote (in DOC 595, filed by the Court without giving us an opportunity to comment) that *he* (well actually, his mother) has a big claim to Amerindo Panama funds because of some perceived investment his mother had made with Alberto Vilar before Amerindo began operations (valued at an asserted $ 5 million in hypothetical calculations (assuming no payouts) in accord with defendants' published performance investment numbers), dismissing hundreds of

thousands in annuity-like disbursements over the years to his mother and to him for their support) to be paid back to *him,* instead of to his mother, who is not competent, he says. However, Mrs. Burke retained competency during Alberto's sentencing and in *her* sentencing letter did not complain of any loss but rather praised her brother Alberto's generosity (see DOC 596 attaching Patricia Burke's letter which refutes her son's "claim.").

5. Even the Receiver, who is still unsure whether he knows the universe of Amerindo investor/claimants or not, and takes the position that he will not even let my clients see the proofs of claim (and will not file the proof of mailing) (we submit to cover up his inability to make progress)[1] -- has not included John Burke on the "claims" roster.  (DOC 315, 05 cv 5231 (RJS).  (Burke has *no* documentation, as he has admitted; he simply has no claim).

---

[1] On October 4, 2013, after filing an unintelligible "claims roster", Ian Gazes wrote to me that he will not "share" proofs of claim with defendants in this case unless the Court orders him to do so and will not file his proof of mailing of Notices; and he again asks for *my* "list" as if it will provide him information he still "does not know."

> **From:** Ian Gazes [mailto:Ian@gazesllc.com]
> **Sent:** Friday, October 04, 2013 6:44 PM
> **To:** 'Vivian Shevitz'
> **Cc:** 'salzbergm@sec.gov'; 'Jacobson, Neal'; 'David C. Burger'; 'Jane Fisher-Byrialsen'; 'Jane Simkin Smith'
> **Subject:** RE: Back-up for claims... SEC v Vilar and Tanaka 05 cv 5231 (RJS)
>
> Ms. Shevitz:
>
> Unless the court orders otherwise and as stated in the Report the Receiver has no intention of sharing the proofs of claim with your clients as demanded. Should the defendants wish to examine the proofs of claim at my office and agree in writing prior thereto not to take notes and/or copy the papers your clients are welcome to do so. Please forward 3 proposed dates and times and we will respond.
>
> Request is hereby made again for the list of Amerindo investors including all related contact information your clients utilized for the recent letters.

(How are we to avail ourselves of the adversary system of justice if we cannot get copies of the proofs of claim affecting our property in the first instance?)

Prosecutor Marc Litt had said *he* "did not know" the universe of Amerindo investors in his last-minutes sentencing submission of February 3, 2010 (DOC 418) that no defense counsel responded to (and there was no time to do so: in any event Mr. Litt wanted sentencing based on what he did *not* know).

Sharon Levin said she found out in 2011 that it would be impossible to value all investor claims because she had not appreciated that there were long-term Amerindo Panama investors with no backup. (Business was done on a proverbial handshake in Panama and if left alone, moneys would have been distributed by Amerindo Panama long ago.)

> From: Levin, Sharon (USANYS)
> Sent: Monday, August 01, 2011 4:58 PM
> To: vivian@shevitzlaw.com; Jane Simkin Smith; 'Susan C Wolfe'; Nathan Dershowitz; 'Victoria Eiger'; rrl@robinsonbrog.com; Jacobson, Neal; Salzberg, Mark D.
> Cc: Lester, Amy (USANYS); Naftalis, Benjamin (USANYS)
> Subject: RE: Courtesy copy 05-cr-621 (RJS) US v. VILAR
>
> Counsel –
>
> Although I proposed in our phone call that as part of the Petition for Remission process DOJ could distribute to the victims and investors their "initial investment sums, without interest, less amounts already obtained from Amerindo from the investment," it appears that this number will be almost impossible to calculate and if not applied to all victims and investors could lead to an inequitable result. What I did not appreciate is that many of the victims and investors have been investors since the late 1980s and that many of the investors may no longer have any record of their initial investment.

Ms. Levin also wrote in that email chain that her understanding was that a Final Order of Forfeiture was irrelevant because a "win" for defendants on appeal would mean the forfeiture orders would be vacated entirely. She wrote:

> As for your suggestion in your Declaration that a distribution can be made to victims/investors without a Final Order of Forfeiture and that we can use "whatever mechanism was used last time," that is not possible. Leaving aside, the legal issues and the fact that the case is in a very different posture now -- the $150,000 payment was made to the Mayers before the Court entered the substitute asset order -- the Mayers are not the only victims/investors seeking recovery. Practically speaking, who is going to determine what the principal is for each investor, who will review their records and who will make those distributions from the forfeited accounts (write the checks or make the wire transfers)? Unless we have a final order of forfeiture, DOJ and the Marshals Service are unavailable to handle those necessary tasks.
>
> Whether the Court enters the Final Order of Forfeiture does not change the defendants' legal position with respect to the forfeiture. If I understand you, the defendants are appealing the forfeiture money judgment. If the defendants prevail on their appeal, the Final Order of Forfeiture will be

6. This appears to be another instance of the government egging on a "witness" to ramble and rant for their cause (this is Burke's third or fourth unfounded allegation as I wrote in DOC 596, attaching Burke's *mother*'s sentencing letter). Yet, the government writes (as if Burke is a credible witness) that Burke "reports" that "upon gaining freedom" Alberto Vilar "plans to `leave this country for Switzerland to be with his true family." Gov. Letter p.3 of 3, DOC 602 filed 10/4/13, referencing September 25, 2013 email from John Burke to the Court).

7. Just how does Burke "know" this? Did he say? Is it an assumption? He *claims* he questioned Mr. Vilar on the eve of Mr. Vilar's 60th birthday over 13 years ago (but he does not say he was with Alberto (and in fact was told *not* to attend the party)). The man has had an admitted alcohol and drug problem and gives no basis for suggesting he knows anything about Alberto Vilar's present life.

8. How would that happen anyway? The government took Mr. Vilar's ability to travel away. He has no passport, has been granted appointment of CJA counsel, and has been living with a friend whom the government also has condemned in the past for merely supporting Mr. Vilar personally through his hard times. The suggestion that Mr. Vilar would somehow appear in Switzerland, which has an extradition treaty with the US, is incredible. The condition in which the government (DOJ and SEC) has left Mr. Vilar would mean that if he were to "flee" he would have to live the rest of his life a fugitive from the US, with no passport, no funds, and no significant other persons in the region for support. (Perhaps he could get into North Korea or Iran.)

---

vacated along with the other orders of forfeiture entered in this case.   I have attached for your information the other forfeiture orders.

Defendants are still being pushed around and punished based on what the government "does not know". We challenge the basis on which the government exercises authority over the "substitute assets" at this time (or ever).   We also challenge the government's *right* to know, and to regulate, Amerindo Panama, or its assets.

9. Although the prosecutor may not know it (or did not investigate or think about it before bringing this automatic motion to revoke bail (a letter-motion without serious legal discussion),) Pre-trial Services officers are aware of Mr. Vilar's serious relationship with a woman in Queens, Ms. R., a teacher in the New York city school system who will be retiring after this year and with whom Mr. Vilar began a relationship in the pretrial era (but relationships suffered in those times because of the intensive pressures of the case.) Because I value Ms. R's privacy, and that of Mr. Vilar (and Mr. Tanaka) as well, I leave her name vague in these public papers. The point here is that Mr. Vilar's emotional ties are here, he has a significant person in his life with whom he is planning a future (though his curfew prevents him from staying with her without a court order, which we have not sought for this purpose yet but plan to do (since no one has a serious objection) while waiting for eventual rehearing and *certiorari* decisions) – and he has *nothing* of value (except hopefully some remaining friends) abroad. Mr. Vilar should not be deprived of his liberty on the government's adopted word of John Burke, a man with a personal agenda who has been granted a louder forum in this case than Mr. Vilar or Mr. Tanaka has been given by the government (and the Court) here.

10. Mr. Vilar already traveled with Ms. R. to Florida for a family reunion (with one of Mr. Vilar's bail signers, Karl Gaztambide) *after* the Court of Appeals' August 30, 2013 decision and came back. If the government's fears were anything real this would have been a man who would have fled then. He didn't.

11. Further, though the government does not seem to realize it, defendants *won* the ruling that the forfeiture must be vacated. Assets are *not* forfeited and the government will have to show forfeitability, which I have questioned and at a *de novo* sentencing will continue to question.

With the *surplus* assets after Amerindo Panama investors are paid off on their May 25, 2005 debt, as the defendants intend to do when the government takes its regulatory hand off the Panama corporation (regulated, as shown below, solely under the "conduct and effects" test), as well as interests in their U.K. pension plan, Mr. Vilar and Mr. Tanaka have no intention of being fugitives "unentitled" to litigate further.

12. If nothing else, the Petitions for Rehearing focus this case in a way that should tell the Court (and even government lawyers should take note) that this is no small deal.  The Court of Appeals rendered a decision of extreme importance likely headed to the Supreme Court.

13. The government facilely imagines that defendants *should* want to flee, because not only do they face "substantial terms of imprisonment" (certainly if they deem the presence of Amerindo Panama funds "not relevant"), but they face "material monetary penalties, in light of their criminal convictions, and ongoing and potential) civil litigation with the SEC, defrauded investors, and others."

14. Pointing to the SEC as a "civil" case "unrelated" to this one, where it is "OK" to hold defendants' assets pursuant to an invalid forfeiture and force litigation because it's "always done this way" (even after destroying the "clean" U.S. advisory company that successfully completed an SEC audit conducted from 2003 through 2005 and did nothing wrong -- exacting the penalty before the case began) is something that the Constitution does not allow. As soon as defendants are given an opportunity to say *anything* in the SEC case, we will complain (again).

15. We will also challenge the validity of the SEC case entirely, based on documents that came from the SEC's files (either not turned over to the prosecutor before he effectuated the arrests and shutdown on May 25, 2005 (since he said at the June 3, 2005 post-arrest, post-search bail

hearing that he was awaiting the results of the SEC's examination to get records of the San Francisco-advisory operation) or ignored, which we discovered in files not appreciated and also ignored but which should have been turned over. *See United States v. Mahaffey*, (2d Cir. August 2, 2012) (Appellate court finds misconduct by SEC and U.S. Prosecutors in "Squawk Box Case," http://wallstreetonparade.com/2012/08/appellate-court-finds-misconduct-by-sec-and-u-s-prosecutors-in-squawk-box-case-overturns-convictions/)

16. In 1993 the SEC expressly stated that it was demanding records of what it called the "affiliated advisory firm registered in Panama (`Amerindo Panama')" and that it was doing so under the "conduct and effects" test -- stating that "generally, the Act is applied to regulate activity taking place outside the United States where that activity produces substantial and foreseeable **effects in the United States or involves conduct occurring in the United States.**" *See* Letter, January 21, 1993, to Alberto Vilar for Amerindo Investment Advisors', Inc. in San Francisco." (emphasis added to highlight the beginning of the "conduct and effects" `test'" regulation asserted all these years).   I append a portion of that letter and ask that the government get the SEC's copy from its File No. 801-24922 as well.  In fact Amerindo Panama was a completely separate corporate entity from the US company (and predated the US company, as did Amerindo UK).  The SEC has purposefully confused and "integrated" the separate Amerindo entities in its regulatory fanaticism to hold foreign companies to US standards:  but the "conduct and effects" test under which the SEC operated (see image below) is dead, and never was the right standard.

> AMERINDO INVEST    ID:3038458138         JAN 26'93   20:39 No.004 P.07
>
> Alberto W. Vilar, President
> Page 6
>
> Absent evidence to the contrary, Registrant is in violation of Rule 206(4)-2(a)(4). Registrant should immediately begin to provide the limited partners with quarterly statements as required by the Rule.
>
> V. **Failure to Provide Requested Documents**
>
> During the examination of Registrant, the examiners requested the trading records for client accounts of off-shore investment advisory firms that are owned and managed by you and Mr. Tanaka. While Registrant provided the staff with the trading records of the affiliated advisory firm registered in the UK ("Amerindo UK"), Registrant declined to provide the staff with the trading records of the affiliated advisory firm registered in Panama ("Amerindo Panama").
>
> The Commission's Division of Investment Management has taken the position that, generally, the Act is applied to regulate activity taking place outside the United States where that activity produces substantial and foreseeable effects in the United States or involves conduct occurring in the United States.¹ Abusive practices such as front running and unauthorized principal and agency cross transactions involving the accounts of foreign clients or foreign affiliates could harm United States investors. For example, an adviser might sell a security from a foreign client's account to the account of a United States client without receiving written authorization from the United States client in contravention of Section 206(3) of the Act, which addresses such agency cross-transactions, or place foreign client transactions ahead of a large transaction by a United States client. The Act should be applied to such activities because they involve United States clients.
>
> Currently, Rule 204-2 of the Act requires, among other things, that registered advisers maintain records of not only their trades, but also of trades by any controlling persons or affiliates thereof who obtain information about investment advice.
>
> The San Francisco office requested guidance from staff in the Division's Washington office. The Washington staff has advised us that the operations of off-shore investment affiliates must be separate from the operations of the registered domestic investment adviser, particularly with regard to the persons providing advisory services, before there is a rational basis for
>
> ―――――――
> ¹ SEC Division of Investment Management, Protecting

17. *Morrison* now makes plain (and we are not in a "plain error" context given pending motions for reconsideration of summary judgment) that the SEC's motions for summary judgment are ill-founded, and that the prosecution was ill- founded too. Defendants' conduct, indeed, falls within the express exception to the Securities Act (section 30) mentioned by the *Morrison* Court in its decision, because they conducted an offshore securities business and it was not for the purpose of evading U.S. regulations. As *Morrison* pointed out, there were no such regulations. (Only a conduct-and-effects inquiry self-promoted by the SEC, supposedly "justify" the imposition by the SEC and its "remedies" here on parties to offshore financial transactions, *none* of the parties to which wanted the SEC's intrusion; in fact the only way the SEC gained "authority" by the SEC Court to do what it has done here, was by *not*

notifying Mr. Tanaka or Mr. Vilar of the TRO proceeding on June 1 2005 and to proceed without their knowledge and without their being represented to disenfranchise them).

18. In any event, the Petitions for Rehearing and Rehearing *en banc* show serious and substantial issues likely to result in reversal (or which should result in a *reduced* term of incarceration because the pending rehearing proceedings gives everyone an opportunity to think about the sentence as it was based on accusations leveled for the first time a day before sentencing (Letter 2/3/10, DOC 418) complete with uncharged offenses committed against speculated unnamed investors (Litt said he had not pursued these charges because of insufficient evidence) who would no doubt be "found" when the government completed forfeiture notices. Mr. Gazes is still looking for them; and *real* investors, known to all, have refused, or declined, or don't want to play the US regulators' game of submitting claims in yet another forum on offshore accounts already acknowledged to be due.

19. There is no reason to anticipate that these men should go to jail again when, as we will show under 18 USC 3553 if nowhere else—there were no losses. The government's theory was flawed. It prosecuted these men for Panamanian conduct but deemed the Panama funds "not relevant" and not only did this Court, but also the Court of Appeals, has so far declined to consider any facts other than those initially selected, crafted and put before the Court by prosecutor Litt.

20. The Court should not prejudge a *de novo* resentencing.

21. The Government's application to revoke bail should be denied.

Dated:  South Salem, New York
       October 18, 2013          _/s/_____
                                             Vivian Shevitz