Vivian Shevitz
Attorney at Law
46 Truesdale Lake Drive
South Salem, New York 10590
(914) 763-2122
Vivian@shevitzlaw.com

October 28, 2013

Honorable Richard J. Sullivan, USDJ
40 Centre Street
New York, New York 10007

Re:  US v. Vilar – 05 cr 621:  Bail Considerations

Dear Judge Sullivan:

In furtherance of the bail issue discussed on October 25, 2013, we suggest that under either standard of considering bail, pending sentencing or pending appeal, bail should be continued.  We have shown by clear and convincing evidence that the appeal is not for the purpose of delay, and that there are conditions that mitigate against any presumed flight risk, in that (a) the Court of Appeals agreed that there is no such overwhelming flight risk, having rejected the notion that Mr. Vilar's "knowing people" abroad warrants denial of bail, and (b) there is *still* a question of law likely to result in a new trial in that the Court of Appeals has been asked to remand for a new trial, instead of finding facts on its own under an erroneous application of the "plain error" standard.  Finally we explain why the "loss" calculation may be different and will be argued differently (with a different defense to government loss guideline positions) at the *de novo* resentencing.

As to "flight" risk (and whether there are conditions, such as those imposed now, sufficient to mitigate against any such "flight risk"), the Court seems to be considering Mr. Vilar's "flight" risk on the basis of his presumed "contacts" abroad.  This is not new.  The Court

said the same thing in denying bail previously. (DOC 527, denying bail on 5/22/12, p.2 ("the fact remains that he has ties abroad and has lived abroad in the past"); DOC 537, denying bail on September 17, 2012 ("Walter Pfaeffle's declaration ... fails to rebut the grounds on which the Court denied Defendants' first request for bail pending appeal).

The Court of Appeals did not agree with the conclusion that these "ties," never further identified, presented an overwhelming and irremediable risk of flight, when it granted bail on October 2, 2012. The government identifies no person as someone capable or willing to "help" Mr. Vilar flee and live the rest of his life as a fugitive without funds (he has a CJA lawyer).

As to the Court's original reason for denying bail, which we suggest is probably still at play in this matter -- that conclusion that Mr. Vilar had a history involving a "pattern of misstatements" to government agencies (DOC 527 quoting Tr. Dec. 18, 2008) -- Mr. Vilar's more recent history in this Court (the last almost-ten years) shows a pattern of candor with Pretrial Services and the other government agencies with which he has dealt. He has not violated bail restrictions. He has done what he has been told he has to do. Continued fear of "flight" on the basis of Alberto Vilar's prior acts (seemingly borne of an arrogation of importance -- part of Alberto Vilar's personality, per his critics) -- is no longer warranted, if ever was justified at all as a ground for criminal penalties or denial of bail.

As to the existence of a "substantial question of law or fact on appeal that is likely to result in reversal or a new trial", while the government (and Court) minimize the Petitions for Rehearing, the fact is that at bottom, our Petitions ask the Court of Appeals on rehearing (DOCS 551 and 556, Appeal 10-521) to (at least) modify the remedy: that is, there should be a new trial where a jury, not appellate judges or this Court, will determine whether these transactions were governed and governable by the United States and the SEC's rules, or pursuant to the laws of

Panama and the UK.  We discuss in the Petition for Rehearing and Rehearing *en banc* the case on which Judge Cabranes relied for his conclusion, *United States v Needham*, 604 F.3d 672 (2d Cir. 2010), to show that his use of a sufficiency-of-the-evidence standard is *not* the appropriate standard to apply when reviewing a plain error case for prejudice.  (Petition p.4, 16-17).  (Judge Cabranes was in the minority in the *Needham* case yet adopted his own rejected standard in this case.  The *Needham* majority rejected it there and we are asking the Court to reconsider here.  ("Here, there is no valid jury finding on the interstate element that secures federal jurisdiction, because the jury was not properly instructed; hence, a sufficiency of the evidence standard is inapplicable.  Instead, we review for prejudice as described above."  604 F.3d at 683 n.5))

Thus, while true that it is more difficult (as a percentage matter) to secure a favorable remedy or even review as the appellate process proceeds, there are *still* "substantial issues" that govern the discussion.  The issues are raised in "live" Petitions for Rehearing (DOCS 556 and 551) before the *en banc* Court of Appeals now.  Given the importance of *Morrison* and the *United States v. Vilar* interpretation of it, there is, we suggest, *still* an issue of substance that may result in reversal or a new trial.  This court should allow the issue to be played out in the appeal process under way and should not "read the tea leaves" in this important appellate process.

In denying bail previously (DOC 527, 5-22-2012), this court read the Court of Appeals "tea leaves" inaccurately in ruling (in what it called an "advisory opinion") that it was "unlikely" that the Court of Appeals would "extend" *Morrison* to apply to criminal cases as well as civil cases (Order DOC 527 p.3).  While the court *also* said in that opinion denying bail that there was a "surfeit of trial evidence demonstrating ... conduct *in the United States*", *id*., we know now that the Court of Appeals rejected even the "conduct" test as the test for domestic transactions, now ruling (in f.n. 11) that physical presence of the purchaser was *the* factor.  In this area of

significant ambiguity and uncertainty (*see Absolute,* which allowed repleading a civil complaint because of that uncertainty) the appeal should play out before this court incarcerates defendants again.  (Indeed, the Court of Appeals recognized that the issue is one that is going to the Supreme Court, ruling in a footnote (fn 40) that the District Court would have to determine "in the first instance ... whether bail should be granted pending any petition for *certiorari*" subject to the same panel's review.).

"*Losses*":  Finally, because a focus of the resentencing is on "losses", as the government has made clear in asking for remand, I must address issues of "losses" and "victims" that will be before the Court at resentencing.  I tried to start explaining to Your Honor (but got ahead of myself, for which I apologize) that at a *de novo* resentencing, we will argue something differently from prior counsel.  We will rebut a showing and theory of "loss", which is the government's burden, with documents showing that *all* moneys on clients' accounts were *not due* or matured as of the shutdown date, but rather were made artificially 'due' as a *result* of it.

While Mr. Colton and Mr. Fahringer (and his predecessors) on the one hand argued that these were contract matters, on the other they failed to follow through with documentary evidence that would inform cross examination (and a defense) *showing* contract defenses that should have been interposed (and the prosecutor hammered this absence of a contract defense in rebuttal summation (Tr.5488-89).  At a *de novo* resentencing in a criminal case, of course, it would be *ineffective* and improper for present counsel *not* to defend on evidence not considered previously:  just as prior counsel failed to offer any defense to "forfeiture" (T.5644-34 (during deliberations counsel stated he did not *know* whether there was a jury trial on forfeiture and "accepted" the prosecutor's statement that there should not be such a jury trial)), they failed to explain why contractually moneys were not yet due at the time of the shutdown.

Lisa Mayer testified at Tr. 1179 she had accepted a modification of the redemption payout (embodied at GX 3361-22).  The Mayers had agreed to a payout of specific amounts, over a period of five years, at which time all the principal plus interest would be paid back.  All payments due under that modification were in fact current to the time of the closure.  Documents (only a few of which I reproduce here) show both acceptance of the agreement and show that the Mayers actually were thankful for "London's" watching their long term finances, so to speak. (See also GX 6200, a February 4, 2004 letter from the Mayers to Amerindo UK addressing how funds should be reflected on account statements after the settlement, *i.e.,* in cash accounts instead of fixed deposit accounts, and asking for updated statements.  (The documents also show that the Mayers invested through a foreign corporation, Aba and Daba, and under Absolute, as seller and purchaser were foreign, the transactions are deemed **not** domestic.  677 F.3d at 69.*))*

```
Attention: ALBERTO VILAR
FAX : 212 223 0021
```

## facsimile transmittal

| | | | |
|---|---|---|---|
| To: | Alberto Vilar | Fax: | 212-753-3539 |
| From: | Lisa and Debra Mayer | Fax: | 914-723-8343 |
| Re: | acknowledgement | Pages: | 1 |
| CC: | Gary Tanaka | Date: | 8/19/2003 |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

Dear Alberto,

Thank-you for your response.  We have always expressed appreciation for your fiduciary above-market and consistent returns.  THANK-YOU.  Again, we appreciate your monitoring our monthly finances as we anxiously await any improvement for all of us.

Sincerely,

Lisa Mayer

20-2004  06:07pm  From-LEADENHALL BANK & TRUST CO         +1 242           T-063  P.001/001  F-341

## LEADENHALL BANK & TRUST COMPANY LIMITED

P.O. Box N-1965
One Montague Place, 2nd Floor
East Bay Street
Nassau, N.P., Bahamas

Telephone: 242-393-6431/Fax: 242-393-6448

## Confidential Fax

| | |
|---|---|
| To: Lisa and Debra Mayer | From: Melanie Moxey |
| Company: | |
| Fax: 914-723-8343 | Pages: (incl. Cover) |
| Re: Daba Inc. | Date: 20 January, 2004 |

Dear Lisa and Debra,

I have followed up with Craig Gibson of Private Trust regarding the expected $271,373.21. He has advised that, you are not directly his clients and therefore he is unable to divulge information regarding his client in view of confidentiality laws which exist here.

If the above is indeed the case, then we simply must wait for the transfer to be effected.

Please note that Mr. Gibson was in no way rude in the communication of the above information.

Regards

Melanie Moxey

GOVERNMENT EXHIBIT
6195
05 Cr. 621 (RJS)   (ID)

The information contained in this facsimile is confidential and intended only for the use of the individual or entity identified. If the reader of this message is not the intended recipient, any dissemination, distribution or copying of the information contained in the message is strictly prohibited. If you have received this message in error, please notify the sender immediately.

---

MAY-2000464

## LEADENHALL
### BANK & TRUST

P.O. Box N-1965, Nassau, Bahamas
Telephone (242) 393-6431-2  Telefax (242) 393-6448-9

### FAX COVER SHEET

| | |
|---|---|
| Date:- | 14th July, 2003 |
| To:- | Ms. Lisa Mayer and Ms. Debra Mayer |
| From:- | Mr. William H. Jennings |

Dear Lisa & Debra

As you know, I met with Renata Tanaka of Amerindo Investment Advisors in London last Tuesday. It was a very useful meeting.

In order to regularise the situation, Renata and I agreed that all communication and instructions should be through Leadenhall, who as you know are providing Directors and Officers for the two companies. Apparently their account records have yourselves as the signatories, which is totally unsatisfactory given the ownership structure.

In the circumstances, could you please write to Renata with the following instructions:-

i. All communication and instructions are to come from the Directors of Aba and Daba;
ii. The signatories on the accounts are to be changed to the authorised signatories of Aba and Daba; a list of which will be forwarded to Renata by Leadenhall; and,
iii. Forward a current list of the two portfolios to Leadenhall as soon as possible.

As discussed when we met in New York earlier this year, it will be acceptable for you to continue to be involved in the Investment process, but as mentioned above, all instructions need to come from the Directors of Aba and Daba.

If you have any questions, please let me know.

With kind regards.

Yours Sincerely,

Managing Director
WHJ/blo



    This modification of the contract is thus demonstrable, and should have been *demonstrated,* not left to hang at trial, and then dropped at sentencing. There were no "losses" to the Mayers by reason of "offense conduct," and the transactions were with Aba and Daba, not the Mayers as individuals. (Further, a document from the Mayer production, shows that the Mayers were probably in Geneva (as their letter to Roycan Bank of 1992, GX 6109, authorizing a transfer to Amerindo UK, states).

There is, in sum, more to discuss at a sentencing, and not only about the Mayers. Graciela Lecube Chavez testified (T. 347, 394) that she did *not* close her account, though she had *discussed* closing it (and sending her son to London to pick up the check or cash).  She had chosen to be paid out until the account was liquidated.  She received the first $20,000 check right away.  When Amerindo was shuttered Graciela received no more, but "Mr. Vilar [had] ma[d]e good on the guarantee" "[t]o a point" before then.).   There are *facts* concerning other "victims" that should bear on the issue of loss and loss causation.  (See Tr.606-10, UGX 3556-7, Colburn settlement for three payments, the first two of which were made with the third due three months after Amerindo was shut down).

We will also address the fact that, even if there had been a "run on the bank" (likening Amerindo Panama to a "bank") on May 25, 2005, Amerindo *could* have liquidated assets and achieved a 100% (or near 100%) payout of current account claims.  The Court expressed skepticism when we said on October 25, 2013 that there could have been a dollar for dollar payout.  (Before he adopted an adversarial position toward defendants) Receiver Ian Gazes agreed (in a footnote) that there is likely be enough in liquidated sums to pay all Amerindo investors on their account statements as of May 25, 2005.   DOC. 283 n.1, 05 cv 5231  (We have been waiting for valuation of privates and information about assets to participate in payout plans)

It speaks volumes that, in fact, the assets *would* have covered investors' principal as of that date (though a fire sale might have made it less likely).  For example, JP Morgan would not be able to pay "all" clients' redemptions today.  A commercial bank takes in deposits (checking, savings, CDs etc.) of all types, then lends it out to a range of borrowers (corporate, credit card, autos, overdrafts, etc.)  Commercial banks like JPM are required to keep a certain percentage of the deposits as "reserves", which they use to meet customer demands for withdrawals.   But they

are not required to keep 100% because, as here, they operate with staggered maturities and redemption demands.  If JP Morgan took in deposits of $10 million and lent out $9 million, it still would not have liquid funds to facilitate every investor.  Put simply, even a simultaneous demand by every investor at the same moment, say, to send $100 to their Aunt Maude in Florida, would force the bank to default because it could not respond to such immediate heavy withdrawals in that it could not possibly call in and liquefy outstanding loans overnight to meet such large unexpected depositor requests.

      Here, by 2005, over 75% of the Amerindo Panama GFDRA program was history, fully redeemed (owing to a cessation of the relationship with Steven Gray.) The offshore business was being further wound down.  Amerindo's investors had staggered maturity dates, and there were no "stated capital" requirements for financial firms in Panama.  However, as the investors knew, Mr. Tanaka and Mr. Vilar had significant assets in the Amerindo US operation, and the defendants knew they could count on the $10 million cash flow plus the Amerindo worldwide assets and their own personal assets to, back up their offshore depositors. That source of security for their private client 'guarantees' and for funding redemptions was curtailed in one swoop.

      After the tech markets crashed in 2002 Amerindo negotiated payouts and slowed redemptions by way of a now more common (since the 2007-09 financial crises) *force majeure policy*– a contract defense employed by hedge funds (recognized by the SEC in its "hedge fund" bulletin, http://www.sec.gov/investor/alerts/ib_hedgefunds.pdf ) designed to prevent investment firms such as Amerindo, to have to sell stocks and bonds in falling markets when investors are panicking and all want to sell at the same time.  Such market crashes made many of Amerindo's and other banking investments temporarily illiquid.  Nearly all investment firms controlling trillions of dollars in investments (especially those with commingled funds, see *Capital Mgmt.*

*Select Fund v. Bennett*, 2d Cir. 2012), invoked this proviso in the financial market collapse in 2007-09.  Many told clients they would not get redeemed for up to three years in restricted payments.   But the point for sentencing is:  the Mayers, Coburn and Cates, for a while – all had waited sympathetically (even if not patiently) because they knew that their long-time money manager Amerindo was recuperating.  Moreover, as a matter of contract, these investors had largely used their accounts as tax-free ATM machines (thus violating contractual terms of the deposits in the first place, rendering the contract null and void) and now had resigned themselves to wait with extended payment schedules.

    At least we should have an opportunity to argue these points at a *de novo* resentencing  to paint a clearer picture of what was happening at Amerindo US and Amerindo Panama, prior to defendants' being judged and punished for the artificially-induced crisis of 2005.

    Bail should be continued.  Defendants have no ability to flee, and the government has not brought forth any new facts.  The notion that because Mr. Vilar "knows people" he can or will flee has already been rejected by the Court of Appeals as insufficient to warrant a denial of bail.  The clearest proof of the pudding is that Mr. Vilar and Mr. Tanaka have not "fled" since the Court of Appeals rendered its decision.  There are serious and significant unsettled issues that should await the conclusion of the appellate process.

                Very truly yours,

                 /s/
                 Vivian Shevitz