**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 31, 2014

**BY ECF AND ELECTRONIC MAIL**

The Honorable Richard J. Sullivan
United States District Judge
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York  10007

Re:    **United States v. Vilar and Tanaka,**
       **S3 05 Cr. 621 (RJS)**

Dear Judge Sullivan:

The Government respectfully submits this letter in connection with the April 24, 2014 resentencing of Alberto William Vilar and Gary Alan Tanaka. For the reasons that follow, the Government submits that re-imposition of a 108-month term of imprisonment for Vilar and a 60-month term of imprisonment for Tanaka would be sufficient, but no greater than necessary to reflect the seriousness of the offense, provide general and specific deterrence, account for the defendants' lack of remorse and post-conviction conduct, and promote the other objectives identified in Title 18, United States Code, Section 3553(a).

## BACKGROUND

### A.  The Offense Conduct

For a twenty-year period ending in 2005, Vilar and Tanaka perpetrated a brazen scheme to defraud investors by soliciting millions of dollars under false pretenses, failing to invest investors' funds as promised, and misappropriating and converting investors' funds to their own benefit and the benefit of others. To execute the scheme, the defendants solicited and caused others to solicit victims to invest in fraudulent investment products, including products called the "Guaranteed Fixed Rate Deposit Account Program" and the "Amerindo SBIC Venture Fund LP." The defendants failed to fulfill their promises to investors by, among other things, failing to invest the funds as promised, unilaterally changing the terms of the investments, embezzling client funds, and failing to redeem the investments upon the investors' requests.

#### 1.  Background

Vilar and Tanaka were the co-founders and sole shareholders of Amerindo Investment Advisors Inc. ("Amerindo U.S."), an investment advisor registered with the SEC. (Tr. 4728;

Hon. Richard J. Sullivan
March 31, 2014
Page 2 of 16

GX 1316-R).[1] Amerindo U.S. was a California corporation with principal offices in San Francisco and New York City; it managed assets of institutional clients and at times was the investment advisor to one or more U.S. mutual funds. (Tr. 465, 4728; GX 1316-R).

In addition, the defendants were the sole shareholders of Amerindo Investment Advisors, Inc. ("Amerindo Panama"), a corporation organized under the laws of Panama. Amerindo Panama purported to be, among other things, the investment manager of the Amerindo Technology Growth Fund ("ATGF"), an off-shore, Panamanian investment fund offered to U.S. investors. (Tr. 4728-31). Notably, Vilar and Tanaka deliberately gave Amerindo Panama a name that was identical to its U.S. counterpart but for the addition of a comma. The evidence at trial made plain that the defendants did so in order to confuse investors about the true identity of the investment advisor with which they were dealing.

Finally, Vilar and Tanaka were the sole shareholders of Amerindo Investment Advisors (UK) Ltd. ("Amerindo U.K."), which managed portfolios of U.S. emerging growth stocks for U.K.-based clients. Amerindo U.K. had an office in London where Tanaka, his wife Renata Tanaka ("Renata"), and others worked, and where certain administrative and other functions related to the firm's private clients and Amerindo Panama were performed, including meeting with and corresponding with investors, preparing client account statements, processing investor redemption requests, and directing equity trades and financial transactions involving investor funds. (SA 530-605).[2]

## 2.  The Guaranteed Fixed Rate Deposit Account Program Fraud

From at least July 1986 until May 2005, Vilar and Tanaka fraudulently induced clients to invest in the Guaranteed Fixed Rate Deposit Account Program ("GFRDA"). The GFRDA was offered to a select group of individual clients—generally close friends and family—by Vilar and Tanaka, who promised investors high rates of return, with little or no risk, within short periods of time. (SA 772). Investors were told that the GFRDA would provide a fixed rate of interest for a fixed term, and that the overwhelming majority of the GFRDA funds would be invested in high quality, short-term deposits, including U.S. Treasury bills and other safe debt securities. (Id.). Vilar and Tanaka further promised the investors that the balance of the funds in their GFRDA accounts—generally no more than 25 percent of the account value—would be invested in publicly traded emerging growth stocks. (Tr. 652). Contrary to these representations, Vilar and

---

[1] "Tr." refers to the trial transcript; "GX" refers to a Government exhibit introduced at trial; "Sent. Tr." refers to the transcript of the original sentencing proceedings; "[Date] Tr." refers to the transcript of proceedings before this Court on the specified date; "[Name] PSR" refers to the presentence investigation report prepared by the Probation Office in advance of the named defendant's sentencing; and "SA" refers to the supplemental appendix that the Government filed on direct appeal. A copy of the SA will be submitted under separate cover.

[2] Amerindo U.S., Amerindo Panama, Amerindo U.K., and subsets of that group of entities and their predecessors are collectively referred to herein as "Amerindo."

Hon. Richard J. Sullivan
March 31, 2014
Page 3 of 16

Tanaka invested *all* of the GFRDA investors' funds in risky, volatile technology and biotechnology stocks. (SA 538; Tr. 476-84, 3134-38). Following the "bursting" of the Internet bubble in the fall of 2000, Vilar and Tanaka were unable to repay GFRDA investors. As a consequence, several investors lost millions of dollars. (Tr. 971-86).

### 3. The Small Business Investment Company Fraud

In June 2002—while experiencing financial stresses in their personal and corporate lives—Vilar and Tanaka fraudulently induced an investor-client of long standing, Lily Cates, to invest $5 million in a small business venture they formed called a Small Business Investment Company ("SBIC"). The SBIC, if it met certain criteria set forth by the Small Business Administration (the "SBA"), was eligible to apply for a license that would allow it to obtain matching funds from the SBA for investments that it planned to make. (Tr. 1512-36).

Vilar falsely represented to Cates that he and Tanaka had been approved for an SBIC license. Vilar recommended that Cates invest $5 million in the SBIC venture, and promised that if Cates made the investment she would make a substantial profit. To sweeten the pot, Vilar promised that Cates would receive payments from Amerindo of approximately $250,000 each quarter, in lieu of the interest payments Cates would be foregoing by committing the $5 million to the SBIC venture. (Tr. 2101-02). In actuality, Amerindo had never been approved for an SBIC license, but rather had been repeatedly rejected for one. (Tr. 1537, 1541-42, 1570-74, 1667-68; SA 724-27).

On June 20, 2002, Cates invested $5 million in the Amerindo SBIC, as Vilar recommended. (Tr. 2100-04; SA 639). Her funds were deposited into an Amerindo bank account at Bear, Stearns & Co. ("Bear Stearns") in the name of a Panamanian corporation called "Amerindo Management Inc." (the "AMI Account"). The corporation and the account were controlled by Vilar and Tanaka. (Tr. 3641; SA 645-47).

During the days and weeks after Cates's $5 million was transferred into the AMI Account, Vilar and Tanaka misappropriated these funds in order to meet personal and corporate obligations. Among the misappropriations were the following transactions: (1) on June 25, 2002, Tanaka transferred $1 million to a personal bank account held by Vilar, and Vilar immediately used that money for a variety of personal expenses (Tr. 4609; SA 883); (2) on June 26, 2002, Vilar and Tanaka transferred approximately $650,000 from the AMI Account to pay for various Amerindo U.S. business expenses (*id.*); and (3) on July 9, 2002, Vilar and Tanaka wired approximately $3.1 million from the AMI Account to an account in Luxembourg, as part of a settlement agreement with a former GFRDA investor named Beulah Birrd (SA 742-52). For the next two years—with neither an SBA license nor the $5 million that Cates had invested in hand—Vilar repeatedly advised Cates (and later her attorney) that her funds were safely in escrow. (SA 615-16, 620, 623, 755, 853; Tr. 1805-06, 2647-48).

Hon. Richard J. Sullivan
March 31, 2014
Page 4 of 16

### 4.   Vilar and Tanaka's Unauthorized Wire Transfers from Cates's Account

Vilar and Tanaka stole additional investment funds from Cates. On September 25, 2003, the defendants sent a letter of authorization to Bear Stearns that bore the forged signature of Cates and directed the transfer of $250,000 from Cates's account to an Amerindo account. (SA 561, 782, 855). In particular, Tanaka ordered his assistant to cut-and-tape the signature of Cates from one document onto another document, in order to make it appear as if Cates had authorized the transfer. (SA 558). The next day, Tanaka moved that $250,000 into one of Vilar's personal bank accounts. (Tr. 2428-34, 3496). During an approximately one-month period following that transfer, Vilar spent the funds on personal expenses, including the repayment of a mortgage obligation in the amount of approximately $53,042.83. (Tr. 2428-36, 3496; SA 606).

In August 2004, Vilar and Tanaka executed another unauthorized wire transfer from Cates's Bear Stearns account. In that instance, they stole an additional $175,000, the proceeds of which were deposited in an Amerindo account in order to meet a margin call. (SA 695-700, 865-66; Tr. 2182, 2476-80).

### 5.   The Defendants' False Statements to the Securities and Exchange Commission

In early 2005, Lily Cates decided that she no longer wanted to do business with Vilar and Tanaka, and she directed them to close her Amerindo account. After 18 years of managing her money, Vilar wrote to Cates and told her—for the first time—that she would have to deal with a company based in Panama if she wanted to close her account. (Tr. 1816-20; SA 618). Specifically, Vilar told Cates that she had never been a client of Amerindo U.S., but instead had always been a client of Amerindo Panama. (*Id.*). Thereafter, Cates notified the Securities and Exchange Commission (the "SEC") of her problems with Vilar, Tanaka, and Amerindo, and the SEC commenced an investigation. (Tr. 2642).

In a letter dated April 8, 2005 (the "SEC Letter"), the SEC notified Amerindo U.S. that it had received a complaint letter sent on behalf of Cates (the "Cates Complaint Letter") and requested a response to the issues raised in that letter. (Tr. 2643-44, 4724; SA 716). Vilar prepared a letter response on behalf of Amerindo (the "Response"). (Tr. 1842-51; SA 710-13). The Response contained numerous false statements made for the purpose of deceiving the SEC and hiding Vilar and Tanaka's unlawful conduct. Among other things, the Response falsely stated that: (1) Cates had always been a client of Amerindo Panama; (2) Amerindo Panama had previously been owned by Vilar and Tanaka, but had been sold in 2001 to unrelated third parties; (3) as of May 20, 2005, there was no common ownership of Amerindo U.S. and Amerindo Panama; and (4) as of May 20, 2005, there was no overlap between the directors, officers, and employees of Amerindo U.S. and Amerindo Panama. (Tr. 1842-51; SA 710-13).

In truth, Vilar and Tanaka had never sold Amerindo Panama. To stall Cates and the SEC further, in 2004, Vilar arranged for a Panamanian attorney, Fernando Berguido, Esq., to fax to him phony (and un-executed) contracts purportedly representing a 1999 sale of Amerindo Panama to a company called "Morton Financial." (Tr. 4738-43; SA 807). That Vilar signed these

Hon. Richard J. Sullivan
March 31, 2014
Page 5 of 16

documents in 2004, and not in 1999, made clear that the purported 1999 sale was nothing more than a sham employed to cover Vilar and Tanaka's tracks. A review of the contracts themselves also made clear that there was no sale in 1999, in 2001, or ever. (SA 807, 822; Tr. 4738-43).

Vilar's lies regarding the true ownership of Amerindo Panama were underscored by the fact that neither Morton Financial nor Amerindo Panama existed independently of Amerindo—to the extent either entity existed at all. (Tr. 3180-92). Amerindo Panama's "office" was a small, windowless space within Berguido's law firm that could fit no more than two people. (Tr. 3180-84). Vilar and Tanaka paid Berguido to maintain this "office" and to keep Morton Financial properly registered as a shell company in Panama. (Tr. 3193-96). Morton Financial, for its part, had no office, nor any telephone, employees, or clients; indeed, it lacked even a single chair. (Tr. 3192-96). Morton Financial's "president" was actually Berguido's high-school-educated paralegal. (Tr. 3204-05, 4072-73). Finally, the bills for both Amerindo Panama and the Morton Financial shell company were sent to Renata at Amerindo's U.K. office long after the purported sale of Amerindo Panama to Morton Financial. (Tr. 3154, 3180).

## B.      The Defendants' First Sentencing

On February 5, 2010, this Court sentenced Vilar and Tanaka to terms of imprisonment of 108 months and 60 months, respectively, and ordered them to forfeit an amount of United States currency to be determined later by this Court. On April 7, 2010, this Court entered orders of forfeiture, directing both Vilar and Tanaka to forfeit their individual interest in $54,351,159. In addition, orders of restitution were also entered, directing Vilar and Tanaka to pay restitution in the amount of $34,899,102.53.

## C.      The Appeal

On appeal, the defendants raised several challenges to their convictions and sentences. With respect to their sentencings, in addition to challenging their restitution and forfeiture judgments, the defendants challenged the Court's finding that the defendants caused an actual loss to investors that exceeded $20 million, a determination that resulted in a 22-level enhancement to the defendants' respective offense levels under the United States Sentencing Guidelines. *First*, the defendants argued that their victim's previous investment gains should have been used to offset their ultimate, fraud-induced losses, asserting that investors who received from Amerindo more than they invested suffered no actual loss. *Second*, they found fault with the Court for not reducing the loss amount by the cash and securities held in various Amerindo accounts, even though none of those accounts bore the name of any of the defendants' victims or was pledged as collateral in connection with the victims' investments. *Third*, the defendants maintained that the Court's victim-specific loss calculations were too high, sweeping in losses that were not within the offenses of conviction.

In a published decision, the Second Circuit affirmed the defendants' convictions in all respects, vacated their sentences, and remanded the case to this Court for *de novo* resentencing. *See United States* v. *Vilar*, 729 F.3d 62, 99 (2d Cir. 2013). Of relevance to these proceedings, the

Hon. Richard J. Sullivan
March 31, 2014
Page 6 of 16

Second Circuit rejecting several of the defendants' arguments, explaining:

> Vilar and Tanaka argue that the amount of actual loss should be zero, because (1) the victims received profits from Amerindo during the course of the scheme, and therefore did not actually lose money; and (2) there is enough money in frozen Amerindo accounts to repay each victim. We disagree because defendants should not benefit from attempting to ensure the continuation of their scheme, *see United States* v. *Carrozzella*, 105 F.3d 796, 805 (2d Cir. 1997), or from inducing investors to reinvest certain interest payments received, *see United States* v. *Hsu*, 669 F.3d 112, 122 (2d Cir. 2012).

> Nor should defendants' liability be reduced by the amount of money available in Amerindo's bank accounts, because the relevant sentencing guideline permits a sentencing court to credit a defendant with available funds only when those funds are designated as collateral for the debt owed the victim. *See* U.S.S.G. § 2B1.1, cmt. n.3(E)(ii) ("In a case involving collateral pledged or otherwise provided by the defendant," the loss shall be reduced by "the fair market value of the collateral . . . .").

*Id.* at 96 n.34. The Second Circuit also instructed this Court to fashion a restitution award "with respect to victims who have been directly harmed by the defendant[s'] criminal conduct" and suggested that the applicable compound interest rate should be less than nine percent. *Id.* at 97 (internal quotation marks omitted). It also directed this Court to enter a new forfeiture order.

## DISCUSSION

### A.     The Applicable Sentencing Range under the Guidelines

At the defendants' original sentencings, the Court found that the advisory Guidelines range applicable to both defendants was 210 to 262 months' imprisonment. (Sent. Tr. 25 (Vilar), 82 (Tanaka)). For the reasons that follow, the Government submits that the same advisory Guidelines range remains applies to the defendants' resentencing.

#### 1.   The Base Offense Level

Because each defendant was convicted of at least one count that carries a statutory maximum term of imprisonment of 20 years or more, the applicable base offense level for each defendants is 7. *See* U.S.S.G. § 2B1.1(a)(1).

#### 2.   The Loss Exceeds $20 Million

Because the defendants are responsible for causing losses in excess of $20 million, a 22-

Hon. Richard J. Sullivan
March 31, 2014
Page 7 of 16

level enhancement to the base offense level is appropriate. *See* U.S.S.G. § 2B1.1(b). That figure is based solely on the losses attributable to Lily Cates, the Mayer family, and Graciela Lecube-Chavez, each of whom, as the Second Circuit has already found, invested with the defendants in the United States. The amount of loss is derived from account statements prepared by the defendants and trial testimony (SA 715 (Cates), 628-29 (Mayers), Tr. 352 (Lecube-Chavez)),[3] and the funds stolen from Cates's brokerage account (SA 865, 782). It is summarized as follows:

|       |                                           |                |
|-------|-------------------------------------------|----------------|
| (i)   | Lily Cates:                               |                |
|       | a. SBIC Investment:                       | $5,000,000.00  |
|       | b. Non-Disbursed SBIC Interest:           | $225,000.00    |
|       | c. Rhodes Capital:                        | $1,000,000.00  |
|       | d. Non-Disbursed Interest and Dividends:  | $3,120,133.85  |
|       | e. Sept. 2003 Theft:                      | $250,000.00    |
|       | f. Aug. 2004 Theft:                       | $175,000.00    |
|       | Cates Subtotal:                           | $9,770,133.85  |
|       |                                           |                |
| (ii)  | The Mayer Family                          | $11,066,713.44 |
|       |                                           |                |
| (iii) | Graciela Lecube-Chavez                    | $48,434.12     |
|       |                                           |                |
|       | **TOTAL**                                 | **$20,885,281.41** |

(Vilar PSR ¶ 79; Tanaka PSR ¶ 79). This loss calculation and the corresponding 22-level enhancement, are consistent with both (i) the loss figures for these three victims as calculated by Probation (Vilar PSR ¶ 79; Tanaka PSR ¶ 79); and (ii) the Court's prior loss calculations at the defendants' original sentencings (Sent. Tr. 23-24, 26, 86). Furthermore, the Second Circuit has already determined that each of these investors' investments with the defendants was a *domestic* transaction under *Morrison* and its progeny. *See Vilar*, 729 F.3d at 78-79 (finding Cates, the Mayer family, and Lecube-Chavez to have invested while in the United States). Accordingly, because the total aggregate loss is in excess of $20 million, the defendants' offense level should be increased by 22 levels.

### 3.  A Substantial Part of the Fraudulent Scheme Was Committed Abroad

Section 2B1.1(b)(9)(B) provides for a two-level enhancement if "a substantial part of a fraudulent scheme was committed from outside the United States." U.S.S.G. § 2B1.1(b)(9)(B). Here, the trial record was replete with testimony and evidence concerning the defendants'

---

[3] As of October 30, 2003, Lecube-Chavez's GFRDA account had a balance of $88,434.12.  (*See* GX 3308-1 (marked for trial; redacted version (GX 3308-1-R) admitted); Tr. 352).  Thereafter, Lecube-Chavez withdrew $40,000 from Amerindo. (Tr. 351-42), leaving an unpaid balance of $48,434.12 (Tr. 352), which constitutes her loss amount.

Hon. Richard J. Sullivan
March 31, 2014
Page 8 of 16

conduct in connection with the offenses, much of which occurred from the offices of Amerindo UK in London, England, as well as the involvement of individuals in Panama in connection with the sham Amerindo Panama company and Morton Financial. Of note, both Vilar and Tanaka previously conceded at their original sentencings, as they had to, that this 2-level enhancement applies. (Sent. Tr. 24 (Vilar), 81-82 (Tanaka)), and they did not contest that enhancement on appeal. Accordingly, a 2-level enhancement is appropriate.

### 4. The Investment Adviser Enhancement Should Be Applied to Both Defendants

Under Section 2B1.1(b)(16)(A)(iii), where the offense conduct involves violations of securities law by individuals who, at the time of the offense, were investment advisers or were associated with an investment adviser, a 4-level enhancement applies. Here, as the Court found at the defendants' original sentencings (Sent. Tr. 25 (Vilar), 82 (Tanaka)), there is no question that the defendants were investment advisers or were associated with an investment adviser at the time they violated the securities laws. A further 4-level enhancement therefore applies.

### 5. Vilar and Tanaka's Conduct Warrants an Aggravating Role Enhancement

At their original sentencings, both Vilar and Tanaka agreed with the Probation Office that their roles as organizers, leaders, managers or supervisors in the criminal activities for which they were convicted warranted a 2-level increase in offense level pursuant to U.S.S.G. § 3B1.1(c). (Sent. Tr. 25 (Vilar), 82 (Tanaka)). The Court also found that enhancement to apply. (Sent. Tr. 25 (Vilar), 82 (Tanaka)). Accordingly, the 2-level role enhancement remains appropriate.

### 6. The Applicable Guidelines Range

Consistent with the Court's findings at the defendants' initial sentencings (Sent. Tr. at 26, 86),[4] the Government submits that the following Guidelines calculations, using November 1, 2008 edition, apply:

| Offense Level | Vilar | Tanaka |
|---|---|---|
| Base offense level | 7 | 7 |
| Loss exceeded $20,000,000 | +22 | +22 |
| Scheme committed outside U.S. | +2 | +2 |
| Investment adviser enhancement | +4 | +4 |
| Aggravating role in the offense | +2 | +2 |
| Total | 37 | 37 |

---

[4] The Court previously found, at Vilar's original sentencing, that no obstruction of justice enhancement was appropriate.

Hon. Richard J. Sullivan
March 31, 2014
Page 9 of 16

| Criminal History Category | I | I |
|---|---|---|
| Guidelines Range | 210-262 months | 210-262 months |

Based on the arguments set forth above, the Court should again conclude that the advisory Guidelines range applicable to each defendant is 210 to 262 months' imprisonment.

## B.    The Section 3553(a) Factors

The Court is well versed in the defendants' fraud—and, since their convictions, their continued efforts both to blame everyone other than themselves for their egregious conduct and to forestall the return of investor funds. The defendants' conduct began decades ago when they defrauded some of their earliest clients and purported friends out of millions of dollars. In furtherance of their scheme, the defendants created phony shell corporations in Panama, employed confusing corporate names (differing from each other by only the presence or absence of a comma) to mislead investors, lied to GFRDA investors about how their funds would be invested, brazenly stole $5 million from Lily Cates through misrepresentations made to her face and used the funds to directly benefit themselves and their firm, stole an additional $425,000 from Cates by cutting and taping her signature on wire transfer authorizations without her knowledge or permission, and used those funds to directly benefit themselves and their firm. The culmination of the scheme involved the defendants lying to the SEC in an effort to cover up and avoid responsibility for their conduct. The actions of the defendants represented a gross breach of their fiduciary duties to their clients, and the jury so found in its verdict convicting Vilar of twelve felonies (with maximum combined sentences of 125 years),[5] and Tanaka of three felonies (with maximum combined sentences of 30 years.

For the reasons that follow, the Court should re-impose sentences of 108 months' imprisonment for Vilar and 60 months' imprisonment for Tanaka.

### 1.  The Nature and Circumstances of the Offenses

Vilar and Tanaka were wealthy, powerful, respected financial professionals. They did not commit these offenses against their peers or against their sophisticated pension fund clients, whose funds were properly held in custodial accounts. They did not steal from those institutional clients because, as was amply demonstrated at trial, they simply could not do so. Instead, they deceived and stole from certain of their private clients—long-time friends, and investors—while

---

[5]    The Government notes here its disagreement with ¶¶ 135 and 136 of the Vilar PSR. Paragraph 135 should refer to one count of Mail Fraud (Count 5), with a statutory maximum term of imprisonment of 20 years. Paragraph 136 should refer to two counts of Wire Fraud (Counts 5 and 6), with a statutory maximum term of imprisonment of 5 years each, rather than 20 years each, because the conduct occurred prior to the enactment of the Sarbanes-Oxley Act of 2002, which increased the statutory maximum term of imprisonment for Wire Fraud to 20 years.

Hon. Richard J. Sullivan
March 31, 2014
Page 10 of 16

paying off others for a simple reason: they thought they could get away with it. Vilar and Tanaka committed these offenses because they thought they could do so with impunity, and because they preferred to mislead and steal from clients rather than to sacrifice something personal like a race horse, donations to opera houses, personal property, or their ego to make good on their promises to their clients, or to support their failing business.

The losses that they caused ranged from the relatively small ($48,434.12 to Graciela Lecube Chavez) to the large (more than $11 million lost by the Mayer family). But to each investor, no matter the size of the loss, the loss was significant and involved a breach of trust. The tactics used by the defendants ranged from the sophisticated (using a Panamanian shell company and crafting phony corporate documents in an effort to distance themselves from that company when necessary) to the crude (cutting and taping a client's signature on a wire transfer request to steal their money). And their motive was commonplace: greed.

## 2.   History and Characteristics of the Defendants

As the evidence at trial demonstrated, Vilar and Tanaka were complementary partners in crime. Vilar was the public face, willing to lie to the world without hesitation whenever it suited his interest; Tanaka tried to stay behind the scenes, managing the operational details, while being careful to put as little as possible in writing, to say as little as possible to investors, and to hide behind the blizzard of lies told by Vilar. As shown below, however, their similarities far outweigh their differences. Both Vilar and Tanaka have shown a willingness to lie and deceive. Neither defendant is able to offer any compelling explanation for their supposedly aberrant behavior. Indeed, neither defendant has taken responsibility for his crimes. Both defendants have claimed, and will likely continue to claim, that there are no losses, no victims, and that the prosecution was based on technicalities at best.

### a.   Alberto Vilar

Vilar has shown no remorse for his crimes and has offered no sympathetic explanation for his actions. Immediately prior to trial, Vilar was quoted in the New York Times as saying, with respect to his defrauding Lily Cates, "There's no way they can prove that. She made millions with the firm, and I had complete authorization to invest her money." He referred to the GFRDA allegations as "a 100 percent lie." Immediately after trial, having had three and one-half years to reflect on his actions, and nine weeks to see the mountain of evidence that proved his guilt, when asked what went wrong, he could only say, "I don't know." To this day, Vilar denies any intent to defraud his clients—and instead has chosen to blame his clients, the Government, and this Court for his present situation.

This is not surprising. As the Court stated in detaining Vilar following his convictions, "The record is replete, I think, with letters that reflect Mr. Vilar's willingness, at almost no provocation, to concoct and fabricate stories that are demonstrably false" and "there is ample proof in this case of Mr. Vilar disregarding the truth and making false statements to clients, to government agencies, even courts . . . ." (12/18/08 Tr. 5, 7). As the Court no doubt recalls from

Hon. Richard J. Sullivan
March 31, 2014
Page 11 of 16

trial and the deception catalogued in the Government's bail submissions, Vilar's pattern of lies
and deceit includes: breaching his fiduciary duties to investors and friends for decades; lying to
the IRS, lying to the SEC; submitting a false declaration to this Court in connection with his
motion to suppress his post-arrest statements; twice falsely certifying to the County Clerk and
Clerk of the New York County Supreme Court that he was a resident of the United Kingdom,
when in fact he was not, to avoid mandatory jury service; and lying to the world at large by
inventing a mythological childhood in Cuba.

### b.  Gary Tanaka

Like Vilar, Tanaka has shown no remorse for his acts; indeed, Tanaka maintains to this
day that he did nothing wrong. In an article posted on September 12, 2009 on the website
www.bloodhorse.com, Tanaka is quoted as saying, "Basically, they nailed us on technicalities.
There are no victims. Nobody lost money. Now you have super-frauds like (Bernard) Madoff
who wiped people out. Nobody lost money with us, and the feds are trying to put us away for
long-term sentences when there are no victims. They wasted $14 million and four years on us. It
doesn't make sense." As the Court well knows, Tanaka was not convicted based on so-called
"technicalities." Tanaka was convicted of crimes that involved decades of lying to investors
about how he, their fiduciary, the man responsible for Amerindo trading, had invested their
funds. Tanaka was convicted because he helped to divert investor funds to benefit his failing
firm, to repay other investors, and to fund the extravagant lifestyle of his business partner. It was
not a "technicality" when Tanaka ordered Maxine Rye to cut and tape Lily Cates's signature on a
wire transfer instruction to steal $250,000 for the benefit of Vilar. That straight-out theft, and the
later theft of another $175,000 using the same crude method, was as brazen and non-technical a
crime as could be.

### 3.  The Defendants' Efforts to Prevent the Return of Investor Funds

At sentencing, Tanaka pledged to the Court that he wanted to return the investors' funds
to the investors. (Sent Tr. 139, 142). That was an empty promise, which has been joined by
Vilar. Since that time, both Tanaka and Vilar have done nothing to facilitate the return of
investor funds. Instead, they have chosen to throw up roadblocks and continued to try to pin
blame on the Government, the Court, and others for their conduct. To cite but a few examples of
the defendants' obstructive conduct:

- In October 2011, Tanaka revealed his intent to prevent the return of funds to the
  Mayer family. Among other things, Tanaka wrote via email[6] from prison:

    These people [*i.e.*, the Mayer family] will wheedle, moan, cry and wail for the
    almighty shekel. I'm sure their grandmother who accumulated this largesse for the
    granddaughters by way of her Puerto Rican department stores would not be very

---

[6] A copy of the email is attached hereto as Exhibit A, and was produced voluntarily to the SEC
by Paul Marcus, an ATGF investor.

> proud to hear of such spendthrifts malingering in the family tree. My gut feeling
> is to just let them fester[.]

- In July 2013, Vilar and Tanaka sent a letter to their investors that purported to provide
  a client update. ("July 2013 Letter" (attached hereto as Ex. B)). The July 2013 Letter
  not only contained a host of materially false statements, but also continued the
  defendants' efforts to blame the Government for their predicament and to deny their
  blatant fraud. For example, the defendants wrote:

  > [I]t should be obvious to all we did not perpetrate a "'fraud," to leave hapless
  > "'victims" in our wake. . . . We have always tried our best to maximize your
  > investment returns. We only wish we could have avoided this colossal waste of
  > time, and the stagnancy of your investment capital. But we have been caught in
  > the cross-hairs of an unrelenting federal campaign to whitewash an unjustifiable
  > act of the wanton destruction of our business and lives, initiated on false
  > accusations.

  > Without question, the defendants failed to invest a single penny according to the
  > terms of the GFRDA and SBIC programs; sought only to maximize payments to
  > themselves; and did everything in their power to prevent the return of investor capital.

- Then, in August 2013, Vilar and Tanaka sent another letter to their investors that
  purported to provide a client update. ("August 2013 Letter" (attached hereto as Ex.
  C)). In this letter, the defendants sought to cast blame at Ian Gazes, the Court
  appointed Receiver, and interrupt his Court-ordered mandate: to return investor funds.

Both the July 2013 Letter and August 2013 Letter are notable in another respect.
Specifically, both are addressed to the clients of "Amerindo Investment Advisors (Panama)"—an
odd turn of phrase, in part, because (based on the trial record and Government's investigation) no
GFRDA client invested with Amerindo Panama. Rather, the GFRDA clients invested with
Amerindo U.S., and thereafter, the defendants unilaterally and without notice changed the
letterhead used to communicate with GFRDA investors. Moreover, in 2005, when confronted
about Amerindo Panama by Lily Cates, the defendants disclaimed any connection or association
to it. Specifically, according to the SEC Letter (*i.e.,* the 2005 letter sent by Vilar in an effort to
frustrate Cates's redemption and the SEC's investigation of the defendants), Amerindo Panama
had purportedly been sold by Vilar and Tanaka in 1999 or 2001 (along with all of the
defendants' clients and their accounts) by the defendants to Panamanian entity called Morton
Financial. (Of course, the defendants' "sale" of Amerindo Panama to Morton Financial was a
complete fiction built upon forged contracts of sale and a corrupt Panamanian attorney.) In light
of the defendants' prior attempts to distance themselves from Amerindo Panama, the defendants'
present assertions that (1) the GFRDA clients are, and were, clients of Amerindo Panama, and
(2) the defendants maintain a connection to Amerindo Panama is ironic—to say the least—and a
further example of the defendants' inability to remember or state the truth with any precision.

Hon. Richard J. Sullivan
March 31, 2014
Page 13 of 16

### 4.   General Deterrence

As the facts of this case make clear, the defendants' fraud went on for decades and was hard to detect. This is because the defendants were lucky, investing in risky, high-technology stocks that had a very good run—albeit completely contrary to the representations made to their investors until, of course, the technology bubble burst and the defendants were unable to meet their clients' redemption requests. The difficulty in detection might have made the scheme an attractive one from the perspective of the defendants and their co-conspirators at the time. It might also explain, at least in part, the duration of the defendants' participation in the conspiracy. But when a defendant who participated in a hard-to-detect crime is finally apprehended and convicted, and now stands before this Court for sentencing, the punishment must be sufficiently serious to serve the important goal of general deterrence—to send a message to anyone who might be tempted to commit a fraud because of the perceived low risk of detection that the consequences of doing so would be severe, if and when the fraud is uncovered and the perpetrators finally brought to justice to answer for their crimes.

To the extent there was, or is, a perception in the marketplace that this conduct was somehow acceptable—*viz.,* the defendants' claim that they generally paid their clients back or had every intention of one day doing so again—this is not an argument that excuses the criminal conduct. To the contrary, such a mistaken "perception," whatever its source, must be countered by a custodial sentence from this Court that is sufficiently meaningful to underscore to those in the securities industry the simple lesson that lying is lying, stealing is stealing, that both are wrong, and that both will be punished accordingly. In other words, if there was in fact a permissive attitude among investment advisors in the securities industry that lulled some of them—including these defendants—into thinking that lying to their clients in order to steal their money was somehow acceptable behavior because they intended to pay their clients back, this state of affairs highlights all the more the need for sentences that are significant and noteworthy enough to achieve the goal of general deterrence.

## C.   Restitution

The Government seeks restitution for the three victims that the Second Circuit has already determined to have invested with the defendants in the United States: Lily Cates, the Mayer family, and Graciela Lecube-Chavez.

As with the loss figure, the amount of restitution is based on the amount of money the defendants obtained from their victims as a result of the scheme to defraud. It is of no moment that the victims' Amerindo holdings might include gains from prior, non-fraudulent investments with the defendants. *See United States* v. *Hsu*, 669 F.3d 112, 122 (2d Cir. 2012) ("[T]he investors were given a clear opportunity to withdraw the total amount of their principal and accrued interest, and were induced not to do so by fraudulent promises of continued gain. The reinvestments were thus appropriately counted as loss."); *United States* v. *Alfonso*, 479 F.3d 570, 572-73 (8th Cir. 2007) (rejecting defendant's application "to use a victim's gains on an earlier investment to offset losses on that same victim's later investment. Just as gains realized by an

Hon. Richard J. Sullivan
March 31, 2014
Page 14 of 16

individual investor lure other investors into the scheme, those gains may also entice that same investor to make further contributions to the fraudulent enterprise."). Moreover, it has been the position of the defendants—across numerous submissions—that the Amerindo account statements contain accurate information as to the dollar amount of client holdings (even if the funds were obtained on false pretenses and improperly invested). (*See* Vilar Br. 218 ("The defendants' position throughout the litigation was that the account statements were accurate[.]")). For either defendant to repudiate those account statements as a basis for ordering restitution would serve only to highlight their bad faith and expand the nature of the fraud.

In addition, the Government submits that it would be appropriate to assess prejudgment interest in the restitution orders. On appeal, Tanaka did not dispute the Court's authority to award prejudgment interest. (Tanaka Br. 117). And the Second Circuit has held that prejudgment interest is appropriate in precisely these circumstances. *See United States* v. *Qurashi*, 634 F.3d 699,704 (2d Cir. 2011) (sentencing court may award prejudgment interest in a criminal restitution order "to ensure compensation in the full amount of each victim's losses"). In *Qurashi*, the Second Circuit observed that a "prejudgment interest award is not meant to guarantee the benefit of any bargain, but is designed to ensure that the . . . victims are fully compensated for their actual loss, which includes the loss of the ability to put their money to productive use." *Id.* at 705. As in *Qurashi*, the victims here were deprived by Vilar and Tanaka of the opportunity to put their investment capital to "productive use," and they were entitled to compensation under the Mandatory Victims Restitution Act (the "MVRA") for that deprivation. *See United States* v. *Scott*, 321 F. App'x 71, 72 (2d Cir. 2009) (summary order) (holding that the "actual value of the stolen property . . . at the time of sentencing was the nominal value of the stolen funds plus the subsequent investment gains lost as a result of the theft").

The Government further recommends that the interest rate be the prime rate of 3.25%, which has been in effect since December 16, 2008.[7] On appeal, Vilar advocated for use of the prime rate as a proper and appropriate rate of interest that should be applied in this case. (Vilar Br. at 227 ("Use of the 'prime rate' makes sense: it reflects the notion that the victim is losing the value of money while the defendant is enjoying it, and keys the amount of loss to real events.")). The interests should be calculated on a compound, rather than simple, basis in order to make the victims whole. As the Second Circuit has recognized in another context, a failure to award compound interest would have the effect of forcing the victim to provide a loan to the wrongdoer at terms better than those available in the market. *See Saulpaugh* v. *Monroe Community*

---

[7] The "prime rate" is defined as the interest rate that commercial banks charge their most credit-worthy customers, generally large corporations. The prime interest rate, or prime lending rate, is largely determined by the federal funds rate, which is the overnight rate which banks lend to one another. As the prime rate is the lending rate for a bank's most reliable customers, it represents an exceedingly conservative rate of interest. Prior to December 16, 2008, the prime rate was significantly higher than 3.25%. Between May 2005 and December 2008, the prime rate ranged between 4.00% and 8.25%. Accordingly, the 3.25% rate proposed by the Government is modest and conservative.

Hon. Richard J. Sullivan
March 31, 2014
Page 15 of 16

*Hospital*, 4 F.3d 134, 145 (2d Cir. 1993) (failure to award compound interest "effectively [gave] the defendants an interest free loan except for one year's worth of interest."). Seen in this light, a failure to award compound interest would serve only to provide a windfall to the defendants. Such a result would be directly contrary to the purposes of the MVRA. Thus, the Court should exercise its discretion by compounding the prejudgment interest as it did at the defendants' initial sentencings.

The Government's calculations result in the following restitution awards to Cates, the Mayer family, and Lecube-Chavez:

| Investor | Loss Amount | Interest Rate | Restitution[8] [9] |
|----------|-------------|---------------|----------------|
| Lily Cates | $9,770,133.85 | 3.25% annually | $12,618,885.40 |
| The Mayer Family | $11,066,713.44 | 3.25% annually | $14,093,518.47 |
| Graciela Lecube-Chavez | $48,434.12 | 3.25% annually | $62,556.42 |
| **TOTAL** | **$20,885,281.41** | | **$27,174,960.29** |

Proposed orders of restitution are attached for the Court's consideration as Exhibit D to this letter.

---

[8]  The compounding calculations—at 3.25% interest per annum—through 2013, are set forth below.

| | **Cates** | | **Mayers** | | **Lecube-Chavez** |
|------|------|---|------|---|------|
| 2005 | $ | 9,770,133.85 | $ | 11,066,713.44 | $ | 48,434.12 |
| 2006 | $ | 10,087,663.20 | $ | 11,426,381.63 | $ | 50,008.23 |
| 2007 | $ | 10,415,512.25 | $ | 11,797,739.03 | $ | 51,633.50 |
| 2008 | $ | 10,754,016.40 | $ | 12,181,165.55 | $ | 53,311.58 |
| 2009 | $ | 11,103,521.94 | $ | 12,577,053.43 | $ | 55,044.21 |
| 2010 | $ | 11,464,386.40 | $ | 12,985,807.66 | $ | 56,833.15 |
| 2011 | $ | 11,836,978.96 | $ | 13,407,846.41 | $ | 58,680.23 |
| 2012 | $ | 12,221,680.77 | $ | 13,843,601.42 | $ | 60,587.33 |
| 2013 | $ | 12,618,885.40 | $ | 14,293,518.47 | $ | 62,556.42 |
| Adjustments | $ | - | $ | (200,000.00) | $ | - |
| **Total Restitution** | **$** | **12,618,885.40** | **$** | **$14,093,518.47** | **$** | **62,556.42** |

[9] The Mayer family's award has been reduced by $200,000 to take account of the two hardship payments—$150,000 and $50,000—that have already authorized by the Court.

Hon. Richard J. Sullivan
March 31, 2014
Page 16 of 16


**D.     Forfeiture**

The Government will file an additional submission related to the forfeiture issues in this matter on April 1, 2014.

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests that this Court (i) re-impose sentences of 108 months' imprisonment for Vilar and 60 months' imprisonment for Tanaka, followed by three years' supervised release for each defendant; and (ii) impose restitution in the amount of $27,174,960.29, with joint-and-several liability between the defendants.


Respectfully submitted,

PREET BHARARA
United States Attorney

        /s/
By:     _____
        Benjamin Naftalis
        Justin Anderson
        Assistant United States Attorneys
        (212) 637-2456 / -1035

Encls.

cc:     Fred Cohn, Esq. (by ECF and email)
        Vivian Shevitz, Esq. (by ECF and email)

# EXHIBIT A

**Confidential**

From: Walter Pfaeffle <walter.pfaeffle@verizon.net>
  To: paulevem <paulevem@aol.com>
Subject: Confidential
  Date: Wed, Oct 26, 2011 1:12 pm

Dear Nat and Vicky,

How does one deal with such people ?  The chronology to date is, first they: 1) side with the DOJ because they were afraid of the repercussions of their then-uncovered tax arrears, and were enticed by the promise of early payment of their remaining Amerindo balance,  2) institute a further civil action in NY court so that they can jump the queue to alleviate their cash-flow desperation, 3) ask AV and I to okay the only advances, so far, given out to any of our clients on the basis of their special  'poverty,' and finally  4) come back to the well (that's us) to try for an even bigger hand-out--'only' $2.8 million which should bring joy to our other patiently-awaiting clients-- when it appears the court case of the SEC/DOJ team is now mired for another six months until next March.

These people will wheedle, moan, cry and wail for the almighty shekel.  I'm sure their grandmother who accumulated this largesse for the granddaughters by way of her Puerto Rican department stores would not be very proud to hear of such spendthrifts malingering in the family tree.

My gut feel is to just let them fester, in light of the above extenuating facts.  Do you have any other views or suggestions ?

Best regards,

Gary
-----Dershowitz, Nathan on 10/20/2011 8:03 AM wrote:

>

From: Patrick W. Begos [mailto:pwb@begoshorgan.com] ;
Sent: Tuesday, October 18, 2011 10:24 AM
To: 'Shevitz, Vivian'; Nathan Dershowitz
Subject: FW: Mayer Family and Vilar/Tanaka/Amerindo -- Follow Up

I have not heard any response, other than Ms. Shevitz#226;#128;#153;s 10/6 email that she was moving to Maine.

Surely there has been enough time to discuss my letter with your clients and prepare a response. Please let me know ASAP what the response is. If there is continued silence I will have no alternative but to conclude that the statements that I understand were made to Judge Swain about an interim distribution were untrue, and proceed accordingly.

# EXHIBIT B

# AMERINDO INVESTMENT ADVISORS (PANAMA)

## LETTER TO OUR INVESTORS - JULY 2013

To Our Investors:

***What is the current status of our investment capital ?***   Nearly $50 million has been on deposit, sitting unmanaged and without earning interest after our forced closure in May 2005 by the United States Attorney in the Southern District of New York (DOJ, for "Department of Justice") and the Securities and Exchange Commission (SEC) (together, "The Feds").

***Will we ever receive full recovery for our investments ?***   Throughout our ordeal we have always declared our intention to pay our clients their full redemptions: that is, the balance on our books at May 2005. This includes any catch-up interest due on all fixed-rate deposits up until that cut-off date. The Feds have made this straight-forward task impossible so far. Fortunately, the vast majority of our private clients have already received more, if not vastly more, than their original balances invested with us.

***Why am I ineligible for any further returns on my investment past May 2005 ?***   Because of the illegal *de facto* freeze on your funds by The Feds, Amerindo was constrained from managing your capital for further appreciation after that cutoff. An in-depth investigation in early 2010 highlighted the *indifference* on the part of The Feds (no investment manager was in place while we were constrained from rendering our expertise, if not *neglect*, in that some of the assets were even astoundingly permitted to be declared "abandoned," then seized, by the custodian J.P. Morgan Chase. In addition, it was determined balances over $20 million did not accrue any interest at all – though we have brought this to the attention of The Feds repeatedly). As a direct consequence, it was calculated on a full evaluation, including private securities, this portfolio *decreased*, in fact, by about $1 ½ million between 2005 and 2010 because of the government's refusal to let us, or anyone else, manage these investments).

***Why didn't we receive our redemption proceeds earlier, if these assets were always intact, as you indicated ?***   Amazingly, it is because the existence of these assets were deemed "not relevant" by the lead DOJ prosecutor (who apparently was concerned if this pot of money were indeed "relevant" it would show that his haste and zeal to convict us was based on patently false assumptions). Without doubt, the prosecutor and the SEC knew about these assets in 2005 when they shut us down. No one seemed to care enough to allow us to pay our investors.

We prepared a precise valuation of these assets for the court's attention in early 2010 (following a nine-month research and analysis--instigated and funded by us despite the fact the Feds had decimated our defense funds). Sadly, no one told the jury about this pot of assets during our criminal trial, which did not commence until late 2008. This fact would have indicated to the jury that, contrary to the Feds' claims, the Amerindo clients referred to by the Feds as "victims" had not lost a penny of their investment (and never had). The very existence of this money continues to be an embarrassment to The Feds, because of their sensational initial public accusation of a Madoff-like "huge Ponzi scheme" on our part, which was a complete fabrication. By hammering on this falsehood they even enticed some of our investors to testify for the prosecution in the "fraud" trial about our contractual relationships.

Since then, the Feds have acted under a "cover-up" mode. Finally, in May 2013, a court-appointed Receiver proclaimed officially that it "appeared" there were "sufficient funds" to pay all our offshore clients all along (even though no one would have imagined a "run on the bank" at the time). Though the Feds have claimed to have been always acting in the interest of our clients, most shockingly they did not have the decency to keep you informed during these over eight past years--to at least to relieve your anxiety-- in revealing the certainty of receiving your still-pending 100% investment proceeds after all this time. Meanwhile, you are still waiting.

***What is the projected payout timetable ?***   Our best guess is that initial payouts will be in your hands early in 2014. An appeal of our conviction was argued in August 2012 after written briefs were submitted. We are still awaiting the decision of the Second United States Court of Appeals (New York). We anticipate a successful outcome, probably by the end of this summer, because this same court released both of us on bail pending appeal, that is, prior to the final decision. This is a concession which is highly unusual. We hope to have wrested official "control" over the funds at that time. We will first need to ascertain and validate the correct amount of our obligations to our clients -- some of whom might have become 'lost' over the intervening years because the Feds, as yet, have not deemed it necessary to even begin the process to evaluate their client claims.

***What is the outlook for the appeal of the criminal convictions and the SEC case against you and Amerindo ?***   We are hopeful of full exoneration along with the return of our 'frozen' funds. At that point we will be

able to start rebuilding our lives after years of incarceration, the loss of our long-established international company and the besmirching of our professional reputations. We will then finally be able to devote our total energies to finish the important task of returning the full investment balances to you.

In closing, it should be obvious to all we did not perpetrate a "fraud," to leave hapless "victims" in our wake. We have included a copy of a recent submission in our legal proceedings. This will give you an overview of recent progress in key legal happenings. We have always tried our best to maximize your investment returns. We only wish we could have avoided this colossal waste of time, and the stagnancy of your investment capital. But we have been caught in the cross-hairs of an unrelenting federal campaign to whitewash an unjustifiable act of the wanton destruction of our business and lives, initiated on false accusations.

Once again, we will return your account balances as of the date we last had control over them, and assure you of our intention and best efforts to accomplish remitting the funds to you as soon as possible.

With best regards,

*Alberto Vilar | Gary Tanaka*

\*\*\* Since our release from prison we have been supported by Social Security benefits and the generosity of our friends and family and two of our appellate lawyers. Our legal struggle is maintained by court-appointed counsel and deferred legal compensation. Alberto has lost his remaining New York residence. Gary has not been allowed to go back to his home in London since 2005, not having seen his family, including son Alex, who is now nearly age 17.

*This is anticipated to be the first of a series of informative updates to our investors. We have not contacted you before now because of a combination of Fed intimidation and advice to the contrary from our previous lawyers. Whereas we have attempted to locate all of our clients from our outdated files we apologize for any omissions and oversights. Please assist us by 1) notifying us of any of your recent contact changes (address, phone number, email), and by 2) passing this letter on to any clients you might suspect have slipped out of touch. You can contact us at our specially designated email address, Amerindo.clients@gmail.com. We look forward to any and all of your comments. Please allow for some delays in our responses back to you because of our shortage in staff and resources.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## APPENDIX: 30 MAY 2013 LETTER FROM VIVIAN SHEVITZ

I am a federal appeals lawyer, former Chief of Appeals of the US Attorney's office, Eastern District of New York (1978-82), representing Alberto Vilar and Gary Tanaka, the founders of Amerindo Investment Advisers Inc., a US Advisory Company of sterling reputation for 25 years. It was shuttered precipitously in May 2005 after 19 armed federal agents executed a secretly-obtained search warrant at Amerindo's New York offices, publicly announced they expected losses in the millions, and arrested my clients, its founders, and trader, on the most tenuous of charges after only 5 weeks' "investigation" on wild allegations – publicly proclaimed – that there would be mega-millions of dollars of client losses (because Amerindo was such a successful company). United States v. Vilar and Tanaka, 05 cr 621 (RJS) (SDNY); appeal 10-521 (US Court of Appeals).

Though Mr. Tanaka and Mr. Vilar never lost a dime of any client's money through fraud (though there were of course normal trading losses in the accounts, fully disclosed and accounted for) and in fact *no client* has claimed "fraud," just delayed redemptions, the damage was done. And it is still being done. The SEC and US made sure these men would not be able to defend themselves properly after bankrupting their highly-regarded $1.25 billion US company, Amerindo Investment Advisors, by "simply" asking their big investment bank, then Bear Stearns, now JP Morgan, to just 'hold onto' the Amerindo funds custodied there until and unless the SEC and US Attorney authorized its release. This, it refused to do even now, and I have been "forced" to defend these men without fee because 9 years later, the same prosecutors and SEC lawyers are trying to take all of their assets (without ever proving the "loss" they proclaimed 9 years ago and still proclaim), and force them to execute a release of the government and JP Morgan despite their malfeasance. I am doing this without for no current fees because, although *criminal defendants* are entitled to appointed counsel (and I represent Mr. Vilar on an appointed basis in the Second Circuit), *civil defendants*, in an SEC case, are not entitled to counsel. The government – with the complicity of the trial judge who has done the prosecutors' work – has just shifted all the financial/"forfeiture" litigation to the parallel sister "*civil* case" and has refused to release money for them to pay fees to anyone, to take care of their own needs, or for any purpose.

A year into the litigation a different federal judge held that that search was unconstitutional and that the government's theory that "Amerindo" was fraudulent was unsustainable. An SEC Monitor responsibly concluded that all money of the US Advisory clients, institutions and pension funds, was "there", and all US company investors got their money back. There was no need for a Monitor.

Nevertheless, the same prosecutors who drafted the defective and unconstitutional search warrant, and the same SEC lawyer who was *present* at Amerindo's offices when the unconstitutional search was occurring, have continued to claim these defendants are responsible for millions of dollars of client losses. They *intimidated* everyone around the defendants, including defendants' own lawyers, into "not looking". They intimidated and bullied defendants themselves – and got defense counsel to "buy into" – the threat of yet greater punishment for what they intimated was yet unindicted offshore "fraud."

When, before sentencing in 2010, it came to light (through a defendant-retained expert's analysis of private tech securities held since 2005) that in fact there had been assets in the Amerindo accounts (frozen at JP Morgan) sufficient to have paid out all investors as of 2005, but depreciating since that time because the government never required or arranged for the assets to be managed and refused to allow the defendants to continue managing their own funds -- the prosecutor told the judge that it was "irrelevant" and defendants should be sentenced *as if* there was a fraud and there were losses. Worse, without ever ascertaining the amount of Amerindo customer claims or the amount of assets held frozen, they secured a "restraining order" as to *all* defendants' assets, including UK pensions, pushing through (before I was on the case) a "forfeiture order" that now (on appeal) the government admits is wrong and must be vacated. (Appeal 10-521, US v Vilar, argued at the Second Circuit Court of Appeals August 21, 2012).

Still to this day, the government is trying to bully defendants into giving up their claims against the government. They threaten to hold up an investor claim process – one we've sought for *years* now – unless we sign a provision *releasing* from liability the DOJ, the SEC, and JP Morgan. That process, and evaluation of frozen assets, was and is a necessary step for Mr. Vilar and Mr. Tanaka, because, as we've told the government repeatedly, it would *demonstrate* that client funds were not "lost" or missing. The SEC and DOJ are pouring millions of dollars into the ninth year of this prosecution to hide their wrongdoing, and immunize themselves and JP Morgan, while Amerindo investors whose money has been tied up for years, while their client's funds, and they, are left hanging.

The Second Circuit took the unusual step of granting bail on October 2, 2012. But the trial judge, who worked with the prosecutor in the Southern District of New York's US Attorney's office with him – as unfortunately, Mr. Tanaka's defense counsel also did-- continues to give the prosecutors *carte blanche*.

The latest move -- to which I responded yesterday -- prompted me to reach out for you. To try to pry the accounts loose and grab far more than "investor money" for JP Morgan to do with what it wants, the government got the Court to appoint a receiver. Instead of trying to hold JP Morgan accountable to maximize the assets, he has worked *with* JP Morgan and was set to recommend it continue to hold the assets, continue to run the show, and to set its own fees and expenses. The SEC's and DOJ's position? 'Sure, go ahead, do it'. And if defendants want to have their clients paid, and first have their clients' claims evaluated (for the first time in 8 years), the defendants should have to pay more, *and sign a* complete and total release. We said no. Someone should be watching this. The attached letter was sent to the Court yesterday, concerning the receiver's plan to push the SEC's agenda, with little regard for the defendants' constitutional rights, or for those of defendants' investors.

***UPDATE MAY 30, 2013.*** Today the receiver filed the expected report. Stunningly, he still "recommends" employing JP Morgan without its even setting forth its fee structure. More stunning is this: As an obvious afterthought to a report prepared before our anticipatory objection, the receiver inserted, as a footnote, the following, which is the receiver's most important conclusion: *"It is believed that the amount of individual investor claims as of May 25, 2005, the last date on which the various investor accounts were actively managed, can be fixed with certainty, and that there should be sufficient cash and public securities in the investor accounts to pay these claims."*

If this is the case, the government's whole case should fail. The prosecutor and SEC have supported its "fraud" case with the allegation that there would be millions of dollars "missing" and lost. They are wrong. There was no fraud. The government suppressed this evidence and convicted defendants on false accusations. It should report the Receiver's conclusion that assets were there all along to have paid investors as of May 25, 2005 to the Court of Appeals and state it to the press.

These men were prosecuted as if their accounts had been "stolen" when the government knew and knows that there was no loss and no theft. As the Supreme Court wrote in a 1956 opinion, "the dignity of the United States Government will not permit the conviction of any person on tainted testimony; this conviction is tainted, and justice requires that petitioners be accorded a new trial." *Mesarosh v. United States,* 352 U.S. 1, 4-9 (1956) (granting motion of Solicitor General to remand the case to the trial court for further proceedings because it learned of untruthful testimony given before other tribunals by a Government witness.)

This case may be worse than the Ted Stevens prosecution with prosecutors gone wild but with defendants completely cut off from their funds to defend this. This cohort of prosecutors in the SDNY around 2005, have done this before, with the notorious *United States v. Stein,* 541 F.3d 130, 136 (2d Cir. 2008) where the SDNY prosecuted KPMG employees after induced KPMG to stop paying the employees' defense costs, through bullying and intimidation of KPMG. The Second Circuit dismissed the indictment for the government wrongdoing. The same thing ought to be done here. And it should be done by prosecutorial action.

I too am seeking to hold the government and JP Morgan accountable for criminal wrongs. No one will listen. They should. Is anyone watching? I hope someone will look at this.

Please confirm any changes or additions
for your address and e-Mail ID to:

Amerindo.clients@gmail.com

# EXHIBIT

# C

# AMERINDO INVESTMENT ADVISORS (PANAMA)

## SECOND LETTER TO OUR INVESTORS - AUGUST 2013

To Our Investors:

We are gratified with the positive responses and encouragement we received after our first letter to our clients last month. We were surprised to learn how many of you had attempted to gain information and/or voiced concern for your own impounded Amerindo Panama account—but to no avail--to the United States Attorney in the Southern District of New York (SDNY) (DOJ, for "Department of Justice") and the Securities and Exchange Commission (SEC) (taken together, "The Feds"). This letter is also motivated by the confusion, and questions raised since some of you received a communication from Mr. Ian Gazes in reaction to our initial letter, as well as "Claim" documents.

*What is Gazes LLC, and who is Mr. Ian Gazes ?* Mr. Gazes (and his firm, Gazes LLC) was directed by the Court to serve as a "receiver" to help break the logjam with respect to the long-tardy investor remittances caused by government inaction. His firm is normally engaged in court-appointed bankruptcy and estate distribution assignments. As such, he is seemingly inexperienced in and unsympathetic to the fact your private investment in Amerindo was registered outside the U.S., and so constituted a legitimate offshore investment domiciled in Panama. We do not give advice but discuss tax implications we discern later on.

*What is the Receiver supposed to do ?* His instructions in the Court orders are not entirely clear, but his initial directive was to take steps to value and preserve the seized assets and begin the process of determining how much is owed to people whom The Feds call "victims" (those who testified for The Feds) and investors. He has, unfortunately, expanded his own mandate and has made recommendations to inflate his directive for himself and chosen associates, including JP Morgan (who has withheld interest on all accounts despite our complaints), to provide extra unwanted, costly services at our expense.

*What did Mr. Gazes neglect to explain in his letter ?* First, as we indicated before, there are important pending matters before the appeals court which could radically disrupt the intended course of Mr. Gazes' efforts by dissolving the legal underpinnings of his task. Specifically, the Order on which his appointment is based, is in turn predicated on a "forfeiture" order in the criminal case, that the government itself said (in its appeal brief) *must be vacated*.

Second, Mr. Gazes' services are not "free" as one might suppose, but rather his appointment was instigated by The Feds, to cover the fact that for eight years they have failed to even ascertain our investors' identities much less inventory the assets that have been there all along. The Feds have objected to allowing a federal magistrate judge conduct this important claims processing, though it would have been "free" – a part of the work of the Court that authorized restraints on the accounts. Already there is a balance of $50,000 Mr. Gazes has claimed from your asset pool, with additional fees approved, for himself, stockbrokers, and accountants he says he needs to determine "tax implications" for distributions to you, our *offshore* investors. (All our Amerindo US clients were fully paid out in 2005; remaining investors are from our offshore company--which was incorporated long before the US company.) Mr. Gazes stated in a May email to our lawyer that the expenses incurred by him and other expenses (for which he wants to obtain an open-ended authorization) should be considered as being simply a "cost of paying our clients." We can tell you that if and when we make the distributions, there will be no such "expenses" levied against our client accounts.

*Mr. Gazes' plan may disrupt your offshore investments.* Some investors expressed concern with Mr. Gazes' paying himself and "professionals" to determine your tax implications. Whereas our inclination would be to await your individual instructions with respect to your investment proceeds, Mr. Gazes' plan seems to include transferring the offshore accounts to an onshore account in his name. This might force you to redeem the funds to the U.S. instead of, at your option, to continue keeping them in offshore investments. You might therefore be assessed immediate direct U.S. taxes through a deduction on the distribution. Mr. Gazes has excluded us from discussions of what he is doing, but it appears that these issues will be determined by Mr. Gazes' chosen tax advisors (at your expense). Our idea would be to hold any distributions offshore until we hear from *you* after you and your advisors determined what you would want to do with your funds in accordance with your personal tax considerations.

*What effect would any immediate pending positive developments for us in court have on my asset distribution ?* As we explained previously, the pending expected reversal of our criminal convictions would lay the groundwork for the collapse of the SEC charges, the termination of the very basis of Mr. Gazes' current 'assignment.'

*What should I do ?*  It is not without reason, nor is it a wasted effort, to gather all your Amerindo investment documentation because they constitute the necessary documents to support a payout in any eventuality, whether instigated by Mr. Gazes or the payout that reverts to us. Our lawyers in fact worked with Mr. Gazes to draft the forms he included in his letter to you.

*What else can I do ?*  In any communication with Mr. Gazes, ask him directly: *1) Why is he forcing 'onshore' (in the U.S.) the proceeds from your legitimate offshore investments in Amerindo Panama?* If this is not your wish, he and the court that appointed him and is approving his proposals, should be so advised. 2) *Why has he failed to even recommend the most direct means to maximize assets by immediately directing JP Morgan to place the client portfolio in an interest-bearing account – a step he has refused to take; and (3) Is he still intending to let JP Morgan participate in the additional business of selling Panamanian-held securities at its own discretion?* We have complained about such things, as have some of our clients, but Mr. Gazes, and The Feds, seem to prefer letting JP Morgan mastermind the mechanics of managing out the funds for liquidation (and get paid to do so). Finally, you might ask him: *4) Why is he excluding us, Gary and Alberto, the original portfolio managers, from shepherding these funds until liquidation* – as has been their punitive but senseless stance from the beginning.

We are flattered and amused in watching The Feds' frantic ploy to play "catch up" to achieve what should have implemented over eight years ago. Mr. Gazes' last-minute attempt at least puts in motion the process of gathering the claims about which we have told The Feds since 2005.

It is more than possible that Mr. Gazes' mandate will end when the basis of his appointment is rendered a nullity in court. Although our lawyer says that we cannot assume anything, we think that when the convictions are overturned we should have lawful control of the funds, and hopefully implement the investment decisions necessary to responsibly liquidate the funds of investors in accordance with their redemption instructions – which we have been prohibited from doing by The Feds' objections. Again, we are dedicated to return your account balances as of the date we last had control over them. We assure you of our intention and best efforts to accomplish remitting the funds to you as soon as possible. We hope that The Feds will not continue to stand in the way.

With best regards,

*Alberto Vilar  |  Gary Tanaka*

*This is a series of informative updates to our investors. We have not contacted you sooner because of a combination of Fed intimidation and advice to the contrary from our previous lawyers. Whereas we have attempted to locate all of our clients from our outdated files we apologize for any omissions and oversights. Please assist us by 1) notifying us of any of your recent contact changes (address, phone number, email), and by 2) passing this letter on to any clients you might suspect have slipped out of touch. You can contact us at our specially designated email address, Amerindo.clients@gmail.com. We look forward to any and all of your comments. Please excuse any delays in our immediate responses back to you because of our deficiencies in staff and resources.*

Please confirm any changes or additions
for your address and e-Mail ID to:

Amerindo.clients@gmail.com

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States of America | **Order of Restitution** |
| v. | **S3 05 Cr. 621 (RJS)** |
| Alberto Vilar, | |
| Defendant. | |

Upon the application of the United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, Benjamin Naftalis and Justin Anderson, Assistant United States Attorneys, of counsel; the presentence report; Alberto Vilar's conviction on Counts One through Twelve of the above Indictment; and all other proceedings in this case, it is hereby ORDERED that:

1. **Amount of Restitution.** Alberto Vilar (the "Defendant") shall pay restitution in the total amount of $27,174,960.29 to the victims of the offenses charged in Counts One through Twelve of the Indictment. The names, addresses, and specific amounts owed to each victim are set forth in the Schedule of Victims attached hereto. Upon advice of a change of address, the Clerk of the Court is authorized to send payments to the new address without further order of this Court.

2. **Joint and Several Liability.** The Defendant's liability for restitution shall be joint and several with that of any other defendant ordered to make restitution for the offenses in this matter, specifically Gary Alan Tanaka who has been convicted of Counts One, Three, and Four of the Indictment. The Defendant's liability for restitution shall continue unabated until either the Defendant has paid the full amount of restitution ordered herein, or every victim has been paid

09.10.2013

the total amount of his loss from all the restitution paid by the Defendant and his co-defendant in this matter.

**3. Sealing.** Consistent with 18 U.S.C. §§ 3771(a)(8) & 3664(d)(4) and Federal Rule of Criminal Procedure 49.1, to protect the privacy interests of victims, the Schedule of Victims attached hereto shall be filed under seal, except that copies may be retained and used or disclosed by the Government, the Clerk's Office, and the Probation Department, as need be to effect and enforce this Order, without further order of this Court.

Dated: New York, New York
      April 24, 2014

_____
THE HONORABLE RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States of America | **Order of Restitution** |
| v. | **S3 05 Cr. 621 (RJS)** |
| Gary Alan Tanaka, | |
| Defendant. | |

Upon the application of the United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, Benjamin Naftalis and Justin Anderson, Assistant United States Attorneys, of counsel; the presentence report; Gary Alan Tanaka's conviction on Counts One, Three, and Four of the above Indictment; and all other proceedings in this case, it is hereby ORDERED that:

**1. Amount of Restitution.** Gary Alan Tanaka (the "Defendant") shall pay restitution in the total amount of $27,174,960.29 to the victims of the offenses charged in Counts One, Three, and Four of the Indictment. The names, addresses, and specific amounts owed to each victim are set forth in the Schedule of Victims attached hereto. Upon advice of a change of address, the Clerk of the Court is authorized to send payments to the new address without further order of this Court.

**2. Joint and Several Liability.** The Defendant's liability for restitution shall be joint and several with that of any other defendant ordered to make restitution for the offenses in this matter, specifically Alberto Vilar who has been convicted of Counts One through Twelve of the Indictment. The Defendant's liability for restitution shall continue unabated until either the Defendant has paid the full amount of restitution ordered herein, or every victim has been paid

09.10.2013

the total amount of his loss from all the restitution paid by the Defendant and his co-defendant in this matter.

**3. Sealing.** Consistent with 18 U.S.C. §§ 3771(a)(8) & 3664(d)(4) and Federal Rule of Criminal Procedure 49.1, to protect the privacy interests of victims, the Schedule of Victims attached hereto shall be filed under seal, except that copies may be retained and used or disclosed by the Government, the Clerk's Office, and the Probation Department, as need be to effect and enforce this Order, without further order of this Court.

Dated: New York, New York
       April 24, 2014


_____
THE HONORABLE RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE