1

NEW YORK STATE SUPREME COURT
NEW YORK COUNTY : CIVIL TERM : PART 54
------------------------------------------------------------X
LISA MAYER, DEBRA MAYER, DABA, INC. and ABA, INC.,

                    Plaintiffs,

             -against-

ALBERTO VILAR, GARY TANAKA, AMERINDO INVESTMENT ADVISORS,
INC. (U.S.), AMERINDO INVESTMENT ADVISORS, INC. (PANAMA),

                    Defendants.
------------------------------------------------------------X
Index No. 603234/2004


New York Supreme Court
60 Centre Street
New York, New York 10007
April 1, 2014


B E F O R E:  HON. SHIRLEY WERNER KORNREICH
              Supreme Court Justice


A P P E A R A N C E S:


BEGOS, BROWN & GREEN, LLP
Attorneys for the Plaintiff
2425 Post Road - Suite 205
Southport, Connecticut  06890
BY:  PATRICK W. BEGOS, ESQ.


ROBINSON, BROG, LEINWAND, GREENE, GENOVESE & GLUCK, P.C.
Attorneys for the Defendants
875 Third Avenue
New York, New York  10022-0123
BY:  DAVID C. BURGER, ESQ.

1

2   A P P E A R A N C E S:   (Continued)

3

4   VIVIAN, SHEVITZ, ESQ.
    Attorney for the Defendant - Gary Tanaka
5   46 Truesdale Lake Drive
    South Salem, New York  10590
6

7

8

9                           Lori Ann Sacco
                            Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1

2          THE COURT:  You may be seated.  What is in

3     front of me is somewhat of a mess.  What it is, is a

4     case which began long ago, and it involves funds

5     which were invested with Mr. Volar and Amerindo just

6     to make things easier.  And they were invested

7     beginning in the '80s really and continued through

8     2005, although the Mayers, which are two sisters and

9     the father, the two sisters had inherited quite a bit

10    of money, and they invested over a $11 million, and

11    to be exact, in January of '01, because this was a

12    continuous investment.  They invested $11,066,713.44

13    with Vilar and Tanaka in their investment fund I

14    guess it is.  It was guaranteed by the defendants,

15    Vilar and Tanaka and their fund, and it was to pay

16    11 percent interest.

17          There was -- When they demanded their money,

18    there was a default, and it was supposedly invested

19    for three years.  When the investment was up again,

20    there was a default.  They didn't receive, I don't

21    believe, the full interest and they certainly didn't

22    receive their money back.

23          Subsequently, Mr. Vilar and Mr. Tanaka were

24    prosecuted by Federal Government for violations of

25    the SEC and other criminal conduct and eventually

26    convicted.  The monies that these men had were frozen

1

2    by the government, by the Federal Government.

3         The Mayers had no money allegedly and were --

4    were in desperate need of money allegedly.  They at

5    some point got $150,000 of their money from the

6    government, but basically were unsuccessful in

7    getting their monies.

8         This case, the case in front of me, is

9    seeking to obtain what was theirs, was stayed pending

10   the criminal prosecution.  I believe that the

11   criminal prosecution ended some time in 2010 I think

12   it was.  Was it?

13        MR. BEGOS:  It was to the end of the criminal

14   trial, which was fall of 2000 -- yeah, I think it was

15   2010.

16        THE COURT:  Right.  And basically the Mayers

17   moved in front of me for a judgment.  According to

18   all the papers, their motion for summary judgment, I

19   believe it was summary judgment, was served on both

20   Vilar and Tanaka, who at that point were in prison.

21   There was -- Mr. Tanaka at some point had been

22   fighting the case, but eventually the summary

23   judgment was not opposed.  And this Court issued a

24   judgment in favor of the Mayers.

25        In issuing the judgment -- Let me look at it

26   to make it clear.  The Court didn't give the Mayers

1

2          everything they wished for.  Instead what the Court

3          did is it awarded them an amount of money admitted to

4          be owed to them by the defendants in a letter from

5          the defendants' investment firm.  And that amount of

6          money, I believe, was as of June of 2004, and it was

7          for $11,000,224 -- 200 -- Strike that --

8          $11,224,936.46.  Now, this was an amount that the

9          fund said it owed, and I believe that was in June of

10         2004.

11              So, rather than award what the Mayers were

12         requesting, which was some $750,000 more, the Court

13         awarded what it viewed as an admission.  And so when

14         it awarded that amount of money, it also found that

15         there were other claims for dealing with two other

16         funds.  And that went forward as well.  But in terms

17         of that judgment, it was that 11 million, which was

18         the admission.

19              And then the Court also awarded interest and

20         found a violation of GBL 349, and awarded attorneys'

21         fees as well.  But the interest was the nine percent

22         interest, and the Court did award it from

23         January 1st, 2004.  There is a question whether that

24         was appropriate at this point.  And at this point

25         there is a motion to renew and reargue, and it's

26         quite -- quite -- Reargument, of course, is not even

1

2      part of this.  It's to renew, because it's so far

3      along after the judgment was awarded.  The judgment

4      was awarded back in August of 2011.

5           So, at this point there is a motion to renew

6      and it -- it argues that the amount of money itself

7      was not right.  Was the wrong amount of money.  It

8      should have been less certain payments that allegedly

9      were made to the Mayers in 2004 and also $150,000

10     that was awarded by the Federal Court to the Mayers.

11          Now, certainly the $150,000 had been before

12     the Court prior in the Mayers' affidavits and in the

13     information as well as some of the payments.  I'm not

14     sure if all of the payments were there or not.  And

15     it was viewed as interest payments, because the Court

16     did not award any interest, certainly not at

17     11 percent, which was part of what was promised prior

18     to the June 2004 admission of 11/22/04.  But it did

19     award the nine percent from 2004 onward.

20          I think there is argument now that the

21     interest should not be awarded after some time in

22     2005, since the monies were frozen by the Federal

23     Government.  And I'm not quite -- I don't quite

24     understand.  They were put into an escrow account

25     with JP Morgan, and apparently not in an interest

26     bearing account from what I -- I don't understand

1

2      that.  And I also wonder if JP Morgan was receiving

3      escrow fees and yet -- because I assume as an escrow

4      agent they may well have been.  I'm not sure.  I

5      would like to know. Also was the money segregated.

6      Was JP Morgan using the money.  If they were using

7      the money, why weren't they paying interest fees.  I

8      mean, all of these are questions that I'm curious

9      about.  And also my first instinct at this point is

10     to contact Judge Sullivan, the federal district, who

11     has this case and speak to him about it.  Only I've

12     not done it because I would like to discuss my doing

13     that with counsel in front of me before I reach out

14     to him.

15            So, I have a lot of questions.  I'll allow

16     you to argue.  And since this is the motion of

17     Mr. Vilar and Mr. Tanaka, my assumption is Mr. Tanaka

18     is not here, is that correct?

19            MS. SHEVITZ:  I'm Vivian Shevitz.  I am

20     helping Mr. Tanaka.  I represent him in the SEC case,

21     and I represent Mr. Vilar in the criminal case and

22     also in the SEC case.  I have not appeared for

23     Mr. Tanaka, because I've appeared in many cases for

24     no fees, and I just can't do it in another case.

25     I'll she glad to assist the Court.  I'll be glad to

26     e-file, but I really can't appear in another case.

1

2          THE COURT:  Well, I understand that.  So

3   basically since you're not appearing, why don't you

4   have a seat in the audience.  And there is someone

5   here for Mr. Vilar, I assume.

6          MR. BURGER:  Yes, your Honor.

7          THE COURT:  You represent Mr. Vilar.  And

8   Mr. Vilar is asking for the same relief in a sense as

9   Mr. Tanaka, although Mr. Tanaka's papers were

10  certainly more informative.  But let me hear from

11  you.

12         MR. BURGER:  Okay, your Honor.

13         THE COURT:  It's your motion.

14         MR. BURGER:  Yes.  Thank you, your Honor.

15  The amount that you referenced was actually in the

16  August 2004 statement of account which was --

17         THE COURT:  It was August not June.

18         MR. BURGER:  Yes.  And that was referenced in

19  the moving affidavit of Lisa Mayer, paragraph 25.

20         THE COURT:  It was a letter.  The reason I

21  say June is there was a letter from Amerindo.  I'm

22  not looking at an affidavit, because to me that's

23  hearsay as to what went on.  I was looking at the

24  letter from Amerindo, which is an admission in this

25  Court's mind as to what Amerindo owes.  That's what I

26  gave, because I viewed it as -- as Amerindo or

1

2          Mr. Vilar's and Mr. Tanaka's admission.  It was

3          written and signed by Mrs. Tanaka, who worked with

4          them on Amerindo letter, on their investment

5          company's letterhead.

6                    MR. BURGER:  I'm not disputing the amount of

7          that statement, your Honor.

8                    THE COURT:  No.  I'm just saying that letter,

9          from what I recall, was dated June.  And whether or

10         not Ms. Mayer says that it's as of August, I'm paying

11         no attention to what she says in her affidavit.  I

12         base this upon the letter itself, which I view as an

13         admission.

14                    MR. BURGER:  The following paragraph in that

15         affidavit referenced a $150,000 payment that your

16         Honor has mentioned.  It also referenced a million

17         dollars in payments, which were undocumented.

18                    Now, the reason this motion was filed at this

19         time is that the SEC filed an affidavit with

20         statements indicating $1,310,728.74, nine separate

21         payments that were made to the Mayers between

22         January 2004 and January 2005.  Those amounts were

23         not before your Honor.

24                    THE COURT:  Well, over a million was.  It

25         wasn't the same amount, but it was a million and

26         something.  And that was -- I think that was stated

1

2        to be interest.  I'm not sure.

3              MR. BURGER:  But, your Honor, that amount did

4        not reduce the amount on the statement.

5              THE COURT:  No, because the Court viewed it

6        as interest, as interest payments on the principal.

7        And the admission was what was in the account at that

8        point, as principal in June of 2004.  But, you know,

9        frankly I have questions, and that's -- and that's my

10       problem.  That's why I wanted to reach out to Judge

11       Sullivan.  I don't know from the papers -- Let me

12       step back.

13              From the papers it looks like there are three

14       women, because apparently they're all friends.  They

15       seem to be the investors.  There seems to be three

16       investors.  Let me look exactly.  One, I believe, one

17       was Cates.  There are three investors that are still

18       owed money.  Are there others?  I would like to know

19       who -- who are the quote unquote victims here.

20       According to these papers there are just three.  Are

21       there more?

22              MR. BURGER:  They are in the SEC action, your

23       Honor.  There is now a procedure whereby a receiver

24       has been appointed, who has been communicating with

25       all --

26              THE COURT:  And being paid, although nothing

1

2          has gone out in all of these years to the victims.

3                    MR. BURGER:  That's right.

4                    THE COURT:  So, these victims, and I view

5          them as victims, have not seen a penny for years and

6          years, but the receiver is making sure he is being

7          paid but not issuing any monies to anybody.  But

8          let's continue.

9                    MR. BURGER:  The receiver that's currently

10         appointed was just appointed several months ago.  So

11         he --

12                   THE COURT:  He's already gotten 50,000 and

13         he's asking for more.  Am I correct?

14                   MR. BURGER:  I believe that's correct, your

15         Honor.

16                   THE COURT:  Go ahead.

17                   MR. BURGER:  And I cannot explain why the

18         money has been without interest all of these years.

19                   THE COURT:  Can you tell me, do you know how

20         many people are claiming against the fund?

21                   MR. BURGER:  I believe it's something on the

22         order of 30.

23                   MS. SHEVITZ:  May I confer with Mr. Begos?

24                   THE COURT:  Yes, if you know.

25                   MR. BEGOS:  It's about 30, your Honor.

26                   THE COURT:  So, there are 30?

1

2              MR. BURGER:  Approximately.

3              THE COURT:  How much money is being claimed?

4              MR. BEGOS:  It's unclear.  Do you want me to

5      answer that?

6              THE COURT:  How can it be unclear after all

7      these years?

8              MR. BEGOS:  Well, what the receiver --

9              THE COURT:  What is the receiver doing for

10     his money?

11             MR. BEGOS:  There are different methods of

12     calculating what people are owed in different forums.

13     The method that the receiver has requested Judge

14     Sullivan to approve for an interim distribution of

15     something like $20 million is what he called a pooled

16     investment approach, which sort of recalculates

17     everybody at a somewhat minimal level and distributes

18     something to each of them.

19             THE COURT:  Oh, its bankruptcy now.

20             MR. BEGOS:  Well, it's -- it's a receivership

21     which is, in some respects, like a bankruptcy.

22             THE COURT:  Right.  Bankruptcy, the only

23     people that make out well are the lawyers.  It looks

24     like that might happen here as well.

25             MR. BEGOS:  Well, we're hoping --

26             THE COURT:  And the debtors usually -- It's

1

2      like robbery without a gun.

3              MR. BEGOS:  We're hoping that -- that Judge

4      Sullivan will be ordering the interim distribution of

5      this $19 million any day now.

6              THE COURT:  So, how much is there in this

7      pool?

8              MR. BEGOS:  There is at least the

9      $19 million.  That's largely the cash that was in

10     several of these accounts.  There are also a number

11     of -- a large number of what the receiver has

12     described as restricted publically traded stocks,

13     which he thinks are valued at something like 40 to

14     $50 million.  But work has to be done before they

15     could be sold, because they were various restrictions

16     on the stock.

17             THE COURT:  So, there isn't just 19 million.

18             MR. BEGOS:  No.

19             THE COURT:  From what you've said there is

20     like 59 million.

21             MR. BEGOS:  Nobody really knows for sure.

22     There may be more, because there is also what have

23     been referred to as private securities, some of which

24     may have been subject to mergers or acquisitions.

25     Some of which may be valuable.  Some of which are

26     not.

1

2          THE COURT:  Where is all of this money?

3          MR. BEGOS:  It's at JP Morgan.

4          THE COURT:  Including the 40 million that you

5     were talking about?

6          MR. BEGOS:  Yes.

7          THE COURT:  And what has JP Morgan been doing

8     with this money?

9          MR. BEGOS:  Essentially nothing.  It was --

10         THE COURT:  Well, what I want to know,

11    because usually a bank -- Money is fungible.  Usually

12    the money is in the hands of the bank and they use

13    it.

14         Now, is this money segregated in some way so

15    it is not being used by JP Morgan?

16         MR. BEGOS:  Primarily it's not in an escrow

17    account or anything like that.

18         THE COURT:  So why -- And it's not in an

19    escrow account segregated?

20         MR. BEGOS:  No.

21         THE COURT:  So, JP Morgan has been using the

22    money?

23         MR. BEGOS:  I believe so.

24         THE COURT:  And they haven't been paying

25    interest on the money?

26         MR. BEGOS:  What JP Morgan --

1

2          THE COURT:  Well, have they been paying

3     interest?

4          MR. BEGOS:  They say they paid interest

5     through, I think, 2008.  They say that under their

6     account agreements, the interest that would accrue on

7     these accounts was something like -- I don't know if

8     it was liable or prime, but some market rate less a

9     half a point.  And they say that in 2008 or 2009, I

10    forget the exact year, the target rate was below half

11    a point.  So, effectively no interest was earned.

12    That's what they say.  I haven't verified that.

13          THE COURT:  I'm wondering if they have

14    $20 million from anyone, whether that's the rate they

15    pay, nothing.

16          MR. BEGOS:  Your Honor, I agree with you.

17          THE COURT:  It is rare in the commercial --

18    in a commercial setting for a bank that has

19    $20 million or anyone that has $20 million at its

20    disposal not to pay anything number one.

21          MR. BEGOS:  I agree.

22          THE COURT:  Number two, were they taking

23    escrow fees?

24          MR. BEGOS:  They, to my knowledge, they have

25    claimed through the receiver that they are entitled

26    to certain custodial fees.  I don't know whether --

1
2      how far back those fees go.
3              THE COURT:  Have they taken any fees?
4              MR. BEGOS:  I do not know if they have
5      deducted any fees.
6              THE COURT:  I would like to know all of this.
7      Do they have the 20 million or do they have all 59
8      million.
9              MR. BEGOS:  Well, they have all of the money
10     and assets that the receiver knows of and has in
11     hand, I believe, are at JP Morgan.  There are a
12     couple of other accounts which are supposedly in
13     other places that the receiver is trying to get ahold
14     of.  There is a lot of assets that were nominally
15     placed under the receiver's control, like race horses
16     owned by Mr. Tanaka, that to my knowledge the
17     receiver hasn't gathered.
18             THE COURT:  If these are race horses from
19     early 2000, they are pretty old race horses at this
20     point.
21             MR. BEGOS:  I wanted to be as accurate as I
22     can be in the answer, your Honor.  The vast majority
23     of the money that we're talking about in the
24     receivership is in a couple of accounts at JP Morgan
25     Chase in the names of various entities that Vilar and
26     Tanaka set up.

1

2          THE COURT:  See, and how much is claimed,

3     that's what I would like to know, by these 30 alleged

4     people approximately.

5          MR. BEGOS:  Well, it's hard to say.  I think

6     the receiver, in his motion for approval of his

7     proposed interim distribution, has -- has counted all

8     the claims on a reduced basis at something like

9     $40 million or $47 million.  But that doesn't

10    include -- That stops the accounting in 2005, when

11    Vilar and Tanaka were arrested.  It reduces people's

12    claims.

13         THE COURT:  In what way?  I mean, I would

14    like to see what the receiver has done.  I need a lot

15    more facts.  I can't make a decision on this.

16         MR. BEGOS:  Well, your Honor, we think

17    that -- I certainly am willing to answer the Court's

18    questions.  As it relates to this particular motion,

19    I don't think the receiver's proceedings relate to

20    that.

21         THE COURT:  Let me just say this.  You know,

22    I make mistakes.  And frankly, as far as I'm

23    concerned, and the one thing I think that the

24    bankruptcy judges do absolutely right is not to grant

25    priorities, and I am not going to grant the Mayers a

26    priority over other quote unquote victims.  So, you

1

2        know, if we're talking about the interest payments,

3        to me that is still -- that is an issue.  And whether

4        or not I had all the facts in front of me at the time

5        is an issue.

6               MR. BEGOS:  Your Honor, if I --

7               THE COURT:  I may well have made a mistake.

8        Now, in terms of the monies they were owed and the

9        principal that they were owed, and I still view it as

10        an admission as of June of 2004, the 11 million 220,

11        whatever it is, I believe that as of June of 2004

12        that is the money, that is the principal that

13        Amerindo said they had.  And I will not vacate that

14        judgment as of June.  Now there may have been

15        payments after June of 2004.  I don't know.  I need

16        more information.  The interest, that's up in the air

17        depending upon what, you know, what the other victims

18        are owed.  And frankly, you know, I -- I just need

19        more information.  I would like to ask you whether I

20        can call Judge Sullivan to get some information.

21               MR. BEGOS:  Your Honor, if I can address the

22        interest question for a moment.  The so called

23        evidence that Mr. Vilar and Mr. Tanaka have submitted

24        to you, it doesn't rise to the level that's necessary

25        to vacate the judgment for several reasons.  Number

26        one, as your Honor has noted, the Mayers did disclose

1

2          interest payments in the summary judgment motion.

3                    THE COURT:  Different amounts.

4                    MR. BEGOS:  Different amounts.  There was no

5          opposition to that by Mr. Vilar or Mr. Tanaka.

6                    THE COURT:  There is an issue raised by

7          Mr. Tanaka of whether or not he was, in fact, served.

8                    MR. BEGOS:  I understand there is an issue

9          raised by Mr. Tanaka on that.  We submit that he was

10         properly served.

11                   THE COURT:  I don't know.

12                   MR. BEGOS:  Your Honor, Mr. Vilar was

13         represented.  Mr. Burger was here when we argued the

14         summary judgment motion.  Payment is an affirmative

15         defense.  Neither defendant pleaded payment as an

16         affirmative defense.  Neither defendant took

17         discovery.  And these defendants are arguing two

18         years after judgment entered that interest that was

19         paid by their own companies was something that they

20         were unaware of until two years later.

21                   One more point, if I may.  If you look at the

22         affidavit that the SEC attorney filed, some of the

23         exhibits -- that's attached as an exhibit to

24         Mr. Burger's affidavit.

25                   THE COURT:  Yes.

26                   MR. BEGOS:  About half of the documents don't

1

2       on their face reveal any payments to the Mayers.  So,

3       if you look, this is all exhibit -- it's Exhibit F.

4       It's Exhibit F to the -- to the Jacobson affidavit.

5               THE COURT:  Oh, it's not this one.

6               MR. BEGOS:  It's -- Jacobson is attached as

7       an exhibit to the Burger affidavit.  It's Exhibit 2,

8       Exhibit 2 to the Burger affidavit.

9               MR. BURGER:  Actually it's Exhibit F.

10              THE COURT:  Wait a minute.

11              MR. BEGOS:  Let me see.

12              MR. BURGER:  Exhibit F are a series of

13      statements and --

14              THE COURT:  I don't see it.  I have --

15              MR. BURGER:  If you have my affidavit

16      attached to the Notice of Motion, your Honor.

17              THE COURT:  I have -- Wait a second.  The

18      Begos affidavit are you talking about?

19              MR. BURGER:  No.  David Burger.

20              THE COURT:  The problem is the Begos

21      affidavit does have, which is nice, tabs that I can

22      use.  I don't see them under any of the others

23      because --

24              MR. BURGER:  Mine has tabs, your Honor.

25              THE COURT:  I don't have it then, because I

26      had to download a lot of it.  Certainly what I have

1

2          doesn't have tabs.

3                  MR. BURGER:  May I read this into the record

4          and hand it up to your Honor?

5                  THE COURT:  Oh, I do have it.  You're right.

6          I'm sorry.  Your exhibit which --

7                  MR. BURGER:  If you turn to Exhibit 2 at the

8          bottom.

9                  THE COURT:  Yes, that's the Jacobson.

10                 MR. BURGER:  The Jacobson declaration.

11                 THE COURT:  Right.

12                 MR. BURGER:  If you turn several pages in,

13         there is Exhibit --

14                 THE COURT:  You see also --

15                 MR. BURGER:  -- F.

16                 THE COURT:  -- this is what I had read what

17         was owed to the Lily Cates, the Mayers and Tara

18         Colburn.  Lilly Cates is a little under 5 million.

19         Colburn, it's about -- a little under half a million

20         and even according to you it's about 9.6 million to

21         Mayers.

22                 MR. BURGER:  Yes, your Honor.

23                 THE COURT:  There is nothing else in any of

24         the others, any other victims.

25                 MR. BURGER:  Exhibit F, your Honor, the first

26         statement states for further credit to Lisa, Deborah

1

2          Mayer.

3                    THE COURT:  Yes, I understand.  But what I

4          was trying to explain to you, the date of this is

5          January 23rd of 2004.

6                    MR. BURGER:  Yes.

7                    THE COURT:  Now, that one I wouldn't consider

8          at all, because as of June of 2004, there is a

9          statement from the investment company itself saying

10         that over 11 million is owed, 11.2 million, a little

11         more than that is owed in principal.

12                   MR. BURGER:  The next one, your Honor, is

13         June 23rd.

14                   THE COURT:  Yes.  I have to look at the

15         letter to see if that's before or after.

16                   MR. BEGOS:  Your Honor, I think the letter

17         you're referring to, the letter was dated in August

18         of 2004.

19                   THE COURT:  Wait a minute.  I'm looking for

20         the letter now, because I did read it.  I thought it

21         was a June date, but I may be wrong.

22                   MR. BEGOS:  It enclosed a statement, I

23         believe that was as of June of 2004.  I think the

24         cover letter was August of 2004.

25                   THE COURT:  Right.  It was a June date.

26                   MR. BEGOS:  Correct.

1

2          THE COURT:  I don't remember if it was the

3    end of June, beginning of June.  I'm not sure.  But

4    that was what I used --

5          MR. BEGOS:  Correct.

6          THE COURT:  -- in terms of the judgment.

7    Because it seemed to me to be an admission.

8          MR. BURGER:  The further statements, your

9    Honor, there is 150,000 paid on September 7th, 2004.

10    An additional payment of $100,000 on the same day.

11    Additional payment of 100,000 on October 15th, 2012.

12          MR. BEGOS:  Actually that one doesn't mention

13    the Mayers at all, that October 15th letter that

14    Mr. Burger is referring to.  All of the subsequent

15    letters don't mention the Mayers.

16          THE COURT:  It's -- Well, it mentions a bank.

17          MR. BEGOS:  It mentions a bank.  It doesn't

18    mention the Mayers.

19          THE COURT:  It doesn't say -- Wait a minute.

20    Which one are you talking about?

21          MR. BEGOS:  As of October 15th, 2004, and all

22    of the subsequent ones.

23          THE COURT:  I'm looking at the dates.

24          MR. BEGOS:  It's on the very top.  It's --

25    There is a bates number.  It's AUK-6-01903.

26          THE COURT:  Yeah.  It says -- It's the same

1

2      bank and the same account number, so I don't think it

3      matters.

4              MR. BEGOS:  It doesn't say that they're for

5      the payment to the Mayers.

6              THE COURT:  It's the same account and the

7      same bank.  I'm not going to ignore that.

8              MR. BEGOS:  And that document and subsequent

9      documents were signed by Gary Tanaka.  So, for him to

10      claim that he was unaware of the interest payments

11      until two years after the judgment was entered is

12      ridiculous.

13              THE COURT:  Well, that's another issue,

14      whether the interest payments are something other,

15      which is what they raise.  I'm not sure.

16              MR. BEGOS:  I will point out, your Honor,

17      that the motion --

18              THE COURT:  Even if they are interest

19      payments, then why should they get double interest?

20              MR. BEGOS:  Well because, as your Honor

21      pointed out -- Well, there is really two answers.

22      One the Court will recall that both defendants based

23      this motion on a false assertion that the Mayers

24      didn't disclose anything to the Court about interest

25      payments received after January 2004.  We pointed out

26      that was entirely false, that the Mayers had

1

2      disclosed about a million dollars in interest

3      payments after January 2004 as the Court noted.

4              Secondly, as the Court pointed out in fashion

5      of the summary judgment decision, the Court used the

6      admitted statement.  Didn't credit the Mayers with

7      interest that had been due but unpaid before that

8      date, which the Mayers submitted evidence of and the

9      defendants didn't challenge.  And also didn't deduct

10     the interest that the Mayers said had been paid after

11     2004.

12              So, in fact, what -- what the summary

13     judgment decision essentially was, was more or less a

14     wash as far as the interest payments were concerned.

15              THE COURT:  Well, it was done -- It was a

16     default in a sense.  It was a summary judgment on

17     default, that's why I used -- what I thought was an

18     admission.  However, I do think if one makes a motion

19     on default, whatever is said by the claimant has to

20     be the truth.

21              MR. BEGOS:  And it was.

22              THE COURT:  And if there is anything in there

23     that is shown not to be true, then the Court has been

24     misled.  And it's not just a matter of an affirmative

25     defense.  It's more.

26              MR. BEGOS:  We stand by the statements and --

1

2        THE COURT:  I think I was trying -- I think I

3   was trying -- I was too hasty partly because the

4   Mayers had not seen any of their money for many

5   years.  The money was being frozen, and the Feds were

6   doing nothing about it other than -- and it looked to

7   some degree like it might be somewhat of a feeding

8   feast by JP Morgan, by the receiver, by everybody

9   else.  But I'm not sure that's the case.  And I may

10   have been hasty in my judgment.  And at this point

11   I'm not willing to be hasty again and to make a

12   decision without knowing the facts.  I just need more

13   facts.  If I need to have a hearing, I'll have a

14   hearing.  But I don't feel that I know enough to make

15   a decision on this.

16        MR. BURGER:  And to answer your prior

17   question, your Honor, we certainly would have no

18   objection to you contacting Judge Sullivan.

19        THE COURT:  How about you?

20        MR. BEGOS:  Nor would I.  Nor would I.

21        THE COURT:  I think I will contact Judge

22   Sullivan to see if I could get more -- if I could get

23   perhaps the receiver's report and find out where the

24   federal action stands.

25        MR. BEGOS:  Your Honor, we're happy to submit

26   the receiver's report.  There is actually --

1

2          THE COURT:  I would appreciate it.

3          MR. BEGOS:  There is two motions that the

4     receiver made.  He made a motion -- I mean, there are

5     several reports.  I think what your Honor really is

6     looking for is there is a motion that he made to

7     approve an interim distribution that laid out what he

8     viewed as people's claims and how he calculated them.

9          THE COURT:  Really, I don't care about what

10    his view was.  What I care about is how much money is

11    being held at this point and how much money is

12    claimed.  And what I would like to know is how much

13    money was claimed as of the date of arrest in 2005 by

14    each of these investors.

15         MR. BEGOS:  We can certainly get you -- The

16    volume of information that the receiver collected is

17    pretty extensive.  What he did was engage in a claim

18    submission process where he invited the world to

19    submit claims and evidence of their statements, which

20    the Mayers submitted and various other investors

21    submitted.  So I know I have looked at that.  There

22    is several redwelds worth of files submitted by

23    various investors.

24         THE COURT:  I assume that the receiver

25    digested this and said X claims so much, you know,

26    what each one claims.

1

2          MR. BEGOS:  Yes.  Yes, but he did it for

3    purposes of this interim distribution.  So, what --

4          THE COURT:  Didn't he look at the Amerindo

5    records to see how much was in the Amerindo accounts?

6          MR. BEGOS:  Apparently -- Well, what was in

7    the Amerindo accounts was what was in the JP Morgan

8    accounts.

9          THE COURT:  What I'm trying to say is

10   Amerindo apparently kept records.

11         MR. BEGOS:  We don't know how good the

12   records are.  As far as I know, the receiver didn't

13   attempt to audit the Amerindo records.

14         THE COURT:  Then what did he do?  To me what

15   is the receiver doing?  Why is he being paid?

16         MR. BEGOS:  Your Honor, I'm not here to

17   defend the receiver.

18         THE COURT:  I certainly hope you're not.

19         MR. BEGOS:  I'm trying to answer the Court's

20   question.

21         THE COURT:  The way to do it is not to say to

22   the world who is owed any money.  The way to do is to

23   look at the records and do some kind of accounting.

24   If the receiver is incapable of it, he shouldn't be

25   paid.

26         MR. BURGER:  If I may, Mr. Vilar and Tanaka

1

2      have offered to assist the receiver, and that has

3      been refused.

4              THE COURT:  Well, I don't know.  I'm not

5      going to go there.  But what I do -- don't understand

6      is all of the records were seized by the Feds when

7      Mr. Tanaka and Mr. Vilar were arrested in 2005.

8      Those were the records the receiver should have

9      looked at and done an accounting of to find out how

10     much is owed.  If the receiver has not done this,

11     then the receiver has not done his job.

12             MR. BURGER:  What the receiver has apparently

13     done is sent out letters to the investors asking them

14     what they think they invested in.

15             THE COURT:  This isn't a class action.  He's

16     acting as if this is a class action.  It's not what

17     it is.

18             MR. BEGOS:  It's a bizarre proceeding, your

19     Honor.  We disagree with a lot of what the receiver

20     is proposing, but what the -- unfortunately for us,

21     what the second circuit law says is that as long as

22     what the receiver is proposing is quote unquote "fair

23     and equitable to victims who are similarly situated",

24     whatever that means, then the proposed distribution,

25     if approved by the Court, is within the Court's

26     discretion.  I don't agree with that, but that's what

1

2          the law says.  And --

3                  THE COURT:  You know, to me it seems that the

4          law -- I've always found that the law does -- wants

5          to do the right and just thing.  And it's not up to a

6          receiver to make a decision as to what the right and

7          the just thing is.  And if the receiver doesn't do

8          his job, I am sure someone such as Judge Sullivan

9          will do the right thing --

10                 MR. BEGOS:  Your Honor --

11                 THE COURT:  -- as a judge in this matter.

12         Ms. Shevitz, you want to appear for Mr. Tanaka?

13                 MS. SHEVITZ:  I will, because I think I have

14         more information than --

15                 THE COURT:  Okay.

16                 MS. SHEVITZ:  -- than everybody.

17                 THE COURT:  Okay.

18                 MR. BEGOS:  So, Ms. Shevitz is appearing for

19         all purposes for Mr. Tanaka in this action, your

20         Honor?

21                 THE COURT:  I have no idea.  She's appearing

22         for today for Mr. Tanaka.  Apparently she's the one

23         that helped him write his papers.

24                 MR. BEGOS:  Your Honor, may I request that

25         Ms. Shevitz either appear or not speak.  If she's

26         going to appear, then we want to be able to serve her

1

2      and we file things electronically.  She should not be

3      permitted to appear and speak today and have her

4      incarcerated client go on and represent himself

5      pro se.

6              MS. SHEVITZ:  No.  I will represent him.  I

7      just want to say this.  Mr. Begos has appeared

8      without appearing in the criminal case and in the SEC

9      case.  He has not intervened in those cases, and they

10     have spoken relentlessly and repeatedly.  Yes.

11             THE COURT:  What does that mean?

12             MS. SHEVITZ:  That means that I'm trying to

13     level the playing field a little by expressing

14     Mr. Tanaka's views, because he's been incarcerated

15     this whole time and his money has been restrained and

16     yes, JP Morgan has been holding this since 2005

17     without letting it go.  We submitted a letter from

18     Bear Stearns.  It was issued in 2005, July 2005

19     stating to one of the investors, we are working with

20     the U.S. Attorney and the SEC and we are not letting

21     the money go.

22             THE COURT:  Well, I think they had no choice

23     at that point.

24             MS. SHEVITZ:  I think they had -- Well, they

25     had no choice if they were pleasing the SEC and the

26     U.S. Attorney.

1

2          THE COURT:  Exactly.

3          MS. SHEVITZ:  But everybody has now taken the

4     position not me, not me, not me, but the fact is that

5     the funds have been frozen.  We say it's the

6     government.  They say it's JP Morgan.  And JP Morgan

7     says nothing.  We're not paying interest.  We're not

8     giving you the money.  We're not doing anything.  And

9     that's been the status.  And we're not paying

10    interest.  And the receiver, amazingly, is not

11    holding JP Morgan accountable.  In fact, he is asking

12    for fees for JP Morgan.

13         What's happening in the SEC case is we have

14    filed an opposition to the receiver's request to get

15    fees for JP Morgan on many grounds, including that

16    Lilly Cates, one of the investors, has an action

17    against JP Morgan, Bear Stearns, and says it's in

18    pari delicto.  Nobody has commented on that yet.  All

19    of this is before Judge Sullivan.

20         For some reason Judge Sullivan has not

21    required anybody to hold JP Morgan accountable.  I

22    think he was misled in 2005.

23         THE COURT:  I don't know.  I doubt if Judge

24    Sullivan is misled.  I may have been.  I'm not

25    going -- I'm sure Judge Sullivan knows what he's

26    doing.

1

2              MS. SHEVITZ:  I can tell you there is an

3       investor pool.  After the criminal case, shortly when

4       things woke up here and woke up after the sentencing,

5       we were still litigating forfeiture, because there

6       was a forfeiture that was vastly overstated.  A

7       substitute asset forfeiture motion hit my desk and

8       hit the criminal case shortly after I was appointed

9       by the Court to represent Vilar on appeal.  I looked

10      at that and said, hey, somebody better do something

11      or else this is waived.  I looked at that and the

12      bottom line is the judge agreed that he had issued a

13      forfeiture order of $36.7 million to high.

14              THE COURT:  What was the forfeiture amount?

15              MS. SHEVITZ:  Well, it should have been 17

16      million, but he made it 54 million.  But the circuit

17      has vacated all of that.  We're going back for

18      resentencing in a month.  Less than a month.

19              THE COURT:  I understand all of that.  But

20      what I would like to know is how much money --

21              MS. SHEVITZ:  Okay.

22              THE COURT:  -- JP Morgan is holding.

23              MS. SHEVITZ:  I'll tell you.  There is cash

24      that has been frozen, about 20, 25 million.

25              THE COURT:  There is a big difference between

26      20 and 25 million.

1

2          MS. SHEVITZ:  I'm sorry.  Twenty-three

3     million.  I'm not sure.

4          THE COURT:  So, it's more than 20 million?

5          MS. SHEVITZ:  Yes, there is more than 20

6     million.

7          THE COURT:  And other than cash?

8          MS. SHEVITZ:  Other than that there is a

9     number of accounts in the quote "investor accounts".

10    They are house accounts of Amerindo.  There are also

11    public securities.  Some of them are priced.  Some of

12    them are not priced.  And we don't know what the

13    receiver has sold, because he got permission to sell

14    some, and they have not given us information.  They

15    have frozen us out.

16         THE COURT:  Well, isn't the receiver's report

17    replete with all of this?

18         MS. SHEVITZ:  No.  Yes and no.  The receiver

19    keeps saying, we don't know what's left.  The latest

20    is, we think -- he thinks --

21         THE COURT:  How could he not know what's

22    left?  It's his job.

23         MS. SHEVITZ:  Believe me, I know.

24         MR. BEGOS:  There are statements from JP

25    Morgan which lists what's in the accounts.  The

26    question is what some of it is worth, and he hasn't

1

2      ventured a formal opinion as to what some of this is

3      worth.  Although he has indicated, I don't know if

4      you want to call it off the record, but not in formal

5      papers, that at least a subset of the securities

6      could be worth as much as 40 to $50 million.

7              MS. SHEVITZ:  There is private securities

8      also.  These are companies that Amerindo invested in

9      at a startup stage.  Some of them went public.  They

10     are still sitting in the JP Morgan accounts.  We

11     pointed that out to them, the receiver, JP Morgan and

12     Judge Sullivan, for instance, a stock called Three

13     Par Data.  That was -- It's still in the account as

14     an unpriced security.  However, in, I think, 2010,

15     don't hold me to that, please, it was bought by HP, I

16     believe.  It's worth much more than it is.  But they

17     still hold it as an unpriced.

18             THE COURT:  Doesn't the receiver owe some

19     kind of duty to -- to make sure that the accounts

20     under his control are not being wasted?

21             MS. SHEVITZ:  Well, judge, I wish you were

22     the judge there, because this is precisely what we

23     have been arguing, and for some reason it's not

24     happening.  The SEC is not requiring that to be done.

25     In 2011 Judge Swain had the SEC case.  And on

26     September 23rd, 2011 she told the SEC and the U.S.

1

2      Attorney to find out what's in the accounts and find

3      out the investor claims and have Gary Tanaka and

4      Alberto Vilar help them to do that and come back.

5      That was 2011.

6            THE COURT:  Did it ever happen?

7            MS. SHEVITZ:  No.  In 2012 the investor

8      started getting all upset, which I don't blame them.

9      They went to court and they said, can we speak.  Can

10     we speak.  Everybody got in speaking.  And so the

11     defendants had to respond to everybody, and we did as

12     much as we could.  And they -- And Judge Sullivan and

13     Judge Swain held a joint court meeting with the

14     criminal case and the SEC case and they said in 2012

15     to the U.S. Attorney and the SEC, go find out what's

16     in the accounts.  Go find out what the assets are.

17     Go find out the investor claims and come back in

18     February of 2012.

19           So, they did produce something.  And then we

20     tried to get a claims process going.

21           MR. BEGOS:  That's not accurate, your Honor.

22     The judge said that Mr. Vilar and Mr. Tanaka could

23     consent to the release of money to investors and that

24     at that point there had to be a consent, and

25     Ms. Shevitz came up with every reason why Vilar and

26     Tanaka would not consent to the release of money.

1

2          I'm not here to justify what the receiver has done or

3          the U.S. Attorney has done.

4                    THE COURT:  All I want to know is how much

5          money JP Morgan has in these accounts and how much

6          money was claimed.  I don't mean is claimed by the

7          various stakeholders at this point.  I want to know

8          through the Amerindo records as of the date of

9          arrest, according to the Amerindo records, what was

10         owed to each of the investors.

11                   MS. SHEVITZ:  Shockingly, judge, the receiver

12         has not looked at the Amerindo records.  That's what

13         he said in his latest report, which we have

14         contested.  And their position always is, they are in

15         disarray.  They are this.  They were seized

16         unexpectedly by the government and in the govern --

17                   THE COURT:  Well, if the receiver's position

18         is that the Amerindo records are not accurate or that

19         they are in disarray as you say --

20                   MS. SHEVITZ:  He hasn't looked at them.

21                   THE COURT:  -- then instead of asking for the

22         investors to put forth claims, he should ask them for

23         the last statement --

24                   MS. SHEVITZ:  He did.

25                   THE COURT:  -- that they got as close to the

26         date of arrest as possible.

1

2          MS. SHEVITZ:  He did.

3          MR. BEGOS:  That's what he did.  We submitted

4     that.

5          THE COURT:  And what did those statements

6     reflect?

7          MR. BEGOS:  I don't know that anybody has

8     added up what's on those last statements.  In some

9     respects the receiver has used those statements.  In

10    other respects he rejected those last statements.  In

11    the Mayers case, for example, although he said he was

12    using the last statement, which was the statement

13    your Honor used, the 11 million 224, he actually used

14    the 2001 statement for the 11 million 66.  For other

15    people they said they didn't have statements, but

16    they said this is what I invested.

17         THE COURT:  Then you can't use those, because

18    that's not appropriate, and he should have gone to

19    the accounts, the Amerindo accounts for those.

20         MR. BEGOS:  Your Honor, I don't disagree.

21         THE COURT:  To me you don't -- this isn't, as

22    I said, this is not a class action.  This is a

23    commercial case in which there are records --

24         MS. SHEVITZ:  Yes.

25         THE COURT:  -- that should reflect --

26         MS. SHEVITZ:  And they do.

1

2          THE COURT:  -- what is owed.

3          MS. SHEVITZ:  And they --

4          MR. BEGOS:  They should except the records

5     were kept by a company that was a giant fraud.

6          MS. SHEVITZ:  No, it was not a giant fraud,

7     Mr. Begos.  Excuse me.

8          MR. BEGOS:  So, we don't know if the records

9     are accurate, but the receiver, certainly to answer

10    your Honor's question, the receiver has represented

11    that he has not looked at the records.  What he told

12    Judge Sullivan was to look at those records, to do an

13    audit of those records would cost an excessive amount

14    of money, and there is no guarantee that at the end

15    of that process anybody would be any wiser as to who

16    was owed what.

17         THE COURT:  What is the receiver?  Is the

18    receiver an accountant of some sort?

19         MR. BEGOS:  He is an attorney who has

20    experience as a bankruptcy trustee.  He was picked by

21    Judge Sullivan.

22         THE COURT:  It's a bankruptcy trustee, which

23    means he's used to taking money and that's it.

24         MS. SHEVITZ:  Yes.

25         THE COURT:  Frankly, this is not appropriate.

26         MR. BEGOS:  Your Honor --

1

2        THE COURT:  What we need here is somebody who

3    can be relied on to do an appropriate accounting or

4    at least look at the records.

5        MS. SHEVITZ:  In 2002, when the government

6    did come back to try and respond to the assets and

7    the claims, they did, the U.S. Attorney, Sharon

8    Levin, did use the Amerindo records.  She put

9    copies --

10        THE COURT:  I would assume they had to look

11    at the records to make out their criminal case.

12        MS. SHEVITZ:  They did.  They didn't for the

13    criminal case exactly.  But for this, there is

14    suppose to be an accounting.  She said it's up to

15    date.  There is more.  She told Judge Swain, when

16    Judge Swain was in the case, that yes, we have the

17    records.  She used them.  The prosecutor used them at

18    sentencing in 2010 and attached account statements,

19    and nobody said they were in disarray.

20        THE COURT:  Were they the account statements

21    for every one of the investors?

22        MS. SHEVITZ:  Yes.

23        MR. BEGOS:  Well --

24        THE COURT:  And where are those account

25    statements?

26        MR. BEGOS:  I believe they are in possession

1

2          of the government.  Part of the issue --

3                THE COURT:  I'm sure Judge Sullivan can get

4          them.

5                MR. BEGOS:  Part of the issue, your Honor,

6          what complicates things somewhat is the criminal

7          trial related to a narrow subset of victims.  It was

8          victims like the Mayers and a couple of others who

9          invested in this guaranteed fixed rate deposit

10         account as well as Lilly Cates, who is sort of off on

11         her own, and she had $5 million stolen.  But the

12         bulk --

13               MS. SHEVITZ:  There has been no finding of

14         that.

15               MR. BEGOS:  There has been.  They are in

16         jail.

17               THE COURT:  Please.  Let's move on.

18               MR. BEGOS:  There are other GFRDA investors

19         who submitted claims in the receivership proceeding

20         that weren't part of the criminal trial.  There are

21         also investors in what was suppose to be a mutual

22         fund called Amerindo Technology Growth Fund.  The

23         Mayers had a small investment in that.

24               THE COURT:  That was the 400,000 plus?

25               MR. BEGOS:  Yes.  There are people with, you

26         know, tens of millions of dollars annually invested

1

2      in that mutual fund.  That wasn't part of the

3      criminal trial either.

4              THE COURT:  I see.  Was that part of the SEC

5      proceeding?

6              MS. SHEVITZ:  Somewhat.

7              MR. BEGOS:  The SEC allegations included

8      that.  To date the Court has only entered summary

9      judgment with respect to the investors who were

10     established as victims in the criminal trial.  The

11     SEC has moved for a default judgment against the

12     defendants, mostly the corporate defendants with

13     respect to everybody else, but that hasn't been

14     entered yet.  So, we have, in terms of -- When your

15     Honor asked --

16             THE COURT:  Well, my assumption then would be

17     that the judgment we're dealing with here is a GRFD

18     is it?

19             MR. BEGOS:  GFRDA.

20             THE COURT:  GFRDA, that account only has 20

21     some odd million in it, is that correct?

22             MR. BEGOS:  No.  The money was all coming.

23     The bulk of the money in assets are in an account

24     that is nominally called Amerindo Technology Growth

25     Fund II.

26             THE COURT:  It includes all of the monies

1

2          from all of the different investments?

3                    MR. BEGOS:  Yes.  If you look at the

4          statements that are attached to the Jacobson

5          declaration that are part of the motion papers here,

6          the transfers that the defendants are saying were

7          interest payments to the Mayers were transferred out

8          of this Amerindo Technology Growth Fund II account.

9          So, part of the problem is there was no -- there was

10         no separate accounting of the GFRDA money versus the

11         ATGF money.  And that's what I understand the

12         question.  And I think there should be a

13         straightforward answer.  I'm simply trying to explain

14         how there isn't yet a straightforward answer to the

15         question.

16                   THE COURT:  Well, it puzzles me because the

17         Feds have had this case since 2005.

18                   MS. SHEVITZ:  Yes.

19                   THE COURT:  They still haven't gotten

20         their --

21                   MS. SHEVITZ:  Yes.

22                   THE COURT:  -- their ducks in a row.  I don't

23         understand it.

24                   MR. BEGOS:  They have not.  And I don't -- I

25         don't excuse them.  I say -- All I can say is we have

26         been fighting since 2005 to try to get paid.  The

1

2          Federal Government, the U.S. Attorney, really the

3          U.S. Attorney's Office and the SEC have not forced

4          payment.  But for many, many years, and with respect

5          to the joint session before Judge Sullivan and Judge

6          Swain that Ms. Shevitz referred to, what the Court

7          had clearly said was the only way this frozen money

8          could be distributed to anybody, is if Vilar and

9          Tanaka consented.  And Vilar and Tanaka steadfastly

10         refused to consent to any distribution.  That's where

11         it ended.

12              THE COURT:  Before that can happen, it seems

13         like Judge Swain and Judge Sullivan wanted to know

14         what was there.  They would not have just agreed to

15         allow Vilar, Tanaka to distribute money.  I am sure

16         that both Judge Swain and Judge Sullivan it sounds

17         like wanted to know what was being held and who had

18         investments.  And it sounds to me like they never got

19         an answer.

20              MS. SHEVITZ:  And still have not.

21              MR. BEGOS:  I think that's probably an

22         accurate statement.

23              MS. SHEVITZ:  Yes, and still have not.

24              MR. BEGOS:  However, the process --

25              THE COURT:  And nothing can be distributed

26         unless that happens.

1

2          MR. BEGOS:  -- the process could have

3     begun --

4          MS. SHEVITZ:  Yes.

5          MR. BEGOS:  -- years earlier if Vilar and

6     Tanaka had consented to it.

7          THE COURT:  I don't understand why it needed

8     their consent --

9          MR. BEGOS:  Because they had --

10         THE COURT:  -- if all the records were in the

11    hands of the Feds.

12         MR. BEGOS:  Because they had appealed their

13    conviction.  The Court had --

14         THE COURT:  No.  No, that's not what I'm

15    saying.  I'm saying, nothing could have happened with

16    or without their consent unless there was an

17    accounting.

18         MS. SHEVITZ:  Yes.

19         MR. BEGOS:  There was essentially a period of

20    limbo.  And this gets into the minutia of federal

21    forfeiture law.  What the District Court, Judge

22    Sullivan had issued what's called an order of

23    substitute assets saying, including the JP Morgan

24    assets, saying these assets can be forfeited to the

25    federal government.  The Justice Department would

26    have a procedure to try to distribute those to

1

2      investors.

3            Because of the appeal of the criminal

4      conviction, because of the issues regarding the

5      amount of the forfeiture, Judge Sullivan never issued

6      what's called a final order of forfeiture, which is

7      what gives the government actual title to the money

8      and allows them to take possession of the money.  And

9      the government basically said until we got that,

10     which we're not asking the Court to issue, there is

11     nothing we can do.

12           THE COURT:  Well, that's -- again, you're

13     just repeating yourself in dealing with the issue of

14     consent.  That's not my concern at this point.  My

15     concern is an accounting basically.

16           MS. SHEVITZ:  Yes.

17           THE COURT:  What is in these accounts and who

18     is owed the money according to the records.  I don't

19     understand why the receiver doesn't go after that,

20     because nothing can be done without that information.

21     And I think it appropriate that no one gets a

22     priority here.  But I also think it appropriate that

23     someone figure out what's there and who is owed what.

24           MR. BEGOS:  Well, we have argued that the

25     Mayers are entitled to a priority and the GFRDA

26     investors are entitled to a priority for various

1

2    reasons.

3              THE COURT:  I'm not willing to go there.

4              MR. BEGOS:  I understand.  Your Honor, I have

5    a question though.  And I want to answer your Honor's

6    questions.  And we're happy to submit the receiver's

7    materials.  And as I said before, I have no objection

8    to your Honor contacting Judge Sullivan.

9              What I'm trying to understand is, I mean, it

10   seems what's -- what's now before the Court is a

11   fairly narrow question of the amount of the Mayers'

12   judgment on the GFRDA claim.  I'm not sure how the

13   larger inquiry relates to the amount of their

14   judgment.

15             THE COURT:  I understand your concern.  My

16   concern is that I may have made a mistake.  I don't

17   want to give the Mayers priority.  That's my problem.

18   I don't think it appropriate for them to have a

19   priority over other investors.

20             MS. SHEVITZ:  Judge, in the SEC action right

21   now recently the SEC filed a document objecting to

22   the positions -- a lot of the -- They have put the

23   investors litigating and having to litigate.  It's

24   really a mess and expensive and uncalled for.  But

25   the SEC has taken the position that the Mayers

26   violated the restraining order knowingly in the

1

2          criminal case by coming here.

3                 Do you have the language here?  By coming

4          here and perfecting, I guess the word is perfecting,

5          the judgment.

6                 MR. BURGER:  Finally quoting from the

7          government's memo of law.  "Finding.  The Mayer

8          family contends that their judgment is entitled to

9          priority and distribution due to the judgment lien

10         they allegedly perfected on the receivership assets.

11         The commissioned staff does not believe that the

12         Mayer family has any priority in distribution,

13         because any lien it may have obtained was in

14         violation of this Court's injunction and is therefore

15         invalid or avoidable."

16                THE COURT:  Which court was that?  There was

17         an injunction issued by whom?

18                MR. BURGER:  At the time of the purported

19         perfection of the lien, the assets in question were

20         subject to the Court's post-conviction restraining

21         order, which enjoined "all persons and entities

22         having actual knowledge of this order" from

23         encumbering or causing to be pledged, hypothecated or

24         encumbered in any manner --

25                THE COURT:  Which was past 2010.

26                MR. BEGOS:  2009.

1

2          MS. SHEVITZ:  2009.

3          THE COURT:  This case was started in 2004.

4          MR. BEGOS:  Correct.

5          MS. SHEVITZ:  Yes.

6          MR. BEGOS:  Your Honor, we have obviously

7     disagreed with the SEC's position.  I will point out

8     that the U.S. Attorney's Office, which is prosecuting

9     the criminal trial, has told Judge Sullivan that they

10    have no objection to our enforcing our judgment.

11    Judge Sullivan hasn't ruled, and he's modified the

12    restraining order.

13         THE COURT:  This is a 2004 case.  This Court

14    stayed these proceedings pending the criminal action.

15         MR. BURGER:  Initially, yes.

16         THE COURT:  Initially.

17         MS. SHEVITZ:  In 2009 there was a restraining

18    order that was unfortunately consented to by prior to

19    defense counsel for Vilar and Tanaka in the criminal

20    case, who we're claiming are ineffective.

21         THE COURT:  Were the investors in front of

22    the Court on that?

23         MS. SHEVITZ:  No, except the Mayers, who came

24    in and wanted their $150,000.  And to get their

25    $150,000 they and the prosecutor entered into a deal

26    which brought this Court into it to get $150,000

1

2          released from the restraint so they could continue

3          paying Mr. Begos to litigate this while we couldn't.

4                    MR. BEGOS:  That's outrageous.  I took no fee

5          out of the $150,000.  It went entirely to the Mayers.

6                    MS. SHEVITZ:  Okay.  They got a special

7          disposition from a restraining order that they knew

8          about in 2009.  The sentencing actually was in 2010.

9          So, this was stayed, I believe, until after the

10         sentencing, except then we were still litigating the

11         forfeiture.  There is a restraining order in effect

12         in the criminal case since 2009 that we have asked to

13         be lifted previously but it was not.  That,

14         unfortunately, not only included the "investor

15         accounts", but it includes accounts that were being

16         managed by Amerindo that do not belong to them but

17         belong to a UK pension fund owned by AXA Insurance or

18         something, a UK entity.

19                    The government and Judge Sullivan has also

20         been told that that is violating UK law and ought to

21         be released, at least managed, but it's one amount of

22         money and stocks under JP Morgan's iron control shall

23         we say.  That was part of the reason that talking

24         about consent to releasing any money back when we're

25         talking about it in 2011 we A, didn't know what

26         everybody was claiming.  We didn't know what the

1

2      government had frozen, because they didn't let the

3      defendants have any participation in it.  We didn't

4      know where our records were.  That's why when you say

5      Mr. Tanaka knew what interest he paid, well, kind of.

6      But we didn't have the records.  We didn't get them

7      until the SEC put them in.

8              THE COURT:  All I know is this is very

9      Kafkaesque.

10             MS. SHEVITZ:  Yes.

11             THE COURT:  The Mayers put, what was it over,

12     $11 million --

13             MS. SHEVITZ:  Correct.

14             THE COURT:  -- into an investment.  That was

15     the principal,, forget interest, back in 2001.

16             MS. SHEVITZ:  Right.

17             THE COURT:  And they have to beg to get their

18     money back.  And the government, this is America,

19     won't release the money.  And they get $150,000 so

20     that they won't be pulpers, but they can't get their

21     $11 million back.  And then a receiver, who is

22     feeding off of this money, can't even get it together

23     to do an accounting.

24             MR. BEGOS:  Correct.

25             THE COURT:  This is Kafkaesque.

26             MS. SHEVITZ:  Believe me, judge, we're caught

1

2        in the cross hairs of that.  My client has been under

3        house detention, jail, lost their U.S. business,

4        which the U.S. Monitor found squeaky clean in 2005.

5               MR. BEGOS:  But they are guilty of fraud.

6               THE COURT:  I am not going to comment on

7        Mr. Vilar and Mr. Tanaka.  That isn't in front of me.

8        What is in front of me is the Mayers who have money

9        clearly --

10              MS. SHEVITZ:  Yes.

11              THE COURT:  -- that was in this investment

12       that was suppose to be paid at the latest in 2003 and

13       can't get their money back.

14              MR. BEGOS:  Your Honor, if there is anything

15       the Court can do to -- to help this process along, I

16       welcome it.  I do -- I do want to though try to limit

17       this motion.  I mean, the motion before the Court I

18       think relates to a fairly simple issue.  I don't mean

19       to circumscribe the Court's review of everything else

20       that's going on in the federal case.

21              THE COURT:  I'm not going to.  It's not my

22       business frankly.  The only thing in front of me is

23       the Mayers at this point.  I do not view this as

24       equitable in any way as it relates to them.  And, in

25       fact, if the other investors were in front of me, I

26       would feel the same way.

1

2          My only issue is not to give the Mayers a

3     priority as against any of the other investors.   I

4     could care less about Mr. Vilar, Mr. Tanaka, the

5     receiver or JP Morgan.  My view on JP Morgan is that

6     they are using the money.

7          MS. SHEVITZ:  Yes.

8          THE COURT:  Therefore, they should be paying

9     interest.

10          MS. SHEVITZ:  Yes.

11          THE COURT:  If the money were segregated and

12     not touched, then perhaps interest should not be

13     paid.  But when a bank has millions, tens of millions

14     of dollars, they pay interest if they are using it.

15     And for them to get fees and pay no interest is to

16     put it mildly inequitable.  So, that's my view on it.

17     It's not in front of me.  It's in front of another

18     judge.  I'm just saying what I see.

19          The fact that a receiver is now here, the

20     receiver's job is not a receiver in a class action.

21     I don't know if there is such a thing.  Or a lawyer

22     in a class action.  Or even a trustee in bankruptcy

23     who is used to feeding on the money and giving the

24     debtors -- the creditors nothing.  But the receiver

25     is there, at least in my view, to do some sort of

26     accounting, particularly since the records are

1

2       available.

3              MS. SHEVITZ:  Yes.

4              THE COURT:  And that's all I'm interested in.

5       I want to know what money is there and who has claims

6       to the money and according to the records, not

7       according to hearsay, what is owed to each investor.

8              MR. BEGOS:  I think -- I think there,

9       unfortunately, at this point, there is probably not

10      an answer to that question.  I think there is -- the

11      receiver has not looked at the Amerindo records and

12      has used a process that he devised to request proofs

13      of claim and documentation, but he's also approved

14      claims without documentation or recommended that the

15      Court approve claims without documentation.

16             THE COURT:  Well, I'm sure the Court will do

17      with it as it will.  The Court will try to do

18      justice.  As far as I'm concerned, if that was a

19      receiver in front of me, he would get not a penny for

20      his fees and there would be another receiver on the

21      case.

22             MS. SHEVITZ:  Which we asked, your Honor.

23             MR. BEGOS:  I should point out, your Honor --

24             MS. SHEVITZ:  We asked for that.

25             MR. BEGOS:  -- Judge Sullivan heard argument

26      on this whole issue of the interim distribution about

1

2      two weeks ago and said at that point that he expected

3      to be issuing an order on the interim distribution

4      proposal within a couple of weeks.  We're -- we're

5      expecting an order on that issue any day now.  Now,

6      it may very well not address ultimate questions of

7      what everybody's claim is and how much money there is

8      available, but simply say this proposal is fair

9      enough for interim distribution and work out any

10     details later.

11            THE COURT:  Well, frankly, I am sure Judge

12     Sullivan is aware of comity, therefore will have to

13     pay attention to this Court's judgment.

14            MR. BEGOS:  We have asked the Court to do

15     that, your Honor.  One of the arguments that we made

16     to Judge Sullivan and to the receiver was that under

17     full faith and credit, the Mayers -- the defendants'

18     liability to the Mayers has been established, and

19     that's the amount.

20            THE COURT:  I will tell you now, I am not

21     sure what I am going to do in terms of the interest

22     and whether or not the ultimate judgment amount might

23     be deducted to some degree.  However, I will tell

24     you, as of the June 2004 date, I stand by that

25     amount.  As of June of 2004, the 11.2 and change was

26     owed, millions.  There might be some deductions from

1

2      subsequent amounts paid perhaps, but those may well

3      be just interest payments.  And then that would

4      effect the interest and not the principal.

5           MS. SHEVITZ:  Judge, we agree with that

6      number.  We have always agreed.  The problem is, and

7      one of the problems is now, there was, in

8      Mr. Tanaka's view, and from what we just found in the

9      records, there was a payout agreement.  By the time

10     of now, the payout would have been all paid.  So,

11     that's why we can't object -- we're not objecting to

12     the entire amount.  We're objecting to the add ons

13     that have overtaken the entire case.  So --

14          THE COURT:  I understand what you're saying.

15     You're saying the interest amounts and things like

16     that.

17          MS. SHEVITZ:  The interest amounts.

18          THE COURT:  As far as I'm concerned, the

19     interest may be effected but that's it.  And the

20     150,000, it may figure into it, if the interest is

21     effected.  I'm not sure.  But as I said, that 11

22     million and change, it's about a 11 and a quarter

23     million is absolutely the number as of June of 2004.

24     The question is whether or not interest is, and I

25     think that has to be rethought.

26          MR. BEGOS:  Can I ask a question and make a

1

2      suggestion?  To minimize the issue here, I'm happy to

3      talk to my client.  If the Court's concern is that

4      the Mayers disclosed a million dollars in interest

5      payments and the defendants are saying it was a

6      million three, and the issue is how does that -- how

7      does that difference --

8              THE COURT:  Well, the issue becomes -- the

9      issue becomes whether interest should be, and I'm not

10     sure if it should be nine percent or if it should be

11     counted from January or if it should be just the nine

12     percent from when the judgment was entered and

13     something other, I'm not sure.  I'm not moving off of

14     the 11 and a quarter as of June.

15             MS. SHEVITZ:  But our position is the

16     defendants have not had use of that money.  It has

17     been --

18             THE COURT:  I understand.

19             MS. SHEVITZ:  -- frozen from them.

20             THE COURT:  They should have had interest

21     being paid on those accounts by JP Morgan.

22             MS. SHEVITZ:  That's what we're saying.  And

23     we a couple of times have contacted JP Morgan and

24     said as account holders we direct you to sweep the

25     money into an interest bearing fund.  To pay

26     interest.  We have asked the SEC to tell them to do

1

2      that.  We asked the U.S. Attorney.  We asked frankly

3      Judge Sullivan.  And unbelievably -- And investors

4      have complained about that too.  I don't know what's

5      going on and why here.

6              MR. BEGOS:  I just want to point out, your

7      Honor --

8              MS. SHEVITZ:  We haven't had the money.

9              MR. BEGOS:  -- on the prejudgment interest

10     question, this is as it relates to the GFRDA, it's a

11     precontract.  I understand there is an issue about

12     from when the Court would calculate it.

13             THE COURT:  Yes.  The real question becomes

14     whether some interest was paid subsequent to the date

15     that I said interest was owed.  That's the real

16     question raised at this point.

17             MR. BEGOS:  And the Mayers in their -- in

18     their summary judgment motion have --

19             THE COURT:  I may have made a mistake

20     frankly.

21             MR. BEGOS:  As your Honor noted, the Mayers

22     also asserted unopposed that there was additional

23     interest due before that date that hasn't been paid.

24             THE COURT:  I understand all of that.

25             MR. BEGOS:  What I do want to just point --

26             THE COURT:  But because I relied on the

1

2    June 2004 statement, that was the amount as of that

3    date.  And I'm not sure -- I don't know what the

4    agreements were.  There were no papers from Vilar and

5    Tanaka.  Tanaka now says he wasn't served.  I don't

6    know.

7              MS. SHEVITZ:  He was at Terminal Island.

8              THE COURT:  I have no idea.  There was an

9    Affidavit of Service.

10              MS. SHEVITZ:  Yes, but it went to San

11    Francisco.

12              MR. BEGOS:  What I was trying to suggest with

13    respect to the interest, if it would make things

14    easier for the Court, I can talk to my clients with

15    respect to the numbers that are in the SEC affidavit

16    and see if they want to fight those numbers.  If they

17    say we'll consent to the Court finding that the

18    interest payments were whatever the SEC says, a

19    million three versus a million and change that the

20    Mayers said, at least that eliminates, and I can't be

21    sure that there will be a consent to that, but if

22    there is, then that eliminates one issue as to the

23    amount of interest that was paid.  Because I think

24    that's really all it is at this point.  We said there

25    was interest paid.  They have said that it's a couple

26    hundred thousand dollars more.  We're talking

1

2          about --

3                  THE COURT:  That is interest paid and

4          accepted --

5                  MS. SHEVITZ:  Yes.

6                  THE COURT:  -- through 2005.

7                  MR. BEGOS:  Through, I think, January of 2005

8          is the assertion.  What the Mayers said they received

9          a million through the end of 2004.  And I'm happy to

10         talk to them about the 2005 interest.  If they want

11         to, you know, concede or not oppose the allegation

12         that they received that interest, at least then we're

13         talking about a 20 some odd million dollar judgment.

14         I don't want to have a lot of dispute over a couple

15         hundred thousand dollars.

16                 THE COURT:  You're also talking about the

17         nine percent.  And I'm not sure -- I'm not sure the

18         dates.  I'm not sure that it was paid.  I didn't have

19         enough facts frankly in front of me.  There are other

20         facts now.  And again there is that whole issue of

21         giving the Mayers a priority, which I hesitate to do.

22                 MR. BEGOS:  I understand.  I understand those

23         issues.  And I guess I'm simply trying to see if I

24         can perhaps resolve one small part of those issues.

25         If the Court thinks it's helpful, I'm happy to talk

26         to my clients about that.  If the Court doesn't think

1

2        it helps resolve this, then we can stand on the

3        papers.

4              I do just want to point out the one argument

5        Ms. Shevitz just now made and Mr. Burger made

6        regarding the entitlement to prejudgment interest.

7        They have made the argument that prejudgment interest

8        can't be awarded against the defendant on a breach of

9        contract action unless there is evidence that he

10       actually had use of the money.  And that's just not

11       the law.  The law, the CPLR clearly says prejudgment

12       interest back to the date of default is mandatory in

13       a breach of contract case.  The Court of Appeals has

14       said clearly that it doesn't matter whether the

15       defendant had use of it or not.

16             A couple of cases that Mr. Burger cited

17       didn't relate to contract actions, concerned the

18       question whether prejudgment interest is punitive.

19       Whether you can award prejudgment interest, for

20       example, on a rent overcharge case when the tenant

21       has already been awarded treble damages, and the

22       Court of Appeals says --

23             THE COURT:  I understand all of that.  The

24       question becomes, was interest paid, was it accepted,

25       and then when was the breach and what interest should

26       be paid as of the date of the breach.  So, those are

1

2          issues.

3                   MR. BEGOS:  Is your Honor looking for more

4          submission from us on any of those points?

5                   THE COURT:  I would like to know, as I said,

6          what I would like to know is how much money there is

7          in the pot and how much money is owed to the

8          investors -- to the investors.

9                   MR. BEGOS:  I'm not sure that any of us will

10         be able to answer any of those particular questions,

11         your Honor.  We can tell you what the receiver has

12         said.  We can tell you what claims have been

13         submitted by claimants.  So it's clear, for example,

14         there is a register of all of the people who have

15         submitted claims and there is a total.  I don't know

16         40 or $60 million.  Whether those monies are actually

17         owed, we couldn't tell you.  And the accounting that

18         the receiver has done now is by the receiver's own

19         admission, it's not a final accounting.  It's

20         attempting to sort of equalize peoples claims for

21         purposes of the interim distribution.  For example --

22                  THE COURT:  He's dealing with it as though it

23         is a bankruptcy --

24                  MS. SHEVITZ:  Yes, it is.

25                  THE COURT:  -- which is not the appropriate

26         way to do it.

1

2          MS. SHEVITZ:  And the SEC is cheerleading

3     that, because they have a bankruptcy guy in the SEC.

4     And they keep citing a case called SEC versus Byers,

5     which is a Ponzi scheme case, which by definition it

6     was going to be in bankruptcy.  This is not that.  It

7     is a solvent entity.  The defendants have claims to

8     management fees.  And the receiver, believe it or

9     not, within a two week period, when he made these

10    motions recently to set claims and distributions,

11    changed his analysis on a dime.  First he allocated

12    certain amounts to all the investors, and within a

13    week, I think a week or two, he came back.  I can

14    give you the document numbers, but I can't give you

15    the dates, because I'm dealing with those.  In

16    document 355 he sets claims, and they were really

17    about the amount of the account statements.  Although

18    he collected crazy NAVs, based on non NAVs that were

19    not in the accounts.  Then the interest rates, he set

20    crazy interest rates as if the fixed deposit

21    agreements went on into infinity, when actually they

22    were a one year deal, and the interest rates drop,

23    which were shown in the accounts, but he didn't look

24    at them.  He did not look at the Amerindo books and

25    records.

26          THE COURT:  Well, I don't know frankly what

1

2          the contracts with each investor were.

3                    MS. SHEVITZ:  Right.

4                    THE COURT:  So, I'm not going to make any

5          kind of judgment as to that.  There may well have

6          been contracts, and there may have been interest

7          amounts that were suppose to be paid.  I have no

8          idea.

9                    MS. SHEVITZ:  I hear you.  Then he changed

10         it.  Document 370.  He said he's going to reduce a

11         lot of people's amounts, because he's going to

12         equalize it as if it is a bankruptcy.  I don't know

13         if he used those words.  And he reduced theirs, their

14         amounts.

15                   THE COURT:  Referring to the Mayers?

16                   MS. SHEVITZ:  Yes.  He reduced -- There are

17         five people who testified at trial.  Believe it or

18         not, he took all of those five people, each and every

19         one of them, he reduced their amounts.  Those were

20         the ones they are supposedly protecting by this whole

21         nine year long criminal case.

22                   So, the second thing pending, in document 370

23         he's reducing the amounts for all of those and

24         reallocating them somehow.  And he still hasn't done

25         an analysis of the private equities, which was the

26         first thing that Judge Sullivan ordered him to do in

1

2          the first receivership order.  And we are just

3          tearing our hair out.

4                    THE COURT:  Look, at this point do I have

5          permission to speak to Judge Sullivan?

6                    MR. BEGOS:  Yes, your Honor.

7                    MR. BURGER:  Yes, your Honor.

8                    THE COURT:  Okay.  And I would just ask the

9          moving parties to order the record and e-file it.

10                    MR. BEGOS:  We will.

11                    MS. SHEVITZ:  To what?  I'm sorry.

12                    THE COURT:  Order the record and e-file it.

13                    MR. BEGOS:  And can I request as a

14          housekeeping matter, either that Ms. Shevitz file a

15          Notice of Appearance or that the Court direct her to

16          file?

17                    THE COURT:  Yes.  Absolutely.  And give your

18          appearance to the reporter as well.

19                    MS. SHEVITZ:  Okay.

20                    THE COURT:  I'm reserving on this.  I just

21          don't have enough facts to make a decision.

22                    MR. BEGOS:  Should I submit the receiver's

23          proposed motion, which probably contains as good

24          information as we can get for your Honor.

25                    THE COURT:  Yes, I would appreciate it.

26                    MR. BEGOS:  Very well.

1

2          MR. BURGER:  Thank you, your Honor.

3          MR. BEGOS:  Thank you, your Honor.

4          MS. SHEVITZ:  This says I've been retained as

5     an attorney.  I'm a pro bono attorney.

6          THE COURT:  Just change it.

7          MS. SHEVITZ:  That's what I am in all of

8     this.  It's my career.

9          MR. BEGOS:  Your Honor, the receiver's

10     motion, should I e-file those or send them in a

11     letter to the Court?

12          THE COURT:  I prefer you to e-file them so

13     then I'll have easier access to them and it is less

14     paper, if you can do it.

15          MR. BEGOS:  I'll see if I can.

16          THE COURT:  If not --

17          MR. BEGOS:  Then do you want courtesy copies

18     of the e-filed documents?

19          THE COURT:  You know what, if it's too big,

20     don't bother.

21          MR. BEGOS:  Okay.  Very well.  Thank you.

22                         ooOoo

23     Certified to be a true and accurate transcript of the

24     above-captioned stenographic minutes.

25     _____

26     Lori Ann Sacco, Official Court Reporter