UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X

UNITED STATES OF AMERICA,

               Plaintiff,

                                   05 cr 621 (RJS)

     -against-


ALBERTO WILLIAM VILAR AND GARY TANAKA,

               Defendants.

_____X




MEMORANDUM IN ANTICIPATION OF THE SENTENCING OF ALBERTO VILAR,
AND IN SUPPORT OF THE DEFENDANTS' MOTION FOR A NEW TRIAL




                              Vivian Shevitz
                              Attorney for Defendant
                               ALBERTO VILAR
                               And, On Motion For New Trial,
                               For Gary Tanaka
                               46 Truesdale Lake Drive
                               South Salem, New York 10590
                               914 763 2122
                               Vivian@shevitzlaw.com


Of Counsel
Ying Stafford

TABLE OF CONTENTS

**GUIDELINE CALCULATIONS AND 18 U.S.C. § 3553 FACTORS**

Prior Loss Determination                                                      2

Loss Analysis In Securities Cases                                            7

"Transaction Causation" Distinguished from "Loss Causation"                  9

Alternative Theory of Loss                                                   18

**An Individualized Assessment of the Circumstances of the Offense, the Identification of Assets Sufficient to Cover Amerindo Panama Investors' Accounts, Arguments Made Evidencing Ineffectiveness of Counsel, and the Prior Punishment of Alberto Vilar, Warrant a Sentence of Time Served Under 18 U.S.C. § 3553(a)**                 **23**

Alberto Vilar's Service To This Country                                      26

Alberto Vilar's Philanthropy                                                 27

Alberto Vilar's Isolation And The Effect Thereof Is Punishment              32

The Sentence Already Served Is Sufficient                                    33

A Sentence of More Than Time Serves No Penological Purpose                  35

**3553(a) Factors:  The Government Discusses Trial Evidence That In Part Does Not Support What The Government Claims, and in Other Parts Presents A False Picture Premised On An Ineffective Defense**                                        **36**

**Forfeiture Should Be Tried Before A Jury**                                **40**

**Restitution Has Not Been Proven By The Government As It Has Not Evaluated The Securities Withheld By The Action Of The Asset Freezes**                   **46**

**A New Trial Should Be Granted Under Federal Rule of Criminal Procedure 33, Or Alternatively 28 U.S.C.§ 2255 Based On Ineffective Assistance Of Counsel; While The Decision On A New Trial Can Be Made After Further Consideration Of These Arguments And Their Bases, At Least The Factual and Legal Claims Advanced By The Government Under 18 U.S.C. § 3553(a) Should Be Considered In Light of These Showings**   **50**

Defense Counsel Failed to Defend Against Charges That – After the Government Found Out That Lily Cates and Lisa Mayer Were Not Clients of Amerindo U.S. – Turned Into An Accusation That "Panama" Was "Dirty", That Lily Cates Didn't Know She Invested In Panama, That Any Panama Product Was A Sham And That "Amerindo" Money (Though Returned To All Amerindo U.S. Investors) Was "Lost" To Panama Investors; There Was No "Theft", No "Missing Money", No "ATGF Fraud"                                                                       50

The Mistaken Impressions Left By Defense Counsels' Failure To Rebut, As Pressed Now By the Government On This Resentencing                                       57

Amerindo Panama was not a shell, sham, non-existent, or fraudulent corporation.    58

Counsel Did Not Rebut The Notion Of "Theft" By Reason Of Withdrawal From One Linked
Amerindo Panama "House Trading Account"                                                   62

The Securities Laws Do Not Apply To Defendants' Business In Panama and  London          66

Counsel Failed To Develop The Limited Defenses Raised in the Criminal Case – that the
Disputes were Contract Claims That Should Not Have Been Handled as Criminal Matters      67

When The Government Pivoted To A Charge That Panama Was "Dirty", Defense Counsel
Should Have Pivoted As Well                                                              71


Counsel's Failures Caused Prejudice and Were Not "Strategic"                             75

**CONCLUSION**                                                                           **80**

TABLE OF AUTHORITIES

## Cases

*Alleyne v. United States*, 133 S. Ct. 2151 (2013) ......................................................... 15, 16, 40, 41

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ................................................................. 15, 40, 41

*Capital Management Select Fund Ltd. v. Bennett*, 680 F.3d 214 (2d Cir. 2012) ......................... 66

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ............................................. 7, 8, 10

*Erica P. John Fund, Inc. v. Halliburton*, 563 U.S. ___, 131 S.Ct. 2179 (2011) .......... 2, 10, 11, 14

*Harrington v. Richter*, 562 U. S. ___, 131 S.Ct. 770 (2011) ........................................................ 54

*Hinton v. Alabama*, 134 S.Ct. 1081 (2014) ........................................................................... 54, 74

*In re National Australia Bank Securities Litigation*, 03 cv 6537 (BSJ) (*Morrison*, District Court
  case (S.D.N.Y. 2004) ........................................................................................................ 73

*Kaley v. United States*, 133 S.Ct. 1580 (2014) ........................................................................... 41

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) ............................................................................ 79

*Libretti v. United States*, 516 U.S. 29 (1995) .............................................................................. 40

*Mayer v. Vilar*, 603234/2004 (N.Y. Supreme Court, N.Y. County) ........................................... 67

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. __, 130 S.Ct. 2869 (2010) ....................... passim

*Porter v. McCollum*, 558 U.S. 30, 130 S.Ct. 447 (2009) ............................................................ 27

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989) ................................. 41

*SEC v. Razmilovic*, 728 F.3d 71 (2d Cir. 2013) ..................................................................... 20, 48

*Southern Union Co. v. United States*, 132 S. Ct. 2344 (2012) .................................................... 40

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................................................... passim

*United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006) ................................................. 33

*United States v. Andrews*, 146 F.3d 933 (D.C. Cir. 1998) ............................................................ 51

*United States v. Arledge*, 553 F.3d 881 (5th Cir.2008) ............................................................ 17

*United States v. Chalupnik*, 514 F.3d 748 (8th Cir. 2008) ............................................................ 17

United States v. Cleveland, 1997 WL 537707 (E.D. La. Aug. 26, 1997) .................................... 43

*United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) .................................................................. 8

*United States v. Fair*, 699 F.3d 508 (D.C. Cir. 2012) .................................................... 12, 14, 17

*United States v. Germosen*, 139 F.3d 120 (2d Cir. 1998) ............................................................ 46

*United States v. Henry,* 472 F.3d 910 (D.C. Cir. 2007) .............................................................. 16

*United States v. Hernandez*, 604 F.3d 48 (2d Cir. 2010) .............................................................. 9

*United States v. Mahaffy,* 693 F.3d 113 (2d Cir. 2012) .............................................................. 60

*United States v. Maldonado*, 996 F.2d 598 (2d Cir.1993) ............................................................ 9

*United States v. Marino*, 654 F.3d 310 (2d Cir. 2011) .............................................................. 46

*United States v. Niebuhr*, 456 Fed.Appx. 36, 2012 WL 147906 (2d Cir. 2012) (*Rutkoske II*) ....... 8

*United States v. Petruk*, 484 F.3d 1035 (8th Cir.2007) .............................................................. 17

*United States v. Polouizzi*, 687 F. Supp. 2d 133 (E.D.N.Y.), *vacated on other grounds*, 393 Fed.

   Appx. 784 (2d Cir. 2010) ........................................................................................................ 40

*United States v. Porcelli*, 865 F.2d 1365 (2d Cir. 1989) ................................................ 42, 45, 78

*United States v. Quintieri*, 306 F.3d 1217 (2d Cir. 2002) ............................................................ 9

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) ............................................................ 15, 47

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007) ...................................................... passim

*United States v. Santos*, 553 U.S. 507 (2008) ........................................................................ 44

*United States v. Stanley*, 54 F.3d 103 (2d Cir.) ("Stanley II"), *cert. denied*, 516 U.S. 891 (1995)  9

*United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996) ................................................................ 43

*United States v. Wilkes*, 2014 WL 928256, No. 11-50152 (9th Cir. March 10, 2014) ................ 40

*United States v. Zangari*, 677 F.3d 86 (2d Cir. 2012) ...................................................... 14, 17, 46

*Wiggins v. Smith*, 539 U.S. 510 (2003) ................................................................................ 85

## Statutes

15 U.S.C. 78dd(b) (Section 30(b) Exchange Act) ................................................................ 72

18 U.S.C. § 3553 .............................................................................................................. 7, 8, 42

18 U.S.C. § 3553(a) ........................................................................................................... passim

18 U.S.C. § 3664(e) ................................................................................................................ 52

18 U.S.C. § 3664(f)(1)(A) ....................................................................................................... 52

21 U. S. C. § 853(a) ............................................................................................................... 47

28 U.S.C. § 2255 .................................................................................................................... 46

Section 30(b) of the Exchange Act, 15 U.S.C. 78dd(b) ........................................................ 72

## Sentencing Guidelines

U.S.S.G. § 2B1.1 .................................................................................................................... 22

    U.S.S.B. 2B1.1, Application Notes 3E(i) and (ii) ............................................................ 3-4

U.S.S.G. § 5H1.11 .................................................................................................................. 32

U.S.S.G. § 6A1.3 .................................................................................................................... 22

## Rules

Fed. R. Crim. P. 32(e) (2) ....................................................................................................... 50

Fed. R. Crim. P. 32.2 ........................................................................................................... passim

Fed. R. Crim. P. 33 ...................................................................................................... 45, 46, 56

## Articles

Amerindo's Vilar Charged With Stealing From Client, May 27, 2005 (Bloomberg)................... 56

Big U.S. banks must boost capital, *Reuters*, April 8, 2014,
   http://www.reuters.com/article/2014/04/08/us-financial-regulations-leverage-
   idUSBREA3709B20140408 ) ................................................................................................ 82

How Delaware Thrives as a Corporate Tax Haven,
   http://www.nytimes.com/2012/07/01/business/how-delaware-thrives-as-a-corporate-tax-
   haven.html?_r=0 ................................................................................................................ 67

Stith, *Federal Sentencing:  One-Way Ratchet*, New York City Bar Association First Annual
   Conference on White Collar Crime (May 2012) ................................................................. 40

U.S. judge accepts SAC guilty plea, OK's $1.2 billion deal," Apr 10, 2014.
   *http://www.reuters.com/article/2014/04/10/us-saccapital-crime-idUSBREA391B520140410* 55

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————X

UNITED STATES OF AMERICA                                05 cr 621 (RJS)

  -against –                                                        ALBERTO VILAR'S
                                                                         SENTENCING MEMORANDUM
                                                                         AND MEMORANDUM IN
ALBERTO VILAR and GARY TANAKA,                           SUPPORT OF MOTION FOR
                                                                         NEW TRIAL
               Defendants.
————————————————————————X

       The Court has set resentencing of the two defendants for April 24, 2014.  This

memorandum is respectfully submitted on behalf of ALBERTO VILAR in anticipation of his

resentencing.  It is also submitted on behalf of both defendants' motion for a new trial under Fed.

R. Crim. P. 33, pursuant to its "excusable neglect" provision, based on the ineffective assistance

of their trial and sentencing counsel, which led to a defective sentence and continue to underlie

"misunderstandings" that have led to punitive government's positions under 18 U.S.C. § 3553(a),

which  should have been corrected and defended.

       **<u>GUIDELINE CALCULATIONS AND 18 U.S.C. § 3553 FACTORS</u>**

       The government asks for the same sentence based on the same Guideline calculations,

including alleged "losses" of the entire account statement amounts of the "victim"- investors.

Defense counsel had acceded to the argument that the only inquiry should be *credits* against

losses.  There was never a determination of "losses" under relevant case law in the first place.

The Court of Appeals affirmed the methodology and the result using that methodology.  Now

that the receiver had "discovered" in the SEC case the millions and millions of dollars in

Amerindo Panama assets that were "there" all along, we argue the standard set by the Court of

Appeals in *United States v. Rutkoske*, 506 F.3d 170, 178, 180 (2d Cir. 2007), and by the Supreme

1

Court in *Erica P. John Fund, Inc. v. Halliburton,* 563 U.S. ___, 131 S.Ct. 2179 (2011), which distinguishes "loss causation" from "transaction causation."  The prior sentence presumed that because there were "transactions" induced by fraud, there were "losses" of the full amounts of the "accounts".  The *accounts* – which *are* "the securities" at issue here -- did not 'lose value" by reason of any identified "offense conduct".  There were many other factors, as discussed below. Perhaps (as we argue) there was a "loss" of the time value of the funds that "should have been returned"; that loss is far below the numbers the government keeps using; the government has not satisfied *its* burden of demonstrating "loss causation."  Further the government did not discuss the Court's ruling in on January 29, 2010, that the value of the assets being discovered then was relevant "at a minimum" under 3553 (DOC 408).  We discuss these matters at some length because of the weighty decisions this Court must make after a decade of prosecution of the defendants.

**Prior Loss Determination**:  In this case the government took the position that <u>all</u> of the money that the defendants "received" by reason of what the Court of Appeals has affirmed to have been fraudulently induced transactions -- misstatements to the GFRDA investors and to Lily Cates concerning the nature and quality of the securities -- constitutes "losses".   Thus, the government posited, the entire "account" of the "defrauded" investors was "lost", and the "loss" amount should be determined to have been that full amount for purposes of the guidelines.

Defense counsel did not challenge that basic assumption, and, ineffectively, failed to value (or press the government to value) the Amerindo Panama holdings (which the government controlled either directly, or indirectly, through failure to allow defendants to have an active hand in the management of the fund  or  to  allow  them  to  challenge  JP Morgan's  refusal  to release funds to the defendants or to take direction from them as to how those funds were to be

treated by that custodial bank Thus, though the applicable fraud guideline requires – to determine a "loss" increase in a securities case -- a determination of the <u>reduction that resulted from the offense in the value of equity securities or other corporate assets</u>"  (USSG 2B1.1, Application Note  3(A) (ii) ("actual loss"), (iii) pecuniary harm), (C)(v)  (emphasis added) --the government, and the defense, ignored the value of the actual security still held by Amerindo Panama (securities which were *defined* as "accounts" for GFRDA investors and also for Lily Cates, who had a conglomeration of different investments in her "account).  Instead, at the sentencing phase of this case, they assumed that the value of the securities – the principal -- at the time of the "offense conduct" was in fact "lost."   The government stated on December 14, 2009 that its position was "straightforward":  that "the loss" was $41,700,000 – the amounts of money the defendants' *received* from the securities sales -- and that neither moneys paid previously, nor money in Bear Stearns accounts – "should operate to reduce the loss."  (December 14, 2009 Tr. 5-6).  In other words, a "loss" of principal was assumed.  Neither prior payments, nor money in what has now (but not then) been identified as "investor accounts", the government argued, should constitute *credits* against the "losses" of the full amounts that Amerindo had "received", despite it being credited on the *accounts.*[1]    (See December 14, 2009 Transcript pp. 39-44, discussing and analyzing only the "credits-against-losses" provisions of the fraud guideline, U.S.S.B. 2B1.1, Application Notes 3E(i) and (ii).)[2]

---

[1] "[T]he government is arguing that the amount of the principal reinvestment that was not returned to them qualifies as a loss amount.  That's the nub of the government's argument." (December 14, 2009 Tr. 10).

[2] This Court attempted to determine whether those moneys *should* be considered in evaluating whether there were "losses" in the first place.  But the Court got insufficient (and ineffective) help from defense counsel; while Mr. Marks started to make the "right" argument, Mr. Colton, who had eschewed his client's attempt to have him present David Ross's report, did not.  Both did not challenge the government's return to the notion of credits *against* losses:

"So I don't think the government ever tried to take the  position that these accounts consist of nothing but the GFRDA money.  In fact, these accounts consisted of a whole host of  different things.  We may be able to use these funds to make restitution to the victims here or it may be that there is  going to be claims filed by various ATGF investors.  I don't  know how that's all going to shake out.

THE COURT:  Is that relevant to calculating the loss?

MR. KLEIN:  It's not.  I don't think it is.

THE COURT:  If you had a situation in which the defendants or any defendants induced investors to put up a million dollars in a fund with a high rate of guaranteed income annually, similar to what has been alleged here, and then the defendants could no longer make good on the investment income, they had access to enough money that they could make good on the demand of principal but chose not to, and just gave people the runaround and said, you can't do it, you need to wait another year, you missed your window of opportunity, did all sorts of things to deny people the opportunity to access their principal, get their principal back, but at the end of the day, after the indictment and after arrest warrants are issued, there was still enough money in the assets of the defendants to cover principal, is that loss?

The answer should have been "no"; there may have been a "fraud"—i.e., a transaction induced by fraud --  but there was no pecuniary loss in the value of the security, other than the loss of the time value of obtaining the return of that money at the time the investor sought and was entitled to return of the principal (though Amerindo Panama was in fact crediting interest throughout).  But defense counsel did not say so, and allowed the prosecutor to argue "credits" against losses again:

MR. KLEIN:  I think that's loss.  You can't just look at 3(E)(ii) [a provision dealing with *credits* against losses] by itself.  You have to look at 3(E)(ii) in conjunction with 3(E)(i), and 3(E)(i) says that the loss is reduced by the amount returned prior to detection of the fraud or prior to when a victim reasonably detected the fraud.  Then 3(E)(ii) says that when there is pledged collateral or collateral provided by the defendants, you can also reduce the loss by what is recovered prior to sentencing.

When reading those two portions of the comment note together, I believe that what 3(E)(ii) is talking about is pledged collateral.  So, in other words, collateral that's pledged in some way where you don't have to depend on the defendants to return the money.  And [Mr. Klein posited, incorrectly] what 3(E)(i) is talking about is the circumstance that your Honor was talking about, where the defendants possessed the assets but don't return the assets prior to detection of the fraud.  Otherwise, what is the point of differentiating between what is returned prior to detection of the fraud and what is not?

***

4

This is another example of Mr. Colton trying to conflate this notion that some of these investments were guaranteed. And there was some disagreement at trial about that. Tanaka tried to at some point pull out of the guarantee.

But I don't think you can do that. I think when you read the two subsections of that application note together, it's pretty clear that the circumstance that your Honor is talking about does not operate to reduce the loss because the defendants did not return it prior to detection of the fraud.

THE COURT: I wanted you to address the point Mr. Marks made, which was really the definitional section under application note 3, actual versus intended loss. He basically accused you of sliding past those two definitions.

MR. MARKS: I thought about the analogy that the Court made. I think it would be helpful --

THE COURT: Which one, the horse racing?

MR. MARKS: Exactly. I think the analogy is inapt and I will tell you why.

In this particular case, Mr. Vilar was a highly skilled investment analyst, and rather than putting the money into horses, he put the money into stocks with excellent fundamentals. Obviously, they were highly volatile stocks, tech stocks are highly volatile, but he knew that these stocks were good and they would eventually come back, and they have come back.

THE COURT: That's not what was told to the investors or at least that was brought out at trial.

MR. MARKS: That's absolutely right, Judge. To answer your Honor's question whether or not there would be a loss if the horse came in at Belmont, the answer is that there would be no actual loss. But there could very well be an intended loss because it was quite likely that the horse wasn't going to come in. In this particular case, Mr. Vilar had every expectation that the stocks would rebound, that the stocks would make a lot of money for investors. They had in the past and they are right now. So I don't think this is like putting the money on a filly at Belmont at all.

THE COURT: It is maybe the difference between promising someone you are going to put it on favorites and putting it instead on long shots.

MR. MARKS: Fair enough. But if the people don't lose any money, there is no actual loss. And there was no intended loss.

THE COURT: Because he thought he was going to actually pick the right horse?

MR. MARKS: No. My point is these weren't horses. He had every expectation that these stocks would do well.

THE COURT: I want to be clear on this. So your view is that I can tell you I am going to invest your money, you as an investor, in safe investments, including Treasuries, take that money and put it on very volatile stocks without your knowledge, and as long as I really believe in my heart of hearts and cross myself every night and say I believe that this long shot volatile stock is going to come in, that's OK?

Without help from the defense as to how to determine whether there were "losses" in the first place, this Court rejected the theory that there should *credits* against "losses".  And as the government points out, the Court of Appeals *affirmed* that methodology and the result.

We do not challenge the methodology of denying "credits" against the assumed losses, as the government and defense counsel argued it previously.  However, it was never argued previously that there was no "loss" to begin with because there was no reduction in the value of the security still held by Amerindo Panama (frozen after May 25, 2005), much less under the proper legal standard.

It was not argued because, simply put, defense counsel had ineffectively failed to investigate the assets or the claims, or to hold the prosecutor to its obligation to come up with a valuation in the first place, of the principal trapped in the "accounts" (the securities at issue), to determine whether there was a "reduction" in that value occasioned by any "offense conduct" on the part of the defendants.  At this *de novo* resentencing, given the "disclosures" of "enough assets" that have come to light (but not fully) in the SEC receivership, we do make this "new" argument, on new facts and under the proper legal analysis so that we too are not ineffective in defending against the government's position.  ).  *See  United States v. Yauri*, 559 F.3d 130 (2d Cir. 2009) (vacating and remanding for counsel's ineffective failure to challenge sentencing court's calculation of loss amount and failure to call court's attention to 2-level reduction).

---

MR. MARKS:  Of course it's not OK.  That's securities fraud.  There is no question about it.  But the loss is not the amount of money that the investors put into the fund.
If Mr. Vilar reasonably foresaw, and I suggest that he did, that these stocks would in the long run do well, then there is no intended loss.
MR. KLEIN:  Just to cut this short.
THE COURT:  I do want to cut this short.
MR. KLEIN:  We are not alleging intended loss here.

We note first that there was no jury finding as to "losses" as the issue was never presented to the jury.  Nor was there ever any finding of "theft" or "misappropriation" of assets of any investor, including Lily Cates.   The government included "theft" accusations within the broad parameters of the count one conspiracy count (or as "intertwined" conduct) -- or simply argued that there had been misappropriations by showing withdrawals from the one Amerindo house trading accounts into which Ms. Cates' funds were deposited initially.

These allegations were not the subject of any verdict, were not the "gist" of the Count One conspiracy or any other charge, and were not shown to have been proven beyond a reasonable doubt or by any standard.   Rather the only "offense conduct" proven (and sustained now by the Court of Appeals) is that as to *three investors*, their purchases were "induced" ("transaction causation") by "lies" about the nature of the investment.

"Transaction causation", however, in any event, is not the same as "loss causation." They are two different concepts.  Defense counsel's failure to distinguish between the two, or to value the assets of Amerindo Panama or the claims, led to a sentencing proceeding and result that was defective –and vacated.

**Loss Analysis In Securities Cases**:  In *United States v. Rutkoske*, 506 F.3d 170, 178, 180 (2d Cir. 2007), the Second Circuit rejected the government's argument that the U.S. Supreme Court's analysis in *Dura Pharmaceuticals, Inc. v. Broudo ("Dura")*, 544 U.S. 336 (2005)  — a civil securities fraud case — does not apply to criminal sentencing (an argument paralleled by the government's rejected argument in *this* case that *Morrison* does not apply to a criminal securities fraud prosecution).  The *Rutkoske* Court found "no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a

defendant's sentence."   In *Dura*, the Supreme Court rejected the Ninth Circuit's "inflated purchase price" theory of loss causation, which held that plaintiffs in a civil stock fraud case could establish loss causation simply by showing that the purchase price was inflated because of the defendants' misrepresentation.  The Court observed that although an artificially inflated price might cause an investor's loss when the investor sells his shares "after the truth makes its way into the marketplace," other factors, such as changed economic conditions, might also contribute to a stock's decline in price – and it held that a plaintiff must *prove* that the misrepresentation (the offense conduct) proximately caused the economic loss.  544 U.S. at 346.

*Rutkoske* (citing *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006)) rejected the government's attempt to "reflexively calculate[e] the loss amount associated with *Rutkoske's* crimes by reference to the total amount lost by *Rutkoske's* victims in their transactions with *Rutkoske's* brokerage firm."   A court in a securities case must determine whether a "loss" (if it exists) "could have been caused, at least in part, by factors other than [the defendant's] fraud", including factors such as `market forces'" *Rutkoske*, 506 F.3d 170, 178, 180 (2d Cir. 2007).

There can be securities fraud *without* any "loss" under the "guidelines".  In *Rutkoske* itself on remand, the district court held that the government had failed to establish *any* loss amount for purposes of calculating the Guideline range but ordered Rutkoske to pay restitution. (The Court of Appeals affirmed.  *United States v. Niebuhr*, 456 Fed.Appx. 36, 2012 WL 147906 (2d Cir. 2012).  Restitution, the Court recognized,  is a related but different calculation under the sentencing statutes. That is, there was "fraud" conduct, inducing a transaction, but no "loss causation" sufficient to warrant an adjustment of the basic fraud offense level.

Such is the case here, we respectfully suggest – or at least any "loss" is measured by the time value (interest) on the funds not returned when Ms. Cates and the Mayers requested their

redemptions on maturity or rescission of their accounts, not the amount of "receipts", or the full "accounts" – because at the time of the shutdown and freeze that removed any notion of "loss causation" from the equation, these investors' accounts were fully funded by assets the *value* of which remained (and remains to this day).  These new facts came to light only after the prior sentencing.  They must be considered at this resentencing *de novo,* along with the Guidelines' definitions *not* of "credits" *against "losses"*, but of the meaning of "losses" and "loss causation" in securities cases in the first place.[3]

### "Transaction Causation" Distinguished from "Loss Causation"

In every securities case, the issue of "loss" is determined by looking at the value of the "the security" after "the fraud" (alleged to have produced "the loss") as compared to the value when purchased or when it "should have been redeemed."   If there is no loss in value "caused" by the offense conduct, there may have been "transaction causation" – which is what the Second Circuit affirmed here in connection with three investors whose transactions the Court of Appeals found to have been "domestic" (hence regulated by the securities laws in the first place)  – but "loss causation"  has not been proved.

That these are different inquiries (a concept apparently lost on, or not advanced by, prior defense counsel here, based on a deficient investigation) is highlighted by the Supreme Court in

---

[3] When a sentence has been vacated for a *de novo* resentencing "the defendant is placed in the same position as if he had never been sentenced." *See United States v. Maldonado*, 996 F.2d 598, 599 (2d Cir.1993).  Where a defendant is entitled to a *de novo* resentencing, a district judge would be required to update the district record and re-weigh the factors contained in 18 U.S.C. § 3553(a).  *United States v. Hernandez*, 604 F.3d 48, 56 (2d Cir. 2010).   Further, while the "mandate rule" ordinarily forecloses relitigation of all issues previously waived by the defendant or decided by the appellate court, when a case is remanded for *de novo* resentencing, the defendant may raise in the district court and, if properly preserved there, on appeal to the court of appeals, issues that he or she had previously waived by failing to raise them. *See United States v. Stanley*, 54 F.3d 103, 107 (2d Cir.) ("Stanley II"), *cert. denied*, 516 U.S. 891 (1995).   *United States v. Quintieri*, 306 F.3d 1217, 1224 (2d Cir. 2002).

a decision rendered after the trial and after sentencing in this case, *Erica P. John Fund, Inc. v. Halliburton Co*., 563 U.S. ___, 131 S.Ct. 2179 (2011) ("To prevail on the merits in a private securities fraud action, investors must demonstrate that the defendant's deceptive conduct caused their claimed economic loss. This requirement is commonly referred to as "loss causation.") The Court made clear:  "Loss causation addresses a matter different from whether an investor relied on a misrepresentation, presumptively or otherwise, when buying or selling a stock."

 *Erica P. John Fund,* a unanimous opinion by Chief Justice Roberts holding that proving "loss causation" at the class certification stage was neither required nor justified, rejected the Fifth Circuit's decision requiring proof of loss causation at that stage.  The Court held that the Fifth Circuit had improperly conflated the separate elements of reliance—sometimes referred to as "transaction causation" (*Dura Pharmaceuticals*, *supra* , at 341–42) —and loss causation, stating:  "The fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory."  Securities class action plaintiffs must still prove loss causation to prevail on the merits of their securities fraud claims, but not at the class certification stage.

 Here, what the government has proved (to the satisfaction of the Second Circuit) is that three investors were induced to purchase securities (which was also the "mail fraud scheme") in connection with "domestic transactions" by virtue of what it labeled material misstatements. Though the government did not have to prove "reliance" in this criminal case, the verdict, affirmed by the Circuit, must be read to mean no more than that Lily Cates, the Mayers, and Graciela LeCube-Chavez, were "caused" to enter the purchase transaction by virtue of misstatements either that (a) the SBA had licensed the SBIC fund, or (b) that money from the

GFRDA investment would be invested on only in the tech stocks that were the focus of defendants' expertise, but also short term liquid sovereign debt, which bore on "liquidity" and availability for redemptions.

The jury, again, was *not* asked to, and did not, determine either whether there was a loss, or whether *that* "offense conduct" "caused" any such loss.

The Court of Appeals, however, no doubt cognizant of *Rutkoske* and of the *Erica P. John* requirement of proving that "offense" conduct "caused" a loss before an investor can recover (or claim "loss" in a criminal case), instructed this Court to determine the "offense conduct" before determining whether there is a "loss" and if so, the amount. ("... on remand, the District Court must decide what acts constitute the offense conduct for the purposes of calculating the appropriate loss amount at sentencing." (Opinion DOC 527, 10-521, pp.2, 54))

The government has done little to narrow down a description of "offense conduct" to determine whether, and what, was a "loss". Rather, at p. 1 of its letter of March 31, 2014, it sets forth its broad allegations, talking about a supposed 20-year crime of misstatement and theft, consistent with the indictment allegations.[4]

---

[4]    The prosecutor writes (March 31, 2014 letter p.1):  "For a twenty-year period ending in 2005, Vilar and Tanaka perpetrated a brazen scheme to defraud investors by soliciting millions of dollars under false pretenses, failing to invest investors' funds as promised, and misappropriating and converting investors' funds to their own benefit and the benefit of others.  To execute the scheme, the defendants solicited and caused others to solicit victims to invest in fraudulent investment products, including products called the "Guaranteed Fixed Rate Deposit Account Program" and the "Amerindo SBIC Venture Fund LP." The defendants failed to fulfill their promises to investors by, among other things, failing to invest the funds as promised, unilaterally changing the terms of the investments, embezzling client funds, and failing to redeem the investments upon the investors' requests."

This is an exceptionally broad statement in a case where, at bottom, it proved transaction fraud as to a mere three investors, and after the SEC monitor exonerated defendants in connection with their conduct of Amerindo U.S., 98% of defendants' business.  After almost a

Obviously this is not the type of "offense conduct" to which a "loss" can be *causally* tied. In the first place, even after supposedly inducing transactions 20 years ago, the defendants *paid* investors regularly, in amounts far exceeding their investments.  Any unidentified statements did not "cause" any specific loss *United States v. Fair*, 699 F.3d 508, 513 (D.C. Cir. 2012).

In the second place, there has been no "theft" – the theme of the arrests in 2005, which has not been proven.  In this ninth year of prosecution, the receiver has finally made the statement at least three times that there *is* enough, in various investments maintained by and on behalf of Amerindo Panama (as any financial institution taking investor deposits would do), to *cover* investor accounts as of the last date Amerindo managed them.  (Receiver's First Report, May 30, 2013; Receiver's Motion to Set Claims, DOC 355, 05 civ 5231; Receiver's Amended Motion to Set Claims, DOC 370, 05 cv 5231).   Moreover, the Receiver expects (though he has not completed work) a *surplus*.

Despite this (post-indictment, post-trial, post-sentencing) "discovery" of *millions and millions of dollars* – sufficient to cover all investor accounts as of May 2005 (which the receiver has added up to either $42 or $46 million, depending on which of his analyses one chooses to accept (DOCS 355, 370, SEC v. Amerindo, 05 cv 5231, though he is still collecting more) – the government *continues* to take the pre-indictment and last-sentencing position that investors "lost" their entire accounts.  However, here, the government ascribes the "cause" of the alleged "loss" to the bursting of the internet "bubble", allegedly "in the fall of 2000."   Specifically, at page 3 of the March 31, 2014 sentencing letter, the government writes:   "Following the "bursting" of the Internet bubble in the fall of 2000, Vilar and Tanaka were unable to repay GFRDA investors. As a consequence, several investors lost millions of dollars. (Tr. 971-86)."

---

decade of prosecution, the government "came up" with "fraud" as against the same two investors it started off with in 2005, plus Graciela LeCube Chavez.

The transcript reference to which the government cites (Tr.971-86) ( Gov. letter, DOC 666 p.3) is to the testimony at trial of Lisa Mayer, not to any *proof* of loss of the *value of the account* (i.e., "the security") that remains to be distributed to the Mayers (albeit now, according to the receiver, in an amount less than their account statement, not because of anything the defendants "did" but because the receiver and the SEC have decided to handle disbursements "differently" (causing chaos to the investors and down and out "fights" among them, see 05 cv 5231).        As to Lily Cates, the government characterizes her "losses" again by the entire amount of her account (DOC 666 p.7)  – this time including not only the amount "obtained" from the SBIC investment, but non-disbursed interest, amounts from the Rhodes capital investment (on which she made over 700%) and supposed "thefts" of amounts that represented by transfers out of her account to another house account – a notion of "theft" that unfortunately was ineffectively defended by prior defense counsel ( who failed to show that house *trading* accounts where *not the same* as "client accounts", and that withdrawals from one house trading account did not mean that money was "stolen" or "misappropriated" (a finding that no jury has ever made). )

While it is true that the Mayers and Lily Cates did not "receive" the amounts in their accounts when they "should have", the "securities" at issue *are* "the accounts" – and the value of these accounts remain as if there had been no misstatement inducing any purchase or retention of securities, and indeed as if there had been no "delay" (or "Failure") to redeem on time.   And for all these nine years, the government has not "yet" proven that they do not have that value.

Any "loss" in value was occasioned by post-May 25, 2005 events brought about by Lily Cates' complaint to both the SEC and the US attorney, resulting in the shutdown of the Amerindo, the arrests of Mr. Vilar and Mr. Tanaka, their disenfranchisement as money

managers, the freezing of their assets, the refusal of the SEC and the receiver to accomplish a claims and payout process (though the receiver's *first* payout proposal (DOC 355) all but mirrored *defendants'* payout proposal offered in writing in July 2012 (and rejected by the SEC)[5]). Per *Rutkoske*'s and the *Erica P. John* principles, these are not "losses" "caused" by the "offense conduct" (much less conduct of which the jury convicted the defendants) but if there are "losses" they are occasioned by something outside of the defendants' control, including the failures of their prior lawyers to "do something" to bring about a distribution process earlier.

It is the government's burden to *prove* causally-produced losses, not speculate. As noted above, there are cases where there is securities fraud but no Guideline losses. The *Rutkoske* case, on remand, is one of those cases. *See United States v. Niebuhr,* 456 Fed.Appx. 36, 2012 WL 147906 (2d Cir. 2012) ("On remand, the district court (McKenna, J.) held that the Government had failed to establish any loss amount for purposes of calculating the advisory range under ...the Guidelines " but ordered restitution on a different basis). As stated in *Rutkoske* I: A defendant can only be held accountable for the losses that he caused; he cannot be held accountable for "[l]osses from causes other than the fraud," which "must be excluded from the loss calculation." *See also United States v. Fair*, 699 F.3d 508, 513 (D.C. Cir. 2012) (defendant's gain not the same as loss; gross proceeds inappropriate gauge of victim's lost profits) , citing, *inter alia*, *United States v. Zangari*, 677 F.3d 86, 93 (2d Cir. 2012) – and suggesting that an additional evidentiary hearing is the appropriate course).

---

[5] The government's accusation that defendants have stood in the way of getting money back to investors is untrue. Defendants advanced this payout proposal in July 2012, based on documents that had been submitted by Marc Litt and Sharon Levin, and urged the Court to appoint the Magistrate Judge to review (or "monitor") a claims process. The government and the SEC objected.

In this case the government has not satisfied its burden of *proving* "losses" *caused* by any "offense conduct" – much less the entire amount of the account, which it claimed, and still claims, is the correct number. Especially given the freezing of assets, the failure of JP Morgan to honor the defendant-account holders' directives to sweep funds into a money market account, the refusal of the SEC to allow defendants to manage funds, the failure of the government (even to this day) to "account" for the assets and claims it was told by Judge Swain on September 23, 2011 to assess and set forth (DOC 168, SEC case transcript), the government has not satisfied its burden of *proving* that defendants' words, or their business decision to "not give the money back" not offense conduct any jury accepted as criminal in the first place), at least a hearing is required before the court accepts the government's "explanation" (or lack of explanation) of "loss causation". *See also* the interesting article by former AUSA David Esseks, commenting on the *Rutkoske* and *Reifler* cases, and suggesting that reliance may well be an element of "loss causation."

*See*      http://www.internationallawoffice.com/newsletters/detail.aspx?g=ca6c729b-7f3c-419e-9c0b-7568d6beddec.

We suggest that, as Mr. Esseks wrote, reliance *is* a factor of "loss causation"; especially in this complicated case, it should be up to a jury, under a reasonable doubt standard, to determine whether, and to what extent, there was a "loss" to any of the investors, and if so whether that "loss" occurred by reason of any "offense conduct" of the defendants (which of course must have been proven to the jury, and identified as the "offense conduct" leading to such loss), as opposed to "something else." We further suggest that, in line with *Alleyne, Southern Union, Apprendi,* and the trend of cases that recognize the importance of a "loss" analysis to a sentencing decision especially in cases governed by Sentencing Guideline U.S.S.G.

15

§ 2B1.1, the standard to prove "loss", when it is the "tail" that "wags the dog", so to speak, should be beyond a reasonable doubt.

We recognize that courts have held that a preponderance theory applies to decisions about "loss" (and other adjustments) under the Guidelines.  However, the whole notion of the "preponderance" standard under the Guidelines is a creation of the Sentencing Commission, and not of common law, and is stated as a Commentary to a policy statement at U.S.S.G. § 6A1.3 ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.")  In his partial concurrence to the constitutional opinion, and dissent to the remedial opinion, in *Booker*, however, Justice Thomas believed that the Court's opinion had "correcte[d the Commission's] mistaken belief [that a preponderance standard is appropriate to meet due process requirements.]  The Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury or admitted by the defendant."  *Booker*, 543 U.S. at 319 n.6).

Several courts, even before *Alleyne*, and *Southern Union*, recognized the inconsistency of applying evidentiary standards below the "reasonable doubt standard after *Booker's* constitutionally- based opinion.   *E.g., United States v. Henry,* 472 F.3d 910, 920-21 (D.C. Cir. 2007) (Kavanaugh, J., concurring).    There is thus a change in the landscape.

Here, the government's case, at the beginning and to this day, was about "losses" to the clients of Alberto Vilar and Gary Tanaka.  On the day defendants were arrested, *Bloomberg News* reported, the prosecutor (David Esseks) told the Magistrate – and the press – that Amerindo had $1.2 billion under management, that **Amerindo had about $1.2 billion in assets under management as of July 15, 2004 (according to the complaint), that the "charges are**

very serious and very well-founded," and the government "fear[ed] that they are just the tip of the iceberg." http://www.bloomberg.com/apps/news?pid=newsarchive&sid=awllgf.n51hQ (May 27, 2005).   Despite the fact that the government has *not yet* determined the amount of investor claims *or* assets of Amerindo Panama – and despite the fact that an SEC Monitor found, by report in November 2005 that the $1.2 billion of assets under management by Amerindo U.S. had not been "lost," "stolen," or mismanaged (Monitor Report, included by prior counsel as an Exhibit to Franks hearing request (DOC 138-21, 8/30/06) but not used by counsel thereafter  to demonstrate the excessiveness of the charges and to defend against the prosecution in the first place) --  – the government has not moved from the position that *everything* the "victims" gave to Amerindo was lost.  This position – driven, we suggest, by the initial charges, but worse, not effectively challenged by defense counsel – still "drives" the sentencing proceeding.  No jury has determined "loss" of any kind resulting from "offense conduct."  We suggest that a standard of proof beyond a reasonable doubt is required when as here, a "loss" calculation drives the availability of a sentence far above the base offense level.

Regardless, however, it is clear that it is the government's burden in any case of loss or where restitution is involved, to *prove* losses, not assume that they exist.  *Accord*, *United States v. Fair*, 699 F.3d 508 (D.C. Cir. 2012) ("actual loss" cannot be equated to "gain" by the defendant, for "loss" calculation or for restitution purposes; MVRA's "authorization is ... limited to the actual, provable loss suffered by the victim and caused by the offense conduct. *See United States v. Zangari*, 677 F.3d 86, 91–92 (2d Cir.2012); *United States v. Arledge*, 553 F.3d 881, 898–99 (5th Cir.2008); *United States v. Chalupnik*, 514 F.3d 748, 754–55 (8th Cir. 2008) (*citing United States v. Petruk*, 484 F.3d 1035, 1038 (8th Cir.2007)); *United States v. Hudson*, 483 F.3d 707, 710–11 (10th Cir.2007); *Boccagna*, 450 F.3d 107, 115–17.).

### Alternative Theory of Loss

To the extent the Court does not accept the notion that there is *no* loss, there is an alternate theory more apt than valuing the security at issue as the "full amount" of the accounts. The securities at issue are, in fact, but "accounts" maintained with Amerindo Panama, such as was the GFRD account, and Lily Cates' account. Though it is the government's burden to *prove* losses in any case, the government did not accomplish this before the prior sentencing, and defense counsel ineffectively agreed with the government that the "full amount" of the accounts, because not paid back by the time of the trial, was "lost."

The receiver had not *yet* determined the amount of assets and claims of all investors, and the U.S. Attorney abandoned the effort completely though being instructed by the combined SEC/criminal case courts in 2010-14 to accomplish this task. This alone means that the government has failed in its burden to prove losses, and that the loss amount for Guideline purposes should therefore be zero. (We realize the Court of Appeals ruled that on the record, the loss was not zero, but it came to that ruling on the basis of a record where, as noted previously, different facts were before this Court, and ineffective arguments were made (assuming losses and discussing "credits" against losses).

For these purposes, if the Court declines to rule that the government has proved *no* loss under these unique circumstances, we suggest that "losses" "suffered" by Lily Cates, the Mayers, and/or Graciela LeCube Chavez, "caused" by any "conduct" of the defendants, as of the time of this sentencing, are limited to the loss of *interest* on the amount they "would have" received between the times the account been redeemed, and the last date that the defendants "had the money" but "did not give it back"  -- the "conduct" identified, finally, by AUSA Litt at the last sentencing hearing.  (At the sentencing proceeding on February 5, 2010, while the Court

18

was asking questions about the "disclosure" of still not-fully-valued assets in "investor accounts", AUSA Litt took the position, after agreeing that defendants had *not* run a Ponzi scheme, that "not giving it back, knowing that you have it, is a serious crime too." (February 5, 2010, Tr. 45).[6]   If this was the offense conduct supposedly causing a "loss", there was no diminution in the value of "the account" in the first place.

According to the evidence, the Mayers' GFRD account matured in December 2003 (though they had taken interest before then, and contrary to Lisa Mayer's trial testimony were not left destitute).   (The reality of the Mayers' investment, ineffectively "defended" by prior defense counsel, is being litigated in New York State Supreme Court.   As Justice Kornreich stated on the record, filed as DOC 421 in the SEC case, she "may have made a mistake)).   As of the time of the payouts, per Lisa Mayer's trial testimony, the Mayers had accepted a settlement (Tr.1179, stating she had accepted 5% interest going forward.   In the State court proceeding, there is evidence that the settlement involved a 4-year payout of principal and interest, and that the Mayers had accepted the first year's payout, plus more, totaling some $1.4 million in 2004.

---

[6]  "But not giving it back, knowing that you have it, is a serious crime too.   It's serious when for years you don't tell the truth to your clients and you stonewall them for information, and you know certain of those clients are suffering." (Tr. 45, 2-5-10).

Mr. Litt said he also rejected the notion that the money was there "all along", claiming that there was a $17 million "shortfall" because of the alleged claim to GFRDA funds from Dextra holdings.   (Sentencing Tr. 44).

We see now, from the receivership activities, that the money *was* there, and that there will likely be a surplus.   Moreover, the government did not appreciate (because for reasons unknown, Mr. Colton never specifically stated) that Dextra had been *repaid* in England by Renata Tanaka in or about June 2005 with her/ Gary Tanaka's funds (when, after the arrests and shutdown, Dextra made a demand for all its funds under the guarantee).   The prosecutor and this Court agreed that Dextra was not making a claim, but no one specifically stated that this redemption had been made It is unfortunate that defendants could not then  have achieved payouts to everyone.)

If the Mayers had removed their funds, and sought interest elsewhere, it is unlikely they would have made anything above 3% as interest on their accounts. We have computed 3% interest on the balance of their account, as well as interest at a 4.5 % rate (the last amount being paid by Amerindo on its fixed deposit accounts, per the account statements).  As of 12-03 (based on their actual account, as per the statement, maintained by Amerindo Panama and accepted by the Mayers throughout the decades), the interest theoretically "lost" because they did not receive the full amount of the balance as of 12-03, was $472,850, at the 3% rate, or $709,290.00 at the 4.5% rate.

As to Lily Cates, 3% interest on the balance due Lily Cates as of December 2004, when she sought a "total divorce" from Amerindo, amounts to $123.480; 4.5 % amounts to $185,220. We suggest that these amounts -- $472,850 and $123.480 – or the higher rate, actually being paid by Amerindo Panama (and which they would have received upon a payout), $709,290.00 and $185,220.00 -- constitutes the most that was "lost" by reason of "offense conduct" identified by the government to have been committed by the defendants.  The reason is:  the *value* of "the security" remained, and remains, intact and undiminished between the time it was "due" (in December 2003 for the Mayers (if they did not settle) or December 2004 for Lily Cates), and today's date.  (There should be no interest after May 25, 2005, because defendants did not have use of or ability to return funds.  *See SEC v. Razmilovic*, 728 F.3d 71 (2d Cir. 2013) (defendant not responsible for interest on frozen funds used for disgorgement to pay investors).  JP Morgan should be responsible for that interest as it was using the money.)

We offer this alternative especially because of the difficulty that everyone has had in identifying "offense conduct" that (not only "may have" but *did*) "cause" a "loss.  At most, the Court should assess "loss" as  the time value of the money to the Mayers and Lily Cates.

to Ms. LeCube Chavez, it is still unclear what amount of her account remained as of the time Amerindo was put out of business.  The receiver has changed the amount twice (and has also changed the amounts supposedly due the Mayers and Cates on their accounts).  (See Receiver's two motions to set claims in the SEC case, DOCS 355 and 370).  Further, Ms. Lecube testified at trial that though she had thought about closing her account when her GFRDA matured, she had agreed with Renata Tanaka to a payout, received a $500 payment, then a $20,000 payment, then another  $20,000 payment January 2005 – and was supposed to have received periodic payments until the account was liquidated.  In May 2005 the defendants were arrested but Ms. Lecube did not know this.  (T.392-94).    It is unclear what amount of interest she therefore theoretically "lost" by the time delay.

The receiver has not looked at the Amerindo records, changed the valuation of her account (DOCS 355, 370), and the government has not satisfied its burden of proving any "loss."

### Other Guideline Adjustments Per The Government

The government would add 2 points on the basis that the defendants' "roles in the offense", deeming them "organizers or leaders".  Though prior counsel did not object to this 2-level Guideline increase, we object.  There were only two people involved in this 'offense,", the two defendants, and the government calls them "partners in crime" (Gov Letter p. 10, 'History and Characteristics").    The two level adjustment for an "aggravating role", when their role was the *only* role, is not warranted.

The government also would add 2 points on the basis that a "substantial part of the fraudulent scheme was committed from outside the United States" (Gov Letter p.7-8).    Again this adjustment was conceded by prior counsel.  Now, based on Morrison and the Court of Appeals ruling that "the offense" was *determined* by the fact of a purchaser's presence in the

21

United States, adjusting a sentence upward by two points for "foreign conduct" seems more than ironic.   It is unwarranted.

The government adds the hefty 4-point adjustment on the ground that Defendants were Investment Advisors or associated with advisors.   While we continue to believe that the defendants did not charge separate advisory fees to their Panama clients, the Court of Appeals ruled that though a letter to Lily Cates during the "divorce" "negotiations" stated that uncharged fees would be due if she left the firm did not identify that these were "advisory" fees, "the jury could reasonably have inferred that fact."   (Opinion DOC 527, 10-521 p.47).[7]   Based on this ruling defendants appear stuck with the 4 point adjustment.

---

[7] The Court of Appeals wrote in the footnote that the letter specifically referred to an "Investment Management Agreement" but that a jury could infer the fees were advisory services. (Opinion DOC 527, 10-521, p.47 n.32).  A "management agreement" is not an "advisory agreement", but trial counsel did not defend on this basis, nor defended at all on the ground that, as Amerindo Panama (as opposed to Amerindo U.S.) the defendants did not charge advisory fees.

**An Individualized Assessment of the Circumstances of the Offense, the Identification of Assets Sufficient to Cover Amerindo Panama Investors' Accounts, Arguments Made Evidencing Ineffectiveness of Counsel, and the Prior Punishment of Alberto Vilar, Warrant a Sentence of Time Served Under 18 U.S.C. § 3553(a)**

> **Alberto Vilar: a complicated man whose generosity benefited the Arts and Education, and individual recipients of his educational largesse, extraordinarily. He made a lot of money for many people.  His business acumen is of impressive proportions.  He is also a flawed man, but the impetus behind his conduct is not "venal."  He has fallen from grace, and has been punished sufficiently.   Any further incarceration is punishment greater than necessary**.

Since Alberto Vilar was last before Your Honor in February 2010 to be sentenced --  he was already incarcerated since December 2008 after the verdict -- he has been continually incarcerated except for the 1 year period he spent released on bail under strict supervision (October 2012 through November 2013).  Now, after being returned to jail, Alberto Vilar has already been imprisoned for approximately 4 years and 5 months.   This was after enduring a lengthy and humiliating pretrial delay (3 years' worth of strict supervision, which of course did not "count" against his sentence), a criminal trial that resulted in his conviction, and continued prosecution by both the Department of Justice and the S.E.C.

Alberto Vilar is again to be sentenced by Your Honor.  The government wants you to re-impose the 108-month sentence, to keep him incarcerated, at further taxpayer expense, until October 2017.  We submit that he has been punished sufficiently and that further incarceration serves no penological goal of value to anyone, including the taxpayers who must fund it.

Whatever arrogance and flaws this man embodies, which have been well-discussed, the fact is:  Alberto Vilar is already crushed.  He is branded a felon, he is a pariah in the opera and investment worlds, and he has been punished through SEC proceedings with a life-time ban on

the activities that he worked up to, worked at, and excelled at, for his entire adult life.  He no longer has his successful business, Amerindo U.S., which he operated from New York in total compliance with SEC standards (as the SEC Monitor found, see December 2005 report, attached (without its exhibits) as DOC 138-21 to the Franks motion).  He is no longer the brilliant investor who commands attention of investors and investment professionals.  He is blighted in his cherished and very public role as the biggest individual contributor to the Metropolitan Opera and other most noble and worthy artistic and educational pursuits.  In the community, he has lost his very worth as a human being.

Since the imposition of the sentence against Alberto Vilar in February 2010, if nothing else is clear, the nature and circumstances of the case have changed, and the legal landscape has changed as well.   Though originally it was thought he "stole" money from his clients to fund what the press reported to have been an elaborate lifestyle, he was not covering pledges that he continued to make despite his not getting salary or bonuses in the same manner or amount as in the past, his home (which some described as an opera set) was foreclosed because he was not funding his mortgages and expenses, and – as now finally being developed in the SEC receivership -- money was not "missing"; "millions" feared by the government to have been "lost" in fact were not "lost" but have remained in accounts maintained by Amerindo Panama. Described by some as arrogant and insensitive, he took liberties with statements to others, he pledged more than he had -- but at bottom, he always tried to cover his pledges and always, prior to this case, no Amerindo client (in any of the Amerindo businesses) "lost" money (other than by market – related trading losses).  He misrepresented, he was aggravating, but he was not a "thief."

24

Your Honor already commented at the prior sentencing proceedings that Alberto Vilar, if nothing else, is a complicated man.  People have asked why Alberto Vilar is the way he is:   his actions remain a mystery to some.   But the answer is not venality.

A private unsolicited letter (ECF Document 414) was written to this Court in 2009, in anticipation of sentencing Alberto Vilar, provides some answer.  Because it sheds light upon Alberto Vilar's complicated personality and life, and provides the Court with perspective (and because prior defense counsel did not discuss the letter), we think it important to discuss it here. The letter was written by a Harvard professor named Charles Maier who comments on Alberto Vilar's much publicized and vilified aggrandizement.  He concludes that his conduct was the result of an "evident childlike character and lack of self-insight."

Professor Maier wrote that he got to know Alberto Vilar "through a shared interest in opera," and followed "from a distance" Mr. Vilar's "arrest and disgrace." Maier said that Mr. Vilar did not ask him for a letter, or even knew that Professor Maier would be submitting one. Nonetheless, because of the important decisions a sentencing court must make, Professor Maier chose to write to the Court to say that he saw Alberto Vilar as "a sort of fantasist living in a world he made up: the background of Cuban expropriation, the close friendship with highly talented singers and conductors, a belief that he was up to following the medical science he also liked to fund, even the conviction for a while that he would soon master the German language, etc. "Maier said their "few conversations" were "marked by this unreality, and at the same time his need to be at the center of the opera world. He rode the dot-com wave to considerable personal wealth, a large proportion of which he used to fund the musical world because, no doubt, it made him feel important. And those who received the funds Maier said he "would have

found [Vilar's] behavior insufferable, except that there was such an evident childlike character and lack of self-insight and unreality to it that it was actually hard to take offense."

Like prior counsel, like everyone else who has met Alberto Vilar in any context other than as a recipient of his wisdom in the investing and charitable giving world, counsel admits to not having the answers to explain this complicated man.  We have met no one like him.  We bet that no one else involved in this case has met anyone like him either.

Alberto Vilar Vilar's life should not be "defined" solely by his offense.

## Alberto Vilar's Service To This Country

Alberto Vilar volunteered for the R.O.T.C his freshman year in college. He spent four years in service to the R.O.T.C., including summer camp.  Upon graduation from college in 1962, Alberto Vilar was commissioned a Second Lieutenant.  He served time in Furth, Germany, at the height of the Cold War, and spent a great deal of time on field maneuvers on the East German border.  Alberto Vilar spent over 2 years in active service, for a total, with ROTC and Reserve time, of 8 years' of service.  During his active service, Alberto Vilar suffered two serious accidents, which have led to a lifetime of spinal problems that plague him to this day. He loved his service in the military and speaks of it often.

Military service, which oddly was not highlighted on his prior sentencing, has been recognized as a mitigating circumstance in determining a criminal sentence, and is now explicitly recognized in the Guidelines.  Effective November 1, 2010, U.S.S.G. § 5H1.11 was amended to strike military service as a factor discouraged from use as a basis for a departure ("not ordinarily relevant"), see U.S.S.G., Appendix C, Amendment 239, and explicitly added the following to the 5H1.11 policy statement:  " Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender

26

characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."  Alberto Vilar Vilar's service in the U.S. Military thus should be considered because, as the policy statement now states it, it has been a traditional mitigating factor at sentencing." *Id*., *citing*, *Porter v. McCollum*, 558 U.S. 30, 130 S.Ct. 447, 455 (2009) (in a capital case, state courts' discounting of Porter's military service as a circumstance of "inconsequential proportions" was unreasonable; "[o]ur Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who served on the front lines as Porter did.  Id. (emphasis added, footnotes omitted).

## Alberto Vilar's Philanthropy

Referred to as "Opera's tragic hero" with "two passions in life opera and philanthropy," Alberto Vilar ranks as one the Metropolitan Opera's top donors.  As reported in a 2006 article about Mr. Vilar's downfall in the New Yorker magazine (seemingly no longer available online except by purchase, but in the government's supplemental appendix on the Appeal 10-521, DOC 212 pp. 41-53),  "what distinguished Vilar among billionaires, was his remarkable generosity and his financial supports for the arts."

Mr. Vilar became passionate about the arts at an early age, he has stated.  He was passionate about classical music since the age of 7.  However, perhaps leading to his unbridled support for the arts, Alberto Vilar Vilar's father's philosophy had squashed his son's interest at the time.   (According to Alberto Vilar, his father thought classical music was for "sissies" and demeaned his son's passion, forbidding his son to fulfill his desire of learning the violin lessons.)

As he became able, Alberto Vilar gave generously to the classical arts and took pains to preserve its legacy.

Belittlement of Alberto Vilar's philanthropy as *purely* for self-aggrandizement is unfair. Letters from recipients of Mr. Vilar's largesse were included with the Reply sentencing memorandum, discussing Alberto Vilar Vilar's extraordinarily generous and charitable works (see Jon Marks' Reply Sentencing Memo, DOC 360 (10-23-09), pp. 6-9).

Mr. Vilar did not sit passively as a charitable donor.  He sat on boards of charitable institutions, contributed to artistic and educational institutions, and sought to and did inspire other wealthy individuals to be active and to donate; he exhibited personal generosity to a number of young people, whom he educated at his expense, without expectation of public acclaim.

As Mr. Marks then wrote, apart from Alberto Vilar Vilar's huge gifts to the Metropolitan Opera, making him either the third largest or largest donor in its history (the Met has reported it variously), he gave generously to other institutions, some of which are not particularly well-known.  For example, he contributed $1,397,000 to the [Itzhak] Perlman Music Program, which few people outside of the music world have ever heard of.   In a letter attached to Mr. Marks' sentencing reply, he quotes the director of development of the Perlman Music Program, that Alberto Vilar "never sought public recognition for his gifts or his help" (Vilar Ex. K, DOC 360). Mr. Vilar was also a contributor to the Brooklyn Academy of Music.  Karen Hopkins, BAM's president, also wrote of the importance of Vilar's support of the arts as the country's leading arts patron (Vilar Ex. L, DOC 360):  "When Alberto Vilar was successful, the entire music and cultural community greatly benefitted from that success.   At that time, Alberto Vilar was the most generous, most committed patron of the arts in the United States.  His love and passion for the arts went beyond mere financial contributions. He believed in and nurtured young artists, supported arts institutions both large and small, and helped arts administrators to improve their

28

organizations.  Alberto Vilar gave critical project support to so many vital artists, allowing them to take risks and develop new approaches."

Mr. Vilar gave $7,000,000 to the Vail Valley Foundation and the Vilar Performing Arts Center, $2,950,000 to the American Friends of the Salzburg Festival, and $1,218,000 to Carnegie Hall.  He donated $ 3.9 million to the Vienna State Opera for the installation of a subtitle system which allow members of the audience to follow the subtitles of the opera in German or English. The City of Vienna decorated him for this important contribution (Vilar Ex. M, DOC 360).

Mr. Vilar made these contributions with his *own* money, which he earned, in the government's words, as the owner of "a legitimate  business that provided spectacular returns  to institutional investors" (DOC 360, *id*., quoting government's memo).  He made contributions for which he received no recognition.  He also gave heavily to young people who benefited from educational opportunities that, without Alberto Vilar's support, they could not have accessed.

Mr. Vilar provided a college or in some cases post-graduate education for eleven young people, some of whom are the following:

-Hunter Cherwick at the time of Alberto Vilar's sentencing, was an ophthalmologist caring for poor people worldwide. He was employed by Orbis, an NGO that provides blindness treatment and prevention worldwide.  Mr. Vilar paid for Dr. Cherwick's entire education. (DOC 352 pp. 11-12).

-Mario Gaztamide, Mr. Vilar's closest friend, who died while Mr. Vilar was incarcerated. He owed his education to Alberto Vilar, who financed MR. Gaztambide's university education, as well as, three years of graduate studies in China. (DOC 352 pp. 11-12).

-Karl Gaztambide, Mr. Vilar's godson, who previously wrote to the Court as well, stating that Alberto Vilar was a valuable mentor to him and completely supported him financially when he was an undergraduate, paying for tuition, books and living expenses.  Mr. Gaztambide also wrote that he was "a better person for having known Alberto Vilar and [he knew] this [to be] the case with many others." (DOC 352 pp. 11-12).

-Pankaj Uppal, an officer at Sinsehi Bank in Tokyo, was the son of a classmate of Alberto Vilar's in the early 1970's, well before Alberto Vilar became wealthy.  As he previously wrote to the Court, his father had asked Alberto Vilar for a short-term loan to pay for Pankaj's college tuition.  Instead, Mr. Vilar gave him money as a gift so that Pankaj could continue his education without any financial concerns.  Pankaj also said that Alberto Vilar "was a teacher, a counselor, a sponsor and supporter. His impact on my life is immeasurable." (DOC 352 pp. 11-12).

-Josephine Sciarrino is the daughter of Tony Sciarrino, who was Alberto Vilar's barber. Sending Josephine to a private college was beyond her father's means. Alberto Vilar paid for her entire education at Boston College. (DOC 352 pp. 11-12).

Alberto Vilar built or purchased homes for friends, family and staff.  He turned over his apartment in Tudor City to Pilar Perez, his housekeeper; provided an apartment for his assistant, Diane Cooper, a house for his friends Mario and Jaquelin Gaztambide.  He bought homes for his sister Patricia and his stepmother, among others. (DOC 352 pp. 11-12).  A number of letters submitted in anticipation of the 2008 sentencing express gratitude for these individual generosities.

There is more to Alberto Vilar than his "misrepresentations."  There is extraordinary generosity and charity.  Many people who make a lot of money do not do that.

Some defendants can point to charitable contributions of some kind and in some degree. However, in imposing sentences pursuant to 18 U.S.C. § 3553(a), courts have recognized that some defendants have a "truly extraordinary" charitable record, and give them credit. *E.g., United States v. Holzer*, 09 Cr. 470 (VM) (imposing a probationary/halfway house sentence instead of jail time, citing inter alia, the defendants' Holzer's "commendable community service and his pro bono work with various not-for profit organizations"); *United States v. Peterson*, 2011 WL 5223012 (outside director of public company who disclosed not-yet-announced merger given sentence of 2 years' probation and 3 months' home confinement because (*inter alia*) defendant had "engaged in a number of civic activities not as a figurehead, but as a participant, a person who gave of himself, not just of his wallet, and engaged in community activities to help his community. And that's significant.")

It is ironic that, despite his charitable record, Alberto Vilar's charity also became his personal hell.  As he was unable to fulfill pledges, the opera companies he loved, and funded, eradicated Alberto Vilar's name from their halls.  The Royal Opera House reverted to calling its atrium simply Floral Hall not Vilar Floral Hall. The Metropolitan Opera House removed Alberto Vilar's name from the Grand Tier, dropped him as a Managing Director, and gave away his reserved seats.

This monumental fall from the grace of the opera world has been punishment.

The good work that Alberto Vilar performed should still be before this Court as a weighty consideration under 18 U.S.C. § 3553(a).  They, as much as the offense shown at trial, define this man.

## Alberto Vilar's Isolation And The Effect Thereof Is Punishment

The severe punishment of exile from the world of opera is compounded by Alberto Vilar Vilar's apparent isolation from the world at large.  Though Alberto Vilar was a genius in the world of investing and could relate in boardrooms, in artistic communities, and in the investment world, he has obviously had difficulty with personal relationships -- a flaw that has no doubt contributed to the events that led to his conviction.

Alberto Vilar is estranged from family, with no children.  He has no relationship with one sister; his sister Patricia, who wrote a letter for the prior sentencing, has unfortunately drifted into advanced Alzheimer's.  People whom he thought were "friends" have dropped him by the wayside.  It is sad.

Viewed in this context is the evidence that Mr. Vilar's personal relationships have been marked by friction.  It is perhaps this difficulty with personal relationships that brought about this case. Alberto Vilar seemed to successfully manage his investment clients, but he failed to communicate successfully with Lisa Mayer, his spurned former girlfriend, and with Lily Cates, who faced similar inadequacy though she considered herself Alberto Vilar's "sister" and who obviously knew Alberto Vilar quite well (and who commented in a September 2003 handwritten letter to Alberto Vilar, whose inability to cover pledges was fodder for high-profile news stories,: "the Economist wrote a great article about you and philanthropy.  Forgive my mis- or bad spelling.  If I were you I would not support those terrible people who have humiliated and soiled your good name (whether your Ego got in your way or not").  (GX 3350-0400001)

It is significant to note that almost all of the Amerindo Panama investors -- if not long-time clients of Amerindo who had dealt with Alberto Vilar for years and years -- were his

"friends" and/or relatives.    We suggest they were equally aware, as was Lily Cates, of Mr. Vilar's now-infamous proclivities).

Moreover, as shown at the trial (to the exclusion of other, pertinent defenses), nearly all these individuals (and/or their offshore businesses that purchased investments in Amerindo Panama) were all in profit relative to their initial investments.    There were no mass-marketing by Mr. Vilar or by Amerindo:  indeed, no "marketing" to these individuals who sought out Mr. Vilar for his investment prowess and gains.    There were all private clients.

Despite this, Alberto Vilar has lost his dignity, his friends, his reputation, and, in effect, his life -- because of the defects that have also brought him before this Court for sentencing a second time.  There is nothing he can do now to "do it over."  He is in no position to make any statements or representations to investors.  There is no doubt that others will have been deterred.

## The Sentence Already Served Is Sufficient

It is by now an "old" argument that even short prison sentences, combined with high financial penalties and the loss of social standing and employment opportunities, have a powerful deterrent effect on potential white collar offenders.  *See United States v. Adelson,*  441 F.Supp.2d 506, 514 (S.D.N.Y. 2006) ("there is a considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective white collar offenders.") (citing scholarly articles).

It is an "old" argument but is being renewed with understandably growing consensus. The "ratcheting up" of white collar sentences to stratospheric levels is not only extremely costly, but it is also unlikely to yield significant reductions in financial crime, and indeed comes at a huge cost to society.

Since *Adelson* there is even more evidence that a short sentence, "softer" on the public's pocket-book, is "sufficient."  High profile defendant Rajat K. Gupta was thus recently sentenced to a term of 2 years' imprisonment for his role in providing material non-public information to Raj Rajaratnam – an act that could have caused untold losses to "a marketplace."  Citing the draconian increase in sentences "the Guidelines no longer tied to the mean what federal judges had previously imposed ... but instead reflect[ing] an even more draconian approach to white collar crime, unsupported by any empirical data," the Court rejected the notion that long sentences driven by Guidelines that have been "ratcheted up" should guide the sentence.  (DOC 127, 11 Cr 907, 10/24/12 (JSR), *citing* Stith, *Federal Sentencing:  One-Way Ratche*t, New York City Bar Association First Annual Conference on White Collar Crime (May 2012).)

The analysis by Judge Rakoff of the use by the government, endorsing the pre-sentence report, of "gains" made from trades prompted by the passing of the inside information, is important.   While the Report calculated "gain" at some $15 million, Judge Rakoff concluded that the tip-based trade was in fact one third of that, or some $5 million.  "But in the arbitrary world of the Guidelines, this big difference makes little difference."   The "loss" number "still overwhelm[ed] all other factors" in the Guideline analysis.  (DOC 127, id., 11 Cr 907 p.9).

Despite describing Mr. Gupta's crime as a "picture" of a man who had "brazenly" breached his fiduciary duty to Goldman Sachs by "stabbing Goldman in the back" in its time of "possible ruin",  Judge Rakoff nonetheless rejected the call for a sentence beyond that which would be "sufficient," by turning to the "bedrock of all federal sentencing," section 3553(a), and considered "objective facts", including the fact that Mr. Gupta had "devoted a huge amount of time and effort to ... socially beneficial activities", as did Mr. Vilar in this case.

As in all cases, the government pointed to "general deterrence" as a rationale for a lengthy sentence.  Judge Rakoff rejected the call, stating:  "no one really know[s] how much jail time is necessary to materially deter insider trading; but common sense suggests that most business executives fear even a modest prison term to a degree than more hardened types might not."  (Id. DOC 127 p.14).

The Court ruled that two years in prison was "sufficient" despite the stunning breach of trust by Mr. Gupta.

Mr. Vilar's completion of  4 ½ years' of incarceration should be deemed "sufficient" to satisfy penological purposes here, as well.

If Alberto Vilar does not pose a continuing danger of committing securities law offenses, and is not in need of education or rehabilitation, the question then becomes:  what conceivable policy consideration could possibly justify locking him in a prison for a longer term?   We submit, there are none.

## A Sentence of More Than Time Serves No Penological Purpose

Imposing lengthy sentences upon non-violent, low risk offenders such as Alberto Vilar, makes no sense from a cost-benefit standpoint. The policy goals set forth in 18 U.S.C. § 3553(a) are accomplished by a shorter term of imprisonment – here the prison term served already.

Rather than protect society, long sentences compound the expense associated with financial crimes -- they tax an already overstressed system at an unprecedented rate when taxpayers are more hard pressed economically than ever, and make it more difficult for us to direct our limited resources towards those offenders who truly are too dangerous to reintegrate.

This renewed interest in reducing prison sentences because of the incredible costs of incarceration has garnered supporters as diverse as Attorney General Eric Holder and Texas

Governor Rick Perry, who agree that "[t]oo many Americans go to too many prisons for far too long, and for no truly good law-enforcement reason." Mr. Holder has unveiled reforms to reduce the number of people sent to America's overcrowded federal prisons.

We respectfully submit that this Court should sentence Alberto Vilar to the "time" he has already "served."  Further incarceration is, we submit, a sentence that is "greater than necessary."

## 3553(a) Factors:  The Government Discusses Trial Evidence That In Part Does Not Support What The Government Claims, and in Other Parts Presents A False Picture  Premised On An Ineffective Defense

The government presses tough positions in discussing 3553 factors that by law must "drive" the sentencing.  Not only does it dismiss the relevance of the millions and millions of dollars of Amerindo Panama assets held (and still being "located") by the SEC receiver to the analysis of "loss", but it ignores this Court's ruling of January 29, 2010 (DOC 408, 05 cr 521) that "the value of the seized Amerindo securities "may be relevant, at a minimum, to consideration of the seriousness of Defendants'offense  pursuant  to 18 U.S.C. § 3553."

Sadly, though Mr. Marks attempted to take up the challenge, he ended up dropping the inquiry about "seized asset" *and* any attempt to press valuation of the assets and claims, to *demonstrate* that the offense was "not as it seemed."   Mr. Colton, for his part, not only did not support his own client's attempt to show (through the report of David Ross, which has never been substantively criticized) that the assets were not only "there" but that because of the *lack* of allowed management, had dissipated.)    When this Court asked at the prior sentencing whether there was something that could have been done, Mr. Colton essentially punted.[8]  (Of

---

[8] At sentencing Tr. 112-16, Tr. 2/5/10, Mr. Colton justified his inaction in this way:

THE COURT: Let me interrupt you there, because the government has insisted that these assets weren't frozen by them by their request or their order, and at least today

36

they  seem to be suggesting that this is something the defendants  could have done and in fact could have attempted to liquidate  or otherwise start paying victims and clients sooner. Do you
disagree with that?

 MR. COLTON: I absolutely do, your Honor. What happened in this case is that the SEC brought their own civil case, as they are of course permitted to do. They sought a receiver for the Amerindo entities. Judge Swain denied it but appointed a monitor and extracted -- I'm not saying wrongly; just that's the way it happened -- extracted a representation from the defendants that they would not manage money, would not act as investment advisors and would not be in the business.

 So, they couldn't. And the SEC would have never allowed it.

THE COURT: But was there ever any attempt either after the verdict or before the verdict to meet with the SEC and the government and try to see about getting these assets liquidated to the benefit of the clients and their victims?

 MR. COLTON [who represented Mr. Tanaka in the SEC case]: No, your Honor, and I will tell you why, because there was a prior discussion on the question of the bail money. And we had a meeting with the government and discussed the possibility of being able to invest the bail money that was sitting in the registry of the court in cash earning minimal interest, and the discussion of trying to invest that money at the defendants' discretion so it would grow and perhaps be able to get money out of that huge pot, and the government said, no, we are not going to let the defendants' judgment on management trading risk the security.

Well, I intuited I think quite correctly that if the government wasn't going to allow the defendants to risk the bail security going down, they would never take that risk with investor money.

THE COURT: Well, I don't think it would have to be structured in such a way that Mr. Tanaka and/or Mr. Vilar were managing the money but simply that you agree on a third person, and the monitor or someone else can just start liquidating, I guess first perhaps assessing the value of these assets.

MR. COLTON: I can tell your Honor that it was a constant source of frustration for Mr. Tanaka that the assets weren't being managed. Nobody ever imagined in July of 2005 when we requested a trial within 60 days that it would last for this period of time. I am not ascribing blame for that, but nobody would have foreseen the type of delay that ended up occurring here.

So, it is easy to say now -- I'm not accusing anyone of anything -- but just generally speaking it's easy to look back and say, well, it took five years, we should have done something. But nobody even wildly imagined it would take that period of time. And there were certain actions that were taken to avoid serious loss. There were Google

course there *was* something that could have been done.  By the time Mr. Colton was no longer

in the case, however, there was a forfeiture and restraining order; the SEC's case had "heated

up"; the SEC required defendants to give up ALL "restrained assets" just to have a pay-out

---

options in the account that were in the money that might have expired, and action was taken to ensure that those funds would be secured, the gains secured and left in place.

I am confident that the SEC wouldn't have allowed these two people to do this work. And we never thought it four years, I think I would advise differently, I think everyone [WE DO NOT KNOW WHO HE MEANT BY "EVERYONE"] would do it differently.

THE COURT: You are talking post-verdict was a year ago, and it would seem to me that it might have been in everyone's interest, including the government's, to try to figure out what these assets are worth, get them liquidated so that, A, we would know what individuals were not made whole and, B, we could just enable investors to get on with their lives.

MR. COLTON: In hindsight that's probably right, but one of the benefits of hindsight is we  know that since the verdict and the downturn of late 2008 the market has gone up and the assets have gone up, so that is a positive thing for investors. Maybe lucky, but I think we will all take that luck and take the additional pot to pay back investors, which has always been Gary's goal.

 With respect to restitution, your Honor, Mr. Marcus makes what I admit is a bold request and a bold proposal: To let Mr. Tanaka work with a committee of investors to grow this money, to find more money, to continue the work he is doing on his own right now.

THE COURT: Well, what work is he doing on his own right now? You mean someone else was hired to do this. Is Mr. Tanaka doing something?

MR. COLTON: He is working directly with Mr. Ross to identify where the money is, to identify which stocks might have had liquidity events from the private portfolio. And, if allowed, in conjunction with the investors, he would use his brilliant financial acumen to try and grow those assets even further.   The fact is that an investor [Paul Marcus] -- who will speak for himself -- trusts him to do that. Frankly he can be more help to whoever is doing that, whether it's him, or a government agent, or a third-party investment manager. He can be of tremendous assistance to get the investors paid, which is why he came back to work after dramatic cancer surgery in the first place.

I have taken up a lot of the court's time, so I would like to close on this thought: Gary Tanaka has been alive for 67 years. A vast majority of that has been as a good, hard working, self-effacing family person. ....

38

process, and was making this demand before ever evaluating the assets and claims.  Even so, the defendants, in July 2012, proposed an investor payout in writing, which was remarkably similar to the first payout proposal "offered" by the SEC receiver in 2014.  It was rejected by the SEC for no reason).

The sad reality of this almost-ten year "hunt" for assets that have always been there, is that, because of trial counsel's failure to *defend* against allegations made before defendants were ever arrested, early understandings that are *not* true "facts" have been carried through to this day.

This has demonstrated to us that, in order to properly present the factors that bear on a sentencing decision under 18 U.S.C. § 3553(a), a Motion for New Trial based on ineffective assistance of counsel must accompany this submission Whether counsel was effective is an issue purposefully left unresolved as to Alberto Vilar by the Court of Appeals (DOC 527, Appeal 10-521, Op. p.52)), and not raised previously by Gary Tanaka – should be and is being made now.[9] Otherwise defendants will be sentenced on unreliable "facts" that, simply, may have been thought true initially, but are not true.  (Because of the pendency of this sentencing proceeding we make the claims of ineffective assistance under Fed. R. Crim. P. 33, together with the showing that (a) Lily Cates submitted a fraudulent claim in the SEC case, and (b) the Mayer judgment in State court, premised on a default, may well be reopened by Justice Shirley Kornreich (*see* DOC 421 in the SEC case) because (i) the Mayers did not tell the State court about all the interest they received in 2004-05 (which interest amount is evidence of the settlement described in Mr. Tanaka's papers) on the motion to vacate in the State case)  and (ii) (because Mr. Tanaka was unrepresented in the State case and Mr. Vilar's counsel was not

---

[9] With the knowledge and permission of Frederick Cohn, Mr. Tanaka's counsel for this resentencing, present counsel is making the Rule 33 motion on behalf of Mr. Tanaka as well as Mr. Vilar.

counsel in the criminal case) Justice Kornreich did not know that there had been no payouts in this federal case, or that the moneys remained frozen even to this day, and did not did not intend to give the Mayers a priority judgment.)      Rule    33    has    been    construed    to    allow    a Fed.R.Crim.P. 33 new trial claim to be made at this time, under the "excusable neglect" provision.   *United States v. Polouizzi*, 687 F. Supp. 2d 133 (E.D.N.Y 2010) (Weinstein, J.). (The Second Circuit vacated the new trial order in a summary order, but the *vacatur* was on the merits, not on the ground of procedural correctness of the Rule 33 order.   *United States v. Polouizzi*, 09-4594, 393 Fed.Appx. 784 (2d Cir. 2010).   Under these circumstances, which Justice Kornreich called "Kafaesque", we ask that this Rule 33 motion be considered and granted, and/or alternatively hold an evidentiary hearing. [10]

## Forfeiture Should Be Tried Before A Jury:

We argue that forfeiture must be decided by a jury beyond a reasonable doubt under the Supreme Court's recent decisions in *Southern Union Co. v. United States*, 132 S. Ct. 2344 (2012), applying *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and by extension *Alleyne v. United States*, 133 S. Ct. 2151 (2013), to monetary penalties in criminal case.   The government understandably retreats to *Libretti v. United States*, 516 U.S. 29, 48–49 (1995), in which the Supreme Court held that there is no Sixth Amendment right to a jury verdict in a criminal forfeiture proceeding.

Recently in *United States v. Wilkes*, 2014 WL 928256, No. 11-50152 (9th Cir. March 10, 2014), the Ninth Circuit held that -- despite the fact that *Libretti* rests on reasons rejected in these new Supreme Court decisions – the Court of Appeals should follow the case that "directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions,"

---

[10] Alternatively the motion should be considered under 28 U.S.C. § 2255.   The Court should appoint counsel for both defendant-petitioners.

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).  "In compliance with the Supreme Court's instructions," the *Wilkes* Court rejected the argument that *Southern Union* implicitly overruled Libretti.   This Ninth Circuit panel did not even try to explain why *Libretti* is still sound and good law in light of *Apprendi, Southern Union* and *Alleyne*.    We suggest that it is not good law, and that any question that a forfeiture is *not* a criminal penalty, subject to *Apprendi* and *Southern Union*, is obliterated by the more recent decision of the Supreme Court in *Kaley v. United States*, 133 S.Ct. 1580 (2014), which upheld pretrial restraints of assets subject to forfeiture in a criminal case merely on the basis of the existence of the forfeiture allegations in the indictment, and which stated:  "Criminal forfeitures are imposed upon conviction to confiscate assets used in or gained from certain serious crimes. See 21 U. S. C. § 853(a)."[11]

In light of these quickly evolving precedents – and AUSA Litt's statement at the December 14, 2009 hearing on Guideline and forfeiture matters that "forfeiture is punishment" (December 14, 2009 Tr.72) -- it would be error to determine any forfeiture without a jury or under any standard other than the "beyond a reasonable doubt" standard of proof.

In any event, a jury trial was and is required in any event under Fed. R. Crim. P. 32.2. Rule 32.2 states that "[i]n any case tried before a jury, if the indictment or information states that the government is seeking forfeiture, the court must determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict."

---

[11] Pretrial hearings have been allowed to determine whether the assets are *traceable* to the alleged offense – an inquiry different from whether there is probable cause for the indictment.  In *Kaley* the Supreme Court determined that this second inquiry, "probable cause", cannot be relitigated given the facial validity of the grand jury indictment.

41

Here, a jury that sat to determine whether to convict the defendants, and the issue of "proceeds" "by reason of the offense", should have been submitted to that jury.  Mr. Colton and Mr. Fahringer – without the knowledge or consent of the defendants – proceeded without a jury determination, ineffectively,[12] but defendants do not and did not waive their rights to a determination by the jury.   Any issue concerning "nexus" of the alleged forfeitable property to the alleged "offense conduct" of the defendants, and the decision required by *United States v. Porcelli*, 865 F.2d 1365 (2d Cir. 1989) evaluating a defendant's contribution through business acumen and hard work (a matter of proportionality), requires the jury determination that flowed from Rule 32.2.

Amount of forfeiture:  the government suggests that this Court could enter a judgment for, seemingly, any amount it chose, because it seeks a "personal money judgment."  That is a misunderstanding of the basis for a personal money judgment.  It must be moored, in the first place, to the type, and amount, of "property" subject to forfeiture in the first place.  Only after that "number" has been determined (and only when there is no "specific" property that satisfies the "forfeiture") can a court enter a personal money judgment, in *that* amount.  In other words, it

---

[12] The following colloquy occurred just after the jury was charged (Tr.5634 ):

   MR. COLTON: Just a question. I frankly don't know the answer but I could research it. Does the jury typically get the forfeiture allegations in an indictment? Should we be   sending that back?
   THE COURT: You know, I was going to ask you folks about why we didn't -- sometimes you ask a jury to deliberate and return a verdict on forfeiture, right?
   MR. LITT: I don't believe that happens. First of all, it's an option within the discretion of the defendants.  But I believe that is only the case where there is specific property to be forfeited. And in this case, my recollection is, it's a money judgment. And that's part of a sentence if any, and that's determined by the Court.
   THE COURT: So shall we redact out the portions of the --
   MR. LITT: I think it's fine to do so.
   THE COURT: Can we do that?
   MR. COLTON: I accept that representation ....

is "capped" by the amount of "proceeds", if any, obtained by the defendants as a result of the offense.

Forfeiture is not a free-ranging determination to be made without reference to the forfeiture statutes in the first place.  Any personal money judgment is tied to the notion of "proceeds" in the first place.  Rule 32.2's commentary discusses the different kinds of forfeiture judgment in a criminal case.  As it states:

"Subdivision (b)(1) recognizes that there are different kinds of forfeiture judgments in criminal cases. One type is a personal judgment for a sum of money; another is a judgment forfeiting a specific asset. *See, e.g., United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996) (government is entitled to a personal money judgment equal to the amount involved in the money laundering offense, as well as order forfeiting specific assets involved in, or traceable to, the offense; in addition, if the statutory requirements are met, the government may be entitled to forfeit substitute assets); *United States v. Cleveland*, 1997 WL 537707 (E.D. La. Aug. 26, 1997), ... (government entitled to a money judgment equal to the amount of money defendant laundered in money laundering case). The finding the court is required to make will depend on the nature of the forfeiture judgment. A number of cases have approved use of money judgment forfeitures. The Committee takes no position on the correctness of those rulings."

"To the extent that the government is seeking forfeiture of a particular asset, such as the money on deposit in a particular bank account that is alleged to be the proceeds of a criminal offense, or a parcel of land that is traceable to that offense, the court must find that the government has established the requisite nexus between the property and the offense. To the extent that the government is seeking a money judgment, such as a judgment for the amount of money derived from a drug trafficking offense or the amount involved in a money laundering offense where the actual property subject to forfeiture has not been found or is unavailable, the court must determine the amount of money that the defendant should be ordered to forfeit.

43

Of course, given that the offense conduct in this case was committed in 2005 and *United States v. Santos*, 553 U.S. 507 (2008), applying the rule of lenity and the lack of a specific definition, defined the term "proceeds" to refer only to "profits," and not to all gross receipts, the government here would have to prove net profits to support a theory of forfeiture of "proceeds", regardless of the standard of proof and regardless of whether jury or judge determines the issue of forfeitability. It offers no analysis. Rather, it seeks forfeiture of gross *receipts* of the defendants for products that – we now know – are backed by assets that have remained frozen since 2005.

The government has just requested the "preliminary order of forfeiture" in this case. *None* was entered at, or before, the previous sentencing, notwithstanding Rule 32.2. That Rule requires that a court "must" enter a "preliminary order" "sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendants." That has not been done here, and it was not "impractical" (Rule 32.2 (B)). Indeed, though the government was directed to file its sentencing papers on March 31, it did not even file its forfeiture papers until the next day, and it did so without asking the Court for permission for the delay. We have now had mere weeks to respond to the sentencing submissions – weighty concerns in this case – though in a normal case, a defendant is to be given at least 35 days to respond to a presentencing report. Fed. R. Crim. P. 32(e) (2) (minimum required notice). The Court should deny forfeiture, which unlike restitution is not mandatory. There are complicated issues which cannot be easily resolved. Indeed, if there were a forfeiture, it would take the Department of Justice another long period of time to undertake the "third party" notifications that it sought to do, which delayed the original proceedings immensely.

In any event, because of the forfeiture of Amerindo US, with its assets and income stream, the penalty of lifetime bans administratively imposed already by the *SEC* (which implicate principles of Double Jeopardy, *United States v. Andrews*, 146 F.3d 933 (D.C. Cir. 1998)*,* and the substantial financial losses already suffered in this case, there has already been a "sufficient" forfeiture, and anything additional would constitute a disproportionate Eighth Amendment violation.   *See United States v. Porcelli*,  supra, 865 F.2d F.2d 1352 (2d Cir. 1989) (reversing the forfeitures as overly broad because they included corporations as to which the Government did not prove any direct receipts from "fraudulent corporations" and directing reconsideration of claim that the forfeitures were disproportionate; "There is also evidence that Porcelli's business expanded and prospered as a result of his hard work and business acumen. In other words, these properties are not entirely the tainted fruits of Porcelli's fraud. The court below erred in not determining the extent of Porcelli's interest in these properties that he would not have acquired or maintained but for his fraudulent scheme."). [13]

Further, as discussed in *Porcelli*, it was not shown that defendants themselves received moneys from the deposits or rollovers made by the Mayers, Lily Cates, or Graciela Lecube Chavez.  In *Porcelli* because of the structure of the forfeiture order and the agreement to return "excess moneys" to Mr. Porcelli, the Court of Appeals did not have to reach the issue of "double jeopardy."

---

[13] "Porcelli's next argument is that if there were proceeds from underreported taxable sales, they were either obtained by the defendant himself, as to which there is nothing in the record, or retained by the businesses he owned. Forfeiture of both money and businesses under a "proceeds" theory is thus contrary to fact and violates double jeopardy. We agree with the Government that this ignores the terms and conditions of Judge Sifton's order insofar as it returns to Porcelli any excess moneys remaining after the prescribed payments to the State and the United States."

Here, the government and SEC have opposed return of excess funds to the defendants. The government (including the SEC) have imposed *de jure* and *de facto* "remedies" (such as destruction of Amerindo U.S., its goodwill, its cashflow, it use as the basis for a guarantee) against defendants already.   The government has made it impossible for the defendants to manage the investments, even though an investor, Paul Marcus, made it plain on the record, including at sentencing, that he *wanted* the defendants to manage the funds.   These properties have already been "forfeited".   Further forfeiture should be denied (at least in the absence of a jury).

## RESTITUTION HAS NOT BEEN PROVEN BY THE GOVERNMENT AS IT HAS NOT EVALUATED THE SECURITIES WITHHELD BY THE ACTION OF THE ASSET FREEZES FROM THE VICTIMS

The government measures restitution by the full amount of the "victims'" account statements – money due the clients when the firm was shuttered.   In *United States v. Zangari,* 677 F.3d 86 (2d Cir. 2012), the Second Circuit held it "error [but not plain error resulting in reversal in that case] for the District Court to substitute Defendant's gains for the victims' losses in calculating restitution".   In language equally applicable here,[14] the government failed to *prove*

---

[14] Because "the purpose of restitution is essentially compensatory," [citation omitted], and because the MVRA itself limits restitution to "the full amount of each victim's loss," 18 U.S.C. § 3664(f)(1)(A), a restitution order must be tied to the victim's actual, provable, loss. *See United States v. Marino*, 654 F.3d 310, 319–20 (2d Cir. 2011) ("[R]estitution is authorized only for losses that [were] . . . directly caused by the conduct composing the offense of conviction and only for the victim's actual loss." (internal citation and quotation marks omitted) (second alteration and ellipsis in original) (emphasis added) ....; *Boccagna*, 450 F.3d at 119 ("Criminal restitution...is not concerned with a victim's disappointed expectations but only with his actual loss."); *cf. United States v. Germosen*, 139 F.3d 120, 130 (2d Cir. 1998) ("[The Victim and Witness Protection Act] requires a showing of actual loss for purposes of restitution."). [footnote omitted]   The Government bears the burden of proving a victim's actual loss by a preponderance of the evidence. 18 U.S.C. § 3664(e).

actual losses that were caused by defendant's conduct.   Therefore, no order of restitution is proper.   The defendants' alleged "gain" (which is actually not "gain" either, as the government has not proven that the securities that remain subject to return, do not account for any "gain" ( a "gain" to Amerindo Panama and not the individual defendants.).

The defendants have taken the position throughout this case that they *want* to pay not only the "victims" chose by the government, but *all* their Panama clients.   The ironic thing is that, despite the length and intensity of this criminal case, the Panama clients are not entitled to restitution in this case.   *United States v. Reifler*, 446 F.3d 65, 136-37 (2d Cir. 2006) ("victim" for purposes of MVRA must be a person entitled to recover through a civil action)."

It is unfortunate that defendants were prevented from paying their clients first by the shutdown, then the *de facto* freeze (GX 3582-16, Bear Stearns Petercsak letter of July 2005, telling ATGF client's representative it was "working with" the SEC and DOJ and it would not release any money from the Bear Stearns-held Amerindo Panama accounts), then by the restraining order and the refusal of the SEC to allow its amendment (except to the extent there would be "hardship" payments to the Mayers).   Of course, the ineffective acquiescence by their trial and sentencing counsel also contributed to the morass.   Counsel did not press the point (and at sentencing in February 2010 sought to "justify" it by saying that they did not know this would happen or they would have done things differently.   See Sentencing Tr. 112-16.

Nonetheless, the law is the law.   There is no restitution under the MVRA *unless* the government *proves* losses caused by offense conduct, not merely that defendants (or their company) had a "gain."

Moreover, there should be no interest on any restitution award because under the principle of *SEC v. Razmilovic,* 728 F.3d 71 (2d Cir. 2013)*,* defendants' frozen assets, which have not earned interest, will be the sole source of restitution.

Unless this Court puts the payment process back in the hands of the defendants, subject to Monitoring by a representative of the Court, this process will not be fair.

As we have brought up, the government was in fact told to *value* the assets and the claims now on many occasions, as early as the sentencing, at least, then in 2011 (in combined case proceedings), then in 2012, and then with respect to the receivership.  The SEC working through receiver Ian Gazes, to this day, has not accomplished the initial mandate of Gazes' appointment to evaluate and quantify the asset pool.  Mr. Gazes has never tackled the valuation of the private securities himself and has only reported contacting outside firms (Goldman Sachs and JP Morgan)--at presumably added fees -- who have declined to accept the project.  He has further stated the valuation of the privates is beyond his scope on several occasions --  although (as we, and Mr. Marcus) pointed out, David Ross, the original appraiser of the yet-to-be-disclaimed 2010 valuation would be available at minimal cost.

Already the Receiver has created different "models" of recompense to the Amerindo Panama investors.  The Amerindo Panama investors have raised cogent objections to Mr. Gazes' methodology, and because his conclusions are not rooted in the Amerindo Panama *records,* which Mr. Gazes has eschewed, have had grounds to fight each other.  The Amerindo Panama books and records are – as Justice Kornreich observed on the record of the argument on the Motion to Vacate the Mayer judgment in the Mayer state case (April 1, 2014) (Filed in this case at DOC 669 and 669-1)– determinative of amounts due.

In order for there to be *real* "restitution", the process should be put in the hands of the defendants subject to monitorship as a condition of release that is part of the sentence (as has been suggested previously, at the September 23, 2011 SEC conference (DOC 168), by Sharon Levin and Judge Swain.

We note that in the SAC Capital case, a Monitor (Bart Schwartz) was selected to oversee the closing of the SAC business to its outside investors.  *See* (one of many articles that appeared on April 10, 2014), "U.S. judge accepts SAC guilty plea, OK's $1.2 billion deal," Apr 10, 2014. *http://www.reuters.com/article/2014/04/10/us-saccapital-crime-idUSBREA391B520140410* While in a case that caused more damage than anything the defendants may have done in this case, we suggest, Steven Cohen has moved on, his investors have been paid, and plans are made to move forward.  This case is stalled we suggest by SEC intransigence.

The defendants have suggested the re-appointment of Robert Knuts as a monitor to oversee the payout process – through the use of the Amerindo Panama records, which – contrary to the false inference allowed by defense counsel – were created with a good accounting system.

Defendants ask again for an opportunity to pay their clients.  Restitution should not be ordered because foundations of the MVRA are not met.

**A New Trial Should Be Granted Under Federal Rule of Criminal Procedure 33, Or Alternatively 28 U.S.C.§ 2255 Based On Ineffective Assistant Of Counsel; While The Decision On A New Trial Can Be Made After Further Consideration Of These Arguments And Their Bases, At Least The Factual and Legal Claims Advanced By The Government Under 18 U.S.C. § 3553(a) Should Be Considered In Light of These Showings.**

**Defense Counsel Failed to Defend Against Charges That – After the Government Found Out That Lily Cates and Lisa Mayer Were *Not* Clients of Amerindo U.S. – Turned Into An Accusation That "Panama" Was "Dirty", That Lily Cates Didn't Know She Invested In Panama, That Any Panama Product Was A Sham And That "Amerindo" Money (Though Returned To All Amerindo U.S. Investors) Was "Lost" To Panama Investors; There Was No "Theft", No "Missing Money", No "ATGF Fraud"**

Defendants were arrested upon *ex parte* criminal complaints, and their Registered Advisory business Amerindo U.S. searched and shuttered by an *ex parte* all-records warrant, on May 25, 2005.  This was based on a charge that through Amerindo U.S. defendants had "stolen" $ 5 million in "client funds" to fund personal expenses.   The government believed that this was the "tip of [an] iceberg" of massive client thefts – a Ponzi scheme – because Amerindo U.S. was so prominent and successful.  On May 27, 2005, with defendants still in jail awaiting detention hearings, *Bloomberg* reported the allegations:   for *all* intents and purposes these accusations became cemented in stone.[15]

---

[15] **Amerindo's Vilar Charged With Stealing From Client**

May 27 (Bloomberg) -- Alberto Vilar, the multimillionaire New York money manager and benefactor to the world's leading opera and ballet centers, was arrested last night and charged by U.S. authorities with stealing $5 million in client funds, which he used to pay bills and continue his philanthropy.

The financier, who amassed a fortune of $950 million after leaving Cuba, is accused of using an investor's funds to make donations to Washington & Jefferson College in Washington, Pennsylvania, and for payments to caterers and

The government had charged *massive fraud and theft*.

These charges required a vigorous defense.  Since "forfeiture" and "restitution" are penalties attending the client's criminal prosecution, a defense lawyer was obligated to know "the numbers" for the sentencing/penalty phase of this criminal case as well.

---

a dishwasher repair company, according to a complaint made public today in federal court in New York.

Vilar, 64, used the unidentified client's investment in 2002 as a ``piggy bank'' to pay personal expenses and make charitable contributions, without the knowledge, consent, or authorization of the victim,'' U.S. Postal Inspector Cynthia Fraterrigo said in the complaint.

 Gary Tanaka, Amerindo's co-founder and co-chief executive, who lives in London, was also charged today with stealing from investors and of using the funds to buy racehorses. Tanaka is being held without bail and will return to court June 3 for a hearing.

                    ***

Amerindo had about $1.2 billion in assets under management as of July 15, 2004, according to the complaint.

``The charges are very serious and very well-founded,'' Assistant U.S. Attorney David Esseks said in court today. ``We fear that they are just the tip of the iceberg.''

                    ***

`Staggering Amounts'

``This is a case which involves staggering amounts of money,'' U.S. Magistrate Judge Henry Pittman said, as he ordered Vilar held without bail until a hearing on May 31.

                    ***

Amerindo was originally founded to invest money for pension funds and private individuals. In 1996, Vilar opened the Amerindo Technology Fund.

According to a registration filing Amerindo made to the Securities and Exchange Commission last July, the firm's clients included pension funds and foundations and did not include any individual investors.

51

None of the defense counsel were prepared for or recognized the critical importance of "the numbers". As was, and has been, apparent from the delays in returning investor funds in this case, defendants (and their investors) have been seriously prejudiced by counsels' failure to defend by failing to investigate their own clients' Amerindo Panama client accounts, actual client claims, and operations.

Otherwise -- as has happened -- the government would be able endlessly to argue "losses" of all client accounts, and the jury, and the court, would never see that the "failure to redeem" on time, which in fact became *the* theory of criminality at the time of sentence, [16] did not equate with "losses" of all client accounts, the "tip of [an] iceberg" of "losses", on which this prosecution was initiated.

The lawyers did not defend these allegations. Because the understandings pressed in the beginning of this case were *not* rebutted by any cogent defense, the government has been able to advance positions, purportedly under 18 U.S.C. 3553(a), asking for the same long custodial sentence, which positions are belied by evidence not used by defense counsel, but available to them. We discuss some of the "misconceptions" that plague the case to this day, sometimes (to try to keep this submission shorter) in the footnotes. For instance, this Court sustained an erroneous impression (which it stated at Tr. 30-31, March 14, 2014 Tr., SEC case) about ATGF investments, believing them to have been "fraudulent when in fact there was no fraud, no ATGF investor had *claimed* "fraud", but the Court was led to believe there was fraud because defense counsel did not rebut a last-minute sentencing submission made by the prosecutor two days

---

[16] This, in fact, was <u>the</u> theory of criminality on which the prosecutor relied at the prior sentencing (February 5, 2010 Tr. 44-45): "There is a difference, to be sure, between taking money under false pretenses as an investment advisor and ignoring one's fiduciary duty -- and taking the money and burning it, or spending it or, you know, buying a yacht with it, whatever -- and not giving it back. But not giving it back, knowing that you have it, is a serious crime too.

before the prior sentencing (DOC 418-1 and 2, docketed by the Court on 2/4/10, the day before sentencing, per Order dated 2/4/10 (DOC 418)) (as well as the fact that the SEC keeps misleading about ""commingling," suggesting that it is "wrong" but never stating why or how it supposedly "caused" any loss or harm to investors;  commingling affects *traceability*, which is why the government (which does *not* raise any issue of "commingling" in its sentencing memorandum, but resorted to "substitute assets" for a *forfeiture* theory.  Commingling has nothing to do with "harm" in this case).

In Mr. Litt's pre-sentencing letter, the prosecutor disclaimed the integrity and conclusions of the David Ross report (filed on January 27, 2010 only after the December 14, 2009 argument on Guideline calculations, at which "credits against losses" became the theory.)  The Ross report was ineffectively *disclaimed* by defense counsel,[17] who failed to embrace the need for and utility

---

[17] Instead of endorsing or advocating the Ross report – which *supports* the defendants' claim that they preserved principal and (except for delayed redemptions) handled investor funds responsibly to maximize returns, defense counsel wanted only to distance himself from it (February 10, 2010 Tr. 10-11).  In a discussion at the Vilar sentence -- at which Mr. Tanaka was not even present -- Mr. Colton was asked about the report stated he had had nothing to do with it:

>THE COURT: All right. I'm not -- I don't think – if  the parties are in agreement that it's at least 42 which will make whole the victims who are identified at trial -- I'm not clear what it would do with respect to other stakeholders, other people who have a claim on the money -- then probably it doesn't make sense to delay. But at this point, I mean the government I thought was pretty clear, they don't know how many other people there might be who lay claim to this money.
>Right, Mr. Litt?
>
>MR. LITT: Not for certain, no.
>
>THE COURT: Right. And I really should be directing this to Mr. Colton, because it's your expert who opined I think on this subject.
>
>MR. COLTON: I need to clear up the record, your Honor. That was sent by Mr. Ross, who has been engaged by Mr. Tanaka. It was not sent by me, and it wasn't a legal expert in that sense. So, we weren't trying to backdoor an expert or anything

of this expert report because he did not investigate the Amerindo Panama assets and client claims.[18]   The report discussed sufficient assets in Amerindo Panama holdings (the four "linked" house trading accounts) to have paid back all investors as of the May 2005 shutdown date, and a disturbing dissipation of the assets by the lack of management of the private equities in the restrained Amerindo accounts since 2005.   There was a failure to hold JP Morgan to pay interest on the cash sums in those accounts (or to direct JP Morgan to sweep the funds into a market fund instead of letting JP Morgan keep the interest it earned), and the failure of active management, which could have increased the "pot" by responsible trading.

The failure of trial / sentencing to have advocated this position has caused substantial injury to all concerned.

Mr. Litt's sentencing reply of 2/3/10 (DOC 418-1) also alleged that though the government had not pursued (much less proven) "ATGF fraud", he *would* be able to find fraud on *perhaps* some 70 presumed ATGF clients if he had the time.   Broad allegations of "total

---

like that. It's somebody who wrote to the court, just so the record is clear, because I would not have put forth an expert report or any type of evidence in that fashion.

THE COURT: Mr. Ross.

MR. COLTON: I just wanted to make the record clear so that it didn't seem like it was something untoward being done by counsel.

If the court is saying that the difference between 42 and 48 is not going to be determinative – likely determinative -- then I think that's right, we should go forward in the normal course.

[18]   As stated in a recent *per curiam* decision summarily overturning a criminal conviction on *Strickland* grounds*:*  "Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence.   This was such a case."  *Hinton v. Alabama,* 134 S.Ct. 1081 (2014), *citing Harrington v. Richter*, 562 U. S. ___, 131 S.Ct. 770 (2011).

fraud" were made in that 2/3/10 sentencing reply. [19]   The accusations went unrebutted by defense

counsel, who did not and could not effectively respond:   "intuiting" that the SEC position was

---

[19] The prosecutor charged in his sentencing reply (DOC 418, pp.4-6):

> The Government pursued criminal charges against the defendants for defrauding investors with respect to Amerindo's GFRDA and SBIC investments. Those investors are owed approximately $21.9 million, plus interest. [3] [footnote content omitted] *(See* Gov't Sentencing Mem. at 80) .

> In addition, the Government is aware of a number of investors in Rhodes Capital whose investments were subsequently converted into GFRDAs or GFRDA-like products, and other investors who invested directly in Amerindo's Guaranteed Hedged Equity Fund (which bears a strong similarity to the GFRDA as reflected in the Fund's subscription agreement, attached hereto as Exhibit C) . [4]

>> 4 The Government did not include these GFRDA-like investors in the restitution and forfeiture figures previously submitted to the Court because the Government did not have sufficient evidence that they were victims of the frauds of which defendants were convicted. To the extent the Government knows their identities, it intends to provide those individuals notice of any forfeited funds, and expects that they may file claims.

>> The Government will evaluate any such claims to determine whether it is appropriate to use forfeited assets, if any, to allow them to recoup some part of their Amerindo investment.

> ATGF Investors

> The Government did not pursue criminal charges with respect to the ATGF investment vehicle. As a consequence, the Government has not previously attempted to determine the existing shareholders of ATGF or their holdings as of the date of defendants' arrests. In the course of investigating this case, however, the Government has gathered some evidence about ATGF ....

The government then listed shareholders in the ATGF, the number of shares it believed were then held, which were limited in number, but prophesied that there were more "out there" who also could be claimants who "lost" money by reason of some undisclosed "fraud" concerning the ATGF investment:   "The data set forth above may represent only a small fraction of ATGF  investors.  As of July 16, 2004, there were reportedly a total of 73 investors in ATGF, approximately 50 of which are not accounted for in the above figures. *(See* Exhibit L, attached hereto, which Vilar provided to Bear, Stearns in the course of his efforts to sell Amerindo US) ."

Exhibit L was not a "list" of current investors "not accounted for".  It may have been a list dating from an earlier era of prior ATGF investors.   The point is, no one "knew."

Defense counsel did not respond to this "listing", or to the fact that there was no ATGF fraud in the first place.   Mr. Gazes has "found" (consistent with defendants' July 2012 payout proposal) that there were only some 30 Panama investors (some are family members who inherited accounts) remaining as of the date of the shutdown.   (SEC DOCS 355, 370 (universe of claimants total some 30-35 (including "family" claims).   Other Panama investors (who may have been named on the unexplained "Exhibit L", pointed to by the prosecutor, had been redeemed and repaid -- *including* Dextra, paid by Renata Tanaka in 2005, out of personal funds, once Amerindo was unable to access the accounts restrained "by JP Morgan" "working closely with" the US Attorney and SEC (GX 3582-16), turned over only at the trial, about which Mr. Petercsak was cross examined (Tr.3486):

Re: Amerindo Technology Growth Fund, Inc.- Standstill Demand

Dear Mr. Sexton:

I am writing on behalf of Bear, Stearns & Co. Inc. ("Bear Stearns") in response to your letter dated June 17, 2005 to Bear Stearns' Los Angeles office. While Bear Stearns is unable to confirm any purported investments by your clients in the Amerindo Technology Growth Fund, Inc., please be aware that Bear Stearns is working closely with both the United States Attorney's office and the Securities and Exchange Commission, as well as with the court-appointed monitor Robert Knuts, regarding the movement of funds from Amerindo accounts at Bear Stearns. No funds will be transferred or withdrawn from these accounts without first consulting them.

Sincerely,
BEAR, STEARNS & CO. INC.
/s/
David Petercsak

cc: Marc Litt, Esq. (United States Attorney's Office, via First Class Mail)
    Mark Salzberg, Esq. (Securities and Exchange Commission, via First Class Mail)
    Robert Knots, Esq. (Day, Berry & Howard LLP, via First Class Mail)
    Patrick Maloney, Esq.

*D. Petercsak*
**3582-16**

More "voluntary restraints" were "requested" by the SEC, as evidenced by this letter from Mark Salzberg to Morgan Stanley, written in October 2010:

October 7, 2010
                          Re: SEC v. Amerindo Investment Advisors Inc., et al.,
                          05-CV-5231 (LTS) (DFE) (S.D.N.Y.)
Dear Mr. Morningstar:

As we have discussed, I represent the plaintiff Securities and Exchange Commission in the above-referenced action. In the Amended Complaint in this action, the Commission alleges that defendants Alberto W. Vilar, Gary A. Tanaka, Amerindo Investment Advisors Inc., Amerindo Investment Advisors, Inc. and various affiliated entities violated the antifraud provisions of the federal securities laws.

"right" (or unchallengeable), he did not undertake to defend by learning (from his client and the Amerindo Panama /UK records in the government's possession) about the universe of ATGF clients, or claims, *or Amerindo Panama assets*.

The government did not undertake the investigation.  Defense counsel should have.  It *was* what the case is about.

If the Court got the wrong impression, so did the jury.   Ineffective assistance of counsel dominated this trial, and under *Strickland v. Washington*, 466 U.S. 668, 694 (1984),  a new trial should be ordered because of the "reasonable probability that but for [these errors of counsel] the result of the proceeding would have been different."

## The Mistaken Impressions Left By Defense Counsels' Failure To Rebut, As Pressed Now By the Government On This Resentencing

The government has taken some punitive positions purportedly under 18 U.S.C. 3553(a), pressing these positions, which defense counsel failed to defend by available – or "developable" evidence, to wit:

---

As you are aware, Messrs. Vilar and Tanaka were found guilty on twelve and three counts, respectively, in the parallel criminal action, United States v. Vilar, 05 Cr. 621 (RJS).

Following the convictions, Judge Sullivan entered a Post-Conviction Restraining Order as well as Forfeiture and Restitution Orders. The United States Attorney's  Office and the defendants are currently litigating the scope of the Forfeiture Order.

We understand that defendants and their affiliates have maintained and/or had discretion over brokerage accounts at Morgan Stanley & Co., Inc., and its related entities (collectively, "Morgan Stanley"). We request that Morgan Stanley promptly notify us if Vilar, Tanaka, or anyone acting or purporting to act on their behalf, attempts to execute securities transactions in, transfer securities from, or withdraw or transfer funds from any brokerage accounts at Morgan Stanley. This request is voluntary. We do, however, appreciate any assistance you can provide us as we pursue this action.

<div style="margin-left:40%">

Sincerely,
 /s/
Mark D. Salzberg
Senior Counsel

</div>

[cc's omitted]

- Amerindo Panama was a "phony shell corporation" that "employed [a] confusing corporate name[] ... to mislead investors" (Gov Sentencing Letter March 31, 2014 p.9.

- ([B]ased on the trial record and Government's investigation) no GFRDA client invested with Amerindo Panama. Rather, the GFRDA clients invested with Amerindo U.S., and thereafter, the defendants unilaterally and without notice changed the letterhead used to communicate with GFRDA investors. ....   (p.12)   ... GFRDA clients are not and were not clients of Amerindo Panama ....   The salutation "Dear Panama investors" was an "odd turn of phrase" because "(based on the trial record and Government's investigation) no GFRDA client invested with Amerindo Panama."  .

  - Defendants would have stolen from institutional clients if they'd had the opportunity but "as was amply demonstrated at trial, they simply could not do so" because they were "greedy" (p.10)

- Defendants made "Efforts to Prevent The Return Of Investor Funds," failed to invest a single penny according to the terms of the GFRDA and SBIC programs; sought only to maximize payments to themselves; and did everything in their power to prevent the return of investor capital.

If *this* is what the trial record showed to the jury, then counsel's ineffectiveness is clear.

### Amerindo Panama was not a shell, sham, non-existent, or fraudulent corporation.

(a)   The fact that Ian Gazes made himself the Receiver of Amerindo Panama (SEC v. Amerindo, 05 cv 5231, DOC 283-1 (5/30/13), also filed as DOC 354-4, Exhibit to Shevitz Declaration in Opposition to Disgorgement and Penalties), speaks volumes to the government's claim that Amerindo Panama was a shell or a sham.   Mr. Gazes controls tens of millions of dollars of moneys (he is still counting) invested in, and by, Amerindo Panama, that has always been "there" awaiting return (DOCS 355, 370, SEC case).   He has said that there are public and private equities in Amerindo Panama investment/trading accounts that have yet to be valued and that there should be a surplus.   For the government to repeat the allegation that the corporation that had preserved all of these funds was a "sham" or a "shell" is irresponsible.

58

(b)   As developed in the SEC case (through investigation of documents obtained by present counsel largely from prior counsels' files, while representing defendants in the SEC case that has "paralleled" this prosecution), [20] the SEC well knew of the existence of Amerindo Panama, that it was a separate entity, and that its name "differed" from that of the U.S. entity by a "comma" (not to mention that it existed in a foreign jurisdiction).  In papers discussed in and attached to DOC 352, 353, 354  in the SEC case (papers submitted in opposition to the pending motion for disgorgement and penalties), [21]  the SEC was told all about Amerindo Panama, the

---

[20] The Court of Appeals itself looked to the SEC case (DOC 527, Appeal 10-521, p 20 n.11) in affirming the convictions.  It is perverse that the government ignores disclosures in filings in that case (though the prosecutors were given notice of the filings in the emailed courtesy copy" submissions) – and would punish the defendants as if they ran a "sham" operation in Panama despite the fact that this is a *de novo* sentencing proceeding where a court is required to consider "new" information.

[21] We quote excerpts from the Declaration in Opposition to the Motion for Disgorgement and Penalties, DOC 354, 05 cv 5231, and incorporate it and its related documents by reference:

> 7. Six months after this [the arrests of defendants, "take-down" of Amerindo U.S., and the installation of a Monitor] happened, the SEC's own Monitor issued a report concluding that everything was "clean" at Amerindo US. (DOC 48).

> 8. To the extent that the SEC sought to punish the defendants for "conducting" their Amerindo entities as an "enterprise" that could be considered one (US) concern, the "enterprise" notion is belied by the SEC's San Francisco file concerning the regulated entity, which (as documented since 1992) has recognized that Amerindo Panama (which predated the US Advisory) was a separate – and unregulated -- entity.

> 9. Attached as Exhibit A hereto is an excerpt from a 1992 letter written to the SEC's San Francisco office by the attorney for Amerindo U.S. In it Attorney Cohen explains that Amerindo Panama was and is an unregulated offshore entity and that its "requirements" were set by its (long time) investors.

> 10. Attached as Exhibit B is a copy of the first three pages of the January 21 1993 letter from the SEC to Amerindo US, seeking Panama records and explanations and resting on the "conduct and effects" test, in the SEC's File No. 801-24922. Also part of Exhibit B is a letter to the SEC, from Amerindo Panama, adopting a one-client pool, and notifying the SEC.

> 11. Attached as Exhibit C is an excerpt of a document request of the principals of Amerindo US, seeking documents and information of Amerindo Panama in connection with the then ongoing audit. By letter of January 14, 2005, the SEC, satisfied with the disclosure, "passed" Amerindo US once again. ....

defendants answered questions posed under the "conduct and effects" test, and after getting answers to the limited questions about "Panama" within SEC's purview in the first place (allocations of IPO's), the SEC (through its San Francisco regulatory office) *passed* Amerindo U.S. in its audit, the last of which was begun in 2003 and concluded in January 2005 – just months before the search and arrests.

(d) To support its innuendo that the Panama corporation never "existed at all" (DOC 666 p.5) (and/or that Ms. Cates had been "deceived," or for whatever purpose the government may be advancing this claim now), the government points to "record evidence" that "Amerindo Panama's `office' was a small, windowless space within Berguido's law firm that could fit no

---

We believe that the SEC did not "share" these regulatory files with the prosecutor before search was conducted and the defendants arrested, nor, perhaps, before the indictment was returned. At Mr. Vilar's first bail hearing, before Magistrate Judge Pitman on May 27, 2005, AUSA Esseks told the court that the government had not yet reviewed the "the 100 boxes" taken out of the Amerindo U.S. premises, but that that was the total of the government's information, along with the witness interviews (Lily Cates) and the "investigation" by Postal Inspector Fratterigo (outlines in the criminal complaints and the search warrant application). Mr. Esseks told the judge that information was still "being gathered, if I understand, out of the office in London – the Amerindo office in London and I think also the information is being gathered out of the Amerindo office in San Francisco." This means, of course, that the prosecutors had *not* reviewed the San Francisco regulatory files in which the exculpatory information was located.

Nor did the prosecutor turn over such files in discovery: they are not on the document lists or in 3500 material. Present counsel located these regulatory files in file maintained by Amerindo's SEC counsel only after she undertook representation. We suggest that there is a *Brady* issue similar to that found in *United States v. Mahaffy,* 693 F.3d 113, 119 (2d Cir. 2012) that resulted in the ordering of a new trial for *Brady* violations. The jury should have known about the SEC knowledge and treatment of Amerindo Panama, and there should have been cross examination of the SEC witnesses. Indeed, they should not be taking the positions they maintain to this day about "Amerindo."

Of course defense counsel could have obtained SEC counsel's files on this matter in the first place, but did not. This is another aspect of the failure of reasonable investigation that warrants a finding of Constitutional ineffectiveness under *Strickland.*

more than two people. (Tr. 3180-84).[22]   The suggestion that the use of a "drop box" office address in Panama evidenced both "corruption" by the attorney in Panama who set up offshore corporations in Panama, and fraud on the part of the defendants, is naïve, but should have been countered at trial.

Legitimate corporations use "drop box" offices *even in the United States* (specifically, in Delaware), to minimize taxes, avoid (not evade) regulation, or to "ply" friendly courts.   A June 30 2012 article in New York Times' Business Day section, entitled *How Delaware Thrives as a Corporate Tax Haven*, http://www.nytimes.com/2012/07/01/business/how-delaware-thrives-as-a-corporate-tax-haven.html?_r=0 discusses at "humdrum office building" in Wilmington Delaware that is the legal address of some 285,000 separate businesses.   "Its occupants, on paper, include giants like American Airlines, Apple, Bank of America, Berkshire Hathaway, Cargill, Coca-Cola, Ford, General Electric, Google, JP Morgan Chase, and Wal-mart.  These companies," the article continues, "do business across the nation and around the world.  Here at 1209 North Orange, they simply have a dropbox."   While some use dropboxes for fraudulent activities, "[m]ost of the businesses incorporated here are legitimate and many are using all legal means to reduce their tax bills – something that most stockholders applaud."

---

[22] The government also says that a purported "lie" made in the letter to the SEC forming the basis of the section 1001 conviction against Mr. Vilar was "false", to wit, "that: (1) Cates had always been a client of Amerindo Panama"  (DOC 666 p. 4).   The 1001 count contained *three* specifications, not *four* (see Superseding Indictment S-3, DOC 133, filed 8/15/06, p. 33, listing specifications One through Three).   It was *not* alleged in that count, nor proven to a jury, that Lily Cates had <u>not</u> "always been a client of Amerindo Panama.   *No* Panama investor has taken the position that he/she/its entity had invested in the U.S. corporation and that he/she/it was not well aware that the investment was in an offshore money management /securities business. Edward Swanson did *not* allege that in his initial correspondence and communication with the SEC.  He alleged that Ms. Cates had always dealt with Alberto Vilar who was in New York.

Amerindo's Panama address was disclosed to the SEC, as noted, when it first registered the U.S. Advisory firm with the SEC (which came *after* the existence of the offshore entities) and continually, through the audit that resulted in a "pass" by the SEC in January 2005.  A drop-box location may roil the SEC and the US Attorney now, but it is part of business life, and its use does not denote fraud but rather an offshore presence (which after *Morrison* is understood to be off limits to U.S. regulation).   Counsel should have defended.

## Counsel Did Not Rebut The Notion Of "Theft" By Reason Of Withdrawal From One Linked Amerindo Panama "House Trading Account"

In the very first pre-arrest criminal complaint against Alberto Vilar (DOC 138-4 filed 8/30/06 as a Franks motion Exhibit), the government theorized that defendants had "stolen" Cates' money because of the nearly contemporaneous withdrawals from the account into which her SBIC funds were placed initially.  Three years later, Bear Stearns' Nierva (and his 3500 material) dispelled the basis for the conclusion:  though not fully developed at trial where Nierva testified, Nierva explained the Bear Stearns, one of ten custody brokers and banks, offered "interchangeable" accounts as a "family" of accounts "rolled up together for margin purposes" with one tax ID, that they were commingled for trading, and all funds were fungible.

The use as a "family" – indeed the use of commingled funds -- effectuated <u>more</u> favorable margin trading, trading that *benefited* not only the ATGF investors, but the GFRD investors, who were relying on Amerindo' guarantee and the growing of the "pot" for future gains.  Counsel's failure to develop this "defense" has caused prejudice to the defendants.

Contrary to the government's accusation of theft by reason of the fact of withdrawal of money form the particular sub-account into which Cates' funds were initially deposited, Cates' deposit actually *"grew"* "the pot" available for margin trading, as witness Nierva stated in this 3500 material (undeveloped by trial counsel who thereby allowed the inference of "theft" to

stand unrebutted).  Nierva's 2008 statement (3500-3, page 3) was that even after the $5 million investment was "moved", "the $5 million is still working in the acct., here allowing them not to be on call; cash used to make margin purchases."

This would have been a dramatic defense to an unjustified charge of theft from a house account, the "other side" of which – the Amerindo accounting record kept track of, for clients whose investments were affected by trades in those house accounts.  Counsel should have developed this defense before, if not during, the trial, or at least before sentencing.  It is complicated, but it was, and is necessary to rebut the inference of "theft" or that "commingling" hurt the Panama investors.

Counsel's defense to the charge was limited to his questioning of SEC witness Wraga, of whom he elicited the concession that she had analyzed only a handful of Bear Stearns accounts as of the time of the trial and had 'no idea" of the universe of Amerindo assets or accounts used for investment trading, deposits, and redemptions (T.4685).  This left out half the story.  To allow the argument that transfers from one Amerindo subaccount at Bear revealed such thefts, allowed the government to treat Amerindo as if it had no accounting or tax departments, and as if account statements did not represent real credits in real accounts.  Counsel should have *shown* the "universe" – something the SEC receiver has not yet done.

Maxine Rye testified that surprisingly, no one from the government had even contacted the Amerindo back office between the 2005 shutdown (which affected, of course, Amerindo UK as well as the U.S. operation)  and the time of her deposition in September 2008 just before trial. Even then there was no inquiry about how accounting was done:  the sole focus of the inquiry

then had been on things like signature stamps and on the issue of how LOA's were made for the trading to be accomplished. Nothing was asked about accounting.[23]

To this day, the SEC receiver (and the SEC) have also refused to examine the Amerindo Panama accounting records. If they did – or if defense counsel had held the government to the task of *proving* theft, which could occur only if there were no corresponding credit to Cates's *account* statement after a withdrawal was made from a "trading account" that contained her, and other investors', funds in a commingled pool – there is a reasonable probability that the outcome would be different.

If nothing else, Lily Cates took interest in her account statements and "confirms", placing handwritten notations on them (GX 105) at times she believed there was a discrepancy for the back office to address. While she did not understand the withdrawal from the linked Amerindo

---

[23] Although Rye also testified that information from trades were allocated for client accounts, no one delved into the information about credits on client accounts from such trades. Rye also stated that the names of accounts used for ATGF trading held at Bear Stearns included ATGF I, ATGF II, Techno Raquia, Olafson, Lily Cates, and M26 (Rye Tr. September 8, 2008, p. 47-48). The account called "Lily Cates" among this family account was *not* an account that actually belonged to Lily Cates, but rather was one of Amerindo's house accounts in which trades were made on a discretionary basis (as she wished). Thus "cut and paste" signatures may have confused her (and her bond broker Eugene Ross), but they did not represent "thefts" – which is no doubt why the government never *charged* the "cut and paste" transfers as separate crimes, but rather either as "parts of the conspiracy" or as "intertwined" events.

Olafson, actually, was within the "102" family of accounts, but was not used for house trading. Rather, it was a standalone account owned by Gary Tanaka and Renata Tanaka, funded exclusively with taxed funds from Mr. Tanaka's Sun Bank account. The account called "Lily Cates" was among these house accounts because "they were all on the same machine" in a "combined report." Trades for the ATGF investors (and GFRDA investors, whose money was pooled for trading, as they were promised a fixed rate, not a particular portfolio, were made through a broker and "book[ed[ to the ATGF account. The whole trade would then 'hit the Bear, Stearns account; the trades "were all part of that same big account but [traded by way of subaccounts". Rye further testified that every day they would receive a list of trades, "with an account written as to which account a trade should be booked". Trades inuring to the benefit of Lily Cates, therefore, would be "booked" as credits on Lily Cates investor account , and would appear on her statement.

trading account, she had not questioned the amount on her account statement.  The Court of Appeals itself assumed the statement "correct" in affirming the mail fraud count; though the government had charged that the account statement was itself false, the jury was charged that the mailing itself need not have been a fraudulent statement.  (Opinion, DOC 527, pp. 38-42).

Defense counsel allowed continuation of the false inference of theft, erroneously discerned by Postal Inspector Fratterigo from her review of but one linked house account.  The failure to "correct" the erroneous view, was ineffective, and has caused prejudice.

The inference of "theft" is exacerbated by the constant SEC refrain in the "related" case that spills over onto this criminal case, that "commingling" of the accounts of Panamanian clients violates its rules.  Commingling may violate rules of US Advisory entities, which require segregated accounts, but it does not violate rules of foreign jurisdictions (or of mutual funds) where there are no rules specifically prohibiting commingling or requiring segregated accounts.  There is no rule applicable to Panama accounts cited anywhere and there is no showing how "commingling" caused any harm.

Further, GFRDA investors were actually informed here, to the extent they relied on offering circulars, that their funds *would* be placed in pooled accounts (which as they knew would maximize trading profits, to their benefit.)  See, e.g., GX 3035, a GFRDA circular, which states:  "Client deposit cash into a designated account in either their name or directly into the Amerindo International Venture Fund account at one of Amerindo's custodians in New York.  Amerindo's principal poled account for Fixed Deposits, the Amerindo International Fixed Venture Fund, is further sub-custodied at various New York City banks .... Amerindo guarantees to pay a fixed rate of interest typically for either twelve or twenty-four months.  Interest can be

paid quarterly directly to the client's deposit account or to any other account the client wishes. Fixed Deposit renewals are subject to renegotiation of the interest rate at maturity."

It seems clear, therefore that the *fact* of commingling may have made it impossible to *trace* (as Mr. Litt said in support of a substitute asset forfeiture); but it has nothing to do with an inability for the government to satisfy its burden of proving "losses," if any, or as a basis for concluding that the commingled money was stolen.  *Accord, e.g.,  Capital Management Select Fund Ltd. v. Bennett*, 680 F.3d 214, 220 (2d Cir. 2012) (securities and property deposited in accounts of RCM, an "unregulated offshore broker", were commingled in a fungible pool and were "part of the general cash reserves of the broker", "a practice ...common in the brokerage industry ...").

### The Securities Laws Do Not Apply To Defendants' Business In Panama and  London

Finally, as a matter of law, SEC rules under the Exchange Act do not apply to defendants who conducted their business in a foreign country.  So the Court in *Morrison v. Nat'l Australia Bank Ltd.,* 561 U.S. __, 130 S.Ct. 2869, 2874 (2010), has recognized, pointing to section 30(b) of the Exchange Act as one reason for rejecting the applicability of the Act extraterritoriality.   *See* section 30(b) of the Exchange Act, 15 U.S.C. 78dd(b), thus specifically states:  "The provisions of [the Exchange Act] or of any rule or regulation thereunder shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States."[24]

---

[24] *Morrison* states that that provision excepts conduct perpetrated "in violation of regulations promulgated by the Securities and Exchange Commission `to prevent ... evasion of [the Act].'  However, *Morrison* notes, there are *no* regulations promulgated under the Act by the SEC.  Consequently it is impossible to infer any conduct purposefully committed in violation of any such non-existent regulations.

66

Ineffectively, trial counsel (and for that matter present counsel, who admits ineffectiveness in this regard) did not previously raise the *fact* (and legal defense) that the Exchange Act is expressly made inapplicable to defendants in connection with their foreign securities business.  We assert this defense, which counsel should have asserted at trial, here.

### Counsel Failed To Develop The Limited Defenses Raised in the Criminal Case – that the Disputes were Contract Claims That Should Not Have Been Handled as Criminal Matters.

Though counsel argued that the "disputes" between Lisa Mayer and/or Lily Cates and Amerindo (regardless of their "disputes" with Alberto Vilar personally) were civil matters, they merely *said* so, and did not use available evidence to *show* that this was so.

Mr. Colton ended his summation (Tr.5462) with a call to the jury to render a verdict "that sends this case back across the street with respect to Gary in terms of back into the contract case it should have been ...."  But ineffectively, neither he, nor Mr. Vilar's counsel, develop the evidence that *shows* that Mayers had settled the case with Amerindo and were accepting the fruits of the settlement up to the time Amerindo was shuttered.  This was ineffective.

Since counsel did not use the Amerindo Panama documents from which he should have argued the settlement, they were not "on the record".  However, in the now-pending Motion to Vacate the Mayer Judgment in State court, Mr. Tanaka developed the evidence that Neal Jacobson attached to his motion to disgorge – Amerindo Panama documents that were previously withheld from the defense (or not sought by prior defense counsel) – which show that the Mayers accepted the "fruits" of a settlement – and suggest that there are other documents evidencing the oral settlement among Amerindo Panama documents to which Mr. Tanaka has not had access (those not used by the receiver, but some of which were attached to Mr. Jacobson's Declaration on his motion to disgorge).

67

This is already lengthy.  The arguments are made in the pending motion to vacate in State court.  We respectfully refer this Court to the documents e-filed in the State court action, *Mayer v. Vilar*, 603234/2004, which resulted in statements by Justice Kornreich during the argument of the motion on April 1, 2014 that she may have "made a mistake" (see Transcript of argument, filed as DOC 421-1 in the SEC case and accompanying letter, DOC 420).   (If the Court requests, counsel will provide the documents e-filed in that State case.)

Instead of merely *saying* to the jury that this was a contract claim, counsel should have demonstrated that, before Mr. Vilar made what appears to have been an erroneous decision to sue that Mayer for defamation in State court, the matter was being handled as a contract settlement.  If – as is the case – counsel was defending on the basis that this was a contract case, it was ineffective to fail to develop the evidence that settlement sums were being paid out.

As to Lily Cates' claim, Mr. Vilar already suggested in his Reply Brief in the Court of Appeals (DOC 271, Second Circuit Appeal 10-521) that the government misconstrued Cates' claim as a "Fraud" claim based on the government's "investigation" into the fact that the SBA had not licensed the SBIC, the venture into which Cates made her investment – and that counsel's failure to develop the evidence that this was so, constituted ineffective assistance of counsel.  (See Reply Brief, pp. 38-44).  The Court of Appeals *explicitly* stated it was not reaching the ineffective assistance of counsel claim.  (DOC 527, Appeal 10-521, p. 2, 51-52).

To save room here we refer to the argument in the Vilar Reply brief and incorporate it herein by reference.  Citing documents that are included in the Vilar Supplemental Appendix, (see Reply Brief, DOC 271, ECF pp 50-51), we described how Ms. Cates' lawyer, Edward Swanson, had in fact characterized the matter as a contract dispute, during negotiation of which Mr. Vilar had made a counter offer for resolution, and that Ms. Cates' request was for rescission

of her purchase of the private venture on the basis that she had not received the Private Placement memo, not that she had been "defrauded." [25]  Further, in his last interview before trial (UGX-3505-15, 7/31/08), Swanson, asked what "escrow" meant, described the precise manner in which Vilar was holding and explained Cates' venture funds: "Escrow acct – defined by E.S. --- + ~ money should not be used for any other purpose until specified event or conditions met." (VSA 278).  In fact the money *was* designated for the Amerindo SBIC venture – which would have been the next round of private equity investment when the time was right to invest in start-ups – or at least a jury could so find if defense counsel had presented this information.

Finally, as to ineffectiveness in failing to advance the actual "contract defenses", as discussed in some of the papers filed in the SEC case (the only "live" case at the time), among documents obtained from Mr. Colton's files in 2013, are documents showing that the SEC *knew* that an SBA license was not an actual condition of the SBIC investment, and Carlos Castellanos should have been cross examined on this.  A 2-page document marked with a Bates number by the government during its "privilege" review, P00879 –P00880, was given to Mr. Colton *by* the prosecutors, but was not used by him (or Mr. Vilar's counsel) to rebut the notion that an SBA license was required.

The documents show an email communication between Kristen Kipp, of Amerindo, and Carlos Castellanos, who was a trial witness on the issue of the SBIC – and the fact that a license had not in fact been granted – in February 2003 (after Lily Cates' investment, which was in June

---

[25] " Cates' lawyer Swanson was a former SEC lawyer who knew what was real and what was not real. The very fact that he had not complained that this venture "never existed" in his string of communications with Vilar speaks volumes. He characterized the SBIC matter as a contract dispute, during negotiation of which Vilar made a counteroffer for a resolution. (VSA 245) (Swanson's communications are reprinted in the Government's Supplemental Appendix, SA-703-704 (GX-902), SA 705-706 (GX-903), SA 707-709 (GX-920), and SA-710-712 (GX-921); this correspondence was also attached to Swanson's initial complaint letter to AUSA Marc Litt. (VSA 240)).

2002).   By that email Ms. Kipp inquired of Carlos:  "... the SEC has come back with a request on further information regarding the SBIC fund.  Dana mentioned to me that you told her that there are 2 offering memorandums for the fund, can you let me know which one we should give them?  They also need the following  additional information:  (1) description of the entity; (2) current status; (3) types of clients; (4) manager and/or advisor; (5) fee structure; (6) type of investments; (7) any Reg D filings – it's not active so this doesn't pertain, correct?"

Mr. Castellanos responded to Kristen Kipp (P-00879):

Concerning the SBIC:
1. There is an Offering Memorandum dated March 4, 2002 that includes Matthew Fitzmaurice and is entitled "Amerindo SBIC Venture Fund LP". We should not give them that one.  There is an earlier version, dated October 1, 2001, entitled "Amerindo Venture Fund LP", which is the one they should have.  We are not hiding anything.  They are essentially the same, except that Fitzmaurice put himself in as lord and master of everything, and now he is no longer with the firm.

I have hard copies, but I am sure that either Rick Cohen or Patton Boggs in Washington have it in electronic form.

2. Description of the entity.  This is a venture capital fund for investing in expansion and late stage companies in technology and biotechnology that is seeking licensing as a Small Business Investment Company (SBIC) from the United States Small Business Administration (SBA) in Washington.  The business form of the fund is a Delaware Limited Partnership which will ultimately have a General Partner (a special purpose company owned by Alberto Vilar and Gary Tanaka), private limited partners (to be determined) and the SBA as a preferred limited partner.  If licensed, the SBA would contribute in equity $2 for each $1 of private limited partner capital up to a total of $50 million in private limited partner capital.  Thus, the maximum size of the assets in the fund would be $150 million.

3. Current status.  The license application is nearing the final stages of review by the Investment Committee of the SBA.  It is impossible to predict the outcome or timing of their decision, but I am optimistic, as are Patton Boggs, and we should have a better idea of the outcome within 3 months.  The fund would not commence operations until the final decision from the the SBA is known.  If the license should be denied, the fund would raise capital and begin operations anyway.

4. Type of clients.  If you are referring to investors in the fund, they would consist of a mix of institutions and high net worth individuals.  In order for individuals to be allowed to invest, they must be accredited and qualified as defined by the SEC and the SBA.  If you are referring to the fund's investments, these would be mainly expansion and late stage companies strictly in Amerindo's universe, namely, electronic technology and biotechnology.

5. Manager and/or advisor.  Amerindo Investment Advisors Inc. will the fund's sole discretionary manager.

6. Fee Structure.  The manager will charge the fund a 2% p.a. asset management fee of the assets actually invested.  The General Partner will receive a carried interest of 20% of new profits, to be paid after statutory distributions have been made to the SBA and to the limited partners in accordance with SBA regulations.

7. Type of investments.  direct equity investments in expansion and late stage companies.

8. Any Reg D filings.  None.  The fund is not active.  It is still a work-in-progress.

Mr. Colton apparently missed this in his files, or did not understand its import.  It would have cast doubt on Lily Cates' assertion – or the government's conclusion – that any misstatement about the status of an SBA license had been "material".   It also would show the SEC's understanding of why Edward Swanson had not claimed "fraud".

### When The Government Pivoted To A Charge That Panama Was "Dirty", Defense Counsel Should Have Pivoted As Well

In a letter dated August 5, 2005, the prosecutor asked for a speedy trial exclusion so that he could obtain documents from the UK:  He disclosed that, though the government had searched and seized documents in May 2005 from Amerindo U.S. on the theory that "L.C." was a defrauded investor in Amerindo U.S. (and consequently the government would finds records in the U.S. office premises), now:  "Vilar has asserted that the Victim was a client of Amerindo Panama [which is what Cates' account records, in the government's possession since *before* the search and arrests had shown[, and that the government "believes that the Investor was solicited in, or from, the Amerindo UK office and invested in a product purportedly offered by Amerindo Panama."  (Letter, Marc Litt to Hon. Kenneth M. Karas, August 2, 2005 pp.2-3).

The prosecutor repeated this "new information"  (actually not "new") [26] at a conference held before Judge Karas on August 11, 2005, when he convinced Judge Karas that  speedy trial exclusion was appropriate  (Tr. 8-9 ):

---

[26]      At Mr. Vilar's bail hearing before Judge Baer on June 3, 2005 the government told Judge Baer they had learned that there were no records of L.C's investment in the New York offices and that in fact there were other Amerindo entities with separate records. (Tr. 15-17).  The prosecutor said he needed just a little more time to find out what a "reasonable bail" would be – similarly to his statement in his Sentencing Reply (DOC 418) in February 2010 that the government did not (yet) know of "all" the investors or their "losses":

> Finally, over $3 million of that $5 million went to a bank in Luxembourg.  The government doesn't know who the account holder is in the bank account in Luxembourg, but that
> is another thing that gives us great concern, that there are overseas bank accounts over which Mr. Vilar has control or access to, and without more knowledge about that, it is difficult to assess.  It is impossible for the government to assess what an appropriate bail amount would be.
>   THE COURT:  You had a week to look.  You found no such records in any of the hundred boxes filled with records that you took out of his office?

THE COURT:  What is so relevant or important about getting the Amerindo U.K. documents?  I signed a letter.  There is some suggestion that, at least according to the government, the money from the victim that was supposed to be targeted to a certain investment but was not, is due to Amerindo Panama, and there may be some documentation in England of all this?  Do I have that right?

MR. LITT:  Yes.  Mr. Vilar has represented in letters both himself personally and through representatives that the victim identified as the victim in the indictment was an investor in Amerindo Panama.  It's also represented in that correspondence that, and we have other information to suggest that sort of the back office operations or the administrative functions of Amerindo Panama were

---

MR. LITT:  That's correct.  Let's be clear about the records.  There are several entities involved here.  One is Amerindo Investment Advisors Inc.  That is a United States corporation.

Then there is Amerindo Investment Advisors Inc., which turns out may be a Panamanian entity.  The books and records for the Panamanian entity may or may not be kept in New York.

THE COURT:  I am not arguing with you.  I am just trying to recollect what your colleague told me was going to happen if he had a few days to look at these books and records.

I certainly don't know what is in them and I am not interested in what is in there.  I just want to be sure it is fair to say you didn't find any of these foreign bank accounts or foreign accounts or statements thereof.

MR. LITT:  That's correct.  I was not here on Friday,  for which I apologize.  I doubt Mr. Esseks made a firm prediction of what would be found in documents he hadn't seen.

THE COURT:  He had no firm predictions.  He told me if  he had a few days, he would be able to find out whatever it  was, whatever he needed in order to produce the kind of bail I
allowed at the time.

MR. LITT:  We believe that many of the books and records that relate to the running of these accounts, Panamanian accounts, are done not in Panama and not in the United States, but in London, where there is another entity called Amerindo Investment Advisors U.K.  We don't have a hundred boxes in London.  We have a hundred boxes we have, and Ms. Necheles [Mr. Vilar's lawyer at the bail hearing] and the court are quite right, we did not find evidence in those hundred boxes of overseas bank accounts.

THE COURT:  As complicated as this mission may be, Mr. Litt, what is the government's proposal, if they have one?

MR. LITT:  The government's proposal is that the defendant give a picture, a true and complete picture of his financial assets.

THE COURT:  Until that time, we should keep him in jail?

MR. LITT:  We are unable to determine what an appropriate bond amount would be.

conducted in the United Kingdom at the Amerindo U.K. office, and therefore we have reason to believe that -- and we also have information that account statements were prepared for the victim in Amerindo U.K. and sent to the victim from Amerindo U.K.'s offices, and that other investors who invested in other things through Amerindo Panama got their information from employees and from documents prepared in the Amerindo U.K. office.  That is our basis for believing that documents relevant to Amerindo Panama its operations, investments -- I should also add that Mr. Tanaka, who was an owner of Amerindo U.K. and was located in the Amerindo U.K. office, was responsible for directing the trading activities, as the government understands it, for all the Amerindo entities, Amerindo U.S. U.K., and Panama.  So investments that were undertaken on behalf of -- securities that were bought and sold and investments made on behalf of Amerindo Panama investors were made and originated at Amerindo U.K. offices.

It's for all those reasons that we believe that there is information relevant to the victim, the victim's investment,   the operations more generally of Amerindo Panama, and the context there of the Amerindo U.K. office.

When the government pivoted to Panama and the UK, however, instead of defending on the basis that the defendants were not liable under the securities laws for foreign securities transactions, defense counsel stuck to the "normal" track, litigating privilege issues as the prosecutor set the agenda, instead of fighting back against charges emanating from extraterritorial excursion.  (See DOC 84-17, 05 cr 621, Mr. Litt's letter to Judge Karas arguing that the government had acted quickly enough in pursuing extraterritorial "discovery" because after all, the defendants did not even have counsel in place between the time of arraignment and July, 2005, and that the government was anticipating a lengthy period of "privilege" review of documents, and so the case would not be tried for good while in any event.)

As we now are only too well aware, defense counsel's failure to raise "the *Morrison* issue" resulted in the affirmance of defendants' convictions under the Court of Appeals' interpretation of the "plain error" rule.  Though the Supreme Court decided *Morrison* in 2010, the *Morrison* case was in fact being actively litigated in the Southern District of New York in

2004 (*In re National Australia Bank Securities Litigation,* 03 cv 6537 (BSJ)).  Memoranda were filed, , albeit on the basis of "subject matter jurisdiction" under the "conduct and effects" test. The case was litigated before the Second Circuit, which issued an opinion in 2008.  547 F.3d 167.  Despite the litigation and the Supreme Court ruling in 2010 jettisoning the application of the securities laws to the Bank operating in Australia, counsel (either unaware of the litigation or in ignorance of the significance of the pushback against expansion of the 'conduct and effects" test) failed to object to the applicability of the U.S. Securities laws to defendants' offshore business --leading to the devastating affirmance by the Court of Appeals.

Had counsel investigated the defendants' Panama operation as their clients were trying to explain, they would have learned that the SEC had stated in its 1993 letter to Amerindo that it was inquiring about Amerindo Panama under the "conduct and effects" test.  (The letter is Exhibit "B" to the Declaration In Opposition to Disgorgement, filed in the SEC case, 2/7/14, DOC 354).

That the defense lawyers *allowed* these accusations (stemming for "Day One" in 2005) to go unrebutted at trial and at sentencing – despite their ability to have obtained Amerindo counsel's copies of the SEC filings and its papers --  constitutes ineffective assistance of counsel under *Strickland v. Washington,*, 466 U.S. 668 (1984), the principle of which was reiterated and applied most recently in a summary grant of *certiorari* and reversal in *Hinton v. Alabama*,   134 S.Ct. 1081 (2014) (defense counsel's performance fell as a matter of law below an "objective standard of reasonableness" because counsel failed to develop the only reasonable defense strategy; he did not know the law that would allow him to hire a "better" expert.)

## Counsel's Failures Caused Prejudice and Were Not "Strategic"

In a case where "losses" *still* drive the government's effort to sting defendants with a Guideline-approved sentence of 210-262 months, counsels' failure to have developed evidence of the value of the assets, as against the total amount of investor claims – or to have held the government to its burden of proof -- constituted ineffective assistance of counsel.   Plainly assets and claims are "relevant."   Indeed, they were "relevant" – as stated in this Court's order of 1/29/10 – "at a minimum" to the sentencing issue of 'severity' of the offense.   Moreover, the assets – and what client money purchased – are also "relevant" to the issue of forfeiture.   When a client is charged with an offense involving loss, restitution, and criminal forfeiture, a lawyer has the obligation to defend.

More to the point, *the jury* should have had this *evidence* of the amount of Amerindo Panama client claims, and the *evidence*  that there are Amerindo-Panama held assets sufficient to have covered *all* investor claims as of the date that Amerindo was forcibly shuttered and defendants rendered incompetent to *pay* the investors, on May 25, 2005 --  as it bore on the *bona fides* of the Panama operation, and the intent of the defendants to "steal" (as opposed to negotiate through the rough spots of their business.)[27]

---

[27] Even had there been a "run on the bank" (likening Amerindo Panama to a "bank") on May 25, 2005, Amerindo could have liquidated assets and achieved a 100% (or near 100%) payout of current account claims – as the Receiver has now indicated, and the jury should have known this. It speaks volumes that, in fact, the assets would have covered investors' principal as of that date (though a fire sale might have made it less likely).   JP Morgan would not be able to pay "all" clients' redemptions today, much less the $18 billion fine that it will soon have to pay, so it appears.   A commercial bank takes in deposits (checking, savings, CDs etc) of all types, then lends it out to a range of borrowers (corporate, credit card, autos, overdrafts, etc.) Commercial banks like JPM are required to keep a certain percentage of the deposits as "reserves", which they use to meet customer demands for withdrawals.   But they are not required to keep 100% because, as here, they operate with staggered maturities and redemption demands.   (On April 8, 2014, it was reported that there are new regulations requiring "Big U.S. banks" to "boost capital" so that they can better cover customer demands.   "The Basel III accord included both a leverage

Arguments made by defense counsel – that clients had *previously* made a lot of money – were *ineffective* to respond to the *actual* charges that defendants had "defrauded" the clients out of money, allegedly *lost* to them currently.

Of course before a defendant is entitled to relief under the Constitution for the ineffectiveness of trial/sentencing counsel, *Strickland* requires a showing that a lawyer's conduct in failing to present a defense – the *only* reasonable defense – is not a strategic choice. Unfortunately for his client Gary Tanaka and for Alberto Vilar, whose attorneys let Mr. Colton take the lead, Mr. Colton himself made statements evidencing that he was not "in tune with" the financial aspects of this case. Neither counsel made submissions prior to the jury deliberations *or at any time* in the case about assets of the Panama company or client claims.

More telling, Mr. Colton made clear at the colloquy just after the jury was charged (Tr. 5634, quoted in the footnote)[28] that he did not *know* the law of criminal forfeiture, *asking* the

---

ratio and risk-based capital requirements, which take into account the riskiness of banks' assets."
http://www.reuters.com/article/2014/04/08/us-financial-regulations-leverage-idUSBREA3709B20140408 )    **Today, if** JP Morgan took in deposits of $10 million and lent out $9 million, it would not have liquid funds to facilitate every investor. A simultaneous demand by every investor at the same moment to send $100 to their Aunt Maud in Florida would force the bank to default because it could not respond to such immediate heavy withdrawals in that it could not possibly call in to liquefy their outstanding loans overnight to meet such large unexpected depositor requests.

Here, the jury should have known that by 2005, over 75% of the Amerindo Panama GFDRA program was history, fully redeemed, owing to the cessation of the relationship with Steven Gray. The offshore business was being further wound down because they were not marketed for new investor funds. Amerindo's investors had staggered maturity dates (and there were no "stated capital" requirements for financial firms in Panama.) Further, as the investors knew, Amerindo guaranteed the fixed deposits through their holdings in Amerindo U.S. as well as the Panama operation.

[28] MR. COLTON: Just a question. I frankly don't know the answer but I could research it. Does the jury typically get the forfeiture allegations in an indictment? Should we be sending that back?

Court, accepting the prosecutor's "representation" about the state of the law, and what the best course of action for the defendants would be, and in effect *waiving* the defendants' right to have a jury *decide* the issue of "forfeitable proceeds."    *Asking the prosecutor* about forfeiture, and accepting his representation (contrary to Rule 32.2, which provides for a jury trial on forfeiture,) is not an adequate investigation and shows an ineffective lack of familiarity with the relevant law, which in this case required an investigation and analysis of the client claims and Amerindo assets.   Counsel did not undertake this analysis.   In fact counsel *disclaimed* the Ross report, submitted by Mr. Tanaka because Mr. Colton would not submit it.   (Sen Tr. 2/5/10 p.10).

If other evidence of a failure of a strategic reason on counsel's part is needed, we point to Mr. Colton's presentation at a Lawline CLE conference on July 1, 2011   on "parallel prosecutions" of criminal and SEC cases.   When a presenter was about to discuss asset forfeiture, and how it intersects with SEC freeze orders, another presenter stated he would be taking notes because he was confused about asset forfeiture.   Mr. Colton stated:  "[I]f I wasn't on camera I'd admit being confused about that too." (We can provide an excerpt of the .wav tape of that to-the-clients devastating admission to the Court; unfortunately Mr. Vilar's counsel were equally deficient  under Constitutional requirements.)

---

THE COURT: You know, I was going to ask you folks about why we didn't -- sometimes you ask a jury to deliberate and return a verdict on forfeiture, right?
MR. LITT: I don't believe that happens. First of all, it's an option within the discretion of the defendants.  But I believe that is only the case where there is specific property to be forfeited. And in this case, my recollection is, it's a money judgment. [However, the money judgment is determined by the amount of the proceeds forfeiture. ]  And that's part of a sentence if any, and that's determined by the Court.
THE COURT: So shall we redact out the portions of  the --
MR. LITT: I think it's fine to do so.
THE COURT: Can we do that?
MR. COLTON: I accept that representation ....   [Mr. Vilar's lawyer accepted it too.]

We do not mean to imply "incompetence" of defense counsel generally, but even a "competent" lawyer has lapses.  It is not "about" the lawyer or his character.  It is about the right to *effective* representation in every case.  When lapses are of Constitutional proportions a defendant is entitled to a remedy under the Sixth Amendment and under *Strickland*.

Confusion, failure to prepare for the penalty, is not preparation for an effective defense.  Forfeiture is complicated, but it was, and is, a *sentence in this* case.  It is a sentence that *requires* analysis of the "property" of the defendant the government claims is "forfeitable' and that property's relationship to "offenses" and other characteristics.

In this case, which alleged that the clients were thieves, it *required* an analysis of client claims, and of the value of the securities they purchased (as the securities become the proceeds and must be valued).   It required an analysis even if solely related to the sentencing in this case.  Any determination of "forfeiture" would involve a determination (under *United States v Porcelli*, 865 F.3d 1365 (2d Cir. 1989)) of the value of defendants' hard work and business acumen in developing any "proceeds" that may have come into the business (and the value of the securities that were provided by Amerindo Panama in return for monetary "proceeds" – securities that *become* "the proceeds").   Plainly it was contrary to defendants' interests to *not* have a jury hear this important information.

It was not a "strategic" call.  It was the result of deficient investigation and inquiry.[29]

Counsel's representation was ineffective under *Strickland. Strickland*, 466 U.S. at 691

---

[29] There is another circumstance that warrants inquiry.  Among the unused/unoffered government exhibits present counsel has offered is UGX 3051, which raises questions about Mr. Colton's reason for essentially omitting a defense of Amerindo Panama or his client's operation of and interest in it.  UGX 3051 is a 1998 LOA to Bear Stearns authoring a wire transfer of $980,000. 00 from the Techno Raquia account, 102-17995 to "Wilson Sonsini Goodrich & Rosati Trust Account" – Mr. Colton's firm at the time of his trial representation (after which Mr. Colton moved to the Sonnenschein firm).

("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); see also *Wiggins v. Smith*, 539 U.S. 510, 533 (2003) ("'[S]trategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation'") (*quoting .Strickland*, 466 U.S. at 690·91); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (defense counsel's failure to conduct pretrial discovery not a strategic decision because it was based on defense counsel's "mistaken belief' ...).

It warrants vacatur of the convictions and a new trial.  There is clearly *prejudice*.



AMERINDO INVESTMENT ADVISORS INC.

One Embarcadero Center, Suite 2300
San Francisco, CA 94111 -3162
Tel: (415) 362-0292
Fax: (415) 362-0533

43 Upper Grosvenor Street
London W1X 9PG
Tel: (0171) 629-2349
Fax: (0171) 493-5158

15 December, 1998

**BY FACSIMILE**

Monty Warmbrand
Specialist Clearance
Bear Stearns & Co. Inc.
1 Metrotech Center North
Fifth Floor
New York, NY 11201

Re: Techno Raquia - A/C # 102 - 17995

Dear Monty:

Please immediately send the following wire transfer:

Bank:           Bank Of America
                530 Lytton Avenue
                Palo Alto, CA 94301

ABA #:          121-000-358

A/C #:          14843-00544

Account Name:   Wilson Sonsinsi Goodrich & Rosati Trust Account

Reference:      Centraul Corporation, J. Michael Arrington (Amerindo)

Amount:         $980,000.00

This wire transfer represents a private placement investment in the above referenced entity.
This will be returned to the account after the expected IPO in late 1999.

Please call me immediately in London on 011-44-171-629-2349 in case of any problems .

Sincerely Yours

JAMES STABLEFORD
Director

GOVERNMENT
EXHIBIT
3051
05 CR. 621 (RJS) (ID)

AUK-10-00002

# CONCLUSION

The Court should vacate the convictions pursuant to Fed. R. Crim. P. 33 and the Sixth Amendment.

While it is considering this motion, the Court should sentence the defendants to the time they have served.

If the Court is inclined to keep Mr. Vilar in prison, Mr. Vilar requests the Court to recommend the Otisville camp.

Dated:  April 14, 2014

_____/s/_____
VIVIAN SHEVITZ
Attorney for Defendant
  ALBERTO VILAR
  And, On Motion For New Trial,
  For GARY TANAKA
46 Truesdale Lake Drive
South Salem, New York 10590
(914) 763-2122
Vivian@shevitzlaw.com

Ying Stafford,
Of Counsel.